1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


JOY BANNER

                         CIVIL ACTION
                         NO. 23-CV-7296

VERSUS


MICHAEL WRIGHT, IN HIS
INDIVIDUAL AND
OFFICIAL CAPACITIES,
JACLYN HOTARD, IN HER
INDIVIDUAL AND
OFFICIAL CAPACITIES;
AND ST. JOHN THE
BAPTIST PARISH




Deposition of JACLYN SUZANNE

HOTARD, taken on August 6th, 2024, in the

offices of St. John the Baptist Parish

Government, 1811 West Airline Highway,

Laplace, Louisiana  70068.

2

```
 1    APPEARANCES:

 2    MOST & ASSOCIATES
      BY: WILLIAM MOST, ESQ.
 3    201 St. Charles Avenue
      Suite 2500
 4    New Orleans, Louisiana  70170
      Phone: (504)509-5023
 5    Email: williammost@gmail.com
           REPRESENTING THE PLAINTIFF
 6

 7    SPEARS & SPEARS
      BY:  IKE SPEARS, ESQ.
 8    AND ALLIE CONLAY, ESQ.
      909 Poydras Street
 9    Suite 1825
      New Orleans, Louisiana  70112
10    Phone: (504) 593-9500
      Email:  ike@spearslaw.com
11         REPRESENTING THE DEFENDANTS

12

13    ALSO PRESENT:

14    Joy Banner

15

16

17    REPORTED BY:

18    Cecilia M. Menesses
      Certified Court Reporter
19

20

21

22

23

24

25
```

3

1                    EXAMINATION INDEX

2                                                Page

3    MR. MOST ...............................5
     MR. SPEARS ............................88
4    MR. MOST ..............................92

5


6              E X H I B I T   I N D E X

7                                                Page

8    Exhibit K .............................12
     Exhibit U .............................20
9    Exhibit ZE ............................44
     Exhibit S .............................63
10   Exhibit T .............................68

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1              S T I P U L A T I O N

2

3              It is stipulated and agreed by and

4    between counsel that the deposition of JACLYN

5    SUZANNE HOTARD is hereby being taken under

6    Federal Rules of Civil Procedure for all

7    purposes in accordance with law;

8              That the formalities of filing,

9    reading, signing and certification are hereby

10   waived;

11             That all objections, except those as

12   to the form of the question and/or

13   responsiveness of the answer, are hereby

14   reserved until such time as this deposition or

15   any part thereof may be used in evidence.

16             *   *   *   *   *   *   *   *

17             CECILIA M. MENESSES, Certified Court

18   Reporter, in and for the State of Louisiana,

19   officiated in administering the oath to the

20   witness.

21

22

23

24

25

5

1              JACLYN SUZANNE HOTARD, 106 IDAHO

2  COURT, LAPLACE, LOUISIANA  70068, AFTER FIRST

3  BEING DULY SWORN IN THE ABOVE-ENTITLED MATTER,

4  DID TESTIFY AS FOLLOWS:

5                   EXAMINATION

6  BY MR. MOST:

7     Q    All right.  My name is William Most.

8  I'm the attorney for the plaintiff in this

9  case.  How are you doing today?

10    A    Doing good.  How are you?

11    Q    I'm doing all right.  Can you give us

12  your full name for the record?

13    A    Jaqueline Suzanne Hotard.

14    Q    I've been referring to you today as

15  Ms. Hotard.  Do you prefer that I refer to you

16  as President Hotard?

17    A    Jaclyn or Ms. Hotard, whatever is

18  comfortable you.

19    Q    Thank you.  Ms. Hotard, have you ever

20  given a deposition before?

21    A    Yes.

22    Q    Roughly, how many?

23    A    Two to three.

24    Q    What kind of cases were those?

25    A    Parish lawsuits.  Parish lawsuits.

6

1      Q     Was one of them -- I think it's been

2    referred to as the clay pit lawsuit.

3      A     Treme, Warren Treme lawsuit.

4      Q     What were the other ones?

5      A     I believe I was in a deposition -- I

6    feel like it was twice on the Treme lawsuit.

7    I may be mistaken.  I don't recall the other

8    one.  It was a long time ago, maybe 15 years

9    ago.  I don't remember if it was -- I really

10   don't remember the nature of the case,

11   honestly.  It was a Parish lawsuit.

12     Q     Thank you.  You realize you're under

13   oath here today?

14     A     Yes.

15     Q     You understand that your answers here

16   today have the same force as if we were in a

17   courtroom with a judge and jury?

18     A     Yes.

19     Q     Is there anything that would prevent

20   you from giving your full attention and

21   truthfully and complete answers, whether it's

22   fatigue, illness, substances, medication,

23   anything else?

24     A     No.

25     Q     And as you know, we can take a break

7

1    as necessary.  As you've seen, I may ask you

2    about who you talked to during a break.  But

3    we can take a break at any time to use the

4    restroom, get a water, Parish business, all

5    that is fine.

6         A    Uh-huh.

7         Q    Ms. Hotard, if I ask you a question

8    that you don't understand or is confusing,

9    will you agree now to tell me that that's the

10   case, rather than just try and answer it?

11        A    Yes.

12        Q    Have you brought any documents with

13   you today to the deposition?

14        A    Not for the purpose of the

15   deposition.

16        Q    Roughly, how long did you spend,

17   ballpark, preparing for this deposition?

18        A    Thirty minutes.

19        Q    Aside from talking to a lawyer, what

20   did you do during that preparation time?

21        A    I re-watched the Council meeting

22   video, the November 28th Council meeting.

23   That's really it.

24        Q    Did you look at any documents to

25   prepare for this depo?

8

1      A    I looked at one or two excerpts from

2  Ms. Banner's deposition, but I didn't read it

3  in its entirety.

4      Q    What excerpts did you look at?

5      A    I just kind of skimmed through the

6  document.  I don't recall anything in

7  particular.  I just skimmed through the

8  document.

9      Q    Other than Ms. Banner's deposition,

10  did you look at any other documents to prepare

11  for today?

12      A    No.

13      Q    Did you take any notes in preparation

14  for today?

15      A    Notes that I have with me in

16  preparation for this deposition or just in

17  general?

18      Q    Let's take them one at a time.  Did

19  you take any notes in preparation for this

20  deposition?

21      A    I guess I'm unsure.  You know, when I

22  watched the meeting video, I may have written

23  one or two things down.  I didn't take them as

24  notes.  It was just trying to refresh my

25  memory of the meeting, but not notes that I'll

9

1    read from or refer to.

2        Q    Did you keep whatever you wrote down

3    there?

4        A    Some of it.

5        Q    I'd ask that you make sure that gets

6    saved.  Maybe you can give it to your attorney

7    for safekeeping, so it doesn't get destroyed.

8            Other than an attorney, did you talk

9    to anyone to prepare for today's deposition?

10       A    No, sir.

11       Q    So, Mrs. Hotard, my understanding is

12   you became a Council member in 2004.

13       A    Correct.

14       Q    And you represented District 4 in the

15   Parish Council for eight years or so?

16       A    Correct.

17       Q    And then you were an At-large Council

18   member until 2020?

19       A    Correct.

20       Q    And you were elected Parish President

21   October 12th, 2019?

22       A    Sounds about right.

23       Q    And then you took office in January

24   of 2020?

25       A    Correct.

10

1    Q    And you sat through the depositions

2  of Mr. Wright and Ms. Landeche, right?

3    A    Correct.

4    Q    So you heard me to talk to them about

5  public comment at Parish Council meetings,

6  right?

7    A    Correct.

8    Q    As with those depositions, when you

9  and I refer to the Parish or the Council,

10  we'll be referring to St. John the Baptist

11  Parish or St. John the Baptist Parish Council,

12  unless we say otherwise.  Agreed?

13    A    Agreed.

14    Q    And so you would have been

15  participating in Parish Council meetings for

16  at least 20 years, right?

17    A    Correct.

18    Q    And so you've been to -- is it safe

19  to say -- hundreds of Parish Council meetings?

20    A    Yes.

21    Q    And during those Parish Council

22  meetings, you've seen -- heard people go way

23  off topic, correct?

24    A    Sometimes.

25    Q    What are some particular ones that

11

1    stand out to you as particularly off-the-wall,

2    off-topic, whacky?

3        A    I mean, I've been there for a long

4    time.  I've seen Council members be put out of

5    Council meetings for getting off topic.  I've

6    seen or heard public comment sometimes get so

7    contentious that, you know, recesses were

8    called.  I've, you know, heard a lot and seen

9    a lot at Council meetings over the years.

10       Q    Would you agree that it's a common

11   thing for members of the public to speak off

12   topic during public comment?

13       A    It's not as common as it used to be.

14       Q    Would you say it's still a common

15   occurrence?

16       A    I mean, it happens, typically, if

17   residents come to comment on a topic and, you

18   know, they're unsure or they believe that

19   something is on the agenda that's not.  And

20   then they're instructed, it has to be an

21   agenda item.  You know, they'll stick to the

22   agenda item or point out the exact agenda item

23   that they're talking about.  It's not -- it's

24   just not as common as it used to be.

25       Q    Sure.  Did you hear Mr. Wright and

12

1    Ms. Landeche testify that they thought it was

2    a common occurrence?

3         A    Yes.

4         Q    Would you agree with them?

5         A    I think their perspective is

6    different because I've been here longer.

7         Q    And so you were asked in discovery

8    requests for any rules for public comment at

9    St. John the Baptist Council meetings.  Do you

10   recall that?

11        A    Yes.

12        Q    And do you recall that the answer was

13   just minutes from a 1993 Council meeting?

14        A    I don't recall, but I trust what

15   you're saying.

16        Q    You don't need to trust me.  We'll

17   take a look at it.

18        A    Is it the Response for Discovery?

19   There's a copy right here (Indicating).

20        Q    Does that say Exhibit K on the front?

21        A    Yes.

22        Q    Thank you.  Do you see that Request

23   for Production Number 2 that's on page 5?

24        A    Uh-huh.

25        Q    Do you see that this asks for "All

13

1    rules for public comment maintained by the

2    Parish"?

3        A    Correct.

4        Q    And you see that the answer was the

5    minutes of the official proceedings from

6    May 27, 1993?

7        A    Yes.

8        Q    Do you know of any other rules for

9    public comment maintained by the Parish?

10       A    The rules -- some of the rules that

11   are followed are Robert's Rules of Order and

12   then, also, guidances provided by the

13   Louisiana Legislative Auditor's Office.  I

14   believe that document was referenced here

15   today regarding guidance for the public

16   comment for the agendas; guidance is often

17   given from the District Attorney's Office.  I

18   believe it was under their guidance that it

19   became placed on the agenda, public comment,

20   at the front of the agenda; three minutes,

21   agenda items only.  So what's typically done

22   is, you pull all of those together to

23   establish how the order and the rules will

24   play out at a Council meeting.  So, for

25   example, with Open Meetings Law, they require

14

1    the public to be able to comment on the items

2    that the body is going to vote upon.  So

3    public comment is allowed for those items.

4    However, public comment isn't allowed -- isn't

5    required on an item that the body isn't going

6    to vote on.  Let's say if it were an executive

7    session item to discuss a personnel matter.

8    That is pulled from the Open Meetings Laws,

9    and that information is provided directly to

10   us and also through advisement of the

11   District Attorney's Office.  So that is

12   followed.  Robert's Rules of Order, more of a

13   parliamentary procedure, that's also followed,

14   as well.  The council has adopted Robert's

15   Rules as their official parliamentary

16   procedure, as well.  So it's pulled from all

17   of those places how the Council is going to

18   operate and, you know, the administration, for

19   the most part, as well.

20       Q    Do you know of any rules specifically

21   with regard to how public comment is to

22   proceed, except for these 1993 minutes?

23       A    I know that for our agenda, public

24   comment is at the beginning of the agenda.

25   I've seen other agendas where it's different.

15

1   The District Attorney's Office has advised

2   that the public comment be at the front of the

3   agenda.  They established -- the Council

4   established at some point whether -- I don't

5   recall if it was through a motion -- that

6   three minutes would be the timeframe given to

7   individuals for their public comment.  That's

8   also on the agenda.  It's required to let the

9   public know and that the agenda items -- the

10  comment is limited to the agenda items only,

11  which is allowed per that guidance from the

12  Legislative Auditor's Office, that you can

13  restrict comment to the agenda items.

14      Q    Right.  So the Legislative Auditor

15  has said a parish can restrict public comment

16  to be on topic, right?

17      A    Uh-huh.  I think -- yes, there's a Q

18  and A.  I believe Councilman Wright referenced

19  that.  I've referenced that in my office, just

20  for other Open Meetings Law.  You know, it's a

21  Q and A.  In that document, it does give some

22  guidance on how governing bodies can, you

23  know, restrict comment to the agenda item so

24  that people, you know, don't come up and

25  overly burden -- if you will -- a Council

16

1    meeting where the Council is conducting their

2    public business, with just coming up and

3    talking about things that are not related to

4    anything on the agenda.

5        Q    Sure.

6        A    Or anything for the public.

7        Q    So a parish can have an on-topic

8    rule.  Does St. John the Baptist have such an

9    on-topic rule?

10       A    I'm not sure if they formally adopted

11   an on-topic rule.  I believe that the

12   Chairman's job is to keep things on topic and

13   to keep some order and decorum in the meeting.

14   We've had instances -- you know, you've asked

15   about comments.  We've had instances where

16   individuals have come up and talked about

17   things that weren't even closely related to

18   something that the public body would have

19   coming before them.

20       Q    Sure.

21       A    And that happens.  So if you don't

22   curtail it, as the Legislative Auditor allows

23   for you to do, then you could have potentially

24   hours and hours, you know, people come in and

25   talk about birthday parties and their own

17

1    personal business and not the public's

2    business.  The purpose of a Council meeting is

3    to conduct the public's business and not

4    personal business.

5        Q    Sure.  But you don't know anyplace

6    where the Parish has adopted such an on-topic

7    rule, agreed?

8        A    Agreed.  I believe it's been adopted

9    through practice.

10       Q    But no many written rule?

11       A    No.

12       Q    So if Joy Banner was speaking off

13   topic at that November 28th, 2023 meeting, to

14   your knowledge, she only would have been

15   breaking a custom, not any written rule,

16   agreed?

17       A    Well, it's on the agenda, and the

18   agenda is adopted by the Council.  So the fact

19   that it is publically advertised as their

20   legal document, that the public comment will

21   be restricted to three minutes and on agenda

22   items only.  I mean, it's in written form.

23   Maybe they have not have adopted collectively

24   that rule.  But collectively, they approved

25   agendas and approve minutes that contain on

18

1    that written document that the public comment

2    is limited to agenda items only and that it's

3    limited to three minutes.

4         Q    Okay.  Do you know who Joy Banner is?

5         A    Yes.

6         Q    She's a resident of St. John the

7    Baptist Parish, right?

8         A    I don't know where she lives.

9         Q    She's a person who has been sharply

10   critical of you, correct?

11        A    She's been critical of many things.

12        Q    Has she been sharply critical of you?

13        A    She has.

14        Q    And she, for example, has sued you in

15   your capacity as Parish President, right?

16        A    I believe so, yes.  I believe this is

17   part of the lawsuit, right?

18        Q    Do you understand that, in this

19   lawsuit, you're sued in both your individual

20   and official capacities?

21        A    I don't have any individual capacity

22   as it relates this occurrence.  But, yes,

23   that's what she's chosen to do.  But she's,

24   you know, come before Council meetings, even

25   prior to this, critical of, you know,

19

1    organizations or other folks where maybe it

2    was personally affecting her.  I've not been

3    the only target.

4        Q    Sure.  Are you aware that in this

5    lawsuit, you're sued in both your individual

6    and official capacities?

7        A    Yes.  I'm aware you can file a

8    lawsuit for anything.  However, I'm required

9    to be at a Council meeting per the St. John

10   the Baptist Parish Home Rule Charter.  I don't

11   have any personal capacity there.

12       Q    In October of 2023, Ms. Banner filed

13   an ethics complaint against you, correct?

14       A    I'm not sure when she filed it.

15       Q    Were you aware of an ethics complaint

16   from Ms. Banner prior to the November 28th,

17   2023 meeting?

18       A    I believe so.

19       Q    At the November 28th, 2023 meeting,

20   there was an agenda item about hiring special

21   counsel, Ray Sexton, right?

22       A    Correct.

23       Q    I'm going to pass you Exhibit U.  Do

24   you see that this is that agenda for that

25   meeting?

20

1      A      Yes.

2      Q      And Item J is the item about hiring

3   Gray Sexton as special counsel?

4      A      Correct.

5      Q      And it says "Jaclyn Hotard" at the

6   beginning of the agenda item.

7      A      Most of the agenda items have my name

8   on them.

9      Q      Because you're the person who

10  introduced that agenda item?

11     A      Typically, most of the agenda items

12  have my name on them because I am the -- the

13  Charter designates me as kind of the chief

14  elected official in charge of the day-to-day

15  operations.  So you'll notice on Planning and

16  Zoning items, Purchasing items, most of the

17  items, my name is on all of the items, as

18  well -- every item on the agenda.

19     Q      Yeah.  And this is the one that has

20  only just your name, correct?

21     A      Correct.

22     Q      Because you're the one introducing

23  this for the Council to consider it, correct?

24     A      Yes.  Well, I introduce all of the

25  items for consideration.

21

1    Q    This agenda item, you introduced it

2  in response to Ms. Banner's ethic complaint,

3  correct?

4    A    This item was introduced to retain

5  the Law Office of Gray Sexton as special

6  counsel to perform any and all services

7  related to ethics laws, ethics issues, any

8  that would arise.  Mr. Sexton's office has

9  been retained in the past by St. John the

10  Baptist Parish Council, so it would be any

11  issues that could potentially come up

12  involving ethics.  Because Mr. Sexton's office

13  is -- you know, he's an expert, if you will.

14  You know, that's his subject matter.

15    Q    Right.  So when --

16    A    It happened in the past before.  The

17  Council had previously retained Gray Sexton's

18  office before.

19    Q    So when there's an ethics issue that

20  pops up, the Council will sometimes retain

21  Mr. Sexton, right?

22    A    Yes, sometimes there's just questions

23  of Mr. Sexton's office, you know, things come

24  up.  In the past, they've come up -- whether

25  it's been my administration or previous

22

1    administrations -- have engaged their office

2    just on questions or anything that could

3    potentially fall under an ethics matter.

4         Q    Sure.

5         A    Yeah.   There are other ethics

6    violations involving Council members right

7    now.

8         Q    So when something pops up that's

9    ethics law related, the Council may hire

10   Mr. Sexton.   What popped up that prompted this

11   agenda item?

12        A    The hiring of Mr. Sexton -- we had

13   engaged Mr. Sexton at some point, the Council

14   did.   What prompted this particular item were

15   the questions regarding multiple ethics issues

16   that were going on.

17        Q    Was one of them Joy Banner's ethics

18   complaint against you?

19        A    Yes.

20        Q    So this agenda item was, at least in

21   part, about Ms. Banner's ethics complaint,

22   agreed?

23        A    The agenda item was about being able

24   to retain special counsel on ethics matters

25   for any and all ethics questions or matters

23

1   that could arise, that he would be tasked with

2   offering guidance or anything in accordance

3   with statute.

4        Q    And one of those things at that time

5   was Ms. Banner's ethics complaint, right?

6        A    Potentially.

7        Q    Potentially, or was it one of things

8   that he was hired to look into?

9        A    Yes.

10       Q    And has Mr. Sexton represented you in

11  defending that ethics complaint?

12       A    I'm not sure what the status of the

13  complaint is.

14       Q    My question was, has Mr. Sexton

15  represented you in dealing with that ethics

16  complaint?

17       A    I'm unsure if they've done anything

18  at this point.  I don't know the status of the

19  complaint.

20       Q    Okay.  But my question is, has

21  Mr. Sexton represented you in any way,

22  regardless of the current status of the ethics

23  complaint --

24       A    I'll answer it the same way.  I'm

25  unsure of what Mr. Sexton has done.

24

1    Q    Did you review Ms. Banner's ethics

2  complaint?

3    A    No.

4    Q    You haven't read it?

5    A    I skimmed through it.

6    Q    So you have read it?

7    A    I did not read that complaint in its

8  entirety.  I've read the first couple of

9  sentences.  But, no, I have not read her

10  complaint.

11   Q    So Ms. Banner filed an ethics

12  complaint against you.

13   A    Uh-huh.

14   Q    You've read the first couple of

15  sentences and then stopped?

16   A    I did.

17   Q    Has anyone told you what's in it?

18   A    Ms. Banner told me at a Council

19  meeting what's in it.

20   Q    The November 28th, 2023 --

21   A    Correct.

22   Q    As of today, have you read the ethics

23  complaint?

24   A    No.

25   Q    Did you look at any of the exhibits

25

1    to it?

2         A    I didn't know there were exhibits to

3    the complaint.  Was I supposed to be provided

4    with copies of any exhibits up to this point?

5         Q    If you would like to, you're welcome

6    to.

7         A    Yeah.  I've not been provided

8    anything from the ethics board, any exhibits

9    or anything.  She may be able to tell you

10   better than I can.

11        Q    So you don't know -- let me put it

12   this way.  Do you think Dr. Banner's ethics

13   complaint is false?

14        A    I do.

15        Q    How would you know if you haven't

16   read it?

17        A    Because she made an allegation at the

18   Council meeting, as I previously stated a few

19   minutes ago.  She said at the Council meeting

20   what was the nature of her ethics complaint.

21        Q    And what was that?

22        A    Was that I signed a rezoning

23   application for a piece of property that

24   belonged to my mother-in-law.

25        Q    And you think that's false?

26

```
1        A    I know that's false.

2        Q    What part of that is false?

3        A    I'll discuss that with the ethics

4    board.

5        Q    Well, we're going to ask about it

6    today, because it's related to this case.

7        A    No, the Ethics Board investigation is

8    not related to this case.

9        Q    What part of that is false?

10       A    Her allegation is false.

11       Q    Which part of it?

12       A    That I signed a rezoning application

13   for a piece of property that belonged to my

14   mother-in-law is false.

15       Q    So you did sign a rezoning

16   application for a piece of property near

17   Wallace, correct?

18       A    Correct.

19       Q    And your mother-in-law is Darla

20   Gaudet, correct?

21       A    Correct.

22       Q    Darla Gaudet is a partial or complete

23   owner in an LLC called Gaumet Holdings, LLC,

24   correct?

25       A    I'm unfamiliar with their business.
```

27

1    Q    Have you ever heard of Gaumet

2  Holdings, LLC before?

3    A    No, they have multiple businesses.

4  I'm just not intimately familiar.  I'm not a

5  participant in the business my mother-in-law

6  is involved in.

7    Q    Sure.  My question is, have you ever

8  heard before today of Gaumet Holdings, LLC?

9    A    I don't recall.  The name of their

10  business that I'm familiar with is called St.

11  John Fleeting.  They may have other companies

12  underneath the main company.  It could be

13  several.  They've been in business probably

14  since before I was born.  Her father started

15  that company, so they've been in business a

16  very long time.  So I'm not familiar with all

17  of the subsidiaries of St. John Fleeting.

18    Q    You're familiar with the area of the

19  Greenfield Grain Elevator Project?

20    A    Somewhat.

21    Q    Are you aware that Gaumet Holdings,

22  LLC owns property that goes right through it?

23    A    I'm not sure where their property is.

24    Q    Right.  But my question was, are you

25  aware that Gaumet Holdings, LLC owns property

28

1    that goes through the Greenfield Grain

2    Elevator Project?

3        A    No.

4        Q    You ever talked to Darla Gaumet about

5    the Greenfield Grain Elevator Project?

6        A    I spoke with her, maybe, after the

7    lawsuit was filed.  I don't remember when a

8    conversation -- I say, "Conversation."  When

9    it came up between she and I after -- I don't

10   remember at what point.  I wouldn't say it was

11   a conversation.  I'm not involved in any way

12   with her business.  I wouldn't know where any

13   property that they own is located.

14       Q    You don't know where any St. John

15   Fleeting or Gaumet Holdings, LLC or any of

16   their other property is located?

17       A    I know where the office is.  I've

18   been to the office.  I don't know exactly

19   where any property they may own anywhere.  I

20   don't have any role or anything in that

21   company.  And she and I don't talk about and

22   haven't ever talked about their family

23   business.

24       Q    So you said that Joy Banner said

25   Darla Gaudet owns property in the Greenfield

29

1   Grain Elevator area.  And you knew that was

2   false, right?

3        A    She said that I signed a rezoning

4   application to rezone property that belonged

5   to my mother-in-law.  That's what she said.

6        Q    And you did sign a rezoning

7   application, right?

8        A    Correct.

9        Q    And so you're saying you know it's

10  false that it involved property owned by your

11  mother-in-law, right?

12       A    Correct.

13       Q    But if you don't know where your

14  mother-in-law's property is, how did you know

15  that it was false as part of that reasoning?

16       A    Because when the Council took action

17  to amend the zoning map, they specifically

18  wanted to rezone the property that Greenfield

19  had purchased, the piece that belonged to

20  Greenfield or the Port.  And when I met with

21  the attorneys the day that the application was

22  signed, I asked them:  One, if this was the

23  action that I was supposed to take based on

24  the Council's action and, you know, made sure

25  that we were only rezoning the Greenfield

1    piece.  Because it was -- from what Planning

2    and Zoning said, there were other tracts

3    involved, not specific to any person.  But

4    those conversations were had that -- you know,

5    what happened, Greenfield bought this

6    property.  Actually, all of the property

7    owners bought this property.  And the zoning

8    was one way, right?  In Greenfield's case, the

9    property, I believe, was, you know, I-3 with a

10   buffer.  And then there was a lawsuit that was

11   filed that challenged the rezoning of that

12   piece.  I believe it was called the Formosa

13   tract -- challenging that Judge Snowdy -- as

14   you know.  You were part of the suit -- agreed

15   and overturned that 9027 lawsuit, so that

16   reverted Greenfield piece to whatever the

17   original zoning was.  So the Council's

18   intention at the time was to -- at least from

19   what they vocalized at the Council meeting --

20   was to make Greenfield whole and rezone, put

21   them back to where they were.  But of all the

22   other property owners who were impacted by

23   9027, they were not part of the rezoning.  It

24   was the Greenfield piece that the Council was

25   interested in putting back -- because

31

1    Greenfield was moving forward with the project

2    that the Council has demonstrated support for.

3    So that's how I knew that what Ms. Banner said

4    was false.  Because the property that was on

5    the books to be rezoned, subject of the

6    rezoning application that I signed, upon the

7    direction of the Council and upon the

8    direction of the District Attorney's Office,

9    was only the piece of property that was

10   belonging to Greenfield or the Port.  I'm not

11   sure if they had transferred to the Port at

12   the time.  For the purposes of this

13   conversation, I'll call it the Greenfield

14   property, because I'm not sure of the

15   relationship between Greenfield and the Port.

16   If the Port owns it and they lease to

17   Greenfield or if Greenfield owns it and they

18   lease to the Port.

19        Q    Sure.

20        A    We'll call it the Greenfield

21   property.

22        Q    Sure.

23        A    And Ms. Banner knows that.  She knows

24   that her statements are false.  Because it was

25   said numerous times that the Council's

32

1    intention was to rezone the property for the

2    Greenfield tract, not any other tract of

3    property belonging to any other residents.

4        Q    Did you look at the maps of what was

5    to be rezoned?

6        A    I looked at the maps during the

7    lawsuit or the day we had a hearing.  I don't

8    remember exactly which lawsuit it was, and

9    there was a copy of the maps that I looked at

10   from the Planning and Zoning Director to try

11   and get an understanding of what was some of

12   the confusion, but that map -- you have to

13   understand.  It's a lot of narrow tracts of

14   land, so even on the map that I looked at, it

15   just looks like these skinny long little

16   lines, if you will.  But I did look at a map

17   that day in Edgard.

18       Q    So you looked at a map that showed a

19   lot of skinny tracts that would be rezoned as

20   industrial?

21       A    No, those were just parts of the --

22   like that was a map of the area, the pieces

23   that were going to be rezoned.  Yes, there

24   probably would have been some of these pieces

25   as well, whatever was included in the

33

1    Greenfield tracts.  And they were listed in

2    that resolution that the Council adopted

3    authorizing the amendment of the zoning map.

4        Q    Do you know who owns those skinny

5    tracts of land?

6        A    Those were the Greenfield pieces.

7        Q    How do you know that?

8        A    Because that's what the attorneys

9    told me and the Planing and Zoning Department.

10       Q    And you say, "Attorneys," plural.

11   Which attorneys are you talking about?

12       A    At that time, that was Chief Green

13   and Sammy Acardo in that meeting that day,

14   while I signed the rezoning application.

15       Q    So if I told you that one of those

16   skinny tracts of land is owned by an LLC

17   managed by Darla Gaudet, that's a complete

18   surprise to you?

19       A    Yes, and I would say that's

20   incorrect.

21       Q    If one of those skinny tracts of land

22   was purchased by an LLC managed by Darla

23   Gaudet four days before you were elected

24   Parish President, that would be a surprised to

25   you?

34

1      A     Like I said, I don't know about their

2   business or what land they purchase or don't

3   purchase.  So anything you would tell me about

4   that company would be a surprised to me.

5   Because I'm just not involved at all.

6          You know, you have to understand.

7   I've known Ms. Darla a long time, but I didn't

8   become her daughter-in-law until a few years

9   ago.  So I'm even more so removed from the

10  business operations over there.  I'm not

11  involved at all.  I have no idea -- I don't

12  even know what it is they do over there on

13  that side of the river.  I'm just not familiar

14  enough with what's going on over there.

15     Q     When did you become her

16  daughter-in-law?

17     A     April 5th, 2019.  And if she or any

18  of those property owners have property, they

19  purchased it at whatever the zoning was.

20  Every one of those property owners, whether

21  it's 50 property owners in the Formosa tract,

22  would have needed a crystal ball to know that

23  Judge Snowdy was going to come in and

24  invalidate Ordinance 9027.  They bought that

25  property at whatever the zoning was hailed out

1    to be at the time.  No one could have even

2    foreseen that the zoning because -- I'll back

3    up.

4         Typically, when investors purchase

5    expensive property like Greenfield did or even

6    sometimes an investor looking to buy a little

7    tract of land to do a small multifamily

8    development, they request zoning verification

9    from the Parish so that they know that the

10   tract of land that they're purchasing, the

11   piece or the parcel, is zoned what they

12   believe it's zoned.  So when all of those

13   property owners bought the property, provided

14   they bought in between 1990 and when Judge

15   Snowdy overturned the zoning, they purchased

16   that property -- some with zoning verification

17   letters -- but they bought those properties

18   with knowledge that it was -- they were

19   purchasing it with the zoning classification

20   that was shown in the map at the time.

21        So I believe there are property

22   owners who own property in that tract who

23   don't even realize that their properties have

24   now gone from whatever the zoning was that

25   they bought it at to whatever it was before

36

 1  1990.  I think some of them don't even realize

 2  it.

 3      Q    So you're aware, it sounds like, that

 4  there's a few long skinny tracts that go right

 5  through the middle of the Greenfield area,

 6  right?

 7      A    That's what you just told me.

 8      Q    You said you looked at a map and saw

 9  long skinny tracts, right?

10      A    Yeah, but I don't know which of the

11  tracts going through the Greenfield property

12  Greenfield doesn't actually own.  I would not

13  be able to tell you that.  I didn't study the

14  maps in that depth.

15      Q    So you know that there's long skinny

16  tracts that go right through the Greenfield

17  property, but you don't know who owns that?

18      A    I know there's long skinny tracts

19  that make up the Greenfield property.  You're

20  telling me that there are tracts of land that

21  go through the Greenfield property that

22  Greenfield doesn't actually own?  That's you

23  telling me that.  I haven't studied the

24  property in depth like that.  The way I've

25  understood it is that there was -- the tract

37

1    that -- the Formosa tract, I believe was how

2    it was referenced -- and Greenfield bought all

3    or a portion of that tract for a grain

4    elevator.  There was a challenge from that

5    rezoning from 1997.  Judge Snowdy invalidated

6    that -- I believe it was 9027, that rezoning,

7    he invalidated that.  So every piece of

8    property that was in that area, whatever the

9    zoning was at the time prior to 1990, it

10   reverted back to that.  But how many pieces go

11   through a Greenfield tract or through another

12   tract, I don't know.

13        Q    So if your mother-in-law managed or

14   owned an LLC that owns one of those long

15   skinny tracts right through the middle of the

16   Greenfield property, and you knew that, you

17   would not be able to participate in Parish

18   decision-making about that property, right?

19        A    You know, I believe that -- if it's

20   her or it's anyone else, as a property owner,

21   and you learn that a piece of property that

22   you've owned for 20 or 30 years -- because

23   some of them, I'm sure, may have owned it for

24   that long -- and the court case now has taken

25   the property that you have and made it into

38

1    something else.  I think that's a problem.  If

2    the Council authorizes me to rezone a piece of

3    property, Greenfield's property for the

4    purpose of Greenfield being able to construct

5    their grain elevator and they authorized --

6    not authorized, but instruct me do it when

7    they took that vote to amend the zoning map,

8    that is giving me instructions that I don't

9    have the liberty to just say, I'm not going to

10   follow the orders of the Council, or they

11   could say, you're committing malfeasance.

12   Because we've ordered you to do something and

13   you are failing to do it.  In fact, I've been

14   involved in a writ of mandamus before -- or

15   one of my directors have.  And that was the

16   conversation that I had with the attorneys

17   that day.  Because, honestly, a rezoning this

18   way, to my knowledge, has ever happened this

19   way before.  So I was unsure with the Planing

20   and Zoning Director what do we do now that the

21   Council was taken this action.

22        Q    But just as a general matter, if your

23   mother-in-law's LLC owned one of those long

24   skinny tracts right through the middle of the

25   Greenfield property, you probably shouldn't be

1   involved in the decision-making around it?

2       A    I believe that signing a rezoning

3   application at the direction of the Council to

4   rezone a piece of property belonging to

5   Greenfield, who the Council just told them is

6   an I-3 piece -- and now it's not an I-3 piece.

7   It's residential -- I don't believe that's

8   problematic, regardless of whose property it

9   would have been near, because that was the

10  directive of the council, with their wishes to

11  make Greenfield whole.  Because Greenfield had

12  just purchased a piece of property for

13  millions of dollars that the Parish had

14  guaranteed to them that was Industrial 3.  I

15  think the Council probably weighed in their

16  potential liability for not correcting the

17  sins of that Council from 1990.

18      Q    You understand that Joy Banner has

19  suggested that your mother-in-law is involved

20  in property right in the middle of the

21  Greenfield Project, right?

22      A    She stated at the Council meeting

23  that I signed a rezoning application for

24  property that belongs to my mother-in-law, and

25  that's false.

40

1      Q    Right.  So what steps did you take to

2    figure out whether your mother-in-law owned

3    property in that area?

4      A    I didn't take any steps.  I trusted

5    when I spoke to Planning and Zoning that the

6    only tract of land that was being submitted to

7    be rezoned was the pieces or piece that

8    belongs to Greenfield.  I specifically asked

9    them that when I learned of this allegation.

10          Joy is tapping you, if you want to

11    see what she's saying.

12      Q    So you had that conversation with the

13    lawyers after the November 28th, 2023 meeting?

14      A    Let's see.  After the -- I don't want

15    to mix the timeline up.  What's the date --

16    Joy can tell us better than anybody.  What's

17    the date on the rezoning application that's

18    the subject of your ethics complaint?

19      Q    Well before November 28, 2023.

20      A    Whatever the date is on that -- I

21    don't even know the date.  That's when we

22    discussed the procedure for carrying out what

23    the Council's action required me and the

24    Planning and Zoning Department to do.  That's

25    what we discussed in that meeting.

41

1    Q    Sure.

2    A    It was after, when Joy made the

3  comment at the November 28th meeting that I

4  wanted to see if there was any truth -- which

5  I didn't think there was, because she will lie

6  a lot.  And so I asked the Planning and Zoning

7  Department that -- let me make sure that only

8  Greenfield property is involved.  And not just

9  because of what Joy said, but because she was

10 spreading more lies to residents.  We began

11 getting calls from other residents saying that

12 we were rezoning their property against their

13 will.  And so I asked Planning and Zoning was

14 there any truth to the lies that are being

15 told to the residents, because we're getting

16 calls from residents.  And some Council

17 members actually asked us questions about it.

18 But the date of the rezoning application, the

19 date that's on that application is the date

20 that I met with Keith Green, Sammy Accardo,

21 Tara Lambeth to ask Legal for guidance on how

22 do we go about effectuating the action that

23 the Council took.  Because this was the first

24 time in my involvement that the Council took

25 an action like that to amend the zoning map.

42

1    Even though the code gives them the authority

2    do it, typically rezonings are initiated by

3    individual property owners.  They come in to

4    rezone their property.  So this was

5    unfamiliar, at least to me as the Parish

6    President, and unfamiliar to our new Planning

7    and Zoning Director at the time.

8            So after the Council took their

9    action, I scheduled a meeting with the

10   District Attorney's Office and Sammy and

11   Planning and Zoning Director to say, what must

12   I do?  And that's when it was stated, you

13   would process this as St. John Parish as the

14   applicant and you, as the chief elected

15   official would sign the rezoning application,

16   and that's what I did.

17       Q    So then after the November 28th, 2023

18   meeting when you heard Ms. Banner say

19   something about your mother-in-law owned

20   property or being related to property near

21   Greenfield, you said you then did something to

22   figure out if that was true?

23       A    Uh-huh.

24       Q    And that was, you talked to the

25   Planning and Zoning --

43

1      A      I asked the Planning and Zoning

2   Director to ensure that there wasn't any other

3   properties.  Because like I said, we began

4   receiving calls from other residents and from

5   council members who said that residents were

6   calling them saying that we were rezoning

7   their property against their will.  In fact,

8   some of those residents showed up to the

9   hearing that I attended in Edgard to say that

10  they didn't have any knowledge that their

11  property was being rezoned.  So I asked Tara,

12  I said, is there -- you know, why are these

13  residents saying this?  She said, the only

14  property that is being rezoned is the

15  Greenfield piece.

16     Q      Did you ask her if there was any of

17  your mother-in-law's related property right

18  there in the middle?

19     A      No.

20     Q      Are you aware of any rights-of-way

21  that Greenfield would be required to get over

22  those long skinny tracts in the middle of the

23  Greenfield area?

24     A      No, I'm not familiar with their

25  project.

44

1      Q    You advocated the Greenfield Project,

2  correct?

3      A    What do you mean?

4      Q    You've written letters of support of

5  the Greenfield Project?

6      A    I wrote a letter of support in 2020,

7  in support of a grant application for their

8  project.

9      Q    So a few months after your election,

10  you wrote a letter in support of the

11  Greenfield Project, correct?

12      A    Yes, a grant application in support

13  of the project.

14      Q    So if you found out that an LLC

15  managed by your mother-in-law owned one of

16  those long skinny tracts through the

17  Greenfield area, would you take some steps to

18  recuse yourself in the future from the matter?

19      A    If I -- I would seek the advice of

20  counsel.

21      Q    I'm circulating Exhibit ZE, and I'll

22  represent to you that this is a printout from

23  the assessor's website.  Does this look like

24  an assessor map to you?

25      A    I don't know.

45

1      Q     Do you see that's a long skinny tract

2    highlighted in blue here?

3      A     Correct.

4      Q     And this goes through -- that's one

5    of those long skinny tracts that goes through

6    the middle of the Greenfield area?

7      A     Okay.

8      Q     Does it look like that to you?

9      A     Which one is the Greenfield area?

10     Q     Greenfield area is sort of to the

11   east of the Highway 3213 bridge approach.

12     A     Okay.

13     Q     So does this look to you like one of

14   those --

15     A     Is this the Greenfield piece in the

16   yellow?  It's just not marked on the paper.

17     Q     Yeah, the Greenfield area is not

18   marked.  But do you know roughly where it is?

19     A     Roughly.

20     Q     Are these those long skinny tracts

21   that you were talking about before?

22     A     I believe so.

23     Q     And you see that at least one of

24   these is owned by Gaumet Holdings, LLC?

25     A     Correct.

46

1    Q    And you're saying you had no idea

2  before today that Darla Gaudet is a manager of

3  Gaumet Holdings, LLC?

4    A    You asked me if I was familiar with

5  that company.  I can't say if I've ever heard

6  of Gaumet Holdings.  I'm familiar with St.

7  John Fleeting.  That's the name of the company

8  that my husband works for.

9    Q    So if it turns out that this property

10 was owned by an LLC managed by your

11 mother-in-law, you're saying you didn't know

12 that before -- you don't even, maybe, know it

13 today, but you certainly didn't know it before

14 today?

15   A    Correct.

16   Q    In that conversation you had with

17 Tara Lambeth after the November 28th, 2023

18 meeting to check on Ms. Banner's allegations,

19 was that a verbal conversation?

20   A    Yes.  And we've had multiple

21 conversations about this, so it wasn't just

22 one.  Not this particular topic, but just

23 about the whole Greenfield situation.

24   Q    And was that after November 28th,

25 2023 conversation or conversations, was that

47

```
 1    reflected in any sort of writing or memo,

 2    email, text messages or anything like that?

 3        A    No.  I mean, I talked to Dr.

 4    Lambeth -- I mean, my department heads at the

 5    time.  We're such a small staff that we just

 6    communicate with all of the staff all day

 7    long.

 8        Q    And when you got Ms. Banner's ethics

 9    complaint, you read a few sentences in and you

10    decided you didn't want to read any more,

11    correct?

12        A    Correct.

13        Q    Did you read far enough to see that

14    it involved your mother-in-law?

15        A    No.  I mean, I knew that Dr. Banner

16    made those allegations.  She made those

17    allegations prior to the November 28th

18    meeting.  In fact, she had been making those

19    allegations on Facebook pages, social media

20    lives, putting them in the newspaper.  She had

21    been making these allegations in the wind.

22    And so she had, you know, been saying certain

23    things.  I don't know exactly what she said,

24    but she's been making allegations.  Like I

25    said, she makes allegations all the time
```

48

1   against all types of people, threats.  I've

2   been standing at the podium and Dr. Banner

3   said behind me that I was going to jail.

4   She's, you know -- it's borderline harassment.

5   It's intimidation.  She's staged protests

6   outside of my office where a protester was

7   sitting on my vehicle.  I'm just familiar with

8   her style.  Actually, the police had to be

9   called that day.

10       Q    When you say, they had to be called,

11   you called the police?

12       A    I didn't.  Someone notified me that

13   Joy was out there recording -- Jo or Joy, and

14   the protester was sitting on my vehicle and

15   someone called the police.

16       Q    Now that you've seen this map of a

17   tract of property going through, maybe, the

18   Greenfield area owned by Gaumet Holdings, LLC,

19   did you take any steps to determine if it's

20   true that that's managed with your

21   mother-in-law?

22       A    I will consult with Legal.

23       Q    I mean, if your mother-in-law owns

24   that piece of property, looking at in Exhibit

25   ZE -- if she manages it, then she has a

49

1    substantial economic interest in the

2    Greenfield property, would you agree?

3        A    No.

4        Q    Why not?

5        A    I just disagree with you.

6        Q    Okay.  Even if that property goes

7    right through the middle of the proposed

8    Greenfield Project?

9        A    Yes.  Looking at the size of this

10   property -- and I'm not sure how big it is,

11   but it looks really, really tiny.  I don't

12   know if a property owner who holds a piece

13   that tiny has a substantial financial interest

14   in anything around it.  I'm not a real estate

15   developer, but that looks like a very tiny

16   piece.  It's a sliver.  There are multiple

17   slivers in there.  Would that financially

18   impact any of them?  You know, some of the

19   testimony of the opponents of Greenfield have

20   said it's going to decrease the value of all

21   of this property.  You're telling me that it's

22   going to increase the value.  I don't know,

23   but it appears to me on the surface, these are

24   tiny little slivers that may be insignificant

25   to Greenfield.

50

1    Q    Well, if someone owns a tiny sliver

2  that crosses the entire Greenfield Project, a

3  multi hundredths of millions or billions of

4  dollars project and owning a piece of property

5  right across the middle of that would be

6  extremely valuable, because Greenfield would

7  need to get a right-of-way to cross it,

8  agreed?

9    A    I think you're speculating that it's

10 extremely valuable.  I mean, we obtain -- the

11 Parish obtains right-of-ways from people all

12 the time at no cost when we are land locked,

13 just to be able to access services.  That's

14 pure speculation.

15   Q    In St. John Fleeting, are you aware

16 that it does transportation, barge repairs,

17 dock transfers, that kind of thing?

18   A    I don't know what they do.

19   Q    You never looked at their website?

20   A    No.

21   Q    Do you know what the word "Fleeting"

22 means?

23   A    I really don't know.  I've often

24 joked, you know, just with my husband that I

25 have no idea what happens on the other side of

51

1  the river in general.  I didn't -- I don't

2  know.  I don't know exactly -- I wouldn't know

3  what they do.  I don't know what Associated

4  Terminals does.  I don't know what any of the

5  businesses up and down the river -- I mean, I

6  have a general understanding.  But what they

7  actually do, I don't know if they're

8  transporting products, cleaning barges.  I'm

9  not involved at all with the family

10 business -- with their family business, at

11 all.

12     Q    And you don't know in part because,

13 at least once you saw a document, the ethics

14 complaint, and you stopped reading after a

15 couple of sentences, correct?

16     A    Correct.  You mean that I don't know

17 what the family business does or what their

18 family business does?  What was the question

19 again?  I'm sorry.

20     Q    Sure.  You're aware that the ethics

21 complaint, at least in part is about

22 Darla Gaudet's businesses, right?

23     A    Correct.

24     Q    And so when you read -- when you

25 started to read a document about Darla

52

1    Gaudet's businesses, you stopped after a

2    couple of sentences and didn't read the

3    remainder, connect?

4        A    Correct.  Joy could tell you more

5    about that business than I can.

6        Q    Okay.  Let's move on to a different

7    topic.  So on November 28th, 2023, Ms. Banner

8    went to the podium to give public comment,

9    right?

10       A    Correct.

11       Q    And then she started to make public

12   comment, right?

13       A    Correct.

14       Q    She started to talk about ethics

15   issues related to you, right.

16       A    No, her first comment was, she wanted

17   to comment on executive session, a lawsuit the

18   Descendants Project had that was on the agenda

19   listed on the executive session.  That's the

20   first thing she attempted to do.  She was told

21   that there was no public comment on executive

22   session items, and she moved along.

23       Q    And she moved along to talking about

24   her ethics complaint against you, right?

25       A    She started to talk about Item J.

53

1    She brought that up.  She said a few things

2    before she went into the ethics complaint.

3        Q    And you asked the Chairman to

4    establish order, correct?

5        A    I asked for a point of order when Joy

6    was talking about -- or attempted to talk

7    about an item that was on the executive

8    session agenda.  In fact, I believe I said,

9    "Point of order."  And Chairman Wright let Joy

10   know that there was no discussion on executive

11   session item.  And then Chairman Wright

12   recognized me.  And then said something to the

13   effect, that's what I was going to say.  And

14   then she moved on and started to talk about --

15       Q    Okay.  And then started talking

16   about --

17       A    Correct.

18       Q    -- Agenda item J, correct?

19       A    Correct.

20       Q    And then you jumped in again and

21   said:  "The item on the agenda is not my name,

22   nor anything that Ms. Banner is speaking

23   about," right?

24       A    Something to that effect.

25       Q    And your name was on the agenda?

54

1       A     Correct.   My name is sponsoring the

2   item.   Dr. Banner started to talk about,

3   again, a rezoning application, Darla Gaudet's

4   property.   Those items were not on the agenda.

5   The agenda item was to engage legal services

6   from a law firm about ethics matters.

7   Rezonings were not on the agenda.   Greenfield

8   was not on the agenda.   Darla Gaudet was not

9   on the agenda.   None of those items were

10  actually on the agenda.   So she was being told

11  that she needed to stick to the actual agenda

12  item, just as any other resident is informed

13  when they get off topic.

14          Dr. Banner -- it was a recent Council

15  meeting that she attended.   And she proceeded

16  to address the audience and invite them to her

17  personal party, if you will, to discuss

18  rezoning issues.   And she was told at that

19  meeting, this is not your meeting.   This is

20  the public meeting.   You have to stick on

21  topic with the agenda.   And she continued to

22  turn and face the public to tell them about

23  this forum.

24      Q    Are you sure that was Joy banner, not

25  Jo Banner?

55

1      A     Maybe it was Jo, and Joy was there

2   with her.  But there had been other instances

3   at other the meetings, council meetings since

4   then, where Joy Banner has come up to the

5   podium and gotten off topic and had to be

6   brought back on topic.  It's repetitive.

7      Q     On November 28, 2023 when she's

8   talking about Greenfield, Darla Gaudet, you

9   understood she was talking about the contents

10   of her ethics complaint, right?

11      A     Correct.

12      Q     And the ethics complaint was one of

13   the things that prompted the Parish to hire

14   Gray Sexton, correct?

15      A     Correct.  But that still -- the

16   agenda item still wasn't the ethics complaint.

17   Joy was attempting to discuss an ethics

18   complaint under the jurisdiction of the Ethics

19   Board at the Parish Council meeting.  That's

20   what she was attempting to do.  I believe she

21   knew exactly what she was doing, but she

22   wanted to get in what it was she wanted to

23   say, whether or not it was an item on the

24   agenda or not, and she knows that items that

25   are not on the agenda aren't discussed at the

56

1    Council meeting.  And other residents are told

2    to stay on topic during Council meetings if

3    they're off topic in their discussions.

4         Q    And then you said, "Chairman -- Mr.

5    Chairman, I'm going to ask you to stop this

6    comment," correct?

7         A    Correct.

8         Q    And you were referring to Joy Banner?

9         A    Correct.

10        Q    Did anyone advise you to say that?

11        A    No.

12        Q    Did any attorney advise you to stop

13   Joy Banner's comment?

14        A    No.  The attorney -- Keith Green did

15   make a comment, I believe, at some point when

16   Joy was talking.  I don't recall, but I

17   believe he did make a comment about the

18   discussion had to be limited to items that

19   were on the agenda.  I believe Keith Green

20   made that statement, that items had to be on

21   the agenda.

22        Q    But you didn't seek Mr. Green or any

23   other attorney's advice about whether to tell

24   Joy Banner to stop her comment?

25        A    I didn't need to seek the attorney's

57

1    advice, because everyone in the -- all of us

2    in the room, council members, the attorneys

3    and Joy, as well, are aware that comment must

4    remain on topic and it's advertised in our

5    agenda, which Joy had a copy of, that public

6    comment is for agenda items only and limited

7    to three minutes per citizen.

8        Q    Whether or not you needed to or not,

9    my question was:  You didn't seek any

10   attorney's advice about whether to ask the

11   Chairman to stop Joy Banner's comment,

12   correct?

13       A    Not at that moment, no.

14       Q    At any other moment?

15       A    No.

16       Q    And you made the statement, asking

17   the Chairman to stop this comment, in your

18   role as Parish President, correct?

19       A    Correct.  That's the only reason I'm

20   there.

21       Q    And you asked the Chairman to stop

22   Dr. Banner's comment because of the content of

23   what Dr. Banner was saying, correct?

24       A    It was -- yes.  It was in

25   contradiction of what we allow residents to

58

1    come up and provide comments on items that are

2    not on the agenda.

3        Q    And you expected that the Chairman

4    would stop the comment if you asked him to,

5    correct?

6        A    I expected that he would take my

7    request under consideration, as he would take

8    anybody else's request under consideration.

9    There have been times where, you know, he's

10   allowed a little bit more time to speak.  Even

11   in this instance when he open public comment,

12   Joy was actually sitting down and not

13   appearing that she was going have public

14   comment, he closed it.  And then, of course,

15   he opened it back up to let her talk.  Because

16   we want to encourage public comment on agenda

17   items.  So that's typically the way that the

18   meeting is conducted.

19       Q    Okay.  But the Parish President

20   asking the Chairman of the Parish Council to

21   stop a comment, you'd expect that the Chairman

22   would take the Parish President's request

23   particularly seriously, agreed?

24       A    I wouldn't say particularly

25   seriously.  I would say that -- you know, the

59

1    way the charter is set up, the governing

2    authority -- St. John the Baptist Parish

3    governing authority is consisted of nine

4    council members and the Parish President; the

5    Parish President being a nonvoting member.  So

6    I can ask for a point of order, a point of

7    personal privilege if the room is too cold or

8    these types of things.  I wouldn't say that I

9    would expect to get special consideration.  I

10   would expect that if I asked for a point of

11   order or asked for discussion to be curtailed

12   to the agenda item, as it is advertised on the

13   agenda, that it will be three comments per set

14   of agenda items only.  I would ask that he

15   would give that consideration no different

16   than if it were any other Council member who

17   asked for that same consideration.

18       Q    Okay.  But you'd give more

19   consideration than a random member of the

20   public and said, stop this comment?

21       A    Well, a random member of the public

22   doesn't have the ability to ask for a point of

23   order.

24       Q    Right.  So you had the ability as the

25   Parish President to ask the Chairman of the

60

 1   Council to stop a comment, correct?

 2       A    To keep a comment in line and on the

 3   topic of the agenda.  Joy could have spoken

 4   about all of the agenda items that were on

 5   topic but for agenda items that the public

 6   body is not casting a vote upon.  That's the

 7   guidance from the Attorney General's Office --

 8   the LLA -- and on items that are off topic.

 9       Q    Okay.  But you asked him to stop this

10   comment, and you were allowed to ask him to

11   stop the comment because of your role as

12   Parish President?

13       A    I asked him to keep the topic -- the

14   comments to the items specifically on the

15   agenda.

16       Q    Do you not think you said:  "Stop

17   this comment"?

18       A    I may have, yes.

19       Q    Do you want to listen to it?

20       A    No.  It was very traumatizing.  I

21   don't want to listen to it again.

22       Q    We'll avoid listening to it unless we

23   have to, if that's the case?

24       A    I won't listen to it again.

25       Q    Do you have any reason to think you

61

1  didn't say, "Stop this comment"?

2      A    No.

3      Q    If you said, "Stop this comment," you

4  were able to do so because you were the Parish

5  President, correct?

6      A    Correct.

7      Q    And do you recall saying -- speaking

8  directly to Ms. Banner, saying, "Ms. Banner,

9  first of all, you're in violation of state law

10 right now."

11     A    I absolutely said that.

12     Q    The state law that you were referring

13 to, was that the state law that Mr. Wright

14 read subsequently?

15     A    I'm not sure.

16     Q    Do you recall what state law you were

17 referring to?

18     A    I was referring to state law that the

19 ethics board provided to me that said that I

20 could not discuss ethics complaints.  Kathleen

21 Allen, the Ethics Administrator told me that

22 it was a violation of state law to discuss an

23 ethics complaint and that statute was provided

24 previously to me by the Ethics Board.  Because

25 I was instructed that I couldn't discuss an

62

1    ethics complaint that is ongoing with another

2    Council member.

3        Q    So the Ethics Board said you can't

4    talk about it.

5        A    They said no one can until they

6    decide whether or not they're going take up a

7    -- I don't know what it's called on their end,

8    but until they decide whether they're going to

9    take it up or not that it is a violation of

10   state law for anyone to publically discuss it.

11       Q    Okay.  And they said that to you

12   verbally or in an email?

13       A    Could have been both.

14       Q    Would you recall if there was an

15   email?

16       A    I've emailed Kathleen Allen before.

17   I don't recall.  I'd have to go back.  But I

18   know that when I received a complaint about

19   another Council member, it was stamped in red

20   with a statute on it that says that it's

21   confidential.

22       Q    Did you understand that, when you

23   said you were in violation of state law, you

24   were referring to a criminal statute?

25       A    I didn't know whether it was a

63

1   criminal or a civil.  Like I said, I've been

2   advised by the Ethics Board that it is against

3   the law to discuss ethics complaints prior to

4   them deciding on whether they're moving

5   forward with it.  So I believed that if that

6   state law applied to me, it applied to Joy, as

7   well.  But what do I know?

8       Q    Did you read the state law they were

9   referring to?

10      A    I believe so at the time.  It's

11  stamped on there -- it either says,

12  "Confidential" and maybe it has the state law

13  underneath "Confidential."  I'm sure --

14  actually, when Joy got a copy of the

15  complaint, from what I was told, her copy was

16  stamped "Confidential" as well.  I guess she

17  ignored that part.

18      Q    So you read the law that they were

19  referring to?

20      A    I read a portion of that, yes.

21      Q    I'll give you what's been designated

22  Exhibit S.  Is that the law that you're

23  talking about?

24      A    It's -- when I looked up the statute

25  that's provided by the Ethics Board, I don't

64

1    believe it's this long.  I believe it's just

2    one or two sentences.

3        Q    So you looked at some other law, not

4    this one?

5        A    Uh-huh -- no.  When the Ethics Board

6    provides it to you, as they provided to Joy to

7    let her know that it was against the law to

8    discuss this, but they -- it's a shorter --

9    it's a couple of sentences.  It's not this big

10   long document.

11       Q    So you're aware of what the Ethics

12   Board has provided to Joy Banner?

13       A    I've been told what they provided to

14   her because she posted a copy of the

15   complaint, I believe, on Facebook.  It was

16   stamped, "Confidential" on her copy.  Someone

17   told me that.  I didn't see that, but someone

18   told me that she posted a copy of that

19   document on her Facebook page, and it was

20   stamped "Confidential" by the Ethics Board.

21       Q    Okay.  Who told you that?

22       A    I don't remember.

23       Q    But you didn't see it, yourself?

24       A    No.

25       Q    So when you said, "Ms. Banner, first

1    of all, you're in violation of state law right

2    now," you were referring to a law that the

3    Ethics Board sent you that you looked at, but

4    you don't recall what it is?

5        A     From what the Ethics Board said to

6    me -- and this was in conjunction with another

7    Council member's Ethics complaint -- was that

8    I was not allowed -- that no one was allowed

9    to discuss it -- that I wasn't allowed to

10   discuss it with anyone.  It was against the

11   law to discuss it with anyone.

12       Q    And that's what you were referring to

13   when you said, "Ms. Banner, first of all,

14   you're in violation of state law right now"?

15       A     Correct.  Because the Ethics Board

16   had previously told me that I could not

17   discuss another ethics complaint involving

18   another Council member with anyone.

19       Q    The Ethics Board is not your lawyer,

20   right?

21       A     No.

22       Q    And you didn't seek their legal

23   advice?

24       A     No.

25       Q    When you said, "Ms. Banner, first of

66

1     all, you're in violation of state law right

2     now," were you essentially warning her that

3     there could be legal consequences if you keep

4     talking the way you are?

5          A     Could be, uh-huh.

6          Q     Including imprisonment, potentially?

7          A     Or someone could -- you know, I guess

8     file a lawsuit that she's knowingly discussing

9     something that state law prohibits you from

10    discussing.

11         Q     Right.  So when you're saying,

12    "Ms. Banner, you're in violation of state law

13    right now," you were communicating to her that

14    if she continued talking in that way, she

15    could be imprisoned or sued?

16         A     I don't know about imprisoned.  I'm

17    not that familiar with the law, if you are

18    imprisoned.  But that there was a provision in

19    state law that prevented the discussion of an

20    ethics complaint until the Ethics Board has

21    decided whether or not a formal investigation,

22    I believe, will be held.  And from what the

23    Ethics Board explained to me is, the reason

24    they do that is anyone can file an ethics

25    complaint.  And they will at least

67

1   preliminarily look into that ethics complaint.

2   So it's to protect people from individuals

3   frivolously filing ethics complaints and then

4   going to discuss it, saying you're under

5   investigation.  When they look into all of the

6   ethics complaints.  So until they've gotten

7   past that first step, it's to protect the

8   process.

9        Q    So when you said, "Ms. Banner, you're

10   in violation of state law right now," you were

11   communicating to her that if she kept talking

12   the way she was, she might be sued or other

13   things potentially, agreed?

14        A    Could be, possibly.  But that's not

15   under -- that would not have been under my

16   jurisdiction.  That would have been up to

17   someone else to decide.

18        Q    Okay.  But otherwise, you agree with

19   my statement?

20        A    Yes.

21        Q    So Exhibit S in front of you, the

22   statute in front of you, Keith Green emailed

23   that to you, right?

24        A    I don't remember if he emailed it to

25   me.  If you tell me he did, he did.

68

1     Q    That's okay.  You don't have to take

2   my word for it.

3     A    I trust you.

4     Q    You may, but we'll look at the

5   documents.

6     A    I know that -- well, I don't know

7   what I know.

8     Q    What were you going to say, you know

9   that --

10    A    I was just going to say, I mean, I

11  heard Councilman Wright and Jackie say that

12  Keith emailed it to them, so he could have

13  very well had me copied on that email.

14    Q    This is what we've identified as

15  Exhibit T as in Tom.  Do you see that this is

16  an email chain from November 28th, 2023?

17    A    Yes.

18    Q    And you see that at 1:23 on

19  November 28th, 2023, Keith Green emails you

20  and Michael Wright and a couple of other

21  people.

22    A    The District Attorney and her

23  assistant.

24    Q    And he writes, "Mr. Chairman, Madam

25  President:  Per our conversations, Mr.

69

1    Chairman, attached is a copy of Louisiana R.S.

2    42:1141.4(L)(1)."

3        A    Yes.

4        Q    So you had a conversation with Keith

5    Green and Michael Wright about this?

6        A    I don't recall if we had a

7    conversation.  I don't recall if it was -- if

8    I had a conversation.  I'm not sure if

9    Councilmen Wright gave testimony that he had a

10   conversation with Chief Green, and so -- I

11   don't know what he's referencing in "Per our"

12   -- I just don't recall.

13       Q    Sure.  And you see that he says,

14   "Attached is a copy of the law"?

15       A    He says, "As I advised, you should

16   make a statement about this statutory

17   provision and the limits it places on the

18   level of discussion the Council may have

19   relative to Item J.  If you have questions,

20   please do not hesitate to contact me at any

21   time."  Yes.

22       Q    Did you read the attachment to his

23   email?

24       A    I don't recall.

25       Q    The law that he's talking about here,

70

1   is that the law you were describing when you

2   told Ms. Banner she was in violation of state

3   law?

4       A    Yes.

5       Q    I mean, you must have looked at it

6   before you told her she was in violation of

7   the law, correct?

8       A    I recall -- as I stated before, when

9   another investigation came across my desk of

10  another Council member, seeing this statute

11  stamped on that paperwork when I received it.

12  And I looked at it at that time, so I was

13  familiar.  Because, again, as I stated, the

14  Ethics Board cautioned me that I was unable to

15  discuss that particular ethics complaint

16  involving another Council member with anyone

17  because it was marked "Confidential" until

18  they say it's not confidential any more.

19      Q    Okay.  But when you told Joy Banner

20  she was in violation of state law, you were

21  referring to the law in Mr. Green's email,

22  right?

23      A    No, I was referring to the law

24  that -- it may be the same law, that the

25  Ethics Board -- and you can ask Joy what

71

1    statute is stamped on the complaint that she

2    filed against me that she received a copy of.

3        Q    So you may have been referring to the

4    law in Mr. Green's email, but you don't

5    recall?

6        A    I don't recall.

7        Q    And you don't recall if you read the

8    attachment to it?

9        A    I've read this portion before.  This

10   L portion that is highlighted, I have read

11   that before (Indicating).  That may be the

12   exact one that's stamped on the Ethics Board

13   complaints when we receive them.

14       Q    Sure.  Do you know if you've read any

15   of the rest of that law?

16       A    I don't know.  I could read through

17   the entire document, if you'd like and tell

18   you if any of it is familiar.  I'm unsure to

19   tell you right now if I've read through.

20       Q    Why don't you look at the first five

21   lines or so and see if any of that --

22       A    On A?

23       Q    At the very top from the "R.S." down

24   to about five lines down .

25       A    (Witness complies.) I can't say if

1    I've read this or if I'm just familiar that

2    they should give a public notice of its

3    hearings.  I don't want to give the wrong

4    information.

5        Q    You see the part about the note about

6    Unconstitutional Statutes Report?

7        A    On that back page?

8        Q    On the front page at the very top.

9        A    Yes.

10       Q    That's a warning sign that this

11   statute might be unconstitutional, agreed?

12       A    I'm not an attorney.

13       Q    But you understand that some laws on

14   the books are unconstitutional, agreed?

15       A    Agreed.

16       Q    And the fact that there's a note that

17   this was included in the Unconstitutional

18   Statutes Report might be a red flag that this

19   could be an unconstitutional statute, agreed?

20       A    Why would the Ethics Board still

21   stamp their documents with this statute?

22       Q    Ma'am, that's not my question.  My

23   question was, a note at the top about this

24   being included in an Unconstitutional Statutes

25   Biennial Report is a red flag that this might

```
 1   an unconstitutional statute, agreed?
 2       A    I take the Ethics Board to be --
 3       Q    Ma'am, that's not my question.
 4       MR. SPEARS:
 5              I'm going to object and ask that
 6           you allow her to answer the question.
 7           If you think she didn't answer it
 8           improperly, then you can rephrase the
 9           question.
10       MR. MOST:
11              Fair enough.  I did interrupt
12           her.  Yes, you may continue.
13       THE WITNESS:
14              When I received information from
15           the Ethics Board on another Council
16           member just a few months ago, they
17           were very clear that this was the law
18           and that the items -- I could not
19           discuss the items.  So I'm not an
20           attorney.  I would like to believe
21           that the Ethics Board wouldn't still
22           include provisions of state law on
23           their documents that are not good
24           law, especially, you know, if people
25           are filing complaints with them and
```

74

1              trust them to thoroughly investigate,

2              if they're still stamping documents

3              with bad law.

4      BY MR. MOST:

5          Q    Okay.  I hear you.  I hear that, you

6      know, you received that from the Ethics Board

7      and what you said about it.  But,

8      specifically, I'm asking about this note at

9      the top of this statute.

10         A    Okay.

11         Q    The fact that there's a note that it

12     was included in an Unconstitutional Statute

13     Biennial Report, that's a red flag that this

14     could be an unconstitutional statute; would

15     you agree?

16         A    I'm not sure what the

17     Unconstitutional Statutes Biennial Report is,

18     so I can't speak to what this report puts out.

19     If you tell me that this is the official

20     report of declaring laws unconstitutional, but

21     I'm not familiar enough with this particular

22     report to say whether or not it means that a

23     law is unconstitutional.

24         Q    But it's at least something someone

25     should look into before threatening someone

75

```
 1   with this law, agreed?
 2           MR. SPEARS:
 3                 Object to the form of the
 4           question.
 5   BY MR. MOST:
 6       Q    You can answer unless he tells you
 7   not to.
 8       A    I don't have an answer.
 9       Q    You don't have an opinion about
10   whether --
11       A    I don't want to speculate on what
12   someone should do with a biennial report that
13   they're unfamiliar with.  And given that --
14   that's my answer.
15       Q    Okay.  I asked Mr. Wright about
16   whether he knows different things now than he
17   did on November 28, 2023.  And he pointed out,
18   of course, he's a human.  Everybody knows
19   different things over time, right?
20       A    Right.
21       Q    And you agree with that?
22       A    Yes.
23       Q    If you knew on November 28th, 2023
24   what you know now, would you have done
25   anything differently with regards to Joy
```

76

1    Banner in that November 28th, 2023 meeting?

2        A    I don't know.

3        Q    You don't know if you would do

4    anything differently?

5        A    I don't.

6        Q    If you learned that this statute was

7    ruled unconstitutional by a federal judge,

8    would you have done anything differently in

9    that November 28th, 2023 meeting?

10       A    If -- yes.  If a federal judge would

11   tell us or tell the Ethics Board, tell

12   everyone who needs to know that this law is

13   unconstitutional, that would be different, of

14   course.

15       Q    Because you should not tell

16   Ms. Banner she's in violation of a state law

17   if that state law is unconstitutional, agreed?

18       A    Agreed.  Just as Joy should not tell

19   me that I'm going to jail when I'm standing up

20   at the podium.  She doesn't know that.  She

21   can't arrest me.

22       Q    So in one of your discovery

23   requests -- in one of the discovery requests

24   to you, you were asked to identify all of the

25   times, other than November 28th, 2023, that

77

1   you've asked or directed the Council Chair to

2   stop a member of the public's comment.  And

3   you responded, "When necessary, I will

4   intervene and request that the Council Chair

5   maintain order."  Do you recall that answer?

6        A    Yes.

7        Q    Can you recall any other times,

8   besides November 28, 2023, that you've asked

9   the Council Chair to stop a member of the

10  public's comment?

11       A    Yes.

12       Q    What was that?

13       A    I would have to go back to the

14  meetings, but it happens often, not just with

15  Chairman Wright.  Chairman Madere has been

16  chairing meetings and individuals may get off

17  topic.  Sometimes the District Attorney's

18  Office intervenes to instruct the Chairman to

19  have the person who is at the podium giving

20  public comment bring their comment back on to

21  topic, but it does happen.  I'd have to go

22  back and look at minutes.  But it has happen

23  before, since I've been Parish President from

24  myself or from the District Attorney's Office,

25  saying:  Chairman, we need to get back on

78

1    topic or, Chairman, this item is not on the

2    agenda.

3         Q    Have you ever before asked the

4    Chairman to stop a comment?

5         A    Typically, the request is to stop --

6    I don't know if I've said:  Stop that comment.

7    Or, Chair, this item is not on the agenda.  I

8    believe before I said to stop the comment that

9    the Chairman had already instructed Joy that

10   she needed to stick to the agenda item.

11   Typically, when a resident is informed that

12   they have to keep their public comment to the

13   agenda item, they do.  With Joy, that's

14   typically not the case.  And so, usually, if I

15   have to ask the Chairman for a point of order,

16   you know -- and sometimes it's not a point of

17   order, but, Chairman, this isn't an agenda

18   item.  Sometimes a resident may confuse two

19   agenda items.  So sometimes we just have to

20   say, it's not this item.  It's the next item

21   kind of thing.

22        Q    Sure.

23        A    And sometimes the District Attorney's

24   Office will also -- Chairman, this isn't the

25   agenda item.  You need to get this comment

1    back on topic.

2        Q    So sometimes as Parish President,

3    you've said, a member of the public is off

4    topic and suggested that the Chairman guide

5    them back on topic, right?

6        A    Yes.

7        Q    Did you do that as a Council member,

8    too?

9        A    I'm sure.

10        Q    But you can't recall any time that

11    you've said -- actually, asked the Council

12    Chairman to stop a public comment, agreed?

13        A    I would agree with that.  I think the

14    difference in this case is that Joy was asked

15    to keep her comments to the agenda item and

16    she refused.  And that's where the comment

17    was -- you know, that they -- the comment

18    needed to be stop.  She was just refusing to

19    comply with what all of the other residents

20    typically comply with when they're told to get

21    back on topic.

22        Q    So in 20 years on the Council and as

23    Parish President, the only time you can recall

24    asking a chairman to stop a comment was Joy

25    Banner, correct?

80

1      A     No.  Now that I'm thinking about it,

2   we've had meetings -- we've had meetings where

3   comments have become hostile.  You know, we've

4   had to call recesses when tempers would flare.

5   So in the past, there have been times where --

6   hey, we've got to stop this.  We've got to

7   stop this discussion.  Sometimes a five-minute

8   recess is called.  I believe in this

9   particular case, Chairman Wright clearing the

10  chambers -- that has been the recommendation

11  of the Sheriff's Office.  Sometimes it

12  requires a cooling off period.  Because you

13  know, tempers can run high.  But there have

14  been times in the past where I or other

15  Council members have said, we've got to stop

16  this comment or we've got to stop this and

17  either call for recesses.  I think once we

18  adjourned early from a meeting that had gotten

19  pretty contentious.

20     Q     Can you recall a particular time that

21  you asked the Chairman to stop this comment

22  besides Joy Banner?

23     A     They're -- I wouldn't be able to

24  point to a specific Council meeting, but just

25  thinking in my 20 plus years, you know, there

81

1    has been times where myself or other Council

2    members have asked the Chairman to stop

3    comment that was off topic or --

4         Q    Sure.  But I'm not asking about you

5    or other Council members.  I'm asking, can

6    recall times, other than with Joy Banner, that

7    you personally have asked the Chairman to stop

8    the comment?

9         A    Not at this moment.  Not at this

10   moment.

11        Q    Ms. Hotard, have you been asked to

12   preserve documents for this case?

13        A    I don't recall.  I mean, I know that

14   typically, when we're in litigation, I mean,

15   documents are preserved anyway.

16        Q    Have you been asked to preserve text

17   messages from your cellphone, for example?

18        A    I may have.

19        Q    Have you looked through text messages

20   on your cell phone to find documents for this

21   case?

22        A    Yes.  I believe that was one of the

23   requests.

24        Q    Did you hear Mr. Wright talk about a

25   Louisiana Legislative Auditor white paper?

82

1     A    Yes, I heard him reference that.

2     Q    Is that the Legislative Auditor Q and

3  A that you were talking about?

4     A    Yes.

5     Q    The incident involving where you were

6  asking the Chairman to stop this comment of

7  Joy Banner, have you talked to anybody about

8  that incident, other than an attorney?

9     A    What incident?

10    Q    On November 28th, 2023, there was an

11 incident where Joy Banner was making public

12 comment.  You asked the Chairman to stop her

13 public comment.  The Chairman read a statute

14 that talks about imprisonment.  I'll refer to

15 that as "The Incident."  Okay?

16    A    Okay.

17    Q    Have you talked to anyone about the

18 incident, other than an attorney?

19    A    I'm sure I have.

20    Q    Like who?

21    A    I don't know.

22    Q    Have you texted with anybody about

23 that incident?

24    A    I don't recall.

25    Q    Have you emailed with anybody about

83

1    that incident?

2        A    I don't recall.  Do I have to

3    disclose talking to the spiritual --

4        Q    I'm not going to ask you -- the

5    question was, does she have to disclose

6    spiritual --

7        A    I mean, it was a public meeting.

8    Everybody was talking about it.

9        Q    I'm not going to ask you about

10   spiritual advice.

11       A    What about speaking to medical

12   professionals about it?  Just asking.  I mean,

13   it was a very public meeting.  Everyone was

14   talking about it.

15       Q    Not getting into details about it,

16   you're saying you've talked to medical

17   professionals about that meeting?

18       A    I'm just asking if that would be

19   something I would have to disclose to you.

20       Q    You would if I pressed you about it,

21   but I'm not going to press you about it.

22       A    I appreciate that.

23       Q    I'm getting close to the end.  So

24   we've established that at the November 28th,

25   2023 St. John the Baptist Parish Council

84

1    meeting, you asked Chairman Wright to stop

2    Dr. Banner's public comment, right?

3        A    Correct.  Or stop that topic.  Not

4    her entire -- if she wanted to talk about

5    something that was actually on the agenda --

6    my intent was to stop that particular comment.

7    Because the agenda is clear that it's agenda

8    items and only three minutes per citizen.  So

9    my intent was to not silence her totally.

10   Because she speaks at many meetings.  And it

11   was about staying on topic with the agenda.

12       Q    But you wanted to silence the

13   particular thing she was talking about?

14       A    I wanted her to follow the rules.

15       Q    Right.  But you used the word,

16   "Silence."  You wanted to silence the

17   particular thing she was talking about,

18   agreed?

19       A    I wanted her to follow the rules.

20       Q    By stopping what she was talking

21   about?

22       A    By preventing her from breaking what

23   is allowed for public comment and that is

24   agenda items only.

25       Q    And your understanding of how she

1    could comply with that was by stopping talking

2    about what she was talking about?

3        A    Talking about items that were not on

4    the agenda, correct.

5        Q    And that would require her to stop

6    talking about what she was talking about,

7    agreed?

8        A    And to talk about what's on the

9    agenda.  Yes, we agree.

10       Q    Ms. Hotard, have you ever been

11   arrested?

12       A    No.

13       Q    Have you ever been the subject or the

14   target of a criminal investigation?

15       A    Not to my knowledge.

16       Q    If the Ethics Board -- I'm not

17   counting that within a criminal investigation.

18       A    Not to my knowledge.  I've never

19   been.

20           MR. MOST:

21               Let's take a few minutes and

22           pause and then regroup.  I think

23           we're probably close to the end.

24               (BRIEF RECESS)

25

86

1   BY MR. MOST:

2       Q    Ms. Hotard, is Keith Green your

3   lawyer?

4       A    The District Attorney's Office is the

5   legal adviser to St. John the Baptist Parish

6   governing authority.

7       Q    And the email that he sent you in

8   advance of the November 28th, 2023 meeting,

9   did you seek his advice?

10          MR. SPEARS:

11              I'd have to object.  Because I'm

12          looking at this email, and I don't

13          see where this is a factually correct

14          statement.

15              I take it back.

16  BY MR. MOST:

17      Q    That's okay.  No problem.

18      A    I don't recall.

19      Q    So you don't recall if you sought

20  Mr. Green's advice or not, right?

21      A    I don't recall.

22      Q    And do you recall if you were asking

23  for -- seeking his advice or receiving his

24  advice what about you would do in the future?

25      A    What do you mean?

87

1  Q Well, were you getting advice from
2 Mr. Green about your future conduct?
3  A No.
4  Q Are you familiar with Rollo Security
5 Services?
6  A Yes.
7  Q And Rollo Security Services provides
8 security for Greenfield?
9  A I'm not sure of their arrangement
10 with Greenfield.
11  Q Rollo Security Services is owned by
12 David Rollo?
13  A I'm not sure who owns Rollo Security
14 Services.
15  Q And David has worked as a consultant
16 for Greenfield?
17  A I'm unsure of Greenfield's business.
18  Q And you know that David Rollo works
19 with Greenfield, right?
20  A Correct.  I'm not sure of the nature
21 of his relationship with Greenfield.  You
22 asked if he was a consultant.  I don't know
23 what his role is.
24  Q Yeah, right.  And your campaign has
25 paid David Rollo, as well?

88

```
1        A    My campaign?

2        Q    Uh-huh.

3        A    For what?

4        Q    Your campaign has hired Rollo

5   Security Services?

6        A    I don't recall hiring Rollo Security

7   Services.

8             MR. MOST:

9                  That's the end of my questions,

10             baring redirect and if we have to

11             keep the deposition open for the

12             limited video issue.

13                  Do you have any questions?

14             MR. SPEARS:

15                  Just a couple of clarifying

16             questions.

17                       EXAMINATION

18   BY MR. SPEARS:

19        Q    Madam President, first of all, thank

20   you for your service.

21             In your 20 plus years in Parish

22   Government, it included a stint as a Parish

23   Council Member At Large; is that correct?

24        A    Correct.

25        Q    And it also included, during that
```

89

```
 1    time period, you serving as the Chair of the

 2    Parish Council, correct?

 3         A    Correct.

 4         Q    In your years as a Parish Council

 5    member and Parish President, has it always

 6    been your understanding that the Parish has

 7    adopted Roberts Rules of Order as its official

 8    parliamentary procedures?

 9         A    Yes.  It's been referenced at many

10    Council meetings.

11         Q    Is it also your understanding that,

12    as per the adoption of the Council, that

13    public comment is limited to three minutes per

14    person?

15         A    Yes.  It's also stated on our

16    publically advertised agenda.

17         Q    It is also your understanding that

18    the Council does not allow or permit one

19    public member to donate or to cede his or her

20    three minutes to another public member?

21         A    That's correct.

22         Q    During your 20 plus years of service

23    to this Parish, you are familiar that from

24    time to time there have been ethics complaints

25    filed against members of the Parish, separate
```

1   and apart from the one involving Joy Banner

2   complaining against you, correct?

3      A    Correct.

4      Q    In each of those complaints, is it

5   your understanding that you are advised by the

6   Louisiana Board of Ethics that there's a cloak

7   of confidentiality that's stamped on the

8   correspondence, indicating that you are not or

9   shall not disclose the existence of that

10   ethics investigation?

11      A    Correct.

12      Q    And so based on your 20 plus years,

13   you've always been guided by the Ethics Board

14   that it is improper and illegal to violate

15   that cloak of confidentiality, correct?

16      A    Correct.

17      Q    Is it your belief that, even up until

18   today, that that is still the practice and

19   policy of the Louisiana Board of Ethics to

20   advise persons that they are not to discuss or

21   disclose ongoing investigations until they're

22   made public by the Board of Ethics?

23      A    It's more than my belief.  I've been

24   advised up to this point by the Ethics Board

25   that it is still confidential and not able to

91

1    be discussed.

2        Q    And so when you expressed that

3    Ms. Banner was in violation of the law, that

4    would be the law that was given to you and

5    advised -- and that you were advised

6    relative to -- by the Louisiana Board of

7    Ethics and its counsel, in addition to any

8    other advice you've gotten, correct?

9        A    Correct.

10       Q    Now, you indicated that in recent

11   years, your complaint is not or was not the

12   only pending ethics complaint; is that

13   correct?

14       A    Correct.

15       Q    At the time that you all were

16   considering retaining the services of R. Gray

17   Sexton, do you know what other ethics

18   complaints might have been pending?

19       A    Yes.

20       Q    What would those have been?

21       A    I would have to disclose the person

22   who the complaint is against, and I've been

23   advised that it would be improper or illegal,

24   but it is another sitting Council member.

25       Q    So there was at least another

92

1    separate ethics complaint pending at the same

2    time that you all were considering hiring R.

3    Gray Sexton?

4        A    Correct.  In fact, I've received a

5    couple of subpoenas from the Ethics Board

6    about that investigation.

7            MR. SPEARS:

8                Nothing further.

9                EXAMINATION

10   BY MR. MOST:

11       Q    How long were you Chair of the Parish

12   Council for?

13       A    I don't know.

14       Q    A couple of years?

15       A    Yes.

16       Q    During that time, how many times did

17   you read a criminal statute out loud during a

18   public comment?

19       A    I don't know.

20       Q    Can you recall any times?

21       A    No.

22       Q    Seems like it would be a memorable

23   thing if you did?

24       A    If I would have been advised by the

25   District Attorney's Office, I would have.

93

1      Q    So you've never read a criminal

2  statute out loud during a Parish Council

3  meeting as Chair, correct?

4      A    I don't recall that.

5      Q    Do you have Exhibit S in front of

6  you, the law?

7      A    I believe I gave it back to you, and

8  I believe these are yours, also.

9      Q    I'll give you those back.

10      A    Do you need me to hold on to this?

11      Q    Yes.  Why don't you look at that.  So

12  looking at the back of that.  It's Subsection

13  L-1, which is what you said is what you've

14  read in the past.

15      A    Yes.

16      Q    What this says can't be talked about

17  is the testimony taken at a private

18  investigation or a private hearing or give out

19  any information concerning a private

20  investigation or private hearing.

21      A    And it says, "Or to make any public

22  statement."  "Or to make any public

23  statement."  The sentence in its entirety:

24  "It shall be a misdemeanor punishable by a

25  fine of not more than $2,000 or imprisonment

94

1   for not more than one year or both for any

2   member of the Board of Ethics, its Executive

3   Secretary, other employee or any other person,

4   other than the person who is subject to the

5   investigation or complaint to make public the

6   testimony taken at a private investigation or

7   private hearing or to make any public

8   statement or give out any information

9   concerning a private investigation or private

10  hearing."

11        So I was instructed in my

12  conversations with the Ethics Board, you

13  cannot make any public statement.  It's very

14  clear in the law, by any person, except for

15  the person who is the subject of the

16  investigation or complaint.  I am the subject.

17      Q    You don't think that anyone except

18  the subject of the complaint can say anything

19  about an ethics complaint at all?

20      A    Not at the point when the

21  investigation is confidential.  As I stated

22  before, and the Ethics Board has explained it

23  to me, and they could explain it to you -- and

24  I know they've explained it to Joy, or at

25  least put "Confidential" on the complaint.

95

1   The reason they have that in place is to

2   protect the person that the complaint is

3   lodged against, because any person, whether

4   they are anonymous or not, can make a

5   complaint.  I can go and make a complaint

6   against you to the Ethics Board, and then

7   tomorrow go on Facebook Live and say, "William

8   Most is under an investigation by the Ethics

9   Board," and that will be a factual statement.

10  The Ethics Board, from what they've explained,

11  they have this law in place so that I don't do

12  that or individuals don't file a complaint,

13  just for the purpose of saying, you're under

14  investigation.  Now, once they do their due

15  diligence and they determine that if given all

16  of the facts are true, that they will move

17  forward with a formal investigation.  Then it

18  goes on their agenda.  In fact, these items

19  before it goes on to a formal proceeding are

20  in their executive session for that reason,

21  because it's confidential.

22      Q    Do you see the word, "Complaint"

23  anywhere in this section?

24      A    It says:  "To make any public

25  statement or give out any information

96

1    concerning a private investigation or private

2    hearing."  So any public statement.  What Joy

3    did was, she was making a public statement.

4        Q    Okay.  She was making a public

5    statement about her complaint, right?

6        A    She's not the subject of the

7    complaint.  It says --

8        Q    Wait.  My question was, was she

9    making a comment about her complaint?

10            MR. SPEARS:

11                 I'm going to object, and I'm

12            going to ask, once again, that you

13            allow her to fully answer the

14            question.  And if you're not

15            satisfied with the answer, then you

16            can delve further.

17            THE WITNESS:

18                 She was making a comment about

19            an ethics complaint that she made,

20            herself.  It would be no different

21            than if I make a complaint against

22            her, then I could go on Facebook Live

23            and say that Joy Banner is under

24            investigation by the Ethics Board.

25            I, though, will choose to follow the

```
 1              law that the Ethics Board placed on
 2              that information that was sent to me
 3              about another Council member and not
 4              do that.
 5    BY MR. MOST:
 6         Q    Right.  So Joy Banner was talking
 7    about her complaint, correct?
 8         A    Correct.
 9         Q    And what this prohibits is talking
10    about the Ethics Board's investigation or
11    hearing, correct?
12         A    That's not what this prohibits.  This
13    prohibits -- I'll read it again for you.
14         Q    Uh-huh.
15         A    "It shall be a misdemeanor punishable
16    by a fine of not more than $2,000 or
17    imprisonment for not more than one year or
18    both for any member of the Board of Ethics,
19    it's Executive Secretary, other employee or
20    any other person, other than the person who is
21    subject to the investigation or complaint to
22    make public the testimony taken at a private
23    investigation or private hearing or to make
24    any public statement."  That is independent.
25    There's another "Or" after that.  So to make
```

1    any public statement.

2         Joy was not the person who was

3    subject of the investigation or complaint, so

4    she would have been prohibited from making any

5    public statement.  And that's what this says.

6    Now, she chose to do that.  That's what she

7    chose to do.  But this -- I have followed this

8    from -- or on the other complaints that are

9    currently pending right now.  I followed the

10   law that the Ethics Board is still using as

11   current law.

12        Q    Do you think this prohibits someone

13   making a public statement or a public

14   statement concerning the private investigation

15   or private hearing?

16        A    I believe this prohibits any person

17   other than -- and that's the language.  These

18   aren't my thoughts.  The facts are the facts.

19   It states, "Any other person other than the

20   person who is subject of the investigation" --

21   which Joy Banner is not the subject of the

22   investigation.  I am the subject, based on her

23   complaint.  That person would be prohibited to

24   make any public statement.  I think public

25   statement is very clear.  If you stand up in

99

1   an open Council meeting, you're making a

2   public statement.  If get on Facebook Live and

3   your live is open to the public, you're making

4   a public statement.  "Or give out any

5   information concerning a private

6   investigation" -- any information means

7   anything.  So you can't make a public

8   statement about it or give out any information

9   concerning a private investigation or private

10  hearing without the written request of the

11  public servant or other person investigated.

12  And I've not made any written requests.

13  That's what Joy was attempting to do at the

14  Council meeting.  That's what she did.  She

15  didn't attempt to do it.  She did.

16       Q    Did she give out any information

17  about the private investigation?

18       A    She did.

19       Q    What?

20       A    She stated that I was under

21  investigation for signing a rezoning

22  application for a piece of property that

23  belonged to my mother-in-law.

24       Q    What information did she give out

25  about that private investigation?

100

1    A    That is the nature of the complaint.

2  She gave out that information.  She gave out

3  the information on her Facebook Lives.  She

4  gave out information --

5    Q    Did you say "Facebook Lives" or

6  "Lies"?

7    A    Yeah, like going on Facebook Live.

8  Well, they're lies, too.  She made public

9  statements on Facebook Lives.  She made public

10  statements at the Council meeting, at that

11  November 28th meeting.  I believe she made

12  those same public statements at a Planning and

13  Zoning meeting when she said, the Parish

14  President is under investigation for signing a

15  rezoning application for property that belongs

16  her to mother-in-law.  And the only reason

17  that she knew that was an investigation was

18  because she filed a complaint; therefore, she

19  received a copy from the Ethics Board

20  confirming her complaint and with it stamped

21  that the matter was confidential.  She just

22  disregarded the law.

23    Q    And you've telling me today that

24  there's a Parish Council member of St. John

25  the Baptist Parish who is under investigation

101

1    by the Ethics Board?

2         A    Yes.

3         Q    So you're giving me that information

4    about the ethics investigation?

5         A    I'm telling you that a member of

6    Parish Council is under investigation by the

7    Ethics Board because I was specifically asked

8    a question about -- if I was familiar with

9    this law.  But I have not disclosed to you

10   that member.  I have not discussed with you

11   any of that information, because I will follow

12   the law.  And I will follow what the Ethics

13   Board has said to me, that I am not to discuss

14   the nature of that investigation with anyone.

15   I haven't given you a name and I haven't told

16   you what the complaint or the investigation

17   was about.  What your client did was stand up

18   in a public meeting and said she made the

19   complaint, who the complaint was on, and what

20   the nature of the complaint was.  That's two

21   different things.

22        Q    So you told me today that the Ethics

23   Board has issued subpoenas related to an

24   investigation into a sitting Parish Council

25   member?

102

1      A    Yes.

2      Q    And you've told me that you've

3  responded to those?

4      A    Yes, and that information is

5  confidential pursuant to this law that the

6  Ethics Board has advised all of us on,

7  including your client when she received the

8  paperwork from the Ethics Board about this

9  complaint.  She was provided that same

10 information.  She just chose to disregard that

11 information because it didn't suit her

12 personal agenda.

13     Q    And you don't think you've told me

14 anything about an investigation, even though

15 you've told me one exists into a sitting

16 Council member and that subpoenas have been

17 issued about it?

18     A    If I had the choice not to answer any

19 of these questions, Bill, I would not be here.

20 But I'm being asked the questions, and so I'm

21 answering.  But what I didn't step into was to

22 give any information.  And I believe you may

23 have even asked.  But I will not give any

24 information that I know is against the law

25 from what the Ethics Board has told me that I

1  could not share.

2          Now, for purpose of this deposition

3  and for putting facts out there about other

4  investigations and agenda items, I provided

5  that information to you.  But when asked about

6  the details of that, I am going to follow the

7  law and, I will always do that.

8          MR. MOST:

9              Okay.  Anything else,

10         Ms. Spears?

11         MR. SPEARS:

12             Nothing else.  We waive reading

13         and signing as to all three

14         deponents.

15         MR. MOST:

16             Thank you very much for your

17         time, Parish President.

18      (AT THIS TIME, 4:44 P.M., TESTIMONY WAS

19  CONCLUDED AND THE RECORD WAS CLOSED.)

20                  *   *   *

21

22

23

24

25

1              C E R T I F I C A T E

2

3           I, CECILIA M. MENESSES, Certified
   Court Reporter, in and for the State of
4  Louisiana, as the officer before whom this
   testimony was taken, do hereby certify that
5  JACLYN SUZANNE HOTARD, after having been duly
   sworn by me upon authority of R.S. 37:2554,
6  did testify as hereinbefore set forth in the
   foregoing 103 pages; that this testimony was
7  reported by me in the stenotype reporting
   method, was prepared and transcribed by me or
8  under my personal direction and supervision,
   and is a true and correct transcript to the
9  best of my ability and understanding; that the
   transcript has been prepared in compliance
10 with transcript format guidelines required by
   statute or by rules of the board, that I have
11 acted in compliance with the prohibition on
   contractual relationships, as defined by
12 Louisiana Code of Civil Procedure Article 1434
   and in rules and advisory opinions of the
13 board; that I am not related to counsel or to
   the parties herein, nor am I otherwise
14 interested in the outcome of this matter.

15

16       Dated this 16th day of August, 2024

17

18

19

20

21       CECILIA M. MENESSES, CCR
         CCR #84099
         STATE OF LOUISIANA
22

23

24

25

**A**

**ability** 59:22,24
  104:9
**able** 14:1 22:23
  25:9 36:13
  37:17 38:4
  50:13 61:4
  80:23 90:25
**ABOVE-ENTI...**
  5:3
**absolutely** 61:11
**Acardo** 33:13
**Accardo** 41:20
**access** 50:13
**acted** 104:11
**action** 1:4 29:16
  29:23,24 38:21
  40:23 41:22,25
  42:9
**actual** 54:11
**addition** 91:7
**address** 54:16
**adjourned** 80:18
**administering**
  4:19
**administration**
  14:18 21:25
**administrations**
  22:1
**Administrator**
  61:21
**adopted** 14:14
  16:10 17:6,8,18
  17:23 33:2 89:7
**adoption** 89:12
**advance** 86:8
**advertised** 17:19
  57:4 59:12
  89:16
**advice** 44:19
  56:23 57:1,10
  65:23 83:10
  86:9,20,23,24
  87:1 91:8
**advise** 56:10,12
  90:20
**advised** 15:1 63:2
  69:15 90:5,24
  91:5,5,23 92:24

102:6
**advisement** 14:10
**adviser** 86:5
**advisory** 104:12
**advocated** 44:1
**agenda** 11:19,21
  11:22,22 13:19
  13:20,21 14:23
  14:24 15:3,8,9
  15:10,13,23
  16:4 17:17,18
  17:21 18:2
  19:20,24 20:6,7
  20:10,11,18
  21:1 22:11,20
  22:23 52:18
  53:8,18,21,25
  54:4,5,7,8,9,10
  54:11,21 55:16
  55:24,25 56:19
  56:21 57:5,6
  58:2,16 59:12
  59:13,14 60:3,4
  60:5,15 78:2,7
  78:10,13,17,19
  78:25 79:15
  84:5,7,7,11,24
  85:4,9 89:16
  95:18 102:12
  103:4
**agendas** 13:16
  14:25 17:25
**ago** 6:8,9 25:19
  34:9 73:16
**agree** 7:9 11:10
  12:4 49:2 67:18
  74:15 75:21
  79:13 85:9
**agreed** 4:3 10:12
  10:13 17:7,8,16
  22:22 30:14
  50:8 58:23
  67:13 72:11,14
  72:15,19 73:1
  75:1 76:17,18
  79:12 84:18
  85:7
**Airline** 1:19
**allegation** 25:17

26:10 40:9
**allegations** 46:18
  47:16,17,19,21
  47:24,25
**Allen** 61:21 62:16
**ALLIE** 2:8
**allow** 57:25 73:6
  89:18 96:13
**allowed** 14:3,4
  15:11 58:10
  60:10 65:8,8,9
  84:23
**allows** 16:22
**amend** 29:17
  38:7 41:25
**amendment** 33:3
**and/or** 4:12
**anonymous** 95:4
**answer** 4:13 7:10
  12:12 13:4
  23:24 73:6,7
  75:6,8,14 77:5
  96:13,15
  102:18
**answering**
  102:21
**answers** 6:15,21
**anybody** 40:16
  58:8 82:7,22,25
**anyplace** 17:5
**anyway** 81:15
**apart** 90:1
**APPEARANC...**
  2:1
**appearing** 58:13
**appears** 49:23
**applicant** 42:14
**application** 25:23
  26:12,16 29:4,7
  29:21 31:6
  33:14 39:3,23
  40:17 41:18,19
  42:15 44:7,12
  54:3 99:22
  100:15
**applied** 63:6,6
**appreciate** 83:22
**approach** 45:11
**approve** 17:25

**approved** 17:24
**April** 34:17
**area** 27:18 29:1
  32:22 36:5 37:8
  40:3 43:23
  44:17 45:6,9,10
  45:17 48:18
**arrangement**
  87:9
**arrest** 76:21
**arrested** 85:11
**Article** 104:12
**Aside** 7:19
**asked** 12:7 16:14
  29:22 40:8 41:6
  41:13,17 43:1
  43:11 46:4 53:3
  53:5 57:21 58:4
  59:10,11,17
  60:9,13 75:15
  76:24 77:1,8
  78:3 79:11,14
  80:21 81:2,7,11
  81:16 82:12
  84:1 87:22
  101:7 102:20
  102:23 103:5
**asking** 57:16
  58:20 74:8
  79:24 81:4,5
  82:6 83:12,18
  86:22
**asks** 12:25
**assessor** 44:24
**assessor's** 44:23
**assistant** 68:23
**Associated** 51:3
**ASSOCIATES**
  2:2
**At-large** 9:17
**attached** 69:1,14
**attachment**
  69:22 71:8
**attempt** 99:15
**attempted** 52:20
  53:6
**attempting** 55:17
  55:20 99:13
**attended** 43:9

54:15
**attention** 6:20
**attorney** 5:8 9:6
  9:8 56:12,14
  60:7 68:22
  72:12 73:20
  82:8,18
**attorney's** 13:17
  14:11 15:1 31:8
  42:10 56:23,25
  57:10 77:17,24
  78:23 86:4
  92:25
**attorneys** 29:21
  33:8,10,11
  38:16 57:2
**audience** 54:16
**Auditor** 15:14
  16:22 81:25
  82:2
**Auditor's** 13:13
  15:12
**August** 1:17
  104:16
**authority** 42:1
  59:2,3 86:6
  104:5
**authorized** 38:5
  38:6
**authorizes** 38:2
**authorizing** 33:3
**Avenue** 2:3
**avoid** 60:22
**aware** 19:4,7,15
  27:21,25 36:3
  43:20 50:15
  51:20 57:3
  64:11

**B**

**B** 3:6
**back** 30:21,25
  35:2 37:10 55:6
  58:15 62:17
  72:7 77:13,20
  77:22,25 79:1,5
  79:21 86:15
  93:7,9,12
**bad** 74:3
**ball** 34:22

**ballpark** 7:17
**banner** 1:4 2:14
    17:12 18:4
    19:12,16 24:11
    24:18 28:24
    31:3,23 39:18
    42:18 47:15
    48:2 52:7 53:22
    54:2,14,24,25
    55:4 56:8,24
    57:23 61:8,8
    64:12,25 65:13
    65:25 66:12
    67:9 70:2,19
    76:1,16 79:25
    80:22 81:6 82:7
    82:11 90:1 91:3
    96:23 97:6
    98:21
**Banner's** 8:2,9
    21:2 22:17,21
    23:5 24:1 25:12
    46:18 47:8
    56:13 57:11,22
    84:2
**Baptist** 1:11,18
    10:10,11 12:9
    16:8 18:7 19:10
    21:10 59:2
    83:25 86:5
    100:25
**barge** 50:16
**barges** 51:8
**baring** 88:10
**based** 29:23
    90:12 98:22
**began** 41:10 43:3
**beginning** 14:24
    20:6
**belief** 90:17,23
**believe** 6:5 11:18
    13:14,18 15:18
    16:11 17:8
    18:16,16 19:18
    30:9,12 35:12
    35:21 37:1,6,19
    39:2,7 45:22
    53:8 55:20
    56:15,17,19

63:10 64:1,1,15
    66:22 73:20
    78:8 80:8 81:22
    93:7,8 98:16
    100:11 102:22
**believed** 63:5
**belonged** 25:24
    26:13 29:4,19
    99:23
**belonging** 31:10
    32:3 39:4
**belongs** 39:24
    40:8 100:15
**best** 104:9
**better** 25:10
    40:16
**biennial** 72:25
    74:13,17 75:12
**big** 49:10 64:9
**Bill** 102:19
**billions** 50:3
**birthday** 16:25
**bit** 58:10
**blue** 45:2
**board** 25:8 26:4
    26:7 55:19
    61:19,24 62:3
    63:2,25 64:5,12
    64:20 65:3,5,15
    65:19 66:20,23
    70:14,25 71:12
    72:20 73:2,15
    73:21 74:6
    76:11 85:16
    90:6,13,19,22
    90:24 91:6 92:5
    94:2,12,22 95:6
    95:9,10 96:24
    97:1,18 98:10
    100:19 101:1,7
    101:13,23
    102:6,8,25
    104:10,13
**Board's** 97:10
**bodies** 15:22
**body** 14:2,5
    16:18 60:6
**books** 31:5 72:14
**borderline** 48:4

**born** 27:14
**bought** 30:5,7
    34:24 35:13,14
    35:17,25 37:2
**break** 6:25 7:2,3
**breaking** 17:15
    84:22
**bridge** 45:11
**BRIEF** 85:24
**bring** 77:20
**brought** 7:12
    53:1 55:6
**buffer** 30:10
**burden** 15:25
**business** 7:4 16:2
    17:1,2,3,4
    26:25 27:5,10
    27:13,15 28:12
    28:23 34:2,10
    51:10,10,17,18
    52:5 87:17
**businesses** 27:3
    51:5,22 52:1
**buy** 35:6

## C

**C** 104:1,1
**call** 31:13,20 80:4
    80:17
**called** 11:8 26:23
    27:10 30:12
    48:9,10,11,15
    62:7 80:8
**calling** 43:6
**calls** 41:11,16
    43:4
**campaign** 87:24
    88:1,4
**capacities** 1:8,10
    18:20 19:6
**capacity** 18:15,21
    19:11
**carrying** 40:22
**case** 5:9 6:10
    7:10 26:6,8
    30:8 37:24
    60:23 78:14
    79:14 80:9
    81:12,21
**cases** 5:24

**casting** 60:6
**cautioned** 70:14
**CCR** 104:20,21
**Cecilia** 2:18 4:17
    104:3,20
**cede** 89:19
**cell** 81:20
**cellphone** 81:17
**certain** 47:22
**certainly** 46:13
**certification** 4:9
**Certified** 2:18
    4:17 104:3
**certify** 104:4
**chain** 68:16
**Chair** 77:1,4,9
    78:7 89:1 92:11
    93:3
**chairing** 77:16
**chairman** 53:3,9
    53:11 56:4,5
    57:11,17,21
    58:3,20,21
    59:25 68:24
    69:1 77:15,15
    77:18,25 78:1,4
    78:9,15,17,24
    79:4,12,24 80:9
    80:21 81:2,7
    82:6,12,13 84:1
**Chairman's**
    16:12
**challenge** 37:4
**challenged** 30:11
**challenging**
    30:13
**chambers** 80:10
**charge** 20:14
**Charles** 2:3
**charter** 19:10
    20:13 59:1
**check** 46:18
**chief** 20:13 33:12
    42:14 69:10
**choice** 102:18
**choose** 96:25
**chose** 98:6,7
    102:10
**chosen** 18:23

**circulating** 44:21
**citizen** 57:7 84:8
**civil** 1:4 4:6 63:1
    104:12
**clarifying** 88:15
**classification**
    35:19
**clay** 6:2
**cleaning** 51:8
**clear** 73:17 84:7
    94:14 98:25
**clearing** 80:9
**client** 101:17
    102:7
**cloak** 90:6,15
**close** 83:23 85:23
**closed** 58:14
    103:19
**closely** 16:17
**code** 4:2,1 104:12
**cold** 59:7
**collectively** 17:23
    17:24
**come** 11:17 15:24
    16:16,24 18:24
    21:11,23,24
    34:23 42:3 55:4
    58:1
**comfortable** 5:18
**coming** 16:2,19
**comment** 10:5
    11:6,12,17 12:8
    13:1,9,16,19
    14:1,3,4,21,24
    15:2,7,10,13,15
    15:23 17:20
    18:1 41:3 52:8
    52:12,16,17,21
    56:6,13,15,17
    56:24 57:3,6,11
    57:17,22 58:4
    58:11,14,16,21
    59:20 60:1,2,10
    60:11,17 61:1,3
    77:2,10,20,20
    78:4,6,8,12,25
    79:12,16,17,24
    80:16,21 81:3,8
    82:6,12,13 84:2

84:6,23 89:13
92:18 96:9,18
**comments** 16:15
58:1 59:13
60:14 79:15
80:3
**committing**
38:11
**common** 11:10
11:13,14,24
12:2
**communicate**
47:6
**communicating**
66:13 67:11
**companies** 27:11
**company** 27:12
27:15 28:21
34:4 46:5,7
**complaining** 90:2
**complaint** 19:13
19:15 21:2
22:18,21 23:5
23:11,13,16,19
23:23 24:2,7,10
24:12,23 25:3
25:13,20 40:18
47:9 51:14,21
52:24 53:2
55:10,12,16,18
61:23 62:1,18
63:15 64:15
65:7,17 66:20
66:25 67:1
70:15 71:1
91:11,12,22
92:1 94:5,16,18
94:19,25 95:2,5
95:5,12,22 96:5
96:7,9,19,21
97:7,21 98:3,23
100:1,18,20
101:16,19,19
101:20 102:9
**complaints** 61:20
63:3 67:3,6
71:13 73:25
89:24 90:4
91:18 98:8

**complete** 6:21
26:22 33:17
**compliance** 104:9
104:11
**complies** 71:25
**comply** 79:19,20
85:1
**concerning** 93:19
94:9 96:1 98:14
99:5,9
**CONCLUDED**
103:19
**conduct** 17:3
87:2
**conducted** 58:18
**conducting** 16:1
**confidential**
62:21 63:12,13
63:16 64:16,20
70:17,18 90:25
94:21,25 95:21
100:21 102:5
**confidentiality**
90:7,15
**confirming**
100:20
**confuse** 78:18
**confusing** 7:8
**confusion** 32:12
**conjunction** 65:6
**CONLAY** 2:8
**connect** 52:3
**consequences**
66:3
**consider** 20:23
**consideration**
20:25 58:7,8
59:9,15,17,19
**considering**
91:16 92:2
**consisted** 59:3
**construct** 38:4
**consult** 48:22
**consultant** 87:15
87:22
**contact** 69:20
**contain** 17:25
**content** 57:22
**contentious** 11:7

80:19
**contents** 55:9
**continue** 73:12
**continued** 54:21
66:14
**contractual**
104:11
**contradiction**
57:25
**conversation**
28:8,8,11 31:13
38:16 40:12
46:16,19,25
69:4,7,8,10
**conversations**
30:4 46:21,25
68:25 94:12
**cooling** 80:12
**copied** 68:13
**copies** 25:4
**copy** 12:19 32:9
57:5 63:14,15
64:14,16,18
69:1,14 71:2
100:19
**correct** 9:13,16
9:19,25 10:3,7
10:17,23 13:3
18:10 19:13,22
20:4,20,21,23
21:3 24:21
26:17,18,20,21
26:24 29:8,12
44:2,11 45:3,25
46:15 47:11,12
51:15,16,23
52:4,10,13 53:4
53:17,18,19
54:1 55:11,14
55:15 56:6,7,9
57:12,18,19,23
58:5 60:1 61:5
61:6 65:15 70:7
79:25 84:3 85:4
86:13 87:20
88:23,24 89:2,3
89:21 90:2,3,11
90:15,16 91:8,9
91:13,14 92:4

93:3 97:7,8,11
104:8
**correcting** 39:16
**correspondence**
90:8
**cost** 50:12
**council** 7:21,22
9:12,15,17 10:5
10:9,11,15,19
10:21 11:4,5,9
12:9,13 13:24
14:14,17 15:3
15:25 16:1 17:2
17:18 18:24
19:9 20:23
21:10,17,20
22:6,9,13 24:18
25:18,19 29:16
30:19,24 31:2,7
33:2 38:2,10,21
39:3,5,10,15,17
39:22 41:16,23
41:24 42:8 43:5
54:14 55:3,19
56:1,2 57:2
58:20 59:4,16
60:1 62:2,19
65:7,18 69:18
70:10,16 73:15
77:1,4,9 79:7
79:11,22 80:15
80:24 81:1,5
83:25 88:23
89:2,4,10,12,18
91:24 92:12
93:2 97:3 99:1
99:14 100:10
100:24 101:6
101:24 102:16
**Council's** 29:24
30:17 31:25
40:23
**Councilman**
15:18 68:11
**Councilmen** 69:9
**counsel** 4:4 19:21
20:3 21:6 22:24
44:20 91:7
104:13

**counting** 85:17
**couple** 24:8,14
51:15 52:2 64:9
68:20 88:15
92:5,14
**course** 58:14
75:18 76:14
**court** 1:1 2:18
4:17 5:2 37:24
104:3
**courtroom** 6:17
**criminal** 62:24
63:1 85:14,17
92:17 93:1
**critical** 18:10,11
18:12,25
**cross** 50:7
**crosses** 50:2
**crystal** 34:22
**current** 23:22
98:11
**currently** 98:9
**curtail** 16:22
**curtailed** 59:11
**custom** 17:15

**D**

**D** 3:6
**Darla** 26:19,22
28:4,25 33:17
33:22 34:7 46:2
51:22,25 54:3,8
55:8
**date** 40:15,17,20
40:21 41:18,19
41:19
**Dated** 104:16
**daughter-in-law**
34:8,16
**David** 87:12,15
87:18,25
**day** 29:21 32:7
32:17 33:13
38:17 47:6 48:9
104:16
**day-to-day** 20:14
**days** 33:23
**dealing** 23:15
**decide** 62:6,8
67:17

**decided** 47:10
  66:21
**deciding** 63:4
**decision-making**
  37:18 39:1
**declaring** 74:20
**decorum** 16:13
**decrease** 49:20
**DEFENDANTS**
  2:11
**defending** 23:11
**defined** 104:11
**delve** 96:16
**demonstrated**
  31:2
**department** 33:9
  40:24 41:7 47:4
**depo** 7:25
**deponents**
  103:14
**deposition** 1:16
  4:4,14 5:20 6:5
  7:13,15,17 8:2
  8:9,16,20 9:9
  88:11 103:2
**depositions** 10:1
  10:8
**depth** 36:14,24
**Descendants**
  52:18
**describing** 70:1
**designated** 63:21
**designates** 20:13
**desk** 70:9
**destroyed** 9:7
**details** 83:15
  103:6
**determine** 48:19
  95:15
**developer** 49:15
**development**
  35:8
**difference** 79:14
**different** 12:6
  14:25 52:6
  59:15 75:16,19
  76:13 96:20
  101:21
**differently** 75:25

76:4,8
**diligence** 95:15
**directed** 77:1
**direction** 31:7,8
  39:3 104:8
**directive** 39:10
**directly** 14:9 61:8
**Director** 32:10
  38:20 42:7,11
  43:2
**directors** 38:15
**disagree** 49:5
**disclose** 83:3,5,19
  90:9,21 91:21
**disclosed** 101:9
**discovery** 12:7,18
  76:22,23
**discuss** 14:7 26:3
  54:17 55:17
  61:20,22,25
  62:10 63:3 64:8
  65:9,10,11,17
  67:4 70:15
  73:19 90:20
  101:13
**discussed** 40:22
  40:25 55:25
  91:1 101:10
**discussing** 66:8
  66:10
**discussion** 53:10
  56:18 59:11
  66:19 69:18
  80:7
**discussions** 56:3
**disregard** 102:10
**disregarded**
  100:22
**District** 1:1,2
  9:14 13:17
  14:11 15:1 31:8
  42:10 68:22
  77:17,24 78:23
  86:4 92:25
**dock** 50:17
**document** 8:6,8
  13:14 15:21
  17:20 18:1
  51:13,25 64:10

64:19 71:17
**documents** 7:12
  7:24 8:10 68:5
  72:21 73:23
  74:2 81:12,15
  81:20
**doing** 5:9,10,11
  55:21
**dollars** 39:13
  50:4
**donate** 89:19
**Dr** 25:12 47:3,15
  48:2 54:2,14
  57:22,23 84:2
**due** 95:14
**duly** 5:3 104:5

**E**

**E** 3:6,6 104:1,1
**early** 80:18
**east** 45:11
**EASTERN** 1:2
**economic** 49:1
**Edgard** 32:17
  43:9
**effect** 53:13,24
**effectuating**
  41:22
**eight** 9:15
**either** 63:11
  80:17
**elected** 9:20
  20:14 33:23
  42:14
**election** 44:9
**elevator** 27:19
  28:2,5 29:1
  37:4 38:5
**else's** 58:8
**email** 2:5,10 47:2
  62:12,15 68:13
  68:16 69:23
  70:21 71:4 86:7
  86:12
**emailed** 62:16
  67:22,24 68:12
  82:25
**emails** 68:19
**employee** 94:3
  97:19

**encourage** 58:16
**engage** 54:5
**engaged** 22:1,13
**ensure** 43:2
**entire** 50:2 71:17
  84:4
**entirety** 8:3 24:8
  93:23
**especially** 73:24
**ESQ** 2:2,7,8
**essentially** 66:2
**establish** 13:23
  53:4
**established** 15:3
  15:4 83:24
**estate** 49:14
**ethic** 21:2
**ethics** 19:13,15
  21:7,7,12,19
  22:3,5,9,11,17
  22:21,24,25
  23:5,11,15,22
  24:1,11,22 25:8
  25:12,20 26:3,7
  40:18 47:8
  51:13,20 52:14
  52:24 53:2 54:6
  55:10,12,16,17
  55:18 61:19,20
  61:21,23,24
  62:1,3 63:2,3
  63:25 64:5,11
  64:20 65:3,5,7
  65:15,17,19
  66:20,20,23,24
  67:1,3,6 70:14
  70:15,25 71:12
  72:20 73:2,15
  73:21 74:6
  76:11 85:16
  89:24 90:6,10
  90:13,19,22,24
  91:7,12,17 92:1
  92:5 94:2,12,19
  94:22 95:6,8,10
  96:19,24 97:1
  97:10,18 98:10
  100:19 101:1,4
  101:7,12,22

102:6,8,25
**Everybody** 75:18
  83:8
**evidence** 4:15
**exact** 11:22 71:12
**exactly** 28:18
  32:8 47:23 51:2
  55:21
**EXAMINATI...**
  3:1 5:5 88:17
  92:9
**example** 13:25
  18:14 81:17
**excerpts** 8:1,4
**executive** 14:6
  52:17,19,21
  53:7,10 94:2
  95:20 97:19
**Exhibit** 3:8,8,9,9
  3:10 12:20
  19:23 44:21
  48:24 63:22
  67:21 68:15
  93:5
**exhibits** 24:25
  25:2,4,8
**existence** 90:9
**exists** 102:15
**expect** 58:21 59:9
  59:10
**expected** 58:3,6
**expensive** 35:5
**expert** 21:13
**explain** 94:23
**explained** 66:23
  94:22,24 95:10
**expressed** 91:2
**extremely** 50:6
  50:10

**F**

**F** 104:1
**face** 54:22
**Facebook** 47:19
  64:15,19 95:7
  96:22 99:2
  100:3,5,7,9
**fact** 17:18 38:13
  43:7 47:18 53:8
  72:16 74:11

92:4 95:18
**facts** 95:16 98:18
   98:18 103:3
**factual** 95:9
**factually** 86:13
**failing** 38:13
**Fair** 73:11
**fall** 22:3
**false** 25:13,25
   26:1,2,9,10,14
   29:2,10,15 31:4
   31:24 39:25
**familiar** 27:4,10
   27:16,18 34:13
   43:24 46:4,6
   48:7 66:17
   70:13 71:18
   72:1 74:21 87:4
   89:23 101:8
**family** 28:22 51:9
   51:10,17,18
**far** 47:13
**father** 27:14
**fatigue** 6:22
**federal** 4:6 76:7
   76:10
**feel** 6:6
**figure** 40:2 42:22
**file** 19:7 66:8,24
   95:12
**filed** 19:12,14
   24:11 28:7
   30:11 71:2
   89:25 100:18
**filing** 4:8 67:3
   73:25
**financial** 49:13
**financially** 49:17
**find** 81:20
**fine** 7:5 93:25
   97:16
**firm** 54:6
**first** 5:2 24:8,14
   41:23 52:16,20
   61:9 64:25
   65:13,25 67:7
   71:20 88:19
**five** 71:20,24
**five-minute** 80:7

**flag** 72:18,25
   74:13
**flare** 80:4
**Fleeting** 27:11,17
   28:15 46:7
   50:15,21
**folks** 19:1
**follow** 38:10
   84:14,19 96:25
   101:11,12
   103:6
**followed** 13:11
   14:12,13 98:7,9
**FOLLOWS** 5:4
**force** 6:16
**foregoing** 104:6
**foreseen** 35:2
**form** 4:12 17:22
   75:3
**formal** 66:21
   95:17,19
**formalities** 4:8
**formally** 16:10
**format** 104:10
**Formosa** 30:12
   34:21 37:1
**forth** 104:6
**forum** 54:23
**forward** 31:1
   63:5 95:17
**found** 44:14
**four** 33:23
**frivolously** 67:3
**front** 12:20 13:20
   15:2 67:21,22
   72:8 93:5
**full** 5:12 6:20
**fully** 96:13
**further** 92:8
   96:16
**future** 44:18
   86:24 87:2

─────────────
**G**

**Gaudet** 26:20,22
   28:25 33:17,23
   46:2 54:8 55:8
**Gaudet's** 51:22
   52:1 54:3
**Gaumet** 26:23

27:1,8,21,25
   28:4,15 45:24
   46:3,6 48:18
**general** 8:17
   38:22 51:1,6
**General's** 60:7
**getting** 11:5
   41:11,15 83:15
   83:23 87:1
**give** 5:11 9:6
   15:21 52:8
   59:15,18 63:21
   72:2,3 93:9,18
   94:8 95:25 99:4
   99:8,16,24
   102:22,23
**given** 5:20 13:17
   15:6 75:13 91:4
   95:15 101:15
**gives** 42:1
**giving** 6:20 38:8
   77:19 101:3
**go** 10:22 36:4,16
   36:21 37:10
   41:22 62:17
   77:13,21 95:5,7
   96:22
**goes** 27:22 28:1
   45:4,5 49:6
   95:18,19
**going** 14:2,5,17
   19:23 22:16
   26:5 32:23
   34:14,23 36:11
   38:9 48:3,17
   49:20,22 53:13
   56:5 58:13 62:6
   62:8 67:4 68:8
   68:10 73:5
   76:19 83:4,9,21
   96:11,12 100:7
   103:6
**good** 5:10 73:23
**gotten** 55:5 67:6
   80:18 91:8
**governing** 15:22
   59:1,3 86:6
**Government**
   1:19 88:22

**grain** 27:19 28:1
   28:5 29:1 37:3
   38:5
**grant** 44:7,12
**Gray** 20:3 21:5
   21:17 55:14
   91:16 92:3
**Green** 33:12
   41:20 56:14,19
   56:22 67:22
   68:19 69:5,10
   86:2 87:2
**Green's** 70:21
   71:4 86:20
**Greenfield** 27:19
   28:1,5,25 29:18
   29:20,25 30:5
   30:16,20,24
   31:1,10,13,15
   31:17,17,20
   32:2 33:1,6
   35:5 36:5,11,12
   36:16,19,21,22
   37:2,11,16 38:4
   38:25 39:5,11
   39:11,21 40:8
   41:8 42:21
   43:15,21,23
   44:1,5,11,17
   45:6,9,10,15,17
   46:23 48:18
   49:2,8,19,25
   50:2,6 54:7
   55:8 87:8,10,16
   87:19,21
**Greenfield's** 30:8
   38:3 87:17
**guaranteed** 39:14
**guess** 8:21 63:16
   66:7
**guidance** 13:15
   13:16,18 15:11
   15:22 23:2
   41:21 60:7
**guidances** 13:12
**guide** 79:4
**guided** 90:13
**guidelines** 104:10

─────────────
**H**

**H** 3:6
**hailed** 34:25
**happen** 77:21,22
**happened** 21:16
   30:5 38:18
**happens** 11:16
   16:21 50:25
   77:14
**harassment** 48:4
**heads** 47:4
**hear** 11:25 74:5,5
   81:24
**heard** 10:4,22
   11:6,8 27:1,8
   42:18 46:5
   68:11 82:1
**hearing** 32:7 43:9
   93:18,20 94:7
   94:10 96:2
   97:11,23 98:15
   99:10
**hearings** 72:3
**held** 66:22
**hereinbefore**
   104:6
**hesitate** 69:20
**hey** 80:6
**high** 80:13
**highlighted** 45:2
   71:10
**Highway** 1:19
   45:11
**hire** 22:9 55:13
**hired** 23:8 88:4
**hiring** 19:20 20:2
   22:12 88:6 92:2
**hold** 93:10
**Holdings** 26:23
   27:2,8,21,25
   28:15 45:24
   46:3,6 48:18
**holds** 49:12
**Home** 19:10
**honestly** 6:11
   38:17
**hostile** 80:3
**Hotard** 1:9,17
   4:5 5:1,13,15
   5:16,17,19 7:7

9:11 20:5 81:11
85:10 86:2
104:5
**hours** 16:24,24
**human** 75:18
**hundreds** 10:19
**hundredths** 50:3
**husband** 46:8
50:24

**I**

**I-3** 30:9 39:6,6
**IDAHO** 5:1
**idea** 34:11 46:1
50:25
**identified** 68:14
**identify** 76:24
**ignored** 63:17
**IKE** 2:7
ike@spearslaw...
2:10
**illegal** 90:14
91:23
**illness** 6:22
**impact** 49:18
**impacted** 30:22
**imprisoned** 66:15
66:16,18
**imprisonment**
66:6 82:14
93:25 97:17
**improper** 90:14
91:23
**improperly** 73:8
**incident** 82:5,8,9
82:11,15,18,23
83:1
**include** 73:22
**included** 32:25
72:17,24 74:12
88:22,25
**including** 66:6
102:7
**incorrect** 33:20
**increase** 49:22
**independent**
97:24
**INDEX** 3:1
**indicated** 91:10
**indicating** 12:19

71:11 90:8
**individual** 1:8,9
18:19,21 19:5
42:3
**individuals** 15:7
16:16 67:2
77:16 95:12
**industrial** 32:20
39:14
**information** 14:9
72:4 73:14
93:19 94:8
95:25 97:2 99:5
99:6,8,16,24
100:2,3,4 101:3
101:11 102:4
102:10,11,22
102:24 103:5
**informed** 54:12
78:11
**initiated** 42:2
**insignificant**
49:24
**instance** 58:11
**instances** 16:14
16:15 55:2
**instruct** 38:6
77:18
**instructed** 11:20
61:25 78:9
94:11
**instructions** 38:8
**intent** 84:6,9
**intention** 30:18
32:1
**interest** 49:1,13
**interested** 30:25
104:14
**interrupt** 73:11
**intervene** 77:4
**intervenes** 77:18
**intimately** 27:4
**intimidation** 48:5
**introduce** 20:24
**introduced** 20:10
21:1,4
**introducing**
20:22
**invalidate** 34:24

**invalidated** 37:5
37:7
**investigate** 74:1
**investigated**
99:11
**investigation**
26:7 66:21 67:5
70:9 85:14,17
90:10 92:6
93:18,20 94:5,6
94:9,16,21 95:8
95:14,17 96:1
96:24 97:10,21
97:23 98:3,14
98:20,22 99:6,9
99:17,21,25
100:14,17,25
101:4,6,14,16
101:24 102:14
**investigations**
90:21 103:4
**investor** 35:6
**investors** 35:4
**invite** 54:16
**involved** 27:6
28:11 29:10
30:3 34:5,11
38:14 39:1,19
41:8 47:14 51:9
**involvement**
41:24
**involving** 21:12
22:6 65:17
70:16 82:5 90:1
**issue** 21:19 88:12
**issued** 101:23
102:17
**issues** 21:7,11
22:15 52:15
54:18
**item** 11:21,22,22
14:5,7 15:23
19:20 20:2,2,6
20:10,18 21:1,4
22:11,14,20,23
52:25 53:7,11
53:18,21 54:2,5
54:12 55:16,23
59:12 69:19

78:1,7,10,13,18
78:20,20,25
79:15
**items** 13:21 14:1
14:3 15:9,10,13
17:22 18:2 20:7
20:11,16,16,17
20:17,25 52:22
54:4,9 55:24
56:18,20 57:6
58:1,17 59:14
60:4,5,8,14
73:18,19 78:19
84:8,24 85:3
95:18 103:4

**J**

**J** 20:2 52:25
53:18 69:19
**Jackie** 68:11
**Jaclyn** 1:9,16 4:4
5:1,17 20:5
104:5
**jail** 48:3 76:19
**January** 9:23
**Jaqueline** 5:13
**Jo** 48:13 54:25
55:1
**job** 16:12
**John** 1:10,18
10:10,11 12:9
16:8 18:6 19:9
21:9 27:11,17
28:14 42:13
46:7 50:15 59:2
83:25 86:5
100:24
**joked** 50:24
**Joy** 1:4 2:14
17:12 18:4
22:17 28:24
39:18 40:10,16
41:2,9 48:13,13
52:4 53:5,9
54:24 55:1,4,17
56:8,13,16,24
57:3,5,11 58:12
60:3 63:6,14
64:6,12 70:19
70:25 75:25

76:18 78:9,13
79:14,24 80:22
81:6 82:7,11
90:1 94:24 96:2
96:23 97:6 98:2
98:21 99:13
**judge** 6:17 30:13
34:23 35:14
37:5 76:7,10
**jumped** 53:20
**jurisdiction**
55:18 67:16
**jury** 6:17

**K**

**K** 3:8 12:20
**Kathleen** 61:20
62:16
**keep** 9:2 16:12,13
60:2,13 66:3
78:12 79:15
88:11
**Keith** 41:20
56:14,19 67:22
68:12,19 69:4
86:2
**kept** 67:11
**kind** 5:24 8:5
20:13 50:17
78:21
**knew** 29:1 31:3
37:16 47:15
55:21 75:23
100:17
**know** 6:25 8:21
11:7,8,18,21
13:8 14:18,20
14:23 15:9,20
15:23,24 16:14
16:24 17:5 18:4
18:8,24,25
21:13,14,23
23:18 25:2,11
25:15 26:1
28:12,14,17,18
29:9,13,14,24
30:4,9,14 33:4
33:7 34:1,6,12
34:22 35:9
36:10,15,17,18

37:12,19 40:21
43:12 44:25
45:18 46:11,12
46:13 47:22,23
48:4 49:12,18
49:22 50:18,21
50:23,24 51:2,2
51:2,3,4,7,12
51:16 53:10
58:9,25 62:7,18
62:25 63:7 64:7
66:7,16 68:6,6
68:7,8 69:11
71:14,16 73:24
74:6 75:24 76:2
76:3,12,20 78:6
78:16 79:17
80:3,13,25
81:13 82:21
87:18,22 91:17
92:13,19 94:24
102:24
**knowingly** 66:8
**knowledge** 17:14
35:18 38:18
43:10 85:15,18
**known** 34:7
**knows** 31:23,23
55:24 75:16,18

**L**

**L** 4:1 71:10
**L-1** 93:13
**Lambeth** 41:21
46:17 47:4
**land** 32:14 33:5
33:16,21 34:2
35:7,10 36:20
40:6 50:12
**Landeche** 10:2
12:1
**language** 98:17
**Laplace** 1:20 5:2
**Large** 88:23
**law** 4:7 13:25
15:20 21:5 22:9
54:6 61:9,12,13
61:16,18,22
62:10,23 63:3,6
63:8,12,18,22

64:3,7 65:1,2
65:11,14 66:1,9
66:12,17,19
67:10 69:14,25
70:1,3,7,20,21
70:23,24 71:4
71:15 73:17,22
73:24 74:3,23
75:1 76:12,16
76:17 91:3,4
93:6 94:14
95:11 97:1
98:10,11
100:22 101:9
101:12 102:5
102:24 103:7
**laws** 14:8 21:7
72:13 74:20
**lawsuit** 6:2,3,6,11
18:17,19 19:5,8
28:7 30:10,15
32:7,8 52:17
66:8
**lawsuits** 5:25,25
**lawyer** 7:19
65:19 86:3
**lawyers** 40:13
**learn** 37:21
**learned** 40:9 76:6
**lease** 31:16,18
**legal** 17:20 41:21
48:22 54:5
65:22 66:3 86:5
**Legislative** 13:13
15:12,14 16:22
81:25 82:2
**Let's** 8:18 14:6
40:14 52:6
85:21
**letter** 44:6,10
**letters** 35:17 44:4
**level** 69:18
**liability** 39:16
**liberty** 38:9
**lie** 41:5
**lies** 41:10,14
100:6,8
**limited** 15:10
18:2,3 56:18

57:6 88:12
89:13
**limits** 69:17
**line** 60:2
**lines** 32:16 71:21
71:24
**listed** 33:1 52:19
**listen** 60:19,21,24
**listening** 60:22
**litigation** 81:14
**little** 32:15 35:6
49:24 58:10
**live** 95:7 96:22
99:2,3 100:7
**lives** 18:8 47:20
100:3,5,9
**LLA** 60:8
**LLC** 26:23,23
27:2,8,22,25
28:15 33:16,22
37:14 38:23
44:14 45:24
46:3,10 48:18
**located** 28:13,16
**locked** 50:12
**lodged** 95:3
**long** 6:8 7:16
11:3 27:16
32:15 34:7 36:4
36:9,15,18
37:14,24 38:23
43:22 44:16
45:1,5,20 47:7
64:1,10 92:11
**longer** 12:6
**look** 7:24 8:4,10
12:17 23:8
24:25 32:4,16
44:23 45:8,13
67:1,5 68:4
71:20 74:25
77:22 93:11
**looked** 8:1 32:6,9
32:14,18 36:8
50:19 63:24
64:3 65:3 70:5
70:12 81:19
**looking** 35:6
48:24 49:9

86:12 93:12
**looks** 32:15 49:11
49:15
**lot** 11:8,9 32:13
32:19 41:6
**loud** 92:17 93:2
**Louisiana** 1:2,20
2:4,9 4:18 5:2
13:13 69:1
81:25 90:6,19
91:6 104:4,12
104:21

**M**

**M** 2:18 4:17
104:3,20
**Ma'am** 72:22
73:3
**Madam** 68:24
88:19
**Madere** 77:15
**main** 27:12
**maintain** 77:5
**maintained** 13:1
13:9
**making** 47:18,21
47:24 82:11
96:3,4,9,18
98:4,13 99:1,3
**malfeasance**
38:11
**managed** 33:17
33:22 37:13
44:15 46:10
48:20
**manager** 46:2
**manages** 48:25
**mandamus** 38:14
**map** 29:17 32:12
32:14,16,18,22
33:3 35:20 36:8
38:7 41:25
44:24 48:16
**maps** 32:4,6,9
36:14
**marked** 45:16,18
70:17
**matter** 5:3 14:7
21:14 22:3
38:22 44:18

100:21 104:14
**matters** 22:24,25
54:6
**mean** 11:3,16
17:22 44:3 47:3
47:4,15 48:23
50:10 51:5,16
68:10 70:5
81:13,14 83:7
83:12 86:25
**means** 50:22
74:22 99:6
**media** 47:19
**medical** 83:11,16
**medication** 6:22
**meeting** 7:21,22
8:22,25 12:13
13:24 16:1,13
17:2,13 19:9,17
19:19,25 24:19
25:18,19 30:19
33:13 39:22
40:13,25 41:3
42:9,18 46:18
47:18 54:15,19
54:19,20 55:19
56:1 58:18 76:1
76:9 80:18,24
83:7,13,17 84:1
86:8 93:3 99:1
99:14 100:10
100:11,13
101:18
**meetings** 10:5,15
10:19,22 11:5,9
12:9 13:25 14:8
15:20 18:24
55:3,3 56:2
77:14,16 80:2,2
84:10 89:10
**member** 9:12,18
59:5,16,19,21
62:2,19 65:18
70:10,16 73:16
77:2,9 79:3,7
88:23 89:5,19
89:20 91:24
94:2 97:3,18
100:24 101:5

101:10,25
102:16
**member's** 65:7
**members** 11:4,11
  22:6 41:17 43:5
  57:2 59:4 80:15
  81:2,5 89:25
**memo** 47:1
**memorable** 92:22
**memory** 8:25
**Menesses** 2:18
  4:17 104:3,20
**messages** 47:2
  81:17,19
**met** 29:20 41:20
**method** 104:7
**Michael** 1:7
  68:20 69:5
**middle** 36:5
  37:15 38:24
  39:20 43:18,22
  45:6 49:7 50:5
**millions** 39:13
  50:3
**minutes** 7:18
  12:13 13:5,20
  14:22 15:6
  17:21,25 18:3
  25:19 57:7
  77:22 84:8
  85:21 89:13,20
**misdemeanor**
  93:24 97:15
**mistaken** 6:7
**mix** 40:15
**moment** 57:13,14
  81:9,10
**months** 44:9
  73:16
**mother-in-law**
  25:24 26:14,19
  27:5 29:5,11
  37:13 39:19,24
  40:2 42:19
  44:15 46:11
  47:14 48:21,23
  99:23 100:16
**mother-in-law's**
  29:14 38:23

43:17
**motion** 15:5
**move** 52:6 95:16
**moved** 52:22,23
  53:14
**moving** 31:1 63:4
**multi** 50:3
**multifamily** 35:7
**multiple** 22:15
  27:3 46:20
  49:16

**N**

**N** 3:6 4:1
**name** 5:7,12 20:7
  20:12,17,20
  27:9 46:7 53:21
  53:25 54:1
  101:15
**narrow** 32:13
**nature** 6:10
  25:20 87:20
  100:1 101:14
  101:20
**near** 26:16 39:9
  42:20
**necessary** 7:1
  77:3
**need** 12:16 50:7
  56:25 77:25
  78:25 93:10
**needed** 34:22
  54:11 57:8
  78:10 79:18
**needs** 76:12
**never** 50:19
  85:18 93:1
**new** 2:4,9 42:6
**newspaper** 47:20
**nine** 59:3
**nonvoting** 59:5
**note** 72:5,16,23
  74:8,11
**notes** 8:13,15,19
  8:24,25
**notice** 20:15 72:2
**notified** 48:12
**November** 7:22
  17:13 19:16,19
  24:20 40:13,19

41:3 42:17
46:17,24 47:17
52:7 55:7 68:16
68:19 75:17,23
76:1,9,25 77:8
82:10 83:24
86:8 100:11
**Number** 12:23
**numerous** 31:25

**O**

**O** 4:1
**oath** 4:19 6:13
**object** 73:5 75:3
  86:11 96:11
**objections** 4:11
**obtain** 50:10
**obtains** 50:11
**occurrence** 11:15
  12:2 18:22
**October** 9:21
  19:12
**off-the-wall** 11:1
**off-topic** 11:2
**offering** 23:2
**office** 9:23 13:13
  13:17 14:11
  15:1,12,19 21:5
  21:8,12,18,23
  22:1 28:17,18
  31:8 42:10 48:6
  60:7 77:18,24
  78:24 80:11
  86:4 92:25
**officer** 104:4
**offices** 1:18
**official** 1:8,10
  13:5 14:15
  18:20 19:6
  20:14 42:15
  74:19 89:7
**officiated** 4:19
**okay** 18:4 23:20
  45:7,12 49:6
  52:6 53:15
  58:19 59:18
  60:9 62:11
  64:21 67:18
  68:1 70:19 74:5
  74:10 75:15

82:15,16 86:17
96:4 103:9
**on-topic** 16:7,9
  16:11 17:6
**once** 51:13 80:17
  95:14 96:12
**ones** 6:4 10:25
**ongoing** 62:1
  90:21
**open** 13:25 14:8
  15:20 58:11
  88:11 99:1,3
**opened** 58:15
**operate** 14:18
**operations** 20:15
  34:10
**opinion** 75:9
**opinions** 104:12
**opponents** 49:19
**order** 13:11,23
  14:12 16:13
  53:4,5,9 59:6
  59:11,23 77:5
  78:15,17 89:7
**ordered** 38:12
**orders** 38:10
**Ordinance** 34:24
**organizations**
  19:1
**original** 30:17
**Orleans** 2:4,9
**outcome** 104:14
**outside** 48:6
**overly** 15:25
**overturned** 30:15
  35:15
**owned** 29:10
  33:16 37:14,22
  37:23 38:23
  40:2 42:19
  44:15 45:24
  46:10 48:18
  87:11
**owner** 26:23
  37:20 49:12
**owners** 30:7,22
  34:18,20,21
  35:13,22 42:3
**owning** 50:4

**owns** 27:22,25
  28:25 31:16,17
  33:4 36:17
  37:14 48:23
  50:1 87:13

**P**

**P** 4:1
**P.M** 103:18
**page** 3:2,7 12:23
  64:19 72:7,8
**pages** 47:19
  104:6
**paid** 87:25
**paper** 45:16
  81:25
**paperwork** 70:11
  102:8
**parcel** 35:11
**parish** 1:11,18
  5:25,25 6:11
  7:4 9:15,20
  10:5,9,11,11,15
  10:19,21 13:2,9
  15:15 16:7 17:6
  18:7,15 19:10
  21:10 33:24
  35:9 37:17
  39:13 42:5,13
  50:11 55:13,19
  57:18 58:19,20
  58:22 59:2,4,5
  59:25 60:12
  61:4 77:23 79:2
  79:23 83:25
  86:5 88:21,22
  89:2,4,5,6,23
  89:25 92:11
  93:2 100:13,24
  100:25 101:6
  101:24 103:17
**parliamentary**
  14:13,15 89:8
**part** 4:15 14:19
  18:17 22:21
  26:2,9,11 29:15
  30:14,23 51:12
  51:21 63:17
  72:5
**partial** 26:22

**participant** 27:5
**participate** 37:17
**participating**
10:15
**particular** 8:7
10:25 22:14
46:22 70:15
74:21 80:9,20
84:6,13,17
**particularly** 11:1
58:23,24
**parties** 16:25
104:13
**parts** 32:21
**party** 54:17
**pass** 19:23
**pause** 85:22
**pending** 91:12,18
92:1 98:9
**people** 10:22
15:24 16:24
48:1 50:11 67:2
68:21 73:24
**perform** 21:6
**period** 80:12 89:1
**permit** 89:18
**person** 18:9 20:9
30:3 77:19
89:14 91:21
94:3,4,14,15
95:2,3 97:20,20
98:2,16,19,20
98:23 99:11
**personal** 17:1,4
19:11 54:17
59:7 102:12
104:8
**personally** 19:2
81:7
**personnel** 14:7
**persons** 90:20
**perspective** 12:5
**phone** 2:4,10
81:20
**piece** 25:23 26:13
26:16 29:19
30:1,12,16,24
31:9 35:11 37:7
37:21 38:2 39:4

39:6,6,12 40:7
43:15 45:15
48:24 49:12,16
50:4 99:22
**pieces** 32:22,24
33:6 37:10 40:7
**pit** 6:2
**place** 95:1,11
**placed** 13:19 97:1
**places** 14:17
69:17
**plaintiff** 2:5 5:8
**Planing** 33:9
38:19
**Planning** 20:15
30:1 32:10 40:5
40:24 41:6,13
42:6,11,25 43:1
100:12
**play** 13:24
**please** 69:20
**plural** 33:10
**plus** 80:25 88:21
89:22 90:12
**podium** 48:2 52:8
55:5 76:20
77:19
**point** 11:22 15:4
22:13 23:18
25:4 28:10 53:5
53:9 56:15 59:6
59:6,10,22
78:15,16 80:24
90:24 94:20
**pointed** 75:17
**police** 48:8,11,15
**policy** 90:19
**popped** 22:10
**pops** 21:20 22:8
**Port** 29:20 31:10
31:11,15,16,18
**portion** 37:3
63:20 71:9,10
**possibly** 67:14
**posted** 64:14,18
**potential** 39:16
**potentially** 16:23
21:11 22:3 23:6
23:7 66:6 67:13

**Poydras** 2:8
**practice** 17:9
90:18
**prefer** 5:15
**preliminarily**
67:1
**preparation** 7:20
8:13,16,19
**prepare** 7:25
8:10 9:9
**prepared** 104:7,9
**preparing** 7:17
**PRESENT** 2:13
**preserve** 81:12
81:16
**preserved** 81:15
**President** 5:16
9:20 18:15
33:24 42:6
57:18 58:19
59:4,5,25 60:12
61:5 68:25
77:23 79:2,23
88:19 89:5
100:14 103:17
**President's** 58:22
**press** 83:21
**pressed** 83:20
**pretty** 80:19
**prevent** 6:19
**prevented** 66:19
**preventing** 84:22
**previous** 21:25
**previously** 21:17
25:18 61:24
65:16
**printout** 44:22
**prior** 18:25 19:16
37:9 47:17 63:3
**private** 93:17,18
93:19,20 94:6,7
94:9,9 96:1,1
97:22,23 98:14
98:15 99:5,9,9
99:17,25
**privilege** 59:7
**probably** 27:13
32:24 38:25
39:15 85:23

**problem** 38:1
86:17
**problematic** 39:8
**procedure** 4:6
14:13,16 40:22
104:12
**procedures** 89:8
**proceed** 14:22
**proceeded** 54:15
**proceeding** 95:19
**proceedings** 13:5
**process** 42:13
67:8
**Production** 12:23
**products** 51:8
**professionals**
83:12,17
**prohibited** 98:4
98:23
**prohibition**
104:11
**prohibits** 66:9
97:9,12,13
98:12,16
**project** 27:19
28:2,5 31:1
39:21 43:25
44:1,5,8,11,13
49:8 50:2,4
52:18
**prompted** 22:10
22:14 55:13
**properties** 35:17
35:23 43:3
**property** 25:23
26:13,16 27:22
27:23,25 28:13
28:16,19,25
29:4,10,14,18
30:6,6,7,9,22
31:4,9,14,21
32:1,3 34:18,18
34:20,21,25
35:5,13,13,16
35:21,22 36:11
36:17,19,21,24
37:8,16,18,20
37:21,25 38:3,3
38:25 39:4,8,12

39:20,24 40:3
41:8,12 42:3,4
42:20,20 43:7
43:11,14,17
46:9 48:17,24
49:2,6,10,12,21
50:4 54:4 99:22
100:15
**proposed** 49:7
**protect** 67:2,7
95:2
**protester** 48:6,14
**protests** 48:5
**provide** 58:1
**provided** 13:12
14:9 25:3,7
35:13 61:19,23
63:25 64:6,12
64:13 102:9
103:4
**provides** 64:6
87:7
**provision** 66:18
69:17
**provisions** 73:22
**public** 10:5 11:6
11:11,12 12:8
13:1,9,15,19
14:1,3,4,21,23
15:2,7,9,15
16:2,6,18 17:20
18:1 52:8,11,21
54:20,22 57:5
58:11,13,16
59:20,21 60:5
72:2 77:20
78:12 79:3,12
82:11,13 83:7
83:13 84:2,23
89:13,19,20
90:22 92:18
93:21,22 94:5,7
94:13 95:24
96:2,3,4 97:22
97:24 98:1,5,13
98:13,24,24
99:2,3,4,7,11
100:8,9,12
101:18

**public's** 17:1,3
77:2,10
**publically** 17:19
62:10 89:16
**pull** 13:22
**pulled** 14:8,16
**punishable** 93:24
97:15
**purchase** 34:2,3
35:4
**purchased** 29:19
33:22 34:19
35:15 39:12
**purchasing** 20:16
35:10,19
**pure** 50:14
**purpose** 7:14
17:2 38:4 95:13
103:2
**purposes** 4:7
31:12
**pursuant** 102:5
**put** 11:4 25:11
30:20 94:25
**puts** 74:18
**putting** 30:25
47:20 103:3

**Q**

**question** 4:12 7:7
23:14,20 27:7
27:24 51:18
57:9 72:22,23
73:3,6,9 75:4
83:5 96:8,14
101:8
**questions** 21:22
22:2,15,25
41:17 69:19
88:9,13,16
102:19,20

**R**

**R** 91:16 92:2
104:1
**R.S** 69:1 71:23
104:5
**random** 59:19,21
**Ray** 19:21
**re-watched** 7:21

**read** 8:2 9:1 24:4
24:6,7,8,9,14
24:22 25:16
47:9,10,13
51:24,25 52:2
61:14 63:8,18
63:20 69:22
71:7,9,10,14,16
71:19 72:1
82:13 92:17
93:1,14 97:13
**reading** 4:9 51:14
103:12
**real** 49:14
**realize** 6:12 35:23
36:1
**really** 6:9 7:23
49:11,11 50:23
**reason** 57:19
60:25 66:23
95:1,20 100:16
**reasoning** 29:15
**recall** 6:7 8:6
12:10,12,14
15:5 27:9 56:16
61:7,16 62:14
62:17 65:4 69:6
69:7,12,24 70:8
71:5,6,7 77:5,7
79:10,23 80:20
81:6,13 82:24
83:2 86:18,19
86:21,22 88:6
92:20 93:4
**receive** 71:13
**received** 62:18
70:11 71:2
73:14 74:6 92:4
100:19 102:7
**receiving** 43:4
86:23
**recess** 80:8 85:24
**recesses** 11:7
80:4,17
**recognized** 53:12
**recommendation**
80:10
**record** 5:12
103:19

**recording** 48:13
**recuse** 44:18
**red** 62:19 72:18
72:25 74:13
**redirect** 88:10
**refer** 5:15 9:1
10:9 82:14
**reference** 82:1
**referenced** 13:14
15:18,19 37:2
89:9
**referencing** 69:11
**referred** 6:2
**referring** 5:14
10:10 56:8
61:12,17,18
62:24 63:9,19
65:2,12 70:21
70:23 71:3
**reflected** 47:1
**refresh** 8:24
**refused** 79:16
**refusing** 79:18
**regard** 14:21
**regarding** 13:15
22:15
**regardless** 23:22
39:8
**regards** 75:25
**regroup** 85:22
**related** 16:3,17
21:7 22:9 26:6
26:8 42:20
43:17 52:15
101:23 104:13
**relates** 18:22
**relationship**
31:15 87:21
**relationships**
104:11
**relative** 69:19
91:6
**remain** 57:4
**remainder** 52:3
**remember** 6:9,10
28:7,10 32:8
64:22 67:24
**removed** 34:9
**repairs** 50:16

**repetitive** 55:6
**rephrase** 73:8
**report** 72:6,18,25
74:13,17,18,20
74:22 75:12
**reported** 2:17
104:7
**Reporter** 2:18
4:18 104:3
**reporting** 104:7
**represent** 44:22
**represented** 9:14
23:10,15,21
**REPRESENTI...**
2:5,11
**request** 12:22
35:8 58:7,8,22
77:4 78:5 99:10
**requests** 12:8
76:23,23 81:23
99:12
**require** 13:25
85:5
**required** 14:5
15:8 19:8 40:23
43:21 104:10
**requires** 80:12
**reserved** 4:14
**resident** 18:6
54:12 78:11,18
**residential** 39:7
**residents** 11:17
32:3 41:10,11
41:15,16 43:4,5
43:8,13 56:1
57:25 79:19
**resolution** 33:2
**responded** 77:3
102:3
**response** 12:18
21:2
**responsiveness**
4:13
**rest** 71:15
**restrict** 15:13,15
15:23
**restricted** 17:21
**restroom** 7:4
**retain** 21:4,20

22:24
**retained** 21:9,17
**retaining** 91:16
**reverted** 30:16
37:10
**review** 24:1
**rezone** 29:4,18
30:20 32:1 38:2
39:4 42:4
**rezoned** 31:5
32:5,19,23 40:7
43:11,14
**rezoning** 25:22
26:12,15 29:3,6
29:25 30:11,23
31:6 33:14 37:5
37:6 38:17 39:2
39:23 40:17
41:12,18 42:15
43:6 54:3,18
99:21 100:15
**rezonings** 42:2
54:7
**right** 5:7,11 9:22
10:2,6,16 12:19
15:14,16 18:7
18:15,17 19:21
21:15,21 22:6
23:5 27:22,24
29:2,7,11 30:8
36:4,6,9,16
37:15,18 38:24
39:20,21 40:1
43:17 49:7 50:5
51:22 52:9,12
52:15,24 53:23
55:10 59:24
61:10 65:1,14
65:20 66:1,11
66:13 67:10,23
70:22 71:19
75:19,20 79:5
84:2,15 86:20
87:19,24 96:5
97:6 98:9
**right-of-way** 50:7
**right-of-ways**
50:11
**rights-of-way**

43:20
**river** 34:13 51:1
  51:5
**Robert's** 13:11
  14:12,14
**Roberts** 89:7
**role** 28:20 57:18
  60:11 87:23
**Rollo** 87:4,7,11
  87:12,13,18,25
  88:4,6
**room** 57:2 59:7
**roughly** 5:22
  7:16 45:18,19
**rule** 16:8,9,11
  17:7,10,15,24
  19:10
**ruled** 76:7
**rules** 4:6 12:8
  13:1,8,10,10,11
  13:23 14:12,15
  14:20 84:14,19
  89:7 104:10,12
**run** 80:13

**S**

**S** 3:9 4:1 63:22
  67:21 93:5
**safe** 10:18
**safekeeping** 9:7
**Sammy** 33:13
  41:20 42:10
**sat** 10:1
**satisfied** 96:15
**saved** 9:6
**saw** 36:8 51:13
**saying** 12:15 29:9
  40:11 41:11
  43:6,13 46:1,11
  47:22 57:23
  61:7,8 66:11
  67:4 77:25
  83:16 95:13
**says** 20:5 62:20
  63:11 69:13,15
  93:16,21 95:24
  96:7 98:5
**scheduled** 42:9
**Secretary** 94:3
  97:19

**section** 95:23
**security** 87:4,7,8
  87:11,13 88:5,6
**see** 12:22,25 13:4
  19:24 40:11,14
  41:4 45:1,23
  47:13 64:17,23
  68:15,18 69:13
  71:21 72:5
  86:13 95:22
**seeing** 70:10
**seek** 44:19 56:22
  56:25 57:9
  65:22 86:9
**seeking** 86:23
**seen** 7:1 10:22
  11:4,6,8 14:25
  48:16
**sent** 65:3 86:7
  97:2
**sentence** 93:23
**sentences** 24:9,15
  47:9 51:15 52:2
  64:2,9
**separate** 89:25
  92:1
**seriously** 58:23
  58:25
**servant** 99:11
**service** 88:20
  89:22
**services** 21:6
  50:13 54:5 87:5
  87:7,11,14 88:5
  88:7 91:16
**serving** 89:1
**session** 14:7
  52:17,19,22
  53:8,11 95:20
**set** 59:1,13 104:6
**Sexton** 19:21
  20:3 21:5,21
  22:10,12,13
  23:10,14,21,25
  55:14 91:17
  92:3
**Sexton's** 21:8,12
  21:17,23
**share** 103:1

**sharply** 18:9,12
**Sheriff's** 80:11
**shorter** 64:8
**showed** 32:18
  43:8
**shown** 35:20
**side** 34:13 50:25
**sign** 26:15 29:6
  42:15 72:10
**signed** 25:22
  26:12 29:3,22
  31:6 33:14
  39:23
**signing** 4:9 39:2
  99:21 100:14
  103:13
**silence** 84:9,12,16
  84:16
**sins** 39:17
**sir** 9:10
**sitting** 48:7,14
  58:12 91:24
  101:24 102:15
**situation** 46:23
**size** 49:9
**skimmed** 8:5,7
  24:5
**skinny** 32:15,19
  33:4,16,21 36:4
  36:9,15,18
  37:15 38:24
  43:22 44:16
  45:1,5,20
**sliver** 49:16 50:1
**slivers** 49:17,24
**small** 35:7 47:5
**Snowdy** 30:13
  34:23 35:15
  37:5
**social** 47:19
**Somewhat** 27:20
**sorry** 51:19
**sort** 45:10 47:1
**sought** 86:19
**sounds** 9:22 36:3
**speak** 11:11
  58:10 74:18
**speaking** 17:12
  53:22 61:7

83:11
**speaks** 84:10
**Spears** 2:7,7,7
  3:3 73:4 75:2
  86:10 88:14,18
  92:7 96:10
  103:10,11
**special** 19:20
  20:3 21:5 22:24
  59:9
**specific** 30:3
  80:24
**specifically** 14:20
  29:17 40:8
  60:14 74:8
  101:7
**speculate** 75:11
**speculating** 50:9
**speculation** 50:14
**spend** 7:16
**spiritual** 83:3,6
  83:10
**spoke** 28:6 40:5
**spoken** 60:3
**sponsoring** 54:1
**spreading** 41:10
**St** 1:10,18 2:3
  10:10,11 12:9
  16:8 18:6 19:9
  21:9 27:10,17
  28:14 42:13
  46:6 50:15 59:2
  83:25 86:5
  100:24
**staff** 47:5,6
**staged** 48:5
**stamp** 72:21
**stamped** 62:19
  63:11,16 64:16
  64:20 70:11
  71:1,12 90:7
  100:20
**stamping** 74:2
**stand** 11:1 98:25
  101:17
**standing** 48:2
  76:19
**started** 27:14
  51:25 52:11,14

52:25 53:14,15
  54:2
**state** 4:18 61:9,12
  61:13,16,18,22
  62:10,23 63:6,8
  63:12 65:1,14
  66:1,9,12,19
  67:10 70:2,20
  73:22 76:16,17
  104:3,21
**stated** 25:18
  39:22 42:12
  70:8,13 89:15
  94:21 99:20
**statement** 56:20
  57:16 67:19
  69:16 86:14
  93:22,23 94:8
  94:13 95:9,25
  96:2,3,5 97:24
  98:1,5,13,14,24
  98:25 99:2,4,8
**statements** 31:24
  100:9,10,12
**states** 1:1 98:19
**status** 23:12,18
  23:22
**statute** 23:3
  61:23 62:20,24
  63:24 67:22
  70:10 71:1
  72:11,19,21
  73:1 74:9,12,14
  76:6 82:13
  92:17 93:2
  104:10
**Statutes** 72:6,18
  72:24 74:17
**statutory** 69:16
**stay** 56:2
**staying** 84:11
**stenotype** 104:7
**step** 67:7 102:21
**steps** 40:1,4
  44:17 48:19
**stick** 11:21 54:11
  54:20 78:10
**stint** 88:22
**stipulated** 4:3

57:11,17,21
58:4,21 59:20
60:1,9,11,16
61:1,3 77:2,9
78:4,5,6,8
79:12,18,24
80:6,7,15,16,21
81:2,7 82:6,12
84:1,3,6 85:5
**stopped** 24:15
51:14 52:1
**stopping** 84:20
85:1
**Street** 2:8
**studied** 36:23
**study** 36:13
**style** 48:8
**subject** 21:14
31:5 40:18
85:13 94:4,15
94:16,18 96:6
97:21 98:3,20
98:21,22
**submitted** 40:6
**subpoenas** 92:5
101:23 102:16
**Subsection** 93:12
**subsequently**
61:14
**subsidiaries**
27:17
**substances** 6:22
**substantial** 49:1
49:13
**sued** 18:14,19
19:5 66:15
67:12
**suggested** 39:19
79:4
**suit** 30:14 102:11
**Suite** 2:3,9
**supervision**
104:8
**support** 31:2
44:4,6,7,10,12
**supposed** 25:3
29:23
**sure** 9:5 11:25
16:5,10,20 17:5

19:4,14 22:4
23:12 27:7,23
29:24 31:11,14
31:19,22 37:23
41:1,7 49:10
51:20 54:24
61:15 63:13
69:8,13 71:14
74:16 78:22
79:9 81:4 82:19
87:9,13,20
**surface** 49:23
**surprise** 33:18
**surprised** 33:24
34:4
**Suzanne** 1:16 4:5
5:1,13 104:5
**sworn** 5:3 104:5

## T

**T** 3:6,10 4:1,1
68:15 104:1,1
**take** 6:25 7:3
8:13,18,19,23
12:17 29:23
40:1,4 44:17
48:19 58:6,7,22
62:6,9 68:1
73:2 85:21
86:15
**taken** 1:17 4:5
37:24 38:21
93:17 94:6
97:22 104:4
**talk** 9:8 10:4
16:25 28:21
52:14,25 53:6
53:14 54:2
58:15 62:4
81:24 84:4 85:8
**talked** 7:2 16:16
28:4,22 42:24
47:3 82:7,17
83:16 93:16
**talking** 7:19
11:23 16:3
33:11 45:21
52:23 53:6,15
55:8,9 56:16
63:23 66:4,14

67:11 69:25
82:3 83:3,8,14
84:13,17,20
85:1,2,3,6,6
97:6,9
**talks** 82:14
**tapping** 40:10
**Tara** 41:21 43:11
46:17
**target** 19:3 85:14
**tasked** 23:1
**tell** 7:9 25:9 34:3
36:13 40:16
52:4 54:22
56:23 67:25
71:17,19 74:19
76:11,11,11,15
76:18
**telling** 36:20,23
49:21 100:23
101:5
**tells** 75:6
**tempers** 80:4,13
**Terminals** 51:4
**testify** 5:4 12:1
104:6
**testimony** 49:19
69:9 93:17 94:6
97:22 103:18
104:4,6
**text** 47:2 81:16
81:19
**texted** 82:22
**thank** 5:19 6:12
12:22 88:19
103:16
**thereof** 4:15
**thing** 11:11 50:17
52:20 78:21
84:13,17 92:23
**things** 8:23 16:3
16:12,17 18:11
21:23 23:4,7
47:23 53:1
55:13 59:8
67:13 75:16,19
101:21
**think** 6:1 12:5
15:17 25:12,25

36:1 38:1 39:15
41:5 50:9 60:16
60:25 73:7
79:13 80:17
85:22 94:17
98:12,24
102:13
**thinking** 80:1,25
**Thirty** 7:18
**thoroughly** 74:1
**thought** 12:1
**thoughts** 98:18
**threatening**
74:25
**threats** 48:1
**three** 5:23 13:20
15:6 17:21 18:3
57:7 59:13 84:8
89:13,20
103:13
**time** 4:14 6:8 7:3
7:20 8:18 11:4
23:4 27:16
30:18 31:12
33:12 34:7 35:1
35:20 37:9
41:24 42:7 47:5
47:25 50:12
58:10 63:10
69:21 70:12
75:19 79:10,23
80:20 89:1,24
89:24 91:15
92:2,16 103:17
103:18
**timeframe** 15:6
**timeline** 40:15
**times** 31:25 58:9
76:25 77:7 80:5
80:14 81:1,6
92:16,20
**tiny** 49:11,13,15
49:24 50:1
**today** 5:9,14 6:13
6:16 7:13 8:11
8:14 13:15
24:22 26:6 27:8
46:2,13,14
90:18 100:23

101:22
**today's** 9:9
**told** 24:17,18
33:9,15 36:7
39:5 41:15
52:20 54:10,18
56:1 61:21
63:15 64:13,17
64:18,21 65:16
70:2,6,19 79:20
101:15,22
102:2,13,15,25
**Tom** 68:15
**tomorrow** 95:7
**top** 71:23 72:8,23
74:9
**topic** 10:23 11:5
11:12,17 15:16
16:12 17:13
46:22 52:7
54:13,21 55:5,6
56:2,3 57:4
60:3,5,8,13
77:17,21 78:1
79:1,4,5,21
81:3 84:3,11
**totally** 84:9
**tract** 30:13 32:2
32:2 34:21 35:7
35:10,22 36:25
37:1,3,11,12
40:6 45:1 48:17
**tracts** 30:2 32:13
32:19 33:1,5,16
33:21 36:4,9,11
36:16,18,20
37:15 38:24
43:22 44:16
45:5,20
**transcribed**
104:7
**transcript** 104:8
104:9,10
**transferred** 31:11
**transfers** 50:17
**transportation**
50:16
**transporting**
51:8

**traumatizing** 60:20
**Treme** 6:3,3,6
**true** 42:22 48:20 95:16 104:8
**trust** 12:14,16 68:3 74:1
**trusted** 40:4
**truth** 41:4,14
**truthfully** 6:21
**try** 7:10 32:10
**trying** 8:24
**turn** 54:22
**turns** 46:9
**twice** 6:6
**two** 5:23 8:1,23 64:2 78:18 101:20
**types** 48:1 59:8
**typically** 11:16 13:21 20:11 35:4 42:2 58:17 78:5,11,14 79:20 81:14

**U**

**U** 3:8 4:1 19:23
**uh-huh** 7:6 12:24 15:17 24:13 42:23 64:5 66:5 88:2 97:14
**unable** 70:14
**unconstitutional** 72:6,11,14,17 72:19,24 73:1 74:12,14,17,20 74:23 76:7,13 76:17
**underneath** 27:12 63:13
**understand** 6:15 7:8 18:18 32:13 34:6 39:18 62:22 72:13
**understanding** 9:11 32:11 51:6 84:25 89:6,11 89:17 90:5 104:9
**understood** 36:25

55:9
**unfamiliar** 26:25 42:5,6 75:13
**UNITED** 1:1
**unsure** 8:21 11:18 23:17,25 38:19 71:18 87:17
**use** 7:3
**usually** 78:14

**V**

**valuable** 50:6,10
**value** 49:20,22
**vehicle** 48:7,14
**verbal** 46:19
**verbally** 62:12
**verification** 35:8 35:16
**VERSUS** 1:6
**video** 7:22 8:22 88:12
**violate** 90:14
**violation** 61:9,22 62:9,23 65:1,14 66:1,12 67:10 70:2,6,20 76:16 91:3
**violations** 22:6
**vocalized** 30:19
**vote** 14:2,6 38:7 60:6

**W**

**Wait** 96:8
**waive** 103:12
**waived** 4:10
**Wallace** 26:17
**want** 40:10,14 47:10 58:16 60:19,21 72:3 75:11
**wanted** 29:18 41:4 52:16 55:22,22 84:4 84:12,14,16,19
**warning** 66:2 72:10
**Warren** 6:3
**wasn't** 43:2 46:21

55:16 65:9
**watched** 8:22
**water** 7:4
**way** 10:22 23:21 23:24 25:12 28:11 30:8 36:24 38:18,19 58:17 59:1 66:4 66:14 67:12
**we'll** 10:10 12:16 31:20 60:22 68:4
**we're** 26:5 41:15 47:5 81:14 85:23
**we've** 16:14,15 38:12 46:20 68:14 80:2,2,3 80:6,6,15,16 83:24
**website** 44:23 50:19
**weighed** 39:15
**welcome** 25:5
**went** 52:8 53:2
**weren't** 16:17
**West** 1:19
**whacky** 11:2
**white** 81:25
**William** 2:2 5:7 95:7
**williammost@...** 2:5
**wind** 47:21
**wishes** 39:10
**witness** 4:20 71:25 73:13 96:17
**word** 50:21 68:2 84:15 95:22
**worked** 87:15
**works** 46:8 87:18
**wouldn't** 28:10 28:12 51:2 58:24 59:8 73:21 80:23
**Wright** 1:7 10:2 11:25 15:18 53:9,11 61:13

68:11,20 69:5,9 75:15 77:15 80:9 81:24 84:1
**writ** 38:14
**writes** 68:24
**writing** 47:1
**written** 8:22 17:10,15,22 18:1 44:4 99:10 99:12
**wrong** 72:3
**wrote** 9:2 44:6,10

**X**

**X** 3:6,6

**Y**

**Yeah** 20:19 22:5 25:7 36:10 45:17 87:24 100:7
**year** 94:1 97:17
**years** 6:8 9:15 10:16 11:9 34:8 37:22 79:22 80:25 88:21 89:4,22 90:12 91:11 92:14
**yellow** 45:16

**Z**

**ZE** 3:9 44:21 48:25
**zoned** 35:11,12
**zoning** 20:16 29:17 30:2,7,17 32:10 33:3,9 34:19,25 35:2,8 35:15,16,19,24 37:9 38:7,20 40:5,24 41:6,13 41:25 42:7,11 42:25 43:1 100:13

**0**

**1**

**1:23** 68:18
**103** 104:6

**106** 5:1
**12** 3:8
**12th** 9:21
**1434** 104:12
**15** 6:8
**16th** 104:16
**1811** 1:19
**1825** 2:9
**1990** 35:14 36:1 37:9 39:17
**1993** 12:13 13:6 14:22
**1997** 37:5

**2**

**2** 12:23
**2,000** 93:25 97:16
**20** 3:8 10:16 37:22 79:22 80:25 88:21 89:22 90:12
**2004** 9:12
**201** 2:3
**2019** 9:21 34:17
**2020** 9:18,24 44:6
**2023** 17:13 19:12 19:17,19 24:20 40:13,19 42:17 46:17,25 52:7 55:7 68:16,19 75:17,23 76:1,9 76:25 77:8 82:10 83:25 86:8
**2024** 1:17 104:16
**23-CV-7296** 1:5
**2500** 2:3
**27** 13:6
**28** 40:19 55:7 75:17 77:8
**28th** 7:22 17:13 19:16,19 24:20 40:13 41:3 42:17 46:17,24 47:17 52:7 68:16,19 75:23 76:1,9,25 82:10 83:24 86:8 100:11

**3**

**3** 39:14
**30** 37:22
**3213** 45:11
**37:2554** 104:5

**4**

**4** 9:14
**4:44** 103:18
**42:1141.4(L)(1)**
  69:2
**44** 3:9

**5**

**5** 3:3 12:23
**50** 34:21
**504** 2:10
**504)509-5023** 2:4
**593-9500** 2:10
**5th** 34:17

**6**

**63** 3:9
**68** 3:10
**6th** 1:17

**7**

**70068** 1:20 5:2
**70112** 2:9
**70170** 2:4

**8**

**84099** 104:21
**88** 3:3

**9**

**9027** 30:15,23
  34:24 37:6
**909** 2:8
**92** 3:4