<pre>
 1                 UNITED STATES DISTRICT COURT

 2                 EASTERN DISTRICT OF LOUISIANA

 3   ******************************************************************
     JOY BANNER, PH.D.                        CIVIL ACTION
 4                                            NO. 23-7296
     VERSUS                                   SECTION "G"(4)
 5                                            OCTOBER 2, 2024
     MICHAEL WRIGHT, ET AL
 6   ******************************************************************

 7

 8                   TRANSCRIPT OF MOTIONS HEARING
            HEARD BEFORE THE HONORABLE KAREN WELLS ROBY
 9                 UNITED STATES MAGISTRATE JUDGE

10

11   APPEARANCES:

12   FOR PLAINTIFF:              William B. Most, Esq.
                                 MOST & ASSOCIATES
13                               201 St. Charles Avenue
                                 Suite 2500
14                               New Orleans, LA 70170

15

16   FOR MOVANT DARLA GAUDET:    Richard J. Tomeny, Jr., Esq.
                                 8550 United Plaza Boulevard
17                               Suite 702
                                 Baton Rouge, LA 70809
18

19

20
     Official Court Reporter:    Alexis A. Vice, RPR, CRR
21                               500 Poydras Street, HB-275
                                 New Orleans, LA  70130
22                               (504) 589-7777
                                 Alexis_Vice@laed.uscourts.gov
23

24

25   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
     PRODUCED BY COMPUTER.

                          OFFICIAL TRANSCRIPT
</pre>

```
 1                    P-R-O-C-E-E-D-I-N-G-S
 2                     (OCTOBER 2, 2024)
 3                    (MOTIONS HEARING)
 4
 5          DEPUTY CLERK: Calling Civil Action No. 23-7296, Joy
 6   Banner versus Michael Wright, et al.
 7          Counsel, please make your appearances.
 8          MR. MOST: Yes, William Most here for the plaintiff
 9   Joy Banner.
10          And Counsel for the moving party is not present.  I
11   called them about 30 minutes ago, and it went straight to
12   voicemail.  I tried his cell phone.
13          (Whereupon, Mr. Tomeny joined the proceedings via
14   telephone.)
15          THE COURT: Richard?
16          MR. TOMENY: Yes.
17          THE COURT: This is Judge Roby.  You are in court.  I
18   have a court reporter here and your opponent.  Why are you not
19   here?
20          MR. TOMENY: Judge Roby, I apologize.  I did not --
21   first of all, I did not request oral argument; so I didn't
22   understand it would be set.
23          THE COURT: I issued an order telling you to come.
24          MR. TOMENY: You did, Your Honor, and I apologize.  I
25   did not -- I went and checked the docket because I got a text
```

OFFICIAL TRANSCRIPT

1  this morning from Mr. Most asking if I was running late.  I did
2  not even see it come in my email.  I'm not saying it didn't,
3  but I just did not see it.

4          **THE COURT:** Oh, it's there.  Did you see it today?

5          **MR. TOMENY:** I saw it on the docket.  I cannot find it
6  in my email.  But I will certainly look.  I apologize.

7          **THE COURT:** We can go and look and see if you opened
8  it too.  I don't know if you know that, so.

9          Yeah, for all my lawyers, we can check and see if you
10 opened it.

11         **MR. TOMENY:** I will look at my email right now.  I'm
12 sitting in front of my computer, but I could not find it
13 initially when I looked real quickly on my phone.

14         Let me just see.  It would have been on the 27th, I
15 believe, is what I saw from the docket.

16         I do not see it.  Let me go back to all emails and
17 see if we've got it in spam.

18         **THE COURT:** We shouldn't be going to your spam because
19 I'm sure you get a lot of stuff from us.

20         **MR. TOMENY:** I'm looking right now.  Hang on.

21         **THE COURT:** It looks like my afternoon is open.  Can
22 you get here by 2:00 o'clock?

23         **MR. TOMENY:** Very close to 2:00 o'clock.  I do see it
24 came in, and I did not -- I apologize, Judge, I just didn't see
25 it.

OFFICIAL TRANSCRIPT

1    **THE COURT:** So I'll see you at 2:00 o'clock.

2    Mr. Most, can you return at 2:00?

3    **MR. MOST:** If you would like, Your Honor.

4    **THE COURT:** Yeah, I'd like.

5    **MR. TOMENY:** Thank you, Judge, I appreciate it.

6    **THE COURT:** See you at 2:00.

7         (A recess was taken.)

8    **THE COURT:** Good afternoon.

9    **DEPUTY CLERK:** Calling Civil Action No. 23-7296, *Joy*

10   *Banner versus Michael Wright, et al.*

11   Counsel, make your appearance for the record.

12   **MR. TOMENY:** Good afternoon, Your Honor, Richard

13   Tomeny for Mover Darla Gaudet.

14   **MR. MOST:** And William Most for plaintiff Joy Banner.

15   **THE COURT:** All right, Counsel for the Mover, you may

16   proceed.

17   **MR. TOMENY:** First, Your Honor, I'd like to apologize

18   to the Court and to my other counsel for my tardiness, and I

19   appreciate the indulgence of the Court in letting me come and

20   argue this afternoon.

21   Your Honor, our motion to quash is based on really

22   five different principles all of which are supported by, we

23   believe, the Federal Rules of Civil Procedure and the

24   jurisprudence.  The key point that I would like to stress to

25   this Court is this.  Darla Gaudet is a nonparty.  She's being

OFFICIAL TRANSCRIPT

1  subpoenaed as a witness in a First Amendment case.

2            **THE COURT:** Uh-huh.

3            **MR. TOMENY:** And Your Honor, I'm sure, is familiar

4  with the facts that gave rise to the First Amendment complaint

5  filed by Ms. Banner against public officials in St. John

6  Parish.

7            My client, first of all, was not even at the meeting

8  where this event took place.  She didn't witness it.  She has

9  no information about the meeting other than, you know, whatever

10 people already know about it from, you know, reading in the

11 paper.  She has no stake in the outcome of that case or of any

12 other complaint -- cases or complaints that Mr. Most alludes to

13 in his petition, in his complaint regarding the development of

14 the property on the west bank across in St. John Parish or

15 anything else related to all of those issues.  She has no stake

16 in that outcome.

17           She is a private citizen.  Her only connection, only

18 connection, and why we are here is because her daughter-in-law

19 Jaclyn Hotard happens to be the president of the council and

20 one of the parties against one -- a defendant in this case.

21           So I think because of those factors, it's a higher

22 standard of discoverable material and the scope of discovery

23 when it relates to a nonparty.  I think the mover has to show

24 more than just, "Well, it might lead to some relevant

25 evidence," which is the general standard.  You know, "It could

OFFICIAL TRANSCRIPT

1  be helpful to my case," again, the general standard.  "I might
2  glean some facts I didn't know, perhaps, but I don't really
3  know what it is I will get."

4          But generally, discovery is given a broad scope, and
5  as Mr. Most pointed out, particularly, in civil matters, you
6  know, they want to give everybody an opportunity except when it
7  comes to a nonparty.  And the case law supports the fact that
8  he has to show more.  He has to show real relevance to the
9  information that he seeks to his case, real relevance, a
10  connection.  I would suggest to you, not only does there have
11  to be real relevancy, there has to be some evidence that would
12  be admitted at the trial.

13          Now he has said, well, you know, we want -- motive is
14  a big part of a First Amendment claim.  I take his word for
15  that.  One of the things he said is, well, he believes that
16  Darla Gaudet could shed some light on Ms. Hotard's motives in
17  her actions at the council meeting.

18          **THE COURT:** Does Ms. Gaudet have some connection to
19  the rezoning application at issue in this matter?

20          **MR. TOMENY:** She does not except that -- she doesn't
21  have any connection to the application.  A company that she has
22  an interest in, Gaumet Holdings owns --

23          **THE COURT:** What's the name of it?

24          **MR. TOMENY:** Gaumet, G-A-U-M-E-T, Holdings, LLC.  It
25  is a privately, closely-held company.  Ms. Gaudet is the

OFFICIAL TRANSCRIPT

1  managing member.  This is all in public records.  Mr. Most

2  knows this.

3              **THE COURT:** Uh-huh.

4              **MR. TOMENY:** She owns two narrow strips of land along

5  the river that come up to the river batture in the same area as

6  where this Greenfield development was proposed to go in that

7  Ms. Banner opposed and which was the subject --

8              **THE COURT:** Would she benefit financially from this

9  rezoning?

10             **MR. TOMENY:** No.

11             **THE COURT:** Why not?  It sounds like to me she would

12 because if she is -- she's the only member that -- the holding

13 company owns this land.  The way you described it is, for lack

14 of a better description, on the right and the left and then

15 there's something in the middle.  If they want the whole thing,

16 that would include her land, correct, if it's rezoned to permit

17 the construction; correct?

18             **MR. TOMENY:** I guess you could say that, Your Honor,

19 but let me give you a --

20             **THE COURT:** So she would have an interest?

21             **MR. TOMENY:** But historically, let me give you the

22 historical background of Ms. Gaudet's acquisition of those two

23 parcels.

24             **THE COURT:** Does that matter?

25             **MR. TOMENY:** Yes, it does.

OFFICIAL TRANSCRIPT

1          **THE COURT:** If her daughter-in-law is on the council
2  and it's involving land that benefits the mom-in-law, that
3  would help relations between daughter-in-law and momma-in-law.
4          **MR. TOMENY:** Maybe; maybe not.  Here's what matters,
5  Your Honor.
6          **THE COURT:** Uh-huh, okay.
7          **MR. TOMENY:** When Ms. Gaudet bought the land -- and
8  she bought this in 2014 and 2015, years before Ms. Hotard
9  married her son.
10          **THE COURT:** Doesn't matter.
11          **MR. TOMENY:** And more importantly --
12          **THE COURT:** It just means she's smart and he's smart
13  and they all smart and they all going to profit.  But anyway,
14  go ahead.
15          **MR. TOMENY:** More importantly, when Ms. Gaudet bought
16  that land, it was zoned industrial.
17          **THE COURT:** What is it zoned now?
18          **MR. TOMENY:** Well, that's part of the history of how
19  we got here.
20          **THE COURT:** What is it zoned now?
21          **MR. TOMENY:** Her land is zoned R1.
22          **THE COURT:** Which means?
23          **MR. TOMENY:** What happened was --
24          **THE COURT:** Which means?  I don't know what that
25  means.

OFFICIAL TRANSCRIPT

1          **MR. TOMENY:** Residential.  You couldn't put a

2    commercial activity on there.  That's what it means.

3          **THE COURT:** Okay.  So when did that change from

4    industrial to residential and how long?

5          **MR. TOMENY:** This is part of the history of the

6    lawsuit.

7          **THE COURT:** Yeah, I know.

8          **MR. TOMENY:** It changed.  I don't know the exact date,

9    but --

10         **THE COURT:** What year?

11         **MR. TOMENY:** When the opponents, when Ms. Banner and

12   the opponents came out against this proposed development of

13   this grain elevator on their property, they found --

14         **THE COURT:** On whose property?

15         **MR. TOMENY:** On the property that the grain elevator

16   company bought.  They owned -- the grain elevator company,

17   Greenfield, owns this property.  Ms. Gaudet's small piece of

18   property, I think there's one or more --

19         **THE COURT:** They got to buy it from her.

20         **MR. TOMENY:** No, they don't.

21         **THE COURT:** Yeah, they do.

22         **MR. TOMENY:** They don't need her property.

23         **THE COURT:** They don't need it?

24         **MR. TOMENY:** No.

25         **THE COURT:** Why not?

OFFICIAL TRANSCRIPT

1    **MR. TOMENY:** Because they have a huge chunk of ground,

2  they don't need her property.  But here's what happened with

3  the zoning.  Stay with me.

4    **THE COURT:** I am.

5    **MR. TOMENY:** When Ms. Gaudet bought --

6    **THE COURT:** If her land was zoned residential, it

7  would seem to me that the land that the grain company bought

8  was residential.  That in order for them to do what they want

9  to do, they have to have the designation changed back to

10 industrial; yes?

11   **MR. TOMENY:** No, because that's not what happened.

12 What happened was when the grain company bought the land, just

13 like when Ms. Gaudet bought the land, it was zoned industrial

14 already.  She bought it because it was zoned industrial.

15   **THE COURT:** When did it change?

16   **MR. TOMENY:** Ms. Banner -- and I don't know exactly.

17 Mr. Most may be able to tell you because he was involved.

18   When Ms. Banner came out and opposed the grain

19 elevator, they apparently researched the records and found that

20 the zoning of the industrial years before, 20-something years

21 before, was not done correctly.  That's what I'm told.

22   **THE COURT:** Oh, so it's legally residential because

23 somebody did a hook and a crook, changed it, but it wasn't

24 really changed.  And so now it's residential, and it's got to

25 be changed to industrial; right?

OFFICIAL TRANSCRIPT

1    **MR. TOMENY:** That was what was said.  So the sequence
2 of that is this.

3    **THE COURT:** Is that true or not true?  You say that's
4 what was said which implicates untrue.

5    **MR. TOMENY:** Your Honor, I just was retained in this
6 case three months ago.  I have the general facts.

7    **THE COURT:** You don't know enough, fair enough.

8    **MR. TOMENY:** But I will tell you this.  The zoning,
9 when Ms. Gaudet bought the land, was industrial.  That's what
10 she bought it for.  It got changed in the context of whatever
11 defects there were in that original zoning designation 25 years
12 ago to residential; so they had to get it changed back.

13    The council, as part of their development with the
14 grain elevator people, had to rezone, had to get the zoning
15 application redone.  And so they redid it, and they corrected
16 the defect.  All of this happened, I think, three, four years
17 ago.

18    **THE COURT:** You call it a defect.  They call it a
19 change in zoning is the issue; yeah?

20    **MR. TOMENY:** Right.  But from my client's standpoint,
21 she bought it as industrial.

22    So now fast-forward to today.  What happened is
23 because of the rezoning that was done of that property that
24 would permit the grain elevator to go, it's not -- the grain
25 elevator's property is zoned industrial again.  My client's

OFFICIAL TRANSCRIPT

1    zoning did not get changed.  It's still, in other words, when
2    they rezoned the rezoning, her property --
3              **THE COURT:** You're saying hers is residential?
4              **MR. TOMENY:** Yes.
5              **THE COURT:** An theirs is industrial?
6              **MR. TOMENY:** Yes, that's what I understand.
7              **THE COURT:** And you're saying they don't need her land
8    to do what they want to do?
9              **MR. TOMENY:** That's correct.
10             **THE COURT:** So you're saying asking for her stuff is a
11   waste of time and irrelevant; correct?
12             **MR. TOMENY:** Yes.
13             **THE COURT:** Mr. Most.
14             **MR. MOST:** So there are several pieces of land that
15   this LLC owns in the vicinity.  Two of them are near the
16   project.  One of them runs right through the middle.
17             **THE COURT:** Of the project?
18             **MR. MOST:** Right through the middle of the project.  I
19   can submit a map to the Court.
20             **THE COURT:** Yeah, you're going to have to.
21             **MR. MOST:** Sure.  Because there's -- this is along the
22   Mississippi River, and so many of the parcels are long, thin
23   strips.  And the grain elevator company wanted to put in an
24   $800 million project.
25             And four days before the parish president was

OFFICIAL TRANSCRIPT

1  elected, Ms. Gaudet was purchasing property in this area.  And
2  one of the pieces of property runs right through the middle of
3  the project.  So the project, to go forward, they will have to
4  bring grain by rail down from the south to the river going
5  right through Gaumet Holdings, LLC's property.
6          **THE COURT:** Which means they got to buy it?
7          **MR. MOST:** Yes, or get a right-of-way.
8          **THE COURT:** Or get a right-of-way and pay her in
9  perpetuity.
10         **MR. MOST:** And so the parish president is the one who
11 personally signed the rezoning application that changed lots of
12 this land from residential to industrial.
13         **THE COURT:** And that's her daughter-in-law?
14         **MR. MOST:** That's her daughter-in-law.  And under the
15 ethics code --
16         **THE COURT:** Good ol' Louisiana.
17         **MR. MOST:** A former parish president went to federal
18 prison related to this piece of property.
19         **THE COURT:** Good ol' Louisiana.
20         **MR. MOST:** So you know, the relevance of this
21 deposition is because the parish president was deposed, and she
22 says she doesn't know anything about her mother-in-law's
23 business, doesn't know what it does, where it is, nothing about
24 it.  And so now we would like to see if that's true.
25         **THE COURT:** What proof do you have that four days

OFFICIAL TRANSCRIPT

1  before this purchase, that four days before, what is it, the

2  grain elevator proposal was approved she started buying up

3  land?

4       **MR. MOST:** No, it wasn't -- Gaumet Holdings, LLC,

5  purchased the last piece of property in this area four days

6  before Jaclyn Hotard was elected parish president.

7       And then soon after she was elected parish president,

8  she started supporting the project, sent a letter to the

9  federal government supporting it, and then subsequently

10 personally approved or personally signed the rezoning

11 application.  So the closeness in time was between the land

12 purchase and her election.

13      **THE COURT:** But she had not assumed the position at

14 that time?

15      **MR. MOST:** True, but I think --

16      **THE COURT:** Was she opposed or not opposed, or was it

17 a certainty that she would become parish president or what?

18      **MR. MOST:** There was another -- there were other

19 people in the race.  I think four days before the election,

20 there's a good sense of who may win.

21      But you know, the tying it to the First Amendment

22 retaliation claim in this case --

23      **THE COURT:** Yeah, tell me how that's connected because

24 I don't know that I understand that.

25      **MR. MOST:** Sure.  So the First Amendment retaliation

OFFICIAL TRANSCRIPT

1    claim is about how our client was prohibited from speaking and
2    threatened with an unconstitutional statute at a parish council
3    meeting.
4              **THE COURT:** What does that have to do with the land?
5              **MR. MOST:** Sure.  Because the topic at issue at that
6    parish council meeting was about hiring outside counsel for the
7    parish president, defending her against an ethics complaint
8    about everything we've just been talking about.
9              So the land led to an ethics complaint that led to a
10   meeting where they were deciding whether or not to pay for a
11   lawyer to defend the parish president against this ethics
12   complaint.  It was at that meeting that my client was
13   threatened with a law that the Eastern District had declared
14   unconstitutional nine years prior.
15             So we think the reason why the parish president
16   specifically asked that Joy Banner be stopped from talking was
17   because what she was talking about was the ethics complaint
18   which was about the relationship between the mother-in-law and
19   the daughter-in-law.
20             So, you know, we didn't start by seeking to depose
21   Ms. Gaudet.
22             **THE COURT:** I don't understand why getting this
23   information helps your First Amendment claim.  It might help an
24   ethics claim, but I don't know why it helps this claim.
25             **MR. MOST:** Because the parish president, the defendant

OFFICIAL TRANSCRIPT

1  in this case, at her deposition said, "I don't know anything
2  about my mother-in-law's business.  We've never talked about
3  it.  She's never told me anything about it.  I don't know
4  anything about it."

5          **THE COURT:** Okay.

6          **MR. MOST:** And so we think that's not true, and so we
7  would like to depose the other end of those communications and
8  see, "Do you talk to your daughter-in-law about your business?
9  Does she know anything about it?"  Because if there's truly
10  complete separation between those two people --

11          **THE COURT:** It sounds like you're fishing.

12          **MR. MOST:** I don't think we are, Your Honor.  The core
13  of this case is about what happened at a meeting about an
14  ethics complaint, and the ethics complaint was about these two
15  people.

16          **THE COURT:** What happened at a meeting about an ethics
17  complaint, but the issue at the meeting was the hiring of
18  outside counsel.  It was not the substance of the ethics
19  complaint; correct?  Correct?

20          **MR. MOST:** That was the agenda topic.  But what Joy
21  Banner started to give public comment about was the content of
22  the ethics complaint.

23          **THE COURT:** She started it, but that doesn't mean that
24  that's the purpose of the meeting.  She was trying to take
25  control of the darn meeting and convert it to what she wanted

OFFICIAL TRANSCRIPT

1 as opposed to the issue as to whether the council would

2 authorize the retention of outside counsel; right?

3           The fact that she raised it doesn't mean it was the

4 intended subject of the meeting.  The fact that she raised it

5 means she was trying to convert the substance of the meeting to

6 what she wanted.

7           But the real issue is not the ethics relationship

8 between the two in the lawsuit.  The real issue is whether they

9 properly said you can't speak in a public setting; correct?

10           **MR. MOST:** No, Your Honor.  The proper -- one of the

11 issues in the case is what was the motivation of Jaclyn Hotard

12 in directing the parish president to stop Joy Banner from

13 talking, and what Joy Banner was talking about was the content

14 of the ethics complaint.

15           **THE COURT:** I think you're stretching it.

16           Anyway, you've got a response?

17           **MR. TOMENY:** Briefly, Your Honor.  Ms. Hotard didn't

18 marry Ms. Gaudet's son until four or five years later.

19           **THE COURT:** Later when?

20           **MR. TOMENY:** 2019, four or five years after she had

21 the land.  So there's no connection.  They weren't even married

22 when she bought the land.

23           **THE COURT:** I think you're missing the point.

24           **MR. TOMENY:** No, I'm not.  I think Your Honor has the

25 point.  He's on a fishing expedition.

OFFICIAL TRANSCRIPT

1    **THE COURT:** Yeah, but I think your explanation doesn't

2    help the circumstance.  The fact that she owned the land before

3    her son married Hotard doesn't mean anything.  What matters to

4    me now is what was the subject of the meeting.

5    **MR. TOMENY:** I agree with you.  And I think all this

6    stuff about Greenfield and the grain elevator and the land and

7    the zoning, it might play in another lawsuit, but not this one.

8    This is a First Amendment case.

9    What can my client say about a First Amendment

10   violation of Joy Banner at a meeting, a public meeting where

11   she tried to speak?  Nothing.  There is no -- there's nothing

12   that she has evidence that would shed any light on his claim.

13   That's his claim.

14   If he has another claim for another reason about

15   opposing the grain elevator -- which by the way, Your Honor,

16   that project is over.

17   **THE COURT:** Which project is over?

18   **MR. TOMENY:** The grain elevator.  They pulled out.

19   They're not going to build it.  They announced that at the end

20   of August, middle of August.  They are not going to put a grain

21   elevator there.  So to the extent that that was ever relevant,

22   it's gone.  It's gone.

23   One other point, I think, is that because she's a

24   nonparty, he's got to show some connection.  This is a First

25   Amendment, a First Amendment claim.  And Your Honor hit it

OFFICIAL TRANSCRIPT

1  right.  What connection would my client's business or her land

2  or whatever else was going on with the grain elevator have to

3  do with that claim and that meeting?  Nothing, nothing.

4        The ethics complaint, well, let it run its course.

5  Let it run its course, and Ms. Hotard will deal with that if

6  she has to.  But, again, that is not the subject of this

7  lawsuit.

8        **MR. MOST:** Your Honor, if I may briefly?

9        **THE COURT:** Uh-huh.

10       **MR. MOST:** In discovery in that deposition, we

11 confirmed that the parish has never done this before to any

12 other person.

13       **THE COURT:** Never done what?

14       **MR. MOST:** Threatened someone with arrest under this

15 statute in any other parish meeting.  And so the question is

16 why --

17       **THE COURT:** Who did the threatening?

18       **MR. MOST:** I'm sorry?

19       **THE COURT:** Who threatened?

20       **MR. MOST:** Jaclyn Hotard directed the parish

21 president -- the president of the council to stop this comment,

22 and then the president of the council then took out a piece of

23 paper and read from a criminal statute.  Stopped Ms. Banner

24 during her public comment, read to her from a criminal statute,

25 described that there could be potential imprisonment, and then

OFFICIAL TRANSCRIPT

1   asked her if she wanted to continue.

2         **THE COURT:** But Hotard didn't tell her or him to read

3   from that statute; right?  She just gave an instruction to stop

4   it; correct?

5         **MR. MOST:** Hotard and the president of the council

6   were on the same email chain about this statute.  So they had

7   talked about this before.  The statute was offered in an email,

8   and then she directed --

9         **THE COURT:** Well, that may make it illegal right

10  there, but what does this have to do with the price of tea in

11  China?

12        **MR. MOST:** Because the question in a First Amendment

13  retaliation claim is:  What was the motive of the government

14  actors in taking the action they did?  And so the question is

15  why did Jaclyn Hotard do this thing, which she's never done

16  before, direct someone else to stop comment.

17        **THE COURT:** You deposed Hotard; yes?

18        **MR. MOST:** We did.

19        **THE COURT:** And Hotard told you what her motivation

20  was; right?

21        **MR. MOST:** Yes.

22        **THE COURT:** Which was?

23        **MR. MOST:** She thought Ms. Banner was off topic.  But

24  we found out the parish doesn't have an on-topic rule; so she

25  was accusing her of violating a rule that the parish council

OFFICIAL TRANSCRIPT

1    does not have.

2           **THE COURT:** Off topic, meaning, we're talking about

3    whether counsel could be hired, and you want to talk about the

4    underlying ethics issue which is not up for discussion today.

5    So that would be off topic even if there's no formal policy,

6    quote, for off topic; right?

7           **MR. MOST:** So the First Amendment does allow

8    government bodies in what's called a limited public forum like

9    a council meeting like this to pass a rule that requires public

10   comment to be on topic.  That's permissible.

11          **THE COURT:** Right.  But you're not required to?

12          **MR. MOST:** That's correct.

13          **THE COURT:** You can still control your meeting.  When

14   somebody else comes in and tries to change the topic, you can

15   refocus them and say, "No, that's not on the issue, on the

16   table for discussion today.  The only issue we have for

17   discussion today is the retention of counsel, and so we're not

18   talking about what you want to talk about."

19          Otherwise, you can have anybody off the street come

20   in and change the whole form of the meeting, and you never get

21   any, you know, public business done.

22          **MR. MOST:** That's true.

23          **THE COURT:** So there's no requirement that they have

24   to adopt a policy that permits that, right, or limits the

25   topic?


                         OFFICIAL TRANSCRIPT

1          **MR. MOST:** They do have to pass a rule.

2          **THE COURT:** So you're saying if I go to the city

3    council and they don't have a rule and I want to go up in there

4    and talk about what I want to talk about, they can't control

5    their meeting?

6          **MR. MOST:** Yes.  Usually, they have a time limitation,

7    and then some organizations have a topic limitation.  So for

8    example, New Orleans has passed a rule that says you have to be

9    on topic, and also that you have either two or three minutes to

10   talk.

11         This parish had a time limitation, but no topic

12   limitation.  And so yes, anybody could get up and talk for two

13   minutes about whatever they wanted.

14         **THE COURT:** And you're saying they couldn't shut them

15   up?

16         **MR. MOST:** Not without violating the First Amendment.

17         **THE COURT:** They couldn't get up and walk out and let

18   them talk?

19         **MR. MOST:** Could they get up and walk out?  I'm not

20   sure about that.

21         **THE COURT:** It seems to me that would have been my

22   solution.  Talk all you want.  I ain't here.

23         **MR. MOST:** Yeah, but what they can't do is

24   discriminate on the basis of the content or the viewpoint of

25   the speech, right.  So if they are applying a rule differently

OFFICIAL TRANSCRIPT

1  based on the content of what someone is saying, that violates

2  or at least it's subject to strict scrutiny under the First

3  Amendment.  And so if they stop someone from talking which --

4      **THE COURT:** What was her reason for stopping her,

5  because she wasn't on topic is her explanation?

6      **MR. MOST:** That was her explanation at the deposition.

7      **THE COURT:** And you don't believe it?

8      **MR. MOST:** No, because she's never done that before

9  and the only time she's ever done it --

10     **THE COURT:** Is that because everybody else was on

11  topic?

12     **MR. MOST:** No.  We have plenty of deposition testimony

13  that people go off topic all the time.  The parish has never

14  reacted to that in the way they did on this date.  And so the

15  question is why.  And we think it's based on the content and

16  viewpoint of the speech that was being used.  And to understand

17  that, you have to understand the motivation of the government

18  actors.

19     I think it's relevant that we've learned here today a

20  piece of information that is not publicly available.

21     **THE COURT:** What's that?

22     **MR. MOST:** So my colleague referred to Ms. Gaudet as a

23  managing member of this LLC.  That is not publicly available

24  information.  The only thing that the Secretary of State lists

25  is who is a manager or an officer of an LLC.  It doesn't tell

OFFICIAL TRANSCRIPT

1  you who's a member.

2          So that's one of the things we're trying to figure

3  out is:  Does Darla Gaudet have an ownership stake in this LLC?

4  If she doesn't, then that suggests there may not have been an

5  ethical problem here.  But if she does, then that's different.

6  And so one of our questions is does Darla Gaudet own part of

7  Gaumet Holdings, LLC, and we've heard today that she does.  But

8  that's new.

9          And also, we would be perfectly comfortable with

10 implementing this Court's standard confidentiality protective

11 order and applying it to the deposition and the documents

12 produced.  We've offered that.  So to the extent that there are

13 confidentiality concerns, we are more than open to the standard

14 protective order, having them designated as confidential, and

15 then following the protective order.

16          I'll also note that this Court in the past has found

17 objections to be waived if FRCP 45's 14-day rule is not

18 followed, and it was not followed here.

19          **THE COURT:** What took you so long?  What took you so

20 long?  Because after 14 days, you're obligated to respond to

21 the subpoena.

22          **MR. TOMENY:** I don't think I was even retained until

23 after 14 days.

24          **THE COURT:** So your client screwed up?

25          **MR. TOMENY:** They set the deposition.


                        OFFICIAL TRANSCRIPT

1          **THE COURT:** No, no, no, no, no.  I'm talking about the

2   subpoena.  Let's stay focused.

3          **MR. TOMENY:** She was subpoenaed for a deposition.

4          **THE COURT:** Uh-huh.

5          **MR. TOMENY:** And so she received the subpoena.  I was

6   retained.

7          **THE COURT:** The deposition was noticed, and a separate

8   subpoena for documents was issued?  Is that how it played out,

9   Mr. Most?

10         **MR. MOST:** No, it was one subpoena for deposition and

11  documents.  And Mr. Tomeny did reach out to me well before --

12  so the original subpoena was June 28th.  My colleague reached

13  out to me on July 1st.  At his request, we issued a new

14  subpoena to push it back because he was out of town.  And then

15  the first thing that could be --

16         **THE COURT:** When was the new subpoena issued?

17         **MR. MOST:** July 29th.  And then the first thing that

18  could remotely be characterized as objections was a letter of

19  August 15th which was already passed the 14 days.

20         Mr. Tomeny had been retained as early as July 1st

21  when he reached out to me.  So it's not the case --

22         **THE COURT:** But it was reissued on the 29th; right?

23         **MR. MOST:** That's right.

24         **THE COURT:** So the time we're really looking at is

25  between the 29th and the 15th?

OFFICIAL TRANSCRIPT

1          **MR. MOST:** That's right.  And he had certainly been

2     retained.

3          **MR. TOMENY:** I was in communication with Mr. Most

4     about the deadlines and extensions.

5          **THE COURT:** You ain't filed no extension asking me to

6     give you some gratis?

7          **MR. TOMENY:** I did not, Your Honor.

8          **THE COURT:** Right, and so it seems to me you went

9     passed the 14-day period; right?

10          **MR. TOMENY:** By a day.

11          **THE COURT:** Wouldn't you concede that?

12          **MR. TOMENY:** By a day.

13          **THE COURT:** By a day.

14          **MR. MOST:** By three days, Your Honor.

15          **MR. TOMENY:** Well, three.  So notwithstanding that --

16          **THE COURT:** You got a case that says when you miss the

17     deadline, I shouldn't follow that, and I should blow passed the

18     14-day period?

19          Because I'll be honest with you, I routinely enforce

20     that rule.  I don't know why I shouldn't enforce it on this

21     end, you know.  You probably had a good argument on the

22     relevancy point, but if you miss the timeliness point, it kind

23     of moots the issue, doesn't it?

24          **MR. TOMENY:** Well, Your Honor, I would say this.  I

25     thought that Mr. Most was gracious enough to grant me the time

OFFICIAL TRANSCRIPT

1    I needed to get up to speed on the case in the time allotted.
2    We picked -- as soon as I talked to him, we picked another
3    deposition date.

4        **THE COURT:** What was the date of compliance on the
5    subpoena?  When did you have to comply?

6        **MR. TOMENY:** July 29th.

7        **THE COURT:** Oh, so you didn't -- when did you --

8        **MR. TOMENY:** Well, he issued a subpoena for July 29th.

9        **THE COURT:** You didn't file the motion to quash until
10    September 5th.

11        **MR. TOMENY:** But in the meantime, I was in
12    communication with Mr. Most.  We picked another deposition
13    date.  And I said, "Let's pick a deposition date, but I may
14    want to oppose the motion.  I'm looking at filing a motion to
15    quash."

16        **THE COURT:** So here's the problem.

17        **MR. TOMENY:** My emails that I attached to my reply
18    show that.  We were working together toward getting either a
19    deposition or -- and if I objected, to get in front of the
20    Court.

21        I said, look, and I called him for a conference to
22    have it on August 15th, a discovery conference, and he said
23    he was in court, could I extend it.

24        I said I will extend it only if you agree not to
25    object to -- if you agree to give me the time to get in front

OFFICIAL TRANSCRIPT

1  of the judge if we can't agree to it.

2          **THE COURT:** You got a document that shows me you said

3  that?

4          **MR. TOMENY:** Yes, it's attached to my reply memo.

5  It's attached.  He agreed to it.

6          **THE COURT:** Your reply memo.

7          **MR. TOMENY:** He was in trial.  He could not go through

8  with the discovery conference that I requested, and he

9  needed -- it was a week and a half later.

10         And so we had the discovery conference.  We then

11  tried to even further agree with email exchanges and so forth

12  about making a compromise.  And when we couldn't, I filed a

13  motion the next day.

14         **MR. MOST:** Right, but I specifically said that it'd be

15  fine to extend things because you were already passed the Rule

16  45, 14 days; so that issue was moot.  I put that -- in my email

17  of August 16th, I said, "And yes, I'm happy to extend the

18  deposition date, if necessary" -- this is R. Doc. 42-2.  "I'm

19  happy to extend the deposition date, if necessary, to allow

20  time for motion practice.  Because the Federal Rule of Civil

21  Procedure 45(d)(2)(B) deadline is tied to the date of subpoena

22  service, I don't think extending the deposition date will

23  change anything there."

24         Because by that point, we were already passed the 14

25  days.

OFFICIAL TRANSCRIPT

1    **MR. TOMENY:** But he's telling me he wouldn't object.
2 And now he objects in his memorandum, and now he's objecting to
3 the Court.
4    **THE COURT:** No, no, no.  He said he's fine with moving
5 the deposition.  He basically said in a polite way, "But I
6 think I got you on the subpoena."  That's how I read what he
7 wrote.
8    **MR. TOMENY:** I didn't read it that way, Your Honor.
9    **THE COURT:** He says, "I'm happy to extend the
10 deposition date if you want to go ahead and do your motion
11 practice."
12    **MR. TOMENY:** Yeah, well.
13    **THE COURT:** But your motion practice is on the
14 subpoena, but he says Rule 45(d)(2)(B) says that the deadline
15 as to the subpoena is tied to the date of the subpoena service.
16 So I don't think giving you a break on the depo date is going
17 to change your obligation to comply with the subpoena is what
18 he was saying.  That's what that email says to me.
19    **MR. TOMENY:** It wasn't real clear to me, Your Honor.
20    **THE COURT:** It's clear to me.
21    **MR. TOMENY:** I didn't read it that way.
22    **MR. MOST:** I generally agree to any request for an
23 extension when it comes before a deadline is passed.  But I
24 feel like my duty of zealous advocacy means I can't
25 retroactively undo a deadline that's already been missed.

OFFICIAL TRANSCRIPT

1      **THE COURT:** By the time he communicated with you, this
2  was on the day after the -- 8/15 was the response date that it
3  was due?

4      **MR. MOST:** I'll have to look.  The FRCP 45 two-week
5  deadline was August 12th.

6      **THE COURT:** August 12th.  So you were already a couple
7  of days late when you tried to get him to extend the deadline.

8      **MR. TOMENY:** No, I was asking for a discovery
9  conference, Your Honor.  I didn't ask him for an extension of
10  the deadlines.

11      **THE COURT:** Oh, no, you said you wanted motion
12  practice to address the issue of the subpoena.  The problem is,
13  what he's saying is the date for your compliance on the
14  subpoena was August 12th.  So you were four days late on the
15  deadline.

16      There's some case law that suggests that there's some
17  flexibility in the compliance requirement on the 14-day rule.
18  But I'll just say one of my former colleagues found that you
19  can go -- that you may not be subject to the 14-day
20  requirement, but your motion to compel has to be filed before
21  the date of compliance.  So in order for what you were trying
22  to do to be effective, you had to file your motion to quash
23  before August 12th which was your date of compliance on the
24  subpoena that was extended.  Instead, instead --

25      **MR. TOMENY:** No, Your Honor.  Your Honor, the date of

OFFICIAL TRANSCRIPT

1  compliance was September 24th.

2          **THE COURT:** Huh?

3          **MR. TOMENY:** Yes.  The subpoena says appear and

4  produce these documents on September 24th.

5          **THE COURT:** Is that what it says?

6          **MR. MOST:** Yes, but the two-week deadline of FRCP 45

7  was August 12th.  So you've got the service of the subpoena.

8  Then two weeks later, you have to file objections, and then

9  there's the date of the deposition itself.

10          **THE COURT:** When did he have to comply with the

11  subpoena?  It's a simple question.

12          **MR. TOMENY:** September 24th.

13          **THE COURT:** Then he ain't late.

14          **MR. TOMENY:** Thank you, Your Honor.

15          **MR. MOST:** The objections would have been late, but

16  yeah.

17          **THE COURT:** Pardon me?

18          **MR. MOST:** He did not comply with the --

19          **THE COURT:** He filed the motion in time enough to

20  address the issue before his objections could be waived.  So

21  this is a nonissue.

22          **MR. MOST:** That's not what Your Honor held in

23  *Duplantier*.  You held that when objections were not filed by

24  the two-week period after service of the subpoena, quote, "As

25  such, the Court finds that plaintiff's objections are waived."

OFFICIAL TRANSCRIPT

1    So at least in one case in the past, you found that the failure
2    to provide objections within two weeks led to the objections
3    being waived.
4              **THE COURT:** In two weeks of the date of the return?
5              **MR. MOST:** Date of service, yes.
6              **THE COURT:** But the issue was not raised probably in
7    *Duplantier* as to whether or not that finding would extend if
8    the date of compliance had not expired.  So with regards to
9    that, yes, I did say that in 2011.
10             And in 2018, Judge Wilkinson in *Sines versus Kessler*
11   questioned whether -- he disagreed with my finding that the
12   14-day rule applied to a nonparty.  But that's the purpose of a
13   subpoena; so I disagree with him on that.  And instead, he said
14   that if a person filed a motion to quash before the compliance
15   date, then the subpoena -- then it still would be timely.  So
16   there's an issue there.
17             **MR. MOST:** Yes, Your Honor.  And we even put in our
18   brief one of Wilkinson's cases because we acknowledge that
19   there is a disagreement between judges about whether that 14
20   days means you've waived your objections or not.  And so we,
21   you know.
22             **THE COURT:** But in *Duplantier*, did they -- I don't
23   think they raised the issue of when the return date was on the
24   subpoena?  I don't think that was the issue in that case.
25             **MR. MOST:** Yeah, it says the subpoena was served on

OFFICIAL TRANSCRIPT

1  May 12th.  Compliance was required by -- oh, it does say

2  compliance was required by May 27th.  Therefore, objections

3  were due 14 days after the subpoena was served on May 26th.

4  They did not formally object to the subpoena.  Instead filed

5  the instant motion on June 10th.  As such, the Court finds that

6  the plaintiff's objection --

7            **THE COURT:** Before or after the compliance date?  Was

8  that before or after?  I don't know.

9            **MR. MOST:** It was after.

10            **THE COURT:** Right.  So they missed it because they

11  didn't even file it within the compliance date.  So I enforced

12  the 14-day rule.

13            In Jay's case, it appears that the motion was filed

14  before the compliance date requirement, but after the 14 days.

15  So that's not really a conflict as I see it.  It kind of gives

16  us a little bit of wiggle room.  So based on what y'all are

17  telling me, it sounds like it's timely filed.

18            I will say, though, I have concerns about relevancy.

19  What are you seeking in this subpoena?  Some of it may be

20  relevant, and some of it may not.

21            **MR. MOST:** Yeah.  So in terms of documents, we're

22  asking for documents reflecting the ownership of Gaumet

23  Holdings, LLC, and I think we'd be fine with either documents

24  or testimony about that because the question is who owns This

25  LLC.  That's not publicly available.

OFFICIAL TRANSCRIPT

1          And then the second is correspondence about
2    Greenfield or the proposed grain terminal because Ms. Hotard
3    says she has never communicated with Darla Gaudet about this
4    material.

5          **THE COURT:** Right, and so I see where you're going.
6    If the mother-in-law had conversations with the grain elevator
7    people, that would maybe suggest something ain't quite true.

8          **MR. MOST:** Or more importantly, if Gaudet had emails
9    or text messages with Hotard about it, then that would show
10   that Hotard was not being truthful in her deposition.

11         **THE COURT:** Yeah, well, I doubt that that exists.

12         **MR. TOMENY:** Your Honor, may I comment?

13         **THE COURT:** Who?

14         **MR. TOMENY:** May I comment on what he just said?

15         **THE COURT:** Yeah, yeah, yeah.

16         **MR. TOMENY:** I go back to what Your Honor said in the
17   beginning.  What relevancy is it --

18         **THE COURT:** He's saying it goes to motive.  That's how
19   I interpret.  Is that what you're saying, Mr. Most?

20         **MR. MOST:** Yes, Your Honor.

21         **MR. TOMENY:** He already has that.  He has what's in
22   the public records.  Gaumet Holdings, Darla Gaudet is listed in
23   the public records.

24         **THE COURT:** As a member, controlling member?

25         **MR. TOMENY:** I think she's listed as managing member,

OFFICIAL TRANSCRIPT

1  yeah, I believe she is.

2            **MR. MOST:** No, Your Honor.

3            **THE COURT:** Show me something that says --

4            **MR. MOST:** It says "manager" on the website, not

5  member.

6            **THE COURT:** Well, how is he supposed to know it's a

7  manager member?

8            **MR. TOMENY:** I mean most LLCs appoint managers who are

9  members.  You can list it either way.  She signs, you know, she

10  signs on -- that's been public -- he already has that

11  information.  He has the information about what strips of land

12  she owns and where it's located relevant to this proposed grain

13  elevator.  But how is any of that relevant?

14            I mean if it shows motive, if that's what he thinks

15  shows motive, he has the evidence.  He has it.

16            **MR. MOST:** This is the first time we've ever heard

17  that Darla Gaudet owns that land.  If that's true, that's one

18  of the things we're --

19            **MR. TOMENY:** I didn't say she did.  I said the

20  company -- I said she is a managing member of the company.

21            **MR. MOST:** That's what we've heard for the first time

22  today.  That's why we're seeking this discovery because that

23  information is not elsewhere available to us.  And so if he's

24  willing to say this in open court, then at the very least we

25  should --

OFFICIAL TRANSCRIPT

1       **THE COURT:** You have the proof that the holdings

2  company, that she's a managing member, sir?

3       **MR. TOMENY:** It's in the public records.  He has it.

4       **THE COURT:** I hear what you're -- Hannah, go get my

5  iPad, please.

6       **MR. TOMENY:** Your Honor, his complaint, original

7  complaint where he recites all these things about the proposed

8  development of the grain elevator and the connection between

9  Hotard, he has in a footnote the information from the public

10  records about Darla Gaudet's company.  She has more than one,

11  and he has it in the footnote in his complaint.

12       **MR. MOST:** That's a different company.

13       **MR. TOMENY:** St. John Fleeting.

14       **MR. MOST:** That's St. John Fleeting which is not the

15  company that we're talking about here.

16       **MR. TOMENY:** But he has the information.  That's why

17  he sent a subpoena.  That's why he subpoenaed those records.

18  But how is any of that -- let me go to another point on all of

19  this that we haven't talked about yet.

20       Everyone is entitled to the right to privacy

21  especially in their financial affairs.  That is why the

22  information is not public, to prevent this kind of thing.

23  People are entitled to have their personal business kept

24  private.

25       There's case law after case law, and I cite it in my

OFFICIAL TRANSCRIPT

1  memo, Judge, that supports the proposition that financial

2  information is to be protected especially in this case where it

3  has nothing really to do with the claim, the First Amendment

4  claim.  It has nothing to do with it.

5          If he would have filed a lawsuit to attack the

6  rezoning and the benefit and the inside deals, all the things

7  he's alluding to, that would be one thing.  That's a different

8  lawsuit.  It's not this lawsuit.

9          This lawsuit is a First Amendment violation of an

10  event that occurred in a public meeting.  My client wasn't

11  there.  And he already has all the other information he needs

12  about whatever proposed relationship her land may have to his

13  ethics complaint.

14          **MR. MOST:** I've heard both in that colloquy that this

15  is information I already have that is publicly available and

16  also that it is confidential and private.

17          **THE COURT:** Yeah, you did say that.  Which one is it?

18  Is it confidential and private, or does he have it?

19          **MR. TOMENY:** Your Honor, no, the information about the

20  ownership of that company is confidential and private.  It is

21  not public.

22          What's public is the fact that Darla Gaudet is the

23  manager of that company.  You can draw whatever inference -- he

24  can draw whatever inference he wants from that, okay, any

25  inference he wants.  But the ownership is different.  It goes

OFFICIAL TRANSCRIPT

```
 1   deeper.

 2           MR. MOST: I mean I think they --

 3           THE COURT: Are you saying she doesn't own it?  I

 4   thought you said she did.

 5           MR. MOST: If he's saying that Darla Gaudet owns this

 6   land, which he has said today --

 7           MR. TOMENY: No, I didn't say that.  I said her

 8   company --

 9           THE COURT: He said her company did.

10           MR. TOMENY: That she has an interest in, by virtue of

11   the fact that it's on the public records, yeah.

12           MR. MOST: There is no publicly available information

13   that she has an ownership stake in this LLC.

14           MR. TOMENY: And what difference would it make if she

15   did to your lawsuit, to your First Amendment claim?  That's the

16   point, Judge.  That's the point.

17           MR. MOST: Because if she has an ownership stake in

18   this company, then there's financial interests between the

19   parish president and her mother-in-law that's defined by

20   statute and would provide a plausible motive for the parish

21   president to shut down a critic who is speaking exactly about

22   this topic.

23           MR. TOMENY: Whoa, that's a stretch.  That's a

24   stretch, Judge, for a nonparty, a nonparty.  He already has the

25   facts he needs if he can put that in front of a jury or whoever
```

OFFICIAL TRANSCRIPT

1  is going to try this case.  If that's what he wants to show as
2  a motivation for her to shut her down, he has it.  He doesn't
3  need my client.  He doesn't need the ownership interest.  He
4  has all the connections he needs.  She is a nonparty.  She
5  should not be drug into this.

6          **THE COURT:** Who are we talking about, Shelby Gaudet?
7  Who are we talking about?

8          **MR. TOMENY:** Darla Gaudet.

9          **THE COURT:** Darla.  Because I ran the name.  Is the
10 legal name Gaudet -- oh, Gaumet.

11          **MR. TOMENY:** Gaumet, G-A-U-M-E-T.  Gaumet, LLC.

12          **MR. MOST:** If Your Honor is looking at the Secretary
13 of State's website, it's under Gaumet Holdings, LLC.

14          **THE COURT:** It does say she's a manager and officer.

15          **MR. MOST:** That's correct.

16          **THE COURT:** Which is consistent with what he said.  So
17 I don't understand why you need more.

18          **MR. MOST:** Because what this tells you is who is a
19 manager or officer.  It doesn't tell you anything about the
20 ownership of the LLC.  These could be hired agents, or they
21 could be owners of the company.  We don't know.

22          And what he has said today is that she is a managing
23 member which would mean an ownership stake, but the Secretary
24 of State's website doesn't say that.  It is not public
25 information who is an owner of an LLC.


                         OFFICIAL TRANSCRIPT

1    **MR. TOMENY:** Nor should it be, Your Honor.  That's my
2 point.  This is a privately held company.  Nor should that be,
3 anymore than we need to find out what Mr. Most owns or anybody
4 else.  It's financial information.  It's entitled to privacy
5 and protection.

6    **THE COURT:** I don't think he was asking for financial
7 information.  I read the subpoena.

8    **MR. TOMENY:** No, the ownership is financial
9 information.

10    **THE COURT:** You keep saying it's financial
11 information.  It's structural information, not financial.

12    **MR. TOMENY:** The ownership of a company is financial.
13 It's part of your assets and your holdings.  If you read the
14 cases, they say people are entitled to privacy about --

15    **THE COURT:** Give me the case that says you can't find
16 out about an LLC.  Give me a case.  Cite it to me.  Reference
17 it to me in your document here.  Let's see.

18    **MR. TOMENY:** I will find it.  I will find it.

19    **THE COURT:** I think what you said, you referenced a
20 case involving cell phones, right, and that's not right because
21 I permit cell phone discovery all the time.

22    I'm talking specifically about the discoverability of
23 an LLC because you claim -- you keep using that term, "Judge,
24 people are entitled to privacy for their financial
25 information."  When you use the term "financial information,"

OFFICIAL TRANSCRIPT

1  what I think about are income tax records or records of income

2  coming in.  That's not what the subpoena is asking for.

3          It's asking for, as I interpret it, more along the

4  lines of the formulation documents as opposed to who gets what

5  percentage of income.

6          **MR. TOMENY:** Your Honor, the case --

7          **THE COURT:** Go ahead.

8          **MR. TOMENY:** *U.S. versus Amodeo.*  It's a Second

9  Circuit Case in 1995 I cite.  It says, "The Supreme Court" --

10         **THE COURT:** Hold up, let me catch up.

11         **MR. TOMENY:** It's on page 10.

12         **THE COURT:** Yeah, this says, "Financial records of a

13 wholly owned business" --

14         **MR. TOMENY:** Family affairs.

15         **THE COURT:** -- "family affairs, illnesses,

16 embarrassing conduct," none of that applies here --

17         **MR. TOMENY:** This is a wholly owned business, Your

18 Honor.  It's private.

19         **THE COURT:** You said this case talks about financial

20 records.  Formulation documents are not financial records.

21         **MR. TOMENY:** Your Honor, the privacy cases, if you go

22 on to the next case, Louisiana Supreme Court 1981.

23         **THE COURT:** Hold up.

24         **MR. TOMENY:** They talk about the right to privacy.

25 "Every person shall be secure in his person, his property,

OFFICIAL TRANSCRIPT

1  communications, houses" --

2         **THE COURT:** Let me tell you this. Ain't nobody got

3  nothing private today. If I ran your name in Mr. Google,

4  Mr. Google would tell me where you live. Mr. Google would tell

5  me who your neighbors are. Mr. Google would tell me just about

6  everything you own. So you don't have that right to privacy

7  from 1995 that we used to have.

8         **MR. TOMENY:** Your Honor, to your point well taken,

9  Mr. Most has that information. Why does he need my client?

10        **THE COURT:** Make up your mind. It's either private or

11 it's not.

12        **MR. TOMENY:** He has what's available to the public,

13 what you recited, Google and search and Facebook and all these

14 other things.

15        **THE COURT:** And AI, if I put it in ChatGPT and pull up

16 your business.

17        **MR. TOMENY:** But not everything is there. And it's

18 unfortunate, but it doesn't make it right, Your Honor. It

19 doesn't make it right the fact that you can do it.

20        My point is in this case he has to show more. He is

21 on a fishing expedition. He has information that will

22 allegedly support his connection between the zoning and the

23 grain elevator and Ms. Gaudet and Ms. Hotard. He has all of

24 that now.

25        **THE COURT:** So the other case you cite me, which is an

OFFICIAL TRANSCRIPT

1  '81 case, clearly says -- and who is this by?  Louisiana

2  Supreme Court.  I'd be interested in what the U.S. said, but

3  nonetheless, what the Louisiana Supreme Court said was that

4  while we have a right to privacy, it's not absolute.

5         **MR. TOMENY:** No, it's not.

6         **THE COURT:** It's limited by the State's reasonable

7  exercise of police power.  There is no such absolute right.

8         So my question is -- I haven't gotten over the

9  relevancy argument yet, but let's assume that I do get over the

10  relevancy argument.  I don't understand why the formulation

11  documents you think should not be produced.

12         **MR. MOST:** And, Your Honor, we don't even need the

13  formulation documents.

14         **THE COURT:** What are you asking for?

15         **MR. MOST:** It really would be sufficient if they just

16  told us what is the ownership stake of Ms. Gaudet.  We don't

17  need to know who the other --

18         **THE COURT:** Percentage?

19         **MR. MOST:** Sure.  And we're willing to enter into a

20  protective order.  Look, we acknowledge that this is not public

21  information, and we're happy to do what this court very

22  commonly does with not public information which is have it

23  produced subject to a confidentiality protective order.

24         And we respect that it's private, but that doesn't

25  mean it's protected from discovery.  It just means that then

OFFICIAL TRANSCRIPT

1  you take steps to make sure it's not shared around willy-nilly
2  which we're completely comfortable doing.
3        **MR. TOMENY:** As to a nonparty, it still has to be
4  relevant, Judge.  That's my point.
5        **THE COURT:** Well, he said it's relevant to motive.  So
6  here's the deal.  For example, if she had like an 80 percent
7  interest in the holding company and the daughter-in-law runs
8  things, whether she claims to know or not, he can create an
9  inference that it's a family hookup kind of thing.  And it's
10  for the other side to defend and say, "No, it's not, and this
11  is why."
12        As for correspondence, I don't know if the
13  correspondence is relevant or not.  Because if it's all
14  happening around the same time as the governing body's decision
15  to allow the grain company in, it could be relevant.  It's hard
16  for me to say that it's not.
17        My problem, Mr. Most, though, is your subpoena as
18  written has no temporal limitation, and I don't know when, how
19  long.
20        **MR. MOST:** Yeah.
21        **THE COURT:** Based on what he's saying, she's owned
22  this property for a while.  She could have been having
23  conversations well before her daughter-in-law became parish
24  president.
25        **MR. MOST:** That's fair, Your Honor.  I think certainly

OFFICIAL TRANSCRIPT

 1  communications after November 23rd would not be relevant to

 2  the motive of what happened in 2023rd, so we could cut it off

 3  there.

 4          **THE COURT:** Say that again.

 5          **MR. MOST:** After November 2023.  I think I said

 6  2023rd.

 7          **THE COURT:** Is that when she assumed --

 8          **MR. MOST:** That's when the incident that forms the

 9  basis of this lawsuit occurred.  So anything after that

10  wouldn't be relevant.

11          **THE COURT:** Well, what about before?

12          **MR. MOST:** I think we could start it at when Jaclyn

13  Hotard became parish president.

14          **THE COURT:** Which is when?

15          **MR. MOST:** The election was in October 2019.

16          **THE COURT:** What date did she assume office?

17          **MR. MOST:** I think it was January the next year.

18          **THE COURT:** January what?

19          **MR. MOST:** Of 2020.

20          **THE COURT:** What date?

21          **MR. MOST:** I could pull up the exact date.  But I'd be

22  comfortable having it run from the date she assumed office to

23  the date of the council meeting at issue, and that be the

24  temporal limitation.

25          **THE COURT:** Y'all need to give me the date because I

OFFICIAL TRANSCRIPT

1 don't like to put anything as vague as that in an order.

2          **MR. MOST:** Understood.  I can pull that up.

3          **MR. TOMENY:** Your Honor, may I say something?

4          **THE COURT:** You may.

5          **MR. TOMENY:** It seems to me in addition to the whole

6 relevancy connection, the fact that this project is gone --

7          **THE COURT:** It's gone because the grain company said,

8 "I'm not getting involved in this Louisiana mess."  But that

9 doesn't mean that at the time this occurred that there weren't

10 other motivations.  I don't know if there were or there

11 weren't.

12          That is the subject of this suit, like, "Why would

13 you shut me down?  You never did it to anybody else, and it's

14 because your people were involved."  I don't know if it is or

15 it isn't.  But it seems to me that the reason for decisions

16 being made and that may have had a reason or may have been

17 motivated by protecting or restricting the flow of information.

18          **MR. TOMENY:** Your Honor, he took Ms. Hotard's

19 deposition.  I read it.  He didn't ask her any of that.

20          **THE COURT:** He didn't ask her any of what?

21          **MR. TOMENY:** He didn't ask Ms. Hotard anything like --

22          **THE COURT:** Anything like what?

23          **MR. TOMENY:** Does she own an interest in the company?

24          **THE COURT:** No, no, I don't think he cares if she owns

25 it.  If the mother-in-law owns it, he's going to try to create

OFFICIAL TRANSCRIPT

1  a suggestion that she knew and that somehow would impact her

2  behavior.

3          **MR. MOST:** We did ask her these things.  If Ms. Hotard

4  had been able to answer these questions, we would not have

5  sought the deposition of Ms. Gaudet at all.

6          For example, we asked Ms. Hotard:

7          "Question:  Darla Gaudet is a partial or complete

8  owner in an LLC called Gaumet Holdings, LLC; correct?"

9          And she answers, "I'm unfamiliar with their

10 business."

11         So if we had been able to establish through her that

12 she knows her mother-in-law is a part owner, then we would

13 never have needed this deposition at all.  The only reason

14 we're asking for this deposition is because Ms. Hotard denied

15 any knowledge about these things.

16         So I tried to get this information from the parties

17 to the case first before seeking the step of going to a

18 third-party which I acknowledge, you know, it comes with a

19 heavier burden, right, which is why I tried to get it first

20 from the parties to the case.

21         **MR. TOMENY:** Ms. Gaudet is not going to be able to say

22 what Ms. Hotard knew or didn't know.

23         **THE COURT:** He's not asking her for that.  What he

24 wants to know is her communications with the grain company

25 during this period of time and what her ownership interests

OFFICIAL TRANSCRIPT

1    are, and then he can take that and ask additional questions.
2    You may be right.  She may say, "I have no idea.  I don't
3    know."

4            But if the issue is motive, I could see how
5    potentially the communications may provide support for motive.
6    It may not.  I don't know.  I also don't know how many
7    communications there are.

8            What I think I'm inclined to do is to tell you, sir,
9    to give them to me for in camera review, but to produce to
10   Mr. Most -- and it doesn't need to be the documents.  Just give
11   him the percentage of her holdings in the company.  And I will
12   look at these documents and figure out if they have any
13   relevance to the issue in the case.

14           If there's no relevance, I'll return the documents to
15   you.  If there is relevance, I will explain -- we may have a
16   follow-up hearing, and I will explain to you why I think it's
17   relevant and order the release.  But I will not release them.
18   I will return them to you for you to release, okay?

19           **MR. TOMENY:** And this is the Gaumet Holdings
20   documents?

21           **THE COURT:** Correct.

22           **MR. TOMENY:** Okay.

23           **THE COURT:** I have a question.  I just saw another
24   name.  What's this Greenfield Louisiana, LLC, what's that?  Is
25   that the grain company?


                      OFFICIAL TRANSCRIPT

1          **MR. TOMENY:** That's the grain company.

2          **THE COURT:** Okay.

3          **MR. TOMENY:** Your Honor, I do not have the documents

4    myself.

5          **THE COURT:** Oh, I didn't think you did.  I didn't

6    think you got them yet.  I wouldn't have gotten them yet either

7    unless I knew what the court was going to do.  Just get them to

8    me in ten days.

9          Here's the deal.  Hopefully, they're in a format

10   where you can just attach them as a PDF and send them to my

11   eFile box.  And my law clerk will pull it, and I will look at

12   it.  And we'll either reconvene in person or by Zoom, and I'll

13   let you know what I think about the documents, okay.

14         **MR. TOMENY:** Yes, ma'am, will do.  Thank you.

15             (An off-the-record discussion was held.)

16         **THE COURT:** My law clerk said -- so the defendants in

17   this matter which would be Ms. Hotard, right, denied that

18   Gaudet was an officer and manager of the LLC in their answer

19   which is directly contradicted by what you said.

20         So how would she know to deny it if she didn't know

21   anything about it?

22         **MR. TOMENY:** Your Honor, is that in the answer to the

23   complaint?

24         **THE COURT:** Uh-huh, according to my law clerk who read

25   all of my pleadings.

OFFICIAL TRANSCRIPT

1          **MR. TOMENY:** I didn't read it.

2          **THE COURT:** You should go read the answer.

3          **MR. TOMENY:** Was it in our allegations of denial?

4          **THE COURT:** It's on behalf of Ms. Hotard where she

5    denies that Gaudet was a member.  Right?

6          **MR. TOMENY:** What does it say?  I apologize, Judge.

7          **LAW CLERK:** "President Hotard's mother-in-law Darla

8    Gaudet is the officer and manager of Gaumet Holdings, LLC."

9          **THE COURT:** That's the allegation.

10          **MR. TOMENY:** Okay.

11          **THE COURT:** In the answer, they deny it.

12          **MR. MOST:** This was in our opposition brief.

13          **THE COURT:** Which is a direct contradiction to what

14    you just represented to me.  There's your relevancy.  There's

15    your relevancy.

16          **LAW CLERK:** "The allegations in paragraph 33 are

17    denied as written and Defendants call for strict proof of each

18    and every allegation contained therein."

19          **THE COURT:** So they denied that as a fact.

20          **MR. TOMENY:** As written?

21          **THE COURT:** It's written that she's a manager and

22    blah, blah, blah, and they said, "No, she's not."

23          **MR. TOMENY:** Okay, Your Honor.

24          **THE COURT:** And you said, "Yes, she is."

25          **MR. TOMENY:** Because she is.  I mean she's the

OFFICIAL TRANSCRIPT

1  manager.  You saw it on the public records.

2          **THE COURT:** The point is Hotard is claiming, "I don't

3  know nothing," in the deposition and in her pleadings saying,

4  "I do know something, and no, she's not."  And you're telling

5  me, "Oh, yes, she is."

6          **MR. TOMENY:** Your Honor, I'll get you the records.

7          **THE COURT:** All right, thank you.

8          Ten days, is that good?

9          **MR. TOMENY:** Yes, Your Honor.  I'll try to get them to

10  you before.  I'm leaving town on Wednesday.  I'm going to try

11  to get it to you Monday or Tuesday.

12          **THE COURT:** Are you going to be gone long?  We don't

13  have deadlines; right?

14          **MR. MOST:** There's a witness and exhibit list that's

15  October 28th, I believe.  But I'm sure the judge would allow

16  us, if there were some additional documents we got after that,

17  to add them.  Trial's in January.

18          So if he needs a little more time, I'm open to it

19  because it may take some time to compile these communications

20  that we've asked for.

21          **THE COURT:** How long is your trip?  Would the 18th

22  be better?

23          **MR. TOMENY:** I will be coming back -- let me see,

24  Judge.  I'm leaving Wednesday.  I'm coming back Sunday.  Then

25  I'm leaving again the following Thursday and coming back that

OFFICIAL TRANSCRIPT

1  Monday.

2            **THE COURT:** Oh, so we're looking more like the 25th.

3            **MR. MOST:** The witness and exhibit list is due

4  October 28th, but I suspect we could get permission --

5            **THE COURT:** Who is our judge?

6            **MR. MOST:** It's Judge Brown.

7            **MR. TOMENY:** Judge, I can get --

8            **THE COURT:** The stuff to me before you leave?

9            **MR. TOMENY:** -- the documents.  Communications, I

10  don't know.  We haven't even looked.  I don't even know if

11  there are any.

12            **THE COURT:** Why don't you do this, see what you got.

13  There may not be much.  If there's a whole bunch, send an email

14  to the eFile.  We'll do a quick call, and we'll figure out what

15  we need to do.  I think Judge Brown would be amenable just

16  because of the nature of the issue.

17            **MR. TOMENY:** Thank you, Your Honor.

18            **MR. MOST:** Thank you, Your Honor.

19            **THE COURT:** My deadlines are usually not effective

20  until I issue a written order.  But given the scheduling order

21  deadlines, I'm going to trigger yours today, right, to the ten

22  days because you think you might be able to get it, and you'll

23  let me know if you run into trouble, and then we'll pivot from

24  there.

25            **MR. TOMENY:** Yes, Your Honor.  Thank you.

                  OFFICIAL TRANSCRIPT

1    **THE COURT:** All right.

2    **DEPUTY CLERK:** That concludes today's hearing.  Thank

3    you, Counsel.

4    (Whereupon this concludes the proceedings.)

5

6

7

8    <u>**CERTIFICATE**</u>

9

10    I, Alexis A. Vice, RPR, CRR, Official Court Reporter for

11    the United States District Court, Eastern District of

12    Louisiana, do hereby certify that the foregoing is a true and

13    correct transcript, to the best of my ability and

14    understanding, from the record of the proceedings in the

15    above-entitled and numbered matter.

16

17    */s/Alexis A. Vice, RPR, CRR*
            Alexis A. Vice, RPR, CRR
18            Official Court Reporter

19

20

21

22

23

24

25

OFFICIAL TRANSCRIPT