UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


JOY BANNER                          CIVIL ACTION

                                    NO. 23-CV-7296

VERSUS


MICHAEL WRIGHT, et al.




        DEPOSITION OF RICHARD C. STANLEY, ESQ.,

given in the above-entitled cause, pursuant to the

following stipulation, before Sandra P. DiFebbo,

Certified Shorthand Reporter, in and for the State

of Louisiana, at 909 Poydras Street, Suite 2500,

New Orleans, Louisiana, on the 11th day of

November, 2024, commencing at 9:00 AM.

```
 1    APPEARANCES:

 2

 3            MOST & ASSOCIATES
              BY: WILLIAM MOST,
 4            ATTORNEY AT LAW
              201 St. Charles Avenue
 5            Suite 2500, #9685
              New Orleans,Louisiana  70170
 6            Representing the Plaintiff

 7

 8
              SPEARS & SPEARS
 9            BY: IKE SPEARS,
              ATTORNEY AT LAW -and-
10            ALEXANDRA CONLAY,
              ATTORNEY AT LAW
11            909 Poydras Street
              Suite 1825
12            New Orleans, Louisiana  70112
              Representing the Defendants
13

14

15    Reported By:

16

17            Sandra P. DiFebbo
              Certified Shorthand Reporter
18            State of Louisiana

19

20

21

22

23

24

25
```

```
 1     E X A M I N A T I O N          I N D E X

 2

 3                                      Page

 4   BY MR. MOST:                      5, 64

 5   BY MR. SPEARS:                      56

 6

 7

 8

 9     E X H I B I T                  I N D E X

10

11                       Page

12

13   Exhibit ZJ                        12

14   Exhibit ZL                        23

15   Exhibit X                         34

16   Exhibit ZM                        38

17

18

19

20

21

22

23

24

25
```

```
1              S T I P U L A T I O N

2

3              It is stipulated and agreed by and

4    between Counsel for the parties hereto that the

5    deposition of RICHARD C. STANLEY, ESQ., is hereby

6    being taken via Zoom videoconferencing, pursuant to

7    the Federal Rules of Civil Procedure for all

8    purposes in accordance with law;

9              That the formalities of reading and

10   signing are specifically waived;

11             That the formalities of sealing,

12   certification, and filing are hereby specifically

13   waived.

14             That all objections, save those as to

15   the form of the question and responsiveness of the

16   answer are hereby reserved until such time as this

17   deposition or any part thereof is used or sought to

18   be used in evidence.

19                   *  *  *  *  *

20             Sandra P. DiFebbo, Certified Shorthand

21   Reporter, in and for the State of Louisiana,

22   officiated in administering the oath to the

23   witness.

24

25
```

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

```
 1              RICHARD C. STANLEY, ESQ., having been
 2         first duly sworn, was examined and testified on
 3         his oath as follows:
 4    EXAMINATION BY MR. MOST:
 5         Q.    Good morning, Mr. Stanley.  My name is
 6    William Most.  I'm the attorney for the plaintiffs
 7    in Banner v. Wright.  Could you give us your full
 8    name for the record?
 9         A.    Sure.  Richard C. Stanley.
10         Q.    I assume you have taken and defended many
11    depositions in your career, correct?
12         A.    I have.
13         Q.    Have you ever been a deponent in a
14    deposition?
15         A.    I have.
16         Q.    Roughly, how many?
17         A.    I was trying to think of that this
18    morning.  I'm going to say between ten to 12 times.
19         Q.    So you understand that you're under oath
20    today?
21         A.    I do.
22         Q.    That your answers here today have the
23    same force as if we were in a courtroom with a
24    judge and jury?
25         A.    I do.
```

1          Q.   Is there anything today, whether illness,

2     fatigue, medications, substances, or anything else

3     that will prevent you from understanding my

4     questions and answering them truthfully and

5     completely?

6          A.   I hope not, no.

7          Q.   Is there anything to your knowledge,

8     though?

9          A.   No.

10         Q.   And as you know, we can take a break at

11    any time, although, I'll tell you in advance that I

12    may ask you who you talked to and what you reviewed

13    during any break.  All right?

14         A.   Sure.

15         Q.   Will you agree now that if I ask a

16    question that is confusing or you don't understand

17    it, will you agree now to tell me that's the case

18    rather than just try and answer it anyway?

19         A.   I'll do my best, yes.

20         Q.   Have you brought any documents with you

21    today to the deposition?

22         A.   I did.  I brought a copy of my expert

23    report and a copy of my CV, which I think I sent to

24    counsel.

25         Q.   Any others?

1         A.    No.

2         Q.    Roughly, how much time did you spend

3    preparing for this deposition?

4         A.    Oh, preparing for the deposition?

5    Probably an hour and a half or so.

6         Q.    Was that today or a different day?

7         A.    Yesterday and this morning.

8         Q.    What did you do to prepare for this

9    deposition?

10        A.    I read back through the materials, read

11   back through the report, read the transcript again,

12   and read the King case again.

13        Q.    So the report is your expert report?

14        A.    Yes.

15        Q.    The transcript is the transcript of the

16   public meeting in which Joy Banner spoke?

17        A.    In November of last year, yes.

18        Q.    You read King v. Alexander, the E.D. La.

19   case?

20        A.    I did.

21        Q.    What other materials did you review to

22   prepare for this deposition?

23        A.    I think that's it.  I may have briefly

24   looked at the Perriloux case from the Louisiana

25   Fifth Circuit, but I think that's it.

1      Q.    You are a partner at the law firm of

2  Stanley, Reuter, Alford, Owen, Munson & Paul,

3  correct?

4      A.    Correct. It's ROO-ter, not ROY-ter.

5      Q.    I take it you are the Stanley in Stanley,

6  Reuter?

7      A.    That's correct.

8      Q.    Your firm represents businesses like

9  Entergy and government entities like cities and

10 parishes, correct?

11     A.    Yes, among other clients, of course.

12     Q.    Have you ever represented St. John the

13 Baptist Parish?

14     A.    My partner has something to do with St.

15 John the Baptist Parish.  I don't recall.  I may

16 have had something to do with St. John the Baptist

17 Parish about four years ago or five years ago with

18 an insurance coverage case, but I'm not sure if

19 that was St. John or St. James, to be honest with

20 you.

21     Q.    You think your firm has represented St.

22 John the Baptist Parish in the past, and you may

23 have, but you're not sure?

24     A.    Correct.

25     Q.    Have you or your firm, to your knowledge,

1    ever represented Jaclyn Hotard or Michael Wright?

2         A.    Not to my knowledge, no.

3         Q.    What about Ike Spears or his law firm?

4         A.    I don't recall formally representing Ike,

5    although, from time to time, Ike and I talk about

6    things, and he might call me for advice informally.

7         Q.    And you understand that today you are

8    outside your role as an advocate, and you are here

9    to be a teller of the literal truth, correct?

10        A.    Right.

11        Q.    Do you consider yourself to be an expert?

12        A.    In certain areas, yes.

13        Q.    What area would those be?

14        A.    Ethics, constitutional law, commercial

15   litigation.

16        Q.    Any other areas?

17        A.    According to certain publications,

18   probably, but those are the areas that I practice

19   in quite a bit.

20        Q.    So some publications may have listed you

21   as an expert, but those are the only ones that you

22   feel like you are an expert in; is that fair?

23        A.    I wouldn't say that.  I'm trying to be

24   humble.  I have a broad array of interests and a

25   broad array of experience, but I feel very

1    comfortable saying that I'm an expert in those

2    fields.

3        Q.   Are there any other, besides ethics,

4    constitutional law, and commercial litigation, are

5    there any other nonlegal areas that you consider

6    yourself to be an expert in?

7        A.   Nonlegal? I'm not sure how to answer that

8    question.  To go back to -- you asked me if I was

9    confused to tell you.  I'm not sure how to answer

10   that question.

11       Q.   Sure.  Would you consider yourself to be

12   an expert in any scientific field?

13       A.   No.

14       Q.   You are not an expert in psychology or

15   sociology or cognition or how people think outside

16   of legal issues, correct?

17       A.   No.  I have a degree in political

18   science, but I would not consider myself an expert

19   in political science, at least not anymore.

20       Q.   Or any other scientific field?

21       A.   Correct.

22       Q.   And you said that you do feel yourself to

23   be an expert in ethics.  That is legal ethics,

24   correct?

25       A.   Correct.

```
 1        Q.    So that would be the law governing
 2   attorney conduct, correct?
 3        A.    Correct.
 4        Q.    And constitutional law and commercial
 5   litigation, those are two other areas of law that
 6   you would be an expert in, correct?
 7        A.    At least I would consider myself, yes.
 8        Q.    So the things that you consider yourself
 9   to be an expert in, at least the ones you have
10   described here today, are all expertise about the
11   law, correct?
12        A.    About the law and lawyers practicing
13   within the law, yes.
14        Q.    Have you done any research into how
15   nonlawyers understand the law?
16        A.    As part of my teaching responsibilities,
17   we do cover the fact of how the public looks at
18   lawyers, how the public understands the law, and
19   how the public has access or nonaccess to justice,
20   so to some extent, yes.
21        Q.    Do you consider yourself to be an expert
22   in how nonlawyers understand the law?
23        A.    I don't think anyone is an expert in how
24   others understand things.
25        Q.    But there is a scientific body of
```

```
 1   research about how nonlawyers understand the law,
 2   correct?
 3        A.   I wouldn't know that, and I wouldn't
 4   necessarily consider that a discipline.
 5        Q.   So if there is such a discipline, you are
 6   not familiar with it?
 7        A.   I'm not an expert in it.
 8        Q.   Are you familiar with it?
 9        A.   No.
10        Q.   You agree that no witness, including
11   experts, can testify as to legal conclusions,
12   correct?
13        A.   Legal conclusions are for the Court, yes.
14        Q.   I'm going to designate as Exhibit ZJ --
15   the reason why I am starting with ZJ is because it
16   is a continuation of prior depositions.
17        A.   That's fine.
18        Q.   Mr. Stanley, Exhibit ZJ is your expert
19   report and CV, correct?
20        A.   That looks to be, yes.
21        Q.   Paragraph 11 on Page 2 outlines what you
22   were asked to provide an expert opinion on,
23   correct?
24        A.   Correct.
25        Q.   It says, "I have been asked whether a
```

1   person could reasonably believe that a statute,

2   which in one district court case was held to be

3   unconstitutional 'as applied,' was still valid in

4   other applications," correct?

5        A.   That's what it says.

6        Q.   And so your opinion that you were asked

7   to provide is about what a person might believe if

8   a statute was found to be unconstitutional as

9   applied, correct?

10       A.   I wouldn't say it that way.  I mean, I

11  was summarizing here what I was asked to do to try

12  to make it as concise as I could, but, essentially,

13  the assignment was in the context of what happened

14  at that meeting.  If someone had called and asked

15  me right before that statute was read whether or

16  not it would have been a problem to read the

17  statute, then I would have applied this standard to

18  determine whether or not it was unreasonable, which

19  is a much longer way of saying what I was trying to

20  say here.

21       Q.   If the statute in question was both held

22  unconstitutional as applied, and, also, facially

23  unconstitutional, this opinion would have limited

24  relevance; do you agree?

25       A.   Well, that's -- first of all, I disagree

1    with your premise.  It was not held

2    unconstitutional in all of its applications.  It

3    was as applied and in one respect unconstitutional.

4    I think that that is the nub of the problem, the

5    confusion with the King opinion, but I'm not sure

6    how much relevance or irrelevance the Court would

7    ascribe to my opinion in terms of trying to

8    understand what to do in a situation like this when

9    presented with that problem.

10        Q.   So I understand that your opinion is that

11   the facial unconstitutionality of the statute at

12   issue in this case, the facial unconstitutionality

13   was dictum, correct?

14        A.   Yes.  In my opinion, it was dictum and --

15   but even if not dictum, it was a very limited

16   holding.

17        Q.   I want to talk about your methodology in

18   drawing conclusions.

19        A.   Sure.

20        Q.   You said you sort of received this

21   assignment to reach a conclusion about the

22   reasonableness of certain behavior, right?

23        A.   The reasonableness of what one would do

24   given a set of circumstances.

25        Q.   So that was the assignment, right?

1      A.    Yes.

2      Q.    So what you did next was you read some

3   documents about the factual scenario, correct?

4      A.    I did.

5      Q.    You read the complaint.  You read one of

6   the judge's orders in this case.  You read a joint

7   status report and a transcript of the parish

8   council meeting, right?

9      A.    Yes.

10      Q.    Did you read anything else about the

11   facts of the case?

12      A.    I can't recall anything else at the time.

13   If it's not listed, I don't recall it.

14      Q.    And you learned from reading those

15   documents that during the parish council meeting

16   the chair of the council stopped the plaintiff and

17   read to her from a state statute purporting to

18   criminalize certain kinds of speech, correct?

19      A.    At some point in the transcript that did

20   occur.

21      Q.    And so then you sat down and did some

22   legal research about the statute, correct?

23      A.    I read the King case, and I refreshed my

24   recollection on the standards that would apply in a

25   situation like this.

```
 1          Q.   That's legal research, correct?
 2          A.   Some of it was.
 3          Q.   What did you do that was not legal
 4     research?
 5          A.   Some of it was just reading treatises,
 6     just, again, reminding myself of what I thought the
 7     standards were for limited public forum, content
 8     regulation, viewpoint discrimination, that sort of
 9     thing.
10          Q.   So you read at least one case, and you
11     looked at legal treatises, correct?
12          A.   Legal treatises or perhaps even, you
13     know, notes that I used for bar instruction.
14          Q.   That's all legal research, agreed?
15          A.   Some of it is just reading notes, so I'm
16     not sure that's research.
17          Q.   At least some of it was legal research?
18          A.   Some of it was.
19          Q.   And then you looked at the facts and then
20     applied the law to the facts to reach your
21     conclusions, correct?
22          A.   I looked at the facts and put myself in
23     the position of someone who had I been called on at
24     a particular moment in time to say can I or can I
25     not read the statute, what would a lawyer
```

reasonably educated in constitutional law, what

advice or standard would they use to give that

advice at that point in time.  So that was,

essentially, my thought going into this project.

Q.   So your methodology was to look at the

facts, research the law and your notes, and then

think about what a reasonable lawyer would advise a

client in this scenario?

A.   What a lawyer -- yeah.  Essentially -- I

don't know what Mr. Wright knew or did not know at

that moment in time.  He can testify about what he

knew or did not know.  What I was trying to

determine is if you freeze the scene at that point

in time, and had Mr. Wright called me and asked me

what I thought would be reasonable, I was trying to

assess that question at that moment in time.

Q.   Okay.

A.   Of course, I would do that as a lawyer,

because that's what I am.

Q.   So is your opinion contained in your

expert report about what a reasonable lawyer would

do or advise in this scenario?

A.   What a reasonable lawyer would advise a

client who was in the position of Mr. Wright.

Q.   So when your expert report talks about

1    reasonableness, it's about the reasonableness of

2    hypothetical legal advice that could have been

3    given to Mr. Wright?

4         A.   Well, it's broader than that, in my

5    opinion, because, again, as you know, it's a tricky

6    situation.  If a member of the public had all the

7    advantages of an education, then I think it's co-

8    extensive with what the member of the public would

9    have thought was reasonable.  So I don't think it's

10   just about advice.  I think it's also an expression

11   of what an educated member of the public, who

12   understood all these principles, would also

13   conclude.

14        Q.   So if I'm understanding you correctly,

15   you looked at the facts, you researched the law and

16   your notes, you thought about what a reasonable

17   lawyer would advise given this scenario, and then

18   from that you infer that that would also suggest

19   the reasonableness of a nonlawyer; is that correct?

20        A.   Yeah.  That's pretty much correct.

21        Q.   What was your methodology for determining

22   -- for the last step, going from reasonable lawyer

23   to reasonable nonlawyer?  What was your methodology

24   for figuring out that inference?

25        A.   My experience over 39 years of practice.

1      Q.   That it would be reasonable for a lawyer

2  to advise something, you are saying it's sort of,

3  therefore, automatically reasonable for the person

4  to act in a way that conforms with that advice?

5      A.   William, I wouldn't say it's automatic

6  for the client to follow advice, but in the vast

7  majority of cases, approaching over 90 percent, I

8  found that clients do listen and do think through

9  it and do follow the advice of their counsel.

10     Q.   So is your opinion about what a non-

11 lawyer would reasonably do if they received advice

12 from a lawyer?

13     A.   I don't understand the question.

14     Q.   Fair enough.  I just asked you about that

15 last logical inferential stuff, and your

16 explanation was 90 percent of the time, roughly,

17 people listen to the advice of their lawyers,

18 right?

19     A.   Well, they understand then the law and

20 the facts, and then they choose to act accordingly.

21 So what I do, essentially, is act as an educator of

22 the client and say, here is how I see the law. Here

23 is what I think the law is, and here is how I think

24 it might apply to your factual circumstance.  Then

25 the client, or the person, the nonlawyer, having

1    full possession of that information, typically

2    agrees and will act in accord with that.  So my

3    inference of a reasonable person is based on truly

4    a long time advising clients on constitutional

5    issues and having them say, yeah, okay, that makes

6    sense.

7         Q.   When you opine about the reasonableness

8    of the actions of a nonlawyer in your expert

9    report, are you opining about the reasonableness of

10   a person who has been advised by a lawyer?

11        A.   A person who is either advised by a

12   lawyer or who has the equivalent information as if

13   they were advised by a lawyer.

14        Q.   What information would that be?

15        A.   Well, the same information -- they can go

16   to law school, but, presumably, hopefully, in our

17   society, they could also read the law and educate

18   themselves about the law as it applied to their

19   particular business.  Lots of my business clients

20   are very, very well-versed in the law that applies

21   to their businesses.

22        Q.   So your conclusion about the

23   reasonableness of a nonlawyer in your expert report

24   applies -- you are describing a reasonable person

25   who has either been advised by a lawyer or done

1    their own legal research, correct?

2         A.   Or at least learned enough to be familiar

3    with the standards that would apply to their

4    question before them.

5         Q.   The legal standards, correct?

6         A.   Yes.

7         Q.   Are you aware that there has been a

8    motion in limine forbidding any argument related to

9    advise of counsel in this case?

10        A.   No.

11        Q.   If there is such a motion in limine, then

12   your expert opinion is of lesser relevance; would

13   you agree?

14        A.   I wouldn't give an opinion on that unless

15   I knew what the motion was and what the Court's

16   order was.

17        Q.   So broadly in reaching this -- in

18   drafting this expert report, you looked at the

19   facts, you researched the law and your notes, and

20   then you applied the law and the facts to reach an

21   opinion and advice that a lawyer might give,

22   correct?

23        A.   A lawyer might give and what a reasonable

24   person would generally do based on that advice.

25        Q.   So this is roughly the same process you

1    would take if a client came in with a question

2    about this, correct?

3          A.   I think that is fair to say.

4          Q.   Or if you were drafting a legal brief on

5    this topic, correct?

6          A.   A brief would be different, perhaps,

7    because I think when you are taking positions as an

8    advocate, you typically take -- the facts have

9    already occurred, and you're not at a point where

10   you are about to do something.  So I see advocacy

11   as different than prospective advice.

12         Q.   But in terms of the methodology of

13   looking at the facts, researching the law and your

14   notes, and then writing some sort of piece about

15   it, that is, roughly, the same methodology as if

16   you were writing your expert report here or a legal

17   brief, correct?

18         A.   I would say more like writing an expert

19   report or an advice letter or a law review article.

20         Q.   The content of your expert report, at

21   least the opinion section, is very similar to what

22   you might see in a legal brief, correct?

23         A.   You know, I don't -- I wouldn't say that.

24   I would be writing a brief differently, but it

25   certainly, I think, has some aspects that would

1    overlap what would be included in a brief, to be

2    fair.

3         Q.    Did you write the entirety of your expert

4    report?

5         A.    Yes, I did, although my associate looked

6    at it and suggested some grammatical changes, but,

7    yes, I wrote it.

8         Q.    So the substance is entirely yours?

9         A.    The substance is mine.

10        Q.    I'll mark this as Exhibit ZL.  Do you see

11   that this appears to be a brief that was filed in

12   this lawsuit?

13        A.    It has the same caption.  It seems to be

14   signed and has a Pacer number, so, yes, I would

15   agree.

16        Q.    If you would go to Pages 4 and 5.

17        A.    Okay.

18        Q.    Do you see the bottom half of Page 4

19   going up to 5, do you see that this is almost

20   verbatim the same text as Paragraphs 13 and on of

21   your expert report?

22        A.    I'm sorry.  Your page -- bottom of Page 4

23   starting with what paragraph?

24        Q.    Starting with, "Joy Banner's claim

25   principally rests."

1    A.   Yeah.  Let me read it.  Yeah, it looks
2    substantially similar.
3         Q.   So someone copied and pasted sections of
4    your expert report and put it into the legal
5    argument section of a legal brief, correct?
6         A.   Well, I don't know, but it would appear
7    that -- I think there is a lot of similarities in
8    there, a lot of consistencies, so that would look
9    to be the case.
10        Q.   More than a lot of similarities.  It is
11   --
12        A.   I didn't compare it word for word,
13   William.  I'm sorry, but, yes, I agree it looks --
14   it would look to me like someone had a draft of my
15   report and may have used it in this brief.  The
16   report is dated October 25th.  The brief is dated
17   October 30th, so counsel could have had my report.
18        Q.   So portions of your expert report are at
19   least similar enough to a legal brief that a lawyer
20   was able to copy and paste from it to generate a
21   legal brief?
22        A.   I'm not sure that's a question for me.
23        Q.   Would you disagree with that statement?
24        A.   I don't know.  You'd have to ask the
25   lawyer who wrote the brief.

1    Q.   So if you were called to testify in front

2    of a jury in this case, you would be explaining to

3    the jury the methodology that we discussed earlier,

4    correct?

5    A.   I believe so.

6    Q.   And based on your legal research and

7    reviewing your notes, what advice you might -- a

8    lawyer might give and then what someone who

9    received that advice or did their own research

10   might do, correct?

11   A.   Well, yes, including -- the only thing I

12   would add is including my experience in this field

13   over the past few decades.

14   Q.   Your experience in the field in terms of

15   what people do when they get advice from lawyers?

16   A.   Well, in terms of constitutional law and

17   giving advice to people who have constitutional

18   issues.

19   Q.   You didn't interview the defendants or

20   the plaintiff in this case, correct?

21   A.   I did not certainly interview the

22   plaintiff, and I was, I think, on one brief call

23   where Mr. Wright was also on the call, but it

24   wasn't an interview.  I didn't have any questions

25   for him.

```
 1        Q.    Did he talk at all about his thought
 2   process or the facts of this case?
 3        A.    You are taxing my memory here.
 4             MR. SPEARS:
 5                  Can we go off the record for a quick
 6               second?
 7             MR. MOST:
 8                  Let's have him finish the question.
 9             THE WITNESS:
10                  I can answer.  My recollection is
11                  that the nature of the call was to
12                  determine whether this Mike Wright was
13                  the same as another Mike Wright that I
14                  knew.  I think that was the thrust of
15                  the call.
16   BY MR. MOST:
17        Q.    So at least your expert report is not in
18   any way based on questions you asked of Mr. Wright,
19   correct?
20        A.    That is correct.  Nothing that Mr. Wright
21   said in that call formed any basis of my opinion.
22        Q.    And you have not read Ms. Hotard's or Mr.
23   Wright's deposition transcripts have you?
24        A.    I have not.
25        Q.    So you don't know anything about how Mr.
```

1    Wright or Ms. Hotard actually thought about this
2    situation that's the basis of this case, correct?
3         A.    That's fair to say.
4         Q.    You don't know if they actually did any
5    research on their own, correct?
6         A.    I don't know.
7         Q.    You don't know if they actually got any
8    advice from a lawyer about it?
9         A.    I don't know.
10        Q.    Your methodology that you've used during
11   this expert report, is it capable of being
12   subjected to testing for accuracy?
13        A.    Oh, I think so.  I think, you know, other
14   constitutional lawyers could look at it and give
15   their opinion whether I was right or wrong and
16   whether my conclusions were reasonable.
17        Q.    So the testing that could be done would
18   be to ask other lawyers?
19        A.    Other experts in constitutional law.
20        Q.    Has your methodology been subjected to
21   peer review?
22        A.    In this case?
23        Q.    Either in this case or your methodology
24   more generally that you apply here.
25        A.    Well, let me see if I can break down the

 1    question.  Certainly my views on constitutional law
 2    have been subject to peer review when I wrote law
 3    review articles that included constitutional
 4    issues.  When I do BARBRI and submit my outline, my
 5    statements about what the law is and that outline
 6    are subject to peer review by BARBRI, and I believe
 7    Professor Chemerinsky looks at that as well, or at
 8    least some of it.  So to some extent it's peer
 9    reviewed.  This particular exercise was not peer
10    reviewed.
11        Q.   Have you written any publications that
12    are directly relevant to your expert report here?
13        A.   If I covered an issue about this in one
14    of those old articles, I don't recall it.
15        Q.   If you look at your expert report, Page 2
16    Paragraph 10.
17        A.   Okay.  Yes.
18        Q.   You say you were provided with and have
19    reviewed various documents relating to the
20    underlying litigation, including, and you list
21    some, but I wasn't sure if this was a complete list
22    based on the word "including."  Are there any
23    others?
24        A.   I don't think so.  I think this is it.
25    It was a small group.

1        Q.   Looking at Paragraph 12 from Page 2 to 3,

2    you write, "When Dr. Banner spoke at the St. John

3    Parish Council meeting on November 28, 2023, she

4    began to make comments about a pending ethics

5    complaint against a public official that remained

6    in the investigation phase," correct?

7        A.   Yes.

8        Q.   So that's your summary of what Miss

9    Banner did that might possibly run afoul of the

10   statute issue in this case, correct?

11       A.   Oh, no, no.  I was just giving factual

12   background there to -- you know, this was my

13   understanding based on what I read and my

14   discussions -- what I read and my discussions with

15   counsel as to exactly how it unfolded.

16       Q.   But this is at least what she did that

17   could possibly run afoul of --

18       A.   I just -- I'm sorry.  I interrupted you,

19   William.

20       Q.   That's okay.  This is your description of

21   what Ms. Banner did that could possibly run afoul

22   of R.S. 42:1141.4?

23       A.   This was just based on my reading of your

24   complaint, I think, to be honest.  This was just a

25   summary of that and my understanding of her

1    allegations in the complaint.

2         Q.   But do you know of anything else she

3    might have done that could have possibly violated

4    the statute?

5         A.   No.

6         Q.   When I talked about the statute in this

7    deposition, I'll be referring to R.S. 42:1141.4.

8         A.   Sure.  {L)(1) or the whole thing?

9         Q.   (L)(1) unless I specify otherwise.

10        A.   Okay.

11        Q.   And if you refer to the statute, will you

12   be doing the same?

13        A.   Sure.

14        Q.   What Dr. Banner did that could have

15   possibly run afoul of the statute is that she made

16   a public statement or gave out information

17   concerning a board of ethics investigation without

18   the consent of the investigative person, correct?

19        A.   I think the complaint itself and the

20   investigation that was apparently ongoing, if there

21   was an investigation.

22        Q.   So what Ms. Banner did that could have

23   run afoul of the statute would be to talk about the

24   board of ethics complaint or investigation without

25   consent of the investigated person, correct?

1          A.    Yes.   That's what the statute says.

2          Q.    You have read King v. Caldwell?

3          A.    I have.

4          Q.    Do you think that King v. Caldwell was

5     correctly decided?

6          A.    I'm not sure.  Well, I wasn't asked to

7     give that opinion, but if you want me to give that

8     opinion, I would say I would not agree with parts

9     of that opinion.

10         Q.    Which part do you disagree with?

11         A.    Well, first I thought that the judge

12    should have considered the mootness argument more

13    fully.  I don't think he needed to reach the

14    constitutional issue.  The second part is the as

15    applied versus on its face.  The plaintiff, it

16    looked to me, made a facial complaint.  The Court

17    restricted it back down to as applied, which was

18    enough to dispose of the case.  So there was no

19    reason to say further, I think maybe this might be

20    unconstitutional in all of its applications on this

21    one phrase, and then that one phrase, as I read the

22    Court's opinion, confused me in two regards.  I

23    didn't know exactly the scope of what the judge was

24    holding, and then the second part was he certainly

25    seemed to say, well, look, if there is a compelling

1  state interest that could justify that type of

2  restriction, but then didn't really explore what

3  type of compelling state interest would, in fact,

4  allow the statute to be applied on those three

5  words.  So that's my critique.  Not that it's

6  relevant.

7       Q.   Do you disagree with the holding that the

8  statute was unconstitutional as applied to the

9  plaintiffs in King v. Caldwell?

10      A.   That's a good question.  Another question

11  that I wasn't asked to consider, but let me think

12  about it for a second.  I think the best way to

13  answer it, William, is if I were a district judge,

14  and I am not, I might have decided that issue

15  differently had it reached me.  So I understand

16  Judge Feldman's reasoning.  I understand how he got

17  there, and, of course, he is the judge, and I'm

18  not, but had the role been reversed, I might have

19  decided the as-applied challenge differently.  And

20  that's only because -- and if you want further

21  explanation, I'll give it, or I'll shut up, if you

22  want, because I think the compelling state interest

23  test would have been satisfied, perhaps, but I

24  needed to -- I would need to know more about the

25  facts of that case, honestly, to make that

1    judgment.

2        Q.    Do you think the First Amendment allows

3    the state to imprison someone for talking about a

4    board of ethics complaint they filed?

5        A.    I think there are statutes on the books.

6    Whether it is the board of ethics, the judiciary

7    commission, or federal statutes that mandate

8    confidentiality of certain things that occur in

9    terms of a complaint or an investigation.  I think

10   those statutes are constitutional, because I think

11   they are protecting valid compelling state

12   interest.  Whether this statute in the context of a

13   whistleblower, who was then prosecuted, actively

14   prosecuted by the attorney general, that would have

15   troubled me significantly, so that's why I'm saying

16   I'm not certain I would have decided it the same

17   way, but it would have caused me great

18   consternation both ways, and I would have wanted to

19   look at it very carefully.

20       Q.    Would you agree that in King v. Caldwell,

21   the judge found the statute unconstitutional as

22   applied to a person who is talking publicly about a

23   board of ethics complaint that they had filed?

24       A.    That's my reading of the case, yes.

25       Q.    And that's also the situation with Joy

1    Banner, correct?

2        A.    I don't know that it is, because my

3    understanding was that the complaint to the board

4    of ethics was actually filed by an organization and

5    not by Ms. Banner personally, although, Ms. Banner

6    did supply an affidavit.

7        Q.    I'll mark this as Exhibit X.  You see

8    that this is Ms. Banner's ethics complaint?

9        A.    I don't know that to be the case, but

10   I'll take your word for it.

11       Q.    You see on the first page there is an

12   organization that is submitting this?

13       A.    At the top left it says, "Center for

14   Constitutional Rights."

15       Q.    And you see it says, "My organization

16   represents Dr. Joyceia Banner?"

17       A.    I see that.

18       Q.    The subject line is Complaint from Dr.

19   Joyceia Banner.

20       A.    I see that.

21       Q.    So Dr. Banner is the complainant of this

22   board of ethics complaint, correct?

23       A.    I would infer from this that Dr. Banner

24   made a complaint to the Center for Constitutional

25   Rights, and then the Center for Constitutional

1    Rights made a complaint to the board of ethics.

2         Q.    Would it make a difference if the Center

3    for Constitutional Rights is a legal organization

4    that is legally representing Dr. Banner?

5         A.    Not necessarily.

6         Q.    So if you file an ethics complaint with

7    the board of ethics on behalf of a client, are you

8    saying the client is not the complainant in that?

9         A.    Generally, I would agree that that is

10   true.  In the disciplinary context, if I file a

11   complaint for a client, I'm considered the

12   complainant.

13        Q.    The King v. Caldwell's holding did not

14   turn on whether the person was the complainant or

15   another person talking about the board of ethics

16   complaint, did it?

17        A.    My recollection is imperfect.  I don't

18   think that it did turn on that fact.  It did

19   certainly -- the facts of the case were that the

20   person who made the complaint was the person who

21   was also alleging the First Amendment problem with

22   the statute.  I think that could make a difference

23   in terms of the scope of the statute and the

24   compelling state interest.

25        Q.    Sure.  But the King v. Caldwell decision

1    did not turn on that?

2        A.    It certainly didn't discuss it.

3        Q.    When you concluded that the facial

4    unconstitutionality holding of King v. Alexander

5    was dictum, did you find any case or other

6    authority indicating that or that was your legal

7    conclusion based on reading the opinion?

8        A.    That was my legal conclusion based on

9    reading the opinion.  I don't think -- in terms of

10   subsequent history of King, I didn't see anybody

11   call it dictum.

12       Q.    You concluded that a facial

13   unconstitutionality holding was dictum because it

14   was unnecessary to the outcome of the case,

15   correct?

16       A.    Unnecessary to the holding, right.

17       Q.    Because the Court also concluded it was

18   unconstitutional as applied, correct?

19       A.    Right.  All relief that was requested to

20   be granted based on the first conclusion.

21       Q.    But the reverse would be true as well.

22   The as-applied conclusion could be dictum, because

23   it would be unnecessary if the statute was found

24   facially unconstitutional, correct?

25       A.    If it was found facially

1   unconstitutional, but Judge Feldman's opinion did

2   not say the statute was unconstitutional in all

3   applications.  I think a fair reading of it is he

4   certainly said it's unconstitutional as applied,

5   and, also, in one other respect it may be facially

6   unconstitutional.  It is facially unconstitutional,

7   and it is that second part that looks like almost

8   an alternative holding.  I don't think that that

9   necessarily -- I didn't see enough analysis to say

10  why it would be unconstitutional as to all persons

11  regarding that one part of the statute.

12       Q.   Right, but that was the holding of the

13  Court.  It was facially unconstitutional?

14       A.   That was the opinion of the Court.  The

15  holding of the Court was that the statute was

16  unconstitutional.  (L)(1) was unconstitutional as

17  applied and with respect to that one extra piece,

18  and the attorney general and governor were

19  enjoined.

20       Q.   So given the fact that the Court found

21  the statute to be facially unconstitutional, in

22  part, the as-applied part could be alternatively

23  dictum as well?

24       A.   Yeah, but I wouldn't agree with that.

25  That's not the way I read the case.  I think the as

1    applied was the primary holding, and the other part

2    was a secondary.  Secondary remark almost.

3         Q.    You conclude that because of the order in

4    which they appeared in the opinion?

5         A.    That's the way I read it.

6         Q.    But what indicates to you that one

7    holding was primary and the other was secondary?

8    Is it the order of them or is it something else?

9         A.    It was -- well, I don't have the opinion

10   in front of me.  If you want me to look at the

11   opinion, I'll try to tell you.

12        Q.    Yeah.  This is not a pop quiz.

13        A.    That's all right.

14        Q.    I'm going to designate this as ZM.

15        A.    Let me see.  So I'm looking at Page 4 of

16   5, William.  It's got the small number, 657, to the

17   left of it, and this is the paragraph.  "It's

18   invalid both as applied to these plaintiffs and on

19   its face, at least in part," and then it goes on to

20   say, "Insofar as the statute makes it a crime for

21   'any other person' besides the subject of an ethics

22   investigation, 'to make any public statement or

23   give out any information concerning a private

24   investigation or private hearing of the Board of

25   Ethics' absent the subjective of the

1    investigation's written request, the statute is
2    impermissibly overbroad."  And my quarrel with that
3    part is that unless you are holding it
4    unconstitutional in all applications, this
5    overbreadth challenge requires an analysis that I
6    didn't see.  So that's why I thought it was -- I
7    concluded that the judge put it in as an
8    afterthought, in essence, to give the legislature
9    an opportunity to amend the statute.  That was my
10   conclusion.
11        Q.   Sure.  So that section you read that
12   begins, "Insofar as the statute makes it a crime,"
13   and ends with, "The statute is impermissibly
14   overbroad," the Court is saying it's impermissibly
15   overbroad for the statute to make it a crime for
16   any other person, besides the subject of the ethics
17   investigation, to make a public statement or give
18   out any information concerning the private
19   investigation or private hearing of the board of
20   ethics, right?
21        A.   That's exactly what it says.
22        Q.   That's what Joy Banner did that
23   supposedly ran afoul of the statute, correct?
24        A.   Well, I'm not saying what she did ran
25   afoul of the statute.  I mean, the statute was read

1   by someone at a hearing, at a public meeting.  I
2   don't know that I would conclude that she violated
3   the statute.
4        Q.   Sure, but do you know of anything other
5   than what is described here that she might have
6   done that could have run afoul of this statute?
7        A.   No.
8        Q.   So the only thing that Joy Banner did
9   that could have run afoul of this statute is part
10  of what the Court found to be impermissibly
11  overbroad, correct?
12       A.   Well, your question had a couple of
13  different parts in there.  This Court didn't look
14  at anything Joy Banner did, obviously, so this
15  Court is referring to the conduct of the parties
16  who were prosecuted, Terry King and Laura King, for
17  the comments they made about their ethics complaint
18  which was a result of, I think, a whistleblower for
19  a coroner's office.  So what Dr. Banner did in
20  respect of what this opinion is saying in this
21  particular paragraph we're looking at in this
22  exhibit, I don't know what Judge Feldman may or may
23  not have said about that.  I'm not willing to make
24  that connection.
25       Q.   You read the transcript of what Dr.

1    Banner said, right?

2         A.    I did.

3         Q.    And she made a statement, a public

4    statement, or gave out information concerning a

5    private investigation or public -- private hearing

6    of the Board of Ethics, right?

7         A.    I would have to look at the transcript.

8    She certainly disclosed that there was a complaint.

9    She certainly disclosed the subject matter of the

10   complaint and the person who was the subject of the

11   complaint.  So there are aspects of what was in the

12   board of ethics complaint that she disclosed.  I

13   think that one could conclude that that would come

14   within the statute that we're talking about.

15        Q.    And to the extent that it came within the

16   statute, it would be part of what the Court in King

17   v. Caldwell found unconstitutional as impermissibly

18   overbroad, agreed?

19        A.    Said in its opinion was unconstitutional

20   as overbroad.  I'm not sure it was necessary to the

21   holding.

22        Q.    Do you know of anything else Joy Banner

23   did or was accused of doing that might in any other

24   way fall within running afoul of this statute?

25        A.    I'm unaware of like any other conduct, if

1    she had a TV show or went on the radio or talked to

2    people in public.  If she did any of that, I don't

3    know about it.

4         Q.   So the only things you know that Joy

5    Banner did that could run afoul of this statute

6    would fall within what the Court in King v.

7    Alexander said was unconstitutional for the law to

8    punish?

9         A.   Well, it would fall within that portion

10   of the statute which Judge Feldman said, in my

11   view, alternatively was overbroad.

12        Q.   And, therefore, unconstitutional to

13   punish?

14        A.   Therefore enjoining the attorney general

15   and the governor from enforcing it.

16        Q.   If the statute is impermissibly

17   overbroad, it means the First Amendment prohibits

18   criminal punishment for it, correct?

19        A.   If a statute is unconstitutionally

20   overbroad, it would be a complete defense to a

21   criminal prosecution.

22        Q.   So you understand that at this parish

23   council meeting, Michael Wright read from the

24   statute out loud, right?

25        A.   I am.

1    Q.   Are you aware that the piece of paper he

2  read from had a notation at the top that the

3  statute was included in the unconstitutional

4  statutes bi-annual report?

5    A.   No.

6    Q.   If he was reading from a piece of paper

7  that said that, that would be a big red flag for

8  whoever is reading the piece of paper, right?

9    A.   I think I saw that in your complaint, and

10  my answer to that is maybe.  Maybe a flag, maybe a

11  yellow flag, maybe not at all, because, for

12  instance, when I first got this case, one of the

13  things I did was go to the Greenbooks and look up

14  the statute and see what the Greenbook said.  I

15  didn't see any flag in the Greenbooks, which I

16  don't know how the Greenbooks are done.

17            I was a little surprised that somebody --

18  I didn't even see a reference to King in the

19  annotations in the Greenbooks.  When I saw in your

20  complaint that little banner headline, I did ask my

21  associate to look that up, and he did.  He drilled

22  down on that, and, apparently, whoever wrote that

23  note sent a comment to the legislature saying, you

24  may want to consider who, other than the folks

25  named in this statute directly, might be subject to

1    confidentiality, at which point the legislature did

2    nothing. So what is one to infer from that history?

3    Someone who is astute said after King v. Caldwell,

4    you should take a look at this.  The legislature

5    got that information and did not act.  So there are

6    multiple conclusions one could draw, any of which

7    are speculative.  One is that the legislature

8    disagreed and didn't think the holding found it

9    unconstitutional; one of which is the legislature

10   just ignored it, because they had other business to

11   do; one of which is that the legislature thought

12   that the statute was sufficiently clear and had

13   other applications that were legitimate, and, so,

14   therefore, it didn't chose to do anything about it.

15            I don't know which of those, if any.

16   There could be others that I have not named.  So

17   that kind of left me with a dead end.  So I saw the

18   flag you mentioned in your complaint.  It would

19   have led me, as a lawyer, a constitutional lawyer,

20   to look further, which I did, and I found it to be

21   a dead end.

22        Q.   Well, it would lead someone to the King

23   v. Alexander case finding this statute

24   unconstitutional, at least as is applied to some

25   people?

1      A.    I would think that it would, or at least,

2  you know, you would somehow find it.

3      Q.    So you talked earlier about reasonable

4  lawyers and reasonable people.  Reasonable lawyers,

5  if they saw a notation at the top of a statute that

6  it was part of the unconstitutional statutes bi-

7  annual report, they would want to look into that,

8  right?

9      A.    Oh, I think so.

10     Q.    And same with a reasonable nonlawyer as

11  well, correct?

12     A.    If they understand how to do it and what

13  it meant, yeah.

14     Q.    The fact that the word "unconstitutional"

15  is at the top of a piece of paper, if the piece of

16  paper is law, it is something that someone should

17  look into reasonably, right?

18     A.    I would think it's a word that the public

19  understands.

20     Q.    And would prompt a reasonable person to

21  look into that before taking further action,

22  agreed?

23     A.    I don't know.  I don't know that I can

24  opine what a reasonable person would have done.  I

25  know what a reasonable lawyer would do.

1    Q.   You don't think you can opine about what
2    a reasonable person would do in Michael Wright's
3    situation?
4    A.   No, because I don't know if he would have
5    understood what any of that meant.
6    Q.   You think you can opine about what a
7    reasonable person in Jaclyn Hotard's situation
8    would have done if she also had this document that
9    said unconstitutional at the top?
10    A.   It would be the same answer.
11    Q.   That you can't opine as to their
12    reasonableness of their actions, agreed?
13    A.   Correct.  I distinguish that from, again,
14    if I had frozen time, and they had called me, and I
15    looked at that and seen that, I would have drilled
16    down on it, and I would have provided them with
17    advice which they could have followed or ignored.
18    Q.   On Page 4 of your opinion, you conclude
19    in the bottom of Paragraph 17, you say, "Plainly,
20    the reading of the statute after these remarks had
21    no impact on the speech that already had taken
22    place," and you also write, "Finally, Dr. Banner in
23    fact published her viewpoint and had other avenues
24    to publish her beliefs, thus she was not deprived
25    of all channels of communication."  Do you see

1    that?

2         A.    I do.

3         Q.    So you are concluding that Dr. Banner

4    didn't have anything more to say on this?

5         A.    Well, I have no idea whether she wanted

6    to say more.  I know that -- I read there was talk

7    about whether the time limit was up or not up, and

8    then there were interruptions and discussions.  By

9    the way, I have not looked at the video.  I

10   probably should have, but I didn't.  I just read

11   the transcript.  What I was saying here is she

12   certainly got out all of this information,

13   including her viewpoint that this parish should not

14   pay legal fees for the ethics board investigation,

15   for the defense of the ethics board investigation.

16   So it seemed to me that the thrust of her complaint

17   that was on topic was out before the statute was

18   read.

19        Q.    When you say on topic, you're saying

20   those things you just described were on the topic

21   of the agenda item that night, correct?

22        A.    I don't know that they were related to --

23   I agree with Mr. Wright.  This is not something --

24   I think this is beyond what I was asked to do, but

25   I agreed that, as you know, it's a limited public

1    forum.  You are entitled to say, we're only going

2    to talk about the topics on the agenda, and the

3    scope of the topic is whether or not you should pay

4    or hire an attorney to defend this investigation.

5    I don't believe it said who was being investigated

6    or what the nature of the investigation was.  So

7    certainly her speech as to whomever is being

8    investigated by the board of ethics I don't think

9    public dollars should be going to pay their legal

10   fees.  That's a fair comment.  I think she got that

11   point out.  I think she got that point across

12   before anybody read the statute.

13       Q.   When you say that's a fair comment, you

14   mean on the topic of the agenda?

15       A.   Yeah, exactly.  Now, the other stuff, it

16   is probably a little bit outside the agenda item,

17   maybe two or three circles away from the direct

18   point that was on the agenda, but she was, I think,

19   describing things that are not -- were not on the

20   agenda, and that's when she was starting to get

21   interrupted.

22       Q.   You admit you don't know if Dr. Banner

23   had anything more to say?

24       A.   I agree.  I have no idea.

25       Q.   You can't really say whether her speech

1    was factually or not factually curtailed, agreed?

2         A.   In the respect of that meeting, correct.

3    Now, I do know that she wasn't curtailed from

4    walking outside talking to a reporter.

5         Q.   Sure.  You've represented parishes and

6    municipalities for decades; is that fair to say?

7         A.   I wouldn't say that, William.  I have

8    represented parishes from time to time, but I don't

9    know that I have consistently done it for decades.

10        Q.   But at least you represented parishes and

11   municipalities on and off for decades?

12        A.   That's fair.

13        Q.   Have you ever in any of that work heard

14   of a parish council leader cutting a public comment

15   short and reading a criminal statute to the

16   speaker?

17        A.   I'm not saying it didn't happen, but none

18   of my cases involved that.

19        Q.   You don't ever recall that happening

20   other than this case?

21        A.   In the parish council meetings I've

22   attended, I don't recall it happening.

23        Q.   Or municipalities or any other government

24   body?

25        A.   I don't recall that happening.

1          Q.   You also talk in here that the board of

2     ethics complaint was subsequently dismissed by the

3     board of ethics in 2024, right?

4          A.   I don't know if I put a date on it, but,

5     yeah, that's information I received from counsel.

6          Q.   It was subsequent to this November 2023

7     meeting, right?

8          A.   I think that is correct.

9          Q.   So the dismissal of the ethics complaint

10    could not bear on the reasonableness of the

11    decisions of the defendants at the time, correct?

12         A.   I disagree with that.  I think that that

13    is part of why this confidentiality exists.  I

14    think it's part of the compelling state interest

15    test, that until you get past a threshold almost

16    probable cause type standard with the investigating

17    agency, there is a much more compelling state

18    interest in maintaining confidentiality than after,

19    for instance, they decide to proceed with a formal

20    investigation.  I think those are two different

21    things.  Once the complaint is displaced, if

22    anything, I think the compelling state interest

23    gets heightened.  So the compelling state interest

24    is certainly present at a time when the board of

25    ethics is still looking at the complaint and

1    deciding whether or not it states a basis to

2    proceed.

3        Q.    So you're saying that the state's

4    interests are heightened after the complaint is

5    dismissed?

6        A.    I would think, so, yes.

7        Q.    But it doesn't retroactively go back in

8    time and create a compelling interest in the time

9    before, correct?

10       A.    It wouldn't make it more compelling, but

11   the fact that that possibility exists makes the

12   first phase very compelling.

13       Q.    I see.

14       A.    So, anyway, that's -- yeah.

15       Q.    So the risk of the complaint being

16   dismissed is what informs the interest, say, as of

17   November 2023?

18       A.    Yeah.   It's one of the factors that I

19   think supports the government's interest in

20   maintaining confidentiality.

21       Q.    Got it.   You're familiar with Daubert

22   standard?

23       A.    Yes.

24       Q.    You filed Daubert motions in the past?

25       A.    Probably.

1      Q.   If you were litigating a case, and you
2  received from the other side an expert report like
3  yours, is it fair to say your expert report has
4  legal conclusions in it?
5      A.   Legal conclusions help form part of what
6  my opinion was.
7      Q.   Would you file a Daubert motion about an
8  expert report like this?
9      A.   I don't know.  I'd have to -- it would be
10  based on the particular facts and circumstances of
11  the case.
12      Q.   Do you think this expert report will
13  survive a Daubert challenge?
14      A.   I don't know.
15      Q.   Well, what do you think?
16      A.   I'll leave it to Chief Judge Brown.
17      Q.   If you had to guess, do you think it will
18  survive Daubert?
19      A.   I think if Chief Judge Brown concludes
20  that it may be helpful to the jury to hear what a
21  reasonably informed constitutional lawyer or a
22  client who is reasonably informed of constitutional
23  standards thought at the moment before the statute
24  was read, then it will survive. If she concludes
25  that the jury would not be helped by the

 1    information, then no.

 2        Q.   I'm asking you, do you think that this

 3    expert report will survive a Daubert challenge?

 4             MR. SPEARS:

 5                  I object.  It's been asked and

 6                answered.

 7             THE WITNESS:

 8                  All I can tell you, William, is what

 9                I said.  I'm not going to predict the

10                future.  I'm very bad at that

11                sometimes.

12    BY MR. MOST:

13        Q.   You understand that there is a

14    significant risk that this expert report will be

15    excluded under Daubert?

16        A.   There is risk in all cases that an expert

17    report will be excluded under Daubert.

18        Q.   But this one in particular, given it's --

19        A.   I wouldn't say this one in particular.

20        Q.   Okay.  Did you tell defendants or

21    defendants' counsel that there was a potential

22    Daubert problem with this expert opinion?

23        A.   What I told defense counsel was that I

24    obviously cannot opine on legal conclusions. That's

25    the province of the court.

1    Q.   Mr. Stanley, you are an adjunct professor
2  at Tulane Law School?
3    A.   I am.
4    Q.   An adjunct professor is a part-time
5  professor who teaches a class or two a semester?
6    A.   Correct.
7    Q.   You're not tenured?
8    A.   No, of course, but we do have grades, and
9  I went from either associate to assistant to full,
10 but I'm not a tenured member of their faculty.
11   Q.   Outside of the classroom, do you ever
12 describe yourself as Professor Stanley?
13   A.   No.
14   Q.   Do you describe yourself as Professor
15 Stanley in the classroom?
16   A.   Yes.
17   Q.   It would be strange for someone outside
18 of the classroom to call you Professor Stanley,
19 agreed?
20   A.   I wouldn't -- no, because it happens.  I
21 think, again, it is a sign of being perhaps overly
22 polite.  I don't expect it.
23   Q.   Sure.  I mean, if someone -- if you were
24 in court, and someone started talking about you as
25 Professor Stanley, that wouldn't really be a really

1   accurate description of your role in the world,
2   correct?
3        A.   Well, it's not inaccurate in that I have
4   taught there for 39 years, but it's not what I
5   would go by.
6        Q.   We are getting closer to the end here.
7   You've been hired as an expert witness before,
8   correct?
9        A.   I have.
10        Q.   Were you an expert witness about
11   standards for lawyers?
12        A.   Yes.   Standards of care for lawyers, yes.
13        Q.   Have you ever been hired as an expert
14   witness for any other expert area?
15        A.   No.
16        Q.   So this would be the first time you've
17   been asked to opine about the reasonableness of a
18   nonlawyer?
19        A.   Well, because it's so related to what the
20   standard of care would be for the lawyer, yes, but
21   I think it was a very -- the opinions are, if you
22   will, intertwined.
23        Q.   So your opinions about a nonlawyer here
24   are intertwined with how a reasonable lawyer should
25   act, agreed?

1          A.   Correct.

2          Q.   I think you said in here you charge $500

3     an hour for deposition; is that right?

4          A.   $500 an hour is my usual hourly rate.

5          Q.   So that's the hourly rate for your work

6     in this case?

7          A.   Yes.

8          Q.   Do you know how much you billed for this

9     expert report?

10         A.   You know, I looked at that, because I

11    knew you were going to ask it.  I think I put in

12    about, for the report, about four hours, but I

13    think I've billed a total of seven, and my

14    associate may have billed a similar amount.

15              MR. MOST:

16                   Ike, are you going to have any

17                 questions for the witness?

18              MR. SPEARS:

19                   Just a few.

20              MR. MOST:

21                   Barring redirect, I'll end there.

22    EXAMINATION BY MR. SPEARS:

23         Q.   Rick, just a few questions.  In addition

24    to your instruction for 39 years or so in

25    constitutional law, is this at which law school?

1    A.    What law school did I go to?  Harvard.

2    Q.    No.  Which law school are you instructing

3  at?

4    A.    Tulane.

5    Q.    So, Professor Stanley, in addition to

6  your 39 years or so of instructing at Tulane Law

7  School, do you have any other experience as an

8  instructor in constitutional law?

9    A.    Yes.

10   Q.    Share that with us, please.

11   A.    I was first retained by something called

12  New Orleans Bar Review when I was still a lawyer at

13  Stone, Pigman, to teach the constitutional law

14  section of the bar, for that bar review course.

15  That course, I think, then was sold at some point

16  to BARBRI.  There was a couple of year hiatus where

17  I did not teach constitutional law, and then BARBRI

18  came back and asked if I would do it for them, and

19  I did.  And when I say for them, I'm talking about

20  the Louisiana exam.  I'm not talking about the

21  national exam.

22   Q.    So this would be instruction for the bar

23  review in the area of constitutional law; is that

24  correct?

25   A.    That's correct.

1          Q.    You've been doing that for over 25 years?

2          A.    At least.

3          Q.    At least 25 years. With regard to law

4    review, you've indicated that you have written some

5    law review articles in the area of constitutional

6    law; is that correct as well?

7          A.    Symposia for Loyola Law Review, yes.

8          Q.    Just give us a overview of what the

9    symposia of constitutional law would include?

10         A.    So those articles would have collected

11   the decisions of the U.S. Fifth Circuit for the

12   prior year that involve constitutional law issues,

13   and then, really, the article is in the nature of a

14   comment about those decisions.

15         Q.    So it would be a review and analysis of

16   any con law, constitutional law, decisions handed

17   down by the Fifth Circuit during that time frame?

18         A.    Correct.

19         Q.    We've had a lot of discussion about the

20   King versus Caldwell case.  I think it has also

21   been referred to as the King versus Alexander case.

22   With regard to that case by the late Judge Marty

23   Feldman, it is my understanding that that case was

24   rendered sometime in May of 2014.  Is that about

25   accurate?

1      A.   That's my recollection.

2      Q.   It would be your understanding that the

3  legislature has met multiple times during both

4  regular sessions and special sessions since the

5  King ruling.  They've been alerted to the fact that

6  there was at least a ruling by Judge Feldman that

7  declared a portion of the statute unconstitutional,

8  yet the legislature has chosen not to amend that

9  section of the statute.  Is that a fair statement?

10     A.   That's my understanding.

11     Q.   So if someone were to pull that

12  particular statute, Louisiana Revised Statute

13  42:1141.4 (L)(1), it would still read today the

14  same way it read when Judge Feldman issued his

15  decision?

16     A.   The text of the statute itself is the

17  same, yes.

18     Q.   And you know from drilling down, as you

19  said, and doing research that at least someone

20  alerted the legislature, Louisiana legislature, to

21  the fact that there was the King versus Caldwell

22  decision out there, and they might want to review

23  the statute?

24     A.   Right.  There was -- I think Mr. Most had

25  it in his complaint, that there was a banner, if

 1   you will. If you went online, it would alert you to

 2   the fact that part of the statute had been held

 3   unconstitutional.

 4        Q.   It is your understanding, and I think it

 5   may be in your report, that there was no appeal to

 6   the United States Fifth Circuit or the U.S.

 7   Supreme Court of the King versus Caldwell decision;

 8   is that correct?

 9        A.   I did not locate any appeal.

10        Q.   And there was no ruling by a state court

11   of Louisiana, Supreme Court, relative to the

12   constitutionality of that particular statute; is

13   that correct?

14        A.   I did not locate any.

15        Q.   In your report -- first of all, the

16   report that you have tendered to me and that I've

17   given to Mr. Most, have you amended or have a need

18   to amend, supplement, or modify that report in any

19   regard?

20        A.   I'm glad you asked that.  There is a -- I

21   reread it, and then I said let me check that,

22   because it didn't sound right to me.  There was an

23   error that I'm going to take blame for, but if you

24   look at Paragraph 17, and you go down to where I'm

25   reciting parts of the transcript, there is a line

1    about eight lines up from the bottom that says, "Of

2    Ethics: argued that 'we as taxpayer should not be

3    allowed to pay.'"  The word "allowed" is wrong. The

4    word is actually "asked."  I attribute that to bad

5    handwriting.  My secretary transcribed what she

6    thought I wrote, and I missed it, so my apologies.

7    It should be "asked."

8        Q.    Other than that amendment, is there any

9    other need to supplement, amend, or correct

10   anything that was written in your expert report?

11       A.    Not based on what I have at this time.

12       Q.    In regard to your curriculum vitae which

13   is also attached as part of Exhibit ZJ, is there

14   anything that has been omitted that you feel the

15   need to add, modify, or correct?

16       A.    No.  What I would say to that is the

17   cases that are listed here, Representative Matters,

18   are not necessarily up to date.  I don't know that

19   they include my representation of the bar

20   association in the First Amendment challenge before

21   Judge Africk.

22       Q.    Have you ever been tendered as an expert

23   to any court, state or federal, and rejected by

24   that court?

25       A.    No.

1    Q.   So each time you've been tendered as an
2    expert witness, you have been accepted as an expert
3    by the court?
4    A.   Yes.
5    Q.   Rick, finally, I think you noted some
6    critical distinctions between the facts, the
7    factual scenario in the King versus Caldwell case
8    and the factual scenario in the Banner versus
9    Wright case, which is the subject of this
10   litigation.  Would you take a minute, even if you
11   need to recite it from your report, and share what
12   would be the critical distinctions that you view
13   between the King versus Caldwell case and the
14   Banner versus Wright case.
15   A.   Without reading the report but from
16   memory, is in the King case, it was the parties who
17   were defendants in the case were the actual
18   complainants as opposed to an intermediary
19   complaining for them, which could be a distinction,
20   and the other thing is that those individuals in
21   the King case were the actual subject of a criminal
22   prosecution which was nolle prossed, but they were
23   -- either a Bill of Information or an indictment
24   had occurred, so the statute had been enforced as
25   to them and to their conduct.  It was not a

1    situation where a statute was read to them.

2    Accordingly, the third distinction was in that case

3    you actually had the parties who were going to

4    enforce the statute enforcing the statute, whereas,

5    in this case, you have someone who has no authority

6    to enforce the statute reading the statute aloud at

7    a public meeting, so those three stand out to me.

8    There may be others.

9        Q.   So you are saying it's of some importance

10   that neither Defendant Hotard or Defendant Wright

11   would have had the authority to effect an arrest of

12   Joy Banner for violating or potentially violating

13   the statute?

14       A.   To my knowledge, neither one of them has

15   law enforcement authority or prosecutorial

16   authority.

17       Q.   And with regard to a plain reading of the

18   statute as it is written in the Louisiana Revised

19   Statute, is there any reason for a lawyer or lay

20   person to believe that that statute, and I'm

21   talking specifically about the confidentiality

22   portion of that statute, would be unconstitutional

23   in any and every aspect?

24       A.   My answer would be no, because such

25   statutes do exist in state and federal law.

64

1          Q.    And the ruling of Judge Feldman in the

2     King versus Caldwell case, would it be your opinion

3     that that ruling is applicable to the unique set of

4     facts that were presented in that particular case?

5          A.    In that case?

6          Q.    Yes.

7          A.    Well, clearly.  Clearly the ruling

8     relates to that case, yes.  The question is does it

9     inform me in any way as to this case, and the

10    answer is certainly it deserves consideration.

11         Q.    Would it automatically lead one to

12    believe that it is unconstitutional as considered

13    in the facts of the Banner versus Wright case?

14         A.    I wouldn't draw that conclusion.

15              MR. SPEARS:

16                   Nothing further.

17    BY MR. MOST:

18         Q.    Okay.  A couple of follow-up things.  Mr.

19    Spears asked about has the legislature changed the

20    law post King v. Alexander, right?

21         A.    Correct.  He did.

22         Q.    Whether or not the legislature amends the

23    statute, that doesn't necessarily affect whether it

24    is constitutional or not, right?

25         A.    I agree.

1      Q.    For example, after Garrison v. Louisiana,
2  the US Supreme Court declared parts of Louisiana's
3  criminal defamation statute unconstitutional, and
4  the Louisiana legislature left it unchanged on the
5  books for decades, correct?
6      A.    I think there are many relics of law that
7  have been declared unconstitutional, some of which
8  are unconstitutional indirectly by other cases.
9      Q.    So the fact that a statute remains on the
10  books doesn't tell you whether it's constitutional
11  or not?
12      A.    No, but it does tell you what a member of
13  the public might think if they see it.
14      Q.    Mr. Spears asked you about distinctions
15  between the factual scenario in King v. Alexander
16  and Ms. Banner.  You listed a couple.  Do any of
17  those distinctions track Judge Feldman's analysis
18  of whether the statute was impermissibly overbroad
19  or not?
20      A.    The answer is they are related to it for
21  a variety of reasons.  One is this case presents a
22  different standing issue than he had or mootness
23  issue.  The other thing is that it relates
24  differently to the compelling state interest
25  analysis, because those factual distinctions I

1  think are important to that analysis.  So I do

2  think that those factual differences would be

3  things that would have to be considered in the

4  second case.

5        Q.   But there is no indication that Judge

6  Feldman's -- what he wrote about impermissible

7  overbreadth of the statute turns on any of those

8  distinctions you mentioned, correct?

9        A.   I don't want to -- I can't answer the

10  question as you framed it, because I don't quite

11  know what he meant when he said that.  He could

12  have meant that, but it's not clear, because the

13  analysis is somewhat incomplete as to when he says

14  it's overbroad.  Is it overbroad in all of its

15  applications with respect to those words?  I don't

16  know that he went that far or intended to go that

17  far or only overbroad as to those words for people

18  in this position under these circumstances.  So

19  anybody else who is in the same exact position as

20  these people and these circumstances, I would say

21  it's overbroad as to them.  It's hard to say what

22  Judge Feldman intended with those words.

23        Q.   Sure, but at least the text of what he

24  wrote does not say in any way that the

25  impermissible overbreadth turns on any of those

1    distinctions he mentioned, agreed?

2        A.    I wouldn't agree, because it all precedes

3    what he said.  He certainly -- Judge Feldman was

4    not in the habit of putting things in his opinion

5    that he didn't think was important or he didn't

6    think were important, so I think that he certainly

7    thought that everything he said in context was

8    important, and, certainly, that formed part of his

9    analysis for overbreadth.

10       Q.    You talked about whether Michael Wright

11   or Jaclyn Hotard had like authority or law

12   enforcement capacity, correct?

13       A.    Yeah.  Well, I said I don't think they

14   had law enforcement authority or prosecutorial

15   authority.

16       Q.    You have been to parish council meetings,

17   right?

18       A.    I have.

19       Q.    And at parish council meetings there is

20   often law enforcement officers there, correct?

21       A.    Yes.

22       Q.    And they take directions from whoever is

23   chairing the parish council meeting, correct?

24       A.    They can or they can act independently.

25       Q.    So when Michael Wright was chairing the

1    parish council meeting here, he had authority to

2    direct the actions of law enforcement officers who

3    were there to provide security, correct?

4         A.   Well, law enforcement officers answer to

5    their superiors, but if the purpose of the person

6    was to maintain public order, and the chairman

7    asked for order to be maintained, then I think they

8    kind of switch into a sergeant-at-arms role, and

9    they can then act.  From what I saw in the

10   transcript, I didn't see anybody get arrested or

11   anybody, you know, say, look, we're arresting you

12   for violation of this statute.  So I didn't -- if

13   that was -- if that happened, I'm unaware of it.

14        Q.   So the chairman of the parish council can

15   give directions to the sergeant-at-arms, correct?

16        A.   Yeah.  If he wants to maintain order in

17   the courtroom, yes, or in the council room, I

18   should say.

19        Q.   Okay.  Let me just check my notes real

20   quick.  You don't have any opinions to offer at the

21   trial of this matter that you have not reflected in

22   your expert report, agreed?

23        A.   I don't know of any that are not -- that

24   we didn't discuss today.

25             MR. MOST:

1               Okay.  Thank you very much for your

2        time.

3               [End of deposition, 10:25]

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              C E R T I F I C A T E

 2

 3              This certification is valid only for
    a transcript accompanied by my original signature
 4  and original required seal on this page.

 5              I, SANDRA P. DIFEBBO, Certified
    Court Reporter, in and for the State of Louisiana,
 6  as the officer before whom this testimony was
    taken, do hereby certify that RICHARD C. STANLEY,
 7  ESQ., after having been duly sworn by me upon
    authority of R.S. 37:2554, did testify as
 8  hereinbefore set forth in the foregoing 69 pages;

 9              That the testimony was reported by
    me in stenotype, was prepared and transcribed by me
10  or under my personal direction and supervision, and
    is a true and correct transcript to the best of my
11  ability and understanding;

12              That the transcript has been
    prepared in compliance with transcript format
13  guidelines required by statute or by rules of the
    board, that I have acted in compliance with the
14  prohibition on contractual relationships as defined
    by Louisiana Code of Civil Procedure Article 1434
15  and in rules and advisory opinions of the board;

16              That I am not related to Counsel or
    to the parties herein, nor am I otherwise
17  interested in the outcome of this matter.

18

19

20

21  _____
    Sandra P. DiFebbo,
22  Certified Shorthand Reporter

23  Date:  11/13/24

24

25
```