UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

JOY BANNER, Ph.D. * CIVIL ACTION
* No. 23-CV-7296
Versus *
* JUDGE NANNETTE J. BROWN
MICHAEL WRIGHT, * MAGISTRATE JUDGE,
et al * KAREN W. ROBY
* * * * * * * * * * * * * * * * * * * * * *

Deposition of JOY BANNER,
located at the law office of
Spears & Spears 909 Poydras Street,
Suite 1825, New Orleans, Louisiana 70112,
taken on Wednesday, July 31, 2024,
commencing at 1:00 PM.

Reported by:
LAURA DAUTERIVE
Certified Court Reporter
State of Louisiana

I N D E X


Caption 1

Appearances 3

Agreement of Counsel 4

Examination by

MR. SPEARS 5


* * * * *

Exhibits:


1 Driver's License 18

2 Complaint 79

3 Response to Written Discovery 102

4 Candidate's Report 129

Certificate 160

A P P E A R A N C E S

Representing the Plaintiff:

DAVID J. LANSER,ESQ
Most & Associates
201 St. Charles Avenue
Suite 2500, No. 9865
New Orleans, LA 70170
(504) 533-4521

david.lanser@gmail.com

Representing the Defendants:

IKE SPEARS, ESQ

SPEARS & SPEARS

909 Poydras Street, Suite 1825

New Orleans, LA 70112

(504) 593-9500

ike@spearslaw.com

Also Present:

Allie Conlay

S T I P U L A T I O N

It is stipulated and agreed by and between counsel that the deposition of

JOY BANNER

is hereby being taken under the Federal Rules of Civil Procedure in accordance with law, pursuant to notice;

That the formalities such as reading, signing, sealing and certification are hereby waived; The witness reserves the right to read and sign the deposition.

That all objections, save those as to the form of the questions, are hereby reserved until such time as this deposition, or any part thereof, may be used or sought to be used in evidence.

All objections are to be made in accordance with the Federal Rules of Civil Procedure.

* * * * *

Laura Dauterive, Certified Court Reporter in and for the State of Louisiana, officiated in administering the oath to the witness.

JOY BANNER,

157 Alexis Court, Vacherie, Louisiana 70090, after having been first duly sworn, testified as follows:

MR. SPEARS:

Good afternoon, Ms. Banner. My name is Ike Spears. We met just a little while ago I think for the first time, but I'm not certain. Nonetheless, I am the attorney for the defendants you've sued in this particular federal litigation which would include St. John the Baptist Parish and Council President Michael Wright -- I'm sorry -- Council Chair Michael Wright and Parish President Jaclyn Hotard.

In order to start, I just want to go over a few basic rules to make sure that you and I are in sync as to how the deposition should go. The first is extremely important that you be verbal as opposed to shaking your head or nodding your head, hunching your shoulders, and "uh-huh" and "uh-

uh" because this court reporter has to take down every single thing that you say. Please allow me to finish my question before answering, even though it's very likely you may understand where I'm going and what I'm about to ask. For the sake of having a good record, allow me to finish, then you can respond. Okay?

THE WITNESS:

Yes.

MR. SPEARS:

Sometimes I talk too fast. That's just a habit. I talk too fast and sometimes I may ask multiple questions as opposed to breaking it down to one question at a time. Sometimes I'm unclear. I think I know what I'm saying, but I don't. Probably my public school education. But, nonetheless, if I'm going too fast, it's okay for you to ask me to slow down. Okay?

THE WITNESS:

Yes.

MR. SPEARS:

If I'm going too fast, it's okay for you to ask me to slow down. Okay?

THE WITNESS:

Yes.

MR. SPEARS:

If I'm unclear as to what I'm asking, it's okay for you to clarify because I want to make sure that the answer you're giving is to the question I'm asking. Okay?

THE WITNESS:

Yes.

MR. SPEARS:

And if for any reason I ask too many questions at once and you need me to break it down into separate questions, please ask me to do that, and I certainly will do so. Okay?

THE WITNESS:

Yes.

MR. SPEARS:

I need you to understand that this deposition is being taken under

oath and is subject to the same penalties as if we were in a court of law, which means that anything you say, you've been sworn in, is subject to the penalty of perjury. Do you understand that?

THE WITNESS:

Yes, I do.

MR. SPEARS:

If I ask you a question -- and I don't anticipate this, but it sometimes happens. If I ask you a question that you think is inappropriate or that you think is none of my business, it's okay for us to go off the record and for you to speak with your counsel and for him to advise you whether or not you should or could answer the question. This is preferable as opposed to you giving me an incomplete answer or a wrong answer because you think it's none of my business. Okay?

So if I get into an area that you think is sensitive, it's okay for us

to go off the record and we'll give you all some private space to meet or we'll all exit this room and let you meet in this room. Okay?

THE WITNESS:

Yes.

MR. SPEARS:

During the course of this deposition, your lawyer may object. However, unless your attorney specifically tells you not to answer the question, I'm going to still ask you to answer the question even though he has made an objection for the record. Okay?

THE WITNESS:

Yes.

MR. SPEARS:

If for any reason you need to take a break -- sometimes these things go long. I don't anticipate that this will be extraordinarily long, but we don't know. Sometimes what I ask depends on the answers that I'm getting. But if for any

reason you need to a break, a break to use the restroom, to get some water, to stretch, it's okay for us to take a break, and we will accommodate you. Okay?

THE WITNESS:

Yes.

MR. SPEARS:

After your deposition is complete and before it is finalized, you will have a right to do what we call reading and signing your deposition. And it means that you'll have a chance to review it and make sure that everything was taken down accurately and correctly. And if it was not, to make any necessary edits. You don't have to advise me at this moment. And certainly, after you confer with your attorney, you can advise the court reporter whether or not you want to exercise that right to read and sign your deposition. Okay?

THE WITNESS:

Yes.
MR. SPEARS:
Okay.
EXAMINATION BY MR. SPEARS:
Q. Have you ever given deposition testimony before?
A. No, I haven't.
Q. Have you ever testified in a court of law before?
A. Yes.
Q. Can you tell me when and where and what were the circumstances?
A. I --
Q. First of all -- excuse me -- was it more than or simply once?
A. It was twice, I believe.
Q. Let's talk about the first time.
A. The -- I don't remember the exact date, but I testified regarding a Greenfield property. We had a motion for an injunction to stop construction on a property because we believed that there were potential burial grounds of enslaved people that might be harmed, so I testified.
Q. Can you tell me which court you

testified in?

A. It's the district court in Edgard.

Q. And who was the judge before whom you testified?

A. Judge Snowdy.

Q. And can you tell me about what year this was?

A. This was 2023.

Q. And let's talk about the second time you testified in court.

A. The second time that I testified in court was 2024. Again, don't remember the exact date. Maybe March or April. But I testified regarding the St. John the Baptist Parish zoning of the Greenfield's property, and I testified that there was not a sign on the site ten days prior to the planning and -- I believe, the planning and zoning meeting and our council meeting.

Q. Before which judge did you testify?

A. Again, that was Judge Snowdy.

Q. So both times that you testified in court it would have been before Judge Snowdy?

A. Yes.

Q. And one time was in 2023, and the second time was in 2024?

A. Yep.

Q. Are there any other times that you can think of where either you testified as a witness in court or you gave a deposition?

A. No.

Q. Other than the lawsuit that we're going to discuss in great detail today, have you ever been involved in any other lawsuits or litigation either as a plaintiff, meaning you were suing someone, or as a defendant, meaning you were being sued?

A. As plaintiff, we -- or I am involved, I don't know if it's personal or not as the -- well, actually, yes. As a person -- as a resident and as the director of The Descendants Project, we are involved in a lawsuit regarding the Greenfield property and the residential zoning that was illegally changed to industrial zoning.

Q. Do you know the caption or the title of that case? Who is suing whom?

A. I know we're the plaintiffs. The Descendants Project versus St. John the

Baptist Parish Council, St. John the Baptist Parish Planning and Zoning, and St. John -- and Jaclyn Hotard, I believe, the parish president because they're all involved in the zoning.

Q. Are there any other plaintiffs in that particular lawsuit that you're aware of?

A. No.

Q. Are you represented by counsel in that particular litigation?

A. Yes.

Q. Who would be your attorneys in that litigation?

A. So Pam Spees and Bill Quigley from the Center of Constitutional Rights. They have represented us in zoning. I've been represented by Tulane Environmental Law Clinic who has represented us in terms of the permits. And then William Most, who has represented -- and Dave Lanser and his team, that represented us for zoning issues for -- for restraining orders for council votes, and that's all I can remember.

Q. Okay. For the litigation, which of

these lawyers, law firms, or law clinics are the attorneys on the pleadings for The Descendants Project versus St. John the Baptist Parish in adverse?

A. I believe -- are you asking for this specific?

Q. Not the case that we're here to talk about today. You said there was a case --

A. Yeah --

Q. -- called The Descendants Project versus Jaclyn Hotard, St. John, and others.

Who is the lawyer handling that case?

A. I believe it is between Center for Constitutional Rights, which is Pam Spees and Bill Quigley, and William Most & Associates for the others.

Q. And just so the record is clear, have you ever testified in court in any criminal matters?

A. No, I haven't.

Q. Have you ever personally filed bankruptcy?

A. No, I haven't.

Q. In an earlier response to discovery, you indicated that you have never been

arrested or convicted of any crimes.

Is that answer still correct?

A. Yes.

Q. Please tell me, what is your full legal name, or as they say in my neck of the woods, what's your government name?

A. My name is Joyceia Marie Banner.

Q. Spell Joyceia for me.

A. J-O-Y-C-E-I-A.

Q. And your middle name is Marie?

A. Yes, it is.

Q. Banner.

A. Uh-huh (affirmative).

Q. And that is the name -- or your name as it appears on your birth certificate and all legal documents?

A. Yes.

Q. Have you ever been married?

A. No, I haven't.

Q. Have you ever legally changed your name from Joyceia Banner to Joy Banner?

A. No.

Q. Have you ever been named -- known -- excuse me -- by any other names other than Joy Banner and Joyceia Banner?

A. No.
Q. Do you possess a Louisiana driver's license?
A. Yes, I do.
Q. Do you have it present with you today?
A. Yes, I do.
Q. Can I take a look at your driver's license?

MR. SPEARS:

Let the record reflect that Ms. Banner has given me Louisiana personal driver's license Number 006781949 with an address of 157 Alexis Court in Vacherie, Louisiana.

BY MR. SPEARS:

Q. Is this your current driver's license?
A. Yes.
Q. And I'm assuming unless you tell me otherwise, that if you have a passport, it would have the same name on it?
A. Yes.
Q. Okay.

MR. SPEARS:

With your permission, I'd like to make a copy and attach it to your deposition. if I can do that.

THE WITNESS:

Sure.

MR. SPEARS:

Allie, can you do that?

MS. CONLAY:

Uh-huh (affirmative).

MR. SPEARS:

And see if Camilla has any exhibit stickers for us.

MS. CONLAY:

Okay.

(Ms. Conlay leaves the room at this time.)

BY MR. SPEARS:

Q. Do you have any official government documentation in the name of Joy Banner?

A. No.

Q. Do you have any licenses or degrees or diplomas in the name of Joy Banner?

A. No.

Q. Do you own any motor vehicles?

A. Yes.

Q. Are those motor vehicles registered

to you?

A. Yes.

Q. Are they registered in the name of Joy Banner or Joyceia Banner?

A. Joyceia.

Q. Do you have any bank accounts?

A. Yes.

Q. Are any of those bank accounts in the name of Joy Banner?

A. I don't believe so.

Q. Okay. Do you have any checking, savings, investment accounts, any accounts in the name of Joy, J-O-Y, Banner?

A. I don't believe so.

(Ms. Conlay returns.)

BY MR. SPEARS:

Q. Do you have any loans or mortgages?

A. Yes.

Q. Are any of those loans or mortgages in the name of Joy, J-O-Y, Banner?

A. I don't believe so.

Q. Okay. So it would be fair to say that all of your business transactions, bank accounts, mortgages, vehicle registrations, government documents, are all in the name of

Joyceia Banner and not Joy Banner, correct?
A. Yes, that's what I believe.
Q. And that would include any credit cards or debit cards?
A. Again, I believe so.
Q. Okay. Are you aware that this particular lawsuit that we're going to be discussing today is filed in the name of Joy, J-O-Y, Banner?
A. I'm aware.
Q. Okay. And did you review and approve this particular lawsuit being filed in the name of Joy Banner, as opposed to your legal government name?
A. Yes.
Q. Can you take a moment, Ms. Banner, to share with me your educational background starting with high school coming forward, please?
A. Sure. I went to high school at Ascension Catholic in Donaldsonville and graduated in '96. Then went LSU and received a Bachelor of Science in marketing in 2000. Then went on to Nicholls and got an MBA at the end of 2001. And then went

back for my doctorate in 2004 at LSU and received a PhD in communication studies with a focus in organizational communication in 2008.

Q. In connection with your MBA --

A. Uh-huh (affirmative).

Q. -- at Nicholls -- and that Nicholls State University of Louisiana?

A. Yes.

Q. What year did you receive that?

A. In 2001.

Q. And your PhD at LSU, what year did you receive that?

A. I just said 2008.

Q. In obtaining your PhD, did you have to do any particular thesis paper?

A. I had to write a dissertation.

Q. And what was the subject matter or the topic of your dissertation?

A. It was a minute ago. It was the -- examining the cross -- the intersection of family -- family communication and business communication. So it was research on family businesses.

Q. We have previously asked in our

discovery that was presented to you through your lawyer for copies of any diplomas or degrees you might have. And I think the response was either they were behind glass or too difficult to obtain. And so I'll ask again, can you provide us with copies of your diplomas and degrees, or would you be willing to sign a release so that we can obtain them from the various institutions?

A. I'll sign a release. They are behind glass, and some are in storage or whatever. They're not easy to access. But I'll be more than happy to sign a release.

Q. Okay. And can we do that today before you leave?

A. Sure.

Q. Okay. Thank you. It makes my job a lot easier.

Do you have or have you obtained any particular professional licenses or certifications?

A. No, I haven't.

Q. In this particular case, the case which is in federal court, which is styled Banner versus Wright, et al., you have

retained the law firm of William Most; is that correct?

A. Yes.

Q. With regard to your agreement with William Most, are you paying the fee, or is someone paying the fee for you?

MR. LANSER:

I'm going to object to it. You know, it's privileged what her agreement is with us.

MR. SPEARS:

Well, I don't it -- well, if you direct her not to answer it, tell her don't answer it. But we have a right to know. But you're the lawyer.

MR. LANSER:

Yeah. There's no reason to answer that.

MR. SPEARS:

Okay.

BY MR. SPEARS:

Q. Do you know whether or not your agreement is on an hourly basis or contingent upon recovery?

MR. LANSER:

The same objection.

BY MR. SPEARS:

Q. Have you hired or retained any lawyers other than William Most and his firm in connection with this litigation?

A. I'm not going to answer that either then.

Q. Well, you can't decide. But now, if your lawyer tells you not to answer, then you're following your lawyer's instruction. Otherwise, you'll be in contempt.

MR. LANSER:

You don't have to answer that.

The record of the case shows who's enrolled as her attorneys.

MR. SPEARS:

I understand. But she also has a litany of lawyers who she has, apparently, preexisting relationships with.

MR. LANSER:

Understood.

MR. SPEARS.

Okay.

MR. SPEARS:

Q. In preparation for today's deposition, have you reviewed any materials?

A. Other than just the complaint and the response.

Q. When you say "the response," what exactly are you referencing?

A. The ones that we submitted that your office -- you sent to us that we sent back to you.

Q. So that would be your responses to the discovery submitted to you by the defendants?

A. Yes.

Q. So you reviewed the complaint. And there's two complaints. There was an original complaint and an amended complaint.

Which one did you review?

A. I reviewed the amended.

Q. Okay. Other than the amended complaint and your responses to discovery, have you reviewed anything else in preparation for today's deposition?

A. Not that I can really remember.

Q. Did you review the video recording of the parish council meeting that's at issue?

A. I may have.

Q. Did you meet with your attorney in preparation for today's deposition?

A. Yes.

Q. Okay. The documents you reviewed, can you tell me when you reviewed them?

A. I don't remember exactly.

Q. Was it yesterday?

A. I know it wasn't yesterday.

Q. Was it this week?

A. I don't think -- I'm not sure. I don't remember.

Q. Was it within the past week?

A. Maybe within the past week.

Q. Okay. And in reviewing the amended complaint, do you understand that one of your allegations against the defendants is that they violated Louisiana Open Meetings Law, correct?

A. Yes, I think. I'm not -- I kind of get confused between the First Amendment and the open meetings. But, yes, I believe -- yes.

Q. Would you like to take a moment to review the amended complaint again to make

sure your answer is correct?

A. No, I trust -- I trust what I feel.

Q. Okay. So with regard to your claim that St. John the Baptist Parish and defendants, Wright and Parish President Hotard, violated the Louisiana Open Meetings Law, please tell me what exactly did they do that amounted to a violation.

MR. LANSER:

I'm going to object to the form to the extent it calls for a legal conclusion.

THE WITNESS:

Right.

MR. SPEARS:

Okay.

BY MR. SPEARS:

Q. So please tell me what did they do that amounted to a violation of the Louisiana Open Meetings Law?

MR. LANSER:

The same objection.

THE WITNESS:

Yeah, I'm not a lawyer.

MR. SPEARS:

Okay.

BY MR. SPEARS:

Q. Are you familiar with the Louisiana Open Meetings Law?

A. I'm somewhat familiar.

Q. Do you know whether or not it requires that notice of the meeting be posted in advance of the meeting?

A. Yes.

Q. Do you know if it requires that notice of the meeting be posted or published more than 24 hours before the meeting?

A. Yes.

Q. With regard to the meeting in question, this would be a meeting dated November 28 of 2023; is that correct?

A. Yes.

Q. Okay. With regard to the 20- -- I'm sorry -- the November 28, 2023, meeting, the meeting which is the subject of your federal lawsuit, do you have any reason to believe that the Parish failed to timely post notice of the meeting?

A. I -- so the Opening Meeting Law -- and I -- it wasn't -- I don't think that it

was about the timing.

Q. Okay. But my question is do you have any reason to believe or to allege that the Parish did not comply with the law relative to posting the notice more than 24 hours before the meeting?

Do you have any reason to believe that?

A. But that's not all to -- that's not all that's involved in Open Meetings Law. So as far as timing, I believe, from what I remember, that wasn't so much the issue.

Q. So is the answer to the question, Ms. Banner, yes, they did timely post notification of the meeting, or no, they did not?

A. I don't remember.

Q. Okay. Do you have any reason to believe that they did not timely post notice of the meeting?

A. I don't have any reason to, but it's striking my memory that that was the core complaint that I had.

Q. Do you have any reason to believe the agenda of the meeting was not published in

advance?

A. I don't remember, but again, I don't think that it was. The Open Meetings Law was really in regard to the timing of the agenda. It was -- yeah, I'll just -- I'll end it there.

Q. Was the agenda published in advance?

A. I don't remember.

Q. Did you come to the meeting with a copy of the agenda?

A. I did.

Q. When did you get a copy of the agenda?

A. I don't remember. That was in November.

Q. Did you get it at the meeting or before the meeting?

A. Maybe I'd gotten it both. I usually get a copy there, or I usually have one either on my phone or in my hand.

Q. So would it be fair to say that your experience with regard to the St. John the Baptist Parish Council is that the agenda for parish council meetings is generally distributed in advance of the meeting?

A. You -- so, yes and no.
Q. Let's talk about November 28, 2023.
A. Uh-huh (affirmative).
Q. Was the agenda for that meeting distributed in advance of that meeting?
A. It was distributed in advance.
Q. Okay. And you received a copy in advance of the meeting?
A. I downloaded -- I believe I downloaded it. I access to it online.
Q. At that particular meeting, the meeting of November 28, 2023, was there a quorum of parish council members present?
A. Yes.
Q. At that particular meeting, the meeting of November 28, 2023, did the parish council allow for public comment on agenda items?
A. Yes. But I will add that the public comment was opened and quickly closed, and I had to actually stand up and insist on a public comment. Council Wright said, "Public comment open. Public comment closed." And I had to stand up and ask for a public comment.

Q. So you were afforded an opportunity at that particular meeting -- again, the meeting of November 28, 2023, you were afforded an opportunity to give public comment, correct?

A. That's debatable because I don't believe what -- what I -- what took place was saying that I was given the opportunity for public comment. I would not consider that being -- someone allowing public comment.

Q. In addition to yourself, it's my understanding that there were other persons who also spoke during the public comment period at that particular meeting. Is that correct and as you recall?

A. Allowed to speak is, again, this question is debatable because they weren't allowed to speak on what they wanted to speak on. So I don't say that's being allowed to speak.

Q. Well, let me ask you differently. First of all, you did speak, correct?

A. If there were -- if I made attempts to speak and verbalize, I tried to. But I

was -- but as far as that being public comment, no, because I was instantly -- almost as I started to talk, I was immediately interrupted. So that's debatable whether we can call that actually being able to speak.

Q. You were the first speaker, correct?

A. If -- if that's qualified as speaking, which I don't think it is.

Q. You were the first person up to speak, correct?

A. I was the first person up for the purpose of speaking.

Q. And there were several people who spoke after you, correct?

A. I believe there -- I believe there were.

Q. Okay. So multiple people spoke at the November 28, 2023, meeting during the public comment period, correct?

A. Yes, there were a couple. I can't remember the exact number.

Q. And during your time period, one of the things you wanted to speak on was a matter that was subject to executive

session, correct?

A. That's -- yes, I believed that I -- since it was on the agenda that I could speak to it.

Q. And you were advised that you were not permitted to give a comment on items that were listed for executive session, correct?

A. Correct.

Q. Do you disagree with that interpretation that public comment is not permitted on matters for Executive Session?

A. I don't know. I mean, I didn't -- I just took what Michael Wright said. He was a council person. He said, "You can't -- it's not on executive session, and you can't comment it on." So I took -- I took it, and I followed what he said.

Q. As you sit here today several months later, is it your position -- is it your belief that Chairman Wright was wrong or mistaken regarding his statement that public comment could not be allowed on executive session?

A. The fact -- it was not in reference

to what triggered him reading about me being in prison. It was specifically about the board of ethics case. That is the thing that has been my primary complaint. That is the thing that has stressed me out the most. And so, quite honestly, if there was something about the executive session, it might be, but in terms of where I felt my rights were truly being stepped on was on that portion.

Q. Okay. So just so that it's clear that you're answering the question that I'm asking, as you sit here today, do you have any reason to believe that he was wrong or mistaken in his statement that public comment could not be allowed on items that were slated for executive session?

A. No.

Q. Okay. There was a second item you wanted to speak to regarding the hiring of counsel to deal with an ethics matter, correct?

A. Yes.

Q. You and several other members of the public spoke, and essentially opposed that

item, correct?

A. We were not allowed to speak.

Q. When you say "we," who are you referencing specifically?

A. I am referencing community members. It was me, it was my sister, and those of us that are particularly concerned in the community. There are several of us that are concerned about the zoning and concerned about Jaclyn Hotard signing off on that application and the board of ethics investigation and we're concerned about taxpayer money, our money, being used to defend her against something that was ultimately impacting here.

Q. How many of those people who you're referencing? And you mentioned your sister, who are the other persons who wanted to speak?

A. I know at least Kim Matthieu.

Q. Kim Matthieu. Who is she?

A. Kim. His name is --

Q. Yeah, I'm sorry.

A. He is -- he is a resident of Edgard.

Q. And did Mr. Kim Matthieu get up to

speak?

A. He did get up to speak.

Q. Did Mr. Kim Matthieu speak?

A. He spoke, but he altered what he was going to speak on.

Q. Okay. And how do you know he altered what he was going to speak on?

A. Because we talked about it.

Q. And when did you talk to Mr. Kim Matthieu?

A. At that point, we had all gotten kicked out of the -- no, I think Kim spoke after we had got -- we had all gotten kicked out of the council chambers. But then, probably a discussion -- I don't know exactly when, but I think a discussion and immediately following up. We were all -- we were out as a community and several of us that were there. I mean, it's a group of us that came to speak and then were not -- people either didn't get up to speak or they changed what they were going to speak because we were told that we were going to be thrown in prison. Or, I was told I was going to be thrown in prison, and so they

inferred that they would be thrown in prison if they tried to speak.

Q. So who told you you would be thrown in prison?

A. Michael Wright.

Q. Did anyone approach you or threaten to arrest you?

A. I -- when he said a fine or imprisonment, I took that seriously. I didn't -- there were -- there were police officers. These meetings are run where there are cops around us. There are cops immediately next to where we are sitting. A cop is immediately next to Jaclyn Hotard. The minute that we say something that does not -- is not allowed by the council, they call in the cops. So there is a real belief, I felt, that I could, yes, be thrown into prison and yes, get arrested.

Q. Okay. Not counting the meeting of November 28, 2023, were you ever before -- you, personally, ever before threatened with arrest at a parish council meeting?

A. No.

Q. Not counting that meeting, did you

witness anyone get arrested at a parish council meeting?

A. No, I have not.

Q. Not counting that meeting, can you tell me how many previous meetings your sister has publicly spoken at?

A. My sister has publicly spoken at? I don't know the number offhand, but it's been probably almost as much as the same times I've spoken. We've spoken repeatedly.

Q. Other than your sister and Mr. Kim Matthieu, who are the other persons who were part of your group who came to speak?

A. They're not part of our group. They are part of a community. And so that -- there might have been, as a community, about 12, 13 of us that had come out.

Q. Can you give me the individual names of the community members?

A. I can't remember all the community members that were there.

Q. Can you remember any other than your sister and Kim Matthieu?

A. I believe I turned those in with my responses.

Q. And other than the night in question or the day in question of the council meeting on November 28, 2023, did you have any subsequent conversations with these persons who indicated that they wanted to speak but they feared speaking?

A. Yes.

Q. And who would those people be?

A. So we asked -- as we're -- so there's a lot of discussion about what is happening in St. John the Baptist Parish. And so as we are talking about these -- like, we are talking about these issues, but in terms of it was this person who said this thing, like, this time, there's a lot. So I don't have those details right -- like, as precise as you're asking because there is a lot of issues that we talk about as a community about St. John the Baptist Parish.

Q. Are any of those people prepared to come to court to say that they wanted to speak but they were fearful?

A. You'd have to ask them.

Q. I can't ask them unless I know their names. See how that goes?

A. Yeah, well.

Q. So far, I have three names. I have your name. I have your sister's name.

That's -- tell me your sister's full legal name, again.

A. My sister's name is Jocyntia.

Q. Uh-huh (affirmative). Spell that for me.

A. J-O-C-Y-N-T-I-A.

Q. So I have your name, Jocyntia Banner, your sister, and Mr. Kim Matthieu.

As we sit here today, are there any other names that you could think of who you believe came to speak out on that particular item, but they did not speak out of fear?

A. I don't remember those individuals. Now, Stephanie Aubert is someone who would speak.

Q. Was she at the meeting?

A. Yes.

Q. Did she speak?

A. No. Well, I can't -- I can't remember. If she did, she did not -- I don't believe that she spoke.

Q. Okay. After the public comment

period, ultimately, the item -- the item regarding authorization of legal counsel to deal with the ethics matter came to a vote; is that correct?

A. Yes.

Q. Do you remember what the vote was?

A. I don't remember what the exact vote breakdown was. I think it was 6/3.

Q. Okay. Was the six votes in the majority in favor of passing the ordinance on the issue?

A. Yes, it was.

Q. Do you remember who the three votes were against the issue?

A. I believe it was Councilman Torres, Schnyder, and Griffin. I'm not sure, but I'm pretty sure.

Q. Okay. So just so that it's clear, your specific complaint regarding the Open Meetings Law is not the meeting was not properly noticed, correct?

That is not one of your complaints, correct?

A. That is -- I -- I'm not sure. I don't remember.

Q. Okay. It's not that there was not a quorum, correct?
A. That's correct. There was a quorum.
Q. Okay. It's not that you did not have the agenda in advance, correct?
A. Correct.
Q. It's not that there was not a public comment period, correct?
A. That is debatable. That's the problem because I don't --
Q. Okay. Explain it.
A. That was not public comment.
Q. Explain why it wasn't public comment.
A. Public comment is you have three minutes to say -- if it's relevant to the agenda item, you have three minutes uninterrupted to say what you have to say. That did not take place.
Q. Well, according to my view, you had more than three minutes.
Don't you recall?
A. No, I did not have three minutes. I did not have three minutes uninterrupted and unchallenged without the threat of arrest.
Q. And you also asked to have additional

time placed on the clock.

Do you remember that?

A. I did not ask -- it wasn't additional time. I was asked to have the time that was taken away from me by Mr. Wright.

Q. Was that granted -- your request?

A. Not -- no. Because I still wasn't allowed to speak.

Q. Okay. In addition to your Open Meetings Law claim, you also seem to have a claim that your First Amendment rights were violated?

A. They were.

Q. Explain that to me.

MR. LANSER:

I'm going to object to form. It calls for a legal conclusion.

BY MR. SPEARS:

Q. How were your rights violated?

A. I was not allowed to speak. The First Amendment rights means that you have the right to speak. I was not allowed to speak.

Q. Okay.

A. In my interpretation. I am not an

attorney, but as a US citizen, I thought that's one of the most basic fundamental rights of being an American, and it was denied -- denied me that night.

Q. So was it denied by the council president?

A. Him and Jaclyn Hotard.

Q. They both denied you your rights?

A. Yes, they did. Because she stood up and immediately was objecting to me speaking.

Q. In your petition, you actually have it styled Joy Banner, PhD

Are you aware of that?

A. Maybe I -- if I use -- it might be Joy Banner. I've used Joy Banner, usually, not on any legal documentation. But I've never had any confusion between Joy Banner or Joyceia Banner.

Q. Okay.

A. So that's not any attempt to be -- it to be tricky or anything. It's just sometimes it goes by Joy, and sometimes it goes by Joyceia.

Q. I'm simply asking if you're aware

that your legal counsel, in filing your lawsuit or the lawsuit where you're the named plaintiff, lists you not simply as Joy Banner, not as Joyceia Banner but as Joy Banner PhD?

A. Yes.

Q. Okay. Which suggests to me that your academic status is somehow relevant to this lawsuit. Is that what you believe?

MR. LANSER:

Object to the form. legal conclusion.

THE WITNESS:

My -- I use my title in and out. I mean, I don't think about it. Sometimes I sign it, sometimes I don't.

BY MR. SPEARS:

Q. You reviewed and approved the use of your name as Joy Banner PhD before the lawsuit was filed, correct?

A. Yes.

Q. Okay. And that suggests to me and to others that somehow the use your academic credential, PhD is somehow relevant to these

proceedings.

A. That's your suggestion; that's not mine.

Q. Okay.

A. That's your conclusion.

Q. I'm concluding that because --

A. I'm not saying that. That's what you're suggesting. So if that's what you think, that's what you think.

Q. Okay. You listed in your factual allegations that Dr. Joy Banner, again using your credential Dr. Joy Banner, is a former university professor and current community leader.

What makes you a community leader in St. John or anywhere?

A. So the work that -- first of all, I am a community resident.

Q. No. What makes you a community leader?

A. I'm getting -- that's what makes a leader. First of all, it starts by the fact that I live in my community. And that I believe myself -- no not believe myself, I am a leader because we stand up for, and my

work is focused on standing up for justice. And whether that's economic justice, whether that's environmental justice, but especially racial justice. So we look at and examine the systems especially related to the legacies of slavery.

And so those are things that we speak on, and that's what we have created an organization from that standpoint. And so that's what -- that's why I'm a leader.

Q. So you're a leader because you speak up and speak out?

A. Speak up, speak out, and there's more than speak up and speak out. We also act.

Q. Okay. As a leader, do you have any followers?

A. I would not call them followers. I'd call them -- we are allies. We are in this together.

Q. Okay. So it's my understanding that at some point during the elections last year, as a leader, you decided to put your name on the ballot to run for the St. John parish council, correct?

A. I did.

Q. And it's also my understanding that after the votes were tallied, out of four candidates, you came in a distant fourth place, correct?
A. I came in distant.
Q. I'm asking you.
A. Yes, I did.
Q. A distant fourth?
A. A distant fourth.
Q. Okay.
A. And I'm proud -- I'm proud of the fact that I ran.
Q. So it would seem to me that although you think you're a leader, the voters of St. John may disagree?
A. Being they could disagree. They have the right to disagree.
Q. Well --
A. And they did in that particular case. I have no problem with that.
Q. Okay. So you would agree that although you are a self-proclaimed leader, when given the opportunity to elect you into a leadership position, the voters rejected you and you came in fourth place?

A. So I don't think leadership is simply something that is measured by a vote. So, I mean, if they made a vote and they didn't vote for me, doesn't mean that I don't consider myself a leader. I still consider myself a leader. Now, if that's the assumption that you want to make, that's up to you.

Q. Well, it's not -- if they decided not to vote for you, can we at least agree that the overwhelming majority of voters --

A. I won the vote in Wallace.

Q. Okay.

A. Which is my immediate community.

Q. Okay.

A. So that -- isn't that leadership?

Q. So are you now the mayor of Wallace?

A. Did I say I was the mayor of Wallace?

Q. I'm trying to understand the significance of you --

A. I'm trying to understand your question.

Q. My question is some people declare themselves leaders, and when you begin to peel back the layers and examine the facts,

the facts don't always reconcile.

A. So what's your expertise in leadership -- in leadership studies?

Q. It's not important for me to have an expertise for me to have an expertise in leadership studies.

What is important is for me to understand why is it that you, as a leader, were rejected by the voters?

A. Is Jesus a leader?

Q. Jesus isn't on the ballot and he's not in this litigation.

A. Well, I'm -- the reason why I'm asking these questions is because as someone with a business background and with, actually, a background a part of my PhD studies was in leadership, leadership is defined by many things. It doesn't necessarily mean that as a leader you win a vote. There are things that impact a vote.

We all know that votes can be influenced. Votes can be bought. People can vote. People don't vote. So if we're determining who is a leader based on a vote they get -- and there's a lot of people that

are leaders, right? I consider my parents leaders. Did they run for office? Did they get votes? Not necessarily.

So I'm just saying that your question is really vague. But if that's -- if that's the metric that you're using to define leadership, so be it. But it's not -- it's far away from the only metric which defines leadership, if you can even define leadership.

Q. Well, in your world view in your metric, would you define the elected parish council members in St. John the Baptist Parish as leaders?

A. In their -- there is official leadership roles. I would not characterize them based on their behaviors as necessarily having embodying leadership qualities.

Q. So are you saying that the elected members of the St. John the Baptist Parish are leaders or that they are not leaders?

A. Their formal role is that leader -- of a leader. They were elected as leadership roles. Do they possess the characters of a leader? No, many of them do

not --

Q. Okay.

A. -- in my opinion.

Q. You also indicate that you're a former professor.

Where were you a university professor?

A. I was a professor at Huston-Tillotson University and St. Edward's University.

Q. Okay. Tell me the years at Huston-Tillotson.

A. 2012 to 2016.

Q. And where is that university located?

A. In Austin, Texas.

Q. And what was your other university professorship?

A. St. Edward's University.

Q. St. Edward's?

A. St. Edward's University.

Q. And where is that?

A. That's also in Austin.

Q. And during what years?

A. That was 2008 to 2012.

Q. And what was your reason for parting ways with St. Edward's?

A. I was actually -- I wanted to go to Huston-Tillotson. I had -- so I had a Dean that was from Louisiana. So I ended up wanting to switch to go to another university. That's all.

Q. You were not terminated or asked to leave. Is that a fair statement?

A. Fair.

Q. Okay. And you were at Huston-Tillotson until 2016?

A. Yes.

Q. And what was your reason for leaving Huston-Tillotson?

A. I wanted to come home and be involved in the heritage and tourism industry.

Q. Were you terminated from Huston-Tillotson or asked to leave?

A. No, I was not.

Q. Can you walk through for me your employment since graduating with your BA in science from LSU?

A. Since graduating, I worked at Laura Plantation because I went straight from my BS and right into my M.BA And then my MBA, I think I worked at Laura Plantation for --

I can't remember how long. And then I was a substitute teacher and a teacher, because, yeah, a teacher ended up leaving, at Our Lady of Grace Catholic School in Reserve. And then at that point, I was -- I went back to get my PhD, and I was a graduate assistant as a doctoral student. And then I received a fellowship and worked at Barnes & Noble while I finished my PhD

Q. Okay. So I heard Laura Plantation. Where is that located?

A. That's in Vacherie.

Q. And what years were you at Laura Plantation?

A. So after my -- actually, my -- so for after the -- after I got my BS and after I got my MBA, 2002-ish. I'm not exactly sure. That was a long time ago.

Q. Uh-huh (affirmative). And for how long?

A. I'm not sure. I'm really not sure. I can't remember.

Q. And what years were you at Lady of Grace in Reserve?

A. That was -- that would have been,

like, 2002 through 2004.

Q. And you said you were doing substitute teaching?

A. Substitute, and then a teacher had to leave, and so then I actually became the 8th grade -- 8th grade teacher.

Q. And what was your job title or description at Laura Plantation?

A. I was the gift manager or something gift shop.

Q. And with regard to Laura Plantation and Lady of Grace, were you terminated from either of these jobs?

A. No, I wasn't.

Q. What was your reason for leaving?

A. They weren't permanent jobs, per se. I was still pursuing my -- interested in getting my PhD, so...

Q. And after Lady of Grace and after getting your PhD, where did you work?

A. I worked at St. Edward's, then Huston-Tillotson, and then Whitney Plantation.

Q. Well, St. Edward's, Huston-Tillotson, and then Whitney Plantation.

A. Uh-huh (affirmative).
Q. When did you work at Whitney Plantation?
A. So as soon as I came back, 2000- -- wait, 2016 to 2022, I believe.
Q. What was your job title at Whitney Plantation?
A. I was the director of communications.
Q. And to whom did you report?
A. Initially, I reported to the founder of the museum, John Cummings, and then I was a director of communications and reported to the executive director.
Q. And who was the executive director?
A. Ashley Rogers.
Q. When did you start and when did you leave Whitney Plantation, if you've left?
A. I just told you. I started in 2016, and I believe I ended it -- I left in 2022-ish. I think 2022. I'd have to make sure, but it's 2022, I think.
Q. During that same time period from 2016 to 2022, did you have any employment elsewhere?
A. So I started -- if -- since we

organized The Descendants Project in 2000- -- at the end of 2020, and so at that point, I was also doing -- maybe doing part-time work on The Descendants Project, so I don't know if you -- when you would consider that an additional job, but those time frames, it overlapped.

Q. Okay. Let's discuss The Descendants Project. First and foremost, you list yourself as a founder and co-leader of The Descendants Project.

Now, who would be the other co-leaders?

A. The co-director is my sister, Jocyntia Banner.

Q. Is co-leader and co-director interchangeable terms?

A. I think that they are -- it depends. Because, like I said, I think that there is more ambiguity like you were asking the questions about the term leader. So I think in saying co-director -- in terms of our title, we use co-director. Now, in terms of someone looking at us and what do we do, we co-lead, yes. But in terms of our official

roles, what we put on paper most of the time is co-director.

Q. Okay. Well, in the lawsuit, the litigation you approved, you used the title founder and co-leader. So it's not a term that came up with, it's a term that you and your attorneys used, so.

A. Okay. Okay. That's fine. Just --

Q. So are there any other co-leaders other than yourself and your sister?

A. So in the official capacity of our -- of what that term means in that use, we are -- we are the two leaders and we're the two executive directors.

Q. Okay. And you are founded to begin co-leading this organization in 2020, correct?

A. Yes.

Q. Okay. Now, is The Descendants -- tell me in your own words, or I guess if you have a mission statement, what is The Descendants Project?

A. Sure. So The Descendants Project we are a non-profit 501(c)(3), and the mission is to eradicate, in particular, the legacies

of slavery. We do this with a focus on environmental, economic, social, racial, focusing on those injustices. And in particular, we focus on the areas of heritage and tourism that have been used or can be used, if used correctly, to address those legacies.

So what we do is educate people about the links of plantation economy, plantations of those legacies to what we are currently facing as our primarily descendant community.

Q. And where is your organization headquartered or housed?

A. We are headquartered in Wallace.

Q. And what is the physical address in Wallace?

A. So right now, our physical address is 135 West 8th Street, but we are in the process of -- well, yeah, 135 West 8th Street.

Q. Okay. And are you in the process of relocating?

A. No.

Q. And West 8th Street is in Wallace?

A. It is.
Q. Other than yourself and your sister, are there any other employees or directors of The Descendants Project?
A. Yes.
Q. Who would they be?
A. Our community -- community -- community liaison education coordinator is Stephanie Aubert.
Q. Is this the same Stephanie Aubert who was going to speak at the meeting?
A. Yes. She's also a member of the Wallace community.
Q. Okay.
A. And Ali Johnson who is also our operations manager.
Q. Was it Ali or Lee?
A. Ali.
Q. A-L-I?
A. A-L-I.
Q. Ali Johnson.
A. Uh-huh (affirmative).
Q. And Ali Johnson's title, again?
A. He is operations manager.
Q. And I'm assuming these are paid

positions, not volunteered positions?

A. They're paid positions.

Q. Okay. And other than yourself, your sister, Stephanie, and Ali, any other?

A. And then Verdell Banner who is the director of operations.

Q. And Verdell's last name is Banner.

Is he any relation to you?

A. He is my brother, yes.

Q. Okay. I'm spelling Verdell, V-E-R-D-E-L-L?

A. Yes. Verdell is the director of operations. He's also our industry -- he consults on the industrial projects and permits.

Q. Okay. Anyone else that we've missed?

A. So then we have -- we just hired a communications -- communications and digital manager, but she hasn't done her onboarding yet. And the we're bringing on --

Q. Who is she?

A. Her name is Kalie.

Q. How are we spelling Kalie?

A. K-A-L-I-E.

Q. Uh-huh (affirmative).

A. Dutra, D-U-T-R-A. And then we're also bringing on an environmental -- a regional environmental justice coordinator who has not started yet. But if you want their names, I can give you her name, too.

Q. If you have it.

A. Sure. It's Yvonne, E -- sorry -- Y-V-O-N-N-E, Holden, H-O-L-D-E-N.

Q. Okay. Is that the entirety of your staff?

A. I mean, I guess you don't like all of the -- because, I mean, we have landscapers, we have builders, we have electricians --

Q. Are they full-time employees, or --

A. Yeah. No, they're not full-time employees, so.

Q. Now, you indicated that your position as co-founder, co-leader, co-director is a paid position?

A. Yes.

Q. Okay. And your sister's position is a paid position as well?

A. Yes, it is.

Q. And other than your paid position with The Descendants Project, are you

employed anywhere else currently?

A. No.

Q. Okay. What are the primary sources of funding for The Descendants Project? Do you get any government grants or funding?

A. We don't get any government funding or grants.

Q. Do you get any funding from John Cummings or the Whitney Plantation or Whitney Foundation?

A. We don't get from Whitney Plantation.

Q. Okay. What are your primary sources of funding?

A. We -- as a non-profit 501(c)(3), we receive funding through various grants that you can -- that are in the historic preservation space or in social justice that are in historic preservation, that are an intersection of several of those fields. And so we have, especially in environmental justice, we have funders who hear of our work. They're some grants that we, again, have applied to, but then there's some funders who see what we're doing, see our work, and then they fund us.

Q. Okay. In your filings with the secretary of state, it indicates that The Descendants Project was originally known as Louisiana Creole Cultural Corridor; is that correct?

A. Yes, that is correct.

Q. And what is the reason or the need for the change?

A. So what we -- and it still -- so what we decided to do in that Louisiana Creole Cultural and Heritage, first of all, it's a lot. It's a long title, so it became a bit cumbersome. And what we -- we understood that where we were coming at from heritage and tourism and culture was what we, me and my sister, had learned from working in that space, which was there was lack of representation of the local black community that when it came to a lot of the narrative surrounding plantations, we weren't included.

That preservation efforts and attention towards these other historic sites did not include the uplift, specifically, of black-descendant communities. And at the

same time, I had became more active in work with descendant communities at Montpelier and at Monticello. So I went and did that work, and I was, like -- and I thought, if they are defining themselves as descendant communities, that is exactly what we are.

And what we're speaking to is about Louisiana heritage creole and culture in corridor, but it is much more than that. It's about our developing our way of life. It is building up heritage and tourism as a safe alternative to heavy industry, which is something that me and my sister have advocated for since we were, like, 19 and 20. So we have been involved in that work.

So we just realized that The Descendants Project was the headline, and cultural heritage and tourism is something that under -- it's a subset. And by the way, we are working on, actually, developing that corridor as we speak. So that's the reason why we changed it.

Q. Okay. And you've mentioned a few times -- we've mentioned a few times your sister.

And just so that the record is clear, your sister is your twin sister?

A. She is my twin sister, yes.

Q. Okay. And she goes by Jo, and you go by Joy?

A. Agreed, yes. Jo and Joy.

Q. Listed as a director -- as a secretary director is Harriet Banner.

What relationship, if any, is Harriet Banner to you?

A. She is my mother.

Q. Okay. Also listed as treasurer director is William Banner.

What relation --

A. That's my dad.

Q. Do either play an active role with The Descendants Project?

A. Yeah. Other than being on our board, they volunteer a lot of man and woman hours to the various activities, meetings, events we have planned, and again, they are a part of the governing body of The Descendants Project. Both of them have a background in industry. Also, they are members of the community.

And then, plus, they were there when we -- at kind of the kitchen-tabled board, that when you're putting together an organization, the board that you start off with. So they are still a part of our board until we feel the need or feel it's the right time to build that board.

Q. Are there any other board members for The Descendants Project other than you, your sister, your mother, and your father?

A. Yes. Natalie King Pedroso.

Q. Natalie King. And you'll have to spell Pedroso for me.

A. Yes. P-E-D-R-O-S-O.

Q. Ad how long has Natalie King Pedroso has been on the board?

A. Natalie has been about a year.

Q. Uh-huh (affirmative).

A. Maybe less than a year.

Q. And is she simply a director, or does she have a title?

A. She is a board member.

Q. Anyone else?

A. No, that's it. Yeah, that's it.

Q. So Natalie King Pedroso would be the

only -- well, is she a family member?

A. She's not.

Q. Okay. She's the only non-family member?

A. She's the only non-family member.

Q. Okay. And your mother and father, William and Harriet, are they paid --

A. No.

Q. -- by The Descendants Project?

A. No.

Q. Are they currently employed or retired?

A. They are retired.

Q. From what profession did your mother retire?

A. My mother retired from Union Carbide, which was DOW. And my dad retired from Shell.

Q. In response to some of our previous discovery, you indicated that you were a business owner in -- there's a business list to you called Fee-Fo-Lay.

A. Fee-Fo-Lay Cafe.

Q. Okay. Spelled F-E-E dash F-O dash L-A Cafe, LLC. First and foremost, is

business still operating?

A. It is -- it depends on what you mean by operating because we have been on pause since Greenfield. Honestly, it has taken up -- so this extra litigation efforts and extra time that we need to spend on zoning, illegal zoning issues have not given us a lot of time to staff it. But it still has all of its licenses, and the intent is to open and actually have it operating daily for that purpose.

Now, we have -- it has operated. We've used it for meetings. People have still -- we've done some catering there. So it is operational, and just not as it was where it was everyday operations, which is what we would prefer.

Q. Other than yourself, is there anyone else with an ownership interest in Fee-Fo-Lay?

A. My sister Jo.

Q. Okay. So you all are co-owners or co-leaders of Fee-Fo-Lay?

A. Yes.

Q. And what type of business -- if you

had to describe it -- if you had to check a box and say what were the services or commodities that Fee-Fo-Lay offered, what would those services or commodities be?

A. So you have to -- the commodities what we -- we opened up the cafe, like I said before, and I'm sorry, but when it comes to heritage and tourism in that space, I just -- my answers are long.

But we wanted to prove to River Parishes Tourist Commission where my sister was working and to St. John the Baptist Parish Economic Development and to the council members, that a space owned and operated by black descendants could be profitable. Because the idea for The Descendants Project, originally, was what we had pitched to our Tourist Commission and to Economic Development for them to put more focus and effort into the local black community. They rejected it.

So we were, like, we'll do it ourselves. And Jo was the -- she came up with The Descendants Project as a non-profit. I wanted to have a space where we

could prove that a black business could be a part of this space. And so we -- because Whitney is nearby, and I thought, no, there's nothing, and there's no one providing this coffee or providing refreshments or food, so why don't we open up the building that we had as a cafe. And so that's what we did. And we had beignets, we had coffee, we had smoothies, etcetera.

But what we really were selling was the folklores, the history and heritage of our community, especially within those couple of streets of what we grew up with. And so we literally had a little mini exhibit of our family, like, on the walls, and so we talked about our family when people would visit. And we had a little folklore trail that's also in the front of the cafe.

And so that's really what -- when we talk about out commodities, yes, it was coffee; yes, it was beignets; but at the end, we were telling the story. We were letting people know about our community and that history that after you walked out of

plantation, people just didn't just disappear. They came right here, and they created their own communities right on the outskirts.

And so that's what we did, and that's what we love, and hope that we can open it up again.

Q. What was the physical location or physical address of Fee-Fo-Lay Cafe?

A. 5593 Highway 18 in Wallace.

Q. And what is the distance or the proximity between the Fee-Fo-Lay Cafe and the Whitney Plantation?

A. A mile and a half.

Q. Was it the expectation that visitors of the Whitney Plantation would walk from the plantation to Fee-Fo-Lay, or vice versa, walk from Fee-Fo-Lay to the plantation?

A. No.

Q. Was there any formal relationship between the plantation -- the Whitney Plantation and Fee-Fo-Lay?

For instance, was there a referral network from the plantation saying, "Don't forget to stop at Fee-Fo-Lay," or was there

a referral from Fee-Fo-Lay saying, "We can sell tickets to the Whitney Plantation," or "We've got brochures for the Whitney Planation," or what have you?

A. So the way that we -- to the local businesses there, they're -- also, we did the same with Whitney, and we also did the same with Laura Plantation. If someone would come in and ask where do I go -- is there plantations to see? We'd tell them Whitney, we'd tell them Laura, we'd tell them across the river.

So I mean, as far as, like, an informal network, I think that we did leave some brochures at Whitney, but we also had signs up. So people would come to Whitney what we found, and then would say -- well, they would see our signs, and then maybe ask Whitney, where is this located? Because a lot of times they wouldn't know. And then it would show them -- point them the way to our cafe.

But as someone who worked at Whitney, I did the same when it came, like, where is Laura? Where is Oak Alley? And so you end

up sort of being the informal visitor center for people that are visiting.

Q. Was there a time when you were working both for the Whitney Plantation and operating Fee-Fo-Lay?

A. Yeah, I was working. I was not -- I was volunteering at the Fee-Fo-Lay Cafe.

Q. Okay. And when did the -- when last did Fee-Fo-Lay operate?

A. We operated -- we tried to open. No, not tried. We opened in -- I can't remember if it was in '21 or '22 when we tried to reopen. Because what we also found out, and this hurts my heart, we had a lot of people in the community, -- we hoped, although we were in this heritage and tourism space and there's a lot of tourists, we hoped that we would have members from the community that would also come and want to be a part of the business. And they did come.

And so they asked us if we could please open. And we tried. And we just handle with everything going on, and with lawsuits, and primarily, we couldn't. I was frying beignets and on the phone with

lawyers at the same time, so that we couldn't do it.

Q. So would this have been before the COVID epidemic or after that you're speaking of?

A. After. It was after.

Q. Okay. So you tried to reopen after the COVID epidemic?

A. We were open after COVID.

Q. Okay.

A. We were -- actually, we were open during COVID. So we had one of those -- we didn't have people coming into the space, but we had reconfigured the cafe to take orders by the door, and we did -- we still did pretty good during COVID.

Q. Were you open before COVID?

A. We were open before COVID.

Q. Okay. The physical space that you gave us an address for in Wallace, who owns that building?

A. That building -- that is a good question. I believe that it is owned by -- the building itself, it's owned by my sister, Jo Banner.

Q. Jo. So you weren't paying rent.
It was a building owned by your sister?
A. Yes.
Q. Okay. You're also listed as -- you and your sister -- listed as directors of Banner Communications, LLC.
What type of company is that?
A. It was a communications firm that we thought we were going to open or pursue, and we didn't.
Q. So is it your statement that Banner Communications, LLC, never did any business?
A. I can't -- I don't believe that we did.
Q. Okay. And it's not in existence anymore, or is it in existence still?
A. I would say that it's not in existence for us, per se. Now, if there's some -- if it's still something open on the treasurer's site, I don't know if it's -- put it -- for us, it does not exist.
Q. Okay. You're listed as a director -- again, both you and your sister are listed as directors with the West St. John

Stakeholders.

What is that organization?

A. That organization is a community group on the West Bank of St. John Parish. They're just community members that were getting together to do different community initiatives. We had a lot of -- so we did, like, backpack giveaways for education functions, and some cultural things that we did. So basically, preservation of the West Bank.

Q. You have mentioned -- well, let me ask before I get into this.

Other than the business entities and non-profit entities that we have discussed over the last few minutes, are there any other business operations or organizations with which you are a member or a director that we have not discussed?

A. I don't think so.

Q. Okay. You've mentioned in your lawsuit and also at the public meeting that is the subject of this lawsuit that you had filed a board of ethics complaint against Parish President Jaclyn Hotard; is that

correct?

A. That is correct.

MR. SPEARS:

I'm going to give to you and your lawyer a document that we're going to mark for the purposes of this deposition as Exhibit 2.

Could you take a look at that, and I want to discuss it with you.

THE WITNESS:

(peruses document) Okay.

MR. SPEARS:

Okay.

BY MR. SPEARS:

Q. Does this appear to be a copy? And forgive me, I don't have the high-end color copiers like Mr. Most and the gang. We only have a black and white machine --

A. That's fine.

Q. -- and it's aged, at that.

A. That's okay.

Q. So I know that your document was in color.

But other than the fact that mine is in black and white, grayscale or whatever

you want to call it, does this appear to be a correct copy of the complaint that you filed with the Louisiana Board of Ethics against Parish President Jaclyn Hotard?

A. It appears.

Q. Okay. So first, I'll ask you, it appears that Pam Spees with the Center of Constitution Rights, is this the same Pam that you were referencing earlier who works with attorney Bill Quigley?

A. Yes.

Q. Okay. And she filed this complaint at your request; is that correct?

A. Yes.

Q. And you reviewed this complaint prior to it being filed, correct?

A. Yes.

Q. The essence of this complaint -- and I don't want to go through each and every paragraph of your affidavit.

But the essence of the complaint is you thought it was inappropriate and/or a conflict of interest that Parish President Hotard signed a rezoning application that included property or land that was owned or

managed by her mother-in-law.

Is that roughly it, or --

A. Not that just I believe or felt that it's inappropriate or unethical, which I do, it's illegal.

Q. Okay. When you say it's illegal, what law does it violate?

MR. LANSER:

Object to the form to the extent it calls for a legal conclusion. Go ahead.

MR. SPEARS:

But she said that it was illegal. So let me help her.

MR. LANSER:

I objected to the form.

MR. SPEARS:

Okay.

MR. LANSER:

I stated my objections. You can go ahead and answer.

THE WITNESS:

Well --

BY MR. SPEARS:

Q. Dr. Banner, you understand that subject to the --

A. I'm not a -- I'm not a lawyer, so I don't know.

Q. Okay. See, you've got to wait --

A. Sorry.

Q. Do you understand that something can be unethical, but yet, be legal? Do you understand that?

A. Yeah. It's just like somebody can be a leader without being an official leader, right?

Q. Well, it helps when the people vote for you.

A. It don't have to.

Q. It helps.

A. It don't have to.

Q. So you use the specific term that it was illegal. We know that you think it's unethical because you filed an ethics complaint.

So now, I'm trying to determine what specific law, if any, you believe it violated.

MR. LANSER:

The same objection to form.

THE WITNESS:

I don't know. I don't know. That's just my -- it's my gut feeling. I'm not an attorney.

BY MR. SPEARS:

Q. Okay. But you think it's wrong?

A. I think it's wrong.

Q. And you think it's a conflict?

A. I think it's a conflict.

Q. And you think it violates the ethical laws?

A. Yes.

Q. Okay. So now, with regard to the zoning application itself, is there someone in parish government other than the parish president, that would have the authority to sign a rezoning application?

MR. LANSER:

Object to the form. Legal conclusion.

THE WITNESS:

I don't know.

BY MR. SPEARS:

Q. Okay.

A. I don't think it matters.

Q. If someone other than Jaclyn Hotard had signed the application for rezoning, would she still, in your opinion, be violating the code of ethics?

A. She -- what I know is she signed the application. Now, if, what, or whatever the what ifs, I don't know. She signed the application, and that's what I know.

Q. Okay. You used a term in your lawsuit, and maybe also your responses, that you called "up-zoning."

Are you familiar with that term?

A. Yes.

Q. Okay. Let me first ask, do you have any certifications, qualifications, or degrees in real estate?

A. No, I do not.

Q. Do you have any degrees, certifications, or qualifications in real estate appraisals?

A. No.

Q. Do you have any degrees, certifications, or qualifications in land development?

A. No, other than living next to industrial and agriculture and residential land and being aware of what -- being aware of the situation that we are in is that industrial land goes for a higher price. 10s of millions and 45, 50 million dollars of land that's zoned industrial. I know that as a community member.

Q. What research, if any, did you conduct before filing your ethics complaint against Parish President Jacklyn Hotard?

A. We -- I don't -- I don't remember. And if that research -- that would have been something done with Pam, and then that would be privileged.

Q. That's what you think?

A. Well, if it's between me and my attorney, then I would rather not get into any particularities of what I discussed with her. I can tell you that you can -- you can go -- I have gone online and see who owns which property. That's all public record, and you could see how much it sells for. And in terms of research associated with the Greenfield site, that's what I know.

We have an urban planner that informs us and as we communicate. But other than research that I did prior to it, then -- plus, I don't remember exactly what I researched, anyway.

Q. Okay. Well, you're a very smart lady, and I'm sure when you do your research, you document your research, and you take notes and you keep files of that nature. I know you do because you're smart. Now, let me ask --

A. No, that's -- that's an assumption that you made.

Q. Okay.

A. I got a lot going on in my life, and there are times where I wish I kept better files and better notes than I did.

Q. So let's walk through a few there. You gave me a lot, and I'm going to unpack them. Okay?

First and foremost, you say you have an urban planner. Who is that?

A. His name is Justine Kray, and he's been at many of the meetings to speak in regard to the zoning.

Q. And Justin's last name is?

A. Kray, K-R-A-Y.

Q. And Justin Kray, what is his area of expertise? You say he's an urban planner, but does he have a specific qualification or certification that you're aware of?

A. He does have -- has the bonafides. I just -- I don't know exactly what it is, but he has the certifications and degrees and all that goes along with it. He is -- we, as The Descendants Project, he works with us for the zoning.

Q. But he's not an employee of The Descendants Project?

A. No, he's a contractor.

Q. Okay. And if I wanted to take contractor Justin Kray's deposition, where could I reach him?

A. I don't have his information offhand, but I could share with you.

Q. You don't have a phone number?

A. I don't know if I should give him your -- give you his information.

Q. Well --

A. I feel funny handing someone's

information. I know it's a deposition, but...

Q. Well, let's start with this.

Whether you feel funny or not, do you have his information?

A. I don't have his information with me.

Q. Okay. Do you have his physical address and his telephone number?

A. I don't know his physical address offhand, and then, I have his phone number at my office.

Q. Okay. And for which organization or organizations does Justin Kray work?

A. He is -- he is his own individual consultant.

Q. And in which city, parish, or state would he work?

A. I guess, throughout Louisiana.

Q. Is his office in Baton Rouge? Is it in LaPlace? Is it New Orleans?

A. I don't know.

Q. When you meet with Justin Kray, where do you meet with Justin Kray?

A. He meets with us in Wallace.

Q. Okay.

A. Or at -- or this council chambers.

Q. Okay. And you say that he has lots of degrees and certifications.

Do you know any of the degrees and what they might be in?

A. I don't -- I mean, I know he has -- he has the name with all of the letters behind it and the certifications. He's been part of our -- I'm sure in the documents that you have, his maps and stuff are listed in here. For example, like he was the one who drew up this map.

Q. Okay.

A. So yeah, I --

Q. So let's make sure we're talking about the same thing. You're flipping through your complaint --

A. Uh-huh (affirmative).

Q. -- and contained within the complaint is an exhibit. I believe it's Exhibit C.

A. Exhibit C.

Q. And so is your testimony that Exhibit C would be two maps that were created by the urban planner, Mr. Justin Kray, K-R-A-Y, correct?

A. Yes.
Q. Is there anything else contained within this document -- and for the record, Exhibit C is also attached to a letter at the very end, which is a letter written to Parish Attorney Samuel Accardo, part of Exhibit F.
Is that the same map at the very last page of Exhibit F?
A. Yes.
Q. Okay. So that map, the last page of Exhibit F, and Exhibit C, itself, would be maps created by Urban Planner Justin Kray, whose address and phone number you don't have right now?
A. Right -- Justin --
Q. Okay. And it's not in your cell phone?
A. It's in my work phone.
Q. Is that a cell phone?
A. It's -- my work phone is at home --
Q. Okay.
A. -- in my office.
Q. Okay. And remember, we started these proceedings by reminding everyone that these

statements are under oath --

A. Sure.

Q. -- and subject to penalty of perjury.

A. Sure. I understand that.

Q. Okay. Now, is it Justin Kray who told you that the value of the property would be increased by the rezoning, or someone else?

A. No one had to tell me.

Q. Okay.

A. As I said, he -- this is a known -- a pretty well-known fact.

Q. It's not known to me.

A. It's known to me because I'm from that community.

Q. Okay.

A. And I'm aware of residential land and industrial land and agricultural land because zoning is very relevant to my life, my business, and my family. So I am very much aware that industrial land goes for much higher than residential land.

Q. Did Justin Kray ever say to you, in any of your multiple meetings, that the rezoning application that you complained of

increased the value of the land?

A. No. I mean, I don't think that -- I'm not -- I don't understand your question.

Q. You've made a bold statement --

A. Uh-huh (affirmative).

Q. -- that it's common knowledge --

A. Uh-huh (affirmative).

Q. -- that when you rezone land from residential to industrial, that the value goes up.

A. That's not a bold statement. You can look at the paperwork. You can look at landholdings. You can look at it. It's available at the Louisiana Economic Development. You could go to the parish council -- I mean, the property listings. Like, it's not bold knowledge -- a bold claim. It's -- it's a fact, right?

Q. Okay. So all I'm trying to determine in this one question --

A. Uh-huh (affirmative).

Q. -- is whether Justin Kray has ever told you that, that the rezoning of the land in question increased in value?

A. Whether we -- I think here is where

-- let me unpack your question. We are all in agreement that residential to industrial --

Q. Who might be "we"?

A. It would be --

Q. Who might be "we"?

A. "We" are --

Q. Let's get our pronouns together. Who is "we"?

A. As a community --

Q. So the community is in agreement?

A. -- so we understand that -- it's just common -- I mean, I just -- I don't understand your question because it's common knowledge for us. I mean, maybe -- maybe it's because I live there in that in the middle of an industrial zone, but it's common knowledge. So I can't really unpack your question.

Q. Has Justin Kray ever told you that the rezoning that you complained of in your ethics complaint increased the value of the land in question?

MR. LANSER:

Object to form. Asked and

answered.

THE WITNESS:

Yeah, I still don't understand the question.

BY MR. SPEARS:

Q. Okay. Do you have any documentation -- or you say that you look up property values and sales.

Do you have any documentation showing what the value of the land in question was before the rezoning and what the value might be now?

A. I may have that research. I am -- I may have that research -- that specific research.

Q. And where is that research now?

A. It would -- if it's one of my files, because it's -- again, it's something that we may have looked at earlier on in the beginning of this. So I have to see if we had any sales documents of the land as sugarcane land. So that would have -- so it would have been, like, from the '90s.

Q. And that would be what it sold for then?

A. Uh-huh (affirmative).
Q. And do you have any recent sales now?
A. Yes.
Q. Okay.

MR. SPEARS:

So I'm going to ask you to give that information to your counsel, and we're going to ask your counsel to supplement your responses with those documents. We'll give him a formal question asking for those records. Okay?

THE WITNESS:

Sure. Now, it's also available online, and public record.

MR. SPEARS:

I don't want it from online. I want it from you.

THE WITNESS:

Okay.

MR. SPEARS:

Okay?

THE WITNESS:

I'm just letting you know.

MR. SPEARS:

I'm just letting you know I want it from you. I don't want it from online. You've done the work. I want to see the work.

THE WITNESS:

All right.

BY MR. SPEARS:

Q. Okay. You indicated in your lawsuit that you came to the meeting, and we're going back to the meeting of November 28th -- and if you need to pause for any reason, just let me know.

You came to the meeting with certain pamphlets that you intended to pass out; is that correct?

A. Yes.

Q. And you also had a posterboard --

A. Uh-huh (affirmative).

Q. -- that you wanted to show the council.

A. Uh-huh (affirmative).

Q. Is the posterboard in any ways different from the exhibits that we just saw, which was the Exhibit C, or was it something different?

A. So I believe it -- so I can't answer that question for sure because there were some alterations that the Parish was -- Planning and Zoning was doing that was impacting some of the -- what land was a part of this as well. So I believe it is, but to tell you the truth, I do have a couple of iterations of a similar map with the slight changes that the Parish was doing.

Q. Is the iteration of the similar map with the slight changes what you were intending to present before the council on that evening?

A. Yes, yes.

Q. And do you still have that posterboard?

A. I do have the posterboard.

Q. Could you give that to your lawyer as well?

A. Yes.

Q. Okay. You indicated that you had certain pamphlets that you wanted to distribute.

Do you still have copies of those

pamphlets?

A. That's a good question. I'm not sure about that.

Q. Was it produced in-house, or did you send it out to be done professionally?

A. Those I had either -- it might have been Office -- it may have been Office Depot that I had that copied, but I'm not sure.

Q. If you can find a copy of the pamphlet, would you give that to your counsel as well?

A. I sure can.

Q. At the meeting in question, you did not express a specific objection to Gray Sexton, but you were expressing an objection that you did not think that this was something that should be paid for with parish funds, correct?

A. Yeah, I think -- yeah, that and taxpayer dollars.

Q. Okay. And you begin your comment by saying, essentially, and I'm paraphrasing, "I know it's probably not going to change the outcome of what you all intend to do" or something to that effect?

A. I may have said that.

Q. Okay. So you went to the meeting pessimistic that your presentation would change the ultimate outcome?

A. But you never -- you know, you go there pessimistic, but there has been a lack of information, from what I understand, so you never know. I mean, there is something that you may say that someone -- that one of the council members may be like, "Whoa, I didn't know that part of it," and it could change their vote.

So I can't say that I was entirely -- was I probably thinking that it was going to get a no vote -- I mean, or they were going to vote for anyway, yes. But then, again, you never know. So I can't say I was entirely all that pessimistic.

Q. Is it fair to say that the final vote, and maybe not the number of who voted yes or who voted no, the final vote of the agenda item being passed by the council -- by the parish council, was what you expected upon your arrival?

A. Yeah. I'm not -- I would -- you

know, that's a -- that is -- maybe call it me being naive. But again, that maybe there -- I always have that hope that if -- that there's something that I may say that's going to cause a council member to take a pause and rethink what I would expect them to do. So I mean, I can't -- I would be -- if I'm honest, I always have hope that my words will have some impact.

Q. Okay. In your responses to discovery, I think you indicated that as a result of this incident -- and I want to find it to make sure I'm not misstating it -- you were suffering some anxiety?

A. Yes.

MR. SPEARS:

Allie, find that for me.

BY MR. SPEARS:

Q. And tell me specifically what has been the results as it relates to any physical reaction you are now having as a result of the way you were treated at that meeting?

A. So the -- I had never had my name and the word "imprisonment" ever said in the

same sentence before. And when Michael Wright said, "Misdemeanors and imprisonment," at that moment, I was terrified because he was serious about it, and they had cops there. I'm thinking, "What's going to happen with me and my business?" I thought that I had done something wrong enough for me to be in prison. And there's anxiety and there's stress, and you can't take back that fear of what happened, and it's continued.

It's something -- I do my best to stay away from council meetings. I feel it's necessary for me -- as necessary as it feels for me to be there, I'm having issues where I have not even been going to -- been going to the meetings because I just can't. It was causing too much emotional stress and strain just even being -- going to that council meeting that I don't even go.

Q. So attending council meetings is now a trigger?

A. It is very much a trigger. I was going regularly. And then -- and everything we are doing, as important as it is,

including this case, as important as it is for me to be there in that audience, I cannot do it.

Q. Okay.

MR. SPEARS:

Let me show you what we'll mark as Exhibit 3, and this I received from your counsel minus the verification, which is the response to written discovery we gave to you.

MY MR. SPEARS:

Q. And I'll turn your attention to page 5, Interrogatory Number 6, where the question is actually what injuries or damages you incurred as a result of the incident.

And your response -- once you get past the objection -- is that you have sustained stress, fear, and anxiety.

A. Yes.

Q. Is that still your answer?

A. That is still my answer.

Q. In regard to the stress, fear, and anxiety, have you sought any medical treatment for that?

A. I have not, and I'm understanding that I need to, though, because it has not gone away.

Q. So is it a fair statement, as we sit here now, that for the stress, fear, and anxiety caused as a result of the incident, which is the subject of your lawsuit, you intend to seek medical treatment?

A. It is ongoing. It is an ongoing issue that is not getting any better. It is getting worse.

Q. So is it your intention to seek medical treatment?

A. I'm -- I am -- I can tell you that it's not getting better.

Q. Is it your intention to seek professional counseling?

A. It's -- as I sit now, my associations with what happened here is not getting better. It's getting worse.

Q. Okay. And because your condition is getting worse -- first of all, let's get clarity on exactly what are these conditions and what are these symptoms.

Explain them to me in as much detail

as you can so I can explain it to a jury.

A. I am -- when someone tells you that you're going imprisoned, I keep reliving that moment in my head. And what is particularly upsetting for me is my parents were there in the courtroom, and my elders were there in the courtroom. And at that -- in the council chambers. And what I keep seeing is them looking at me, who they do see as a leader, they do see as someone -- whether I won the vote or not -- they see somebody that gets up there and that fights and that stands up for not only my rights but for their rights.

And then to turn around and see them seeing me and seeing us get escorted and seeing me threatened with imprisonment, that's what I can't -- that's what difficult. And in that moment when he said, "Imprisonment," I thought that -- I did not take it for a joke. I thought it was serious. I know, and I still think, it's serious when he said, "You're imprisoned."

And so, again, and that's -- you know, I had -- it was just -- to have him,

to have your parish president standing up before you and saying, "Shut her" -- you know, "Don't let her speak. She's violating the Board of Ethics laws." That's not just Michael Wright and Jaclyn Hotard. That is an official. A council president, representative. That's your parish president saying, basically, throw her in jail. I took it seriously.

And I mean -- and I know as much as you can go back and say, you know, like, "Oh, it was -- it was taken ten years ago," you know, "It was taken off the books." In that moment, I didn't know that. That can't go back and take away what happened that night, seeing my 80-year-old parents, you know, and going through the fear of losing my business and losing everything because I thought I did something wrong for speaking out. You can't get that back. Anyway, I'll just stop there.

Q. So who physically escorted you out of the council chambers?

A. We were -- there was someone that came to speak after us, and that person --

so I'm going to associate with it. They cleared the chambers. They cleared the chambers. So we were all cleared out, but that's not the first time that the chambers have been cleared when we came up there to speak about this damn zoning, and we get shut down.

And you've got the district attorney and all of these other people standing up and with cops and stuff all around you and you can't speak. And then people -- you know, like those -- it doesn't matter whether they're violating your -- violating your rights. Who are they going to throw out? Who are they going to -- who are they going to arrest? You. The cops got to listen to what they say.

So we get thrown out all the time. At a planning and zoning meeting that I had to go through with the final -- with the rezoning of this land back to industrial, I got kicked out. So, I mean, it's ongoing. And you asked about why the stress and the fear and anxiety is going on, it's because it's not stopping. All of that is -- what

happened in that moment, I keep, again, reliving. And so, yeah, I just...

Q. So if I'm hearing correctly, Ms. Banner, you were not individually singled and escorted, but the entire council chambers was cleared?

A. Yes.

Q. Okay. Not you individually, but everyone was asked to leave.

A. Everyone was asked to leave, but I was the one, in that moment, he said, "You misdemeanors." And I think I -- I'll look back in the transcript, but I think he says Ms. Banner. He says my name, and here are the consequences, and he doesn't -- imprisonment. Not just arrest, imprisonment for up to a year.

Q. Uh-huh (affirmative).

Now, the council chambers was cleared, but everyone was invited to come back in, correct?

A. We were.

Q. And you came back in?

A. I did.

Q. And at no point in time did anyone

handcuff you or physically arrest you, correct?

A. No.

Q. Now, again, the stress, the fear, and anxiety that has been brought on, is this a daily occurrence?

A. Yes.

Q. Okay. And is it your testimony that since November 28, 2023, you have not returned to a parish council meeting?

A. No, I have. I have returned to council meetings, but I realize that is -- so I have an Apple watch. I was sitting in a meeting, and my heart rate was up so high -- twice that it happened during these meetings -- that my watch went off and said, "Your heart rate has increased. It appears that you are sitting, but your heart rate is up." It gave me a warning.

And after that, I realized that it was --not only that -- I was going and I go when I can, but I realized that four or five days before the meeting, it gets even more intense. Then I just decided, like, I couldn't go. I can't -- I was losing too

much of the time that I needed to spend doing my job, doing my work, worrying about having an additional concern or the additional fear of going to these council meetings, so I don't go.

Q. So can you tell me since November 28, 2023, how many subsequent parish council meetings have you attended?

A. I don't know the exact number. I don't know the exact number, but I can't say, like -- did I stop going to -- I tapered off, and I was trying to go as much as I could. But again, it was -- the symptoms were not really getting better. And then I, again realized that, and got to a point where I couldn't -- I couldn't go.

Q. Can you tell me at the subsequent meetings that you attended since November 28, 2023, have you spoken during the public comment period?

A. Uh-huh (affirmative). I have.

Q. Okay. The issue with regard to the anxiety and your Apple watch alerting you to your heart rate, how many meetings did that occur at -- subsequent meetings?

A. That happened at at least two meetings.

Q. Okay.

A. At least two meetings. Yeah.

Q. And I think you also indicated that leading up to the meetings, you get these bouts of anxiety.

A. Uh-huh (affirmative).

Q. And I'm assuming that your Apple watch also goes off and alerts you to that as well?

A. If I'm wearing it, and I can't say that I wear it. I mean, I'm not wearing it now. So I don't -- I don't wear it as much as I probably should, but...

Q. Okay. Would it be fair to say that on least two occasions, you attended a parish council meeting wearing your Apple watch, and your Apple watch alerted you to increased anxiety?

A. Uh-huh (affirmative).

Q. And it's my understanding -- although I cannot afford an Apple watch, it's my understanding that these records are somehow memorialized.

MR. LANSER:

I'm going to object to form. It calls for speculation.

But go ahead and answer.

THE WITNESS:

I don't really know that. I don't know. I don't think I understand your question.

BY MR. SPEARS:

Q. If I needed to authenticate, to verify and confirm what you're saying, we should be able to go into the Apple watch database and see on this date, you had an elevated heart rate while sitting in a meeting, correct?

MR. LANSER:

The same objection.

THE WITNESS:

I don't know.

BY MR. SPEARS:

Q. Okay. We'll find out.

A. You can. I don't -- I mean, I have no objection to that.

Q. Could you perhaps look at your watch --

A. And see if I can find a record.

Q. -- look at the calendar --

A. Uh-huh (affirmative).

Q. -- and advise your counsel of the exact meetings where you had this elevated heart rate?

A. If I can -- if I can pull up the dates, which I should be able to do, I can.

Q. Okay. With regard to your non-open meetings claim, your First Amendment freedom of speech claims, is it your position that your First Amendment rights were violated because you were cut off by Hotard and Wright, or do you have some other reason you believe your First Amendment rights were violated?

MR. LANSER:

Object to the form. It calls for a legal conclusion.

But go ahead and answer.

THE WITNESS:

I was a -- I was about to say I don't think I understand the question.

BY MR. SPEARS:

Q. But you believe you were on topic?
A. Yes.
Q. And you understand what I mean when I say "on topic"?
A. In terms of regarding the agenda item.
Q. The agenda item, that's correct.
A. Yes.
Q. And do you believe that there's a distinction between getting into the weeds about your specific ethics complaint and addressing whether or not should or should not hire a lawyer to handle an ethics matter?

MR. LANSER:
Object to the form. Legal conclusion.

THE WITNESS:
Yeah.

BY MR. SPEARS:
attorneys mean when they say that we were engaged -- and by we, I mean the defendants -- were engaged in viewpoint discrimination?

MR. LANSER:

Object to the form. Legal conclusion.

THE WITNESS:

Do you understand?

MR. SPEARS:

I am not sure I understand. I mean, I -- yeah, I'm --

BY MR. SPEARS:

Q. Let me ask it a different way.

Do you believe that you were being censored, shut down, and not allowed to speak because you were criticizing Jaclyn Hotard?

A. I was not -- my intention was not there to be there criticizing her, but being that she immediately stood up and reacted the way that she did, yes.

Q. Well, do you believe that your comments were or were not critical of Jaclyn Hotard?

A. My comments were what they were. My comments were stating fact -- what I believed was fact.

Q. Were the thoughts critical of Jaclyn Hotard?

A. If she believes or if anyone believes they were critical, then that's their opinion. But I was simply stating what was fact and what I though was agenda topic. And you talking about it being general, I thought the agenda item was very specific in that it gave the name of any attorney, it gave the Board of Ethics, it gave -- so everything that I wanted to -- everything that I saw was very relevant.

Q. Now, Ms. Banner, you have three degrees from two very distinguished universities, and all I'm asking you is do you believe -- do you personally believe that the facts that you were reciting were critical of Parish President Jaclyn Hotard?

MR. LANSER:

Object to the form, but go ahead.

THE WITNESS:

I believe the facts are the facts.

BY MR. SPEARS:

Q. Were the facts complimentary of Parish President Hotard and her conduct?

A. The facts are the facts.

Q. Uh-huh (affirmative). Do you believe that you were threatened or shut down because you were criticizing Jaclyn Hotard?

A. I believe that what they felt -- clearly, they thought that it was -- that they thought it was critical because of their reaction.

Q. Okay. And Michael Wright read a statute but did not specifically say that "I'm going to have you arrested," correct?

A. He said, "Imprisonment." When I heard imprisonment, I felt imprisonment, and there's cops surrounding us, so imprisonment meant imprisonment.

Q. We've already agreed that none of the police officers approached you, correct?

A. He said the word "imprisonment," and I took him very seriously.

Q. Okay. Have you had any conversations with Parish President Jaclyn Hotard or Council Chair Michael Wright since that incident?

A. No.

Q. Have you -- other than a council meeting, have you seen either of them since

that incident?

A. No.

Q. So other than your fear, anxiety, and stress, have you sustained any other injuries or damages as a result of what happened to you at that meeting?

MR. LARSEN:

Object to the extent it calls for a legal conclusion.

But go ahead and answer.

THE WITNESS:

What I can tell you now that I am a physical -- a physical -- something that I've been dealing with now is dental issues. I've been clenching my jaws more and at night, and so I'm having some dental issues. I spent -- yeah, so there's -- yeah, I have, again, clenching my jaws, and I've had to -- just recently had some -- to go get some dental work done as a result.

BY MR. SPEARS:

Q. Do you relate your dental issues in any way to the November 28, 2023, incident

that occurred in the parish council chambers?

A. I'm not sure. That's something that I am consulting with my -- well, I haven't spoken with my dentist about it, per se. But, I'm not sure. It's something that I am looking into.

Q. Okay. You have been to the dentist since the November 28, 2023, meeting, correct?

A. Yes.

Q. And if I'm hearing correctly, it's because of a situation where you are clenching your jaws and it's causing you some discomfort and problems.

A. That's what I am -- there's nothing that my dentist said to me yet. I just -- as I was getting work done, I thought, you know what, I've been clenching my jaws a lot, and I'm wondering if this has any relation to it.

Q. Well, let's to try to get to the bottom of that because it sounds like a very serious matter.

First and foremost, do you have any

reason to suspect or believe that the clenching -- is it the clenching of your jaws?

A. Uh-huh (affirmative).

Q. That the clenching of your jaws is somehow related to the stress and anxiety that you are experiencing because of the November 28, 2023, incident?

A. I think it is one of the stress responses --

Q. Okay.

A. -- that as the stress is getting -- the stress is increasing. That, it could be.

Q. So you believe it is a stress response and you intend to share that with your dentist; is that a fair statement?

A. I don't -- like I said, I don't believe that is a stress response. I believe that's a question that I have, is it a stress response?

Q. Well, who is your current dentist?

A. I don't have a -- I don't have a primary dentist that I go to because I just, again, have this.

Q. Who is the dentist that you've seen since the November 28, 2023, parish council meeting?

A. Oh, I'll have to get that name for you.

Q. Okay. The dentist that you've seen since your November 28, 2023, parish council meeting, is it a dentist who you have seen before, or was this a first-time visit?

A. I had -- so it's been -- so before I -- she was my dentist, or their office, my dentist during COVID. And so I kind of got off track with them. And that's why I have a little bit of -- I mean, I'm not -- I want to be honest about what I am evaluating what I'm thinking could be stress responses. And so that's why I'm not sure, per se.

But I'm not -- have I been regularly seeing the dentist as much as I should post-COVID, since COVID? Not as much. So that's why I'm not as up to date on my dentist's name. I'll have to get that name for you.

Q. Okay. Now, you're going to -- when you see this dentist, ask the dentist to explore whether or not the clenching of your

jaws is somehow related to the stress --

A. Yes.

Q. -- that you have experienced because of the incident at the November 28, 2023, meeting?

A. Yes. And I'm sure you'd like to see those records once she consults with me on it.

Q. Do you have any objection to us seeing those records?

A. No, I don't.

Q. Would you be willing to sign a medical release for your dentist to give us this records?

MR. LANSER:

Well, I'll just butt in here for a second. These records -- just to clarify, these don't exist yet because you haven't spoken to your dentist.

THE WITNESS:

No, they don't.

BY MR. SPEARS:

Q. Well, let me clarify. I thought you've seen the dentist at least once since

the meeting regarding the clenching of the jaws?

A. Yes, but like I said, I didn't talk to my dentist about it.

Q. Okay. First of all, just so the record is clear, have you seen the dentist post November 28, 2023, once or more than once?

A. Once.

Q. And the dentist who you have seen post November 28, 2023, is it your intention to see the same dentist again?

A. Probably, yes.

Q. And when you see this dentist again, you will share with him or her that you believe you're experiencing symptomatic clenching of the jaws as it relates of stress and anxiety induced by the November 28, 2023, incident, correct?

A. I think those are your words.

Q. Well, I'm asking questions to try to understand better what it is you intend to share with your dentist.

A. I am -- I am -- I don't know. I'm figuring it out.

Q. But you --

A. I am still evaluating my own stress. So I'm not trying to dodge questions, but I am evaluation my own stress. I don't know what I want to share.

Q. Are you going to see any doctors or any therapists relative to the new-found stress and anxiety and fear that you are experiencing since the November 28, 2023, parish council meeting?

A. I am still unpacking that, and so at the moment, I don't know.

Q. So it's possible that you may seek professional help?

A. I'm not sure.

Q. Do you have any idea when you will come to a decision about whether or not to seek professional help?

A. I don't know.

Q. Do you think it will be before our January trial date?

A. I have no idea.

Q. Okay. But it is your statement that you have not sought professional help at this time?

A. I have not.

Q. Were you seeking -- scratch that.

Were you in counseling or therapy before the January -- not January -- the November 28, 2023, incident?

A. No.

Q. Have you ever had professional therapy or counseling?

A. If I did, I can't remember. It would have been a long time ago.

Q. On the date of the incident, again, the November 28, 2023, had you consumed any alcohol?

A. I had -- no, I hadn't. I mean, not that, no. I can say pretty surely that it was a Tuesday, so no.

Q. If it had been a Saturday?

A. I mean, if I -- if it had been -- if I had gone out and went to dinner and had -- and then I don't -- I'm not a heavy drinker. I'm not, really, sometimes even usually not even a social drinker, so no.

Q. On the date of the incident, which is November 28, 2023, had you taken any drugs or medication?

A. No, not that I --

Q. Do you --

A. No.

Q. Do you take any drugs or medication on a regular basis?

A. Yes.

Q. Which medications?

A. I -- I don't want to talk about my medications, my personal life. That seems very personal.

Q. It may be personal to you, but maybe something the judge or jury needs to know.

A. That's right, and I should not be -- so I -- the regular medications that I do take, I do take an anti-depressant, venlafaxine.

Q. Venlafaxine?

A. Yes.

Q. Did you take venlafaxine on the date of this incident?

A. I did. I -- so the way that it -- because it's a 24-hour, so it might not have been on that day, but it still would have been the -- I still would have been my regular dose, put it that way.

Q. Other than venlafaxine, is there any other medications that you take on a regular basis?
A. No.
Q. Were you using any illegal drugs on that date?
A. No.
Q. Have you ever used any illegal drugs?
A. No.
Q. Have you ever been treated for alcoholism?
A. No.
Q. Have you ever been treated for drug addiction?
A. No.
Q. You've treating for depression?
A. By my medication, yes.
Q. And who is your physician that prescribed the anti-depressant?
A. Who is the physician now?
Q. Well, let's unpack that.
Who's your current physician?
A. Well, you are saying who was the physician who prescribed the medication.
Q. When you said "now," it leads me to

believe that you've had more than one physician.

A. Well, I've been -- this medication is not a new medication, so I've changed doctors since it was prescribed to me. So originally prescribed it, I don't remember. Who prescribes it now, I can tell you who my general practitioner is who prescribed it.

Q. Who is your current physician who prescribes the medication?

A. It's -- okay. Her name is -- what is her first name? Her last name is Collins.

Q. C-O-L-L --

A. C-O-L-L-I-N-S.

Q. And Dr. Collins is located where?

A. In the -- not -- in Destrehan.

Q. And other than Dr. Collins, are you being treated by any other medical professionals?

A. No.

Q. And although you have been on this medication for quite some time, Dr. Collins was not the original doctor who prescribed the medication?

A. No.

Q. Okay. And you don't remember the name of the original doctor, or do you remember?

A. No, I've been on it for some years.

Q. Is that five years? Is that ten years? Is that 15 years?

A. It's been since -- I think since I've moved to Louisiana. So that would be within five -- five years.

Q. And prior to that, you were on no medications?

A. No.

Q. In connection with your current role at The Descendants Project, I think you indicated, but I want to clear the record, that you no longer have any affiliation with the Whitney Plantation; is that correct?

A. I do not. I do not work for the Whitney Plantation.

Q. Do you have any affiliation with John Cummings?

A. In that he's my former boss, and that I have a personal affiliation with him.

Q. Okay. When you ran for parish council, he was your largest contributor,

correct?

A. He wasn't my largest contributor, because I've had several donors at the -- the most I could get was $1,000, so I had several donors that donated the maximum amount of $1,000.

Q. Okay.

A. So he wasn't my largest contributor.

Q. Well --

A. That's what I -- that's what I remember.

Q. That's what you remember, and that's -- you can only give me what you remember.

MR. SPEARS:

I'm going to show you what we'll mark as Exhibit 4, and I want you to take a look at it.

BY MR. SPEARS:

Q. Does this to appear to be a copy of your candidate's report from your race as a candidate for St. John the Baptist Parish councilmember?

A. Yes, I think so.

Q. Okay. And these reports generally will list who gave you money and what you

spent that money on, correct?

A. Yes.

Q. Okay. And this is a report generated by you or someone working for your campaign, correct?

A. Yes.

Q. Okay. And so I want to direct your attention to the section which is called Disbursements, which is the last page 10 of 10.

A. Uh-huh (affirmative).

Q. And there is an entry -- the third entry shows a return contribution of $1,300 --

A. Yes.

Q. -- to John Cummings, correct?

A. Right. Exactly.

Q. And that indicates to me that in order to return $1,300, it means that he donated $2,300.

A. He believed he was donating what I thought was the maximum. And so when I found out that the maximum actually was $1,000, that's when I returned it. So he didn't donate -- he wasn't my biggest

contributor, per se, because I was wrong in what was the maximum. I had other people that were willing to donate the maximum, too.

Q. Did you have anyone else who gave you $2,300 and had to get a refund back?

A. Because at that time I knew. I had been corrected, so no.

Q. Okay. So just so that the record is clear, at that point, John Cummings was your largest financial contributor?

A. At -- I mean, yes, if you want to -- if you want to say that, sure.

Q. I simply want to say what the record reflects.

A. Sure. I mean, if that's -- again, I was mistaken, but if that's what you want to say, that's fine with me.

Q. It's not what I want to say. I'm asking you --

A. I perceive as the money was returned, so he did not give me that money because I returned it. So what he contributed was actually the $1,000 that was the legal limit, so he didn't contribute it.

MR. LANSER:

Also, Mr. Spears, I will just say, you know, her candidacy, anything related to her candidacy really has nothing to do with these proceedings.

MR. SPEARS:

That's your opinion. But you've been wrong before, and you're probably wrong again.

MR. LANSER:

It really has nothing to do with these proceedings.

MR. SPEARS:

Well, then you should tell the judge on me.

MR. LANSER:

Well, that's what I'm saying.

MR. SPEARS:

Okay. Tell the judge on me.

MR. LANSER:

I'm saying we're very much bordering bad faith questioning here.

MR. SPEARS:

You tell the judge on me.

MR. LANSER:

Okay.

MR. SPEARS:

Or tell Bill to tell the judge on me.

MR. LANSER:

Who's Bill?

MR. SPEARS:

We went through that bullshit earlier.

Off the record.

THE WITNESS:

My goodness.

MR. LANSER:

No, that was on the record. You didn't say off the record.

MR. SPEARS:

Can we resume now?

MR. LANSER:

Are you going to continue this line of questioning?

MR. SPEARS:

Yeah.

MR. LANSER:

No. If you want to keep doing

this, this is in bad faith. I'm sorry.

MR. SPEARS:

Okay. So are you --

MR. LANSER:

So we can contact the judge --

THE WITNESS:

Yes.

MR. LANSER:

-- and I could file a motion under rule 30(d)(3). If you want to do it that way. We can pause the deposition.

MR. SPEARS:

Just tell me what you're doing so I can know.

MR. LANSER:

Okay.

MR. SPEARS:

Well, what are you doing?

MR. LANSER:

I'm going to go ahead and file a motion under FRCP 30(d)(3). I think this line of questioning really has nothing to do with the matter at

hand. Her candidacy has nothing to do with the litigation. Mr. Cummings has nothing to do with the litigation. This seems to be some sort of fishing expedition meant to embarrass Ms. Banner or, possibly, Mr. Cummings. I'm not quite sure.

MR. SPEARS:

Are you directing her not to answer my questions?

MR. LANSER:

I am.

MR. SPEARS:

Okay. So are you telling her don't answer any questions from this moment on? I just want to be clear so when we go in front the judge, I can tell the judge what happened.

MR. LANSER:

If you would like to continue with questions on a different topic that's relevant --

MR. SPEARS:

If we don't finish, I'm going to notice a deposition again once we

past your Rule 30.

MR. LANSER:

That's fine. We can file a Rule 30 then.

MR. SPEARS:

I'm good either way you want to do it, man. This isn't -- this isn't my first case, and it isn't my first rodeo.

THE WITNESS:

I think you're --

MR. LANSER:

Well --

MR. SPEARS:

I think we're nearing the end of this, but if you want to put your client through a second deposition, I'm okay with that.

MR. LANSER:

That's fine.

MR. SPEARS:

Well, let's decide what we're doing.

MR. LANSER:

I already said I'm filing the

motion.

THE WITNESS:

Uh-huh (affirmative).

MR. SPEARS:

Okay. I'm trying to resume the deposition. Are you saying don't resume?

MR. LANSER:

I already said do not resume.

MR. SPEARS:

Don't resume the deposition?

MR. LANSER:

If you're planning on continuing this line of questioning, then do not resume it.

MR. SPEARS:

What line are you referencing?

MR. LANSER:

The line of questioning regarding her candidacy and the candidate's report. This has absolutely nothing to do with the case at hand.

MR. SPEARS:

Okay. This is what we're going to do --

MR. LANSER:

So I'm going to file motion for a protective order.

MR. SPEARS:

Here's what we're going to do. I'm going to get off the campaign report because I don't want to make the lady come back.

MR. LANSER:

That's what I'm suggesting. So if you want to continue on a different line of questioning, that's fine.

MR. SPEARS:

Yeah. But we're going to preserve this, and I'll let you take it up with the judge. Okay?

MR. LANSER:

That's fine.

THE WITNESS:

Uh-huh (affirmative).

MR. SPEARS:

All right.

BY MR. SPEARS:

Q. Explain to me the documents that

you're going to give to your lawyer that shows the increase valuation.

Is that an increased valuation of the rezoned Gaudet property or an increased valuation of other properties in the rezoned area?

A. Can you explain that? Can you ask that question again?

Q. Part of your complaint is that the rezoning application that President Hotard signed had the impact of upzoning certain properties.

A. Uh-huh (affirmative).

Q. You've also indicated that you're going to give your attorney some research that you have done, and that research shows, basically, the before and after of the selling price or the valuations of certain properties; is that correct?

MR. LANSER:

I'm going to object to the form to the extent it mischaracterizes her prior testimony.

But go ahead and answer if you can.

THE WITNESS:

I will -- I can look at my research and see what I have. But it's also available in public -- I guess, what you'd call a public record.

BY MR. SPEARS:

Q. We've discussed that.

A. Right.

Q. But I want your research.

A. Yeah, but I don't want to have to keep be doing work that maybe you should be doing.

Q. I don't want you to do -- I don't want you to do new work.

A. I don't want to do your work.

Q. I don't want you to do new work. I just want to get a copy of the work you've already done.

A. I will see what I have.

Q. Okay.

A. Because I think it's pretty -- it's common knowledge. I think a review of the tax assessor's office could be pretty much -- could explain the different taxing of

land. Again, you're a smart person. And you've got a lot of degrees, too, so you know.

Q. Everybody with a law degree isn't smart. Okay, trust me.

A. No. No, you're smart, Mr. Spears.

Q. Trust me.

A. You're smart. So that's easy.

Q. Everyone with a law degree isn't smart.

A. Yeah, well.

Q. Okay. Trust me on that.

A. You're smart. You know.

Q. Even some people with Ivy League law degrees are not that smart.

A. Well, you -- but you're smart, and you know, don't you?

Q. Thank you for the complement.

A. And you know.

Q. All right. Look, is it your recollection from your research that the Gaudet property, the property that you say is owned or managed by Jaclyn Hotard's mother-in-law --

A. That's not what I say. That's what's

in -- isn't that in Darla Gaudet?

Q. Okay. I'm trying to ask a question.

A. I'm sorry. But that's not what I say, so I just --

Q. It's a fact?

A. -- I want to be -- I just want to be clear. Yeah.

Q. Okay.

A. Uh-huh (affirmative).

Q. Is it your belief, based on your research, that the value of that property increased?

A. That is my belief.

Q. Okay. And that's based on your research?

A. That is based on -- I -- you're -- again, I think we had a problem with this question before. I'm so -- am I answering the question?

Q. Yeah.

A. Again, this is the question that we had before.

Q. Uh-huh (affirmative).

A. You're -- so there is awareness of what property values are. That's what I can

tell you. Am I aware of the difference between property values of industrial land, residential land, agricultural land. Am I aware that there's a difference in pricing? Yes. Does it mean that I can go through, or if my research has industrial land is worth this much or agricultural land? I don't know.

Q. Okay.

A. But it is general knowledge -- again, you're a smart person, too, so I do assume that you know that it is general knowledge that land is different.

Q. And did you see a specific price valuation? For instance, can we say that Tract 1 was valued at $10,000 before the rezoning, and Tract 1 is now valued at $25,000?

A. I'm sure that's research that you can do. But do I --

Q. Is that reflected in your research? That's what I'm asking you.

A. I would have to see.

Q. Okay.

A. I'd have to check. I don't know if

it's that specific.

Q. Okay. I want to take a moment and play for you the segment of the parish council meeting --

A. Uh-huh (affirmative).

Q. -- where you're speaking. And I want you to tell me -- and I'm okay if you want to pause it or rewind it, but I want you to tell me exactly at the exact minute marker where either Jaclyn Hotard or Council Chair Michael Wright threatens to have you arrested. Okay?

A. Okay.

Q. All right.

MR. SPEARS:

I'm going to come around and put the recording where you can see it. And this is an old Mac, so don't make fun of me. I can't afford an Apple watch or a good Mac.

THE WITNESS:

Oh, Mr. Spears. You are funny. You are indeed a funny person.

MR. SPEARS:

So tell me when you're ready.

THE WITNESS:

I'm ready.

(VIDEO PLAYING)

THE WITNESS:

Wait. You said Michael Wright, but when -- I want to when -- as Jaclyn Hotard is standing up there and accusing me of breaking or violating laws, it starts from that point, too.

BY MR. SPEARS:

Q. Okay. So is that where she said she was going to have you arrested?

A. That is not where she said, but she's telling me that I'm violating state laws.

Q. Okay.

(VIDEO PLAYING)

THE WITNESS:

There you go.

BY MR. SPEARS:

Q. I'm sorry. Did you want me to stop there?

A. I mean, he's made up it's a mis- -- when he starts it's a misdemeanor and a fine and imprisonment and then up to a year, is

where, I mean now. I feel -- I felt like in that moment, that was a threat. He was threatening me with arrest. He was threatening me with imprisonment.

Q. Okay.

A. I don't think you can get much clearer than that.

MR. SPEARS:

Let's see what else happens.

(VIDEO PLAYING)

BY MR. SPEARS:

Q. Okay. So just so it's clear, it looks like you talked up until 6:51, and you started at 1:35; does that sound right?

I know there were interruptions.

A. That -- there's interruption. I couldn't -- I don't think somebody calling me -- (knocks on table).

I mean, is this talking? Is that talking?

BY MR. SPEARS:

Q. Can we at least agree that the starting point --

A. I'm sorry. I need to -- that's upsetting to watch it.

MR. SPEARS:

Do you need to take a break? You're entitled to take a break if you need to.

THE WITNESS:

Just give me a second.

MR. SPEARS:

Take your time.

(sotto voce with Ms. Conlay)

(Ms. Conlay leaves the room.)

Whenever you want to resume.

THE WITNESS:

Okay.

BY MR. SPEARS:

Q. I understand your position that you were interrupted. I understand that.

But just to clarify, what I'm asking you is are you at the podium until the 6 minute and 51-second mark?

Do you need to see the time?

A. I am -- I am at the podium. I am at the podium.

Q. Until 6 minutes and 51 --

A. If you -- if you say so, and if that's what it says.

Q. Well, I want to make sure you agree with me.

A. That's -- yes.

Q. Do you agree with me?

A. Yes, that's --

Q. And do you agree that you started speaking at 1 minute and 35 seconds?

A. I do not agree that I started speaking because I was never allowed to speak uninterrupted.

Q. Do you --

A. So I do not agree with that, no.

Q. Well, will you agree that you came to the podium at one minute and 35 seconds?

A. I came to the podium.

Q. So can we agree that you were at the podium from 1 minute, 35 seconds to 6 minutes and 51 seconds? Can we agree on that?

A. I was at the podium trying to speak.

Q. And can we also agree that as part of your speech, you did make it clear that you opposed the parish council paying for Gray Sexton to --

A. I don't --

Q. You --

A. I don't think I made it clear.

Q. Okay. Can I just finish? So what I want to do is that you're going to let me finish and then you --

A. Sure. Go ahead, Mr. Spears. Go ahead.

Q. Was it clear that you were opposed to the parish council paying for Gray Sexton to be involved in the ethics investigation?

A. I do not think it was clear because as I am saying it, they're banging on a gavel, Hotard is standing up and interrupting me, the district attorney is chiming in, so no, I can't say that it was necessarily clear.

Q. Would you also -- or would you agree that there were other members, including Shandrell Perilloux (phonetic), who spoke after you, also saying that they oppose the use of parish funds to pay for Gray Sexton?

A. I do not remember them being able to speak, either.

Q. Do you remember anyone who spoke in favor of using parish funds to hire Gray

Sexton?

A. No, there was no one that spoke in favor of it.

Q. So is it a fair statement --

A. But no one got up to speak in favor of it.

Q. Right. Is it a fair statement that anyone who spoke on that agenda item spoke in opposition to that agenda item?

A. I don't think that is clear. I think what they -- what they spoke -- if they were speaking on about that particular agenda item and that particular issue, whether it's opposition or not, if they're stating a fact, they're stating a fact.

Q. Okay. So if you decide to seek medical attention or professional counseling for your fear, stress, and anxiety, will you advise your attorney so that your attorney can advise me?

A. Yes.

Q. Are you seeking to have the jury in this case compensate you for your fear, anxiety, and stress?

MR. LANSER:

Object to the form. That's a legal question.

You can answer.

BY MR. SPEARS:

Q. Are you seeking to be compensated by the jury at our trial for your fear, anxiety, and stress?

A. I think that's in line with what I was saying before that I don't know in terms of my fear, stress, or anxiety, so I can't tell you right now that I know.

Q. Okay. Are you seeking to be compensated by the jury in this matter for what you have styled as a violation -- and I say you, your brilliant lawyers -- have described as a violation of the United States Constitution and the Louisiana Constitution relative to your First Amendment rights?

MR. LANSER:

Object to the form. legal conclusion.

THE WITNESS:

I don't know.

MR. SPEARS:

Okay.

BY MR. SPEARS:

Q. Other than not allowing you to freely speak as you wished to speak, are you aware of any other actions by Jaclyn Hotard, Michael Wright, or the St. John the Baptist Parish that violated the Louisiana Open Meetings Law.

MR. LANSER:

Object to the form. Legal conclusion.

THE WITNESS:

I don't. I'm not sure.

BY MR. SPEARS:

Q. Okay. Other than not allowing you to freely speak as you desired to speak and reading the statute relative the penalty for violating the ethics laws, are you aware of any other action by Jaclyn Hotard, Michael Wright, or St. John the Baptist Parish that violated your constitutional rights?

MR. LANSER:

Object to the form. Legal conclusion.

THE WITNESS:

Again, I don't know.

MR. SPEARS:

Okay. Ms. Banner, I don't have any other questions for you, and in deference to your lawyer, I'm not going to subpoena you again to reopen the issue of your campaign finances. So I'll leave that topic alone.

But thank you for your time. I appreciate you and the great work you're doing.

THE WITNESS:

I just want to clear --

MR. SPEARS:

Are we on or off the record?

MR. LANSER:

Hold on. I have no questions.

THE WITNESS:

Okay.

MR. SPEARS:

Are we on the record or off the record?

MR LANSER:

I think we can go off the record.

THE WITNESS:

Well, no, I just want to be on the record for --

MR. SPEARS:

Okay. On the record.

THE WITNESS:

I just want to be clear that I don't believe that what I was allowed for my public -- to be able to give my comment and be able to give that -- to speak as I should have been allowed to speak what they believed was my viewpoint. So I want -- I want to be clear about that. I was not allowed to speak the way that I wanted to -- wanted to speak.

Now, I understood that what I was given was the facts about what was on the agenda and what was something that was relevant, I was given those facts. And now, someone else's belief that those were critical outside of what was the facts, is what could have inspired them to shut me down. But at the end of the day, I was not able to speak. So I just

wanted to end it there.

FURTHER EXAMINATION BY MR. SPEARS:

Q. Okay. So I just want to follow-up on that. And I appreciate everything you're saying, you know. Look, I appreciate everything you're saying. Okay.

Just so that the record is clear, was there a time, either before the November 28, 2023, meeting or after the November 2023, meeting that you were not allowed to freely give your public comment?

A. Yes, there were times before. This was the first time that -- it was never this bad. It was -- it was there was never imprisonment. I was never banging in the gavel as extensively as it was. That was -- it was the parish -- again, that was a real prohibition of me being able to speak.

And just rewatching it now and then hearing, you know, literally, he was -- he was banging on that gavel. Jaclyn Hotard was up. She was -- she was yelling at him to stop it. "I remind the Councilmember. I want to remind him."

Wright is he telling the other

Councilmembers, "I want to remind the other councilmembers." So what was the purpose of that?

Q. So --

A. So I mean, that's not -- to me that was not speech. Speech is your -- you are up there with the ability to speak and with people able to hear you and your thoughts. And what was -- what that was was not somebody -- that was not speaking as what speech is supposed to be.

Q. So you were never before threatened with a statute, but you believe there were times you were interrupted and not allowed to give your full presentation.

A. I mean, there -- look, we are all aware that the meetings have gotten contentious, and there have been -- but this was the absolute worst. This was most, so I mean, I -- this was, again, statutes, imprisonment, again imprisonment, basically warning the councilmembers. Jaclyn Hotard popping up and down in her seat. That was even beyond extreme even for St. John the Baptist Parish.

MR. SPEARS:

That's good. We're off the record.

THE WITNESS:

Now, we're off the record.

COURT REPORTER:

Before I go off, I have to ask do you need a copy?

MR. LANSER:

Yeah, we'll read and sign.

MR. SPEARS:

And I guess you've never --

COURT REPORTER:

You're going to read and sign, and you want a copy for yourself?

MR. LANSER:

Yes.

MR. SPEARS:

I guess, you're going to -- can you review that and let your client know if she can sign it?

MR. LANSER:

Yeah.

MR. SPEARS:

I guess you've never seen --

COURT REPORTER:

Do you have a specific date that you need it by?

MR. SPEARS:

No. We're in no rush. We don't have a trial until January.

(WHEREUPON, the deposition was concluded at 4:05 PM.)

R E P O R T E R' S P A G E

I, LAURA DAUTERIVE, Certified Court Reporter in and for the State of Louisiana, the officer before whom this sworn testimony was taken, do hereby state:

That due to the spontaneous discourse of this proceeding, where necessary, dashes (--) have been used to indicate pauses, changes in thought, and/or talkovers; that same is the proper method for a Court Reporter's transcription of a proceeding, and that dashes (--) do not indicate that words or phrases have been left out of this transcript;

That any words and/or names which could not be verified through reference material have been denoted with the phrase "(phonetically spelled)."

LAURA DAUTERIVE
Certified Court Reporter
Louisiana License #2015011

C E R T I F I C A T E

This certification is valid only for a transcript accomplished by my original signature and original required seal on this page.

I, Laura Dauterive, Certified Court Reporter in and for the State of Louisiana, as the officer before whom this testimony was taken, do hereby certify that

JOY BANNER,

after having been duly sworn by me upon authority of R.S. 37:2554; did testify as hereinbefore set forth in the forgoing pages; that this testimony was reported by me in the voice writing method, was prepared and transcribed by me or under my personal direction and supervision; that the transcript has been prepared in compliance with the transcript format guidelines required by statute or by rules of the board, as described on the website of the board; that I have acted in compliance with the prohibition on contractual relationships, as defined by Louisiana Code of Civil Procedure Article 1434 and in rules and advisory opinions of the board; that I am not related to counsel or to the parties herein, nor am I otherwise interested in the outcome of this matter.



Laura Dauterive
Certified Court Reporter
State of Louisiana
Certificate No. 2015011

**A**

**A-L-I** 61:19,20
**ability** 156:7
**able** 33:6 111:12 112:8 149:22 154:8,9,25 155:18 156:8
**absolute** 156:19
**absolutely** 137:21
**academic** 46:8,24
**Accardo** 90:6
**access** 22:12 31:10
**accommodate** 10:5
**accomplished** 160:2
**accounts** 19:6,8,12 19:12,24
**accurately** 10:16
**accusing** 145:8
**act** 48:14
**acted** 160:12
**action** 1:3 152:19
**actions** 152:5
**active** 66:1 67:16
**activities** 67:20
**Ad** 68:15
**add** 31:19
**addiction** 126:14
**addition** 32:12 44:9
**additional** 43:25 44:3 58:6 109:3,4
**address** 17:14 60:6 60:16,18 73:9 76:20 88:8,9 90:14
**addressing** 113:12
**administering** 4:24
**advance** 28:8 30:1 30:7,25 31:5,6,8 43:5
**adverse** 15:4
**advise** 8:18 10:18 10:21 112:4 150:19,20
**advised** 34:5
**advisory** 160:15
**advocated** 66:14
**affidavit** 80:20
**affiliation** 128:16 128:20,23
**affirmative** 16:13 18:9 21:6 31:3 41:7 55:19 57:1 61:22 62:25 68:18 89:18 92:5 92:7,21 95:1 96:18,21 107:18 109:21 110:8,21 112:3 116:1 119:4 130:11 137:3 138:21 139:13 142:9,23 144:5
**afford** 110:23 144:19
**afforded** 32:1,4
**afternoon** 5:6
**aged** 79:20
**agenda** 29:25 30:5 30:7,10,13,23 31:4,17 34:3 43:5 43:16 99:22 113:5,7 115:4,6 150:8,9,12 154:18
**ago** 5:8 21:20 55:18 105:12 124:10
**agree** 49:21 50:10 146:22 148:1,4,6 148:8,12,13,16 148:18,21 149:17
**agreed** 4:3 67:6 116:15
**agreement** 2:6 23:4,10,23 93:2 93:11
**agricultural** 91:18 143:3,7
**agriculture** 85:2
**ahead** 81:11,21 111:4 112:20 115:18 117:10 134:22 139:24 149:6,7
**al** 1:8 22:25
**alcohol** 124:13
**alcoholism** 126:11
**alerted** 110:19
**alerting** 109:23
**alerts** 110:10
**Alexis** 5:2 17:15
**Ali** 61:15,17,18,21 61:23 62:4
**allegations** 26:17 47:11
**allege** 29:3
**Alley** 74:25
**Allie** 3:20 18:7 100:17
**allies** 48:18
**allow** 6:3,8 31:17
**allowed** 32:17,19 32:21 34:23 35:16 36:2 38:16 44:8,20,22 114:11 148:9 154:7,11,14 155:10 156:14
**allowing** 32:10 152:3,15
**alterations** 97:3
**altered** 37:4,6
**alternative** 66:12
**ambiguity** 58:20
**amended** 25:16,18 25:19 26:15,25
**Amendment** 26:21 44:11,21 112:10 112:12,15 151:19
**American** 45:3
**amount** 129:6
**amounted** 27:8,19
**and/or** 80:22 159:10,16
**answer** 7:11 8:19 8:21,22 9:11,13 16:2 23:13,14,18 24:6,9,13 27:1 29:13 81:21 97:1 102:21,22 111:4 112:20 117:10 135:10,15 139:24 151:3
**answered** 94:1
**answering** 6:4 35:12 142:18
**answers** 9:24 71:9
**anti-depressant** 125:15 126:19
**anticipate** 8:11 9:21
**anxiety** 100:14 101:9 102:19,24 103:6 106:24 108:5 109:23 110:7,20 117:3 119:6 122:18 123:8 150:18,24 151:7,10
**anymore** 77:17
**anyway** 86:5 99:16 105:20
**apparently** 24:19
**appear** 79:15 80:1 129:19
**Appearances** 2:5
**appears** 16:15 80:5 80:7 108:17
**Apple** 108:13 109:23 110:9,18 110:19,23 111:12 144:19
**application** 36:11 80:24 83:15,18 84:3,7,9 91:25 139:10
**applied** 64:23
**appraisals** 84:21
**appreciate** 153:10 155:4,5
**approach** 38:6
**approached** 116:16
**approve** 20:11
**approved** 46:19 59:4
**April** 12:13
**area** 8:24 87:3 139:6
**areas** 60:4
**arrest** 38:7,23 43:24 106:16 107:16 108:1 146:3
**arrested** 16:1 38:19 39:1 116:10 144:12 145:13
**arrival** 99:24
**Article** 160:14
**Ascension** 20:21
**Ashley** 57:15
**asked** 21:25 40:9 43:25 44:4 54:6 54:17 75:21 93:25 106:23 107:9,10
**asking** 7:9,12 15:5 35:13 40:17 45:25 49:6 51:14 58:20 95:11 115:13 122:21 131:20 143:22 147:17
**assessor's** 140:24
**assistant** 55:7
**associate** 106:1
**associated** 85:24
**Associates** 3:4 15:16
**associations** 103:18
**assume** 143:11
**assuming** 17:20 61:25 110:9
**assumption** 50:7 86:12
**attach** 18:2
**attached** 90:4
**attempt** 45:21
**attempts** 32:24
**attended** 109:8,18 110:17

**attending** 101:21
**attention** 65:23 102:12 130:8 150:17
**attorney** 5:10 9:10 10:20 26:2 45:1 80:10 83:5 85:18 90:6 106:8 115:7 139:15 149:14 150:19,19
**attorneys** 14:13 15:2 24:15 59:7 113:21
**Aubert** 41:17 61:9 61:10
**audience** 102:2
**Austin** 53:14,21
**authenticate** 111:10
**authority** 83:17 160:7
**authorization** 42:2
**available** 92:14 95:14 140:4
**Avenue** 3:4
**aware** 14:7 20:6,10 45:14,25 85:3,3 87:6 91:17,21 143:1,4 152:4,18 156:17
**awareness** 142:24

**B**

**BA** 54:20
**Bachelor** 20:23
**back** 21:1 25:8 50:25 55:5 57:4 96:10 101:10 105:11,15,20 106:21 107:13,21 107:23 131:6 138:8
**background** 20:17 51:15,16 67:23
**backpack** 78:8
**bad** 132:23 134:1 155:14
**ballot** 48:23 51:11
**banging** 149:12 155:15,21
**bank** 19:6,8,23 78:4,11
**bankruptcy** 15:22
**Banner** 1:3,13 4:5 5:1,6 16:7,12,21 16:21,25,25 17:12 18:18,21 19:4,4,9,13,20 20:1,1,9,13,16 22:25 29:14 41:10 45:13,16 45:16,18,19 46:4 46:4,5,20 47:11 47:12 58:15 62:5 62:7 67:8,10,13 76:25 77:7,12 82:1 107:4,14 115:11 135:6 153:3 160:6
**Baptist** 5:13 12:14 14:1,1 15:4 27:4 30:23 40:11,19 52:13,20 71:12 129:21 152:6,20 156:25
**Barnes** 55:8
**based** 51:24 52:17 142:10,14,16
**basic** 5:19 45:2
**basically** 78:10 105:8 139:17 156:21
**basis** 23:23 125:5 126:3
**Baton** 88:19
**beginning** 94:20
**behaviors** 52:17
**beignets** 72:8,22 75:25
**belief** 34:21 38:18 142:10,13 154:21
**believe** 11:16 12:18 14:3 15:5 15:13 19:10,14 19:21 20:2,5 26:22 28:21 29:3 29:7,11,19,24 31:9 32:7 33:16 33:16 35:14 39:24 41:14,24 42:15 46:9 47:24 47:24 57:5,19 76:23 77:14 81:3 82:23 89:20 97:1 97:6 112:15 113:1,9 114:10 114:18 115:14,14 115:20 116:1,4 119:1,15,19,20 122:16 127:1 154:7 156:13
**believed** 11:22 34:2 114:23 130:21 154:11
**believes** 115:1,1
**best** 101:12
**better** 86:16,17 103:10,15,20 109:14 122:22
**beyond** 156:24
**biggest** 130:25
**Bill** 14:15 15:15 80:10 133:4,7
**birth** 16:15
**bit** 65:12 120:14
**black** 65:18 71:15 71:20 72:1 79:18 79:25
**black-descendant** 65:25
**board** 35:3 36:11 67:18 68:2,4,5,7 68:8,16,22 78:24 80:3 105:4 115:8 160:11,12,15
**body** 67:22
**bold** 92:4,11,17,17
**bonafides** 87:7
**books** 105:13
**bordering** 132:23
**boss** 128:22
**bottom** 118:23
**bought** 51:22
**bouts** 110:7
**box** 71:2
**break** 7:18 9:20 10:1,1,4 147:2,3
**breakdown** 42:8
**breaking** 6:16 145:8
**brilliant** 151:15
**bringing** 62:20 63:2
**brochures** 74:3,15
**brother** 62:9
**brought** 108:5
**BROWN** 1:6
**BS** 54:24 55:16
**build** 68:7
**builders** 63:13
**building** 66:11 72:7 76:21,22,24 77:2
**bullshit** 133:9
**burial** 11:22
**business** 8:15,23 19:23 21:22 51:15 69:21,21 70:1,25 72:1 75:20 77:13 78:14,17 91:20 101:7 105:18
**businesses** 21:24 74:6
**butt** 121:16

**C**

**C** 3:1 89:20,21,23 90:4,12 96:24 160:1,1
**C-O-L-L** 127:13
**C-O-L-L-I-N-S** 127:14
**cafe** 69:23,25 71:6 72:7,19 73:9,12 74:22 75:7 76:14
**calendar** 112:2
**call** 10:11 33:5 38:17 48:17,18 80:1 100:1 140:5
**called** 15:10 69:22 84:12 130:8
**calling** 146:17
**calls** 27:11 44:17 81:10 111:3 112:18 117:8
**Camilla** 18:11
**campaign** 130:4 138:6 153:7
**candidacy** 132:3,4 135:1 137:20
**candidate** 129:21
**candidate's** 2:18 129:20 137:20
**candidates** 49:3
**capacity** 59:11
**caption** 2:4 13:22
**Carbide** 69:16
**cards** 20:4,4
**case** 13:23 15:7,8 15:12 22:23,23 24:14 35:3 49:19 102:1 136:8 137:22 150:23
**catering** 70:14
**Catholic** 20:21 55:4
**cause** 100:5
**caused** 103:6
**causing** 101:18 118:14
**cell** 90:17,20
**censored** 114:11
**center** 14:16 15:13 75:1 80:7
**certain** 5:9 96:13 97:23 139:11,18
**certainly** 7:20 10:19
**certificate** 2:22 16:15 160:25
**certification** 4:10 87:6 160:2
**certifications** 22:21 84:16,20

84:24 87:9 89:3,8
**Certified** 1:24 4:22 159:3,24 160:4 160:23
**certify** 160:5
**Chair** 5:15 116:21 144:10
**Chairman** 34:21
**chambers** 37:14 89:1 104:8 105:23 106:2,3,4 107:6,19 118:2
**chance** 10:14
**change** 65:8 98:23 99:4,12
**changed** 13:21 16:20 37:22 66:22 127:4
**changes** 97:9,12 159:10
**characterize** 52:16
**characters** 52:25
**Charles** 3:4
**check** 71:1 143:25
**checking** 19:11
**chiming** 149:15
**circumstances** 11:12
**citizen** 45:1
**city** 88:16
**Civil** 1:3 4:7,19 160:14
**claim** 27:3 44:10 44:11 92:18 112:10
**claims** 112:11
**clarify** 7:9 121:18 121:24 147:17
**clarity** 103:23
**clear** 15:17 35:11 42:18 67:1 122:6 128:15 131:10 135:16 142:7 146:12 148:22 149:2,8,11,16 150:10 153:13 154:6,13 155:7
**cleared** 106:2,2,3,5 107:6,20
**clearer** 146:7
**clearly** 116:5
**clenching** 117:15 117:19 118:14,19 119:2,2,5 120:25 122:1,17
**client** 136:17 157:20
**Clinic** 14:19
**clinics** 15:1
**clock** 44:1
**closed** 31:20,24
**co-** 58:12
**co-director** 58:14 58:16,22,23 59:2 63:18
**co-founder** 63:18
**co-lead** 58:25
**co-leader** 58:10,16 59:5 63:18
**co-leaders** 59:9 70:23
**co-leading** 59:16
**co-owners** 70:22
**code** 84:5 160:13
**coffee** 72:5,9,22
**Collins** 127:12,15 127:17,22
**color** 79:16,23
**come** 30:9 39:17 40:21 54:14 74:9 74:16 75:19,20 107:20 123:17 138:8 144:16
**comes** 71:8
**coming** 20:18 65:14 76:13
**commencing** 1:18
**comment** 31:17,20 31:22,23,23,25 32:5,9,11,14 33:2 33:20 34:6,11,17 34:23 35:16 41:25 43:8,12,13 43:14 98:21
109:20 154:9 155:11
**comments** 114:19 114:21,22
**Commission** 71:11 71:18
**commodities** 71:3 71:4,5 72:21
**common** 92:6 93:13,14,18 140:23
**communicate** 86:2
**communication** 21:2,3,22,23
**communications** 57:8,12 62:18,18 77:7,9,13
**communities** 65:25 66:2,6 73:3
**community** 36:5,8 37:18 39:15,16 39:19,20 40:18 47:13,15,18,19 47:23 50:14 60:12 61:7,7,8,13 65:18 67:25 71:21 72:12,24 75:15,18 78:3,5,6 85:8 91:15 93:10 93:11
**company** 77:8
**compensate** 150:23
**compensated** 151:5,13
**complained** 91:25 93:21
**complaint** 2:16 25:3,14,16,16,20 26:16,25 29:23 35:4 42:19 78:24 80:2,12,15,18,21 82:21 85:10 89:17,19 93:22 113:11 139:9
**complaints** 25:15 42:22
**complement** 141:18
**complete** 10:9
**compliance** 160:10 160:12
**complimentary** 115:23
**comply** 29:4
**concern** 109:3
**concerned** 36:7,9,9 36:12
**concluded** 158:7
**concluding** 47:6
**conclusion** 27:12 44:17 46:12 47:5 81:10 83:21 112:19 113:17 114:2 117:9 151:22 152:11,24
**condition** 103:21
**conditions** 103:23
**conduct** 85:10 115:24
**confer** 10:20
**confirm** 111:11
**conflict** 80:23 83:9 83:10
**confused** 26:21
**confusion** 45:18
**Conlay** 3:20 18:8 18:13,15 19:15 147:9,10
**connection** 21:5 24:5 128:13
**consequences** 107:15
**consider** 32:9 50:5 50:5 52:1 58:5
**Constitution** 80:8 151:17,18
**constitutional** 14:16 15:14 152:21
**construction** 11:21
**consultant** 88:15
**consulting** 118:4
**consults** 62:14
121:7
**consumed** 124:12
**contact** 134:6
**contained** 89:19 90:2
**contempt** 24:11
**contentious** 156:18
**contingent** 23:24
**continue** 133:20 135:20 138:11
**continued** 101:11
**continuing** 137:13
**contractor** 87:15 87:17
**contractual** 160:12
**contribute** 131:25
**contributed** 131:23
**contribution** 130:13
**contributor** 128:25 129:2,8 131:1,11
**conversations** 40:4 116:19
**convicted** 16:1
**coordinator** 61:8 63:3
**cop** 38:14
**copied** 98:8
**copiers** 79:17
**copies** 22:2,6 97:25
**cops** 38:12,12,17 101:5 106:10,16 116:13
**copy** 18:2 30:10,12 30:19 31:7 79:15 80:2 98:9 129:19 140:18 157:8,15
**core** 29:22
**correct** 16:2 20:1 23:2 26:19 27:1 28:16 32:5,16,23 33:7,11,15,20 34:1,8,9 35:22 36:1 42:4,21,23 43:2,3,5,6,8 46:21 48:24 49:4

59:17 65:5,6 79:1 79:2 80:2,13,16 89:25 96:15 98:18 107:21 108:2 111:15 113:7 116:10,16 118:10 122:19 128:17 129:1 130:1,5,16 139:19
**corrected** 131:8
**correctly** 10:16 60:6 107:3 118:12
**corridor** 65:4 66:9 66:21
**council** 5:14,15 12:19 14:1,23 25:25 30:23,24 31:13,17,22 34:15 37:14 38:16,23 39:2 40:2 45:5 48:24 52:13 71:14 89:1 92:16 96:20 97:13 99:10,22 99:23 100:5 101:13,20,21 104:8 105:6,23 107:5,19 108:10 108:12 109:4,7 110:18 116:21,24 118:1 120:2,7 123:10 128:25 144:4,10 148:23 149:9
**Councilman** 42:15
**councilmember** 129:22 155:23
**councilmembers** 156:1,2,22
**counsel** 2:6 4:4 8:17 14:10 35:21 42:2 46:1 95:7,8 98:11 102:8 112:4 160:16
**counseling** 103:17
124:3,8 150:17
**counting** 38:20,25 39:4
**couple** 33:21 72:13 97:8
**course** 9:8
**court** 1:1,24 4:22 5:2 6:1 8:2 10:21 11:8,25 12:2,10 12:12,23 13:6 15:18 17:15 22:24 40:21 157:6,13 158:1 159:3,11,24 160:4,23
**courtroom** 104:6,7
**COVID** 76:4,8,9 76:12,16,17,18 120:12,20,20
**created** 48:8 73:3 89:23 90:13
**credential** 46:25 47:12
**credit** 20:3
**creole** 65:4,10 66:8
**crimes** 16:1
**criminal** 15:18
**critical** 114:19,24 115:2,16 116:6 154:21
**criticizing** 114:12 114:15 116:3
**cross** 21:21
**cultural** 65:4,11 66:18 78:9
**culture** 65:15 66:8
**cumbersome** 65:13
**Cummings** 57:11 64:9 128:21 130:16 131:10 135:2,7
**current** 17:17 47:13 119:22 126:22 127:9 128:13
**currently** 60:10 64:1 69:11
**cut** 112:13

**D**

**D** 2:1
**D-U-T-R-A** 63:1
**dad** 67:15 69:17
**daily** 70:10 108:6
**damages** 102:15 117:5
**damn** 106:6
**Darla** 142:1
**dash** 69:24,24
**dashes** 159:8,13
**database** 111:13
**date** 11:19 12:13 111:13 120:21 123:21 124:11,23 125:19 126:6 158:2
**dated** 28:15
**dates** 112:8
**Dauterive** 1:23 4:22 159:3,23 160:4,22
**Dave** 14:21
**DAVID** 3:3
**david.lanser@g...** 3:7
**day** 40:2 125:23 154:24
**days** 12:17 108:23
**deal** 35:21 42:3
**dealing** 117:14
**Dean** 54:2
**debatable** 32:6,18 33:5 43:9
**debit** 20:4
**decide** 24:8 136:22 150:16
**decided** 48:22 50:9 65:10 108:24
**decision** 123:17
**declare** 50:23
**defend** 36:14
**defendant** 13:12
**defendants** 3:10 5:11 25:12 26:17
27:5 113:22
**deference** 153:5
**define** 52:6,9,12
**defined** 51:18 160:13
**defines** 52:8
**defining** 66:5
**degree** 141:4,9
**degrees** 18:20 22:3 22:7 84:17,19,23 87:9 89:3,4 115:12 141:2,15
**denied** 45:4,4,5,8
**denoted** 159:18
**dental** 117:15,17 117:21,24
**dentist** 118:5,8,17 119:17,22,24 120:1,6,8,11,12 120:19,24,24 121:13,20,25 122:4,6,10,12,14 122:23
**dentist's** 120:21
**depends** 9:24 58:18 70:2
**deposition** 1:13 4:4 4:12,15 5:21 7:25 9:9 10:9,12,23 11:5 13:6 18:3 25:2,22 26:3 79:7 87:17 88:1 134:13 135:25 136:17 137:6,11 158:7
**Depot** 98:7
**depression** 126:16
**descendant** 60:11 66:2,5
**descendants** 13:18 13:25 15:3,10 58:1,4,8,11 59:19 59:22,23 61:4 63:25 64:4 65:3 66:17 67:17,22 68:9 69:9 71:15 71:17,24 87:11
87:14 128:14
**describe** 71:1
**described** 151:16 160:11
**description** 56:8
**desired** 152:16
**Destrehan** 127:16
**detail** 13:9 103:25
**details** 40:16
**determine** 82:22 92:19
**determining** 51:24
**developing** 66:10 66:20
**development** 71:13 71:19 84:25 92:15
**difference** 143:1,4
**different** 78:6 96:23,25 114:9 135:21 138:12 140:25 143:13
**differently** 32:22
**difficult** 22:5 104:19
**digital** 62:18
**dinner** 124:19
**diplomas** 18:21 22:2,7
**direct** 23:13 130:7
**directing** 135:9
**direction** 160:9
**director** 13:17 57:8 57:12,13,14 62:6 62:12 67:7,8,13 68:20 77:23 78:18
**directors** 59:14 61:3 77:6,25
**disagree** 34:10 49:15,16,17
**disappear** 73:2
**Disbursements** 130:9
**discomfort** 118:15
**discourse** 159:7
**discovery** 2:17

15:24 22:1 25:11 25:20 69:20 100:11 102:10
**discrimination** 113:23
**discuss** 13:9 58:8 79:9
**discussed** 78:15,19 85:19 140:8
**discussing** 20:8
**discussion** 37:15 37:16 40:10
**dissertation** 21:17 21:19
**distance** 73:11
**distant** 49:3,5,8,9
**distinction** 113:10
**distinguished** 115:12
**distribute** 97:24
**distributed** 30:25 31:5,6
**district** 1:1,1 12:2 106:8 149:14
**doctor** 127:23 128:2
**doctoral** 55:7
**doctorate** 21:1
**doctors** 123:6 127:5
**document** 79:5,11 79:22 86:8 90:3
**documentation** 18:18 45:17 94:6 94:9
**documents** 16:16 19:25 26:5 89:9 94:21 95:10 138:25
**dodge** 123:3
**doing** 56:2 58:3,3 64:24 97:4,10 101:25 109:2,2 133:25 134:15,20 136:23 140:12,13 153:11
**dollars** 85:6 98:20
**Donaldsonville** 20:21
**donate** 130:25 131:3
**donated** 129:5 130:20
**donating** 130:21
**donors** 129:3,5
**door** 76:15
**dose** 125:25
**DOW** 69:17
**downloaded** 31:9 31:10
**Dr** 47:11,12 82:1 127:15,17,22
**drew** 89:12
**drinker** 124:20,22
**driver's** 2:15 17:2 17:8,13,17
**drug** 126:13
**drugs** 124:24 125:4 126:5,8
**due** 159:7
**duly** 5:3 160:6
**Dutra** 63:1

**E**

**E** 2:1 3:1,1 63:7 159:1,1,1 160:1,1
**E-L-L** 62:11
**earlier** 15:24 80:9 94:19 133:10
**easier** 22:18
**EASTERN** 1:1
**easy** 22:12 141:8
**economic** 48:2 60:2 71:13,19 92:14
**economy** 60:9
**Edgard** 12:2 36:24
**edits** 10:17
**educate** 60:8
**education** 6:20 61:8 78:8
**educational** 20:17
**Edward's** 53:9,17 53:18,19,25
56:21,24
**effect** 98:25
**effort** 71:20
**efforts** 65:22 70:5
**either** 13:5,11 22:4 24:6 30:20 37:21 56:13 67:16 98:6 116:25 136:6 144:10 149:23 155:8
**elders** 104:6
**elect** 49:23
**elected** 52:12,19,23
**elections** 48:21
**electricians** 63:13
**elevated** 111:14 112:5
**else's** 154:20
**embarrass** 135:6
**embodying** 52:18
**emotional** 101:18
**employed** 64:1 69:11
**employee** 87:13
**employees** 61:3 63:14,16
**employment** 54:20 57:23
**ended** 54:3 55:3 57:19
**engaged** 113:22,23
**enrolled** 24:15
**enslaved** 11:23
**entire** 107:5
**entirely** 99:13,18
**entirety** 63:9
**entities** 78:14,15
**entitled** 147:3
**entry** 130:12,13
**environmental** 14:18 48:3 60:2 63:2,3 64:20
**epidemic** 76:4,8
**eradicate** 59:25
**escorted** 104:16 105:22 107:5
**especially** 48:3,5
64:20 72:12
**ESQ** 3:12
**essence** 80:18,21
**essentially** 35:25 98:22
**estate** 84:17,21
**et** 1:8 22:25
**etcetera** 72:9
**ethical** 83:11
**ethics** 35:3,21 36:11 42:3 78:24 80:3 82:20 84:5 85:10 93:22 105:4 113:11,13 115:8 149:10 152:18
**evaluating** 120:15 123:2
**evaluation** 123:4
**evening** 97:14
**events** 67:20
**Everybody** 141:4
**everyday** 70:16
**evidence** 4:17
**exact** 11:18 12:13 33:22 42:7 109:9 109:10 112:5 144:9
**exactly** 25:6 26:7 27:7 37:16 55:17 66:6 86:4 87:8 103:23 130:17 144:9
**Examination** 2:8 11:4 155:2
**examine** 48:4 50:25
**examining** 21:21
**example** 89:11
**excuse** 11:14 16:24
**executive** 33:25 34:7,12,16,23 35:7,17 57:13,14 59:14
**exercise** 10:22
**exhibit** 18:12 72:15 79:7 89:20
89:20,21,22 90:4 90:7,9,12,12 96:24 102:7 129:16
**exhibits** 2:14 96:23
**exist** 77:22 121:18
**existence** 77:16,17 77:19
**exit** 9:3
**expect** 100:6
**expectation** 73:15
**expected** 99:23
**expedition** 135:5
**experience** 30:22
**experienced** 121:3
**experiencing** 119:7 122:16 123:9
**expertise** 51:2,5,5 87:4
**explain** 43:11,13 44:14 103:25 104:1 138:25 139:7 140:25
**explore** 120:25
**express** 98:14
**expressing** 98:15
**extensively** 155:16
**extent** 27:11 81:9 117:8 139:22
**extra** 70:5,6
**extraordinarily** 9:22
**extreme** 156:24
**extremely** 5:22

**F**

**F** 90:7,9,12 160:1
**F-E-E** 69:24
**F-O** 69:24
**facing** 60:11
**fact** 34:25 47:22 49:12 79:24 91:12 92:18 114:22,23 115:4 142:5 150:15,15
**facts** 50:25 51:1 115:15,20,21,23

115:25,25 154:17 154:20,22
**factual** 47:10
**failed** 28:22
**fair** 19:22 30:21 54:7,8 99:19 103:4 110:16 119:17 150:4,7
**faith** 132:23 134:1
**familiar** 28:3,5 84:13
**family** 21:22,22,23 69:1 72:15,16 91:20
**far** 29:11 33:1 41:2 52:8 74:13
**fast** 6:13,14,22 7:2
**father** 68:10 69:6
**favor** 42:10 149:25 150:3,5
**fear** 41:15 101:10 102:19,23 103:5 105:17 106:24 108:4 109:4 117:3 123:8 150:18,23 151:6 151:10
**feared** 40:6
**fearful** 40:22
**federal** 4:6,19 5:12 22:24 28:20
**fee** 23:5,6
**Fee-Fo-** 70:19
**Fee-Fo-Lay** 69:22 69:23 70:23 71:3 73:9,12,17,18,22 73:25 74:1 75:5,7 75:9
**feel** 27:2 68:6,6 87:25 88:4 101:13 146:1
**feeling** 83:5
**feels** 101:15
**fellowship** 55:8
**felt** 35:8 38:18 81:3 116:4,12 146:1
**fields** 64:19
**fights** 104:12
**figuring** 122:25
**file** 134:10,22 136:3 138:2
**filed** 15:21 20:8,12 46:21 78:24 80:3 80:12,16 82:20
**files** 86:9,17 94:17
**filing** 46:1 85:10 136:25
**filings** 65:1
**final** 99:19,21 106:20
**finalized** 10:10
**finances** 153:7
**financial** 131:11
**find** 98:9 100:13 100:17 111:21 112:1
**fine** 38:8 59:8 79:19 131:18 136:3,20 138:13 138:19 145:24
**finish** 6:3,9 135:24 149:3,5
**finished** 55:9
**firm** 23:1 24:4 77:9
**firms** 15:1
**first** 5:3,9,22 11:14 11:17 26:21 32:23 33:7,10,12 44:11,21 47:17 47:22 58:9 65:11 69:25 80:6 84:15 86:21 103:22 106:4 112:10,12 112:15 118:25 122:5 127:12 136:8,8 151:18 155:13
**first-time** 120:9
**fishing** 135:5
**five** 108:22 128:5,9 128:9
**flipping** 89:16
**focus** 21:3 60:1,4 71:20
**focused** 48:1
**focusing** 60:3
**folklore** 72:18
**folklores** 72:11
**follow-up** 155:3
**followed** 34:18
**followers** 48:16,17
**following** 24:10 37:17
**follows** 5:4
**food** 72:6
**foremost** 58:9 69:25 86:21 118:25
**forget** 73:25
**forgive** 79:16
**forgoing** 160:7
**form** 4:14 27:10 44:16 46:11 81:9 81:16 83:1,20 93:25 111:2 112:18 113:16 114:1 115:18 139:21 151:1,21 152:10,23
**formal** 52:22 73:20 95:10
**formalities** 4:9
**format** 160:10
**former** 47:12 53:5 128:22
**forth** 160:7
**forward** 20:18
**found** 74:17 75:13 130:23
**Foundation** 64:10
**founded** 59:15
**founder** 57:10 58:10 59:5
**four** 49:2 108:22
**fourth** 49:3,8,9,25
**frames** 58:6
**FRCP** 134:23
**freedom** 112:10
**freely** 152:3,16 155:10
**front** 72:18 135:17
**frying** 75:25
**full** 16:4 41:4 156:15
**full-time** 63:14,15
**fun** 144:19
**functions** 78:9
**fund** 64:25
**fundamental** 45:2
**funders** 64:21,24
**funding** 64:4,5,6,8 64:13,15
**funds** 98:18 149:21 149:25
**funny** 87:25 88:4 144:22,23
**FURTHER** 155:2

**G**

**G** 159:1
**gang** 79:17
**Gaudet** 139:4 141:22 142:1
**gavel** 149:13 155:16,21
**general** 115:5 127:8 143:10,12
**generally** 30:24 129:24
**generated** 130:3
**getting** 9:25 47:21 56:18,20 78:6 103:10,11,15,19 103:20,22 109:14 113:10 118:18 119:12
**gift** 56:9,10
**give** 9:1 32:4 34:6 39:18 63:5 79:4 87:22,23 95:6,10 97:19 98:10 121:13 129:13 131:22 139:1,15 147:6 154:8,9 155:11 156:15
**giveaways** 78:8
**given** 11:5 17:12 32:8 49:23 70:7 154:17,19
**giving** 7:11 8:21
**glass** 22:4,11
**go** 5:19,21 8:16 9:1 9:21 54:1,4 67:4 74:9 80:19 81:10 81:21 85:21 92:15 99:5 101:20 105:11,15 106:20 108:21,25 109:5,12,16 111:4,12 112:20 115:18 117:10,21 119:24 134:22 135:17 139:24 143:5 145:19 149:6,6 153:24 157:7
**goes** 40:25 45:23 45:24 67:4 85:5 87:10 91:21 92:10 110:10
**going** 6:6,21 7:2 9:12 13:9 20:7 23:8 24:6 27:10 37:5,7,22,23,25 44:16 61:11 75:23 77:10 79:4 79:5 86:15,19 95:6,8 96:10 98:23 99:14,15 100:5 101:6,16 101:17,19,24 104:3 105:17 106:1,14,15,16 106:24 108:21 109:4,11 111:2 116:10 120:23 123:6 129:15 133:20 134:22 135:24 137:24 138:2,5,6,15 139:1,15,21 144:16 145:13 149:4 153:6 157:14,19
**good** 5:6 6:8 76:16

76:22 98:2 136:6 144:20 157:2
**goodness** 133:13
**gotten** 30:18 37:11 37:13 156:17
**governing** 67:22
**government** 16:6 18:17 19:25 20:14 64:5,6 83:16
**Grace** 55:4,24 56:12,19
**grade** 56:6,6
**graduate** 55:6
**graduated** 20:22
**graduating** 54:20 54:22
**granted** 44:6
**grants** 64:5,7,15 64:22
**Gray** 98:14 148:23 149:9,21,25
**grayscale** 79:25
**great** 13:9 153:10
**Greenfield** 11:19 13:19 70:4 85:25
**Greenfield's** 12:15
**grew** 72:13
**Griffin** 42:16
**grounds** 11:23
**group** 37:19 39:13 39:14 78:4
**guess** 59:20 63:11 88:18 140:5 157:12,19,25
**guidelines** 160:10
**gut** 83:4

**H**

**H-O-L-D-E-N** 63:8
**habit** 6:14
**half** 73:14
**hand** 30:20 135:1 137:22
**handcuff** 108:1
**handing** 87:25
**handle** 75:23 113:13
**handling** 15:12
**happen** 101:6
**happened** 101:11 103:19 105:15 107:1 108:15 110:1 117:6 135:18
**happening** 40:10
**happens** 8:12 146:9
**happy** 22:13
**harmed** 11:24
**Harriet** 67:8,9 69:7
**head** 5:24,24 104:4
**headline** 66:17
**headquartered** 60:14,15
**hear** 64:21 156:8
**heard** 55:10 116:12
**hearing** 107:3 118:12 155:20
**heart** 75:14 108:14 108:17,18 109:24 111:14 112:6
**heavy** 66:12 124:20
**help** 81:14 123:14 123:18,24
**helps** 82:13,16
**hereinbefore** 160:7
**heritage** 54:15 60:5 65:11,14 66:8,11,18 71:8 72:11 75:16
**high** 20:18,20 108:14
**high-end** 79:16
**higher** 85:5 91:22
**Highway** 73:10
**hire** 113:13 149:25
**hired** 24:3 62:17
**hiring** 35:20
**historic** 64:16,18
65:23
**history** 72:11,25
**Hold** 153:17
**Holden** 63:8
**home** 54:14 90:21
**honest** 100:8 120:15
**honestly** 35:6 70:4
**hope** 73:6 100:3,8
**hoped** 75:15,17
**Hotard** 5:17 14:3 15:11 27:6 36:10 38:14 45:7 78:25 80:4,24 84:2 85:11 105:5 112:13 114:13,20 114:25 115:16,24 116:3,20 139:10 144:10 145:7 149:13 152:5,19 155:21 156:22
**Hotard's** 141:23
**hourly** 23:23
**hours** 28:12 29:5 67:19
**housed** 60:14
**hunching** 5:24
**hurts** 75:14
**Huston-** 53:10 54:9,16
**Huston-Tillotson** 53:8 54:2,13 56:22,24

**I**

**idea** 71:16 123:16 123:22
**ifs** 84:8
**Ike** 3:12 5:7
**ike@spearslaw.c...** 3:17
**illegal** 70:7 81:5,6 81:13 82:19 126:5,8
**illegally** 13:21
**immediate** 50:14
**immediately** 33:4
37:17 38:13,14 45:10 114:16
**impact** 51:20 100:9 139:11
**impacting** 36:15 97:5
**important** 5:22 51:4,7 101:25 102:1
**imprisoned** 104:3 104:23
**imprisonment** 38:9 100:25 101:3 104:17,20 107:16,16 116:11 116:12,12,13,14 116:17 145:25 146:4 155:15 156:21,21
**in-house** 98:4
**inappropriate** 8:14 80:22 81:4
**incident** 100:12 102:16 103:6 116:22 117:1,25 119:8 121:4 122:19 124:5,11 124:23 125:20
**include** 5:13 20:3 65:24
**included** 65:21 80:25
**including** 102:1 149:18
**incomplete** 8:21
**increase** 139:2
**increased** 91:7 92:1,24 93:22 108:17 110:20 139:3,4 142:12
**increasing** 119:13
**incurred** 102:15
**indicate** 53:4 159:9 159:13
**indicated** 15:25 40:5 63:17 69:20 96:8 97:22
100:11 110:5 128:15 139:14
**indicates** 65:2 130:18
**individual** 39:18 88:14
**individually** 107:4 107:8
**individuals** 41:16
**induced** 122:18
**industrial** 13:21 62:14 85:2,5,7 91:18,21 92:9 93:2,17 106:21 143:2,6
**industry** 54:15 62:13 66:12 67:24
**inferred** 38:1
**influenced** 51:22
**informal** 74:14 75:1
**information** 87:19 87:23 88:1,5,6 95:7 99:7
**informs** 86:1
**Initially** 57:10
**initiatives** 78:7
**injunction** 11:20
**injuries** 102:14 117:5
**injustices** 60:3
**insist** 31:21
**inspired** 154:23
**instance** 73:23 143:15
**instantly** 33:2
**institutions** 22:9
**instruction** 24:10
**intend** 98:24 103:8 119:16 122:22
**intended** 96:14
**intending** 97:13
**intense** 108:24
**intent** 70:9
**intention** 103:12 103:16 114:14

122:11
**interchangeable** 58:17
**interest** 70:19 80:23
**interested** 56:17 160:17
**interpretation** 34:11 44:25
**Interrogatory** 102:13
**interrupted** 33:4 147:16 156:14
**interrupting** 149:14
**interruption** 146:16
**interruptions** 146:15
**intersection** 21:21 64:19
**investigation** 36:12 149:10
**investment** 19:12
**invited** 107:20
**involved** 13:10,14 13:18 14:4 29:10 54:14 66:15 149:10
**ish** 57:20
**issue** 25:25 29:12 42:11,14 103:10 109:22 150:13 153:7
**issues** 14:22 40:13 40:18 70:7 101:15 117:15,17 117:24
**item** 35:19 36:1 41:15 42:1,1 43:16 99:22 113:6,7 115:6 150:8,9,13
**items** 31:18 34:6 35:16
**iteration** 97:11
**iterations** 97:8
**Ivy** 141:14

**J**

**J** 1:6 3:3
**J-O-C-Y-N-T-I-A** 41:9
**J-O-Y** 19:13,20 20:9
**J-O-Y-C-E-I-A** 16:9
**Jacklyn** 85:11
**Jaclyn** 5:17 14:3 15:11 36:10 38:14 45:7 78:25 80:4 84:2 105:5 114:12,19,24 115:16 116:3,20 141:23 144:10 145:7 152:5,19 155:21 156:22
**jail** 105:9
**January** 123:21 124:4,4 158:6
**jaws** 117:16,19 118:14,19 119:3 119:5 121:1 122:2,17
**Jesus** 51:10,11
**Jo** 67:4,6 70:21 71:23 76:25 77:1
**job** 22:17 56:7 57:6 58:6 109:2
**jobs** 56:13,16
**Jocyntia** 41:6,10 58:15
**John** 5:13 12:14 13:25 14:1,2 15:3 15:11 27:4 30:22 40:11,19 47:16 48:23 49:15 52:13,20 57:11 64:8 71:12 77:25 78:4 128:20 129:21 130:16 131:10 152:6,20 156:24
**Johnson** 61:15,21
**Johnson's** 61:23
**joke** 104:21
**Joy** 1:3,13 4:5 5:1 16:21,25 18:18 18:21 19:4,9,13 19:20 20:1,9,13 45:13,16,16,18 45:23 46:3,4,20 47:11,12 67:5,6 160:6
**Joyceia** 16:7,8,21 16:25 19:4,5 20:1 45:19,24 46:4
**judge** 1:6,7 12:3,5 12:20,21,23 125:12 132:16,20 132:25 133:4 134:6 135:17,18 138:17
**July** 1:17
**jury** 104:1 125:12 150:22 151:6,13
**justice** 48:1,2,3,4 63:3 64:17,21
**Justin** 87:3,17 88:13,22,23 89:24 90:13,16 91:5,23 92:22 93:20
**Justin's** 87:1
**Justine** 86:23

**K**

**K-A-L-I-E** 62:24
**K-R-A-Y** 87:2 89:24
**Kalie** 62:22,23
**KAREN** 1:8
**keep** 86:9 104:3,8 107:1 133:25 140:12
**kept** 86:16
**kicked** 37:12,13 106:22
**Kim** 36:20,21,22 36:25 37:3,9,12 39:11,23 41:11
**kind** 26:20 68:2 120:12
**King** 68:11,12,15 68:25
**kitchen-tabled** 68:2
**knew** 131:7
**knocks** 146:18
**know** 6:19 9:23 13:15,22,24 23:9 23:15,22 26:9 28:6,10 34:13 36:20 37:6,15 39:8 40:24 51:21 58:5 72:24 74:20 77:21 79:22 82:4 82:19 83:3,3,23 84:6,8,9 85:7,25 86:10 87:8,22 88:1,9,21 89:4,6 95:24 96:1,12 98:23 99:5,8,11 99:17 100:1 104:22,25 105:3 105:10,11,13,14 105:17 106:12 109:9,10 111:6,7 111:19 118:19 122:24 123:4,12 123:19 125:12 132:3 134:16 141:3,13,17,19 143:8,12,25 146:15 151:9,11 151:24 153:1 155:5,20 157:21
**knowledge** 92:6,17 93:15,18 140:23 143:10,12
**known** 16:23 65:3 91:11,13,14
**Kray** 86:23 87:2,3 88:13,22,23 89:24 90:13 91:5 91:23 92:22 93:20
**Kray's** 87:17

**L**

**L** 4:1
**L-** 69:24
**LA** 3:5,15
**lack** 65:17 99:6
**lady** 55:4,23 56:12 56:19 86:7 138:8
**land** 80:25 84:24 85:3,5,7 91:17,18 91:18,21,22 92:1 92:8,23 93:23 94:10,21,22 97:5 106:21 141:1 143:2,3,3,6,7,13
**landholdings** 92:13
**landscapers** 63:12
**Lanser** 14:21 23:7 23:16,25 24:12 24:21 27:9,21 44:15 46:10 81:8 81:15,19 82:25 83:19 93:24 111:1,16 112:17 113:15,24 115:17 121:15 132:1,11 132:17,21 133:1 133:6,14,19,24 134:5,9,17,21 135:11,19 136:2 136:12,19,24 137:8,12,18 138:1,9,18 139:20 150:25 151:20 152:9,22 153:16,23 157:9 157:16,22
**LANSER,ESQ** 3:3
**LaPlace** 88:20
**largest** 128:25 129:2,8 131:11
**LARSEN** 117:7
**Laura** 1:23 4:22 54:22,25 55:10 55:13 56:8,11 74:8,11,25 159:3 159:23 160:4,22

**law** 1:14 4:8 8:3 11:9 14:18 15:1,1 23:1 26:19 27:7 27:20 28:4,24 29:4,10 30:3 42:20 44:10 81:7 82:23 141:4,9,14 152:8
**laws** 83:12 105:4 145:9,15 152:18
**lawsuit** 13:8,19 14:7 20:7,12 28:21 46:2,2,9,21 59:3 78:22,23 84:11 96:8 103:7
**lawsuits** 13:10 75:24
**lawyer** 9:9 15:12 22:2 23:15 24:9 27:24 79:5 82:3 97:19 113:13 139:1 153:5
**lawyer's** 24:10
**lawyers** 15:1 24:4 24:18 76:1 151:15
**Lay** 70:20
**layers** 50:25
**leader** 47:14,15,20 47:22,25 48:10 48:11,15,22 49:14,22 50:5,6 51:8,10,19,24 52:22,23,25 58:21 82:11,11 104:10
**leaders** 50:24 52:1 52:2,14,21,21 58:13 59:13
**leadership** 49:24 50:1,16 51:3,3,6 51:17,17 52:7,9 52:10,16,18,24
**leading** 110:6
**leads** 126:25
**League** 141:14
**learned** 65:16
**leave** 22:15 54:7,17 56:5 57:17 74:14 107:9,10 153:8
**leaves** 18:15 147:10
**leaving** 54:12 55:3 56:15
**Lee** 61:17
**left** 57:17,19 159:14
**legacies** 48:6 59:25 60:7,10
**legal** 16:5,16 20:13 27:11 41:5 42:2 44:17 45:17 46:1 46:11 81:10 82:8 83:20 112:19 113:16 114:1 117:9 131:24 151:2,21 152:10 152:23
**legally** 16:20
**let's** 11:17 12:9 31:2 58:8 86:18 88:3 89:15 93:8 103:22 118:22 126:21 136:22 146:9
**letter** 90:4,5
**letters** 89:7
**letting** 72:24 95:24 96:1
**liaison** 61:8
**license** 2:15 17:3,9 17:13,18 159:25
**licenses** 18:20 22:20 70:9
**life** 66:10 86:15 91:19 125:9
**limit** 131:25
**line** 133:21 134:24 137:14,17,19 138:12 151:8
**links** 60:9
**list** 58:9 69:21 129:25
**listed** 34:7 47:10 67:7,12 77:5,6,23 77:24 89:10
**listen** 106:17
**listings** 92:16
**lists** 46:3
**litany** 24:18
**literally** 72:14 155:20
**litigation** 5:12 13:11 14:11,14 14:25 24:5 51:12 59:4 70:5 135:2,4
**little** 5:8 72:14,17 120:14
**live** 47:23 93:16
**living** 85:1
**LLC** 69:25 77:7,13
**loans** 19:17,19
**local** 65:18 71:20 74:5
**located** 1:14 53:13 55:11 74:19 127:15
**location** 73:8
**long** 9:21,23 55:1 55:18,20 65:12 68:15 71:9 124:10
**longer** 128:16
**look** 17:8 48:4 79:8 92:12,12,13 94:7 107:12 111:24 112:2 129:17 140:2 141:20 155:5 156:16
**looked** 94:19
**looking** 58:24 104:9 118:7
**looks** 146:13
**losing** 105:17,18 108:25
**lot** 22:18 40:10,15 40:17 51:25 65:12,19 67:19 70:8 74:20 75:14 75:17 78:7 86:15 86:19 118:20 141:2
**lots** 89:2
**Louisiana** 1:1,16 1:25 4:23 5:2 17:2,12,15 21:8 26:18 27:6,20 28:3 54:3 65:4,10 66:8 80:3 88:18 92:14 128:8 151:17 152:7 159:4,25 160:4 160:13,24
**love** 73:6
**LSU** 20:22 21:1,12 54:21

**M**

**M.BA** 54:24
**Mac** 144:18,20
**machine** 79:18
**MAGISTRATE** 1:7
**majority** 42:10 50:11
**man** 67:19 136:7
**managed** 81:1 141:23
**manager** 56:9 61:16,24 62:19
**map** 89:12 90:8,11 97:8,11
**maps** 89:10,23 90:13
**March** 12:13
**Marie** 16:7,10
**mark** 79:6 102:6 129:16 147:19
**marker** 144:9
**marketing** 20:23
**married** 16:18
**material** 159:17
**materials** 25:2
**matter** 21:18 33:25 35:21 42:3 106:12 113:14 118:24 134:25 151:13 160:18
**matters** 15:19 34:12 84:1
**Matthieu** 36:20,21 36:25 37:3,10 39:12,23 41:11
**maximum** 129:5 130:22,23 131:2 131:3
**mayor** 50:17,18
**MBA** 20:25 21:5 54:24 55:17
**mean** 34:13 37:19 46:15 50:3,4 51:19 63:11,12 70:2 74:13 89:6 92:2,16 93:13,15 99:8,15 100:7 105:10 106:22 110:13 111:22 113:3,21,22 114:7 120:14 124:14,18 131:12 131:16 143:5 145:23 146:1,19 156:5,16,20
**meaning** 13:11,13
**means** 8:3 10:13 44:21 59:12 130:19
**meant** 116:14 135:5
**measured** 50:2
**medical** 102:24 103:8,13 121:13 127:18 150:17
**medication** 124:25 125:4 126:17,24 127:3,4,10,22,24
**medications** 125:7 125:9,14 126:2 128:11
**meet** 9:2,4 26:2 88:22,23
**meeting** 12:19,19 25:25 28:7,8,11 28:12,14,15,19 28:20,23,24 29:6

29:15,20,25 30:9 30:16,17,25 31:4 31:5,8,11,12,15 31:16 32:2,3,15 33:19 38:20,23 38:25 39:2,4 40:3 41:19 42:20 61:11 78:22 96:9 96:10,13 98:13 99:2 100:23 101:20 106:19 108:10,14,23 110:18 111:15 116:25 117:6 118:9 120:3,8 121:5 122:1 123:10 144:4 155:9,10
**meetings** 26:18,22 27:6,20 28:4 29:10 30:3,24 38:11 39:5 42:20 44:10 67:20 70:13 86:24 91:24 101:13,17 101:21 108:12,16 109:5,8,18,24,25 110:2,4,6 112:5 112:10 152:8 156:17
**meets** 88:24
**member** 61:12 68:22 69:1,4,5 78:18 85:8 100:5
**members** 31:13 35:24 36:5 39:19 39:21 52:13,20 67:24 68:8 71:14 75:18 78:5 99:10 149:18
**memorialized** 110:25
**memory** 29:22
**mentioned** 36:17 66:23,24 78:12 78:21
**met** 5:7
**method** 159:11 160:8
**metric** 52:6,8,12
**Michael** 1:7 5:14 5:16 34:14 38:5 101:1 105:5 116:8,21 144:11 145:5 152:6,19
**middle** 16:10 93:17
**mile** 73:14
**million** 85:6
**millions** 85:6
**mine** 47:3 79:24
**mini** 72:14
**minus** 102:8
**minute** 21:20 38:15 144:9 147:19 148:7,14 148:17
**minutes** 43:15,16 43:20,22,23 78:16 147:23 148:18
**mis-** 145:23
**mischaracterizes** 139:22
**misdemeanor** 145:24
**misdemeanors** 101:2 107:12
**missed** 62:16
**mission** 59:21,24
**misstating** 100:13
**mistaken** 34:22 35:15 131:17
**moment** 10:19 20:16 26:24 101:3 104:4,19 105:14 107:1,11 123:12 135:16 144:2 146:2
**money** 36:13,13 129:25 130:1 131:21,22
**months** 34:19
**Monticello** 66:3
**Montpelier** 66:2
**mortgages** 19:17 19:19,24
**mother** 67:11 68:10 69:6,14,16
**mother-in-law** 81:1 141:24
**motion** 11:20 134:10,23 137:1 138:2
**motor** 18:23,25
**moved** 128:8
**multiple** 6:15 33:18 91:24
**museum** 57:11

**N**

**N** 2:1 3:1 4:1
**naive** 100:2
**name** 5:7 16:5,6,7 16:10,14,14,21 17:22 18:18,21 19:3,9,13,20,25 20:8,13,14 36:22 41:3,3,5,6,10 46:20 48:23 62:7 62:22 63:5 86:23 87:1 89:7 100:24 107:14 115:7 120:4,22,22 127:11,12,12 128:2
**named** 16:23 46:3
**names** 16:24 39:18 40:25 41:2,13 63:5 159:16
**NANNETTE** 1:6
**narrative** 65:19
**Natalie** 68:11,12 68:15,17,25
**nature** 86:10
**nearby** 72:3
**nearing** 136:15
**necessarily** 51:19 52:3,17 149:16
**necessary** 10:17 101:14,14 159:8
**neck** 16:5
**need** 7:17,24 9:19 10:1 65:7 68:6 70:6 96:11 103:2 146:24 147:2,4 147:20 157:8 158:3
**needed** 109:1 111:10
**needs** 125:12
**network** 73:24 74:14
**never** 15:25 45:18 77:13 99:5,8,17 100:24 148:9 155:13,14,15 156:12 157:12,25
**new** 1:16 3:5,15 88:20 127:4 140:15,17
**new-found** 123:7
**Nicholls** 20:24 21:7 21:7
**night** 40:1 45:4 105:16 117:16
**Noble** 55:9
**nodding** 5:24
**non-** 71:24
**non-family** 69:3,5
**non-open** 112:9
**non-profit** 59:24 64:14 78:15
**notes** 86:9,17
**notice** 4:8 28:7,11 28:22 29:5,19 135:25
**noticed** 42:21
**notification** 29:15
**November** 28:16 28:19 30:15 31:2 31:12,16 32:3 33:19 38:21 40:3 96:10 108:9 109:6,18 117:25 118:9 119:8 120:2,7 121:4 122:7,11,18
123:9 124:5,12 124:24 155:8,9
**number** 17:13 33:22 39:8 87:21 88:8,10 90:14 99:20 102:13 109:9,10

**O**

**O** 4:1 159:1
**Oak** 74:25
**oath** 4:24 8:1 91:1
**object** 9:9 23:8 27:10 44:16 46:11 81:9 83:20 93:25 111:2 112:18 113:16 114:1 115:18 117:8 139:21 151:1,21 152:10 152:23
**objected** 81:16
**objecting** 45:10
**objection** 9:14 24:1 27:22 83:1 98:14,15 102:18 111:17,23 121:9
**objections** 4:13,18 81:20
**obtain** 22:5,9
**obtained** 22:19
**obtaining** 21:15
**occasions** 110:17
**occur** 109:25
**occurred** 118:1
**occurrence** 108:6
**offered** 71:3
**offhand** 39:8 87:19 88:10
**office** 1:14 25:8 52:2 88:11,19 90:23 98:7,7 120:11 140:24
**officer** 159:5 160:5
**officers** 38:11 116:16
**official** 18:17 52:15

58:25 59:11 82:11 105:6
**officiated** 4:24
**Oh** 105:12 120:4 144:22
**okay** 6:9,22,23 7:2 7:4,9,12,20 8:15 8:23,25 9:4,15 10:3,5,24 11:3 14:25 17:24 18:14 19:11,22 20:6,11 22:14,17 23:20 24:24 25:19 26:5,15 27:3,16 28:1,18 29:2,18 31:7 33:18 35:11,19 37:6 38:20 41:25 42:9,18 43:1,4,11 44:9,24 45:20 46:7,23 47:4,10 48:15,20 49:10 49:21 50:13,15 53:2,10 54:9 55:10 58:8 59:3,8 59:8,15,19 60:22 61:14 62:3,10,16 63:9,21 64:3,12 65:1 66:23 67:4 67:12 69:3,6,24 70:22 75:8 76:7 76:10,19 77:5,16 77:23 78:21 79:11,13,21 80:6 80:12 81:6,18 82:5 83:7,14,25 84:10,15 86:6,14 86:20 87:16 88:7 88:12,25 89:2,13 90:11,17,22,24 91:5,10,16 92:19 94:6 95:4,12,20 95:22 96:8 97:22 98:21 99:2 100:10 102:4 103:21 107:8 108:8 109:22 110:3,16 111:21 112:9 116:8,19 118:8 119:11 120:6,23 122:5 123:23 127:11 128:1,24 129:7 129:24 130:3,7 131:9 132:20 133:2 134:4,18 135:14 136:18 137:5,24 138:17 140:21 141:5,12 142:2,8,14 143:9 143:24 144:2,7 144:12,13 145:12 145:16 146:5,12 147:13 149:3 150:16 151:12 152:1,15 153:3 153:19 154:4 155:3,6
**old** 144:18
**onboarding** 62:19
**once** 7:17 11:15 102:17 121:7,25 122:7,8,9 135:25
**ones** 25:7
**ongoing** 103:9,9 106:22
**online** 31:10 85:21 95:15,17 96:3
**open** 26:18,22 27:6 27:20 28:4 29:10 30:3 31:23 42:19 44:9 70:10 72:6 73:6 75:10,22 76:9,11,17,18 77:10,20 152:7
**opened** 31:20 71:6 75:11
**Opening** 28:24
**operate** 75:9
**operated** 70:12 71:15 75:10
**operating** 70:1,3 70:10 75:5
**operational** 70:15
**operations** 61:16 61:24 62:6,13 70:16 78:17
**opinion** 53:3 84:4 115:3 132:8
**opinions** 160:15
**opportunity** 32:1,4 32:8 49:23
**oppose** 149:20
**opposed** 5:23 6:16 8:20 20:13 35:25 148:23 149:8
**opposition** 150:9 150:14
**order** 5:18 130:19 138:3
**orders** 14:23 76:15
**ordinance** 42:10
**organization** 48:9 59:16 60:13 68:4 78:2,3 88:12
**organizational** 21:3
**organizations** 78:17 88:13
**organized** 58:1
**original** 25:16 127:23 128:2 160:2,3
**originally** 65:3 71:17 127:6
**Orleans** 1:16 3:5 3:15 88:20
**outcome** 98:24 99:4 160:18
**outside** 154:22
**outskirts** 73:4
**overlapped** 58:7
**overwhelming** 50:11
**owned** 71:14 76:23 76:24 77:2 80:25 141:23
**owner** 69:21
**ownership** 70:19
**owns** 76:20 85:21

**P**

**P** 3:1,1 4:1 159:1,1
**P-E-D-R-O-S-O** 68:14
**page** 90:9,11 102:12 130:9 160:3
**pages** 160:8
**paid** 61:25 62:2 63:19,22,24 69:7 98:17
**Pam** 14:15 15:14 80:7,8 85:14
**pamphlet** 98:10
**pamphlets** 96:14 97:23 98:1
**paper** 21:16 59:1
**paperwork** 92:12
**paragraph** 80:20
**paraphrasing** 98:22
**parents** 52:1 104:5 105:16
**parish** 5:14,16 12:15 14:1,2,3 15:4 25:25 27:4,5 28:22 29:4 30:23 30:24 31:13,16 38:23 39:1 40:11 40:19 48:24 52:12,14,20 71:13 78:4,25 80:4,23 83:16,16 85:11 88:16 90:6 92:15 97:3,9 98:18 99:23 105:1,7 108:10 109:7 110:18 115:16,24 116:20 118:1 120:2,7 123:10 128:24 129:21 144:3 148:23 149:9,21 149:25 152:7,20 155:17 156:25
**Parishes** 71:11
**part** 4:16 39:13,14 39:15 51:16 67:21 68:5 72:2 75:19 89:9 90:6 97:6 99:11 139:9 148:21
**part-time** 58:3
**particular** 5:12 14:7,11 20:7,12 21:16 22:20,23 31:11,15 32:2,15 41:14 49:19 59:25 60:4 150:12,13
**particularities** 85:19
**particularly** 36:7 104:5
**parties** 160:16
**parting** 53:24
**pass** 96:14
**passed** 99:22
**passing** 42:10
**passport** 17:21
**pause** 70:3 96:11 100:6 134:12 144:8
**pauses** 159:9
**pay** 149:21
**paying** 23:5,6 77:1 148:23 149:9
**Pedroso** 68:11,13 68:15,25
**peel** 50:25
**penalties** 8:2
**penalty** 8:5 91:3 152:17
**people** 11:23 33:14 33:18 36:16 37:21 40:8,20 50:23 51:22,23 51:25 60:8 70:13 72:17,24 73:1 74:16 75:2,14 76:13 82:13 106:9,11 131:2 141:14 156:8
**perceive** 131:21

**Perilloux** 149:19
**period** 32:15 33:20 33:23 42:1 43:8 57:22 109:20
**perjury** 8:5 91:3
**permanent** 56:16
**permission** 18:1
**permits** 14:20 62:15
**permitted** 34:6,12
**person** 13:16 33:10 33:12 34:15 40:14 105:25 141:1 143:11 144:23
**personal** 13:15 17:13 125:9,10 125:11 128:23 160:9
**personally** 15:21 38:22 115:14
**persons** 32:13 36:18 39:12 40:5
**peruses** 79:11
**pessimistic** 99:3,6 99:18
**petition** 45:12
**Ph.D** 1:3
**PhD** 21:2,12,15 45:13 46:5,20,25 51:16 55:6,9 56:18,20
**phone** 30:20 75:25 87:21 88:10 90:14,18,19,20 90:21
**phonetic** 149:19
**phonetically** 159:19
**phrase** 159:18
**phrases** 159:14
**physical** 60:16,18 73:8,9 76:19 88:7 88:9 100:21 117:13,13
**physically** 105:22 108:1
**physician** 126:18 126:20,22,24 127:2,9
**pitched** 71:18
**place** 32:7 43:18 49:4,25
**placed** 44:1
**plaintiff** 3:2 13:11 13:14 46:3
**plaintiffs** 13:24 14:6
**Planation** 74:4
**planned** 67:21
**planner** 86:1,22 87:4 89:24 90:13
**planning** 12:17,18 14:2 97:4 106:19 137:13
**plantation** 54:23 54:25 55:10,14 56:8,11,23,25 57:3,7,17 60:9 64:9,11 73:1,13 73:16,17,18,21 73:22,24 74:2,8 75:4 128:17,19
**plantations** 60:9 65:20 74:10
**play** 67:16 144:3
**PLAYING** 145:3 145:17 146:10
**pleadings** 15:2
**please** 6:3 7:19 16:4 20:19 27:7 27:18 75:22
**plus** 68:1 86:4
**PM** 1:18 158:8
**podium** 147:18,21 147:22 148:14,15 148:17,20
**point** 37:11 48:21 55:5 58:2 74:21 107:25 109:16 131:10 145:10 146:23
**police** 38:10 116:16
**popping** 156:23
**portion** 35:10
**position** 34:20 49:24 63:17,19 63:21,22,24 112:11 147:15
**positions** 62:1,1,2
**possess** 17:2 52:24
**possible** 123:13
**possibly** 135:6
**post** 28:22 29:14 29:19 122:7,11
**post-** 120:19
**posted** 28:8,11
**posterboard** 96:17 96:22 97:17,18
**posting** 29:5
**potential** 11:22
**Poydras** 1:15 3:14
**practitioner** 127:8
**precise** 40:16
**preexisting** 24:19
**prefer** 70:17
**preferable** 8:20
**preparation** 25:1 25:22 26:3
**prepared** 40:20 160:8,10
**prescribed** 126:19 126:24 127:5,6,8 127:23
**prescribes** 127:7 127:10
**present** 3:19 17:5 31:13 97:13
**presentation** 99:3 156:15
**presented** 22:1
**preservation** 64:17 64:18 65:22 78:10
**preserve** 138:16
**president** 5:14,16 14:4 27:5 45:6 78:25 80:4,23 83:17 85:11 105:1,6,8 115:16 115:24 116:20 139:10
**pretty** 42:17 76:16 91:12 124:15 140:22,24
**previous** 39:5 69:19
**previously** 21:25
**price** 85:5 139:18 143:14
**pricing** 143:4
**primarily** 60:11 75:24
**primary** 35:4 64:3 64:12 119:24
**prior** 12:17 80:15 86:3 128:10 139:23
**prison** 35:2 37:24 37:25 38:1,4,19 101:9
**private** 9:2
**privileged** 23:9 85:15
**probably** 6:20 37:15 39:9 98:23 99:14 110:15 122:13 132:10
**problem** 43:10 49:20 142:17
**problems** 118:15
**Procedure** 4:7,20 160:14
**proceeding** 159:8 159:12
**proceedings** 47:1 90:25 132:6,13
**process** 60:20,22
**produced** 98:4
**profession** 69:14
**professional** 22:20 103:17 123:14,18 123:24 124:7 150:17
**professionally** 98:5
**professionals** 127:19
**professor** 47:13 53:5,7,8
**professorship** 53:16
**profit** 71:25
**profitable** 71:16
**prohibition** 155:18 160:12
**Project** 13:18,25 15:3,10 58:1,4,9 58:11 59:22,23 61:4 63:25 64:4 65:3 66:17 67:17 67:23 68:9 69:9 71:17,24 87:11 87:14 128:14
**projects** 62:14
**pronouns** 93:8
**proper** 159:11
**properly** 42:21
**properties** 139:5 139:12,19
**property** 11:20,21 12:15 13:19 80:25 85:22 91:6 92:16 94:7 139:4 141:22,22 142:11 142:25 143:2
**protective** 138:3
**proud** 49:11,11
**prove** 71:10 72:1
**provide** 22:6
**providing** 72:5,5
**proximity** 73:12
**public** 6:20 31:17 31:19,22,23,23 31:25 32:4,9,10 32:14 33:1,20 34:11,22 35:15 35:25 41:25 43:7 43:12,13,14 78:22 85:22 95:15 109:19 140:4,5 154:8 155:11
**publicly** 39:6,7
**published** 28:11

29:25 30:7
**pull** 112:7
**purpose** 33:13 70:11 156:2
**purposes** 79:6
**pursuant** 4:8
**pursue** 77:10
**pursuing** 56:17
**put** 48:22 59:1 71:19 77:22 125:25 136:16 144:16
**putting** 68:3

**Q**

**qualification** 87:5
**qualifications** 84:16,20,24
**qualified** 33:8
**qualities** 52:18
**question** 6:4,17 7:12 8:10,13,19 9:12,13 28:15 29:2,13 32:18 35:12 40:1,2 50:22,23 52:4 76:23 92:3,20,24 93:1,14,19,23 94:4,10 95:11 97:2 98:2,13 102:14 111:8 112:24 119:20 139:8 142:2,18 142:19,21 151:2
**questioning** 132:23 133:21 134:24 137:14,19 138:12
**questions** 4:14 6:16 7:17,19 51:14 58:21 122:21 123:3 135:10,15,21 153:4,17
**quickly** 31:20
**Quigley** 14:15 15:15 80:10
**quite** 35:6 127:22 135:7
**quorum** 31:13 43:2,3

**R**

**R** 3:1 159:1,1 160:1
**R'** 159:1
**R.S** 160:7
**race** 129:20
**racial** 48:4 60:2
**ran** 49:12 128:24
**rate** 108:14,17,18 109:24 111:14 112:6
**reach** 87:18
**reacted** 114:16
**reaction** 100:21 116:7
**read** 4:12 10:23 116:8 157:10,14
**reading** 4:9 10:12 35:1 152:17
**ready** 144:25 145:2
**real** 38:17 84:17,20 155:17
**realize** 108:12
**realized** 66:16 108:20,22 109:15
**really** 25:23 30:4 52:5 55:21 72:10 72:20 93:18 109:14 111:6 124:21 132:5,12 134:24
**reason** 7:16 9:19 10:1 23:17 28:21 29:3,7,18,21,24 35:14 51:13 53:24 54:12 56:15 65:7 66:22 96:11 112:14 119:1
**recall** 32:16 43:21
**receive** 21:10,13
64:15
**received** 20:23 21:2 31:7 55:8 102:7
**reciting** 115:15
**recollection** 141:21
**reconcile** 51:1
**reconfigured** 76:14
**record** 6:8 8:16 9:1 9:15 15:17 17:11 24:14 67:1 85:22 90:3 95:15 112:1 122:6 128:15 131:9,14 133:11 133:15,16 140:6 153:15,21,22,24 154:2,4 155:7 157:3,5
**recording** 25:24 144:17
**records** 95:11 110:24 121:7,10 121:14,17
**recovery** 23:24
**reference** 34:25 159:17
**referencing** 25:6 36:4,5,17 80:9 137:17
**referral** 73:23 74:1
**reflect** 17:11
**reflected** 143:21
**reflects** 131:15
**refreshments** 72:6
**refund** 131:6
**regard** 23:4 27:3 28:14,18 30:4,22 56:11 83:14 86:25 102:23 109:22 112:9
**regarding** 11:19 12:14 13:19 34:22 35:20 42:2 42:19 113:5 122:1 137:19
**regional** 63:3
**registered** 18:25
19:3
**registrations** 19:24
**regular** 125:5,14 125:25 126:2
**regularly** 101:24 120:18
**rejected** 49:24 51:9 71:21
**relate** 117:24
**related** 48:5 119:6 121:1 132:4 160:16
**relates** 100:20 122:17
**relation** 62:8 67:14 118:21
**relationship** 67:9 73:20
**relationships** 24:19 160:13
**relative** 29:4 123:7 151:18 152:17
**release** 22:8,10,13 121:13
**relevant** 43:15 46:8,25 91:19 115:10 135:22 154:19
**reliving** 104:3 107:2
**relocating** 60:23
**remember** 11:18 12:12 14:24 25:23 26:7,12 29:12,17 30:2,8 30:14 33:22 39:20,22 41:16 41:23 42:6,7,13 42:25 44:2 55:1 55:22 75:11 85:12 86:4 90:24 124:9 127:6 128:1,3 129:11 129:12,13 149:22 149:24
**remind** 155:23,24 156:1
**reminding** 90:25
**rent** 77:1
**reopen** 75:13 76:7 153:6
**repeatedly** 39:10
**report** 2:18 57:9 129:20 130:3 137:21 138:7
**reported** 1:22 57:10,12 160:8
**reporter** 1:24 4:23 6:1 10:21 157:6 157:13 158:1 159:4,24 160:4 160:23
**Reporter's** 159:12
**reports** 129:24
**representation** 65:18
**representative** 105:7
**represented** 14:10 14:17,18,19,21 14:22
**Representing** 3:2 3:10
**request** 44:6 80:13
**required** 160:3,11
**requires** 28:7,10
**research** 21:23 85:9,13,24 86:3,8 86:8 94:13,14,15 94:16 139:15,16 140:3,10 141:21 142:11,15 143:6 143:19,21
**researched** 86:5
**Reserve** 55:4,24
**reserved** 4:15
**reserves** 4:11
**resident** 13:17 36:24 47:18
**residential** 13:20 85:2 91:17,22 92:9 93:2 143:3
**respond** 6:9
**response** 2:17

15:24 22:4 25:4,5 69:19 102:9,17 119:16,19,21
**responses** 25:10,20 39:25 84:11 95:9 100:10 119:10 120:16
**restraining** 14:23
**restroom** 10:2
**result** 100:12,22 102:15 103:6 117:5,22
**results** 100:20
**resume** 133:18 137:5,7,9,11,15 147:11
**retained** 23:1 24:3
**rethink** 100:6
**retire** 69:15
**retired** 69:12,13,16 69:17
**return** 130:13,19
**returned** 108:10 108:11 130:24 131:21,23
**returns** 19:15
**review** 10:14 20:11 25:17,24 26:25 140:23 157:20
**reviewed** 25:2,14 25:18,21 26:5,6 46:19 80:15
**reviewing** 26:15
**rewatching** 155:19
**rewind** 144:8
**rezone** 92:8
**rezoned** 139:4,5
**rezoning** 80:24 83:18 84:3 91:7 91:25 92:23 93:21 94:11 106:21 139:10 143:17
**right** 4:12 10:11,22 23:14 27:14 40:16 44:22 49:17 52:1 54:24 60:18 68:7 73:2,3 82:12 90:15,16 92:18 96:6 125:13 130:17 138:23 140:9 141:20 144:14 146:14 150:7 151:11
**rights** 14:16 15:14 35:9 44:11,19,21 45:3,8 80:8 104:13,14 106:14 112:12,15 151:19 152:21
**river** 71:10 74:12
**ROBY** 1:8
**rodeo** 136:9
**Rogers** 57:15
**role** 52:22 67:16 128:13
**roles** 52:16,24 59:1
**room** 9:3,4 18:15 147:10
**Rouge** 88:19
**roughly** 81:2
**rule** 134:11 136:1 136:3
**rules** 4:7,19 5:19 160:11,14
**run** 38:11 48:23 52:2
**rush** 158:5

**S**

**S** 3:1 4:1 159:1
**safe** 66:12
**sake** 6:7
**sales** 94:8,21 95:2
**Samuel** 90:6
**Saturday** 124:17
**save** 4:13
**savings** 19:12
**saw** 96:24 115:10
**saying** 6:19 32:8 47:7 52:4,19 58:22 73:24 74:1 98:22 105:2,8 111:11 126:23 132:18,22 137:6 149:12,20 151:9 155:5,6
**says** 107:13,14 147:25
**Schnyder** 42:16
**school** 6:20 20:18 20:20 55:4
**science** 20:23 54:21
**scratch** 124:2
**se** 56:16 77:19 118:5 120:17 131:1
**seal** 160:3
**sealing** 4:10
**seat** 156:23
**second** 12:9,11 13:2 35:19 121:17 136:17 147:6
**seconds** 148:7,14 148:17,18
**secretary** 65:2 67:8
**section** 130:8
**see** 18:11 40:25 64:24,24 74:10 74:18 82:5 85:21 85:23 94:20 96:4 104:10,10,11,15 111:13 112:1 120:24 121:6 122:12,14 123:6 140:3,20 143:14 143:23 144:17 146:9 147:20
**seeing** 104:9,16,16 104:17 105:16 120:19 121:10
**seek** 103:8,12,16 123:13,18 150:16
**seeking** 124:2 150:22 151:5,12
**seen** 116:25 120:1 120:6,8 121:25 122:6,10 157:25
**segment** 144:3
**self-proclaimed** 49:22
**sell** 74:2
**selling** 72:10 139:18
**sells** 85:23
**send** 98:5
**sensitive** 8:25
**sent** 25:8,8
**sentence** 101:1
**separate** 7:18
**serious** 101:4 104:22,23 118:24
**seriously** 38:9 105:9 116:18
**services** 71:2,4
**session** 34:1,7,12 34:16,24 35:7,17
**set** 160:7
**Sexton** 98:15 148:24 149:9,21 150:1
**shaking** 5:23
**Shandrell** 149:19
**share** 20:17 87:20 119:16 122:15,23 123:5
**Shell** 69:18
**shop** 56:10
**shoulders** 5:25
**show** 74:21 96:19 102:6 129:15
**showing** 94:9
**shows** 24:14 130:13 139:2,16
**shut** 105:2 106:7 114:11 116:2 154:23
**sign** 4:12 10:23 12:16 22:8,10,13 46:16 83:18 121:12 157:10,14 157:21
**signature** 160:3
**signed** 80:24 84:3 84:6,8 139:11
**significance** 50:20
**signing** 4:10 10:12 36:10
**signs** 74:16,18
**similar** 97:8,11
**simply** 11:15 45:25 46:3 50:1 68:20 115:3 131:14
**single** 6:2
**singled** 107:4
**sister** 36:6,17 39:6 39:7,11,23 41:11 58:14 59:10 61:2 62:4 65:16 66:13 66:25 67:2,2,3 68:10 70:21 71:11 76:25 77:3 77:6,24
**sister's** 41:3,4,6 63:21
**sit** 34:19 35:13 41:12 103:4,18
**site** 12:17 77:21 85:25
**sites** 65:23
**sitting** 38:13 108:13,18 111:14
**situation** 85:4 118:13
**six** 42:9
**slated** 35:17
**slavery** 48:6 60:1
**slight** 97:9,12
**slow** 6:23 7:3
**smart** 86:6,10 141:1,5,6,8,10,13 141:15,16 143:11
**smoothies** 72:9
**Snowdy** 12:5,21,24
**social** 60:2 64:17 124:22
**sold** 94:24
**somebody** 82:10 104:12 146:17 156:10
**someone's** 87:25
**somewhat** 28:5

**soon** 57:4
**sorry** 5:15 28:19 36:23 63:7 71:7 82:6 134:2 142:3 145:21 146:24
**sort** 75:1 135:5
**sotto** 147:9
**sought** 4:16 102:24 123:24
**sound** 146:14
**sounds** 118:23
**sources** 64:3,12
**space** 9:2 64:17 65:17 71:8,14,25 72:2 75:16 76:13 76:19
**speak** 8:17 32:17 32:19,20,21,23 32:25 33:6,11,24 34:4 35:20 36:2 36:19 37:1,2,3,5 37:7,20,21,22 38:2 39:13 40:6 40:22 41:14,15 41:18,21 44:8,20 44:22,23 48:7,11 48:12,13,13,14 48:14 61:11 66:21 86:24 105:3,25 106:6 106:11 114:12 148:10,20 149:23 150:5 152:4,4,16 152:16 154:10,11 154:14,15,25 155:18 156:7
**speaker** 33:7
**speaking** 33:9,13 40:6 45:11 66:7 76:4 105:19 144:6 148:7,9 150:12 156:10
**Spears** 1:15,15 2:9 3:12,13,13 5:5,7 6:12 7:1,7,15,23 8:9 9:7,18 10:8 11:2,4 17:10,16 17:25 18:6,10,16 19:16 23:11,19 23:21 24:2,16,23 24:25 27:15,17 27:25 28:2 44:18 46:18 79:3,12,14 81:12,17,24 83:6 83:24 94:5 95:5 95:16,21,25 96:7 100:16,18 102:5 102:11 111:9,20 112:25 113:20 114:5,8 115:22 117:23 121:23 129:14,18 132:2 132:7,14,19,24 133:3,8,17,22 134:3,14,19 135:8,13,23 136:5,14,21 137:4,10,16,23 138:4,14,22,24 140:7 141:6 144:15,22,24 145:11,20 146:8 146:11,21 147:1 147:7,14 149:6 151:4,25 152:2 152:14 153:2,14 153:20 154:3 155:2 157:1,11 157:18,24 158:4
**specific** 15:6 42:19 82:18,23 87:5 94:14 98:14 113:11 115:6 143:14 144:1 158:2
**specifically** 9:11 35:2 36:4 65:24 100:19 116:9
**speculation** 111:3
**speech** 112:11 148:22 156:6,6 156:11
**Spees** 14:15 15:14 80:7
**spell** 16:8 41:7 68:13
**spelled** 69:24 159:19
**spelling** 62:10,23
**spend** 70:6 109:1
**spent** 117:17 130:1
**spoke** 32:14 33:15 33:18 35:25 37:4 37:12 41:24 149:19,24 150:2 150:8,8,11
**spoken** 39:6,7,10 39:10 109:19 118:5 121:19
**spontaneous** 159:7
**St** 3:4 5:13 12:14 13:25 14:1,2 15:3 15:11 27:4 30:22 40:11,19 47:16 48:23 49:14 52:13,20 53:9,17 53:18,19,25 56:21,24 71:12 77:25 78:4 129:21 152:6,20 156:24
**staff** 63:10 70:8
**Stakeholders** 78:1
**stand** 31:21,24 47:25
**standing** 48:1 105:1 106:9 145:7 149:13
**standpoint** 48:9
**stands** 104:13
**start** 5:18 57:16 68:4 88:3
**started** 33:3 57:18 57:25 63:4 90:24 146:14 148:6,8
**starting** 20:18 146:23
**starts** 47:22 145:9 145:24
**state** 1:25 4:23 21:8 65:2 88:16 145:15 159:4,6 160:4,24
**stated** 81:20
**statement** 34:22 35:15 54:7 59:21 77:12 92:4,11 103:4 119:17 123:23 150:4,7
**statements** 91:1
**States** 1:1 151:17
**stating** 114:22 115:3 150:14,15
**status** 46:8
**statute** 116:9 152:17 156:13 160:11
**statutes** 156:20
**stay** 101:13
**Stephanie** 41:17 61:9,10 62:4
**stepped** 35:9
**stickers** 18:12
**stipulated** 4:3
**stood** 45:9 114:16
**stop** 11:21 73:25 105:21 109:11 145:21 155:23
**stopping** 106:25
**storage** 22:11
**story** 72:23
**straight** 54:23
**strain** 101:19
**Street** 1:15 3:14 60:19,21,25
**streets** 72:13
**stress** 101:10,18 102:19,23 103:5 106:23 108:4 117:4 119:6,9,12 119:13,15,19,21 120:16 121:1 122:18 123:2,4,8 150:18,24 151:7 151:10
**stressed** 35:5
**stretch** 10:3
**striking** 29:22
**student** 55:7
**studies** 21:2 51:3,6 51:17
**stuff** 89:10 106:10
**styled** 22:24 45:13 151:14
**subject** 8:1,4 21:18 28:20 33:25 78:23 82:2 91:3 103:7
**submitted** 25:7,11
**subpoena** 153:6
**subsequent** 40:4 109:7,17,25
**subset** 66:19
**substitute** 55:2 56:3,4
**sued** 5:11 13:13
**suffering** 100:14
**sugarcane** 94:22
**suggesting** 47:8 138:10
**suggestion** 47:2
**suggests** 46:7,23
**suing** 13:12,23
**Suite** 1:16 3:5,14
**supervision** 160:9
**supplement** 95:9
**supposed** 156:11
**sure** 5:20 7:10 10:14 18:5 20:20 22:16 26:11 27:1 42:16,17,24 55:17,21,21 57:20 59:23 63:7 86:7 89:9,15 91:2 91:4 95:14 97:2 98:2,8,12 100:13 114:6 118:3,6 120:17 121:6 123:15 131:13,16 135:7 143:19 148:1 149:6 152:13
**surely** 124:15
**surrounding** 65:20 116:13

**suspect** 119:1
**sustained** 102:19 117:4
**switch** 54:4
**sworn** 5:3 8:4 159:5 160:6
**symptomatic** 122:16
**symptoms** 103:24 109:14
**sync** 5:20
**systems** 48:5

**T**

**T** 4:1,1 159:1 160:1,1
**table** 146:18
**take** 6:2 9:20 10:4 17:8 20:16 26:24 43:18 76:14 79:8 86:9 87:16 100:5 101:10 104:21 105:15 125:4,15 125:15,19 126:2 129:17 138:16 144:2 147:2,3,8
**taken** 1:17 4:6 7:25 10:15 44:5 70:4 105:12,13 124:24 159:6 160:5
**talk** 6:13,14 11:17 12:9 15:7 31:2 33:3 37:9 40:18 72:21 122:3 125:8
**talked** 37:8 72:16 146:13
**talking** 40:12,13 89:15 115:5 146:19,20
**talkovers** 159:10
**tallied** 49:2
**tapered** 109:12
**tax** 140:24
**taxing** 140:25
**taxpayer** 36:13 98:20
**teacher** 55:2,2,3 56:4,6
**teaching** 56:3
**team** 14:21
**telephone** 88:8
**tell** 11:11,25 12:6 16:4 17:20 23:13 26:6 27:7,18 39:5 41:4 53:10 59:20 74:10,11,11 85:20 91:9 97:7 100:19 103:14 109:6,17 117:12 127:7 132:15,20 132:25 133:4,4 134:15 135:18 143:1 144:7,9,25 151:11
**telling** 72:23 135:14 145:15 155:25
**tells** 9:11 24:9 104:2
**ten** 12:17 105:12 128:5
**term** 58:21 59:5,6 59:12 82:18 84:10,13
**terminated** 54:6 54:16 56:12
**terms** 14:19 35:8 40:13 58:17,22 58:23,25 85:24 113:5 151:9
**terrified** 101:4
**testified** 5:4 11:8 11:19,24 12:1,4 12:10,11,14,16 12:22 13:5 15:18
**testify** 12:20 160:7
**testimony** 11:6 89:22 108:8 139:23 159:5 160:5,8
**Texas** 53:14
**thank** 22:17 141:18 153:9
**therapists** 123:7
**therapy** 124:3,8
**thereof** 4:16
**thesis** 21:16
**thing** 6:2 35:3,5 40:14 89:16
**things** 9:21 33:24 48:7 51:18,20 78:9
**think** 5:8 6:18 8:13 8:14,22,25 13:5 22:3 26:11,20 28:25 30:3 33:9 37:12,16 41:13 42:8 46:15 47:9,9 49:14 50:1 54:25 57:20,21 58:18 58:19,21 74:14 78:20 82:19 83:7 83:8,9,10,11 84:1 85:16 92:2,25 98:16,19 100:11 104:22 107:12,13 110:5 111:7 112:23 119:9 122:20 123:20 128:7,14 129:23 134:23 136:11,15 140:22,23 142:17 146:6,17 149:2 149:11 150:10,10 151:8 153:24
**thinking** 99:14 101:5 120:16
**third** 130:12
**thought** 45:1 66:4 72:3 77:10 80:22 101:7 104:20,21 105:19 115:6 116:5,6 118:18 121:24 130:22 159:10
**thoughts** 114:24 156:8
**threat** 43:24 146:2
**threaten** 38:6
**threatened** 38:22 104:17 116:2 156:12
**threatening** 146:3 146:4
**threatens** 144:11
**three** 41:2 42:13 43:14,16,20,22 43:23 115:11
**throw** 105:8 106:14
**thrown** 37:24,25 38:1,3,18 106:18
**tickets** 74:2
**Tillotson** 53:11 54:10,17
**time** 4:15 5:9 6:17 11:17 12:9,11 13:1,2 18:15 33:23 40:15 44:1 44:4,4 55:18 57:22 58:6 59:1 66:1 68:7 70:6,8 75:3 76:1 106:4 106:18 107:25 109:1 123:25 124:10 127:22 131:7 147:8,20 153:9 155:8,13
**timely** 28:22 29:14 29:19
**times** 12:22 13:4 39:9 66:24,24 74:20 86:16 155:12 156:14
**timing** 29:1,11 30:4
**title** 13:22 46:14 56:7 57:6 58:23 59:4 61:23 65:12 68:21
**today** 13:9 15:8 17:6 20:8 22:14 34:19 35:13 41:12
**today's** 25:1,22 26:3
**told** 37:23,24 38:3 57:18 91:6 92:23 93:20
**topic** 21:19 113:1,4 115:4 135:21 153:8
**Torres** 42:15
**tourism** 54:15 60:5 65:15 66:11,18 71:8 75:16
**Tourist** 71:11,18
**tourists** 75:17
**track** 120:13
**Tract** 143:16,17
**trail** 72:18
**transactions** 19:23
**transcribed** 160:9
**transcript** 107:13 159:15 160:2,10 160:10
**transcription** 159:12
**treasurer** 67:12
**treasurer's** 77:21
**treated** 100:22 126:10,13 127:18
**treating** 126:16
**treatment** 102:25 103:8,13
**trial** 123:21 151:6 158:6
**tricky** 45:22
**tried** 32:25 38:2 75:10,11,12,22 76:7
**trigger** 101:22,23
**triggered** 35:1
**truly** 35:9
**trust** 27:2,2 141:5 141:7,12
**truth** 97:7
**try** 118:22 122:21
**trying** 50:19,21 82:22 92:19 109:12 123:3 137:5 142:2 148:20

**Tuesday** 124:16
**Tulane** 14:18
**turn** 102:12 104:15
**turned** 39:24
**twice** 11:16 108:15
**twin** 67:2,3
**two** 25:15 59:13,13 89:23 110:1,4,17 115:12
**type** 70:25 77:8

**U**

**U** 4:1
**uh** 6:1
**uh-** 5:25
**uh-huh** 5:25 16:13 18:9 21:6 31:3 41:7 55:19 57:1 61:22 62:25 68:18 89:18 92:5 92:7,21 95:1 96:18,21 107:18 109:21 110:8,21 112:3 116:1 119:4 130:11 137:3 138:21 139:13 142:9,23 144:5
**ultimate** 99:4
**ultimately** 36:15 42:1
**unchallenged** 43:24
**unclear** 6:18 7:8
**understand** 6:6 7:24 8:6 24:17 26:16 50:19,21 51:8 82:1,7,9 91:4 92:3 93:12 93:14 94:3 99:7 111:8 112:23 113:3 114:4,6 122:22 147:15,16
**understanding** 32:13 48:20 49:1 103:1 110:22,24
**understood** 24:22
65:13 154:16
**unethical** 81:4 82:8,20
**uninterrupted** 43:17,23 148:10
**Union** 69:16
**United** 1:1 151:16
**universities** 115:13
**university** 21:8 47:13 53:6,9,9,13 53:15,17,19 54:5
**unpack** 86:19 93:1 93:18 126:21
**unpacking** 123:11
**up-zoning** 84:12
**uplift** 65:24
**upsetting** 104:5 146:25
**upzoning** 139:11
**urban** 86:1,22 87:4 89:24 90:13
**use** 10:2 45:15 46:14,19,24 58:23 59:12 82:18 149:21
**usually** 30:18,19 45:16 124:21

**V**

**V-E-R-D-** 62:10
**V-O-N-N-E** 63:8
**Vacherie** 5:2 17:15 55:12
**vague** 52:5
**valid** 160:2
**valuation** 139:2,3 139:5 143:15
**valuations** 139:18
**value** 91:6 92:1,9 92:24 93:22 94:10,11 142:11
**valued** 143:16,17
**values** 94:8 142:25 143:2
**various** 22:9 64:15 67:20
**vehicle** 19:24
**vehicles** 18:23,25
**venlafaxine** 125:16 125:17,19 126:1
**verbal** 5:23
**verbalize** 32:25
**Verdell** 62:5,10,12
**Verdell's** 62:7
**verification** 102:9
**verified** 159:17
**verify** 111:11
**versa** 73:17
**versus** 1:5 13:25 15:3,11 22:25
**vice** 73:17
**video** 25:24 145:3 145:17 146:10
**view** 43:19 52:11
**viewpoint** 113:23 154:12
**violate** 81:7
**violated** 26:18 27:6 44:12,19 82:24 112:12,16 152:7 152:21
**violates** 83:11
**violating** 84:5 105:3 106:13,13 145:9,15 152:18
**violation** 27:8,19 151:14,16
**visit** 72:17 120:9
**visiting** 75:2
**visitor** 75:1
**visitors** 73:15
**voce** 147:9
**voice** 160:8
**volunteer** 67:19
**volunteered** 62:1
**volunteering** 75:7
**vote** 42:3,6,7 50:2 50:3,4,10,12 51:20,20,23,23 51:24 82:13 99:12,15,16,20 99:21 104:11
**voted** 99:20,21
**voters** 49:14,24
50:11 51:9
**votes** 14:23 42:9 42:13 49:2 51:21 51:22 52:3

**W**

**W** 1:8
**wait** 57:5 82:5 145:5
**waived** 4:11
**walk** 54:19 73:16 73:18 86:18
**walked** 72:25
**Wallace** 50:12,17 50:18 60:15,17 60:25 61:13 73:10 76:20 88:24
**walls** 72:15
**want** 5:18 7:10 10:22 50:7 63:4 75:19 79:9 80:1 80:19 95:17,18 96:1,2,4 100:12 120:14 123:5 125:8 128:15 129:16 130:7 131:12,13,14,17 131:19 133:25 134:11 135:16 136:6,16 138:7 138:11 140:10,11 140:14,15,16,17 140:18 142:6,6 144:2,6,7,8 145:6 145:21 147:11 148:1 149:4 153:13 154:1,6 154:12,13 155:3 155:24 156:1 157:15
**wanted** 32:19 33:24 35:20 36:18 40:5,21 54:1,14 71:10,25 87:16 96:19 97:23 115:9
154:15,15 155:1
**wanting** 54:4
**warning** 108:19 156:22
**wasn't** 26:9 28:25 29:12 43:13 44:3 44:7 56:14 129:2 129:8 130:25
**watch** 108:13,16 109:23 110:10,19 110:19,23 111:12 111:24 144:20 146:25
**water** 10:3
**way** 66:10,20 74:5 74:21 100:22 114:9,17 117:25 125:21,25 134:12 136:6 154:14
**ways** 53:25 96:22
**we'll** 9:1,3 71:22 95:10 102:6 111:21 129:15 157:10
**we're** 13:8,24 15:7 20:7 36:12 40:9 51:23 59:13 62:20 63:1 64:24 66:7 79:5 89:15 95:8 96:9 132:22 136:15,22 137:24 138:5,15 157:2,5 158:5
**we've** 39:10 62:16 66:24 70:13,14 74:3 116:15 140:8
**wear** 110:13,14
**wearing** 110:12,13 110:18
**website** 160:11
**Wednesday** 1:17
**weeds** 113:10
**week** 26:10,13,14
**well-known** 91:12
**went** 20:20,22,24 20:25 54:23 55:5

66:3 99:2 108:16 124:19 133:9
**weren't** 32:18 56:16 65:20 77:1
**West** 60:19,20,25 77:25 78:4,10
**white** 79:18,25
**Whitney** 56:22,25 57:2,6,17 64:9,10 64:11 72:3 73:13 73:16,21 74:2,3,7 74:11,15,16,19 74:23 75:4 128:17,19
**Whoa** 99:10
**William** 14:20 15:15 23:1,5 24:4 67:13 69:7
**willing** 22:8 121:12 131:3
**win** 51:19
**wish** 86:16
**wished** 152:4
**witness** 4:11,25 6:10,24 7:5,13,21 8:7 9:5,16 10:6 10:25 13:6 18:4 27:13,23 39:1 46:13 79:10 81:22 83:2,22 94:2 95:13,19,23 96:5 111:5,18 112:21 113:18 114:3 115:19 117:11 121:21 133:12 134:7 136:10 137:2 138:20 140:1 144:21 145:1,4 145:18 147:5,12 151:23 152:12,25 153:12,18,25 154:5 157:4
**woman** 67:19
**won** 50:12 104:11
**wondering** 118:20
**woods** 16:6
**word** 100:25 116:17
**words** 59:20 100:9 122:20 159:14,16
**work** 47:17 48:1 56:20 57:2 58:4 64:22,25 66:1,4 66:15 88:13,17 90:19,21 96:3,4 109:2 117:21 118:18 128:18 140:12,15,16,17 140:18 153:10
**worked** 54:22,25 55:8 56:21 74:23
**working** 65:16 66:20 71:12 75:4 75:6 130:4
**works** 80:9 87:11
**world** 52:11
**worrying** 109:2
**worse** 103:11,20 103:22
**worst** 156:19
**worth** 143:6
**wouldn't** 74:20
**Wright** 1:7 5:15,16 22:25 27:5 31:22 34:14,21 38:5 44:5 101:2 105:5 112:14 116:8,21 144:11 145:5 152:6,20 155:25
**write** 21:17
**writing** 160:8
**written** 2:17 90:5 102:10
**wrong** 8:22 34:21 35:14 83:7,8 101:8 105:19 131:1 132:9,10

**X**

**X** 2:1

**Y**

**Y-** 63:7
**yeah** 15:9 23:17 27:24 30:5 36:23 41:1 55:3 60:20 63:15 67:18 68:24 75:6 82:10 89:14 94:3 98:19 98:19 99:25 107:2 110:4 113:19 114:7 117:18,18 133:23 138:15 140:11 141:11 142:7,20 157:10,23
**year** 12:6 21:10,12 48:22 68:17,19 107:17 145:25
**years** 53:10,22 55:13,23 105:12 128:4,5,6,6,9
**yelling** 155:22
**Yep** 13:3
**yesterday** 26:8,9
**Yvonne** 63:7

**Z**

**zone** 93:17
**zoned** 85:7
**zoning** 12:15,18 13:20,21 14:2,5 14:17,22 36:9 70:6,7 83:15 86:25 87:12 91:19 97:4 106:6 106:19

**0**

**006781949** 17:14

**1**

**1** 2:4,15 143:16,17 148:7,17
**1,000** 129:4,6 130:24 131:24
**1,300** 130:13,19
**1:00** 1:18
**1:35** 146:14
**10** 130:9,10
**10,000** 143:16
**102** 2:17
**10s** 85:6
**12** 39:17
**129** 2:18
**13** 39:17
**135** 60:19,20
**1434** 160:14
**15** 128:6
**157** 5:2 17:14
**160** 2:22
**18** 2:15 73:10
**1825** 1:16 3:14
**19** 66:14

**2**

**2** 2:16 79:7
**2,300** 130:20 131:6
**20** 66:15
**20-** 28:18
**2000** 20:24
**2000-** 57:4 58:1
**2001** 20:25 21:11
**2002** 56:1
**2002-ish** 55:17
**2004** 21:1 56:1
**2008** 21:4,14 53:23
**201** 3:4
**2012** 53:12,23
**2015011** 159:25 160:25
**2016** 53:12 54:10 57:5,18,23
**2020** 58:2 59:16
**2022** 57:5,20,21,23
**2022-** 57:19
**2023** 12:8 13:1 28:16,19 31:2,12 31:16 32:3 33:19 38:21 40:3 108:9 109:7,19 117:25 118:9 119:8 120:2,7 121:4 122:7,11,19 123:9 124:5,12 124:24 155:9,9
**2024** 1:17 12:12 13:2
**21** 75:12
**22** 75:12
**23-CV-7296** 1:4
**24** 28:12 29:5
**24-hour** 125:22
**25,000** 143:18
**2500** 3:5
**28** 28:16,19 31:2 31:12,16 32:3 33:19 38:21 40:3 108:9 109:6,19 117:25 118:9 119:8 120:2,7 121:4 122:7,11 122:19 123:9 124:5,12,24 155:8
**28th** 96:10

**3**

**3** 2:5,17 102:7
**30** 136:1,4
**30(d)(3)** 134:11,23
**31** 1:17
**35** 148:7,14,17
**37:2554** 160:7

**4**

**4** 2:6,18 129:16
**4:05** 158:8
**45** 85:6

**5**

**5** 2:9 102:13
**50** 85:6
**501(c)(3)** 59:24 64:14
**504** 3:6,16
**51** 147:23 148:18
**51-second** 147:19
**533-4521** 3:6
**5593** 73:10
**593-9500** 3:16

**6**

**6** 102:13 147:18,23 148:17

**6/3** 42:8
**6:51** 146:13

**7**

**70090** 5:3
**70112** 1:16 3:15
**70170** 3:5
**79** 2:16

**8**

**80-year-old** 105:16
**8th** 56:5,6 60:19 60:20,25

**9**

**909** 1:15 3:14
**90s** 94:23
**96** 20:22
**9865** 3:5