UNITED STATES DISTRICT COURT

                  EASTERN DISTRICT OF LOUISIANA


JOY BANNER                              CIVIL ACTION

                                        NO. 23-CV-7296


VERSUS


MICHAEL WRIGHT, et al.




              DEPOSITION OF DARLA R. GAUDET,

given in the above-entitled cause, via Zoom

videoconferencing, pursuant to the following

stipulation, before Sandra P. DiFebbo, Certified

Shorthand Reporter, in and for the State of

Louisiana, on the 17th day of December 2024,

commencing at 2:05 PM.

```
 1    APPEARANCES (Via Zoom):

 2

 3             MOST & ASSOCIATES
              BY: WILLIAM MOST,
              ATTORNEY AT LAW
 4            201 St. Charles Avenue
              Suite 2500, #9685
 5            New Orleans,Louisiana  70170
              Representing the Plaintiff
 6

 7             SPEARS & SPEARS
              BY: IKE SPEARS,
 8            ATTORNEY AT LAW -and-
              ALEXANDRA CONLAY,
 9            ATTORNEY AT LAW
              909 Poydras Street
10            Suite 1825
              New Orleans, Louisiana  70112
11            Representing the Defendant

12

13             RICHARD J. TOMNEY, JR.,
              ATTORNEY AT LAW
              8550 United Plaza Blvd.
14            Baton Rouge, Louisiana  70802
              Representing Darla R. Gaudet
15

    Reported By:
16

17             Sandra P. DiFebbo
              Certified Shorthand Reporter
18            State of Louisiana

19

20     E X A M I N A T I O N        I N D E X

21                                  Page

22    BY MR. MOST:                   4, 120

23    BY MR. SPEARS:                 115

24

25
```

1              S T I P U L A T I O N

2

3              It is stipulated and agreed by and

4    between Counsel for the parties hereto that the

5    deposition of DARLA R. GAUDET is hereby being taken

6    via Zoom videoconferencing, pursuant to the Federal

7    Rules of Civil Procedure for all purposes in

8    accordance with law;

9              That the formalities of reading and

10   signing are specifically reserved;

11             That the formalities of sealing,

12   certification, and filing are hereby specifically

13   waived.

14             That all objections, save those as to

15   the form of the question and responsiveness of the

16   answer are hereby reserved until such time as this

17   deposition or any part thereof is used or sought to

18   be used in evidence.

19                    *  *  *  *  *

20             Sandra P. DiFebbo, Certified Shorthand

21   Reporter, in and for the State of Louisiana,

22   officiated in administering the oath to the witness

23   remotely.

24

25

```
 1                 DARLA R. GAUDET, 73 Holly Drive,
 2          Laplace, Louisiana 70068, having been first
 3          duly sworn, was examined and testified on her
 4          oath as follows:
 5    EXAMINATION BY MR. MOST:
 6          Q.    Good afternoon, Ms. Gaudet.  My name is
 7    William Most.  I'm an attorney for the plaintiff in
 8    the lawsuit Banner v. Wright.  How are you today?
 9          A.    I'm good.
10          Q.    Great. Could you give us your full name
11    for the record?
12          A.    Darla R. Gaudet.
13          Q.    And, Ms. Gaudet, have you ever given a
14    deposition before?
15          A.    Yes, I have.
16          Q.    Approximately how many?
17          A.    One.
18          Q.    In what case was that deposition in; if
19    you recall?
20          A.    That was a case that I had somebody suing
21    me.
22          Q.    Did it have anything to do with St. John
23    the Baptist Parish Government?
24          A.    It had nothing to do with that.
25          Q.    So since you have given a deposition
```

1  before, you understand that you're under oath here
2  today?
3       A.   Yes, I do.
4       Q.   That your answers here today have the
5  same force as if we were in a courtroom with a
6  judge and jury?
7       A.   Yes.
8       Q.   And is there anything, whether it is
9  illness or fatigue or medication or substances or
10 anything else that would prevent you from giving me
11 truthful and complete answers today?
12      A.   No.
13      Q.   You know this may take some time, but it
14 does not have to be continuous, so we can take
15 breaks as needed.  If you get to get a drink of
16 water, a snack, use the restroom, just let me or
17 your lawyer know that you want to take a break.  I
18 will just warn you now that I will likely ask you
19 who you talked to during a break and if you
20 reviewed anything.  There may not be the same
21 expectation of the attorney-client privilege during
22 breaks in the deposition, so will you let me know
23 if you need a break?
24      A.   Yes, I will.
25      Q.   Something that will help our court

6

```
1   reporter and help us have a clean transcript, and
2   you are already doing this well, is if you'll wait
3   until I finish asking a question before responding,
4   I will try and do you the same courtesy of waiting
5   until you are finished answering before I ask the
6   next question.  All right?
7        A.   Yes.
8        Q.   If I ask a question that is confusing or
9   you don't understand my question, will you agree
10  now to tell me that is the case rather than just
11  try and answer it anyway?
12       A.   Oh, yes.
13       Q.   Thank you.  Since we're on Zoom, we can't
14  see everything around you, so who is in the room
15  with you right now?
16       A.   My attorney.
17       Q.   And anybody else?
18       A.   No.
19       Q.   Aside from a binder, are there any papers
20  on the table in front of you?
21       A.   No.  That's all that's before me.
22       Q.   The binder is a binder of the documents
23  you produced related to this case?
24       A.   Yes.
25       Q.   Because this is Zoom, we can't see if
```

1    someone tries to pass you a note or tries to

2    message you.  Will you agree now to tell me that if

3    anyone tries to communicate with you during this

4    deposition, whether it's by text message or a note

5    or a hand signal or anything else other than

6    through this Zoom device?

7         A.    Yes.

8         Q.    Thank you.  When did you begin preparing

9    for this deposition, roughly?

10        A.    Oh, God, as soon as I was subpoenaed for

11   it.

12        Q.    So that was some number of months ago?

13        A.    Yeah.  I don't remember what date it was.

14        Q.    What did you do to prepare for this

15   deposition?

16        A.    I talked with my attorney and met with

17   him.

18        Q.    Did you talk to anyone who wasn't your

19   attorney to prepare for this deposition?

20        A.    No. I was not asked to do that.

21        Q.    Did you talk to Jaclyn Hotard in

22   preparation for this deposition?

23        A.    No.

24        Q.    Have you spoken to her about this

25   deposition?

1    A.    I told her I had to give it, yes.

2    Q.    And when I say spoken to or you are

3  speaking with someone, I mean any form of

4  communication, whether that is oral, e-mail, text

5  message.  Is that how you understand me saying

6  that?

7    A.    Yes.

8    Q.    Did you review any documents to prepare

9  for this deposition?

10    A.    The binder that I have right here.

11    Q.    So that binder would consist of text

12  messages between you and Ms. Hotard and then a few

13  documents about Gaumet Holdings, LLC, correct?

14    A.    (Witness nods head.)

15    Q.    Is that a yes?

16    A.    That's a yes.

17    Q.    If you nod or shake your head, it may not

18  be transcribed.

19    A.    Well, I said correct.  I'll try to

20  remember to say yes, no.  Okay?

21    Q.    Correct is fine.  Just shaking of the

22  head or nodding just won't be captured.

23    A.    Okay.

24    Q.    Did you review any other documents to

25  prepare for this deposition?

```
 1        A.    No.
 2        Q.    Have you ever reviewed a copy of Ms.
 3   Hotard's deposition transcript?
 4        A.    No, I have not.
 5        Q.    Did you take any notes to prepare for
 6   this deposition?
 7        A.    No.
 8        Q.    And, you know, we will ask questions
 9   during this deposition, but if you need to take a
10   break to confer with your lawyer about whether to
11   plead the Fifth to any question, please just let us
12   know you need to take a break and talk to your
13   lawyer, and we'll allow you that break.  All right?
14        A.    Okay.
15        Q.    So, Ms. Hotard, you live in St. John the
16   Baptist Parish, correct?
17        A.    You talking to me?
18        Q.    Yes.  I'm sorry.
19        A.    I'm not Ms. Hotard.  I'm Ms. Gaudet.
20        Q.    I apologize.  Ms. Gaudet, you live in St.
21   John the Baptist Parish?
22        A.    Yes.
23        Q.    What is your profession?
24        A.    I'm a business owner.
25        Q.    Do you have any children?
```

1    A.    Yes, I do.

2    Q.    How many do you have?

3    A.    I have three.

4    Q.    And what are their names?

5    A.    Yeah.  I have three.  I actually had

6  four, but one died.

7    Q.    Sorry to hear that.  What are the names

8  of your living children?

9    A.    My oldest one is Rusty Gaudet, Jenna

10  Gaudet, and Ashley Gaudet.

11    Q.    You own or co-own a range of businesses,

12  correct?

13    A.    Yes.

14    Q.    Could you list them right now or are

15  there so many that it would be difficult to list?

16    A.    I'm not -- I don't think that I'm -- this

17  has got nothing to do with what we're talking about

18  right here.

19          MR. TOMNEY:

20               I'm going to object.  The deposition

21            is to examine her about her interest in

22            Gaumet Holdings and related to that and

23            the text messages, so we're going to

24            object to questions -- any questions

25            about any of her other business

```
 1              holdings.
 2         MR. MOST:
 3              Are you aware of any protective
 4         order that limits the scope of this
 5         deposition?
 6         MR. TOMNEY:
 7              I'm going to instruct her not to
 8         answer, because the order that the
 9         judge signed was very specific in what
10         the question -- you were very specific
11         in your motion about what you wanted to
12         question her about, and I can read it
13         to you, if you want, but it was very
14         specific in -- you said your plaintiff
15         offered to limit the deposition to, one
16         -- this is what you told the Court.
17         The basic facts of Gaudet's ownership
18         interest in Gaumet Holdings, LLC.  Two,
19         a broad description of the type of work
20         the company performs, and, three,
21         conversations between Gaudet and Jaclyn
22         Hotard regarding the property or the
23         business.  That's the scope of the
24         deposition, and we're prepared to
25         answer all of those.
```

```
 1              MR. MOST:
 2                   Mr. Tomney, that is an offer that I
 3              made to you that you rejected.  There
 4              is no limitation on the scope of this
 5              deposition.  Can you point to any order
 6              of the Court that limits the scope of
 7              this deposition?
 8              MR. TOMNEY:
 9                   Well, it specifically orders the
10              production of the documents related to
11              that company.  Yes.  That is it, and I
12              read this to mean you are limited, and
13              that's what you've always said from day
14              one to me, to the Court, to your offer,
15              in your pleadings, so we are not going
16              to answer any questions other than the
17              ones that relate to Gaumet Holdings and
18              the text messages that you've got and
19              conversations between Gaudet and
20              Hotard.
21              MR. MOST:
22                   So you are instructing her --
23              MR. TOMNEY:
24                   It's clear on that.
25              MR. MOST:
```

1          What text of the Court's order

2             limits it?

3      MR. TOMNEY:

4          That's my position.  If you have a

5          different position, I respect it, but

6          we are not going to answer any other

7          questions other than questions related

8          to those three things.

9      MR. MOST:

10          Okay.  So the two bases to instruct

11          a client not to answer a question are

12          to protect a privilege or to terminate

13          a deposition to seek a protective

14          order.  Is it your intent to seek a

15          protective order regarding the scope of

16          this deposition?

17      MR. TOMNEY:

18          My intent is for her to answer what

19          the Court ordered in her order to you

20          and what you said you wanted, because

21          my Motion to Quash quashed not only the

22          document production but the deposition

23          itself, and the Court said, no.  I

24          believe that what Mr. Most is asking

25          for related to Gaumet may be relevant

1          to his claims against Ms. Hotard,
2          therefore, I am going to order her to
3          give the deposition on that basis.  If
4          you have a different opinion, that's
5          fine.  We're here today to offer to
6          answer those questions and only those
7          questions.
8     MR. MOST:
9          So the answer is no, you do not
10         intend to seek a protective order?
11    MR. TOMNEY:
12         I think I've already got a
13         protective order.  I think the scope is
14         in her order.  This is what she issued
15         in response to my Motion to Quash.
16         Okay.  I wanted to quash this entire
17         fishing expedition you are on.  The
18         deposition and the documents.  This is
19         her order in response to my motion, and
20         your representation, may I add, in the
21         order, what you represented to the
22         Court, was going to be the scope of
23         this deposition.  Now, that's what
24         we're here to do.  That's what we're
25         going to answer.  If you want to

1           proceed on that basis, then proceed,

2           but that's the basis upon which we're

3           going to answer the questions.  Your

4           choice.

5      MR. MOST:

6           So you are not intending to seek a

7           protective order, and you are not

8           invoking a privilege, correct?

9      MR. TOMNEY:

10          I have an order that tells me what

11          you are entitled to get.  I have one.

12          If you want something further, you go

13          seek it, but I have what I want, and

14          it's --

15     MR. MOST:

16          Can you point me to any language in

17          the order of the Court limiting the

18          scope of the deposition?

19     MR. TOMNEY:

20          It is a 15-page order, and it gives

21          the reasons why we're giving the

22          deposition, why she did not grant my

23          protective order in the first place,

24          and she limited it.  She says it in

25          here that she is limiting because the

1          scope of what you asked for was too
2          broad.  She didn't understand the
3          relevance of any of this, but she is
4          giving you a little leeway in allowing
5          you to ask questions about Gaumet and
6          the text messages after she saw it in
7          camera.  So that's what I'm relying on.
8          If you have a different interpretation,
9          I'll respect it.
10     MR. MOST:
11          Where do you see it limiting the
12          scope? Point me to the language.
13     MR. TOMNEY:
14          It limits it to the scope of what
15          you get to see.  It says, "It is
16          ordered that Darla Gaudet produce 15
17          communications ranging from October 16,
18          2023 through September 14th of 2024,
19          because they are relevant to issues in
20          the case no later than Thursday,
21          December 5th," which we did.  Okay.
22          "It is further ordered that Darla
23          Gaudet produce to the plaintiff the
24          Greenfield letter of November 9th,"
25          which we did, "the Gaumet Holdings

```
 1              charter of February 19th of 2013,"
 2              which we did, "and the Gaumet Holdings
 3              Operating Agreement and exhibits of
 4              February 19th of 2013," which we did,
 5              and that's what we're here to answer
 6              questions on.
 7         MR. MOST:
 8              Yes, but it says, "It is further
 9              ordered that Darla Gaudet shall be
10              deposed no later than ten days from the
11              setting of this order."  It does not
12              have any limitation on the scope of the
13              deposition, Mr. Tomney.
14         MR. TOMNEY:
15              My protective order didn't want to
16              give a deposition at all, and she said
17              -- she is allowing the deposition for
18              these documents for this purpose for
19              what you described, you described to
20              the Court, as the limited scope of your
21              inquiry into Gaumet Holdings and the
22              relationship between Gaumet, Ms.
23              Hotard, and your claims.  That's it.
24              So it's your choice.  You want to stop
25              now, if you don't want to go forward,
```

```
1              fine.  We are here ready to go.  If you
2              don't want to proceed, we'll proceed.
3              We're ready to do it.
4         MR. MOST:
5              Okay.  Let's see if we can get the
6              magistrate on the phone, because your
7              position -- you are inferring that
8              there is a limitation on the scope of
9              this deposition.  There is no such
10             limitation in the order.  You may
11             believe there is one, but there is not
12             one.  Let's see if we can call the
13             magistrate.
14        MR. TOMNEY:
15             You should have asked for this stuff
16             ahead of time, but you didn't.  You
17             asked for limited stuff.  You
18             represented to the Court it was
19             limited, and so, yeah, I believe it is
20             limited.
21             {CALL WAS PLACED TO MAGISTRATE}
22        MR. MOST:
23             They said the judge was in a Zoom
24             conference, but they will get back to
25             us this afternoon.  Let's move on to
```

```
 1                    other areas. We can revisit this if we
 2                    hear from the judge. So if I am
 3                    understanding you correctly,
 4                    Mr. Tomney, you are instructing your
 5                    client not to answer any questions
 6                    about any business other than Gaumet
 7                    Holdings, LLC?
 8               MR. TOMNEY:
 9                    That's correct.
10     BY MR. MOST:
11          Q.   Ms. Gaudet, you know Jaclyn Hotard,
12     correct?
13          A.   Yes, I do.
14          Q.   She is your daughter-in-law?
15          A.   Yes, she is.
16          Q.   She is married to your son, Russell
17     Gaudet?
18          A.   Yes.
19          Q.   That's also known as Rusty Gaudet?
20          A.   Yes.
21          Q.   Is he Russell Gaudet, III?
22          A.   Yes.
23          Q.   How long, approximately, have you known
24     Ms. Hotard?
25          A.   I've known of her for several years as
```

```
 1   council members of St. John the Baptist Parish, and
 2   in two thousand -- geezum '18, '19, her and my son
 3   started dating.
 4        Q.   Did you know her before they started
 5   dating?
 6        A.   I knew of her.  I had no -- nothing to --
 7   I did not know -- I knew of her.
 8        Q.   You and your businesses have made
 9   donations to her campaigns, correct?
10        A.   My businesses have not.  I have.
11        Q.   Through businesses you own or co-own, you
12   own land in St. John the Baptist Parish, correct?
13        A.   Yes.
14        Q.   You and Ms. Hotard have talked about that
15   land, correct?
16        A.   I don't recall that we have, no.  I mean,
17   until all of this came up.
18        Q.   All of this you mean the text -- what do
19   you mean?
20        A.   I mean, the fact that I'm subpoenaed to
21   do a deposition and the rezoning of this property.
22        Q.   So you're saying you don't recall talking
23   to Ms. Hotard about land owned by your businesses
24   prior to receiving the subpoena for this
25   deposition?
```

1       A.    Correct.  Yes.

2       Q.    Do you recall texting with Ms. Hotard

3  about land your businesses owned prior to receiving

4  the subpoena for this deposition?

5             MR. TOMNEY:

6                   Do you have a specific text you want

7                to refer to?

8             THE WITNESS:

9                   Yeah, because, I mean, we could --

10            MR. TOMNEY:

11                  You have all of the texts.  If there

12               is one specifically that you're

13               referring to or several, be happy to

14               look at it and answer your question

15               that way.

16            MR. MOST:

17                  Thank you.

18  BY MR. MOST:

19      Q.    So my question is, do you recall texting

20  with Ms. Hotard about your businesses' land prior

21  to receiving the subpoena for this deposition?

22      A.    Yes.

23      Q.    Do you recall speaking to Ms. Hotard

24  verbally about land owned by your businesses prior

25  to receiving the subpoena for this deposition?

```
 1        A.   What land are you talking about?
 2   Because, I mean, I own several pieces, so which one
 3   are we discussing here?  The one that is involved
 4   in the rezoning?  Is that what you are talking
 5   about?
 6        Q.   Let's start there.
 7        A.   I'm not clear.  I mean, like I have
 8   several.
 9        Q.   You are familiar with Gaumet Holdings,
10   LLC, correct?
11        A.   I certainly am, yes.
12        Q.   That's a company that you co-own,
13   correct?
14        A.   Correct.
15        Q.   Gaumet Holdings, LLC, owns land in St.
16   John the Baptist Parish, correct?
17        A.   Yes, they do.
18        Q.   Do you recall talking to Ms. Hotard
19   verbally about land owned by Gaumet Holdings, LLC,
20   before receiving the subpoena in this case?
21        A.   Yes.  When the zoning came up, I talked
22   about it with her.
23        Q.   When you say the zoning, you mean the
24   potential rezoning of land near Gaumet Holdings,
25   LLC's, land, correct?
```

```
 1        A.    Correct.   That's what we're here for,
 2   right?
 3        Q.    Okay. Gaumet Holdings, LLC, owns land
 4   adjacent to land where there was proposed to be a
 5   grain elevator project, right?
 6        A.    Correct.
 7        Q.    And that grain elevator project was
 8   proposed by Greenfield Louisiana, LLC?
 9        A.    Yes, it was.
10        Q.    Have you ever spoken with Ms. Hotard
11   about the grain elevator project?
12        A.    After the rezoning part came up, yes.
13        Q.    What about before the rezoning?
14        A.    No.
15        MR. TOMNEY:
16             Let me ask you, William, when you
17           say spoken, are you -- you mean verbal
18           versus text messages?  Are you making a
19           distinction?
20        MR. MOST:
21             Well, unless I am more specific,
22           when I say speak to, I'll mean all
23           forms of communication.  You know,
24           verbal, text message, e-mail, anything
25           else.  Is --
```

24

```
 1              THE WITNESS:
 2                   Go ahead.
 3   BY MR. MOST:
 4        Q.   Is that your understanding of my question
 5   so far, Ms. Gaudet?
 6        A.   Yes, but I'd like to know -- I mean, text
 7   messages or am I talking to her? I think I should
 8   be advised of that.
 9        Q.   Okay.  I can be more specific.  So you
10   talked verbally to Ms. Hotard about the grain
11   elevator project, correct?
12        A.   Yes.
13        Q.   Roughly, how many times would you say you
14   have done so?
15        A.   I have no -- I cannot -- listen.  I'm not
16   -- I'm not even going to say how many I think it
17   was.  I'm not, because I don't even know.
18        Q.   But it was more than one, correct?
19        A.   Huh?
20        Q.   It was more than once?
21        A.   Yes.  We had the discussion more than one
22   time, yes.
23        Q.   More than ten times?
24        A.   I don't know.  I don't keep track of
25   every call I make or every time I talk to somebody.
```

```
 1    If I did that, I would be nuts.
 2          Q.    Can you even give us a ball park,
 3    roughly, how many times you've talked to Ms. Hotard
 4    about the grain elevator project?
 5                MR. TOMNEY:
 6                     Objection.  Asked and answered.  She
 7                  said she doesn't remember.
 8                MR. MOST:
 9                     Mr. Tomney, speaking objections are
10                  prohibited.  One such speaking
11                  objection is a speaking -- "Speaking
12                  objections, such as, 'You have answered
13                  the question,' are designed to coach
14                  the witness and are improper."  That is
15                  Hunter v. GEICO, Eastern District of
16                  Louisiana, 17-05070 R Doc 69, September
17                  12, 2018.  I'll ask that you not
18                  continue with any speaking objections
19                  that suggest the answer.  It is
20                  sufficient to say object as to form or
21                  object.  You will preserve your
22                  objection.  Please don't suggest
23                  answers to the witness any further.
24                MR. TOMNEY:
25                     I am objecting because you have
```

```
 1                    asked the same question four times in a
 2                    row, and she has said each time she did
 3                    not know how many, and you said, "Well,
 4                    more than ten?"  "I don't remember."
 5                    "More than 20?"  "I don't remember."
 6                    "Well, how many?"  "I don't remember."
 7                    So I will make my objection on the
 8                    record.  Thank you.
 9               MR. MOST:
10                    Please cease with any speaking
11                    objections, including already answered.
12                    That is specifically raised by the
13                    Eastern District as an improper
14                    speaking objection.  All right.
15     BY MR. MOST:
16          Q.   Ms. Gaudet, have you e-mailed with Ms.
17     Hotard about the grain elevator project?
18          A.   No.
19          Q.   Have you e-mailed with her about Joy
20     Banner or Jo Banner?
21          A.   No.
22          Q.   Or the Descendants Project?
23          A.   No.
24          Q.   Or Greenfield?
25          A.   No.
```

```
1        Q.    You have texted with Ms. Hotard about all
2   those topics, correct?
3        A.    Yes.  I guess you could say, yeah.
4        Q.    Have you spoken with Ms. Hotard about all
5   those topics?
6        A.    Yes.
7        Q.    Do you have any other forms of
8   communication with Ms. Hotard other than verbal,
9   e-mail, and text message?
10       A.    No.
11       Q.    When was the last time you communicated
12  with Ms. Hotard in any form?
13       A.    It's been probably -- I have no idea.  I
14  really don't. I haven't talked to her in the last
15  couple of weeks.
16       Q.    Have you read stories -- well, let me
17  back up.  Have you texted with Ms. Hotard in the
18  last couple of weeks?
19       A.    Nope.
20       Q.    E-mailed with her?
21       A.    Nope.
22       Q.    You recall turning over certain text
23  messages to your lawyer to provide to the Court,
24  correct?
25       A.    Yes.
```

1      Q.   Have you texted with Ms. Hotard since

2   that time?

3      A.   I don't know.  I can't -- I probably

4   have, but I don't look at that all the time.  I

5   mean, I have no idea.  I really don't.

6           MR. TOMNEY:

7                Wait.  Let me --

8           THE WITNESS:

9                Hold on.

10          MR. TOMNEY:

11               Did you understand his question?

12          THE WITNESS:

13               Not really.  I mean, how am I going

14            to talk to her?  I mean, if I text her.

15          MR. TOMNEY:

16               No.

17          THE WITNESS:

18               I don't know how many times I've

19            text her.

20          MR. TOMNEY:

21               I don't think she understood your

22            question. Could you rephrase it?

23   BY MR. MOST:

24      Q.   My question is have you texted with Ms.

25   Hotard since you turned over certain text messages

1    to your lawyer?

2         A.   Yes.

3         Q.   Since you turned over your text messages

4    to your lawyer, have you texted with Miss Hotard

5    about Joy Banner, Jo Banner, the Descendants

6    Project, Greenfield?

7         A.   No.

8         Q.   When did you first learn about the

9    Greenfield elevator project?

10        A.   When I received the letter.

11        Q.   That was the letter from Greenfield?

12        A.   Yes.

13             MR. TOMNEY:

14                  Sixteen.

15             THE WITNESS:

16                  Look there.  Grabbed it quick just

17            one time.

18    BY MR. MOST:

19        Q.   I'll pull this up on the screen.  Can you

20    see the letter up on the screen right now?

21        A.   Yes.  I can see it.  I have it in my

22    book, too.

23             MR. TOMNEY:

24                  William, just to be clear for the

25                record, yeah, this is -- we are looking

1           at a paper copy of Darla Gaudet

2           Document Bates 001, which is the letter

3           dated November 9th of 2021.

4    BY MR. MOST:

5        Q.    That's right.  Ms. Gaudet, what I've

6    designated here as Exhibit ZQ, you see it is a

7    letter dated November 9, 2021 with Bates 001?

8        A.    Yes.

9        Q.    I can zoom in as needed, so if you need

10   me to zoom in.  So you received this letter in

11   November of 2021 through Gaumet Holdings?

12       A.    Yes.

13       Q.    And this was the first you learned about

14   the Greenfield grain elevator project?

15       A.    Yes.

16       Q.    Had you heard of any proposed development

17   of this property prior to this letter?

18       A.    No.

19       Q.    I'm now holding up what is designated as

20   Exhibit ZR, which is a document starting at Bates

21   Number 00059.  Do you see, Ms. Gaudet, this is an

22   Operating Agreement of Gaumet Holdings, LLC?

23       A.    Yes.

24       Q.    Going to Page 33.  Does Page 33 reflect

25   the ownership of this LLC?

31

1          MR. TOMNEY:

2                  That's the original.

3          THE WITNESS:

4                  Yes.  That was the original one.  It

5              is not that way anymore.

6   BY MR. MOST:

7      Q.   What is the current ownership?

8      A.   I think you have that in your documents.

9   Flip over to the next page.  There you go.

10     Q.   Okay.  So we're looking at Page 34, which

11  is Bates 92.  So this reflects the current

12  ownership of the LLC?

13     A.   Yes.

14     Q.   So you control 25 percent or own 25

15  percent of this LLC in your own name, correct?

16     A.   Yes.  That's what it states.

17     Q.   And what is the Five Js Trust?

18     A.   Do I have to answer that?  It's a trust

19  that owns this company.

20          MR. TOMNEY:

21                  You can tell him it's a family

22              trust.

23          THE WITNESS:

24                  It's a family trust.

25          MR. MOST:

1           Mr. Tomney, you just whispered the
2      answer to a question.  You said, "You
3      can answer.  It's a family trust," to
4      Ms. Gaudet, and then she gave that
5      answer.  You are not permitted to give
6      answers to the deponent.  I don't know
7      why you think that is acceptable. I'm
8      going to ask you not to give answers to
9      the deponent anymore.
10  MR. TOMNEY:
11           I think you are confusing her with
12      your questions, but I will say it at
13      this point.  Ms. Gaudet is not going to
14      testify beyond what is in this document
15      about the consistency of any of these
16      two trusts.  You have there that they
17      own -- that they own an interest in
18      Gaumet.  That's what you were looking
19      for.  You see it there.  You see Ms.
20      Gaudet's interest in it, and it also
21      says that, you know, who the trustee of
22      the one trust is.  So the document --
23      we are not going to go beyond that to
24      examine this.  Now, do you have
25      anything else?

33

```
 1              THE WITNESS:
 2                   I'm not going to answer who the Five
 3                J Trust is.  I'm not.
 4              MR. MOST:
 5                   Mr. Tomney, would --
 6              THE WITNESS:
 7                   It's a family trust.
 8              MR. MOST:
 9                   Would you agree with me that you
10                whispered the answer to Ms. Gaudet to
11                the prior question, that it's a family
12                trust?
13              MR. TOMNEY:
14                   She knew the answer.  I didn't have
15                to tell her the answer.  She knew it.
16              MR. MOST:
17                   Yes, but would you agree with me
18                that --
19              MR. TOMNEY:
20                   I think she was confused by your
21                question.
22              MR. MOST:
23                   But would you agree with me that you
24                whispered the answer to the prior
25                question to Ms. Gaudet?
```

```
 1              MR. TOMNEY:
 2                   No.  I will disagree with you.  I
 3                said it is -- a description of it.  You
 4                said, "What is it?"  She didn't
 5                understand your question.  Okay.
 6              MR. MOST:
 7                   So then you whispered to her, "a
 8                family trust," correct?
 9              THE WITNESS:
10                   Okay.  Let me restate this.  Okay.
11                This is a family-owned trust that I'm
12                not going to divulge what is in it and
13                who owns it.  Okay.  So that's how it
14                is.
15     BY MR. MOST:
16         Q.   So are you refusing -- let me ask you
17     this question.  Who are the beneficiaries of the
18     Five Js Trust?
19         A.   I'm not going to answer that.
20         Q.   Is Ms. Hotard a beneficiary of the Five
21     Js Trust?
22         A.   She is not.  That I will answer for you.
23         Q.   Is Russell Gaudet, III, a beneficiary of
24     the Five Js Trust?
25         A.   I'm not going to go any further than
```

1    that.

2        Q.    Really?

3        A.    Yeah.

4        Q.    So this is a family trust that you are

5    the trustee of, correct?

6        A.    It is exactly what I said it was, a

7    family trust.

8        Q.    And you are the trustee, correct?

9        A.    Absolutely.

10       Q.    Is this a family trust --

11       A.    They got that on paper.

12       Q.    Is this a family trust for your family?

13       A.    Yes.

14       Q.    Does that include your children?

15       A.    I don't have to tell you that.  It's not

16   in the scope of all of this.  I provided you with

17   the documents that you have here stating who owns

18   this trust.  There is two owns this company.  There

19   is two trusts that own it and myself.

20       Q.    So you will not tell me if the parish

21   president's husband is a beneficiary of one of the

22   trusts that owns this LLC; is that correct?  You

23   are refusing --

24           MR. TOMNEY:

25               I think it's beyond the scope of the

```
1              order.  I will object.  Beyond the
2              scope.
3         MR. MOST:
4              And you are instructing your client
5          not to answer?
6         MR. TOMNEY:
7              Yes, I am.
8         MR. MOST:
9              On what basis are you instructing
10         your client not to answer that
11         question?  Is it privilege or to invoke
12         a protective order?
13        MR. TOMNEY:
14             Under the scope of the protective
15         order --
16        MR. MOST:
17             There is no protective order in this
18         case.  What --
19        MR. TOMNEY:
20             Under the scope of the order that
21         ordered her production of documents,
22         and she has done that, and the
23         disclosure of the interest in Gaumet
24         Holdings, and she has disclosed that,
25         and that's all we're going to answer,
```

```
 1              and that's what the judge put in her
 2              order when she denied my protective
 3              order.
 4         MR. MOST:
 5              I don't think we have established
 6              who has an interest in Gaumet Holdings,
 7              LLC.  She is refusing to answer
 8              specifically that question.  That is
 9              exactly what I'm trying to figure out,
10              is who has an interest in this LLC. She
11              is refusing to answer.
12         MR. TOMNEY:
13              Mr. Most, you have the operating
14              agreement.  You know full well that
15              this list, it says here, membership,
16              ownership of the operating agreement of
17              Gaumet.  You know that.  This is the
18              sheet that tells who owns the interest.
19              Now you want to go beyond that, and
20              we're not going to answer that, because
21              that is beyond the scope of what the
22              Court ordered.  This is exactly what I
23              argued to the Court you would do.  You
24              would go on a fishing expedition about
25              things that aren't relevant at all to
```

```
 1                    your lawsuit.  So I maintain that the
 2                    order that the Court -- we have
 3                    complied with it.  You now see the
 4                    ownership interest in Gaumet Holdings
 5                    in black and white.  It's been that way
 6                    since 2015, and she has told you, my
 7                    client has told you, Ms. Hotard has no
 8                    interest in this.  You have that.
 9     BY MR. MOST:
10         Q.   Ms. Gaudet, you will not tell me who are
11     the beneficiaries of the trust who own this LLC?
12         A.   I will not.
13         Q.   Okay.  What is the Charles B. Metcalf
14     Trust?
15         A.   I'm not -- that is my brother, and he is
16     deceased.
17         Q.   Who is Crystal Metcalf Kilburn?
18              THE WITNESS:
19                   Do I have to answer that?  Okay.
20              That's my nieces.
21     BY MR. MOST:
22         Q.   Who are the beneficiaries of the Charles
23     Keith Metcalf Trust?
24         A.   I'm not going to divulge that either.
25     That's not relevant to why we're here.  I'm going
```

1    to tell you like my attorney just said.  You've got

2    the ownership of the company.  I am not going to

3    divulge the in tail details of each one of the

4    ownership.  I own this part and so do these trusts,

5    and that's all you asked for, and that's what you

6    are getting, and, yes, I refuse to answer it.

7        Q.    Okay.  And you refuse specifically to

8    tell me whether the parish president's husband is a

9    beneficiary of one of these trusts?

10       A.    Yes.

11       Q.    So we talked about the Greenfield grain

12   elevator project.  You know roughly where that was

13   to be situated, correct?

14       A.    Yes.

15       Q.    And Gaumet Holdings, LLC, owns the land

16   that runs right through the middle of the area

17   proposed for that grain elevator project, correct?

18       A.    Nope.  They don't own it.  They don't own

19   land right through the middle.

20       Q.    I'm going to turn to Exhibit X, Page 10.

21   Do you see what is on Page 10, which is a diagram

22   of some land in St. John the Baptist Parish?

23            THE WITNESS:

24                Which one is he talking about?  In

25            this one? I'm not sure.  On Page 10.  I

1          don't see any page numbers on this.
2    BY MR. MOST:
3         Q.   You see at the top of the screen it says
4    10 of 22?
5         A.   Oh, okay.  I got that.
6         Q.   Do you see that on Page 10 of 22 of
7    Exhibit X it says at the top PZR231463 Land Use
8    Report?
9         A.   Yes.
10        Q.   And this area shaded in purple on the
11   left is the area where the grain elevator project
12   was going to be?
13        A.   I guess that's where it was supposed to
14   be.
15        Q.   Does this match your understanding of
16   where the grain elevator project was going to be?
17        A.   Yes.
18        Q.   Do you see on the right that there is a
19   zoomed-in depiction of that area with certain
20   yellow lines running through it?
21        A.   Yes, I do.
22        Q.   Do these yellow lines reflect parcels
23   owned by Gaumet Holdings, LLC?
24        A.   Yes.  Yes, I do.
25             MR. TOMNEY:

```
 1                    How do you know that?
 2              MR. MOST:
 3                    Wait.
 4              THE WITNESS:
 5                    Yeah, I -- yes,  I know that -- how
 6                 do you -- see, it's got the little -- I
 7                 know, yeah.  Yes.
 8              MR. TOMNEY:
 9                    All right.
10              THE WITNESS:
11                    They're on the outside of it and the
12                 other side of it.
13      BY MR. MOST:
14         Q.   So these yellow lines, for example,
15      Parcel Number 300, 38900, that goes right through
16      the grain elevator area, correct?
17         A.   I don't think it does.  I don't think
18      that -- that's not on the map I have looks like.
19         Q.   Well, I am going back to Exhibit ZQ.  You
20      see on Page 22 ZQ is a depiction of the proposed
21      grain elevator project?
22              MR. TOMNEY:
23                    What is the Bates number on that?
24              THE WITNESS:
25                    Yeah.  Let me look at it from there.
```

```
 1            MR. MOST:
 2                  Bates 22.
 3            THE WITNESS:
 4                  Bates 22?  Is that what you said,
 5            Bates 22?
 6            MR. MOST:
 7                  That's correct.
 8            THE WITNESS:
 9                  Okay.  What is your question?
10  BY MR. MOST:
11       Q.    You see on Bates 22, Page 22 of Exhibit
12  ZQ, this is a depiction of the proposed grain
13  elevator project?
14       A.    Yes.
15       Q.    And you see it up there.  There is a rail
16  extension that would connect the Union Pacific
17  Railroad at the bottom with the grain elevator
18  terminal at the top?
19       A.    Uh-huh.
20       Q.    Gaumet Holdings, LLC's land intersects
21  that rail line, correct, proposed rail line?
22       A.    The rail line, yes.
23       Q.    So the rail line to supply grain to the
24  grain elevator would have to cross Gaumet Holdings,
25  LLC's land, correct?
```

1        A.    Yes.  Only the rail line.

2        Q.    So Gaumet Holdings, LLC, controlled rail

3   access to the grain elevator project, correct?

4        A.    Wait.  You want to rephrase that, because

5   I didn't understand what you're talking about?

6        Q.    Sure.  So Gaumet Holdings, LLC's land

7   intersects where the rail line would be to provide

8   grain to the grain elevator, correct?

9        A.    Yes.

10       Q.    So for this project to proceed with this

11  rail line, the grain elevator would have to

12  purchase either Gaumet Holdings, LLC's land or

13  obtain a right-of-way over it, correct?

14            MR. TOMNEY:

15                Object to the form of the question.

16             You can answer it.

17            THE WITNESS:

18                Well, I would think they would, yes.

19             I mean, I'm on the rail line.

20  BY MR. MOST:

21       Q.    Were there any communications between

22  Gaumet Holdings, LLC, or you and Greenfield about

23  access -- rail access to the grain terminal?

24       A.    Yes.

25       Q.    Were there negotiations by --

1      A.   Hold on.  Let me back up and say -- let
2  me say something else with that.  Okay.  It wasn't
3  about the rail line.  It was about the property, is
4  what we talked about.
5      Q.   You talked with Greenfield about the
6  property?
7      A.   Yes.
8      Q.   About Greenfield purchasing Gaumet
9  Holdings, LLC's property?
10      A.   Yes.
11      Q.   When did those discussions happen?
12      A.   Way back.  Shortly after this -- oh, man.
13  It was in '21, 2021.  What month, I'm not sure, but
14  I know it was at the time the letter came out.
15  Right after the letter came out.
16      Q.   What were the results of those
17  negotiations?
18      A.   We didn't come to any agreement about
19  them purchasing.
20      Q.   Did the discussions end in 2021?
21      A.   Yes.
22      Q.   Were there any subsequent discussions?
23      A.   Nope.
24      Q.   Did you ever talk to Ms. Hotard about
25  those discussions?

1        A.    I don't recall talking to her about them,
2    because at the time -- why would I tell her?
3        Q.    Did you ever discuss those negotiations
4    with Ms. Hotard in any form subsequently?
5        A.    I don't recall having a conversation with
6    her about it.  The only conversation I recall
7    having with her is when all of this started.
8        Q.    When you say "all of this started," what
9    do you mean?
10        A.    When the rezoning situation stuff came
11    up.
12        Q.    Originally, at least in recent years, the
13    Greenfield grain elevator property was zoned
14    industrial, right?
15        A.    Yes, it was.  All the property over there
16    was industrial.
17        Q.    And then due to a court decision --
18        A.    All that plot of land that Greenfield
19    purchased was industrial, including mine.
20        Q.    Then a court decision returned the zoning
21    to residential, correct?
22        A.    Correct.
23        Q.    And then there was a process to rezone
24    the land back to industrial, correct?
25        A.    Yes.

1          Q.    And rezoning it back to industrial was

2    necessary for the grain elevator project to

3    proceed, correct?

4          A.    Correct.

5          Q.    Ms. Hotard was elected parish president

6    October 12th, 2019; is that correct?

7          A.    That sounds about right.

8          Q.    In the days leading up to the election,

9    were you following that election?

10         A.    Well, of course.

11         Q.    Ms. Hotard was dating your son at the

12   time?

13         A.    Correct.

14         Q.    But they were not yet married?

15         A.    I don't remember the year they got

16   married, to be honest with you.

17         Q.    But at least they were a romantic couple

18   during the lead-up to Ms. Hotard's election as

19   parish president, agreed?

20         A.    Yeah.   What's that got to do with it?

21         Q.    But the answer was yes?

22         A.    Yes.   He was involved with Ms. Hotard at

23   the time, yes.

24         Q.    In the days leading up to Ms. Hotard's

25   election, was it clear that she was going to win

1    the election?

2         A.   No.

3         Q.   Why do you say no?

4         A.   She had four other people running against

5    her.

6         Q.   Do you recall buying any property in the

7    days leading up to that election?

8         A.   Huh?

9         Q.   Sure.  Let me rephrase.  Do you recall

10   you or any of your LLCs purchasing property in the

11   lead-up to that election?

12        A.   I purchased a lot of properties.  I

13   couldn't tell you when I purchased them.  Okay.  I

14   mean, I have no -- I don't have a book in front of

15   me telling me that I bought all these properties on

16   these dates.

17        Q.   I am going to pull up the next exhibit as

18   Exhibit ZC. Do you see that this is a printout of

19   the St. John Parish Assessor website for a parcel

20   of property owned by Gaumet Holding, LLC?

21        A.   Yes.

22        Q.   And you see that this is Parcel Number

23   0300032690?

24        A.   Yes.

25        Q.   Going down to Page 2, do you see the

1    section that says, "Ownership History?"

2        A.    Yes.  Down at the bottom.  Okay.

3        Q.    Does this reflect that Gaumet Holdings,

4    LLC, bought this property on October 8th, 2019?

5        A.    If that's what -- that's what the paper

6    says, isn't it?

7        Q.    That's what it indicates to you?

8        A.    Yeah, or it was changed up in the

9    assessor's office on that date.

10       Q.    Do you have any reason to think Gaumet

11   Holdings, LLC, didn't buy this piece of property on

12   October 8th, 2019?

13       A.    No.  I know we bought it.  I just didn't

14   remember when.

15       Q.    So this reflects to you a date that's

16   consistent with your understanding of when Gaumet

17   Holdings, LLC, bought the land, right?

18       A.    Yes. Or acquired the land.

19       Q.    Why do you distinguish between acquired

20   and bought?

21       A.    Because I had one guy that I acquired his

22   later after I had -- we were on a different time

23   schedule with paying him.

24       Q.    Now I'm pulling up Exhibit ZE.  You see

25   this is the same parcel number, 0300038900?

1    A.    Yes.

2    Q.    So this is one of the parcels that

3  intersects the proposed rail line for the

4  Greenfield grain elevator project?

5    A.    Well, I guess it is.  I mean, I know

6  there are several -- there is three of them, I

7  think.  Isn't there?

8    Q.    Yeah.  So Gaumet Holdings, LLC, purchased

9  -- let me back up.  You were involved in the

10  decision to purchase this property?

11    A.    Yes.

12    Q.    Did you make the choice to purchase this

13  property?

14    A.    Yes.

15    Q.    And you made the choice to purchase this

16  property a few days before Ms. Hotard was elected

17  parish president?

18    A.    That's not anything to do with that, with

19  her being elected parish president.

20    Q.    Why do you say that?

21    A.    Well, I don't know why you're saying

22  that, because this is my company.  Okay.  I made a

23  corporate decision to purchase that piece of

24  property.  That's the end of the discussion on it.

25  Had nothing to do with Ms. Hotard.  Not at all.

```
 1        Q.    What was the reason for that corporate
 2   decision to buy this property?
 3        A.    Because I was buying any little strips of
 4   land over there that were for -- that I could get.
 5        Q.    Because you anticipated there might be
 6   industrial development at this area?
 7        A.    No.   That's not the reason I did it.
 8        Q.    What was the reason?
 9        A.    I refuse to answer that.
10        MR. TOMNEY:
11             You can go ahead and answer it.
12        THE WITNESS:
13             Huh?
14        MR. TOMNEY:
15             Hang on one second.
16        THE WITNESS:
17             I was trying to get any little piece
18          of land I could get over there in
19          between all of that other one.
20        MR. MOST:
21             Mr. Tomney, could you confirm that
22          you whispered to Ms. Gaudet, "Answer
23          that?"
24        THE WITNESS:
25             He said I could answer it.
```

```
 1              MR. TOMNEY:
 2                   Yeah.  I said you can answer that,
 3                yeah.  I mean, if you want me to -- I
 4                mean, if you don't want me to help you
 5                get the answers, then I'll stay silent.
 6              MR. MOST:
 7                   What I don't want you to do is
 8                whisper to the deponent.
 9              MR. TOMNEY:
10                   I'm trying to assist in the
11                deposition to make sure that you get
12                everything you want.
13              MR. MOST:
14                   Okay.
15  BY MR. MOST:
16       Q.   I'm sorry, Ms. Gaudet.  What was your
17  answer as to the reason you purchased this --
18  decided to purchase this property?
19       A.   Could the court reporter read it back to
20  me, because I'm not -- we've been going about nine
21  different ways.  Okay.  I purchased all these
22  properties that I could purchase.  That one just
23  happened to be in the year 2019.  The other ones
24  were prior years, and that piece of property
25  purchase had nothing to do with Jaclyn Hotard being
```

1    parish president.  That was family business.
2    Family bought it, and that's it.
3         Q.    Was it purchased because of the
4    anticipation that there might be industrial
5    development at this area?
6         A.    No.  That's not why I purchased it.
7         Q.    Well, then what was the purpose of the
8    purchase?
9         A.    Because I was trying to get every little
10   piece of property that the other people had missed.
11        Q.    For what purpose?
12        A.    Business purposes.
13        Q.    What business purposes?
14        A.    I'm not -- I have marine businesses.
15   Okay. And that's all I'm going to say.  It wasn't
16   anything to do with Jaclyn Hotard at all.
17        Q.    I'm trying to figure out -- this is an
18   extremely thin strip of land, right?
19        A.    Yes.
20        Q.    Maybe less than the width of a house or
21   approximately the width of a house.
22        A.    Oh, absolutely, yes.  All of those are.
23        Q.    Right.  So what was the intended use of
24   this property that you purchased it for?
25        A.    To be used if I needed it for a barge

1    fleet.
2         Q.    In what way --
3         A.    I was purchasing it because I was trying
4    to get a fleet put in over there.
5         Q.    In what way would this thin strip of land
6    going to the highway approach help a barge fleet?
7         A.    Well, because you are only going to
8    Highway 18 on this.  I wanted it for the batture.
9    I didn't want it for the back side.  You are not
10   showing that all these little lines are going up
11   there.  They go all the way up to the river.  You
12   are only going to Highway 18 here.
13        Q.    That --
14        A.    My purpose -- let me finish, okay, before
15   you ask anything else.  My purpose in purchasing
16   this land was for the river frontage property,
17   which is called batture.  I got the back side of
18   it, which is the land on the highway, butts up to
19   the highway, because that's the only way they
20   wanted to get rid of it.  I couldn't just buy the
21   batture.  I had to buy all the other strips, all
22   the strips, all the way back.  Does that answer
23   your question?
24        Q.    Yeah.
25        A.    Okay.  Good.

54

```
1              MR. MOST:
2                   Excuse me.  This is Judge Roby's
3              chambers.
4                   {OFF-THE-RECORD DISCUSSION}
5              MR. MOST:
6                   Good afternoon, Judge Roby.
7              THE COURT:
8                   Good afternoon.
9              MR. MOST:
10                   This is William Most.  Thank you
11              very much for your time.  We're
12              currently in the middle of a
13              deposition.  This is in Banner v.
14              Wright.  The deposition ordered by this
15              Court of third-party witness, Darla
16              Gaudet, who is the mother-in-law of the
17              parish president who is a defendant in
18              the case.  One of the issues in the
19              case is ownership of the land that was
20              in the rezoning area.  You ordered that
21              the Motion to Quash be denied, that Ms.
22              Gaudet subject herself to a deposition.
23              You did not specify a limit on that
24              deposition, that she provide documents
25              relating to the ownership of the LLC
```

```
 1                and various text messages.  We've been
 2                asking questions about that, and one
 3                thing that came up is that the LLC is
 4                owned by Ms. Gaudet and then two
 5                trusts, one of which is a trust she
 6                describes as a family trust, but she
 7                would not answer who the beneficiaries
 8                of that trust were, and we specifically
 9                asked is the parish president's husband
10                a beneficiary of the trust that owns
11                this LLC, and she refused to answer the
12                question.  So that's one issue.
13         THE COURT:
14                On what basis?
15         MR. MOST:
16                She just said it was confidential
17                and that she did not have to -- her
18                lawyer said she didn't have to answer
19                it, because he contended that there is
20                a limited scope to this deposition.
21         THE COURT:
22                I don't remember issuing a limiting
23                order, and nor do I remember counsel
24                asking me to limit the order.  Am I
25                mistaken?
```

```
 1         MR. MOST:
 2              You're correct, Your Honor.  You
 3         denied the Motion to Quash.  You
 4         specified specific documents that
 5         needed to be turned over.  You
 6         identified specific documents that
 7         needed to be turned over, but in R Doc
 8         80, you ordered the deposition, but you
 9         did not specify any limitation on the
10         scope of it.
11    THE COURT:
12              Counsel for Ms. Gaudet, would you
13    want to address the issue from your
14    perspective? You are on mute, sir.
15    MR. TOMNEY:
16              Can you hear me now, Judge?
17    THE COURT:
18              I can hear you now.
19    MR. TOMNEY:
20              From my perspective, it starts with
21         Mr. Most's subpoena for the deposition
22         and for the documents.  The subpoena
23         was very specific.  They subpoenaed
24         records of Gaumet Holdings company, one
25         of Ms. Gaudet's companies.  And, also,
```

1             it subpoenaed records of ownership of

2             that company and e-mails and text

3             messages.  And they also wanted to take

4             her deposition in connection with that

5             company, because, as you recall, his

6             position was that Gaumet owned some

7             land that was the subject of the parish

8             rezoning efforts in connection with the

9             grain elevator project that was going

10            on over there, and her land was

11            adjacent to that proposed rezoning.

12      THE COURT:

13            Let me ask you this question.  Am I

14            misreading this document on the screen,

15            and does this document not say that the

16            owners of Gaumet Holding are two trusts

17            -- well, a trust. Yeah, two trusts and

18  a       person?  Is that a fair estimate?

19      MR. TOMNEY:

20            That's correct.  That's what it

21            says.

22      THE COURT:

23            Since the subpoena had asked for the

24            ownership of Gaumet Holdings, I think

25            it's fair game to acquire -- obtain

```
 1              information as to the holders of the
 2              trust.  At the very least the
 3              beneficiaries of the trust, because,
 4              otherwise, how would there be clarity
 5              on who owns Gaumet Holdings?  So if it
 6              arises from the subpoena, I think it's
 7              within the scope of the subpoena,
 8              because the document itself identifies
 9              the holders who happen to be trusts
10              which have beneficiaries.  So at a
11              minimum, the beneficiaries are to be
12              identified.  What is the next question?
13         MR. TOMNEY:
14              Well, Your Honor, we identified the
15              fact that Ms. Hotard has no interest in
16              these trusts, not now, not ever.  These
17              trusts --
18         THE COURT:
19              Yeah.  That may be a true statement,
20              right, but Ms. Hotard is married, and
21              it would seem logical to me that her
22              husband would potentially be a
23              beneficiary.  He may be excluded.
24              There could be reasons why maybe he is
25              not a beneficiary, but I think it's a
```

```
1              fair question, because the standard
2              that I have to apply is relevance, and
3              I do think it is relevant under these
4              circumstances.
5         MR. TOMNEY:
6              Well, Your Honor, in that regard, do
7          we have to reveal who the other
8          beneficiaries are?  Why is that
9          relevant?
10        THE COURT:
11             I don't know why it wouldn't be,
12         because they are part owners of Gaudet
13         Holdings, which is the question on the
14         table, who owns Gaudet Holdings.  I
15         think it is a fair question.
16        MR. TOMNEY:
17             Your Honor, with all due respect,
18         legally, the trusts are the owners.
19         They own the interest.  The
20         beneficiaries are subject to the terms
21         of the trust.
22        THE COURT:
23             Correct, which means they get the
24         benefits from the trust.  I'm aware of
25         how a trust works.
```

```
 1          MR. TOMNEY:
 2              Right.
 3          THE COURT:
 4              So that means that they technically
 5          benefit by the structure of the trust
 6          based on the legal distribution in
 7          terms of the trust.
 8          MR. TOMNEY:
 9              How is that relevant?
10          THE COURT:
11              By virtue of that, they are sort of
12          like owners.  Even if they can't direct
13          or say what happens to it, they are the
14          ones who, based on what the trustee
15          does, get the proceeds from the trust
16          in the time and manner in which the
17          trust directs.
18          MR. TOMNEY:
19              How is that relevant to the claims
20          involved in this case, Your Honor?  I
21          understand --
22          THE COURT:
23              We don't know, because we don't know
24          the answer to the question.  It may not
25          be relevant, because Mr. Gaudet may not
```

```
 1                be a member of either of the trusts,
 2                and, if so, then it's not relevant.
 3                But if he is, then it is relevant.  I
 4                can't -- I wish I could see into things
 5                that are not apparent, but I can't, and
 6                I think it's appropriate, given the
 7                structure here, to allow the question
 8                to be presented to the witness.
 9        MR. TOMNEY:
10                Okay.
11        THE COURT:
12                Is there another question before the
13           Court?
14        MR. MOST:
15                Yes, Your Honor.  The other
16           questions that Mr. Tomney instructed
17           his client not to answer were about --
18           I was trying to ask questions about Ms.
19           Gaudet's other businesses and whether
20           the parish president's husband is a
21           part owner of those or an employee of
22           any of those other businesses.
23        THE COURT:
24                Irrelevant.  I won't allow that.
25        MR. MOST:
```

```
 1              Okay.  And the final thing --
 2         THE COURT:
 3              Anything else?
 4         MR. MOST:
 5              Yes, Your Honor.  At certain points
 6           in this deposition, Mr. Tomney has been
 7           whispering answers to the deponent.
 8           For example, I asked her what was this
 9           Five Js Trust, and he whispered to her
10           it's a family trust, and then that's
11           the answer she gave.  I'd ask that he
12           cease such speaking objections.
13         THE COURT:
14              Well, he wasn't -- he didn't give a
15           speaking objection.  He gave an answer
16           to the witness, which violates the
17           rules of discovery.  So, Mr. Tomney, I
18           am going to ask you to behave in the
19           manner that the rules of ethics require
20           you to, sir, but I will say to you,
21           Mr. Most, that is the risk that you
22           take when you take a Zoom deposition.
23           I don't think depositions ought to be
24           necessarily taken by Zoom, because you
25           cannot control what is being
```

1         communicated by whom or how, but that
2         is the risk when lawyers get lazy and
3         proceed by depositions, by Zoom.
4         Anything further for the Court at this
5         time?
6    MR. TOMNEY:
7         Your Honor, I'll just say this.  We
8         will abide by the Court's order.  My
9         client was nervous, and I didn't think
10        she understood the question.
11   THE COURT:
12        That's fair.  Then tell her it's
13        okay for her to say I don't understand.
14        He can ask another question, and if she
15        doesn't understand it, she can say, say
16        it a different way, because, again, I'm
17        having trouble understanding.  But even
18        if she doesn't understand the question,
19        Mr. Tomney, you cannot answer the
20        question for her.  You can explain it
21        or you can get counsel, your opposing
22        counsel, to restate the question, but
23        anything beyond that is inappropriate.
24        You all have a good day.
25   MR. TOMNEY:

```
 1                    Thank you, Your Honor.
 2            MR. MOST:
 3                    Thank you for your time.  Okay.
 4              Continuing with the questioning.  Let's
 5              go back to the ownership -- Mr. Tomney,
 6              could you point it so that we can see
 7              Ms. Gaudet?
 8            MR. TOMNEY:
 9                    Yes.  Sorry.
10            MR. MOST:
11                    Thank you.
12   BY MR. MOST:
13        Q.   Ms. Gaudet, during the break you took,
14   did you speak to anybody?
15        A.   No.
16        Q.   Did you look at any documents?
17        A.   No.
18        Q.   So going back to the ownership of Gaumet
19   Holdings, LLC, we are looking at Exhibit ZR here,
20   which is Bates 92.  One of the owners of Gaumet
21   Holdings, LLC, is the Five Js Trust, correct?
22        A.    Correct.
23        Q.   That's a family trust for your family?
24        A.   Yes, it is.
25        Q.   Who are the beneficiaries of that trust?
```

1      A.    Russell J. Gaudet, III, Jenna Gaudet, and
2   Ashley Gaudet, upon my death.
3      Q.    So the parish president's husband is one
4   of the beneficiaries of one of the trusts that owns
5   Gaumet Holdings, LLC?
6      A.    Yes.  Upon my death.  Not until I die.
7      Q.    I'm sorry?
8      A.    Go ahead.
9      Q.    The Charles Keith Metcalf Trust.  That's
10  a family trust for your brother's family?
11     A.    It absolutely is.
12     Q.    Who are the beneficiaries of that trust?
13     A.    Crystal Metcalf Kilburn, Christine
14  Metcalf Stein, and my nephew's son, Caden Charles
15  Metcalf.
16     Q.    So that would be --
17     A.    My brother's three children.  My nephew
18  who died, his son has got his share of the trust.
19     Q.    Thank you.
20         MR. TOMNEY:
21             Hey, William, can we take a short
22          break?  I need a bathroom break.
23         MR. MOST:
24             Yeah.  You want to take five or ten?
25         MR. TOMNEY:

1                    Yeah.  Thank you.
2                    {BRIEF RECESS, 3:29-3:34}
3    BY MR. MOST:
4         Q.   Ms. Gaudet, through an LLC, you purchased
5    land in the area of the grain elevator proposed
6    project in 2019, right?
7         A.   Yes.
8         Q.   It's your testimony that you didn't know
9    about the grain elevator project until 2021; is
10   that right?
11        A.   Correct.
12        Q.   Were you aware in 2020 Ms. Hotard was
13   writing letters in support of the grain elevator
14   project?
15        A.   No.  I was not aware of that.
16        Q.   I'm going to pull up what is -- do you
17   see what is designated as Exhibit ZG?  Do you see
18   that this is a letter dated May 4th, 2020?
19        A.   Okay.
20        Q.   Do you see that it is from the Office of
21   Parish President, Jaclyn Hotard?
22        A.   Yes, I do.
23        Q.   You see that this describes the proposed
24   Port of South Louisiana Greenfield Louisiana
25   Project?

1          A.    Yes.

2          Q.    Were you aware of this letter?

3          A.    No, not at all. I've never seen that.

4          Q.    Did you have any discussions before the

5     2021 Greenfield letter about the Greenfield project

6     with Ms. Hotard or anybody else?

7          A.    I had no discussion about it.  I had not.

8          Q.    I'm going to turn to text messages. I am

9     going to pull up starting with Exhibit ZT, as in

10    Tom.  That's Bates 94.

11               THE WITNESS:

12                    Which one is that?  What number?

13               MR. TOMNEY:

14                    This is Number 1, I believe.  You

15               said October 16?

16               MR. MOST:

17                    Yeah.

18               THE WITNESS:

19                    Number 1. All right.

20    BY MR. MOST:

21          Q.    You have it like tabs in your folder?

22          A.    Oh, yeah.

23          Q.    So it is probably Tab 1 of the text

24    messages.

25               MR. TOMNEY:

```
 1                    Tab 1, yeah.
 2   BY MR. MOST:
 3        Q.    So you were required to turn over certain
 4   text messages in response to a subpoena in this
 5   case, correct?
 6        A.    Correct.
 7        Q.    And we're looking at one of those text
 8   messages?
 9        A.    Yes, you are.
10        Q.    And these are text messages between you
11   and Jaclyn Hotard?
12        A.    Yes.
13        Q.    The bubbles that are on the right that
14   are darker, that's you, correct?
15        A.    Yes.
16        Q.    The bubbles that are on the left that are
17   lighter shaded, those are Ms. Hotard?
18        A.    Yes.
19        Q.    So looking at Bates 94, Exhibit ZT, this
20   is a set of text messages between you and Jaclyn
21   Hotard on October 16, 2023?
22        A.    Yes.
23        Q.    And Ms. Hotard says in these text
24   messages, "I wanted to choke that woman."
25        A.    That's what it says.
```

1          Q.    You responded, "Well, so did I."

2          A.    That's what I said.  Right here in this

3    text message, yes.

4          Q.    Who is the "that woman" that Ms. Hotard

5    was referring to?

6          A.    I really -- because there is -- I'm not

7    sure.  I would think that it was Ms. Banner.

8          Q.    Ms. Banner being Joy Banner?

9          A.    Yes.

10         Q.    So you aren't sure, but based on context,

11   you think Joy Banner is that woman?

12         A.    Well, the date and the time frame, yes.

13         Q.    Later on, on the page, Ms. Hotard refers

14   to that -- the bitch.  Was that also referring to

15   Joy Banner?

16         A.    It's associated with that up there, so

17   I'm taking it that's who it is.

18         Q.    Going to Page 2, you texted, "I own one

19   track and a small track, so I WTF."

20         A.    That's what I stated, yes.

21         Q.    WTF stands for what the fuck?

22         A.    You got it.

23         Q.    And track.  Is that a misspelling of

24   tract, T-R-A-C-T?

25         A.    Yes.  The text messaging has a little

1    time -- you know, it changes things on me.

2        Q.    So when you say, "I own one track and a

3    small track," you were talking about tracts of

4    land?

5        A.    Tracts of land, yes.

6        Q.    And those were the tracts of land that

7    intersected the rail line for the Greenfield grain

8    elevator project?

9        A.    Yes.

10        Q.    And Jaclyn Hotard asked, "How are they

11    saying the property value will increase when Joy

12    said it will increase the value," and you said,

13    "Exactly."

14        A.    Uh-huh.  Yes.

15        Q.    Do you agree that owning a strip of land

16    that controls the rail approach to an $800 million

17    industrial project could increase the value of that

18    tract of land?

19        A.    It would increase any tract of land

20    around there, yes.  Anybody's, not just mine.

21        Q.    Sure.  So the Greenfield grain terminal

22    had the potential to increase the value of the

23    adjacent land, agreed?

24        A.    Of all adjacent property, yes.

25        Q.    So this text message, Bates 95, reflects

1    you and Jaclyn Hotard discussing the land owned by

2    you through an LLC, correct?

3         A.    Repeat that.

4         Q.    Sure.  So this page of text messages,

5    Bates 95, this shows a conversation between you and

6    Jaclyn Hotard about the value of your land near the

7    grain elevator project and the tracts of land that

8    you own, correct?

9         A.    I defined what I owned over there, yes,

10   and that it could increase the value of all land

11   over there, not just certain ones, like it was

12   proposed.

13        Q.    Ms. Hotard knew that you had land over

14   there by the grain elevator project?

15        A.    I'm guessing she found out when all of

16   this went down.  You would have to ask her when she

17   knew, found out about the property, found out that

18   I owned property.

19        Q.    But at least as of the time of this text

20   message, she knew about property that you --

21        A.    By this time, yes, yes.  I don't know

22   when.  She knew I had property here, yes.

23        Q.    But at least by October 16, 2023, Ms.

24   Hotard was aware that you owned land in the

25   Greenfield grain elevator area, correct?

```
1          A.    Yes.
2                MR. TOMNEY:
3                      Mr. Most, can I ask you just for
4                   purposes of clarity, when you say you
5                   own land, you are referring to Gaumet
6                   Holdings?
7                MR. MOST:
8                      That's right.
9                MR. TOMNEY:
10                     Okay.  Thank you.  Because the text
11                  message here says, "I own," and so I'm
12                  reflecting that language.  Let me make
13                  that clear.
14   BY MR. MOST:
15         Q.    So, Ms. Gaudet, when you say, "I own"
16   here, you mean through Gaumet Holdings, LLC, right?
17         A.    Yes.
18         Q.    So today, if I ask you about you owning
19   property that is owned by Gaumet Holdings, will you
20   understand that's what I mean?
21         A.    Okay.
22               MR. MOST:
23                     Thank you, Mr. Tomney.
24   BY MR. MOST:
25         Q.    Going down to Page 3, which is Bates 96,
```

1    you see that Ms. Hotard writes, "I'm still steaming

2    pissed.  I'm mad.  I told her ask anything but to

3    let them say I violated the ethics code."  Do you

4    see that?

5         A.    Yes, I do.

6         Q.    Was this referring to Joy Banner as well,

7    to your understanding?

8         A.    In that string of texts, so I'm going to

9    take it, it was.

10        Q.    Okay.  I'm going to go down to Page 5,

11   which is Bates 98.  Do you see this?

12        A.    Yes.

13        Q.    Do you see the text message from Ms.

14   Hotard that says, "Henri said how the fuck you

15   raising your mother-in-law property value but all

16   theirs is dropping.  So true?"

17        A.    Yes, I do.

18        Q.    Do you know who she is referring to as

19   Henri?

20        A.    Henri, yes.  Henri -- oh, Lord, what is

21   his last name?

22        Q.    Is it Henri Dufresne?

23        A.    Yeah, Dufresne.  Yes.  He is an attorney

24   in St. John Parish.

25        Q.    He also handles real estate matters?

1      A.   Yes.  I'm sure he does.  I don't know

2   exactly what all he handles, but I'm sure he does.

3      Q.   And he handled the sale of land from the

4   Robert Brothers to Greenfield?

5      A.   Oh, I don't know that.

6      Q.   But at least this text message reflects

7   that Jaclyn Hotard, in October '23, was talking to

8   Henry Dufresne about the value of your property,

9   correct?

10      A.   Well, I -- no, I don't know that.

11   Rephrase.  Wait.  You got to back up and rephrase

12   that, because I don't understand where you are

13   going with that.

14      Q.   Sure.  So Ms. Hotard texts you, "Henri

15   said how the fuck you raising your mother-in-law

16   property value," right?

17      A.   Yes.

18      Q.   And so this reflects that Ms. Hotard is

19   talking to Henri about the value of your property,

20   correct?

21      A.   Doesn't it state Henri said?

22      Q.   Uh-huh.

23      A.   Okay.  Well, he said it to her.

24      Q.   Sure.  So Ms. Hotard and Henri had a

25   conversation before October 16, 2023 about the

1    value of your property, correct?

2        A.    I don't know if they had a conversation

3    or not.  I wasn't there.

4        Q.    But that's how you interpret this text

5    message, correct?

6        A.    I interpreted Henri said how is it going

7    to raise hers and not the others.

8        Q.    So you interpret this text message as

9    telling you about a conversation between Henri and

10   Jaclyn Hotard?

11       A.    Where is this going?  I mean, I don't get

12   this.  I've stated that it's -- Henri said -- she

13   said -- she put in there this.  Okay.  What you see

14   right here on the screen.  I don't know the

15   conversation that Jaclyn and Henri had.  I have no

16   idea.  I don't know what he was referring to or

17   where he was going with it.

18       Q.    But at the very least this is Jaclyn

19   Hotard reporting to you about a conversation she

20   had with Henri the topic of which was the value of

21   your land near the Greenfield property?

22       A.    You know Henri Dufresne?  You know him?

23       Q.    Let me just --

24       A.    You know him?

25       Q.    -- finish the question, and then I'll

1    answer that question.  Okay.  So this text message,

2    you understood it to be Jaclyn Hotard reporting to

3    you about a conversation she had with Henri

4    Dufresne about the value of your land near the

5    grain elevator project, correct?

6         A.    This is a statement, not a conversation.

7    That's all I know about it.  It's a statement right

8    there.  I don't know what the conversation

9    consisted of.

10        Q.    Okay.

11        A.    Is that a good answer?  Is that what you

12   want?

13        Q.    Okay.  No, I don't know Henri Dufresne?

14        A.    If you knew him, you probably would

15   understand why he said that.

16        Q.    Which is what?

17        A.    That's how he is.

18        Q.    What do you mean?

19        A.    He just shoots it out.  He don't care.

20        Q.    I'm pulling up Exhibit ZU, which is

21   probably Tab 2 in your book starting at Page 99.

22             MR. TOMNEY:

23                  Yes.  Tab 2 in our book.

24   BY MR. MOST:

25        Q.    So this is further text messages between

1   you and Ms. Hotard?

2          A.    No, sir.  Oh, wait.  Yes.  This is the

3   text message of a conversation -- yeah, the news

4   article, yes.

5          Q.    So Ms. Hotard is texting you news

6   articles?

7          A.    She let me know about it, because they

8   were talking about me in here.

9          Q.    Right.  You can see here that the article

10  she sent you says, "The letter included a map

11  showing multiple properties owned by Gaumet

12  Holdings adjacent to and even within the tract the

13  parish seeks to rezone based on the map provided by

14  the planning department."

15         A.    Yes.  I see that.

16         Q.    So if Ms. Hotard said she doesn't have

17  any idea where you or your LLCs own property, that

18  would not be accurate, agreed?

19         A.    I don't know.  What is he -- I don't

20  understand the question.

21         Q.    Sure.  You've had conversations by text

22  with Ms. Hotard about your LLC's land, correct?

23         A.    Yes.  Now, as of this date, yes.

24         Q.    We're looking at some of those text

25  conversations, correct?

```
 1        A.    Right.
 2        Q.    She even sent you an article that
 3   described the location of some of your LLC's
 4   properties, correct?
 5        A.    Yes.
 6        Q.    So if she said, I don't have any idea
 7   where Darla's LLCs have land, that would not be
 8   truthful, agreed?
 9        A.    It depends on when she said that.
10        Q.    Sure.  If she said that well after this
11   text conversation, it would not be truthful,
12   agreed?
13        A.    No.  Wait.  Let me back up a minute here.
14   Okay.  This is October the 24th, after everything
15   was going on, right.  Okay.  So she was aware of it
16   then.  Prior to that, I don't know if she was aware
17   of it or not.
18        Q.    Right.  So she was aware of it at least
19   by October 2023, agreed?
20        A.    Yes.
21        Q.    So if in 2024, she said, "I don't have
22   any idea where Darla Gaudet's LLCs have land," that
23   would be untruthful, agreed?
24        A.    I don't understand why, what the point --
25   I don't -- wait.  Repeat the question, because you
```

1    got me all confused here.

2         Q.    Sure.

3         A.    Can you ask the question?

4         Q.    If Ms. Hotard said in 2024, "I don't have

5    any idea where Darla's LLCs have land," that would

6    be untruthful, correct?

7         A.    I guess so, yes.  I don't know.  I mean,

8    I don't know -- you don't give no time frame here.

9         Q.    Turning to Page 5, which is Bates 103,

10   you see this talks about Ms. Hotard is texting you,

11   "I'm fucking steaming?"

12        A.    Wait a minute.  Hold on.  I haven't got

13   that yet.

14             MR. TOMNEY:

15                  Here it is.

16             THE WITNESS:

17                  Yes.

18   BY MR. MOST:

19        Q.    You can see that the text message leading

20   up to that, Ms. Hotard is texting you the news

21   article.  She is talking about the newspaper

22   printing baseless allegations.

23        A.    Hold on a minute.  Hold on a minute here.

24   Why you didn't start with the numbers the other

25   way?

1    Q.    We can go through it page by page.  Bates

2    101.

3        A.    Okay.  Bates 101. I see that one.

4        Q.    Ms. Hotard follows up texting you of the

5    news articles with a comment that, "I can't believe

6    Laura Luquet did not contact me before printing

7    this baseless allegation."

8        A.    Yes, I see that.

9        Q.    Then you text her back with your take on

10   it?

11       A.    Yes.

12       Q.    And then she says, "I'm fucking

13   steaming."

14       A.    Yes.  She texts me back.

15       Q.    And then she says, "I'm going to take

16   deep breaths, but I did instruct Baileigh to cancel

17   all advertising with them."

18       A.    I see that.

19       Q.    Baileigh is Ms. Hotard's director of

20   communications at the parish?

21       A.    I really don't know what Baileigh's title

22   is.  I have no idea.  I know a Baileigh.

23       Q.    A Baileigh who works for the parish?

24       A.    Yes.

25       Q.    You understood this to mean that Ms.

1    Hotard has instructed someone from the parish to
2    cancel all advertising with the newspaper?
3         A.   That's what it says, yes.
4         Q.   Then you say, "well, I responded with
5    tactic and diplomacy to you."  I'm not sure what
6    you meant there.  Who were you responding to?
7         A.   I responded with tact and diplomacy.
8    Jaclyn, I guess.  That's who the text message is
9    going to.  I'm not sure what I meant by that. I
10   mean, I don't know.
11        Q.   Go down to Page 6.  You text, "I have had
12   enough of those two bitches on the west bank."
13        A.   Yes.  That's my words exactly.
14        Q.   Those two bitches refers to Joy and Jo
15   Banner?
16        A.   Yes.
17        Q.   And "fuck the paper" refers to
18   L'Observateur?
19        A.   Yes.
20        Q.   Then Ms. Hotard refers to a Bridget?
21        A.   Uh-huh.  Yes, she does.
22        Q.   Did you understand that to be Bridget
23   Dinvaut, the district attorney?
24        A.   That's what I took from it.
25        Q.   So what do you know about Ms. Hotard's

1    conversations with the district attorney?

2        A.   I don't know what she discussed with the

3    district attorney.  She is just telling me Bridget

4    was not happy either.

5        Q.   Do you know why Ms. Hotard was talking to

6    the district attorney about this?

7        A.   Because the allegation -- what they

8    printed in there.  What they printed in the paper

9    is what she was talking to her about.

10       Q.   So the paper printed --

11       A.   Wait a minute.  Let me rephrase that,

12   because I don't know what she was talking about.  I

13   would take it that it was the article.

14       Q.   The article was about Joy Banner and her

15   nonprofit, right?

16       A.   That's what this other one -- that's what

17   it was about, this article was about?

18       Q.   That's my question.

19       A.   The fact that she told what everybody

20   thinks. Let's see.  Let me go back over here. Yeah.

21   Let's see here.  Well, I can barely read the

22   article is what the problem is.

23       Q.   I can zoom in, if you need me to.

24       A.   Let's start over with the questions you

25   have now.

1      Q.    Sure.  So this article was about some

2   arguments made by Joy Banner and her nonprofit, The

3   Descendants Project, right?

4      A.    I can't see the rest of it.  I am only

5   seeing a little bitty bit right here.  Slow down.

6   Don't scroll up.  Hold on.  Adjacent to and even

7   within the tract, based on a map provided by --

8             COURT REPORTER:

9                  I can't quite hear what you are

10                 saying. Are you trying to say that for

11                 the record or not?

12            THE WITNESS:

13                 I'm just reading the article out

14                 loud, is what I'm doing.

15   BY MR. MOST:

16      Q.    Maybe I can clarify by backing up.  This

17   article was about an ethics complaint filed by Joy

18   Banner, correct?

19      A.    I'm not sure what the article was

20   referring to. I mean, as far as what -- why it was

21   filed.  If that's what it was, then that's what it

22   was, but I didn't write it.  I just read over it.

23      Q.    I'm going to turn to Exhibit ZB, which is

24   probably Tab 3 in your binder, starting at Page

25   106, Bates 106.

```
 1        A.    Yes.
 2        Q.    So this is December 5th, 2023.
 3        A.    Yes. I didn't realize you were waiting on
 4   me.
 5        Q.    That's okay.  Here Jaclyn Hotard is
 6   texting you another newspaper article, this one
 7   having a photo of Joy Banner?
 8        A.    Yes.
 9        Q.    Going down to -- and then the subsequent
10   pages have the article itself, correct?
11        A.    Yes.
12        Q.    Then she texts you another article about
13   Joy Banner.  Look at Page Bates 116.
14             MR. TOMNEY:
15                  William, can I ask for a point of
16               clarification?
17             MR. MOST:
18                  Sure.
19             MR. TOMNEY:
20                  This, the first one, started with
21               106, you said that Ms. Hotard texted
22               this to Ms. Gaudet?
23             MR. MOST:
24                  Yeah.  That's what it looks like to
25               me.  Let me ask that for clarity.
```

1    BY MR. MOST:

2        Q.    On Page 106, Ms. Hotard texts Darla

3    Gaudet an article about Joy Banner from the

4    Times-Picayune, right, Ms. Gaudet?

5        A.    Well, the way it looks, I'm not sure if

6    it was me to her or her to me, okay, from the way

7    it looks on here.

8        Q.    But it's at least the light-colored

9    shading on the left-hand side?  You see how down in

10   the lower left it sort of --

11       A.    That's a screenshot from -- that is a

12   screenshot from nola.com.  I could have screenshot

13   that.

14       Q.    Right, but you see how the little speech

15   bubble points to the left, the little tail of the

16   speech bubble?

17       A.    Uh-huh.

18       Q.    So does that indicate to you that this

19   was Ms. Hotard texting it to you?

20       A.    I don't --

21       Q.    We can compare it.  You see that the

22   light-colored speech bubbles with the tail to the

23   left are Ms. Hotard?

24       A.    Uh-huh.

25       Q.    And the dark ones with the tail to the

1    right are you?

2         A.    Yes.

3         Q.    So then this one here, Bates 106, is the

4    light-colored one with the tail to the left, right?

5         A.    Yes, it is.

6         Q.    So this was from Ms. Hotard to you,

7    correct?

8         A.    I would assume that.

9         Q.    So if she texts --

10        A.    Unless I -- the only way I would know is

11   if I looked at my telephone.

12        Q.    Sure, but that is at least how you

13   understand these text messages as we see them

14   printed out here, right?

15        A.    Huh?

16        Q.    That's how you understand these text

17   messages as we see them printed out here, correct?

18        A.    Yeah.  Yes and no.  I mean, it's a double

19   fold answer, especially on this text message,

20   because it says to Jaclyn Hotard.

21        Q.    Right.  Okay.  But either you or --

22   either you sent this article to Ms. Hotard or she

23   sent it to you, right?

24        A.    Correct.  I'll take it that way.

25        Q.    Sure.  There is one from the

```
 1   Times-Picayune, nola.com?
 2       A.    On what page are we on, on that?
 3       Q.    106.  The first page of --
 4       A.    Yes.
 5       Q.    Then going down, there is an exchange
 6   with another article from The Lens that says --
 7   that refers to Joy Banner.  This is Page 116.
 8       A.    Yes.
 9       Q.    Then it's got the contents of that
10   article here on the subsequent pages?
11       A.    Yes.
12       Q.    You see on page Bates 121 that there is
13   actually the map that we looked at earlier?
14       A.    We jumping back over to the maps now?
15       MR. TOMNEY:
16            No, no, no.  Wait, wait, wait.
17            William, for some reason that didn't
18            print in my book, so I don't have in
19            the book, so she'll have to read it.
20            This is still part of the same
21            document, but I think what happened,
22            when we printed, some of the parts of
23            the document were too big for my
24            printer, and they apparently didn't get
25            in the book, so this is a continuation
```

```
 1              from this page.
 2         MR. MOST:
 3              No problem.
 4         THE WITNESS:
 5              Okay.
 6         MR. TOMNEY:
 7              Go ahead and ask your question with
 8              that understanding that it's not in the
 9              book here.
10    BY MR. MOST:
11         Q.   That's fine.  You see that this is The
12    Lens NOLA.  This is the article from The Lens that
13    you and Ms. Hotard -- one of you sent to the other,
14    correct?
15         A.   Yes.
16         Q.   You see that it's got the map of Gaumet
17    Holdings, LLC's property on it?
18         A.   Yes.  I see the map, yes. I thought we
19    were over back on the map section.
20         Q.   Sure.  So you can see that either Jaclyn
21    sent you or you sent Jaclyn an article that
22    actually had a map of Gaumet Holdings, LLC's
23    property inside of the article, right?
24         A.   Yes.
25         Q.   Going down to Bates 127, you see that you
```

1  responded to the Joy Banner article with the

2  statement, "They are the gift that keeps on

3  giving?"

4      A.   Yes, I did.

5      Q.   Then you included two poop emojis?

6      A.   I sure did.

7      Q.   Those poop emojis, were they intended to

8  represent Joy and Jo Banner?

9      A.   That's who is sitting in that picture,

10 isn't it?

11     Q.   My question is, are those two poop emojis

12 intended to represent Jo and Joy Banner?

13     A.   Yes, they are.

14     Q.   And then that's the text message you

15 sent, and then you can see from this bubble to the

16 left that Ms. Hotard added an exclamation point to

17 your poop emoji message?

18     A.   I would take it that, yes.

19     Q.   Moving on to Exhibit ZW, which is

20 probably Tab 4 in your binder.  It starts at Bates

21 128.

22          MR. TOMNEY:

23               Yeah.  We have that one.

24          MR. MOST:

25               Let me know when you are ready.

1          MR. TOMNEY:

2                  We have it.

3    BY MR. MOST:

4          Q.    Ms. Gaudet, you see that Ms. Hotard

5    texted you, "Electricity out at the courthouse?"

6          A.    Yes.

7          Q.    Was this the day of a court hearing for a

8    Descendants Project related thing?

9          A.    I'm sure it was, or I wouldn't have been

10   texting her to find out what -- I wouldn't have --

11   you know, it had to do with this.

12         Q.    Right.  So Ms. Hotard was keeping you

13   updated about the status of Joy Banner's

14   litigation, correct?

15         A.    Yes.  She was keeping me up -- yes.

16         Q.    Why was she keeping you updated about the

17   status of Joy Banner's litigation?

18         A.    Because of my situation with all of this.

19         Q.    What was your situation?

20         A.    I think we're sitting at it today, aren't

21   we? She was telling me what was going on, because I

22   wasn't able to be there.

23         Q.    Why did you want to know about the

24   outcome of the Descendants Project litigation?

25         A.    Well, I don't know which case -- which

1    part you are talking about.  I don't know which

2    part -- which judge we're talking about or what

3    decision was going to be made just from this text

4    message.

5          Q.    Right.  I'm trying to figure out --

6          A.    If you can give me a little more

7    description on what happened on the 14th, I can

8    maybe associate it with that.

9          Q.    Let me back up a little bit.  The

10   Descendants Project is run by Joy and Jo Banner,

11   right?

12         A.    Yes.

13         Q.    And they were litigating about the zoning

14   of the Greenfield land, right?

15         A.    Yes.

16         Q.    And because your land was either in that

17   or directly adjacent to it, you wanted to know

18   about the status of that ligation, correct?

19         A.    Correct.

20         Q.    Because that litigation, if it changed

21   the zoning, could affect the value of your

22   property, right?

23         A.    Would that litigation change the value of

24   my property? It could.

25         Q.    And so for that reason, you wanted Jaclyn

```
 1   Hotard to give you updates about the status of the
 2   litigation and the zoning, correct?
 3        A.   I wanted her to give me updates about
 4   what was going on in the courthouse, yes.  If the
 5   judge ruled, right. What the judge ruled, I guess,
 6   but you are talking about two different judges here
 7   probably at that time.
 8        Q.   Going down to Page 2, you text on
 9   December 14th, 2023, "Hey, I need news," correct?
10        A.   Yes.
11        Q.   So you are asking Ms. Hotard for updates
12   about Joy Banner's litigation, correct?
13        A.   This is Snowdy's court, yes.  I'm asking,
14   because he is the one that overturned it back.
15        Q.   Overturned land back from industrial to
16   --
17        A.   From Industrial 3 to R-1, yes.  That's
18   something I was very upset about.
19        Q.   Why?
20        A.   His ruling.
21        Q.   Why did it upset you?
22        A.   Because I bought the property as an I-3.
23   Okay.  Now I got a R-1, because my property was not
24   rezoned industrial, only the plot that Greenfield
25   owns was.
```

1      Q.   I thought you wanted it for batture

2   purposes?

3      A.   I did, but I had to take the other part,

4   and I figure I-3.  Okay.  We'll take it. That's

5   where my anger comes from, is that.

6      Q.   Have you ever referred to Judge Snowdy as

7   a bitch?

8      A.   I don't think so.

9      Q.   Have you ever described Judge Snowdy with

10   poop emojis?

11      A.   I may have.  I don't know, because right

12   now -- about that time, I was not really happy with

13   him for what he did.

14      Q.   Going back to Page 4.

15      A.   Is that 131?

16         MR. TOMNEY:

17            Yeah.  Bates 131.

18   BY MR. MOST:

19      Q.   Here you are asking Ms. Hotard to give

20   you a heads-up when the judge might rule, correct?

21      A.   Yeah.  We are going to go back.  We got

22   to go back.  These are all together.  Let's go from

23   the beginning here.  Okay.  Let me look at this.

24   Okay.  What was the question?

25      Q.   Here on Page 131, Bates 131, you are

94

1    asking Jaclyn Hotard for specific updates about
2    when the judge rules in Joy Banner's litigation,
3    correct?
4        A.   Yes.  What the time frame he had to rule
5    on.
6        Q.   And she is providing that to you,
7    correct?
8        A.   Correct.
9        Q.   Moving on to --
10       A.   But she also noted down here that it was
11   -- she didn't know whether it would be an in-court
12   hearing or a ruling.  A hearing or a ruling.
13       Q.   Moving on to Exhibit ZX, which is Tab 5
14   of your binder.
15       A.   Yes.
16       Q.   It begins at 132.  Do you see this?
17       A.   Yes, I do.
18       Q.   This is an exchange of text messages
19   between you and Jaclyn Hotard starting on December
20   28th, 2023.  is that correct?
21       A.   Yes, it is.
22       Q.   It looks like she texts you something
23   that says those against the project and so on.
24   What is that?
25       A.   I don't know where that came from.  No, I

1  do.  Look down at the bottom.  It says,

2  "www.irs.gov."  That's an IRS document,

3  information.

4        Q.   I mean, are you sure?  It talks about The

5  Descendants Project.  Do you think this might have

6  been like a flier someone put out, and they

7  included a link to the IRS website?

8        A.   I have no idea.

9        Q.   That's okay.  If you don't know, you

10  don't know.

11        A.   I don't know.  I just know she sent me a

12  screenshot of it.

13        Q.   Going down crossing from Bates 133 to

14  134, she texts you something, and then the words

15  "Joy Banner."

16        A.   Yes.

17        Q.   I can't read what this says.  Is it some

18  sort of financial disclosure for Joy Banner?

19        A.   I'm not sure what that -- I'm not sure.

20  I'm really not.  I can't read it either.  That

21  makes it even worse.

22        Q.   But she is texting you some sort of

23  document about Joy Banner; is that fair?

24        A.   I'm guessing it, yes.

25        Q.   Then you say, "Wow."

```
 1          A.    Uh-huh.

 2          Q.    But you don't recall what this document

 3    was?

 4          A.    I don't, no.

 5          Q.    Moving on to Exhibit ZY.

 6          A.    Where are we at?

 7                MR. TOMNEY:

 8                      This is Tab 6.

 9    BY MR. MOST:

10          Q.    Starting at Bates 135.

11          A.    Yeah.

12          Q.    Here you are texting with Jaclyn Hotard

13    asking her for updates about a parish council

14    meeting, right?

15          A.    Let me see.  I think that was the council

16    meeting, yeah.

17          Q.    A council meeting where Greenfield

18    matters were coming up on the agenda?

19          A.    Looks that way.

20          Q.    She is providing you information about

21    that parish council meeting about Greenfield?

22          A.    Yes.  Again, I was unable to attend.

23          Q.    Exhibit ZZ, which is Tab 7 in your book,

24    starting at page Bates 139.  Do you see this?

25          A.    No.  I'm getting to it.  Give me a
```

1    minute.  We are going into 7?

2         Q.   Yes.  Tab 7, Exhibit ZZ, Bates 139.

3         A.   Okay.

4         Q.   You see that here you are -- this is

5    March 19, 2024?

6         A.   Yes.

7         Q.   You are texting with Jaclyn Hotard asking

8    her for updates about Greenfield going before the

9    council?

10        A.   Yeah.

11        Q.   You specifically ask her to report back

12   to you about who voted yes or no on the Greenfield

13   proposal?

14        A.   Yes.  I see that.

15        Q.   So that's correct?  You were asking Ms.

16   Hotard specifically who voted how on the parish

17   council on the Greenfield matter, agreed?

18        A.   Yes.  That's what I've asked her.  Who

19   voted no for Greenfield and had to remove Joy.

20        Q.   What's that about, having to remove Joy?

21   What does that mean?

22        A.   It was my understanding that she was

23   removed from the meeting, if you read on down in

24   the text.

25        Q.   So you texted with Ms. Hotard about

1  removing Joy from the meeting? Someone removing Joy

2  from the meeting?

3      A.   I just text her that Joy had to -- no

4  vote from Greenfield and had to remove Joy.

5      Q.   And then Ms. Hotard --

6      A.   It says down here Joy was removed from

7  the meeting.  After she answered Troy Valentine and

8  Nicole Brown.

9      Q.   Why did you want to know who voted no on

10  the Greenfield matter?

11      A.   I wanted to see what council people did.

12      Q.   Why?

13      A.   I live in the parish.  I live in that

14  parish.  I mean, you get voted down.  You get, you

15  know, something you have bought -- you are around.

16  You pay attention to the political people and who

17  they -- and what they do.

18      Q.   Can you recall times you've asked Jaclyn

19  Hotard for who voted no on other proposals?

20      A.   Not on anything that doesn't pertain to

21  me.

22      Q.   So you are specifically asking her for

23  the no votes here because it pertained to you and

24  your business, correct?

25      A.   It affected my business.  It would affect

1    my business, yes.  And I don't mean my land

2    business.  I mean my other business.

3        Q.   Right, because you stood -- you have

4    other businesses that stood to benefit from the

5    Greenfield grain elevator project going in,

6    correct?

7        A.   Me and a lot of other people on the

8    river, yes.  I'm not the only one.

9        Q.   So, for example, your St. John Fleeting

10   Company stood to profit if the Greenfield elevator

11   project went through, correct?

12            MR. TOMNEY:

13               Objection.  That is beyond the scope

14            of what we are --

15            MR. MOST:

16               Mr. Tomney, she brought it up.  She

17            brought up her other businesses.  I

18            didn't ask about it.  She responded,

19            brought it up.  If she brought it up,

20            I'm going to ask her about it.

21            THE WITNESS:

22               It could affect me and anybody else

23            on the river that deals in grain and

24            elevators and the things that

25            Greenfield was going to put in.

1    BY MR. MOST:

2        Q.    So your businesses like St. John Fleeting

3    stood to profit if the grain elevator --

4        A.    Yeah, yes, if the Greenfield -- yes, but

5    it's not now from Greenfield, because Greenfield is

6    not going to be there.

7        Q.    Moving to Exhibit YA, which is Tab 8 in

8    your book, starting at Bates 141.  This is a text

9    message from April 4th, 2024 between you and Ms.

10   Hotard; is that correct?

11       A.    Yes, it is.

12       Q.    Here, again, Ms. Hotard is providing you

13   more updates about the status of Joy Banner's

14   litigation?

15       A.    It looks that way.  Snowdy probably won't

16   rule today, but it also says that she probably

17   won't be back from Covington in time for -- to join

18   us for dinner at the Mexican restaurant for my

19   birthday. I can interpret that one, because that's

20   on my birthday.  That's what that message says.

21       Q.    Exhibit YB, which is Tab 9 in your book,

22   starting at Bates 142.

23       A.    Yes.

24       Q.    This is you and Ms. Hotard talking about

25   another council meeting where Greenfield was on the

101

```
 1   agenda?
 2        A.   Yes.
 3        Q.   And Ms. Hotard offered to text you the
 4   play-by-play if you didn't feel like attending?
 5        A.   Yes, judging -- that was a joke, though.
 6        Q.   Well, it was a joke.  Was the dog and
 7   pony show part of a joke or texting you a
 8   play-by-play a joke?
 9        A.   It was.
10        Q.   Was texting you a play-by-play a joke?
11        A.   No.  She was going to -- a play on words
12   is what it was.
13        Q.   But she was actually offering to text you
14   information as the council meeting proceeded,
15   correct?
16        A.   Exactly.  That's exactly what she was
17   offering me, yes.
18        Q.   And then going down to Page 4, she did,
19   in fact, provide you with information about whether
20   the resolution passed and what the vote was?
21        A.   Where are we?
22             MR. TOMNEY:
23                  Where are you?
24             MR. MOST:
25                  Bates 145.  The last page of Tab --
```

```
 1              THE WITNESS:
 2                   The last page of this?
 3              MR. MOST:
 4                   Yeah.
 5              THE WITNESS:
 6                   Okay.  Let's see.  Yes.
 7    BY MR. MOST:
 8         Q.   So she does on April 9th text you the
 9    details of what happened with the Greenfield agenda
10    item and the vote yes and no?
11         A.   I don't know.  Let me back up and see
12    what these other texts between here and there said.
13    Yes.  She would let me know how it all was done.
14    How it was -- how it went.
15         Q.   So at Bates 145, she does, in fact,
16    provide you with the details of the Greenfield
17    agenda item, whether it passed and how many votes
18    there were for and against?
19         A.   Yes.  That is exactly what it is.
20         Q.   And then you specifically asked about the
21    sisters?
22         A.   Yes, I did.
23         Q.   That referred to Joy and Jo Banner?
24         A.   Yes, it does.
25         Q.   Moving on to YC, which is Tab 10 in your
```

1    book, starting at Bates 146.  Let me know when you

2    are there.

3         A.    I'm there.

4         Q.    This is May 28th, 2024, correct?

5         A.    Yes, it is.

6         Q.    It looks like Ms. Hotard is giving you a

7    heads-up about a subpoena, that you're being

8    subpoenaed for a deposition; is that right?

9         A.    Yes.

10        Q.    And she says, "I hate these people."

11        A.    Yes.

12        Q.    And by "these people," she is referring

13   to Joy and Jo Banner?

14        A.    I would take it that is who it is.

15   That's all this has been about anyway.

16        Q.    Then on Page 2 she says, "I also sent to

17   Bridget."  That is the district attorney, correct?

18        A.    Wait.  What?

19        Q.    You see at the bottom of Bates 147?

20        A.    Oh, yes.  I see that.

21        Q.    Bridget, is that the district attorney?

22        A.    Yes.  I would take it that it was Bridget

23   Dinvaut, the district attorney.

24        Q.    Do you know why she was sending it to

25   Bridget Dinvaut?

```
 1          A.   No.  I think the district attorney's
 2    office has got to know what is going on.
 3          Q.   Moving on to --
 4          A.   I'm not --
 5          Q.   I'm sorry?
 6          A.   I'm not a lawyer, but I would definitely
 7    want to advise my district attorney.
 8          Q.   Okay.  So Exhibit YD, which is Tab 11 in
 9    your book, starting at Bates 149.  Let me help.
10    You there?
11          A.   I'm here.  I'm reading it.
12          Q.   Okay.  So here, this is June 17, 2024,
13    correct?
14          A.   Yes.
15          Q.   You are telling Ms. Hotard that someone
16    tried to serve papers on you today?
17          A.   Yes, they did.
18          Q.   And she responds, "I'm sick of them."
19          A.   Yes.
20          Q.   You took that to mean Joy and Jo Banner?
21          A.   Yes.
22          Q.   She says at the bottom, "Snowdy is the
23    judge, and he BETTER," all caps, "throw out their
24    subpoena."  Do you see that?
25          A.   Yes.  I see it.
```

1      Q.   What did you understand her to mean when
2  she said, "BETTER" in all caps?
3      A.   Based on the fact that he should throw it
4  out.  I mean better.
5      Q.   Do you know if Ms. Hotard talks to
6  Mr. Snowdy or Judge Snowdy?
7      A.   I don't know if she talked to him or not.
8      Q.   She offers to have you talk to Ike,
9  correct, or meet with Ike?
10     A.   Yes.  Me and my attorney.
11     Q.   Right.  Ike Spears being Ms. Hotard's
12 attorney?
13     A.   Correct.
14     Q.   Did you meet with Ike Spears or talk to
15 him?
16     A.   No.  I did not.
17     Q.   Page 2, Bates 150.  "Oh, I see.  Okay.
18 It could be the death case I had you refer to."
19 That's the other lawsuit -- some other lawsuit you
20 were involved in?
21     A.   Yes.
22     Q.   So it doesn't mean a death threat or
23 something?  That's like a lawsuit?
24     A.   That's cleared up there. It could have
25 been about the death case.

1      Q.   By death case, you were referring to some

2   lawsuit about someone's death?

3      A.   Yes.  Not a lawsuit.  I just was -- find

4   out if I had a suit against me.

5      Q.   Did that have anything to do with the

6   Banners or The Descendants Project or Greenfield?

7      A.   Wait.  What?

8      Q.   Did this death case have anything to do

9   with Greenfield?

10      A.   No.  Absolutely not.  It had nothing to

11   do with it at all, anything.

12      Q.   Going now to Page 4, you say --

13      A.   What is the Bates number?

14      Q.   152.  The last page of Tab 11.

15      A.   Hold on.  You got to give me a minute,

16   because I'm going to read all what was in between

17   here.  Okay?

18      Q.   Sure.  That's fine.  Let's just move on

19   to the next text message.  I think we've got this.

20      A.   Well, no.  I'm sorry.  I'm not going to

21   comment on anything until I read it.

22      Q.   I know, but I'm going to move on to the

23   next set of text messages.  If you want, you can

24   read it.

25      A.   I think it is just a statement of my

1  anger.

2        Q.    Yeah.

3        A.    I had to go through a lot of expense for

4  something that should not have been done.

5        Q.    So when you say, "Any damn judge should

6  rule.  It has nothing to do with me," are you

7  referring to the Greenfield zoning matter?

8        A.    I'm talking about this -- yes.  The fact

9  that my property didn't even get rezoned for it.  I

10  mean, I just said that already.

11        Q.    Moving on to Tab 12, which is Exhibit YE,

12  starting at 153.

13        A.    Okay.

14        Q.    Jaclyn Hotard texts you on June 24th,

15  2024, "call me," correct?

16        A.    No.  That's me that says call me.

17        Q.    I'm sorry.  You are right.

18        A.    That's me.

19        Q.    You're correct.  So you text Jaclyn "call

20  me" on June 24th, 2024, correct?

21        A.    Correct.

22        Q.    What were you asking her to call you

23  about?

24        A.    Well, I'm going to take it that it was

25  for my -- give her the information on my attorney.

```
 1   Ike's name is on here and so is my attorney's name.
 2       Q.   So your attorney talked to Ike, but you
 3   didn't talk to Ike; is that right?
 4       A.   Correct.
 5            MR. TOMNEY:
 6                 Na-huh.  Objection.  She didn't say
 7                 I talked to him.  I did not talk to
 8                 him, so let's not put something on the
 9                 record that's not accurate.
10            MR. MOST:
11                 Okay.  I'm asking questions.  She is
12                 the one answering.  I can rephrase.
13   BY MR. MOST:
14       Q.   Do you know, Ms. Gaudet, do you know of
15   your attorney talking to Ike Spears?
16       A.   I don't know how they communicated. Okay.
17   I don't.  I just said tell Ike that his name is
18   Richard Tomney.
19       Q.   Moving on to Tab 13, Exhibit YF, starting
20   at Bates 154.  These are text messages between you
21   and Jaclyn Hotard on August 5th, 2024?
22       A.   Yes.
23       Q.   Here Ms. Hotard texts you a picture of
24   Joy Banner?
25       A.   Yes.
```

109

1     Q.   And then going on to the next page, she

2     texts you, "I'm rewatching this for my deposition

3     tomorrow."

4          A.   That's what it says.

5          Q.   So Ms. Hotard was texting you about her

6     preparation for her deposition?

7          A.   Well, I'm not sure what she was texting

8     -- what she was referring to.  It's a picture of

9     Joy.

10         Q.   Right, but Ms. Hotard was texting with

11    you about the topic of her preparing for her

12    deposition, correct?

13         A.   "I'm rewatching this for my deposition

14    tomorrow."  I guess that's what it is.  I mean, I

15    don't know why.  I'm not sure what the relationship

16    with what she is watching.

17         Q.   Did you talk to her in preparation for

18    her deposition?

19         A.   Nope.  Did not.

20         Q.   Moving on to Tab 14, which is Exhibit YG,

21    starting on Bates 156.  This looks to be a press

22    release about Greenfield stopping its grain

23    elevator project.

24         A.   Is that what it is?

25         Q.   I'm asking you.  Is that what it is?

```
1        A.    That's what it says.
2        Q.    Do you recall if Ms. Hotard sent this to
3   you or you sent this to her?
4        A.    I'm not sure.  I really am not sure.
5   I'm not sure who sent it.
6        Q.    I don't think it's apparent from what we
7   have here.
8        A.    Huh?
9        Q.    I don't know it's apparent from what we
10  have here, which is why I was asking. Okay.  Moving
11  on to Tab 15, which is Exhibit YH, Bates 158.  Do
12  you see that?
13       A.    Yes.
14       Q.    This reflects a text message exchange
15  between you and Ms. Hotard on September 14, 2024?
16       A.    Yes.
17       Q.    You say, "Please do not share the
18  information I told you." Is that correct?
19       A.    That's what it says right here.
20       Q.    What was the information you are
21  describing in this text message?
22       A.    I'm going to be honest with you.  I don't
23  remember, because that's September the 14th.  I've
24  had a lot of shit go down since then.
25       Q.    Do you think it was -- so she responds,
```

1    "I won't. I'm only letting people know that no

2    violation was found, and the case is closed."  Do

3    you know what case she is talking about?

4         A.    No.  I probably did at the time, but I

5    don't now.  I don't remember the correlation with

6    this text.

7         Q.    So this was about three months ago today?

8         A.    Yeah.

9         Q.    Your testimony is you don't have any

10   recollection of what the information was; is that

11   correct?

12        A.    No.  I don't recall which information it

13   was.  I really don't.

14        Q.    And then at the bottom it looks like

15   there is some sort of screenshot about Courtney

16   Loupe or Loo-PAY.  I don't know how to pronounce

17   that.

18        A.    Oh.  I don't know what that is.

19        Q.    Do you know who Courtney is?

20        A.    I have no idea.

21        Q.    Okay.

22        A.    That was on Wednesday, September the

23   18th.  That wasn't even on the same day.

24        Q.    Right.  So you don't know what violation

25   Ms. Hotard was referring to or what the case was in

```
 1    her text message, correct?  You don't recall?
 2         A.   Yes.
 3         Q.   Yes, you don't recall?
 4         A.   I don't recall.  I'm sure it's probably
 5    -- this is what I'm thinking it is.
 6         Q.   Which is what?
 7              THE WITNESS:
 8                   Do I have to answer this question?
 9              MR. TOMNEY:
10                   Yeah.
11              THE WITNESS:
12                   Okay.  The Board of Ethics.  I can
13                tell that's what it is.
14    BY MR. MOST:
15         Q.   So you think Ms. Hotard was talking about
16    the Board of Ethics investigation in her text
17    message?
18         A.   Yes.
19         Q.   Does that help you recall what your text
20    message about the information was?
21         A.   Yes, because I didn't want her to share
22    or anybody know that I had to provide documents to
23    them just as I had to provide documents to you.
24         Q.   So you provided documents to the Board of
25    Ethics?
```

113

1    A.    I sure did.

2    Q.    What documents --

3    A.    Against my -- against me.  My attorney

4    advised me that I had to.

5    Q.    So you didn't want to share documents

6    with the Board of Ethics, but your attorney --

7    A.    I don't want to share documents -- I

8    don't want to share any of my documents with

9    anybody.  That's my documents, and everybody puts

10   them out on display.  So, no, I didn't want to give

11   it, but I did, because that was -- I was subpoenaed

12   to -- I was subpoenaed to give them the documents

13   of my company.

14   Q.    And that company is Gaumet Holdings, LLC?

15   A.    That's exactly which one it is, yes.

16   Q.    What documents did you give them?

17   A.    I'm thinking my -- my attorney gave them

18   the operating agreement.  The same thing you got

19   back in the back of the book.

20   Q.    Did you disclose to the ethics board that

21   Jaclyn Hotard's husband is one of the

22   beneficiaries?

23   A.    I didn't disclose anything to the ethics

24   board.  I wasn't involved in that.  My attorney

25   dealt with the ethics board on that.

1      Q.    So let me just finish the question, which
2  is, did you disclose to the ethics board, either
3  directly or through your attorney, that Ms.
4  Hotard's husband is one of the beneficiaries of one
5  of the trusts that owns Gaumet Holdings, LLC?
6      A.    No, I didn't. They asked for the
7  documents, and that's what my attorney provided.
8  They didn't ask anything after that.
9      Q.    So when you texted, "Please do not share
10  the information I told you," you were referring to
11  the fact that you provided documents to the Board
12  of Ethics?
13      A.    Exactly.  That's exactly what it was.
14         MR. MOST:
15              Okay.  I'll turn this over to
16           Mr. Spears or Ms. Conlay.  Do you want
17           to ask any questions?  I'll save time
18           for redirect.
19         MR. SPEARS:
20              I just have a very few questions.
21           I'm not sure if there is a need for a
22           break.  Ms. Darla, do you need a break
23           right now?
24         THE WITNESS:
25              Not right now.  I'm good, Ike.

1          MR. SPEARS:

2               I'll be brief. I apologize that you

3            have to go through this.  I really do.

4          THE WITNESS:

5               Thank you.

6     EXAMINATION BY MR. SPEARS:

7          Q.   Just for purposes of clarity, you

8     indicated that your son, Rusty, began dating and

9     ultimately married Jaclyn Hotard somewhere around

10    2018; is that correct?

11         A.   Yes.

12         Q.   Did you own the property that's been

13    discussed, the property near the Greenfield

14    project, well before that time?

15         A.   Well, some of them I did.  There was one

16    that I had to wait and take over after a certain

17    allotted time.

18         Q.   Okay.

19         A.   Because it was to do with -- nobody had

20    paid the property taxes, and we had to wait for

21    like the 30-year script, however you call that, to

22    come up that he paid the property taxes, and that

23    was what the point was, the reason I didn't.  It

24    doesn't transfer to me until that time.

25         Q.   Just so I can clarify, the bulk of the

1    property, the majority of the property, you owned

2    well before your son married Jaclyn Hotard?

3         A.    Yes, yes.

4         Q.    Then there was another piece of property,

5    a strip of property, that you acquired through a

6    tax sale or a tax auction of some sort?

7         A.    That could have been one of them.  My

8    daughter and them dealt with that while I was out.

9         Q.    It was your understanding that you could

10   not get full title until a certain time period

11   passed, and that time period passed after the

12   wedding?

13        A.    Yes.

14        Q.    But you had made the acquisition, the tax

15   acquisition, before the wedding?  Is that a correct

16   statement?

17        A.    Yes.  I'm going to go with that, yes.

18        Q.    Now, the company that we've been talking

19   about, Gaumet Holdings, how long has it been in

20   existence? Roughly.  You don't have to give me

21   exact dates just roughly.

22        A.    To be honest with you, I don't remember.

23   Let me look here.

24              MR. TOMNEY:

25                   Tab 17.

1           THE WITNESS:

2                 2013 was when the Secretary of State

3              says.

4    BY MR. SPEARS:

5        Q.    Did Jaclyn Hotard ever have financial

6    interest, not your son, Rusty, but Jaclyn, did she

7    ever have any financial interest in that company?

8        A.    No.

9        Q.    Did Jaclyn Hotard ever discuss with you

10   ways to increase the valuation of your company or

11   to increase the valuation of your properties?

12       A.    No, she did not.

13       Q.    Did she ever indicate to you that she was

14   attempting to rezone -- well, let me eliminate that

15   question.  When you bought the property, when you

16   acquired title to the property, how was it

17   originally zoned?

18       A.    I-3.  All of it was.  That whole tract

19   over there was.

20       Q.    So when you bought the property, you

21   thought it was and would always be industrial,

22   correct?

23       A.    Yes, absolutely.

24       Q.    So the action that was being taken by the

25   parish council that, apparently, the Banner sisters

1    were protesting, was really an action to restore it
2    to the zoning category that you thought it would
3    have been when you bought it?  Is that a fair
4    statement?
5         A.   It would only restore the Greenfield
6    part.  It wouldn't restore anything other than what
7    that Greenfield area is.
8         Q.   Got it.  So you --
9         A.   Mines was not rezoned.
10        Q.   -- were left out of that rezoning
11   application?
12        A.   Yes.  I was left out.  That's a good way
13   to put it.  I was left out of that rezoning.  I was
14   written off, yeah.
15        Q.   The Greenfield tracts around you were
16   being rezoned back to industrial, but you were
17   being left out, and you were going to remain
18   residential?
19        A.   I still am residential to this day.
20        Q.   That's an important point.  Did Jaclyn
21   ever discuss or was she ever involved in any way
22   with Gaumet Holdings' business?
23        A.   No.
24        Q.   Did you ever attend the meeting in
25   question, and by the meeting in question, most of

1    this litigation revolves around a meeting that

2    happened in November of 2023 where one of the

3    Banner sisters says that she was cut off and not

4    allowed to rant and rave about the ethics

5    complaint.  Did you personally attend that meeting?

6         A.   I did not attend. I attended a planning

7    and zoning committee meeting.

8         Q.   But you didn't --

9         A.   I don't remember what date that was, if

10   that was before.  I don't remember, but that's the

11   only meeting I attended.

12        Q.   And the planning and zoning committee is

13   different from the parish council; is that correct?

14        A.   Yes, it is.  Yes.  What happened -- I

15   don't need to explain that to you.

16        Q.   There was one specific reference that

17   didn't have a name, but you said it could have been

18   a reference to wanting to choke one of the Banner

19   sisters.  Couldn't it possibly also have been a

20   reference to one of their attorneys, Pamela Spees?

21   Do you remember having some conversations about the

22   attorney who represented the Banner sisters, or

23   does that not ring a bell?

24        A.   There was an attorney in there, in that

25   meeting that I attended, the planning and zoning

1    meeting.  That could have been referencing her.  I'm
2    not going to say it was or wasn't, because I don't
3    know.
4         Q.   So it could have been the lawyer or it
5    could have been one of the Banner sisters?
6         A.   Yeah, it could have been.
7              MR. SPEARS:
8                   William, give me just a quick minute
9                to check my notes.  I'll come back on
10               and may have one or two more questions.
11             MR. MOST:
12                  Sure.
13                  {BRIEF RECESS, 4:45-4:47}
14             MR. SPEARS:
15                  William, I've covered everything I
16               need to cover, so I'm good.  Thank you.
17    BY MR. MOST:
18         Q.   Just a few more.  Ms. Gaudet, Mr. Spears
19    was asking you about the timing of the property
20    acquisition, whether it's like before or after the
21    wedding.  Do you recall that?
22         A.   Yes.
23         Q.   Was it connected to the wedding somehow
24    or it's just you were answering about the time
25    period?  Does that make sense?

121

1      A.   I was talking about the time period of

2  when -- why the -- the purchase was in '19.

3      Q.   I see.  So it wasn't like the purchase of

4  the property somehow had to be after the wedding or

5  something?

6      A.   I don't understand what you are -- where

7  you are going with this.

8      Q.   Sure.  So was there any connection to the

9  purchase of the land and when the wedding was?

10  Like did one cause the other?

11      A.   No. Wedding personal, land business.

12      Q.   And then the fact that Jaclyn Hotard's

13  husband is a beneficiary of one of the trusts that

14  owns Gaumet Holdings, LLC, to your knowledge, has

15  that ever been disclosed before today in any sort

16  of public setting?

17      A.   Not to my knowledge I don't.

18      Q.   Has it ever been disclosed to any

19  government agency, to your knowledge?

20      A.   No. How could it have been?  You all are

21  the only ones that have it, you and my attorney.

22      Q.   Okay.  So that's been a secret until

23  today?

24      A.   It's been a secret until you all -- until

25  the judge ruled I had to give it to you, yes.  It's

1    been -- yeah.

2        Q.   We appreciate your time.  Obviously, you

3    know that there is a trial coming up next month. We

4    can go off the record.  Thank you.

5                 [End of deposition, 4:48]

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                   WITNESS CERTIFICATE

2

3

4

5               I, DARLA R. GAUDET, have read or

6    have had the foregoing testimony read to me

7    pursuant to Rule 30(e) of the Federal Rules of

8    Civil Procedure and do hereby certify that to the

9    best of my ability and understanding, it is a true

10   and correct transcription of my testimony.

11

12

13   Please check one:

14   _____Without corrections

15

16   _____With corrections (see errata sheet)

17

18

19

20   _____    _____

     DARLA R. GAUDET                          Date

21

22

23

24

25

```
 1                C E R T I F I C A T E

 2

 3                This certification is valid only for
    a transcript accompanied by my original signature
 4  and original required seal on this page.

 5                I, SANDRA P. DIFEBBO, Certified
    Court Reporter, in and for the State of Louisiana,
 6  as the officer before whom this testimony was
    taken, do hereby certify that DARLA R. GAUDET,
 7  after having been duly sworn by me upon authority
    of R.S. 37:2554, did testify as hereinbefore set
 8  forth in the foregoing 123 pages;

 9                That the testimony was reported by
    me in stenotype, was prepared and transcribed by me
10  or under my personal direction and supervision, and
    is a true and correct transcript to the best of my
11  ability and understanding;

12                That the transcript has been
    prepared in compliance with transcript format
13  guidelines required by statute or by rules of the
    board, that I have acted in compliance with the
14  prohibition on contractual relationships as defined
    by Louisiana Code of Civil Procedure Article 1434
15  and in rules and advisory opinions of the board;

16                That I am not related to Counsel or
    to the parties herein, nor am I otherwise
17  interested in the outcome of this matter.

18

19

20

21  _____
    Sandra P. DiFebbo,
22  Certified Shorthand Reporter

23  Date:  12/19/24

24

25
```