## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

JOY BANNER, Ph.D.                                            CIVIL ACTION

VERSUS                                                       NO. 23-7296

MICHAEL WRIGHT, individually and in official                SECTION: "G"(4)
capacity, et al.

### Memorandum in Support of Motion for New Trial

Trial in this matter took place from January 27 to 29, 2025. The jury returned a verdict in favor of Defendants.

At trial, Plaintiff put on strong evidence in her favor, including admissions from Defendants that they silenced her based on the content of her speech, text messages about how Defendant Hotard felt "hate" for Plaintiff, and the concession that the "on-topic rule" that was Defendants' explanation for their conduct had never actually been adopted by the Parish.

Defense counsel, by contrast, offered evidence and an array of persistent evidentiary violations. This began in opening, when the Court had to sustain multiple objections to defense counsel falsely representing the law. And then during witness testimony, defense counsel engaged in more than a dozen violations of this Court's evidentiary rulings, including a premeditated attempt to introduce prohibited evidence of advice-of-counsel. Defense counsel also engaged in treatment of witnesses that the Court found to be "abusive" and making a "mockery" of matters, and had to be cautioned at least a dozen times that trial counsel are not allowed to testify.

In determining whether to grant a new trial, the Fifth Circuit has told courts to ask whether the they can say "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error."[1] If

---

[1] *Hollybrook Cottonseed*, 772 F. 3d 1031, 1034 (5th Cir. 2014).

the answer is no, then "it is impossible to conclude that substantial rights were not affected" – and a new trial should be granted.[2]

Here, given the strength of Plaintiff's evidence and the cumulative nature of defense counsel's misconduct, the answer should be no. The Court expressed that during trial, explaining that in one instance of misconduct:

> The concern I have is that there was some of this last lawyer's testimony that I'm really bothered about. I'm not quite sure if my instruction corrected that. Sometimes when things are said, you know, they're out there. And I don't want — and I'm really bothered, Mr. Spears, because I warned you not to ask the question. You asked the question. And so now, you know, the information is out there.[3]

Because it cannot be said that the jury's judgment was unswayed by defense counsel's persistent misconduct and evidentiary-ruling violations, a new trial should be granted.

## I.    Legal Standard

Federal Rule of Civil Procedure 59 governs motions for a new trial. Rule 59(a) provides:

> The Court may, on motion, grant a new trial on all or some of the issues—and to any party—as follows:
>
> (A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court; or
>
> (B) after a nonjury trial, for any reason for which a rehearing has heretofore been granted in a suit in equity in federal court.

A new trial may be granted "if the district court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course."[4]

"The trial court's power to grant a new trial [under Rule 59(a)] on the basis of the court's firm belief that the verdict is clearly contrary to the weight of the evidence has . . . long been

---

[2] *Id.*

[3] Day 2, 303:5-11.

[4] *Sims v. City of Jasper*, 117 F.4th 283, 288 (5th Cir. 2024), *quoting Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985).

regarded as an integral part of trial by jury."[5] "In making the determination, the district court weighs all the evidence, but need not view it in the light most favorable to the nonmoving party."[6]

The Fifth Circuit has instructed that district courts should "respect the jury's collective wisdom and must not simply substitute its opinion for the jury's," but "if the trial judge is not satisfied with the verdict of a jury, [she or he] has the right—and indeed the duty—to set the verdict aside and order a new trial."[7] Under Rule 59, "new trials must not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great—not merely the greater—weight of the evidence."[8]

Trial courts have broad discretion in this area, given that the "authority to grant a new trial . . . is confided almost entirely to the exercise of discretion on the part of the trial court."[9] A motion for a new trial is a "much more lenient test" than for renewed judgment as a matter of law,[10] and will not be upset upon appeal unless an abuse of discretion.[11]

## II.    Discussion

**A.    This Court should grant a new trial because of the cumulative nature of Defendants' misconduct at trial, including repeated violations of the Court's evidentiary rulings.**

The Fifth Circuit has held that a new trial may be granted if "the trial was unfair, or prejudicial error was committed in its course."[12] When a district court is assessing a motion for a new trial based "on the submission of prejudicial information to the jury, the district court must

---

[5] *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985).
[6] *Id*.
[7] *Id*.
[8] *Shows v. Jamison Bedding, Inc.,* 671 F.2d 927, 930 (5th Cir. 1982).
[9] *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980); see also *Peterson v. Wilson*, 141 F.3d 573, 577 (5th Cir. 1998).
[10] Wright & Miller § 2531.
[11] *Jones v. Wal-Mart Stores, Inc.,* 870 F. 2d 982, 986 (5th Cir. 1989).
[12] *Sims v. City of Jasper*, 117 F.4th 283, 288 (5th Cir. 2024), *quoting Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985).

decide whether the error is harmless by assessing whether 'the error did not influence the jury, or had but very slight effect.'"[13]

According to the Fifth Circuit, the test is this: if "one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected" – and a new trial should be granted.[14]

In assessing this, courts often look to the cumulative nature of the erroneous actions.[15] As one court explained, one[16] "or several acts of impropriety on the part of a party may be overlooked with proper instructions given by the Court, but the Court cannot close its eyes where the record shows a persistence" of misconduct.[17]

1.  <u>Defense counsel engaged in persistent misconduct in front of the jury, including making false statements of law, counsel testifying, making a "mockery" of the proceedings, and refusing to move on even when ordered by the Court.</u>

Here, Defendants' counsel's persistent misconduct permeated the entire trial. It began in the first minutes of his opening argument, when the Court sustained repeated objections that Mr. Spears was falsely arguing the law. For example, Mr. Spears argued that R.S. 42:1141.4(L)(1) "is the law" and that Plaintiff had acted "contrary to this confidentiality statute."[18] But the parties had stipulated that that law was determined to be "invalid" nine years earlier.[19] This Court sustained

---

[13] *Hollybrook Cottonseed Processing, L.L.C. v. Am. Guarantee & Liab. Ins. Co*., 772 F.3d 1031, 1034 (5th Cir. 2014), *citing O'Rear v. Fruehauf Corp*., 554 F.2d 1304, 1308 (5th Cir. 1977) (*quoting Kotteakos v. United States*, 328 U.S. 750, 764, 66 S. Ct. 1239, 1248, 90 L. Ed. 1557 (1946)).

[14] *Hollybrook, supra*, at 1034.

[15] *See, e.g., United States v. Cervantes*, 706 F.3d 603, 619 (5th Cir. 2013) ("The cumulative error doctrine provides for reversal when an aggregation of non-reversible errors, i.e., plain and harmless errors that do not individually warrant reversal, cumulatively deny a defendant's constitutional right to a fair trial.")

[16] *Hollybrook*, *supra*, 772 F. 3d 1031 (5th Cir. 2014) (upholding a grant of a new trial when counsel violated a motion in limine by eliciting a single piece of barred testimony.)

[17] *Cecil Corley Motor Co. v. General Motors Corp*., 380 F. Supp. 819, 1974 U.S. Dist. LEXIS 7582 (M.D. Tenn. 1974).

[18] Trial Transcript, Day 1, 24:16-25:13.

[19] R. Doc. 141 (Pre-Trial Order) at pg. 4 (stipulating that In 2014, a federal judge determined that "R.S. 42:1141.4(L)(1) is invalid, both as applied to these plaintiffs and on its face, at least in part.").

4

Plaintiff's objection, and directed that some of Mr. Spears' comments be "withdrawn."[20] But despite the sustained objection, Mr. Spears *immediately* continued with the same argument – which resulted in another sustained objection and required the Court to issue a curative instruction that the jury should "disregard his statement that when she published — her act of publishing it was contrary to the law or unlawful in any way, disregard that."[21] The confidentiality statute ultimately became the main thrust of Defendants' closing argument to the jury.

Defense counsel's misconduct continued into his examination of witnesses, when defense counsel had to be instructed not to testify at least twelve separate times.[22] In at least one case, defense counsel tried to engage in active (but transparent) deceit of the court. Mr. Spears asked witness Guillot "You and I previously went through deposition testimony. . . . And one of the things we concluded was —" before an objection was stated.[23] When the Court pointed out that a lawyer cannot just launch into testifying about the content of a witness' deposition, defense counsel said "I'm not even talking about the deposition, Judge."[24] But of course, the Court had a real-time transcript and pointed out that "You just did."[25]

Defense counsel continued lines of questioning even when an objection was sustained and the Court instructed him to "move on." For example, Mr. Spears asked the Plaintiff if she has run for office and "been soundly not voted by the people in your community who know you best?"[26] The Court sustained an objection and ordered Mr. Spears to "move on." But Mr. Spears did not move on – he continued with the same questioning, next asking "did you run for office in 2014."[27]

---

[20] Day 1, 25:6-7.
[21] Day 1, 26:14-20.
[22] Day 1, 71:20-72:7, Day 1, 82:20-23, Day 1, 83:18-84:1.
[23] Day 2, 232:25-233:3.
[24] Day 2, 233:9-10.
[25] Day 2, 233:11.
[26] Day 1, 78:11-79:3.
[27] *Id.*

The Court had to sustain another objection because Mr. Spears had refused to move on as directed.[28]

Mr. Spears engaged in conduct that the Court determined to be "abusive" and a "mockery" of matters. During Plaintiff's testimony, he pulled out a timer and said:

> I'm going to use this timer, and give us your speech right now, the exact speech you came prepared to say that you said you were stopped from saying by Michael Wright. Are you ready?[29]

Plaintiff's counsel objected, and at a bench conference the Court said "I'm not going to allow you to make a mockery of the speech. . . .  I think that's abusive. . . I think that is just, you know, abusive of this woman to be honest with you.[30] The Court went on to explain that "I'm not going to make a witness come in here and perform. That is unheard of."[31]

2.    <u>Defense counsel engaged in repeated violations of this Court's evidentiary rulings.</u>

The above misconduct was repeated and problematic. But most concerning and most prejudicial to a fair trial was defense counsel's pattern of violations of evidentiary rulings.

The most serious of these was defense counsel's premeditated violation of the Court's ruling about the advice of counsel defense.[32] In a motion in limine, Plaintiff pointed out that the unconstitutional statute was provided to defendants by Assistant District Attorney Keith Green, and moved to exclude any discussion of that fact at trial because advice-of-counsel had not been plead as a defense and because Mr. Green's advice did not qualify for that defense.[33] The Court granted the motion.[34]

But then at trial, the following exchange occurred:

---

[28] *Id*.
[29] Day 1, 87:3-6.
[30] Day 1, 87:16-89:3.
[31] Day 1, 89:16-17.
[32] Rec. Doc. 53.
[33] Rec. Doc. 39-1.
[34] Rec. Doc. 53 ("Any reference to "advice of counsel" is excluded from the trial in this matter.").

[Mr. Spears:]  But explain to the jurors what, if anything, did you do in preparation for that meeting?

[Mr. Wright:]  I spoke with — I had an email and a phone call from District Attorney Keith Green.[35]

Plaintiff's counsel immediately asked to approach the bench and objected on the basis that this was "the exact thing that this Court excluded."[36] It quickly became apparent that this Court-order violation was premeditated; Mr. Spears had approached the bench with a print-out in his hand listing the four elements of an advice of counsel defense.[37] The Court noted that the precise email Mr. Wright referred to had been excluded in pre-trial rulings.[38] Astonishingly, Mr. Spears made clear that he was attempting to put into evidence what Wright heard from District Attorney Green even though (1) the Court had excluded it and (2) Mr. Spears *agreed* that what Green said "absolutely does not" meet the elements of advice of counsel."[39] The Court concluded that Mr. Spears was trying to "get in the backdoor what I did not allow you to present in the front door."[40]

The Court articulated why this was so problematic: if Mr. Wright were able to testify that he got information from his attorney, then the "assumption is that he was advised by his attorney. . .  And then the average person is going to say that, well, that's reasonable to read it because you got it from your attorney. But that's the defense that you did not properly raise. . .  you want to weaponize the fact so that the jury can make the conclusion that he had advice of counsel without having the burden of actually having to prove it."[41]

---

[35] Day 2, 314:5-11.
[36] Day 2, 314:16-17.
[37] *Cf.* Day 2, 314 ("Your Honor, advice of counsel requires four specific things.").
[38] Day 2, 315:12-13.
[39] Day 2, 316:21-23 ("THE COURT: So you're agreeing? You said that his testimony doesn't meet the elements of advice of counsel? MR. SPEARS: Right, it absolutely does not.").
[40] Day 2, 319:2-4.
[41] Day 2, 320:1-321:4.

The Court therefore excluded any further questioning on this topic. But by that point, the damage was done: the jury had already heard about Mr. Wright's "email and a phone call from District Attorney Keith Green." There was no putting that genie back into the bottle.

That was only one of many evidentiary-ruling violations by defense counsel. Some of these consisted of defense counsel's repeated efforts to question non-expert, non-lawyers about what the law is. This began with the very first witness, and the Court admonished defense counsel not to continue such conduct:

> THE COURT: Counsel, she is not an attorney, and I'm not going to allow her to try to opine on the law. I will instruct the jury on what the law is, what the Open Meetings Law is.
>
> We're here to present the facts to the jury. So if there's some facts that you need her to answer, if there's a question you can ask her that can get her to respond in facts and not on the law, I'm going to allow you to proceed, but within those parameters.[42]

But despite being told not to question witnesses about the law, defense counsel continued to do so – over and over and over again. For example, with *the very next witness*, they asked Plaintiff's mother a series of at least five legal questions about the Parish's compliance with the Open Meetings Law.[43]  Some of these questions consisted of <u>defense counsel</u> testifying about the law, explaining what the law "means," and then asking the witness to agree or not. For example:

> Q. And finally, the Louisiana Open Meetings Law requires public bodies to have open meetings. That means that the public has to be there to observe it. Are you aware of that?[44]

It is obviously improper for counsel to say what the law "requires" and what the law "means" in front of the jury, and it is particularly improper to do so *after the Court told counsel not to.* Even so, Defense counsel continued to ask witnesses about their "legal position"[45] and who the "statute

---

[42] Day 1, 100:2-10.
[43] Day 1, 125:10.
[44] Day 1, 127:17-19.
[45] Day 2, 264:22-265:8.

applies to" over repeated sustained objections.[46] Mr. Spears even asked a lawyer-witness what they "would advise" a person,[47] and asked Defendant Wright if a person was "violating any confidentiality statute."[48]

Similarly, at the outset of day two, the Court issued guidance about the ethics complaint. Specifically, the Court ruled that the dismissal of the ethics complaint was not material, because the reasoning was undisclosed and because it came long after the events in question. The Court explained:

> We know there was an ethics complaint. We know it was dismissed. Why or why not really doesn't matter. It was dismissed. And the letter doesn't say why it was dismissed; so I'm not sure who knows why it was dismissed. But it doesn't matter. It's not a material fact in this case.[49]

But defense counsel refused to abide by the Court's directive. They *continued* to repeatedly question multiple witnesses about the dismissal of the ethics complaint[50] and then returned again to it in closing.[51]

Similarly, at the beginning of day two, the Court brought up an anticipated witness, Mr. Sexton. It was unusual that Mr. Sexton was listed a witness, given that he was a lawyer who represented two of the three defendants – the Parish and Ms. Hotard.[52] Before he testified, the

---

[46] Day 2, 266:5-14.
[47] Day 2, 267:13-15.
[48] Day 2, 309:4-8.
[49] Day 2 at 134:19-25.
[50] Day 2, 267:20-22 ("Q. And the fact is that the complaint made against Jaclyn Hotard was thoroughly investigated, reviewed, and dismissed with no ethics violations found; is that correct?"); Day 2, 267:24-25 ("And the letter which you have identified by your signature says no violation was found; correct?"); Day 2, 297:20-21 ("Can you tell the ladies and gentlemen of the jury what was the final outcome of that matter?"); Day 2, 298:1-4 ("Q. What was the final outcome of that matter? A. What was the final outcome of that matter? The Ethics Board informed Ms. Hotard directly that she had not violated the ethics code and the file was closed."); Day 2, 298:9-11 ("Q. On which correspondence? A. The notice that the file was being closed because there was no evidence of a violation of the ethics code.").
[51] Day 3, 430:20-22 ("That letter says that the Board of Ethics considered a confidential investigation and that the matter was closed and no violation of the Code of Governmental Ethics was found.").
[52] Day 2, 302:4-6 ("Q. I just wanted to be clear who you represented. You represented Jaclyn Hotard; correct? A. That is correct and the parish.").

Court set some ground rules: it was "not going to let him testify" about his understanding of what was confidential or not.[53] Defense counsel committed that "We're not raising that issue, Judge."[54] Later, at a sidebar, Defense counsel said again that he "won't ask that."[55] But then Defense counsel asked *exactly* that, asking Mr. Sexton about the "investigative portion" and about his "personal knowledge" of what is or isn't marked confidential.[56] The Court stopped defense counsel and expressed the problem:

> What I'm really concerned about is you said you weren't going to ask that question and you turned around and asked that very question. Don't do that again. You asked the very question I was telling you do not ask because now they have this opinion. I'm going to have to have an opinion from someone who is not an expert.[57]

The Court had to give the jury another curative instruction, and struck both defense counsel's question and Mr. Sexton's response.[58]

The Court cautioned defense counsel not to use the word "inappropriate" to describe Dr. Banner's comment, because it suggested that the comment was "unlawful" but that was not true.[59] But despite the Court's guidance, Defense counsel continued to use the word "inappropriate" in that context.[60]

---

[53] Day 2, 138:13-19 ("Then Defendants, you want to call Gray Sexton. Okay, he knew he was, you know, he's a lawyer, but I'm not going to let him testify that he always understood the Ethics Board's investigation to be confidential because it does not matter what he believed. You didn't stipulate, but you did not oppose Plaintiff's motion early on that there was no defense of — advice of counsel defense.").
[54] Day 2, 138:20.
[55] Day 2, 298:18 ("MR. SPEARS: I won't ask that. I won't ask that.").
[56] Day 2:298:12-299:4.
[57] Day 2, 299:23-300:3.
[58] Day 2, 300:20-301:8.
[59] Day 2, 250:19-251:1 ("I will also say that I'm starting to get a little cringe using the word, you know, something inappropriate, you know, was said in that meeting. So I would kind of caution you on saying that. If it's off topic, it's off topic. There's an issue. The jury will decide, I guess, if it's — if it was inappropriate or — because that sounds like it was unlawful, you know, because that's a whole other issue that we really don't have to — nobody has to decide.").
[60] Day 2, 334:23-25 ("And the fact that she may have been addressing, as you thought to be, inappropriate, confidential ethics matters, was that one of your motivations to tell her to stay on topic?").

The Court directed defense counsel not to question witnesses about the "internal operations of the Board of Ethics."[61] But within a minute, defense counsel was doing exactly that, asking the witness "if and when an ethics complaint involving an elected official comes to your attention, what steps do you take?"[62]

The Court directed defense counsel not to ask a non-expert witness about the reasons why something is "important."[63] But then <u>two questions later</u>, defense counsel asked the witness about "reasons why it's important to keep people on time."[64]

Defense counsel's misconduct was so persistent that it is best summarized in chart form:[65]

| Details | Objection | Citation |
|---|---|---|
| **Defense Violations of Evidentiary Rulings** | | |
| The Court excluded any evidence of advice of counsel, including communications with Assistant District Attorney Keith Green. But then defense counsel chose in a premeditated fashion to solicit testimony from Defendant Wright about his "email and a phone call from District Attorney Keith Green." | **Sustained** | Rec. Doc. 53; Day 2, 314:5-11. |
| The Court ruled that the parties could not question witnesses on the law. But defense counsel did so with the very next witness. | Overruled | Day 1, 100:2-10; Day 1, 125:10; Day 1, 127:17-19. |
| Despite the Court's ruling about not asking legal questions, defense counsel asked witness Guillot about her "legal position." | **Sustained** | Day 2, 264:22-265:8. |
| Despite the Court's ruling about not asking legal questions, defense counsel asked witness Guillot about who the "statute applies to." | **Sustained** | Day 2, 266:5-14. |

---

[61] Day 2, 253:9:11 ("MR. MOST: So the internal operations of the Board of Ethics is off limits? THE COURT: Exactly.")

[62] Day 2, 255:17-19.

[63] Day 2, 282:2-17.

[64] Day 2, 283:11-15.

[65] This list is by no means a full list of every sustained objection at trial. Many additional objections were sustained, but were less prejudicial to a fair trial. (E.g., defense counsel eliciting irrelevant but benign testimony, questioning on cross outside the scope of the direct, or leading witnesses even after being directed not to.)

| | | |
|---|---|---|
| Despite the Court's ruling about not asking legal questions, defense counsel asked lawyer-witness Guillot what she "would advise" a person. | **Sua Sponte** | Day 2, 267:13-15 |
| Despite the Court's ruling about not asking legal questions, defense counsel asked witness Landeche whether Parish actions were "in compliance with the Open Meetings Law." | Overruled | Day 2, 275:11-13 |
| Despite the Court's ruling about not asking legal questions, Defense counsel questioned witness Landeche about what the Open Meetings Law "requires" and whether the parish "complied" with the law. | | Day 2, 286:4-287:10. |
| Despite the Court's ruling about not asking legal questions, defense counsel asked Wright about whether Ms. Perriloux was "violating any confidentiality statute." Jury told to disregard. | **Sustained** | Day 2, 309:4-8. |
| The Court ruled that the dismissal of the ethics complaint was already in evidence and "not a material fact in this case." But defense counsel questioned witness Guillot about it on cross. | **Sua Sponte** | Day 2 134:19-25; 267:20-268:2; |
| Despite the Court's ruling, defense counsel questioned witness Sexton about the dismissal of the ethics complaint. | | 297:20-21, 298:1-4; 298:9-11. |
| Despite the Court's ruling, Defense counsel questioned witness Guillot about the dismissal of the ethics complaint again on direct. | | Day 2, 263:21-25. |
| Despite the Court's ruling, defense counsel brought up the dismissal of the ethics complaint again in closing. | | Day 3, 429:21-22 |
| The Court ruled that it "not going to let [Mr. Sexton] testify" about his understanding of what was confidential or not. But then, as the Court explained, defense counsel "turned around and asked that very question." | **Sua Sponte** | Day 2, 138:13-19, Day 2:298:12-300:3. |
| The Court cautioned defense counsel against using the word "inappropriate" to describe Dr. Banner's public comment because it would suggest that the comment was unlawful. But defense counsel continued used the term. | | Day 2, 250:19-251:1, 334:23-25 |
| The Court directed defense counsel not to question witnesses about the "internal operations of the Board of Ethics." But then defense counsel did exactly that within a minute with witness Landry. | | Day 2, 253:9:11, 255:17-19. |

| | | |
|---|---|---|
| Defense counsel also questioned witness Guillot about the internal operations of the Board of Ethics. | Overruled | Day 2, 261:5-263:3. |
| Despite the Court's ruling that defense counsel shouldn't ask about "prominent supporters" of the industrial project, defense counsel continued to do so. | **Sustained** | Day 2, 311:11-18; 346:21-347:2. |
| **Defense Counsel's False or Improper Statements About the Law** | | |
| In opening, Defendants' counsel argued that R.S. 42:1141.4(L)(1) "is the law" – even though it was determined to be unconstitutional nine years prior. Comment ordered "withdrawn." | **Sustained** | Day 1, 24:16-25:13 |
| In opening, Defendants' counsel argued that Plaintiff's actions were "contrary to the statute" – even though the statute was unconstitutional. Jury told to "disregard" counsel's statement. | **Sustained** | Day 1, 25:9-26:20 |
| Ms. Sallah asked a non-expert witness about the "reasons why it's important to tell the public to stick to agenda items only." The Court directed her not to ask a question like that of a non-expect. But Ms. Sallah continued anyway, asking next "why it's important to keep people on time." | **Sustained** | Day 2, 282:2-283:25. |
| **Defense Counsel Testifying** | | |
| The Court pointed out that counsel's question was "like testimony" when he said "everyone, except for you, seems to say that the only property, the only tracts of land that were in this new zoning application, the one that you wrote the ethics complaint about, was property belonging to Greenfield." | **Sua Sponte** | Day 1, 71:20-72:7 |
| Instead of asking a question, Mr. Spears stated that "First of all, Jaclyn Hotard is not the secretary to the parish council." Court had to say "I'm going to stop you from testifying." | **Sua Sponte** | Day 1, 82:20-23 |
| Instead of asking a question, Mr. Spears stated that "First and foremost, the Open Meetings Law requires that the agenda . . ." Court had instructed Mr. Spears to "Stop testifying." | **Sustained** | Day 1, 83:18-84:1 |
| Instead of asking a question, Ms. Sallah stated that "you also saw that a couple other people — and if you don't recall, I can show you the video of the meeting." Court instructed Ms. Sallah that "You have to ask a question. You're testifying." | **Sua Sponte** | Day 1, 121:25-122:4. |

| | | |
|---|---|---|
| Mr. Spears began to provide himself Ms. Gaudet's answer to a deposition question. Court instructed Mr. Spears "You can't testify for her. You have to ask her a question. And stop reading the deposition. She is here live to testify live." | **Sua Sponte** | Day 2, 187:8-19. |
| Mr. Spears in his next question continued to provide testimony about the deposition. Court instructed Mr. Spears "You can't refer to her deposition. You have to ask her a question because you're not impeaching her." | **Sua Sponte** | Day 2, 188:4-7 |
| Mr. Spears testified about the requirements of the Open Meetings Law: "Q. The meetings, to be compliant with the Louisiana Open Meetings Law, must have some time period in which the public can discuss items that the council is going to vote on. Was that always done?" | Overruled | Day 2, 220:7-10. |
| Mr. Spears began to testify about what "we concluded" in Ms. Guillot's deposition. | **Sustained** | Day 2, 233:3 |
| Mr. Spears testified about what letters are or are not stamped confidential, prompting Court to say "you're testifying again." | **Sua Sponte** | Day 2, 257:10-15. |
| Mr. Spears testified that Mr. Wright's "testimony is you did not notice or read the particular note" Court ruled: "Counsel, you can't testify for him. And you can't lead your own witness either." | **Sua Sponte** | Day 2, 329:14-17 |
| Mr. Spears testified that "I saw you cleared the chamber on the video." | **Sustained** | Day 2, 331:12-15. |
| Mr. Spears testified that facts were "falsely alleged by Ms. Banner." Jury told to disregard. | **Sustained** | Day 2, 333:9-25. |
| Mr. Spears testified that Ms. Hotard's reelection "seems like an incredible vote of confidence." Jury told to disregard. | **Sustained** | Day 2, 343:3-7. |
| **Defense Counsel Making a "Mockery" of Matters** | | |
| Defense counsel pulled out a timer and said "I'm going to use this timer, and give us your speech right now, the exact speech you came prepared to say that you said you were stopped from saying by Michael Wright. Are you ready?" | **Sustained** | Day 1, 87:3-89:18 |
| **Irrelevant, Potentially Prejudicial Material Elicited by Defendants' Counsel** | | |
| Mr. Spears asked Plaintiff whether "at least twice in recent history you have sought to do what Michael and Jaclyn has done which is put your name on the ballot to be elected, and you've been soundly not voted by the people in your community who know | **Sustained** | Day 1, 78:11-21 |

| | | |
|---|---|---|
| you best?" Defense counsel instructed to "move on" – but he did not. | | |
| Immediately after a sustained objection, Mr. Spears continued: "Did you run for office in 2014" | **Sustained** | Day 1, 78:23-79:3 |
| Mr. Spears asked witnesses about other lawsuits filed by Plaintiff's non-profit. | Overruled | Day 2, 226:14-228:9. |
| Mr. Spears tried to indicate to the jury that the judge "know[s] I'm slow," prompting a curative instruction to the jury. | **Sua Sponte** | Day 2, 227:25-228:2, 230:13-17. |
| Even after the Court overruled an objection, defense counsel continued to engage in a "talking objection" that could "influence what the witness would say." | **Sua Sponte** | Day 2, 291:20-25. |

Compare the situation here to that of *Hollybrook Cottonseed,* 772 F. 3d 1031 (5th Cir. 2014). In that case, the Fifth Circuit upheld a grant of a new trial when counsel violated a motion in limine by eliciting a <u>single</u> piece of barred testimony. The violation of the motion in limine was found to require a new trial, even though the court gave an immediate curative instruction and polled the jury for assurance that the jurors could ignore the improper evidence.

Here, we have multiple violations of motions in limine and a huge cumulative weight of other prejudicial statements, testimony by counsel, forbidden questions, etc. The Court even recognized in real-time the cumulative nature of these violations, explaining at a sidebar that because defense counsel was "signaling bad law to the jury," the Court therefore had a "list of other things I'm going to have to instruct the jury about."[66]

The question posed by the Fifth Circuit is whether this Court can "say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error[s]."[67] If the answer is no, then "it is impossible

---

[66] Day 2, 141:20-25.
[67] *Hollybrook, supra,* at 1034.

to conclude that substantial rights were not affected" and a new trial should be granted.[68] Given the dozens of examples of repeated, pervasive, and court-order-violating conduct by defendants, the answer here is <u>no</u>, there can be no fair assurance that the jury's judgment was not swayed. It would have been nearly impossible for any juror to keep track of what testimony was or was not struck, given the number of violations by defense counsel.

And in fact, the Court expressed in real time that it could <u>not</u> say with fair assurance that the jury was not swayed. After witness Sexton's testimony, the Court explained:

> THE COURT: The concern I have is that there was some of this last lawyer's testimony that I'm really bothered about. **I'm not quite sure if my instruction corrected that.** Sometimes when things are said, you know, they're out there. And I don't want — and I'm really bothered, Mr. Spears, because I warned you not to ask the question. You asked the question. And so now, you know, the information is out there.[69]

The motion should be granted.[70]

**B.      This Court should grant a new trial because of the great weight of the evidence in favor of Plaintiff.**

According to the Fifth Circuit, the trial court's "power to grant a new trial on the basis of the court's firm belief that the verdict is clearly contrary to the weight of the evidence" has "long been regarded as an integral part of trial by jury."[71] In making this determination, "the district court weighs all the evidence, but need not view it in the light most favorable to the nonmoving party."[72] "While the court is to respect the jury's collective wisdom and must not simply substitute its

---

[68] *Id.*

[69] Day 2, 303:5-11.

[70] Should new evidence of Defendants' misconduct or other grounds for a new trial become apparent after the date of this filing, Plaintiff will seek leave to supplement this filing.

[71] *Smith v. Transworld Drilling Co.,* 773 F.2d 610, 613 (5th Cir. 1985), citing Wright, Federal Courts 633 (4th ed. 1983).

[72] *Id.*

opinion for the jury's, 'if the trial judge is not satisfied with the verdict of a jury, he has the right - - and indeed the duty -- to set the verdict aside and order a new trial.'"[73]

Here, Plaintiff brought claims under the First Amendment and Louisiana's Open Meetings Law, based on Defendants' actions during her attempt at public comment at a public meeting.

Defendants conceded at trial that Parish President Jaclyn Hotard had sponsored an agenda item about the parish paying for ethics lawyers with taxpayer money.[74] There was only one identified ethics law issue at the time – an ethics complaint against Hotard herself.[75] But that fact was hidden from everyone, even including the councilmembers who were being asked to vote on the item.[76]

When Dr. Banner attempted to speak about that ethics issue and express the point of view that taxpayer money should not be spent on it, Defendants acted to silence her. Defendant Hotard asked Defendant Wright to "stop Dr. Banner's comment."[77] Wright then gaveled Banner to "stop speaking."[78] And then Wright read a section of a criminal law purporting to criminalize Banner's speech.[79]

---

[73] Id.

[74] Day 2, 155:23-156:5 (Wright Testimony) ("Q. All right. And at that 2023 meeting, there was an agenda item about hiring special ethics lawyers; correct? A. Yes. Q. And the agenda item was about the parish paying for those lawyers; correct? A. Yes. Q. With taxpayer money? A. Yes.").

[75] Day 2, 157:1-6 (Wright Testimony) ("Q. Do you recall that you answered this question in a deposition? And do you recall that you were asked, 'But as far as you knew at the time, you only knew of one ethics law issue, the one involving the ethics complaint against Jaclyn Hotard'; agreed? A. Agreed. So I have no reason to dispute that.").

[76] Day 2, 214:11-14 (Testimony of former Councilperson Schnyder) ("Q. Did Ms. Hotard disclose to you or the other members of the parish council that when she sponsored that agenda item, that she herself was facing an ethics complaint? A. No, she did not.").

[77] Day 2, 158:4-5 ("Q. But at one point, the parish president asked you to stop Dr. Banner's comment; correct? A. Yes.").

[78] Day 2, 158:13-15 ("Q. And you expected her to stop what she was saying when you gaveled; correct? A. Yes. I expected all parties to stop speaking.").

[79] See Day 2, 158:16-19 ("Q. And then when you gaveled her quiet, you chose to read a section of a criminal law during Ms. Banner's public comment; correct? A. Yes.").

Both Defendants Wright and Hotard conceded that they acted to silence Dr. Banner because of the <u>content</u> of her speech. Wright admitted:

> Q.    Okay. So it was because of the content of what she was saying that you took the actions that you did; correct?
>
> A.    She was getting off topic, yes.

And Hotard admitted:

> Q.    And you asked the chairman to stop Dr. Banner's comment because of the content of what Dr. Banner was saying; correct?
>
> A.    Because she was off topic, yes.
>
> Q.    So yes, because of the content?
>
> A.    Because she was off topic.
>
> Q.    Yes?
>
> A.    Yes.[80]

But at trial, Defendant Wright made an extraordinary admission about the purported off-topic rule he and Hotard pointed to. Wright conceded that the Parish Council had *never voted on such a rule.*[81] Thus, he and Hotard were admittedly silencing Dr. Banner to enforce <u>a rule that did not exist</u>:

> Q.    Sure. When you gaveled her quiet, it was to enforce a rule that the parish has never formally adopted; agreed?
>
> A.    Correct.[82]

Given that the Open Meetings Law is judged by an objective standard, this is enough to grant a new trial. There is no way to rationally conclude Defendants complied with the public

---

[80] Day 2, 209:16-22.
[81] Day 2, 150:13-15 (Wright Testimony) ("Q. Right. And the parish council votes on its own rules; correct? A. Yes."); 153:22-23 ("Q. Okay. But the council has never voted on an on-topic rule, have they? A. They have not.").
[82] Day 2, 338:13-15.

comment requirement of the Open Meetings Law if they stopped public comment to enforce a rule that did not exist.

It is also more than enough to grant a new trial on the First Amendment discrimination claim.[83] "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys."[84] One exception, however, is that in a limited public forum a government may apply reasonable time, place, and manner restrictions to speech, so long as the restriction does not discriminate against speech on the basis of viewpoint.[85]

Here, Defendants Wright and Hotard both conceded that they were regulating Dr. Banner's speech based on content – and also that the Parish had *not* adopted the reasonable time, place, and manner restriction they invoked. Thus, Plaintiff proved the content-based element of her claim, and disproved Defendants' on-topic-rule defense.[86]

There was abundant evidence of the subjective intent required by Plaintiff's First Amendment retaliation claim. For example, the statute that Wright read had been declared unconstitutional on its face nine years earlier. Wright was on notice of that fact, given that the piece of paper he was reading from "had the word 'unconstitutional' at the top of it."[87] But he did not disclose to anyone in the room that the paper had the word unconstitutional at the top.[88]

---

[83] Viewpoint discrimination is a kind of content-based discrimination claim. *See Matal v. Tam*, 582 U.S. 218, 248, 137 S. Ct. 1744, 1766 (2017) ("A law found to discriminate based on viewpoint is an 'egregious form of content discrimination,' which is 'presumptively unconstitutional.'")

[84] *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995).

[85] Heaney v. Roberts, 846 F. 3d 795, 801-802 (5th Cir. 2017)

[86] *See Boos v. Barry*, 485 U.S. 312, 321 (1988) ("content-based restriction[s] on political speech in a public forum" subject to "most exacting scrutiny").

[87] Day 2, 161:16-18 ("Q. So this piece of paper had the word "unconstitutional" at the top of it; is that correct? A. Yes.")

[88] Day 2, 162:2-6 ("Q. Okay. And given that, it's a true statement that you did not disclose to anyone in the room, whether council members, the public, or Dr. Banner, that the piece of paper had the word "unconstitutional" at the top; agreed? A. Agreed.")

Plaintiff also proved at trial that Hotard's family had a serious financial interest in the rezoning she signed off on. Her mother-in-law testified that a family-owned LLC owned thin strips of land that controlled the rail access to an $800 million industrial project.[89] The mother-in-law agreed that controlling that rail access could increase the value of the land – "if it was zoned right."[90]

The evidence at trial showed that Ms. Hotard was aware of her family's ownership of the land,[91] and that she would provide mother-in-law "updates about the Greenfield matters as they were going through parish council meetings."[92] Ms. Hotard even provided her mother-in-law the "play-by-play of certain parish council meetings" about the Greenfield project as they were happening.[93]

The evidence at trial also showed that the financial benefit to Hotard's family was even closer than her mother-in-law: Hotard's own <u>husband</u> had an 8.3% interest in the land that would

---

[89] Day 2, 166:3-4 ("Q. Thank you. And there was to be a rail extension that would go right through those thin strips that you own; correct? A. That's my understanding of it. Q. So for this industrial project to proceed, the corporation
would either have to buy your company's land or pay for a right of way; correct? A. Yeah.")
[90] Day 2, 166:13-16 ("Q. And owning a strip of land that controls the rail approach to an $800 million industrial project can increase the value of that land; agreed? A. Yeah, if it was zoned right."); see also 179:23-25 ("Q. Thank you. And the value of that land would have increased if the rezoning were approved; correct? A. Correct. Q. And you co-own that company with two family trusts; correct? A. Yes, I do.")
[91] Day 2, 170:23-25 ("Q. So at least by this point, Ms. Hotard was aware that you owned land in the Greenfield grain elevator area; correct? A. Yes."); see also 175:15-17 (Hotard sending her mother-in-law an article with a map of the "properties alongside the Greenfield property"); see also 194:20-23 ("Q. Ms. Hotard, at least by the month before the November 2023 council meeting, you knew that Darla Gaudet owned some land by the Greenfield project; correct? A. Correct.")
[92] Day 2, 175:14-20 ("Q. And you would specifically ask Ms. Hotard for updates about the Greenfield matters as they were going through parish council meetings; correct? A. Correct. Q. You would specifically ask her to report back to you about who voted yes or no on Greenfield matters; correct? A. Yes, I did.")
[93] Day 2, 176:3-17-19 ("Q. And then Ms. Hotard offered to text you the play-by-play if you don't feel like attending? A. Yes." Q. Okay. And going down to page 4, she did, in fact, report to you about the specific vote on the Greenfield matter? A. Yes, she did.")

increase in value if Hotard's rezoning application went through.[94] It was admitted that this was a "secret" until the mother-in-law was required to disclose the information in this case.[95]

        This evidence then explained the background for the direct evidence at trial of Hotard's animus towards Dr. Banner. For example, Hotard's text messages showed Hotard saying "she wanted to choke Joy Banner,"[96] calling Banner "the bitch,"[97] and indicating that she felt "hate" for Joy Banner.[98]

        And then, just a few weeks before the November 2023 meeting, Hotard texted that she was "still steaming pissed" and "mad." She explicitly indicated that she wouldn't let Dr. Banner talk about the ethics issue: she said she would accept "<u>anything, but to let them say I violated the ethics code</u>."[99] The evidence at trial also showed that Hotard committed perjury when she swore that the texts did not exist.[100]

        Thus, whether viewed from an objective point of view – per the Open Meetings Law claim or content-based discrimination claim – or a subjective point of view – per the First Amendment retaliation claim – Plaintiff's evidence was overwhelming.

---

[94] Day 2, 184 ("Q. Now Mr. Most is making a point of your son being a beneficiary of some of the holdings that Gaumet has. Explain to the jurors what is his percentage interest as a beneficiary. A. His percentage is one-third of 25 percent that he — that his father had which is 8.3 percent").

[95] Day 2, 182 ("Q. Okay. Do you see in your deposition you were asked, 'So that's been a secret until today?' And your answer was, 'It's been a secret until you all — until the judge ruled I had to give it to you, yes'? A. Yes, that's correct.").

[96] Day 2, 170:3-5 ("Q. So your understanding of the text message was that Ms. Hotard was saying she wanted to choke Joy Banner; correct? A. It was my understanding, yes.").

[97] Day 2, 170:9-11 ("Q. And you understood Ms. Hotard, when she said "the bitch," to mean Joy Banner; correct? A. I'm guessing that's what she meant.").

[98] Day 2, 177:23-178:4 ("Q. When Ms. Hotard wrote, "I hate these people," you understood her to be referring to Joy Banner and her sister; correct? A. I understood it to be the situation going on, yes. Q. Specifically, "these people," being Joy Banner and her sister; correct? A. Descendants and Joy Banner, yes, her sister.").

[99] Day 2, 171:4-11. Emphasis added.

[100] Day 2, 203:18-22 ("Q. So this was you swearing under oath that no such documents exist; correct? A. Correct. Q. But as we've seen, those documents did exist; correct? A. Correct.").

### III.    Conclusion

Jury trials are always unpredictable. Just because a jury found for one side against the other is no reason for a new trial. But here, given the evidence presented at trial, the jury's verdict was unusually surprising. Plaintiff's two arguments for a new trial (defense misconduct and the overwhelming evidence for plaintiff) put together may provide an explanation: despite the evidence in Plaintiff's favor, defense counsel's dozens of evidentiary violations may have created confusion amongst the jurors. Given the cumulative weight of defense counsel's evidentiary violations, it cannot be said "with fair assurance" that the jury's judgment was untainted by the violations. Accordingly, a new trial should be granted.

Respectfully submitted,

/s/ *William Most*
David Lanser, 37764
William Most, 36914
MOST & ASSOCIATES
201 St. Charles Ave., Ste. 2500, #9685
New Orleans, LA 70170
Telephone: (504) 509-5023
Fax: (504) 414-6400
williammost@gmail.com