<pre>
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
 2

 3   *****************************************************************
     JOY BANNER                              CIVIL ACTION
 4                                           NO. 23-7296
     VERSUS                                  SECTION "G"
 5                                           JANUARY 27, 2025
     MICHAEL WRIGHT, ET AL
 6   *****************************************************************

 7        TRANSCRIPT OF JURY TRIAL DAY 1 - AFTERNOON SESSION
        BEFORE THE HONORABLE CHIEF NANNETTE JOLIVETTE BROWN
 8                  UNITED STATES DISTRICT JUDGE

 9

10   APPEARANCES:

11   FOR JOY BANNER:              William B. Most, Esq.
                                  David J. Lanser, Esq.
12                                MOST & ASSOCIATES
                                  201 St. Charles Avenue
13                                Suite 2500
                                  New Orleans, LA 70170
14

15

16   FOR DEFENDANTS:             Ike Spears, Esq.
                                  Joyce Sallah, Esq.
17                                SPEARS & SPEARS
                                  909 Poydras Street
18                                Suite 1825
                                  New Orleans, LA 70112
19

20

21   Official Court Reporter:    Alexis A. Vice, RPR, CRR
                                  500 Poydras Street, HB-275
22                                New Orleans, LA  70130
                                  Alexis_Vice@laed.uscourts.gov
23

24

25   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
     PRODUCED BY COMPUTER.

                          OFFICIAL TRANSCRIPT
</pre>

**INDEX**

                                                                PAGE

Opening Statements by Mr. Lanser                         11

Opening Statements by Mr. Spears                         18


**WITNESSES FOR THE PLAINTIFF:**


JOYCEIA BANNER

     Direct Examination by Mr. Lanser                    32
     Cross-Examination by Mr. Spears                     68
     Redirect Examination by Mr. Lanser                 108



HARRIET BANNER

     Direct Examination by Mr. Lanser                   111
     Cross Examination by Ms. Sallah                    119

OFFICIAL TRANSCRIPT

```
 1                    P-R-O-C-E-E-D-I-N-G-S

 2                     (JANUARY 27, 2025)

 3          (JURY TRIAL DAY 1 - AFTERNOON SESSION)

 4

 5             (Proceedings held in chambers.)

 6         THE COURT: So we're going to bring him in and talk to

 7    him, but Juror No. 4 now wants to be excused because he picks

 8    up his three-year-old.  So he doesn't speak English very well.

 9    I know I asked that question.  So I haven't spoken to him yet.

10    But just trying to get him to stay in one place is giving me

11    some concern.

12             But he communicated through the marshals or to my

13    case manager that, you know, he's the one who said he has a

14    two-week-old and a three-year-old or whatever.  And he doesn't

15    have any other family here; so he has to pick up the

16    three-year-old from school.

17         DEPUTY CLERK: I'm not sure which child it is.

18         THE COURT: Well, it must be.  The two-week-old would

19    be with the momma, I would imagine.  It's been a while since I

20    had children, but I think, you know.  But he said he could pick

21    them up today.  So I need to get to the bottom of that.  You

22    know, why can he pick them up today, but he can't pick them up

23    the rest of the week, you know.  So we need to get to the

24    bottom of that.

25             And then I'll discuss with you all whether I excuse
```

OFFICIAL TRANSCRIPT

1  him because now we have an abundance of jurors.

2          **MR. SPEARS:** Why did you look at me when you said

3  that?

4          **THE COURT:** I'm just saying.  We usually go with

5  eight, but we got extras.  Okay, so let's bring him in.

6                  (Juror 4 was escorted into chambers.)

7          **THE COURT:** So you're Juror No. 4?

8          **JUROR 4:** Yes.

9          **THE COURT:** What's your name?

10          **JUROR 4:** Ziad Fadhil.

11          **THE COURT:** So I understand that you'd like to be

12  excused from the jury?

13          **JUROR 4:** Yeah.  Remember, I mentioned I have a

14  newborn baby.

15          **THE COURT:** Yeah, two-week-old.

16          **JUROR 4:** But I just have a daughter.  We have a

17  daughter.

18          **THE COURT:** Okay, so you have two children?

19          **JUROR 4:** Yes, ma'am.

20          **THE COURT:** And how old is the other child?

21          **JUROR 4:** Two years and a half.

22          **THE COURT:** And so what's your concern?

23          **JUROR 4:** Take him to school.

24          **THE COURT:** Okay, so you took him to school today?

25          **JUROR 4:** Yeah.  I told them I don't mind to stay

1  today until 5:00, 6:00.  But I can't tomorrow.  I take him to
2  school.
3          **THE COURT:** So what time does school open?
4          **JUROR 4:** 7:30.
5          **THE COURT:** And where do you live?
6          **JUROR 4:** Metairie.
7          **THE COURT:** Okay, so you live in Metairie.  You could
8  take him to school.  We won't start until 9:00.  So what time
9  does it close?
10          **JUROR 4:** The school, it's 2:30.
11          **THE COURT:** So what's going to happen today?
12          **JUROR 4:** Today, my dad's going to go with my brother.
13  Because my dad didn't drive, but my brother drive.
14          **THE COURT:** Why can't they do this for the rest of the
15  week?
16          **JUROR 4:** Because we own a business, I mentioned
17  earlier, and my brother, he going to be at work.
18          **THE COURT:** All right.  Do y'all have any questions?
19          **MR. SPEARS:** I don't have any questions.
20          **THE COURT:** I mean we can discuss it after.  But do
21  you have any questions, any more questions?
22          **MR. MOST:** So is there anyone who can cover for your
23  brother at work?
24          **JUROR 4:** No.  Because we own gas stations and it's
25  hard.  We have like almost 25 people that work for us, and me

OFFICIAL TRANSCRIPT

1 and my brother are in charge.

2       **THE COURT:** So why didn't you raise this?  I asked you

3 several times.

4       **JUROR 4:** I mean actually, I was -- I told you, I was

5 shy.  Even my language is like not very well, but I'm doing

6 good.  But I was shy to raise my hand in front of everybody.

7       **THE COURT:** But I don't want you to think that that's

8 a light matter, so you know.  I asked y'all several times.

9       **JUROR 4:** Yeah, I think twice, yeah.

10       **THE COURT:** Because you need to understand, your lack

11 of forthcomingness is now really causing me a problem in this

12 trial because we had ten.

13       **JUROR 4:** Yeah, yeah.

14       **THE COURT:** And you were one of the ten.  So now,

15 we're short.  So that's not a light thing.

16       **JUROR 4:** Sure.

17       **THE COURT:** So when you serve on a jury, it is a

18 serious matter, right.  I said almost as important as voting.

19       **JUROR 4:** Of course, yes.

20       **THE COURT:** So it does bother me that you seem to take

21 this lightly.  So I want to communicate to you that you're not

22 guaranteed -- I have not decided.  I may not exclude you from

23 the jury.  Your brother, your dad, somebody may have to go pick

24 up that child.

25       **JUROR 4:** Sure.

OFFICIAL TRANSCRIPT

1        **THE COURT:** Okay, they can do it today.  It might be
2    inconvenient.  It may, you know, cause you to move things
3    around.  But you know, you had several opportunities to speak.
4    I'm not just, you know, wasting time out there.

5        **JUROR 4:** Sure.  Sorry about that.

6        **THE COURT:** And you've already taken an oath.  You
7    took an oath.  You know, that means something here.  You took
8    an oath to do your job, and now you're saying you can't do it.
9    It seems to me that it's inconvenient for you to do it, but I
10   don't see that it's impossible for you to do it.

11       So I'm going to excuse you, and then let you know
12   what I decide to do.

13       **JUROR 4:** Sure, thank you.

14       **DEPUTY CLERK:** You can follow me.

15       **THE COURT:** You know, my concern is I don't know what
16   he said in the jury room, and I'm not going to have a mistrial
17   here, you know.  He can do it today.  He can do it every day.
18   It's going to be inconvenient, you know.  I feel like, you
19   know, there is somebody to pick up that child.  And he did say
20   they have 25 employees, and they own several gas stations.  So
21   even the dad and the son, they're not enough to cover all the
22   gas stations.

23       So I think he's trying to, you know, get out of jury
24   service.  He seemed to understand me pretty well, and I can
25   understand his English pretty well.  I don't know about you

1  all. I'm not inclined now after speaking to him, I'm really

2  not inclined to excuse him. But I'd like to hear from each

3  side what you think.

4         **MR. MOST:** Yeah. I think if we were closer to six, I

5  would be more reluctant to ask to release him. But given that

6  we have a ten-member jury already, if we lose one, we're down

7  to nine. That still leaves us several before we get down to

8  the minimum.

9         You know, I agree that there's not a hard conflict

10  like it would be impossible for him to serve. But it does

11  sound like between a two-week-old and a toddler, I think that

12  is a hardship. And so I would recommend releasing him.

13         **MR. SPEARS:** Judge, I don't view it as a hardship.

14  And as you said, he's been sworn in now which gives me

15  palpitations that he comes in after he's sworn in now, when he

16  had a chance at least two or three times to articulate, come up

17  and articulate that he had a conflict. He clearly has 25

18  employees, and you know, I've had employees pick up my kids

19  from work when they were younger. He has a dad and a brother.

20  So I think he has at least 27 people who can take an hour --

21         **THE COURT:** I mean I'm not going to make the

22  assumption that, you know, that you would just let an employee

23  go pick up your child or that you could. There's probably some

24  employment issue if you make somebody who is supposed to be

25  running the cash register, all of a sudden, go pick up kids.

OFFICIAL TRANSCRIPT

1    **MR. SPEARS:** He certainly has his father and his

2    brother who can take an hour or 30 minutes, however long it

3    takes, for him to go pick up the kid and bring the kid home.

4    Judge, I would be opposed to it since he had the

5    opportunity.  And I don't think there's a problem with a

6    language barrier, I agree with you.  I didn't see any language

7    barrier.

8    **THE COURT:** You know, I just don't want to lose any

9    more jurors.  I think about it.  I get concerned that he's

10   going to be distracted now.  And how is he going to feel if

11   he's now requested to leave and now I'm making him stay?  Is he

12   going to pay attention?  You know, is he just, you know.

13   What's most important is that he be fair.

14   To be honest with you, if he had brought it up

15   earlier, based on who I have excused -- I'm talking out loud,

16   okay.  We excused the woman with the son with the Crohn's

17   disease, you know, because that was going to be a distraction.

18   I excused the woman with the back problem.  Who else did I

19   excuse?  Oh, I excused the woman who was going to lose her job.

20   So he's kind of articulated the impact on his

21   business and the inconvenience.  Since it is early, I'm going

22   to go ahead and excuse this juror.  I think it's going to be --

23   it's better now than -- I don't want him going back -- he's

24   still sitting in there; right?

25   **LAW CLERK:** Morgan took him.

OFFICIAL TRANSCRIPT

1     **THE COURT:** Right.  You know, I don't want him going
2  back there and talking to other jurors.  That's the problem we
3  have.  Even if we keep him, if he goes back there and he's
4  disgruntled, it's going to start problems, you know, with the
5  jury.  And then we're going to have somebody else coming.

6     He's been isolated from them with this, and I think
7  it's in the best interest of us moving forward that we just
8  remove him.  If it has already contaminated the jury, we will
9  have to deal with it.

10    But I think it's isolated.  I think he only told the
11 U.S. Marshal and told the case manager.  In the sense that you
12 just don't want somebody mad up there and complaining because
13 then everybody starts complaining.  And this is just their
14 civic duty.

15    So I'm going to go ahead and let him go take care of
16 his two-week-old baby.  He has a two-week-old baby, a wife that
17 just had a baby, and a two-and-a-half-year-old.  So as I said,
18 if he had brought it up timely, I would have -- I don't want to
19 punish him.  He's going to have to come back.  So he's going to
20 be excused.  There's a difference, which means not for this
21 jury, but that just means he's going to have to come back.

22    **MR. SPEARS:** Judge, we don't want to punish him
23 either.  But in an abundance of caution, we'll simply note an
24 objection to him being excused at this stage.

25    **THE COURT:** Okay.  Well, I want to note that at this

OFFICIAL TRANSCRIPT

```
 1   stage, y'all haven't even made opening arguments, and we
 2   usually choose eight jurors and we have ten.  We only need six
 3   to decide.  So I think at this point, this is the best thing to
 4   do.  Thank you.
 5                    (This concludes the in-chambers conference.)
 6               DEPUTY CLERK: All rise.
 7                    (The jury was escorted into the courtroom.)
 8            THE COURT: All right, you can all have a seat.  Thank
 9   you.
10            We'll now have opening statements.
11           MR. LANSER: Ladies and gentlemen of the jury, my name
12   is Dave Lanser, and my colleague William Most and I are the
13   attorneys for the Plaintiff in the case, Dr. Joy Banner.
14           This is a case about free speech and about
15   retaliation by government officials against a citizen for
16   attempting to exercise her free speech.
17           Specifically, as you will hear over the next few
18   days, this case concerns Defendants, a parish president and a
19   councilperson, shutting down our client's attempt to
20   participate in public comment period of the parish council
21   meeting and the reasons why they chose to do so.
22           Now as you heard the judge say, what I say in this
23   opening statement is not evidence.  The evidence will come into
24   this case when you hear the witnesses testify, when you see the
25   video and documents.  But I'm going to give you an overview of
```

OFFICIAL TRANSCRIPT

1  the testimony that you are expected to hear so that as you

2  receive the evidence, it will be easier for you to piece it all

3  together.

4          Dr. Joy Banner is a resident of St. John the Baptist

5  Parish where her family has lived for generations.  Several

6  members of her family still live within a short distance of

7  each other and are active members of their community.  Joy and

8  her twin sister Jo are co-founders of The Descendants Project

9  which is an organization dedicated to honoring the community of

10  St. John the Baptist Parish by protecting and preserving its

11  history and promoting new economic opportunities there.

12          Several years ago, an out-of-state corporation, the

13  Greenfield Corporation, tried to put a major industrial

14  facility, an industrial grain elevator, on residential land

15  immediately adjacent to the home where Dr. Banner and her

16  family live.  The parish government supported this project by

17  attempting to rezone the land from residential to industrial.

18  Joy and her sister helped rally the community to protect their

19  homes and to protect the integrity of the area where her family

20  has roots spanning generations.

21          You will learn at this trial that one specific

22  concern that Joy had was that she had reason to believe that

23  the current parish president and a defendant in this case,

24  Jaclyn Hotard, personally signed a rezoning application for the

25  Greenfield land which Joy believed financially benefited

OFFICIAL TRANSCRIPT

1  Ms. Hotard's family.  That conflict of interest led Joy to file

2  an ethics complaint against Ms. Hotard in October 2023.

3       There are some facts in this case that both sides

4  agreed on, and those agreed upon facts are referred to as

5  stipulated facts.  The judge will read all of these stipulated

6  facts to you after the opening statements.  But I want to

7  mention a few which I believe highlight the story that we're

8  here to tell.

9       So it's a stipulated fact that Dr. Banner filed this

10  ethics charge against Jaclyn Hotard.  It is a stipulated fact

11  that the ethics charge alleged that Jaclyn Hotard had signed a

12  rezoning application that would significantly affect the value

13  of her mother-in-law's LLC's property in violation of state

14  ethics law.

15       We are not here to decide the merits of that ethics

16  complaint, but that ethics complaint that Joy filed against

17  Ms. Hotard sets the stage for the reason why we're here in this

18  courtroom today.

19       It is also a stipulated fact that the St. John the

20  Baptist Parish Council held a public meeting on November 28,

21  2023, and it's a stipulated fact that the St. John the Baptist

22  Parish Council is a public body subject to Louisiana's Open

23  Meetings Law.

24       It's a stipulated fact that Defendant Hotard attended

25  this meeting in her capacity as parish president.  Her

OFFICIAL TRANSCRIPT

1  Codefendant Michael Wright was also at the meeting in his

2  capacity as the elected Chairperson of the council.

3          The parish council posted an agenda before the

4  meeting which included an item of particular interest to Joy.

5  Agenda Item J sought to retain a law firm to perform services

6  related to ethics issues.  And as you'll learn through

7  testimony at this trial, at least one of those issues for which

8  the council sought to hire an attorney was the ethics complaint

9  that Joy filed against Ms. Hotard.

10         After seeing the agenda, Joy posted on Facebook that

11 she was concerned that if this agenda item passed, then

12 taxpayers would have to pick up the tab for Ms. Hotard's

13 personal legal representation.  You will hear that Joy believed

14 taxpayers should not have to pay for legal representation of

15 parish council members to defend against ethics violations for

16 their own personal benefit.  So Joy attended the meeting

17 intending to speak during the public comment on that agenda

18 item, Agenda Item J.

19         You will hear from Joy that she planned to discuss

20 the ethics complaint that she filed against Ms. Hotard in an

21 effort to convince the council to vote "No" on Agenda Item J

22 and to not retain a special ethics counsel at taxpayer expense.

23 You will see that Joy even brought along a poster and some

24 handouts which she hoped to show to the council in support of

25 this public comment.

OFFICIAL TRANSCRIPT

1          You will hear from others who attended the meeting as

2    well that they agreed that taxpayers should not have to pay for

3    personal legal representation of parish council members.

4          But Joy did not get a chance to finish what she

5    planned to say.  In fact, she was hardly allowed to speak at

6    all.  This is where we get to the part that Plaintiff contends

7    is a free speech violation.  This meeting was recorded on

8    video.  And as you will see on the video, Defendant Hotard

9    interrupted Joy shortly into her public comment.

10          It's a stipulated fact that Jaclyn Hotard told

11    Dr. Banner during her public comment that she was, quote, In

12    violation of state law, and asked Chairman Wright to, quote,

13    Stop this comment.

14          Shortly thereafter, Defendant Wright gaveled Joy

15    silent and read aloud a criminal law which included penalties

16    such as fines and jail time.  It's a stipulated fact that

17    Chairman Wright read a state statute aloud during Dr. Banner's

18    public comment.  And you will get the opportunity to see this

19    happen in the video taken of the meeting.

20          Again, this is a criminal statute, and it is a

21    stipulated fact that the statute states in part that a violator

22    may be punished by a fine of not more than $2,000 or

23    imprisonment for not more than one year or both.

24          You will hear testimony from Joy that after Michael

25    Wright read the criminal statute, she continued her comment

OFFICIAL TRANSCRIPT

1  briefly, but ended it prematurely and did not get to fully
2  discuss what she was there to comment on as a direct result of
3  the threat of jail time.
4          But there's a problem with this law that
5  Chairman Wright threatened Joy with.  It's a stipulated fact
6  that in 2014 a federal judge determined that the statute,
7  quote, Is invalid both as applied to these plaintiffs and on
8  its face, at least in part.
9          You will see a copy of the statute from which
10 Mr. Wright read, and that copy stated right at the top, "Note:
11 This provision of law was included in the unconstitutional
12 statutes biennial report to the legislature."  That is to say,
13 Defendant Wright threatened Joy by reading from a paper that
14 had the word "unconstitutional" written at the top.
15         You will hear testimony from Joy that as a result of
16 Defendants' actions, she now rarely participates in public
17 meetings or even attends meetings out of fear of further
18 retaliation; even though her advocacy has been her passion and
19 her life's work.
20         You will hear testimony from others who also intended
21 to speak at that same meeting, but chose not to do so out of
22 fear of arrest.  You will also hear testimony from Joy and some
23 of the individuals who know her best about how she has changed
24 as a result of this experience.
25         So why does this matter?  At the end of this case,

1    you will be asked to decide whether the parish government

2    officials' actions violated Joy's First Amendment right to free

3    speech and also whether their actions violated Louisiana's Open

4    Meetings Law.

5            If you do decide that the Defendants violated

6    Ms. Banner's rights, you'll be asked to determine what is

7    appropriate compensation.  This case revolves around two basic

8    principles:

9            No. 1, whether government officials should be allowed

10   to shut down a citizen's public comment if they do not want

11   people to hear what that person is saying;

12           And No. 2, whether the government should respond to a

13   citizen's attempt to expose government corruption by silencing

14   them and threatening jail time.

15           Defendants may argue in this case that they were just

16   trying to keep the meeting running on track, but it will be up

17   to you to weigh the evidence and decide whether that was their

18   real motivation or if they shut down Joy's public comment in

19   retaliation because of the content of her public comment in

20   violation of her First Amendment rights.

21           You'll see Defendant Hotard's text messages with her

22   mother-in-law and get to decide whether or not those shed any

23   light on the motivation behind silencing Joy.  You'll learn

24   about whether Hotard swore under oath whether or not these text

25   messages even existed.

OFFICIAL TRANSCRIPT

1      You'll find out whether or not the parish even has an

2  on-topic rule which they claim Joy was violating.  You'll find

3  out if Defendant Wright has ever threatened someone else with a

4  criminal law during any other public comment period during his

5  more than decade as a member of the council or if he only did

6  so when Joy was speaking about alleged ethics violations by the

7  parish president.

8      After weighing all the evidence, it will be up to you

9  to decide whether Defendants Jaclyn Hotard, Michael Wright, and

10  the Parish of St. John the Baptist violated Dr. Joy Banner's

11  First Amendment rights and her rights under Louisiana law.

12      Thank you.

13      **THE COURT:** All right, thank you, Counsel.

14      Mr. Spears.

15      **MR. SPEARS:** Thank you, Your Honor.

16      May it please the Court and members of the jury,

17  again, my name is Ike Spears.  And along with my co-counsel

18  Joyce Sallah and our assistant Ally Connolly, we thank you on

19  behalf of our clients, the Parish of St. John the Baptist,

20  Parish President Jaclyn Hotard, and Councilman-At-Large Michael

21  Wright.

22      You're going to learn that Michael Wright and Jaclyn

23  Hotard are dedicated public officials who have served the

24  Parish of St. John the Baptist exceptionally well.  That's why

25  I'm slightly taken aback when I hear Mr. Lanser say that his

OFFICIAL TRANSCRIPT

1  client was attempting to expose public corruption.  It's
2  actually insulting and it's offensive.

3          Michael is currently serving his first term as an
4  elected at-large councilman.  Before that, he was twice elected
5  as a district councilman.  So he has served the people of the
6  Parish of St. John for nine years without scandal, nine years
7  without scandal.

8          Jaclyn is currently serving her second term as parish
9  president.  She was elected to her first term with an
10 overwhelming majority of the vote.  Nearly 70 percent of the
11 people of St. John elected her, allowing her to defeat four
12 opponents in the primary election without a runoff.  Four years
13 later, she was elected again to her second term as parish
14 president with no opposition.

15         Prior to serving as parish president, you will learn
16 that she served two terms as a district council member in
17 St. John Parish, and she served two more terms as an at-large
18 council member in St. John Parish.  Jaclyn has served the
19 people of St. John for over 21 years without scandal, without
20 scandal.

21         Michael and Jaclyn collectively have over 30 years,
22 over 30 years of public service.  They are well versed in
23 following the rules of Louisiana's Open Meetings Law which
24 you're going to hear a lot about today.  And the evidence will
25 show that they're tasked with keeping their meetings on track;

1  even though sometimes they're confronted with hostile and angry
2  members of the general public.
3           They have learned that in public life you have to
4  have thick skin.  You have to let some of the criticisms roll
5  down your back like water on a duck.  It comes with the job.
6  They have served the people without scandal, and they have
7  learned to grow thick skin and not to take any of the
8  criticisms from Joy Banner or anyone else personal, personally.
9           You're going to learn that Joy Banner and her twin
10 sister are well-known community activists out in St. John.
11 They frequently speak at parish council meetings.  They have
12 sued -- not "they," but Joy has sued Councilman Michael Wright,
13 Parish President Jaclyn Hotard, and St. John the Baptist Parish
14 for what she claims is a violation of her First Amendment right
15 to free speech and a violation of Louisiana Open Meetings Law
16 at one of the specific parish council meetings which occurred
17 on November 28, 2023.
18          You're going to learn during the course of this trial
19 a lot about the Louisiana Open Meetings Law, probably more than
20 you ever wanted to know about the Louisiana Open Meetings Law,
21 which governs the way public bodies conduct their meetings.
22          You're going to learn a lot about the First Amendment
23 right to free speech, and one of the things you're going to
24 learn is that the First Amendment right to free speech is not
25 without limits or restrictions.  We live in a society where

OFFICIAL TRANSCRIPT

1   there's certain laws and rules that teach us that certain
2   things are private and confidential.

3           You know a lot about this.  Think about it.  Think
4   about it.  Your health and medical records, private,
5   confidential.  Your banking and financial records, private,
6   confidential.  Your Social Security numbers, private and
7   confidential.  Personnel and employment matters, private and
8   confidential.

9           So just because a nurse at your doctor's office
10  learns certain information about your health status or your
11  medical status or the teller at your local bank learns
12  information about your finances and your Social Security
13  number, their First Amendment right to free speech does not
14  allow them to go out and publicly disclose your personal and
15  private information.

16          The evidence will show that on October 26, 2023, that
17  happens to be my birthday by the way, Joy Banner filed a sworn
18  written complaint with the Louisiana Ethics Board, falsely
19  claiming that Parish President Jaclyn Hotard had a conflict of
20  interest in signing a change of zoning application for property
21  owned by Greenfield Louisiana.

22          You're going to learn that Greenfield Louisiana is a
23  major agricultural company.  In 2021, it purchased property
24  that had been zoned since 1990 as industrial.  Somebody write
25  this down.  In 1990, the property that Greenfield purchased in

OFFICIAL TRANSCRIPT

1   2021 was zoned from residential to industrial.  They purchased

2   these 200 acres with the intent to develop a $600 million

3   state-of-the-art grain export facility.

4        In 2023, two years after the purchase, Joy Banner and

5   others successfully sued, they successfully sued the parish and

6   challenged the fact that the Greenfield acres were not supposed

7   to be industrial, but instead residential.  A judge heard the

8   case.  A state court judge heard the case and ruled in favor of

9   the plaintiffs and decided that an important zoning step had

10  been missed.  And because that important zoning step had been

11  missed, the 200 acres bought for development by Greenfield

12  Louisiana as well as many surrounding properties that had been

13  zoned industrial since 1990 all reverted back to residential.

14        This was a major economic blow, not just for the

15  Parish of St. John, but also for the State of Louisiana.  The

16  Greenfield grain elevator project represented a tremendous

17  economic development opportunity.  The project would have

18  created over 300 high-paying jobs, jobs that paid $75,000 or

19  more.  It would have generated over $10 million a year in tax

20  revenue for the parish and for the state.

21        That is why the Greenfield grain elevator project was

22  strongly supported by Council President Jaclyn Hotard, Council

23  Chair Michael Wright, the majority of the Louisiana elected

24  officials and business leaders, the governor of the state,

25  lieutenant governor of the state, all recognized this was a

OFFICIAL TRANSCRIPT

1  major economic development project.  And what are leaders

2  supposed to do when they campaign?  The first thing they say,

3  "We're going to bring good-paying jobs to Louisiana."  You've

4  heard it.  This was a project to bring good-paying jobs and

5  millions of dollars of tax revenue to St. John the Baptist

6  Parish and the State of Louisiana.

7         In an effort to keep the Greenfield project on track

8  and to reverse the decision of the state court judge, the

9  parish council very quickly moved to redesignate the zoning of

10  the 200 acres that Greenfield had purchased and only the

11  Greenfield property, none of the surrounding properties, but

12  the 200 acres that Greenfield had purchased to restore the

13  industrial zoning because obviously you can't build a

14  $600 million grain elevator on residential property.

15         In the process of moving to restore the industrial

16  designation, Jaclyn Hotard, as parish president, was required

17  to sign the zoning application.  That is her job.

18         Joy Banner's ethics complaint against Jaclyn Hotard

19  claims that Jaclyn Hotard's mother-in-law Darla Gaudet and a

20  company that she controls were going to financially benefit if

21  the application was approved.  This complaint was carefully

22  reviewed, thoroughly investigated by the Louisiana Board of

23  Ethics.  And on September 10, 2024, the Board of Ethics issued

24  a letter stating the investigation was complete and no ethics

25  violation by Jaclyn Hotard was found.  The case was closed.

OFFICIAL TRANSCRIPT

1          You'll learn that when complaints are filed with the
2   Louisiana Board of Ethics, the initial investigations are
3   considered to be strictly confidential.  And for good reason.
4   These investigations are not to be discussed publicly, and
5   there is a specific Louisiana ethics law which prohibits the
6   discussion.
7          You heard during the PowerPoint of Mr. Lanser's
8   presentation that a judge in a case, not this case.  A judge in
9   a case said that a portion of that law was unconstitutional as
10  related to the folks in that case.  That was in 2024.  But
11  since -- 2014, excuse me.
12         Since 2014, I need you to know this law has never
13  been repealed by the state legislature.  It's never been
14  amended by the state legislature.  It's never been modified by
15  the state legislature, and the law is still on the books today.
16         What does the law say?  The law says, "It shall be a
17  misdemeanor punishable by a fine of not more than $2,000 or
18  imprisonment for not more than one year or both for any member
19  of the Board of Ethics, his executive secretary, other
20  employees, or any other person other than the person who is the
21  subject of the investigation or complaint to make public the
22  testimony taken at a private investigation or a private hearing
23  of the Board of Ethics or to make any public statement" -- I'm
24  going to read that for emphasis.
25             "Or to make any public statement or give out any

OFFICIAL TRANSCRIPT

1 information concerning a private investigation or private

2 hearing of the Board of Ethics without the written request of

3 the public servant or other person being investigated."  That

4 is the law.  That was the law.

5          **MR. LANSER:** Objection, Your Honor, argumentative.

6          **THE COURT:** Sustained.  I said sustained.  That last

7 comment is withdrawn.

8          **MR. SPEARS:** Nonetheless, on November 27, the day

9 before the meeting in question, contrary to this

10 confidentiality statute, Joy Banner posted on her Facebook

11 account a copy of the letter from the Board of Ethics to Jaclyn

12 Hotard notifying her of the ethics complaint that had been

13 filed by Joy Banner against her.

14          **MR. LANSER:** Objection, Your Honor.  Arguing law

15 again.  Contrary to the law.

16          **THE COURT:** Let me see.  Approach real quick.

17               (Proceedings held at the Bench.)

18          **THE COURT:** So your objection is he's still saying

19 that this is the law?

20          **MR. MOST:** He's saying that this posting was contrary

21 to the statute which is falsely arguing what the law says.

22          **MR. SPEARS:** No, it isn't contrary to the statute.

23          **MR. MOST:** The statute is unconstitutional.

24          **THE COURT:** So the law was decided, I'll instruct

25 them, the law was decided unconstitutional.

OFFICIAL TRANSCRIPT

1          **MR. SPEARS:** Judge, can they both object?  I thought

2    only one could beat me up at a time.  Mr. Lanser was beating me

3    up.  Now he's beating me up.

4          **THE COURT:** You have to pick one.

5          **MR. MOST:** I'm sorry, I'll let Mr. Lanser come

6    forward.

7          **THE COURT:** I'm going to instruct the jury that

8    although Mr. Spears said she posted it contrary to the statute,

9    whether or not the statute was unconstitutional at the time is

10   an issue of fact.  That's not an issue of fact.  I'm going to

11   decide that.

12              (Whereupon this concludes proceedings held at

13       the bench.)

14         **THE COURT:** Ladies and gentlemen of the jury,

15   Mr. Spears just said that Dr. Banner posted something that was

16   contrary to law that they keep talking about, but I'm going to

17   decide whether or not it is contrary to the law or not, okay.

18         So disregard his statement that when she published --

19   her act of publishing it was contrary to the law or unlawful in

20   any way, disregard that.

21         Okay, proceed.

22         **MR. SPEARS:** May I continue, Your Honor?

23         **THE COURT:** Yes, you can.

24         **MR. SPEARS:** Joy Banner posted on her Facebook account

25   a copy of the letter from the Board of Ethics to Jaclyn Hotard

OFFICIAL TRANSCRIPT

1  notifying her of the ethics complaint that had been filed

2  against her by Joy Banner.

3          When Jaclyn Hotard learned about this inappropriate

4  Facebook post, she immediately reached out to Kathleen Allen

5  who you will learn is the General Counsel to the Louisiana

6  Board of Ethics.  Jaclyn expressly asked in an email, she said,

7  "I'm trying to" --

8          **MR. LANSER:** Objection, Your Honor.  This is subject

9  to our motion in limine.

10          **THE COURT:** Approach.

11                (Proceedings held at the Bench.)

12          **MR. LANSER:** This is following the advice of counsel

13  motion in limine.

14          **THE COURT:** I don't think he's -- let's see.  If you

15  go and say something more, I'm going to explain to the jury

16  that --

17          **MR. SPEARS:** Well, Judge, I mean we've already

18  admitted the email.  It's in our bench book.

19          **THE COURT:** I haven't admitted anything.  If it's in

20  your bench book, it's not admitted.  You have to offer, file,

21  and introduce it.

22          **MR. SPEARS:** I understand that.  We discussed it.  We

23  discussed it, and we're aware of it.  The Court's aware of it.

24          **MR. LANSER:** We're aware that the email exists, but to

25  the extent she's reaching out for a legal opinion from general

OFFICIAL TRANSCRIPT

1  counsel.

2         **THE COURT:** Well, if you talk about the legal opinion,

3  I'm going to --

4         **MR. SPEARS:** There's no legal opinion.  It's a

5  statement she makes where she sends an email to the Ethics

6  Board.  She makes a statement to the Ethics Board.  She didn't

7  ask for a legal opinion.  She didn't get a legal opinion.

8  They're not her lawyer.

9         **MR. LANSER:** Well, if the Ethics Board counsel

10 responds to her, that's where I think we have a problem.

11        **MR. SPEARS:** We didn't publish her response.

12        **THE COURT:** Well, look, none of this is evidence.

13 None of this is evidence.  I'm going to give you a little

14 leeway, but you know where the limits are, okay?

15        **MR. SPEARS:** Yeah.

16        **THE COURT:** Okay.

17        **MR. LANSER:** Thank you, Your Honor.

18            (Whereupon this concludes proceedings held at

19     the bench.)

20        **MR. SPEARS:** Judge, am I getting any of my time back?

21 Can I reclaim my time?

22        **THE COURT:** You can go back.  I don't know that you're

23 going to get back much of your time because some of these

24 things had been covered pretrial.

25            Go ahead, let's see how it goes.

OFFICIAL TRANSCRIPT

1          **MR. SPEARS:** Okay.  After learning about the

2     inappropriate Facebook post, Jaclyn Hotard did, in fact, reach

3     out to General Counsel for the Board of Ethics, and she sent an

4     email saying the following, "I'm trying to understand how she

5     has a letter that was addressed to me.  Not to mention, this

6     appears to be a violation of state law."

7          In her Facebook post, Joy Banner stated that Hotard

8     has a personal attorney, but has a resolution on tomorrow's

9     agenda to make residents pay for her representation.

10          The evidence and testimony will show that with regard

11     to the November 28, 2023 meeting, St. John the Baptist, Jaclyn

12     Hotard, Michael Wright complied with all aspects of the

13     Louisiana Open Meetings Law.

14          The evidence and testimony will also show that no one

15     violated Joy Banner's First Amendment right to free speech.

16     She spoke for over five minutes; even though the time limit

17     that's given to everyone is three.  When she got off the agenda

18     topic, she was reminded by Chairman Wright and Legal Counsel

19     Keith Green to stay on topic.  When she attempted to discuss

20     the details of her ethics complaint against Jaclyn Hotard, she

21     was reminded by Chairman Wright and President Hotard of the

22     specific ethics law that they believed prohibited her public

23     discussion of the ethics complaint she had filed against Jaclyn

24     Hotard.

25          Joy Banner filed this lawsuit not because her rights

OFFICIAL TRANSCRIPT

1  or any laws were violated at the November 28th meeting.  She

2  filed this lawsuit and the many others that she's filed, she

3  and her sister, seeking media attention and social media likes.

4  This is what they do.  They want to be famous, social media

5  influencers.  Please don't encourage them.  Please don't reward

6  this reckless behavior.

7          After you have heard all of the evidence and

8  testimony, I am confident that you will agree with me that

9  there's been no violation of law, and you will return a verdict

10  in favor of Michael Wright, in favor of Jaclyn Hotard, in favor

11  of St. John the Baptist Parish denying Joy Banner's claims,

12  both of them.  Thank you.

13          **THE COURT:** Ladies and gentlemen, I'm now going to

14  read to you the stipulated facts.

15          A stipulation is an agreement.  When there is no

16  dispute about certain facts, the attorneys may agree or

17  stipulate to those facts.  And in advance of trial, the

18  attorneys did agree to these stipulated facts, that they were

19  not in dispute.  You must accept a stipulated fact as evidence

20  and treat that fact as having been proven here in court.

21          The stipulated facts in this case are as follows:

22          No. 1, St. John the Baptist Parish is a public body

23  subject to Louisiana's Open Meetings Law.

24          No. 2, The parish council held a public meeting on

25  November 28th, 2023.

OFFICIAL TRANSCRIPT

1        3, Defendant Michael Wright was the council chair at
2 the November 28, 2023 meeting.

3        4, Defendant Jaclyn Hotard was elected St. John the
4 Baptist Parish President in October 2019.

5        Jaclyn Hotard attended the November 28, 2023 council
6 meeting in her capacity as parish president.

7        Prior to the meeting, Dr. Banner filed an ethics
8 charge against Jaclyn Hotard.

9        7, The ethics charge alleged that Jaclyn Hotard had
10 signed a rezoning application that would significantly affect
11 the value of her mother-in-law's LLC's property in violation of
12 state ethics law.

13        8, Agenda Item J at the November 28, 2023 meeting
14 read, quote, Item J, Jaclyn Hotard, Authorization to retain
15 legal services with the Law Firm R. Gray Sexton as special
16 counsel to perform services related to ethics laws subject to
17 the restrictions imposed by the State of Louisiana regarding
18 ethics procedures and at the rate in accordance with the
19 Attorney General guidelines per statute, end quote.

20        9, During the public comment period of the meeting,
21 Dr. Banner walked to the podium and began to speak.

22        10, Jaclyn Hotard told Dr. Banner during her public
23 comment that she was in, quote, violation of state law, end
24 quote, and asked Chairman Wright to, quote, Stop this comment,
25 end quote.

OFFICIAL TRANSCRIPT

1          11, Chairman Wright read Louisiana Revised Statute

2    Section 42:1141.4(L)(1) aloud during Dr. Banner's public

3    comment.

4          12, Louisiana Revised Statute 42 Section 1141.1(L)(1)

5    states in part that a violation may be punished, quote, by a

6    fine of not more than $2,000 or imprisonment for not more than

7    one year or both, end quote.

8          In 2014, a federal judge determined that R.S.

9    42:1141.4(L)(1) is invalid, both as applied to these

10   plaintiffs, on its face, and at least in part.

11         Those are the stipulated facts.  You are to accept

12   those facts as true.  I will give you a copy of the stipulated

13   facts at the end of the trial when you go to deliberate.

14         All right.  With that, Plaintiff, are you ready to

15   call your first witness?

16         **MR. LANSER:** Yes, Your Honor.

17         **THE COURT:** Is everybody okay?  Y'all need a break?

18   Y'all good?  Okay.

19         **MR. LANSER:** Your Honor, we call Dr. Joy Banner.

20         **THE COURT:** All right, thank you.

21                    **JOYCEIA BANNER,**

22   after having been duly sworn, did testify as follows:

23                    **DIRECT EXAMINATION**

24   BY MR. LANSER:

25   Q.   All right.  Can you state your name for the record,

                    OFFICIAL TRANSCRIPT

1  please?

2  A.    Yes, my name is Dr. Joyceia or Joy Banner.

3  Q.    And what parish do you live in, Dr. Banner?

4  A.    St. John the Baptist.

5  Q.    Do you have any family in St. John the Baptist Parish?

6  A.    Yes, I have a lot of family.

7  Q.    Can you describe your family?

8  A.    Yes.  I have my immediate family, my parents, my elders,

9  my great aunts and uncles, some in their 90s, an extended large

10 family of cousins.

11 Q.    Okay.  Would you say you're close with your family?

12 A.    Yes, very close.

13 Q.    How long has your family lived in St. John the Baptist

14 Parish?

15 A.    I am tenth generation.  So my family has lived in St. John

16 since the 1700s, so 300 years.

17 Q.    And how long have you personally lived in St. John the

18 Baptist?

19 A.    I've lived in St. John the Baptist Parish since I was

20 born.  And then I moved to Baton Rouge to go to LSU for my

21 undergrad and my doctorate.  And then I lived in Austin, Texas

22 for eight years.  And then I came back to my neighborhood which

23 was started by my great grandparents over 120 years ago.

24 Q.    And what inspired you to come back to your neighborhood?

25 A.    I'm very proud of my roots.  I have a background in the

OFFICIAL TRANSCRIPT

1  tourism industry, heritage and tourism industry which was
2  something that I always loved about my community.  And so I
3  wanted to be more a part of growing that industry with
4  something that was already a strong industry.  And I, again,
5  something that I liked, and I definitely wanted to be back with
6  my family.
7  Q.    And what is it that you do for work?
8  A.    I'm the co-director and co-founder of The Descendants
9  Project.
10 Q.    And what is The Descendants Project?
11 A.    It's a nonprofit that my sister and I founded in 2020.
12 It's for the purpose of growing sustainable and smart economic
13 growth as well as promoting the heritage and culture of the
14 community.  Also, community development, working on quality of
15 life for the parish.  So just sustaining the community that we
16 live in so it's here another 300 years.
17 Q.    And you said you're the co-director and co-founder?
18 A.    Yes.
19 Q.    Who is the other co-director and co-founder?
20 A.    That's my twin sister Jocyntia or Jo Banner.
21           **THE COURT:** Pardon me a minute.  Morgan, come up here.
22               (An off-the-record discussion was held.)
23           **THE COURT:** I just want to remind, there's no eating
24 or drinking in the courtroom.  I do allow the lawyers to have
25 some water, but that's it.  Go ahead.

OFFICIAL TRANSCRIPT

1           You're going to have to leave with that coffee or

2    tea.  You too, she gave you a cup of coffee or some tea.

3           **MS. CONNOLLY:** I gave it back to her.

4           **THE COURT:** All right, go ahead.

5    **BY MR. LANSER:**

6    Q.   As co-director, how would you describe your role at The

7    Descendants Project?

8    A.   Yes, so we shaped -- well, I shaped, along with my sister,

9    the vision, direction, the strategy of The Descendants Project.

10   Q.   Okay.  And what are your qualifications for that role?

11   A.   So for the heritage and tourism industry, I have been

12   working in that since I was 19 at a historic site.  And then

13   after going to college and getting my Ph.D., I was a business

14   professor for eight years.  I taught small business

15   entrepreneurship, marketing and communications.  When I moved

16   back home, I took the director of communications position at

17   Whitney Plantation.

18         So off and on, I have about 20, 30 years in heritage,

19   culture, historic preservation, and tourism.  And then I have,

20   again, experience in business and business strategy.

21   Q.   And as part of your job with The Descendants Project, do

22   you ever have to attend public meetings?

23   A.   Yes, I do.

24   Q.   Do you personally believe it's important to participate in

25   public meetings whether or not that was part of your job?

1   A.    Yes.

2   Q.    Can you just elaborate on that, please?

3   A.    Yes, it's important to take part in public meetings

4   because there are definitely laws, there are ordinances, there

5   are resolutions that are being decided upon that literally are

6   shaping your life and shaping your land, your property.

7   Decisions are being made that are crucial to not only where you

8   live, but also in my case, where I work at.   The Descendants

9   Project is headquartered in Wallace.   So it's very important to

10  be able to be informed and to be able to provide information if

11  you feel that's warranted in a public setting.

12  Q.    Okay.   Are you familiar with the Greenfield project?

13  A.    Yes.

14  Q.    Can you just very briefly describe your understanding of

15  that project?

16  A.    Yes.   So Greenfield of Louisiana, LLC, was a massive grain

17  terminal operation that was 300 acres to house the grain, 50

18  grain terminals.   Some that were as tall as the Statue of

19  Liberty, immediately adjacent, only feet away from the nearest

20  home in my community.   It would have dumped about 140 tons of

21  pollution.   Would have brought about 30,000 heavy trucks per

22  year, including a rail, including a dock for ships.

23       So in essence, this was a project that if it had been

24  developed, it would have wiped out my community.   We would not

25  have been able to live there.

OFFICIAL TRANSCRIPT

1  Q.    Okay.  And have you ever filed an ethics complaint against
2  any member of parish leadership?
3  A.    Yes.
4  Q.    Can you just very briefly describe the basis of that
5  complaint and who it is against?
6  A.    Yes.  So the basis of the complaint is that after we
7  successfully was able to overturn the residential zoning
8  initially that was industrial, that land, it was back on the --
9  well, now it was the land was going to be rezoned.  It was back
10 on the agenda with the parish to be rezoned back to industrial.
11 This was about 1300 acres.  So even though the Greenfield
12 project site was 200 acres at that time, the entirety of the
13 acreage was about 1300 acres.  It included acreage outside of
14 the project area.
15     So when that came up for rezoning, we learned that Jaclyn
16 Hotard's mother-in-law owned property that was within those
17 boundaries to be rezoned back to industrial.  And that is the
18 reason why I filed the complaint because Jaclyn Hotard was the
19 one who signed off on the application; even though it was a
20 family member's land.  And I felt that that was something that
21 should have been disclosed to the public.
22 Q.    We're going to move on to an exhibit which was previously
23 identified as J4 in the order.
24             **MR. LANSER:** Your Honor, may I approach the witness?
25             **THE COURT:** Okay.  It will be -- you start from the

OFFICIAL TRANSCRIPT

```
 1  beginning.  This will be Plaintiff's Exhibit 1.
 2           But first of all, before you show her, make sure that
 3  it's -- or we publish it, make sure that Defendants' Counsel
 4  recognizes it.
 5           Do you have any objection?
 6           MR. SPEARS: Is it the complaint?
 7           MR. LANSER: Correct.  May I?
 8           THE COURT: All right.
 9  BY MR. LANSER:
10  Q.   Dr. Banner, do you recognize the document that I just
11  handed you?
12  A.   Yes.
13  Q.   What is this document?
14  A.   It is the Board of Ethics complaint that I filed.
15  Q.   It's the one that you were just discussing --
16  A.   Yes.
17  Q.   -- regarding President Hotard?
18           MR. LANSER: Your Honor, I would move to admit this as
19  Plaintiff's Exhibit 1.
20           THE COURT: Are you going to publish it to the jury?
21           MR. LANSER: And publish it to the jury, yeah.
22           THE COURT: Which means you're going to put it up
23  here?
24           MR. LANSER: Yes.
25           MR. SPEARS: No objection.
```

OFFICIAL TRANSCRIPT

```
 1            THE COURT:  All right, thank you.  And then when
 2   you're done with it, you can offer, file, and introduce it into
 3   the record.
 4   BY MR. LANSER:
 5   Q.   Okay, Dr. Banner, is this the document that you just
 6   identified as your complaint?
 7   A.   Yes.
 8   Q.   And we're looking at page 1 here.  Do you know what this
 9   page is?
10   A.   Yes.  It's the letter, the cover letter that was written
11   to the Board of Ethics on my behalf about the complaint.
12   Q.   Okay.  And what's the date of this letter?
13   A.   October 26th, 2023.
14   Q.   So was that the date that this complaint was submitted to
15   the Board of Ethics?
16   A.   Yes.
17   Q.   And the other documents to this, what are these other
18   documents, just broadly speaking?
19   A.   Yes, so just information supporting the reason why we were
20   submitting the complaint.  So including the application,
21   affidavits, information about President Hotard's mother-in-law,
22   her business, her land holdings.
23   Q.   All these documents, were they attached to the complaint
24   that you sent?
25   A.   Yes.
```

OFFICIAL TRANSCRIPT

1  Q.    So this document that you have in front of you, this is

2  the full and complete version of the complaint that you sent?

3  A.    Yes.

4  Q.    And where did you obtain these documents?

5  A.    All of these are available publicly, most of them.  Some

6  of them are of maps where we noted where the mother-in-law's

7  land is in relation to the Greenfield site.  But the documents

8  are -- it's public information.

9  Q.    Okay.  Prior to filing this complaint with the Ethics

10  Board, did you raise this concern to your parish leadership?

11  A.    Yes, we did.  We submitted a letter letting them know what

12  we believed to be conflicts of interest, and we did not hear a

13  response back from the parish.

14  Q.    What's the current status of the ethics complaint?

15  A.    The ethics complaint was, it was dropped last year, I

16  believe.

17  Q.    And so sometime last year during 2024?

18  A.    Yes.

19  Q.    So as of November 28, 2023, this was still an active

20  complaint?

21  A.    Yes.

22          **MR. LANSER:** I would move to admit this as Plaintiff's

23  Exhibit 1.

24          **THE COURT:** All right.  Any objection?

25          **MR. SPEARS:** No objection.


                        OFFICIAL TRANSCRIPT

 1              **THE COURT:** All right, it's accepted into evidence as
 2   Plaintiff's Exhibit No. 1.
 3              **MR. LANSER:** Right.
 4              **THE COURT:** Do you have a way to identify it?  Do you
 5   have any stickers?
 6              **MR. SPEARS:** We can give him some, Judge.
 7              **MR. LANSER:** We have some right here.  Would you
 8   prefer we hand these over?
 9              **THE COURT:** Yeah, now.  Unless you still need it?
10              **MR. LANSER:** No, Your Honor.
11   **BY MR. LANSER:**
12   Q.   Dr. Banner, did you ever post about this complaint on
13   social media?
14   A.   Yes, I did.
15   Q.   Why did you post about the complaint?
16   A.   I posted about the ethics complaint after I saw the agenda
17   item on the public agenda.  So that's when I posted it.
18              **MR. LANSER:** Your Honor, may I approach the witness?
19              **THE COURT:** Yes.
20   **BY MR. LANSER:**
21   Q.   All right, Dr. Banner, do you recognize this document I
22   just handed you?
23   A.   Yes.
24   Q.   Can you explain what it is?
25   A.   Yes.  So this is after I saw the agenda item that was

OFFICIAL TRANSCRIPT

1  authored -- was on the agenda, listed under Jaclyn Hotard,

2  seeking to retain legal services from her attorney Gray Sexton,

3  who I knew was her attorney, and Board of Ethics, related to

4  ethics laws which I knew was related to the ethics complaint, I

5  posted to inform the community that that agenda item was

6  specific to her personal representation for the Board of Ethics

7  complaint.

8                **MR. LANSER:** I would ask to publish this to the jury.

9                **THE COURT:** Any objection?

10               **MR. SPEARS:** No objection.

11  **BY MR. LANSER:**

12  Q.   So this is the post that you're referring to that's on the

13  screen?

14  A.   Yes.

15  Q.   Whose Facebook account is that, that this is posted on?

16  A.   This is mine.

17  Q.   And this paragraph at the top, who is the author of that

18  paragraph?

19  A.   I am the author.

20  Q.   And what are you, what were you -- first of all, when did

21  you post this?

22  A.   November 27th is what it's dated.

23  Q.   So that was one day before the meeting?

24  A.   One day before the meeting.

25  Q.   All right.  And can you just summarize why you posted

OFFICIAL TRANSCRIPT

1  this, what you're trying to convey in this post?

2  A.    So again, I'm letting the community, making sure that they

3  are aware that there would be a resolution item placed on the

4  agenda by Jaclyn Hotard seeking to have the taxpayers pay for

5  her personal representation as a result of the rezoning of her

6  mother-in-law's land.

7  Q.    And there's two photos on this post as well; correct?

8  A.    Yes.

9  Q.    What is the photo on the left?

10  A.    The photo on the left is a copy of the letter that the

11  Board of Ethics sent to me.

12          **THE COURT:** Let me ask you, there seems to be some

13  items blocked out.  Was that redacted by court order, or was

14  this redacted when it was on the...

15          **MR. LANSER:** That was redacted by Dr. Banner.

16          **THE WITNESS:** Yes.  I redacted it.

17          **THE COURT:** You redacted it?

18          **THE WITNESS:** I redacted it.

19          **MR. LANSER:** You anticipated my question, Your Honor.

20  **BY MR. LANSER:**

21  Q.    So you made these redactions on there?

22  A.    Yes.

23  Q.    And why did you make those redactions?

24  A.    Because it was not my intention to dox anybody, to put

25  anything out there that I felt wasn't specifically relevant to

OFFICIAL TRANSCRIPT

1  the issue at hand, was that we, as the taxpayers, would be
2  paying for her personal representation.
3  Q.    Was it your understanding that this was confidential?
4  A.    It was not my understanding that it was confidential.
5  Even though it's marked "confidential" on there, it's not
6  marked confidential to me.  I was never given any instruction
7  on I needed to keep it secret, that there was some law
8  governing it.
9       And I did not post this until Jaclyn Hotard put this on a
10 public facing agenda.  And so there's nothing in this letter
11 that isn't really contained and relevant to this item.  So I
12 saw she made it publicly available; so I didn't think that
13 there was any confidentiality that I was breaching by posting
14 this letter.
15 Q.    As far as the actual contents of your ethics complaint,
16 was it your understanding that any of that was confidential?
17 A.    No.
18 Q.    And why not?
19 A.    Again, because this is all related to -- it's zoning of
20 public land.  These are decisions that are taking place within
21 public planning and zoning meetings and council meetings.  So
22 everything that we're talking about is and should be open to
23 the public.
24 Q.    And you obtained those documents how again?
25 A.    All through either public records or they were publicly

OFFICIAL TRANSCRIPT

1    posted.

2    Q.    Okay.  And what is the photo on the right?

3    A.    The photo on the right is a copy of the -- is the

4    resolution that I circled specifically that references the

5    authorization to retain legal services.  It was placed by

6    Jaclyn Hotard for her attorney Gray Sexton, and it is to

7    perform services related to ethics laws subject to the

8    restrictions, etcetera.  So again, I felt that this was

9    directly related to the agenda item, Agenda Item J.

10   Q.    How did you obtain a copy of the agenda?

11   A.    This was posted on the parish's website.

12          **MR. LANSER:** I would move to admit this as Plaintiff's

13   Exhibit 2.

14          **THE COURT:** Any objection?  He's not paying attention;

15   so I'm going to admit it as Plaintiff's Exhibit No. 2.

16          **MR. SPEARS:** We don't have any objection, Your Honor.

17          **MR. LANSER:** Okay, moving on to another document, may

18   I approach, Your Honor?

19   **BY MR. LANSER:**

20   Q.    Dr. Banner, do you recognize the document I just handed

21   you?

22   A.    Yes.

23   Q.    What is that document?

24   A.    This is the agenda that was posted on November 27th.

25   Q.    How do you know that?

OFFICIAL TRANSCRIPT

1 A.   Because that's what it says and that's what I also

2 accessed on the website.

3           **MR. LANSER:** I'd ask to publish this to the jury.

4           **MR. SPEARS:** No objection.

5 **BY MR. LANSER:**

6 Q.   Dr. Banner, is this the -- on your screen, is this the

7 document that I just handed you?

8 A.   Yes.

9 Q.   And when did you first receive a copy of this document or

10 access a copy of this document?

11 A.   On November 27th.

12 Q.   And what is the date of the meeting that this agenda

13 concerns?

14 A.   It's November 28th, the next day.

15 Q.   So how long or was this after you filed the ethics

16 complaint?

17 A.   Yes.

18 Q.   Do you always review council agendas when they're

19 released?

20 A.   Yes.

21 Q.   All right.  And on this particular agenda when you

22 reviewed it, were there any items that interested you in

23 particular?

24 A.   Yes.  So there were two items.  Under the executive

25 session, there was *The Descendants Project versus St. John the*

1  *Baptist Parish and St. John the Baptist Parish Council.*  So one
2  of the matters related to the overall zoning case, I believe.
3  And then it was Item J referencing the authorization to retain
4  a lawyer for Jaclyn Hotard.
5  Q.    That's the item that you can see on your screen right now?
6  A.    Yes.
7  Q.    Can you just read this Agenda Item J aloud?
8  A.    Yes.  It says, "Jaclyn Hotard, Authorization to retain
9  legal service with the Law Firm R. Gray Sexton as special
10 counsel to perform services related to ethics laws subject to
11 the restrictions imposed by the State of Louisiana regarding
12 ethics procedures and at the rate in accordance with the
13 Attorney General guidelines per statute."
14 Q.    Okay.  Are you familiar with R. Gray Sexton?
15 A.    Yes.
16 Q.    How so?
17 A.    He was Jaclyn Hotard's counsel, her attorney at one of the
18 cases that Jaclyn testified at.
19 Q.    Okay.  And why did it concern you that residents might
20 have to pay for representation on ethics issues?
21 A.    I was concerned that residents would have to pay.  This
22 was -- first of all, this is Darla Gaudet is Jaclyn Hotard's
23 mother-in-law.  That's her personal relationship.  That's her
24 familial relationship.  She is the parish president.  And it's
25 her responsibility to make sure that she is performing her

OFFICIAL TRANSCRIPT

1  duties; so there is no conflict of interest, and everything is

2  being done very transparently for the awareness of the public.

3      And if she made that error, then she should be accountable

4  for her error and her alone.  I believe it's unfair to make

5  public taxpayers have to pay for her personal representation.

6          **MR. LANSER:** Great.  I'd move to admit this exhibit as

7  Plaintiff's Exhibit 3.

8          **THE COURT:** Any objection?

9          **MR. SPEARS:** No objection.

10          **THE COURT:** All right, it's admitted into evidence as

11  Plaintiff's Exhibit No. 3.

12  **BY MR. LANSER:**

13  Q.    Dr. Banner, did you attend the November 28, 2023 meeting?

14  A.    Yes, I did.

15  Q.    Who did you attend with?

16  A.    I drove there with my sister.  And there were community

17  members and family members there, residents of the community

18  especially of Wallace.

19          **MR. LANSER:** I'd like to pull up the video.  May I

20  publish the video to the jury?

21          **THE COURT:** All right, any objection?

22          **MR. SPEARS:** No objection, Your Honor.

23          **THE COURT:** All right.

24          **MR. LANSER:** Okay, Dr. Banner, I'm just going to play

25  a few seconds of this video.

OFFICIAL TRANSCRIPT

```
 1              (Video recording was played.)
 2  BY MR. LANSER:
 3  Q.    Pausing here at 5 seconds, do you recognize what's being
 4  depicted in this video?
 5  A.    Yes.  It's the council meeting from November 28th.
 6  Q.    Do you recognize yourself in this still image?
 7  A.    Yes.
 8  Q.    I believe there may be a stylist or something up there.
 9  Can you circle yourself?  If you wouldn't mind circling
10  yourself, just so we know where you are?
11              THE WITNESS:  The monitor says, "Out of range."
12              THE COURT:  If she touches it, will it work?
13              THE WITNESS:  Okay, it's working.
14  BY MR. LANSER:
15  Q.    Is it working now?
16  A.    Yes.
17  Q.    Can you circle yourself real quick?
18  A.    (Witness complies.)
19  Q.    And do you recognize any of your family members?
20  A.    Yes.  This is my sister next to me (indicating).
21  Q.    Okay.  And do you recognize Defendant Michael Wright in
22  this still?
23  A.    Yes.
24  Q.    Can you circle him?
25  A.    (Witness complies.)
```

OFFICIAL TRANSCRIPT

1  Q.   Do you see Defendant Hotard in this image?

2  A.   No.  But she's right here off the screen at this desk

3  (indicating).

4  Q.   That desk that's on the left side?

5  A.   Yes.

6  Q.   How do you know she's there?

7  A.   Because I was at the meeting and that's where she was.

8  Q.   Okay.  Does she typically sit at that desk?

9  A.   Yes.

10  Q.   I'm going to move ahead and pause.  So I'm pausing here at

11  1 minute 13 seconds.

12       Do you recognize this, Dr. Banner?

13  A.   Yes.

14  Q.   And what is this?

15  A.   It is the screen during the meeting that gives us

16  instructions about the public comment.

17  Q.   Okay.  And did you have any issue with or were you

18  planning to speak on an agenda item?

19  A.   Yes, yes.

20  Q.   And were you planning to speak for the three allotted

21  minutes?

22  A.   Yes.

23  Q.   I'm going to play just a few minutes of this video, and

24  then I'll have some questions for you afterwards.

25                (Video recording was played.)


                        OFFICIAL TRANSCRIPT

**BY MR. LANSER:**

Q.    Pausing there at 6 minutes 51 seconds, what was going through your head when Mr. Wright read that statute?

A.    When he -- I just remember, I mean, I remember the statement, but the word "imprisonment" stood out very boldly in my mind.  My blood ran cold because I thought at that moment that I had really messed up.

       We were fighting at that time to protect our community that I loved, my family.  We were on the verge of being wiped away.  And I was trying to do whatever I could to make sure I didn't mess that up so that we had the strongest chance of fighting to save my community.

       And then when I heard the words "imprisonment" and "misdemeanor," I thought that's it.  I'm going to jail.  I've messed everything up.  My business is going to be ruined.  My name is going to be ruined.  I just, again, I was terrified, and I was shocked at what happened.

Q.    Have you ever been threatened with jail or fines for giving public comment on any other occasion?

A.    Never, never.

Q.    Were there any law enforcement present in the room?

A.    There's usually -- yes, there's law enforcement.  There's police officers that usually stand around the perimeter of the room.  They stand right next to Jaclyn Hotard.  So yes, they were there, and security is there as well.

OFFICIAL TRANSCRIPT

1  Q.    Earlier in the video, we heard a woman's voice from

2  offscreen.  Did you recognize that voice?

3  A.    Yes.

4  Q.    And who was that?

5  A.    That was President Jaclyn Hotard.

6  Q.    And the complaint that you were talking about in this

7  clip, is that the one that we were discussing earlier?

8  A.    Yes.

9          **MR. LANSER:** I'm going to go back and replay just a

10 few seconds of this, starting at 3 minutes 55 seconds.

11          (Video recording was played.)

12 **BY MR. LANSER:**

13 Q.    Pausing at 4 minutes 17 seconds there, what's the point

14 that you're referring to there?

15 A.    That I never can get to my point.  I never can get to my

16 point that -- they keep telling me to stay on point, to stay on

17 topic.  But they're literally not letting me say enough to show

18 how I'm on topic.  So they keep cutting me off; so I can never

19 explain how what I'm referring to -- and he says at one point

20 in the clip that it doesn't have Jaclyn Hotard's name, or I

21 think she says it.  And it's literally her name is by the

22 resolution, Jaclyn Hotard.  So even that is incorrect.

23 Q.    Did you ever get to make the point that you were trying to

24 make?

25 A.    That degraded down into was me having to defend myself, me

OFFICIAL TRANSCRIPT

1  having to -- I'm reacting.  I'm trying to explain why I'm on
2  point.
3          **THE COURT:** Dr. Banner, can you answer the question
4  first and then explain?  It was a yes or no answer.
5          **THE WITNESS:** No.
6          **THE COURT:** Did you ever get to make your point that
7  you were trying to make?
8          **THE WITNESS:** No, no.
9          **THE COURT:** Okay, now you can explain.
10          **THE WITNESS:** I apologize.  Because I get cut off
11  immediately, I'm immediately having to react, to defend.  I'm
12  replying, I'm responding, but I'm not able to give the point
13  that I'm trying to make.
14  **BY MR. LANSER:**
15  Q.   Okay.  And I'm going to skip ahead to -- so pausing here
16  at 6 minutes 39 seconds, it appears you're holding something in
17  your right hand.  Do you know what that is?
18  A.   Yes.  It's a map of the property.
19  Q.   Did you ever get a chance to use that map during your
20  public comment?
21  A.   No.
22  Q.   Did you bring anything else to present to the council
23  during your comment?
24  A.   I also had handouts.
25  Q.   Did you have an opportunity to distribute those handouts?

OFFICIAL TRANSCRIPT

1  A.   No, I did not.

2          **MR. LANSER:** I move to admit this as Plaintiff's

3  Exhibit 4.

4          **THE COURT:** The videotape?

5          **MR. LANSER:** The whole video, yeah.

6          **THE COURT:** The whole video.  Any objection?

7          **MR. SPEARS:** We have no objection, understanding that

8  we have not played the whole video, but yes.

9          **THE COURT:** Counsel, objections are one word.  You

10 said no objection.

11         **MR. SPEARS:** No objection.

12         **THE COURT:** All right, this is admitted as Plaintiff's

13 Exhibit, what, No. 4?

14         **MR. LANSER:** No. 4, I believe, yes.

15         I'm going to move on to another document.  May I

16 approach the witness?

17         **THE COURT:** Yes.

18 **BY MR. LANSER:**

19 Q.   Dr. Banner, do you recognize the document I just handed

20 you?

21 A.   Yes.

22 Q.   And what is it?

23 A.   It's a map of -- the maps that I had brought with me that

24 evening to show during my public comment.

25 Q.   Is this the actual map or a depiction of the map?

OFFICIAL TRANSCRIPT

1  A.   It's a picture of the board that I brought that evening.

2  Q.   Okay.  And do you know who took this photo?

3  A.   I did.

4  Q.   All right.  So you recognize this as a photo that you took

5  of that same demonstrative?

6  A.   Yes.

7          **MR. LANSER:** I'd ask to publish this to the jury.

8          **THE COURT:** All right.

9          **MR. SPEARS:** No objection.

10  **BY MR. LANSER:**

11  Q.   Okay.  Dr. Banner, is this the document I just handed to

12  you?

13  A.   Yes.

14  Q.   You said you took this photo?

15  A.   I did.

16  Q.   And was this -- I believe your testimony was this is the

17  board that we just saw you holding in the council meeting?

18  A.   Yes.

19  Q.   And did you get a chance to discuss the reason why you

20  brought that board?

21  A.   No, I didn't get a chance to.

22  Q.   Why is this important specifically for that agenda item?

23  A.   This is the most important point that I wanted to make.

24  It's important because those yellow lines are where Jaclyn

25  Hotard's mother-in-law's, that's her land.  So the area in blue

1  is what is being rezoned which includes the Greenfield
2  property.  It's inclusive of Jaclyn Hotard's mother-in-law's
3  land, and it's inclusive of other tracts of land outside of the
4  Greenfield land.

5       So it's not only just Greenfield land getting rezoned.
6  That was a big part of what we were trying to show.  There had
7  been discrepancies, misinformation, and errors in various maps
8  and applications.  We got a professional to go and look at the
9  survey, and this is what we, this is what we showed.  So it was
10 important to show that on the map.

11      It was also important to show, and you can't see it close
12 up, but right around the edge of the Greenfield property
13 immediately adjacent to it is my neighborhood, is my community.
14 And so when we speak at these meetings, it's for the council
15 who is making these decisions to understand the impact that
16 it's going to make to my community.  And it's also to let --
17 when we post, it's also to let community members know the
18 impact because we don't get this information.
19 Q.   So why was this important to that specific agenda item?
20 A.   Because it shows that Jaclyn Hotard's mother-in-law's land
21 is included in the land that she signed the zoning application
22 for.  So that is what brought the Board of Ethics complaint
23 which required her now, as she saw fit, to hire an attorney
24 because it's her mother-in-law, her responsibility.  She was
25 parish president, and now because of her error, we were going

OFFICIAL TRANSCRIPT

1  to have to pay, the taxpayers, for something that she should

2  have known better.

3      **MR. LANSER:** Okay.  I move to admit this as

4  Plaintiff's Exhibit 5.

5      **THE COURT:** Any objection?

6      **MR. SPEARS:** No objection.

7      **THE COURT:** Accepted into evidence as Plaintiff's

8  Exhibit 5.

9      **THE WITNESS:** And may I also add --

10     **THE COURT:** No, you can't.  You can only respond to a

11 question.

12     **THE WITNESS:** Okay, sorry, Your Honor.

13 **BY MR. LANSER:**

14 Q.  And can you just explain what was going through your head

15 as you went back to your seat and sat there for the rest of the

16 meeting?

17 A.  I, again, I was -- I was in shock.  I was terrified.  I

18 could not believe, never before has my name and imprisonment

19 been used in the same sentence.  I took it very seriously.

20     Again, I thought that I had messed up.  I thought how am I

21 going to explain this to my parents.  How am I going to explain

22 it to my attorneys?  Again, I was afraid that I was going to be

23 arrested and jailed for speaking about something that I

24 shouldn't speak of.

25 Q.  And how did it feel to have your family or members of your

1  family witness this happen?

2  A.    My parents were in the audience.  And these public

3  comments are very important for us to be able to make because

4  at no time have we ever get the opportunity to be on the

5  agenda.  We asked council members.  We've asked to speak with

6  the parish about the rezoning, about Greenfield.  And at no

7  point did anyone say that we could -- that anyone allowed us to

8  be on the agenda.

9        So the public comments, that's the only opportunity that

10  we have.  And so I thought that I was doing the right thing by

11  making the community aware, by making council members --

12  because I wasn't even sure that they knew.  There's so much

13  lack of information.  And then to hear the words "imprisonment"

14  and my parents were sitting there in the audience and how proud

15  they are of me and my sibling, me and my sister, and the work

16  that we've done.  And they stood by us through a lot of

17  stuff...

18  Q.    Take your time.

19  A.    My parents are not in the best of health, and they've

20  stood by us through a lot.  These last three and a half years

21  have been so hard.  And just the thought, like I just remember

22  seeing the look in their eyes.  And then like the look of the

23  elders, especially the people who have led me my whole life,

24  people who I look up to, to see them in those meetings and to

25  see them looking at me helpless, it's very hard.  You know,

OFFICIAL TRANSCRIPT

1  they have to hear that their daughter is being -- could be

2  thrown in prison or is being in the same sentence of

3  "imprisonment."  I was very embarrassed.  I was very hurt.  I

4  was very upset for them.

5  Q.   Did this continue to affect you in the months following?

6  A.   Yes.

7  Q.   How did it do that?

8  A.   It's really important, like I said, for us to be involved

9  in the public process especially with the stakes being so high

10 regarding land that is -- it's right next door to us.  So it's

11 been really important for us to have as much ability to be

12 making sure that we're on top of the agenda items, making sure

13 that we are at the meetings.

14     We Facebook Live because we have residents who said they

15 weren't able to even get the televised meetings.  And so people

16 were telling us how they appreciated being able to see it on

17 Live and how they appreciated me and my sister being advocates.

18 We're not doing it for social media likes.  We're doing it to

19 literally save our community.

20     And after this happened, I just realized that the

21 meetings, I tried to go to a couple of meetings after that

22 point, and it was getting so stressful.  It was having such an

23 impact.  I just said I can't do it anymore.  I know how

24 important this is, but if they have a meeting on a Tuesday, by

25 the Thursday of the week before, I was already stressed out

1  about going to the meeting.  And so I realized I can't, I'm
2  just, I'm not able to do it.
3  Q.   Has this experience affected your physical or mental
4  health at all?
5  A.   Yes.  I found that I keep ruminating about it.  There are
6  just certain things that I will not -- I spend so much time
7  thinking about it.  I bring it up a lot.  Even when I'm trying
8  to relax with my friends, it always kind of comes back to, you
9  know, like, oh, yeah, by the way, I've been threatened by
10  arrest, you know.

11       And even like sometimes, like, I realize I was trying to
12  say it in a way that disguised, and I would almost say it as a
13  joke.  And then I realized you're just using this as an excuse
14  to bring this up in occasions that are not appropriate or
15  not -- it doesn't call for it.  Like the context is social.
16  You should be trying to relax, not talking about getting
17  arrested.

18       But I couldn't.  You know, I think I was just needing so
19  much support to get through it, but I just couldn't get it off
20  my mind.
21  Q.   Is that still true today?
22  A.   It's still, it's still -- I've been through stressful
23  situations with the parish.  I've been through contentious
24  situations.  And like it's a setting, but I can kind of -- I
25  can move on from it.  I don't feel like powerless against it.

OFFICIAL TRANSCRIPT

```
 1        This is one that I just cannot get over.  It's just like
 2   there is a helplessness.  There is a sadness.  Because I keep
 3   returning to that moment of when I heard, "misdemeanor, fine,
 4   imprisonment," and felt that I was going to get arrested, and I
 5   just saw like the floor open up underneath my feet.  I just
 6   keep returning to that moment.  And I cannot get, I cannot get
 7   out of it.
 8             MR. SPEARS: Your Honor, may we approach?
 9             THE COURT: Okay.
10                  (Proceedings held at the Bench.)
11             THE COURT: Did you read my opinion?
12             MR. SPEARS: We read the opinion.
13             THE COURT: She can authenticate it.
14             MR. SPEARS: We're objecting.
15             THE COURT: Your objection was to authentication?
16             MR. SPEARS: We're objecting to the production.
17             THE COURT: It's overruled.
18                  (Whereupon this concludes proceedings held at
19        the bench.)
20             MR. LANSER: May I approach the witness, Your Honor?
21             THE COURT: Yes.
22   BY MR. LANSER:
23   Q.   Dr. Banner, do you recognize the document I just handed to
24   you?
25   A.   Yes.
```

OFFICIAL TRANSCRIPT

1    Q.   And can you -- without reading exactly what's on it, can
2    you just describe what it's a photo of?
3    A.   It's a picture of my Apple watch that I had on before one
4    of the -- this is the planning and zoning meeting.  And it was
5    an alert, a high heart rate alert, that my heart rate was over
6    120 beats per minute; although I was sitting for ten minutes.
7    Q.   Okay.  And who took this photo?
8    A.   I took it.
9    Q.   And how do you know -- you mentioned it was at a planning
10   and zoning meeting?
11   A.   Yes.
12   Q.   How do you know it was at a planning and zoning meeting?
13   A.   Because in the background is a copy of the agenda with the
14   agenda item specific to the rezoning of the land.
15   Q.   Whose wrist is that picture --
16   A.   That's my wrist.
17           **MR. LANSER:** Okay, I'd ask to publish this to the
18   jury.
19           **THE COURT:** Yes.
20   **BY MR. LANSER:**
21   Q.   Dr. Banner, is this the document you were just discussing?
22   A.   Yes.
23   Q.   What time does your watch say on there?
24   A.   It's 5:59.  And my -- the high heart rate, my heart felt
25   like it was beating out of my chest.  And then that alarm came

OFFICIAL TRANSCRIPT

```
 1  on, and so I was like wow.  I mean it surprised me, and that's
 2  the reason why I took a picture of it.
 3  Q.   Do you remember what time this meeting that you were at
 4  started?
 5  A.   At 6:00 o'clock.
 6  Q.   Have you ever gotten one of these high heart rate alerts
 7  before?
 8  A.   Not outside of these meetings, no.
 9  Q.   And when you say "not outside of these meetings," how many
10  have you gotten?
11  A.   I think about three or four.
12  Q.   Were any of those prior to November 28th, 2023?
13  A.   No.
14  Q.   Have you ever gotten them outside of one of these
15  meetings?
16  A.   No.
17         MR. LANSER: I move to admit this as Plaintiff's
18  Exhibit 6.
19         THE COURT: Your objection is noted, but it's admitted
20  as Plaintiff's Exhibit No. 6.
21  BY MR. LANSER:
22  Q.   Dr. Banner, has this experience affected your willingness
23  to participate in public comment?
24  A.   Yes.
25  Q.   Has it affected your willingness to participate in
```

OFFICIAL TRANSCRIPT

1  meetings in general?

2  A.    Yes, it has.

3  Q.    How often prior to November 28, 2023 would you go to these

4  meetings?

5  A.    I was going to every single meeting for the most part.

6  Q.    And was that just council meetings or committee meetings

7  as well?

8  A.    We were going to planning and zoning meetings.  Going

9  mostly to council meetings, but a lot of the planning and

10  zoning meetings too.

11  Q.    Since November 28, 2023, are you still going to these

12  meetings?

13  A.    I can't remember the last time that I've been because I

14  just, again, decided that it was causing -- I shouldn't have a

15  week of intense stress leading up to going to a meeting.  So I

16  knew that this was not healthy for me; so I stopped going.

17  Q.    Do you still review agendas when they get released?

18  A.    I even stopped doing that.

19  Q.    Has this had any impact on your job with The Descendants

20  Project?

21  A.    It has impacted my job because we are community advocates.

22  Part of what we do and part of what our community appreciates

23  about the work that we do is that we were keeping them more

24  informed.  As they would tell us all the time that they were

25  watching our Facebook Lives, that they were watching our either

OFFICIAL TRANSCRIPT

1  Facebook Lives of the council meetings or ones where we were
2  explaining because they never got -- what they were expressing
3  to us, they never got full explanations.
4      When agenda items come up, there's hardly any discussion,
5  and immediately it's voted on.  And the community is lost as to
6  what's going on.  And when we were active in that space, the
7  community felt like they were understanding and understanding
8  resolutions and laws relevant to zoning and other important
9  issues that would affect them.
10      So that was something that I -- an aspect of my work that
11  I couldn't do or I can't yet, still not able to do since I was
12  before.  And also, my business is located right there in
13  Wallace right next to the land as well.  So if my new
14  organization that's formed and it is formed in large part for
15  being located in Wallace, being in land that my family has been
16  on for 100-plus years and the community that we've been 300
17  years in, so the impact of us having to move, that was a
18  possible impact, our organization as well.
19  Q.    Prior to November 28, '23, had you ever been critical of
20  parish leadership during public comment?
21  A.    My intention is to discuss, to be able to voice concerns
22  about agenda items.
23          **MR. SPEARS:** Your Honor, I would object and ask that
24  the witness answer the question that's presented.
25          **THE COURT:** She is answering the question.  Overruled.

OFFICIAL TRANSCRIPT

 1              **THE WITNESS:** So --

 2              **THE COURT:** You mean do you want a yes or no answer?

 3         **MR. SPEARS:** That's exactly what I intended, Your

 4    Honor.

 5              **THE COURT:** Okay, all right.  I'll repeat the

 6    question.  Let's see, "Prior to November 28, 2023, had you ever

 7    been critical of parish leadership during public comment?"

 8              Answer yes or no, and then you can explain yourself.

 9              **THE WITNESS:** Okay, sure.  No.

10    **BY MR. LANSER:**

11    Q.    And why would you say no?

12    A.    Because when I speak at a meeting, it is to express

13    concerns.  It's to share information that the council may or

14    may not have.  It's to provide a perspective from someone who

15    is going to be impacted by those decisions.  It's to express

16    concern or gaps in procedures or in steps.

17         Now if someone takes that to be critical, they may take it

18    that way.  But it's never my intent to go up there to just

19    criticize someone for the sake of criticizing.

20    Q.    Have other meetings you've attended ever gotten

21    contentious?

22    A.    Yes, they have.

23    Q.    In other instances where meetings got contentious, did you

24    discuss Ms. Hotard's mother-in-law or her property?

25    A.    No.

                         OFFICIAL TRANSCRIPT

1  Q.    Did they ever threaten you with arrest any other time?

2  A.    No.

3  Q.    So the only time the Parish threatened you with arrest is

4  when you made public Hotard's family's financial interest?

5  A.    That seemed -- yes, that seemed to be a trigger for them.

6          **MR. LANSER:** No further questions.

7          **THE COURT:** All right.  Do y'all need a break, or can

8  we go on to the cross?  Anybody need a break?  Raise your hand

9  if you need a break.

10          Let's take just a quick five-minute break before you

11  do your cross.

12          **DEPUTY CLERK:** All rise.

13              (The jury exited the courtroom.)

14          **THE COURT:** You're still under oath.  Do you need a

15  break, the bathroom or some water?

16          **THE WITNESS:** Both.

17          **THE COURT:** Just know you're not to discuss anything

18  with anyone.  Don't talk to anyone when you go out.  You can go

19  to the bathroom in the hall.

20          **THE WITNESS:** Yes.  Thank you.

21              (A short recess was taken.)

22          **DEPUTY CLERK:** All rise.

23          **THE COURT:** Bring in the jury.

24              (The jury was escorted into the courtroom.)

25          **THE COURT:** Let's have a seat.

OFFICIAL TRANSCRIPT

1          Counsel, you may proceed.

2          **MR. SPEARS:** Thank you, Your Honor.

3                    **CROSS-EXAMINATION**

4     **BY MR. SPEARS:**

5     Q.   Ms. Banner, I want to cover with you some of the things

6     that you discussed on your direct examination.  Let's start

7     with talking about the Greenfield tract, okay.  And I hear and

8     understand that you and your sister and others were opposed to

9     this particular piece of economic development.

10         But you would agree that it was a huge industrial project?

11    Over 200 acres were purchased by Greenfield Louisiana; correct?

12    A.   Yes.  1300 acres approximately.

13    Q.   And you would also agree that when Greenfield purchased

14    the property, they bought it and believed, based on the current

15    zoning, that that was industrial?  In fact, I-3, I think, is

16    the classification, Industrial 3?

17    A.   Yes, yes.

18    Q.   Okay.  So Greenfield came to Louisiana with what they

19    thought was a huge project to benefit Louisiana and St. John,

20    although you opposed it; and they bought over 200 acres of

21    property that when they bought it was Industrial 3.

22         Can we agree on that?

23    A.   Yes, they believed it was Industrial 3.

24    Q.   Well, it actually was.  The zoning was Industrial 3;

25    correct?

                    OFFICIAL TRANSCRIPT

1  A.    They believed it was Industrial 3.

2  Q.    Based on the zoning at the time?

3            **THE COURT:** You're being -- yeah, okay.

4            **THE WITNESS:** They believed it was Industrial 3.

5  **BY MR. SPEARS:**

6  Q.    Okay.  That property was on the parish records with the

7  tax assessor and the real estate records as Industrial 3 going

8  back to 1990; correct?

9  A.    Yes.

10  Q.    In fact, when you and others filed a lawsuit to invalidate

11  the zoning, you had to reference the 90-27 statutes.  The

12  1990-27 statutes which means that it was the 27th piece of

13  ordinance passed in 1990; correct?

14  A.    Yes.

15  Q.    So just so the jurors understand, the Greenfield tract of

16  land, the property that Greenfield purchased in 2021 had been

17  zoned as industrial since 1990; correct?

18  A.    They believed it was zoned.  The zoning was nullified.

19  Q.    Okay.  And the zoning was nullified because the parish

20  government officials at that time did not follow all of the

21  requisite steps to change that zoning in 1990 from residential

22  to industrial.

23       So you and your organizers were successful in challenging

24  that zoning; correct?

25  A.    Yes.  There was a portion where public notice was not

OFFICIAL TRANSCRIPT

1  given when the ordinance was changed.  So yes.

2  Q.    But that was in 1990?

3  A.    That was in 1990.

4  Q.    Jaclyn Hotard wasn't parish president then; correct?

5  A.    No, she wasn't.

6  Q.    And Michael Wright was not on the parish --

7  A.    No, he wasn't.

8  Q.    So whoever the elected officials were in 1990 missed a

9  step; and because they missed a step, the judge ruled that all

10 of Greenfield's property and the surrounding properties that

11 had been zoned or thought to be zoned as Industrial 3 since

12 1990, all reverted back to residential; correct?

13 A.    It was nullified, yes.

14 Q.    Right.  And you would agree with me that clearly

15 Greenfield would not be permitted to build this huge industrial

16 grain elevator on residential property; correct?

17 A.    I can't agree with you there.  I'm not the one making the

18 decision.

19 Q.    Okay.  And in part response to the state court judge's

20 ruling that reverted the Greenfield property from Industrial 3

21 back to residential, the parish council moved quickly to put in

22 a new zoning application and to check all of the steps;

23 correct?

24 A.    The parish council, yes.  This was a decision that was on

25 the parish council.  Yes, that came up through them.

OFFICIAL TRANSCRIPT

1  Q.    Okay.  And clearly you were opposed to the effort to

2  restore the industrial zoning to the Greenfield property

3  because that was your whole mission, to kill the Greenfield

4  project; correct?

5  A.    No, that's not correct.  The issue that we had was that,

6  again, the steps were not being taken properly.  That the

7  tracts that were set to be rezoned were still incorrect even

8  from the lawsuit that we had found; so there was still mistakes

9  and errors.

10       There were still -- the public had not been allowed to

11 voice their concerns.  Again, so there were still -- our intent

12 was not to kill the project.  Our intent was to make sure that

13 all the steps were followed correctly and legally by law.

14 Q.    So were you for the project, or were you opposed to the

15 Greenfield project?

16 A.    I was opposed to the project.  But we can -- I can be

17 opposed to someone, and I respect someone's opinion to be for

18 it.  But what it comes down to, are we following the legal

19 procedures so that it's done fairly.

20 Q.    Okay.  Now, one of the things that I'm confused on is

21 everyone, except for you, seems to say that the only property,

22 the only tracts of land that were in this new zoning

23 application, the one that you wrote the ethics complaint about,

24 was property belonging to Greenfield.

25       There were other people surrounding and near the

OFFICIAL TRANSCRIPT

 1  Greenfield property who had their zoning reverted from --

 2          **THE COURT:** Okay, I'm going to interrupt because you

 3  can't testify, Counsel.  Ask a question.

 4          **MR. SPEARS:** I wanted to ask a leading question,

 5  Judge.

 6          **THE COURT:** Well, that's more than leading.  That's

 7  like testimony.

 8          **MR. SPEARS:** I'm going to break it up.

 9          **THE COURT:** Ask your question.

10  **BY MR. SPEARS:**

11  Q.   Do you agree that the only property on that particular

12  zoning application was Greenfield property and not the

13  surrounding properties?

14  A.   I do not agree.

15  Q.   Where did you get this information from?

16  A.   This is -- we have an urban planner that went and looked

17  at the records, so technically St. John the Baptist Parish's

18  own tract records.  So there's been a lot of confusion between

19  the 1990 zoning that you're referencing and now.  So there's

20  always been confusion about what exactly is part of that tract.

21      What we found was that the tracts to be rezoned,

22  throughout the 30 years, were no longer part of that tract of

23  land.  So it was more than Greenfield's land being rezoned, and

24  those property owners did not know that.

25  Q.   Now is this information you got from Justin Gray or from

OFFICIAL TRANSCRIPT

1   someone else?

2   A.   This is -- so Justin Gray did the analysis, but that

3   information came from the tracts that the council -- the

4   council originally had the tracts with the resolution all

5   listed.  So the tracts came from the parish council.  It was on

6   the agenda.

7   Q.   Okay.  But you said that you got the information from

8   someone.  Was that someone Justin Gray?

9   A.   He was the planner that did the analysis.

10  Q.   Okay.  Now you indicated earlier that because of what

11  happened to you at the November 28, 2023 meeting, you have been

12  hesitant or reluctant to speak out at subsequent meetings.  Is

13  that what you said?

14  A.   Yes.  I have spoken at some subsequent to that happening.

15  But I have not -- I've certainly not been active.  I have not

16  been vocal.  I haven't even been attending the meetings.

17  Q.   Isn't it true that you have spoken at multiple parish

18  council meetings since the November 28, 2023 incident?

19  A.   Like I said, yes, I have been at subsequent meetings where

20  I have spoken.  But the impact of it, I do not attend those

21  meetings any more.  So I do not speak.  I can't remember the

22  last time I spoke at a meeting.

23  Q.   But you have spoken since?

24  A.   Yes, I have.

25  Q.   Multiple times?

OFFICIAL TRANSCRIPT

1  A.    I can't remember if it was multiple times.  It's certainly

2  not at the frequency that I was speaking.  So I did try.  I

3  mean I will say that I did try because it was important for me

4  to speak, but I couldn't continue.

5  Q.    My notes show that you spoke at a November -- I'm sorry,

6  at a February 16th, 2024 meeting.  Do you remember speaking

7  at that meeting?

8  A.    I can't remember that exact date.

9  Q.    Would you have anything to refute the agenda saying that

10 you spoke at that meeting?

11 A.    No, I wouldn't refute that.

12 Q.    My notes also show that you spoke at an April 9th, 2024

13 meeting.  Would you have anything to suggest that you did not

14 speak at that meeting?

15 A.    No, if you say that I did.

16 Q.    You've also spoken at planning meetings because you

17 displayed an Apple watch that said you had an accelerated

18 heartbeat, but that was not at a parish council meeting.  That

19 was at a planning meeting; correct?

20 A.    Correct, correct.

21 Q.    And would I be correct if I told the jurors that Jaclyn

22 Hotard and Michael Wright don't run the planning commission?

23 A.    You would not be correct.

24 Q.    Are they on the planning commission?

25 A.    They are not on the planning commission meetings, but they

OFFICIAL TRANSCRIPT

1  have been in attendance.  I would say that a parish president

2  has power within those meetings.

3  Q.    Well, we know she has power.  That's why the people

4  entrust her to run the parish.

5        But my question is:  You have gone, and you've spoken

6  since November 28 --

7  A.    Uh-huh.

8  Q.    -- 2023 at planning commission meetings as well; correct?

9  A.    I don't remember exactly which one, but if you say that I

10  spoke at one.  Like I said before, I have been at subsequent

11  meetings after that date.  So yes.

12  Q.    Okay.  The one where you had the accelerated heartbeat,

13  not a parish council meeting, but a planning commission

14  meeting, did you speak at that one?

15  A.    I cannot remember.  And I mean it's a good possibility

16  that I did.  I have no problems saying that I did.

17  Q.    And if the agenda says you spoke, would the agenda be

18  correct?

19  A.    I would not, I wouldn't have a problem just agreeing with

20  that.

21  Q.    You said that your alert went off at 5:29.  But the parish

22  council meetings start at 5:30; correct?

23  A.    No, it's 5:59.

24  Q.    5:59 is when your watch alerted you according to you.  But

25  the Parish Planning Committee meetings start at 5:30; correct?

1  A.    I believe they started at 6:00.

2  Q.    Okay.  And the watch you displayed to the jury had no date

3  on it; is that correct?

4  A.    It was that picture was the date that it was.  And the

5  watch said that the -- it measured from 5:47 up until that time

6  frame.

7  Q.    Okay.  And you said that you have gotten a few of those

8  alerts since the November meeting; is that correct?

9  A.    Yes.

10 Q.    Do you recall being asked to leave or escorted out of the

11 Planning Commission meeting?

12 A.    Yes.

13 Q.    Tell the jurors why were you asked to leaving a Planning

14 Commission meeting.  Were you disruptive?

15 A.    I was not disruptive.  Again, this is -- we are -- like

16 you saw with the public comments, when we are testifying or

17 when we are making a public comment or I have felt when it is

18 something that the Parish wants, then we are allowed to speak.

19    When it is something that the Parish or Planning and

20 Zoning objects to, when it's really political and

21 controversial, there is some reason why we are cut off from

22 speaking.  And so I believe at that particular meeting, again,

23 I was being cut off.

24 Q.    But you didn't sue the Parish Planning Committee meeting

25 for cutting you off, did you?

OFFICIAL TRANSCRIPT

1  A.    They didn't threaten me with arrest, no.

2  Q.    Okay.  You didn't sue them for violating your right to

3  free speech, did you?

4  A.    They did not threaten me with arrest, so no.

5  Q.    They actually put you out of the meeting?

6  A.    They did.

7  Q.    Okay.  They didn't threaten you; they put you out of the

8  meeting?

9  A.    They did.

10  Q.    Okay.  Now, from what I'm gathering -- and I want you to

11  correct me if I say anything wrong because this is very

12  important.

13       You hold yourself out as a leader in the Wallace

14  community; correct?

15  A.    I hope that I am one, yes.  I try to be one.

16  Q.    Okay.  And you say that the citizens of the Wallace

17  community, the community that raised you, the community you

18  grew up in, look to you for that leadership?

19  A.    Yes.  Many have come to us and come to me and come to our

20  organization and have expressed that, yes.

21  Q.    Okay.  Over the years as you have been a community

22  advocate, part of what you feel you're doing is you're

23  advocating for these voices, people who don't have a voice in

24  the Wallace community?

25  A.    I wouldn't say they don't have a voice.  I would say that

OFFICIAL TRANSCRIPT

1  there is a lot of fear.  There's a lot of fear of retaliation.
2  St. John the Baptist Parish is harsh, the political atmosphere.
3  We're a small town, but it is -- people are afraid to speak.
4       And so if you want to say they don't have a voice, I
5  wouldn't say that.  But I do understand that there are people
6  who are afraid to speak.  And so I take my ability and
7  willingness to speak very importantly.
8  Q.   So you're the voice for your community, one of the leading
9  voices for your community?
10  A.   I am a voice in the community.
11  Q.   Is it true, Ms. Banner, that at least twice in recent
12  history you have sought to do what Michael and Jaclyn has done
13  which is put your name on the ballot to be elected, and you've
14  been soundly not voted by the people in your community who know
15  you best?
16           **MR. LANSER:** I'm going to object to relevance.
17           **THE COURT:** I'm going to sustain that.  What does that
18  have to do with what happened, Mr. Spears?  Y'all can approach
19  if you want, but come here and tell me.
20           You know what, don't.  I already sustained his
21  objection.  Move on.
22  **BY MR. SPEARS:**
23  Q.   Did you run for office in 2014 --
24           **MR. LANSER:** Same objection.
25           **MR. SPEARS:** I haven't even finished.

OFFICIAL TRANSCRIPT

```
 1            THE COURT: You asked did she run, and that's
 2   connected to the same objection.  So I'm sustaining his
 3   objection.
 4            MR. SPEARS: Okay.  We note an objection.
 5   BY MR. SPEARS:
 6   Q.   Although you're not elected, you still are a
 7   self-proclaimed leader in your community; correct?
 8            THE COURT: Asked and answered.
 9            MR. SPEARS: I'll withdraw the question.
10   BY MR. SPEARS:
11   Q.   You would agree with my statement that Jaclyn Hotard has
12   been elected by the parish that she serves overwhelmingly, with
13   over 70 percent of the vote the first time and with no
14   opposition the second time?
15   A.   Yes.
16   Q.   Your attorney suggested that one of your criticisms or one
17   of the criticisms that Michael and Jaclyn are corrupt
18   government officials.
19        Is that your position, that they're corrupt government
20   officials?
21   A.   They act -- have I seen acts correlated with a lot of
22   corruption, yes.
23            MR. SPEARS: Your Honor, I'd ask that she -- okay,
24   yes.
25   BY MR. SPEARS:
```

OFFICIAL TRANSCRIPT

80

```
 1  Q.   And part of that corruption was her signing this zoning
 2  application?
 3  A.   I believe that was an issue that was very concerning that
 4  should have been made transparent, to avoid any conflicts of
 5  interest and to be very transparent to the public.
 6  Q.   Okay.  Now your attorney displayed a copy of the ethics
 7  letter that you received and posted on Facebook, but you have
 8  certain redactions on that letter; correct?
 9  A.   Yes.
10       MR. SPEARS: Okay.  I want to display, and I'll mark
11  as D1, a copy of that same letter that is unredacted to see if
12  you recognize it.
13       MR. LANSER: No objection.
14       THE COURT: Any objection to that?
15       MR. LANSER: No objection.
16       THE COURT: All right.
17       MR. SPEARS: Oh, I got to hit the button.  Oh, man,
18  I'm low tech.
19  BY MR. SPEARS:
20  Q.   Now for comparison purposes, I'll ask that we look first
21  at P1, and then I'll come back to D2; so we can agree on what
22  was and was not redacted.
23       Can you see that?  Is it on your screen?
24  A.   It's on my screen.
25  Q.   So on your letter that you posted on Facebook, you had
```

OFFICIAL TRANSCRIPT

1  four redactions.  The first redaction was Jaclyn's home

2  address; correct?

3  A.    Yes.

4  Q.    And the second redaction looks like it was the Ethics

5  Board docket number; correct?

6  A.    Yes.

7  Q.    Then the third redaction appears to be the name and phone

8  number of the contact person at the Louisiana Board of Ethics;

9  correct?

10 A.    Yes.

11 Q.    Okay, now I'm going to ask that we go back to the

12 unredacted copy.

13       You agree that you received a copy of this letter because

14 you were the complainant?  Although the letter is addressed to

15 Jaclyn Hotard, you got a copy because you're the person who

16 made the complaint; correct?

17 A.    Yes.

18 Q.    And in this letter in big, bold print is the word

19 "confidential"; correct?

20 A.    Yes.

21 Q.    And you thought that "confidential" meant you could post

22 this on Facebook and discuss it at a public meeting; correct?

23 A.    Well, it doesn't say that I have to keep it confidential.

24 Q.    Is the word -- first of all, you have a Ph.D.; correct?

25 A.    I do.


OFFICIAL TRANSCRIPT

1  Q.   And you have a basic understanding of what the word
2  "confidential" means; correct?
3  A.   What does the word "confidential" mean?
4  Q.   I'm asking the questions.  I'm asking you.  Do you have a
5  basic understanding of what the word "confidential" means?
6  A.   The word "confidential," I do.  But this is not written to
7  me.  I was not given any instruction by the Board of Ethics
8  that I needed to keep it confidential.  There was no statute
9  reference.  There was nothing telling me that I had to keep it
10 confidential.
11 Q.   Okay.  So because the letter was not addressed to you and
12 although you were receiving a copy of it, you did not think
13 that the word "confidential" applied to you.  Is that a fair
14 statement?
15 A.   That was the question, yes.  And I posted this after
16 Jaclyn Hotard posted in a public agenda about a Board of Ethics
17 complaint and being -- and hiring an attorney.  So when she
18 posted it in the public-facing agenda, then I knew that this
19 confidentiality didn't seem to mean what I thought it did.
20 Q.   First of all, Jaclyn Hotard is not the secretary to the
21 parish council.
22        **THE COURT:**  Okay, so you're testifying.  I'm going to
23 stop you from testifying.  You have a question?
24 **BY MR. SPEARS:**
25 Q.   Would you agree that Jaclyn Hotard is not the secretary

OFFICIAL TRANSCRIPT

1  for the parish council?

2  A.    She's not the secretary.  But it's her resolution.  It has

3  Jaclyn Hotard right next to it.

4  Q.    And the person who is responsible for preparing and

5  posting the agenda is the board secretary; correct?

6  A.    I'm not sure to tell you the truth.

7  Q.    Jaclyn Hotard never posted the fact that she had an ethics

8  complaint filed by you on Facebook.  Is that a fair statement?

9  A.    She did not post it on Facebook, that's fair.  But she

10  posted it in a more public place than my Facebook which is the

11  parish website.

12  Q.    That agenda item did not say Jaclyn Hotard has an ethics

13  complaint.  Can we agree on that?

14  A.    Yes, it does say Jaclyn Hotard has an ethics complaint.

15  Q.    Let's put up the agenda.  I think that is P3.  Are you

16  familiar with P3?

17  A.    Yes.

18  Q.    First and foremost, the Open Meetings Law requires that

19  the agenda --

20              **THE COURT:** Okay, stop.

21              **MR. LANSER:** Objection.

22              **THE COURT:** Sustained.  Stop testifying.  Ask a

23  question, Counsel.

24              **MR. SPEARS:** I'm about to ask it.

25              **THE COURT:** No, I'm instructing you to stop giving

OFFICIAL TRANSCRIPT

1  testimony and ask a question.

2  **BY MR. SPEARS:**

3  Q.    Do you agree that this agenda was provided in advance of

4  the November 28th meeting as required?

5  A.    Yes.

6  Q.    Okay.  And do you also agree that Item No. 5 limits

7  comments to three minutes?

8  A.    Yes.

9  Q.    And that is standard at parish council meetings?

10  A.    Depends on who is commenting.  If it's something that is

11  supported by council members and by the administration, time is

12  extended.  And when it's something that's not supported, then

13  time is either interrupted, or it's reduced, or there's some

14  reason why people can't continue.

15  Q.    Is it your understanding based on attending multiple

16  parish council meetings that that particular item, Public

17  Comment, always reflects three minutes on the printed agenda?

18  A.    The words say three minutes.  I certainly have no problem

19  sticking to within the three minutes.  Does that always happen?

20  Is that something that is regularly altered?  Yes.

21  Q.    Is the agenda regularly altered?

22  A.    Yes.

23  Q.    Okay.  So there's some agendas that say three minutes, and

24  some that don't?

25  A.    Oh, I mean if you're talking about the minutes

OFFICIAL TRANSCRIPT

1  specifically, then I think it's always three minutes.  But the

2  agenda gets altered in terms of content right up until its

3  24-hour deadline for changes.

4  Q.    Okay.  Moving down to Agenda Item J, if I can find Agenda

5  Item J, it starts at the bottom of this page, is sponsored by

6  Jaclyn Hotard; is that correct?

7            **MR. LANSER:** Objection.

8            **THE COURT:** What's your objection?

9            **MR. LANSER:** He's testifying again, saying that it's

10  sponsored.

11            **MR. SPEARS:** I said, "Is that correct?"

12            **THE COURT:** He's asking a leading question.  But what

13  was the question again?

14            **MR. SPEARS:** Is it correct that it's sponsored by

15  Jaclyn Hotard?

16            **THE COURT:** If you know the answer, because the way

17  you phrased it, Counsel.

18            **THE WITNESS:** Yeah, I don't know what "sponsored"

19  means.

20            **MR. SPEARS:** Okay.

21  **BY MR. SPEARS:**

22  Q.    Begin reading for us at "authorization" and continue, and

23  let's see if it says what you said it says.

24  A.    It says, "Jaclyn Hotard, Authorization to retain legal

25  services with the Law Firm R. Gray Sexton as special counsel to

OFFICIAL TRANSCRIPT

1    perform services related to ethics laws subject to the
2    restrictions imposed by the State of Louisiana regarding ethics
3    procedures and at the rate in accordance with the Attorney
4    General guidelines per statute."
5    Q.   Okay, so that's slightly different from what you said it
6    said?
7    A.   No, it's not.
8    Q.   All right, okay, no problem.
9         Let me ask you this.  You came to the meeting prepared to
10   speak; correct?
11   A.   I did.
12   Q.   You came to the meeting knowing that there was a
13   three-minute time limit on your speech; correct?
14   A.   Yes.
15   Q.   Do you recall if your speech was written out, or were you
16   going to speak off the top of your head?
17   A.   I had taken notes.  I had bullet points.  I had handouts
18   and also my -- I had actually tested to see whether I fit in
19   the three minutes.  So yeah, I knew --
20   Q.   So you had a prepared speech?
21   A.   It was -- if you want to say bulleted.  I kind of do a
22   combination of speaking within a topic.  I don't have all of my
23   words written out word by word.
24   Q.   But you were very confident that you could say everything
25   you came to the meeting to say with the intention of getting it

OFFICIAL TRANSCRIPT

1  all in the three minutes?

2  A.    Yes.

3  Q.    So I want you to take your time.  I'm going to use this

4  timer, and give us your speech right now, the exact speech you

5  came prepared to say that you said you were stopped from saying

6  by Michael Wright.  Are you ready?

7              **MR. LANSER:** Objection, Your Honor.

8              **THE COURT:** Wait, hold on.  Approach, Counsel.

9                   (Proceedings held at the Bench.)

10             **THE COURT:** What's your objection?

11             **MR. LANSER:** Relevance, I guess, and I don't

12  understand what he's even getting at with this.

13             **THE COURT:** How long ago was that?  How long ago was

14  that speech?

15             **MR. SPEARS:** November of 2023.

16             **THE COURT:** You expect her to come and -- does she

17  have notes for her speech?  I'm not going to allow you to make

18  a mockery of the speech.  We have the videotape.  You can ask

19  her what was it that she wasn't able to say, but I'm not going

20  to make you have a witness perform.  This isn't the O.J.

21  Simpson trial.  We all know how that resulted.

22             **MR. SPEARS:** If she had a prepared three-minute

23  speech --

24             **THE COURT:** She don't have to be prepared for that.

25  I'm not going to -- I think that's abusive.  I think it is, you

OFFICIAL TRANSCRIPT

1  know.  Like I said, you can ask her a general question.  But

2  I'm not going to make that woman give her speech unless she was

3  prepared to come here and give it.  But she came here -- you

4  can ask her the question, and I'm not going to let you time

5  her.  If you had asked for her speech and you had someone

6  demonstrate it, a demonstrative.  But I'm not going to make the

7  Plaintiff be put on the spot and you try to humiliate this

8  woman.

9          **MR. SPEARS:** I'm not trying to humiliate her.

10          **THE COURT:** She said she did not have a written speech

11  on the record.  She said she had some bullet points.  She said

12  she -- this happened in 2023.  I am not going to allow it.  But

13  you can ask her is there something more she wanted to say,

14  okay.  I mean the video speaks for itself.

15          **MR. SPEARS:** Can I first ask her if given the

16  opportunity, could she give her speech right now?

17          **MR. LANSER:** I mean I guess I still don't see how

18  that's relevant to any of this.

19          **THE COURT:** You can't see the timer; so that's not

20  fair.

21          **MR. SPEARS:** I'll give her the timer.

22          **THE COURT:** Well, you can ask her the question.  But

23  you know, if she says no, I just I'm not going to allow that

24  question.

25          **MR. SPEARS:** If she says yes.

OFFICIAL TRANSCRIPT

1    **THE COURT:** I am not -- and I'm not arguing anymore.

2   I think that is just, you know, abusive of this woman to be

3   honest with you.  There are some questions you want to ask her.

4   I almost want to let you do it because she's very articulate

5   and she might embarrass you.  The fact that she wasn't

6   prepared -- what she was prepared to say was, you know, how

7   many years, in 2023?

8    **MR. LANSER:** Yeah, and this is the first time this has

9   come up.

10   **THE COURT:** We're now in 2025, two years ago.  The

11   fact that she has already demonstrated she's been traumatized,

12   I'm not going to let you embarrass her and traumatize her,

13   Mr. Spears.

14   Like I said, you can ask her if there's something

15   more she would have said, but I'm not going to make a witness

16   come in here and perform.  That is unheard of.  I have never

17   heard of anyone treating -- and I don't even think it's to your

18   benefit.  So no, it's denied.

19   (Whereupon this concludes proceedings held at

20   the bench.)

21   **BY MR. SPEARS:**

22   Q.   So Ms. Banner, explain to the jurors what was it that you

23   intended to say in your three minutes that you did not get the

24   chance to say because you were cut off.

25   A.   Yes.  So what, I mean, the most important portion of what

OFFICIAL TRANSCRIPT

1  I wanted to say was specific to the maps and Jaclyn Hotard's
2  mother-in-law's land.  I believe there was some confusion for
3  the council who was making the decision who didn't understand
4  that that was a personal relationship.  That's why I was
5  arguing that it was personal.
6         There was some confusion about the tracts of land and the
7  zoning and the tracts throughout which is why it was important
8  for me to show that map.  I did not get to talk about the maps
9  that I had.  I had handouts to give.  I never got around to
10 passing out the handouts to the council members.
11        And you say I had the chance to say it.  If I started
12 banging a gavel as you're trying to speak, that's not speaking.
13 That's not me being able to speak of my own accord, at the rate
14 that I want to speak, at the tone of voice that I want to have,
15 at the content.  All of those are impacted by me getting
16 interrupted by the Parish Council President and by the parish
17 president.  That's not free speech.
18 Q.    So in addition to posting the day before the meeting on
19 your Facebook account a copy of the confidential ethics letter
20 and indicating that Jaclyn Hotard is being investigated, you
21 also immediately posted after the 23rd (sic) meeting that you
22 were kicked out of the meeting and threatened with arrest;
23 correct?
24 A.    Yes.
25            **MR. SPEARS:** I want to show you two of your Facebook

OFFICIAL TRANSCRIPT

1  posts, and we'll mark this as D2.

2         **DEPUTY CLERK:** Counsel, D1 never got put in the

3  record.

4         **MR. SPEARS:** Oh, offer, file, and introduce D1, Your

5  Honor, which is a copy of the confidential ethics letter.

6         **THE COURT:** All right, any objection, Counsel?

7         **MR. LANSER:** No objection.

8  **BY MR. SPEARS:**

9  Q.    What we'll mark as D2 which are two of your -- we got to

10 make that bigger if we can.

11        Do you recognize that social media posting?

12 A.    Yes.

13 Q.    And that's posted on The Descendants Project social media

14 page?

15 A.    The Descendants Project social media page, yes.

16 Q.    And you control that page; correct?

17 A.    No.  Actually, I -- I mean I have authority over it.  I

18 didn't post that.  I didn't have a problem with it being

19 posted.

20 Q.    Okay.  I think there's another posting from The

21 Descendants Project.  Can you read what that headline says?

22 A.    Yes, it says, "St. John Parish sued for shutting down

23 critic, told not to rezone controversial site."

24 Q.    Okay.  So these are postings that your organization that

25 you're a co-founder of placed on social media regarding the

OFFICIAL TRANSCRIPT

1  meeting that you say you were intimidated and threatened at;
2  correct?
3  A.    Yes.
4  Q.    And in fact, in addition to these postings, there are
5  dozens of other postings that you have made concerning this
6  particular litigation; correct?
7  A.    Probably, yes.
8  Q.    Well, either you did or you didn't?
9  A.    I don't know the exact number, but yeah.
10 Q.    And that's one of the things you and your sister and The
11 Descendants Project, that's one of the things you all do; you
12 all post on social media?
13 A.    Yes.
14 Q.    Okay.  Do you keep up with how many likes you get on
15 social media?
16 A.    I don't keep up with it.  I don't keep track of it.
17        **MR. SPEARS:** Your Honor, we'd offer, file, and
18 introduce D2.
19        **MR. LANSER:** No objection.
20        **THE COURT:** All right.
21 **BY MR. SPEARS:**
22 Q.    Let's go back to the council video if we can pull it up.
23       You would agree that even after you spoke, there were
24 multiple, additional people who spoke at the same council
25 meeting on the same agenda item; correct?

1  A.    I don't think there were multiple people.  No, there
2  wasn't anyone who really spoke to the agenda item that -- from
3  what they told me were able to say what they intended to say.
4  Q.    Let's go to P3, and I'm going to ask that you forward it
5  to the very end of Ms. Banner's testimony since we've already
6  heard that.  It was 6 minutes and a little change.  Wait, go
7  back.  Go back.  Go back a little bit more.  Go back a little
8  bit more.
9       I'm going to ask you to watch this with me, and then I'm
10 going to ask you some questions about it, okay?
11 A.    Okay.
12                   (Video recording was played.)
13            **THE COURT:** Pull up the video, and I want Counsel to
14 approach.
15                   (Proceedings held at the Bench.)
16            **THE COURT:** So what does Ms. Perrilloux's statements
17 have to do with this lawsuit?
18            **MR. SPEARS:** One of the things that she's claiming is
19 that after we read the statute, nobody else wanted to speak.
20 Well, that's not true.
21            **THE COURT:** That's not an issue.  And what I'm
22 concerned about, what you have alluded to is maybe she didn't
23 get to say what she wanted to say, but someone else maybe said
24 it.  But that is not her First Amendment right, and I'm not
25 going to allow you to confuse the jury.  It's incorrect.

                         OFFICIAL TRANSCRIPT

1          She has only talked about her, the actions chilling
2   her.  That's what the First Amendment is, and this is her
3   lawsuit.
4          She is not in here.  And what I'm not going to allow
5   you to do, and I have cautioned you.  I've had a lot of motions
6   in limine about this, is that we're not bringing the Perrilloux
7   lawsuit in.  It's not about that.  So what is she going to know
8   about --
9          **MR. SPEARS:**  Judge, I just asked the question.  She
10  said nobody spoke after her.
11         **THE COURT:**  She didn't say that.  She did not say --
12  you cannot make up things in this court.  You cannot make up
13  things in this court.  She never said no one spoke.  Did she?
14         **MR. SPEARS:**  Can I see what she said, Judge?
15         **THE COURT:**  Why don't you ask the question?  Ask the
16  question.  Was anyone allowed to speak after you?  If she says
17  yes, that's it.  Because I'm about to, you know, disregard that
18  whole -- I don't even know why -- I was giving you some leeway,
19  and I allowed you to --
20         **MR. SPEARS:**  Judge, there was a specific question.
21         **THE COURT:**  Then I see Ms. Perrilloux talking.  You
22  didn't object.  But I'm telling you, I have some concern of
23  where you're going with this.  She didn't know what was in
24  Ms. Perrilloux's mind.  The fact that some other persons were
25  not interrupted, if someone else got to say what she's going to

1  say does not mean that she got -- that her First Amendment

2  rights were not cut off.

3          **MR. SPEARS:** It's two claims, Judge.  One is Open

4  Meetings, okay, whether we complied with Open Meetings in

5  letting people speak.  That goes to that.

6          **THE COURT:** And so if we're talking about Open

7  Meetings, again, I caution you, do not bring up what was

8  decided in another case on Open Meetings Law.

9          **MR. SPEARS:** I'm just showing that we run open

10  meetings correctly and that people get to speak.

11          **MR. LANSER:** Just because someone else got to speak

12  does not mean the open comment period was run correctly.  We

13  allege it was not.

14          **THE COURT:** You'll get a chance to do redirect.  And

15  you know, when you have an objection, you need to stand up; so

16  I can see you.  You need to stand up and state what your

17  objection is.

18          **MR. SPEARS:** But there's two issues, Judge.  Open

19  Meetings is a separate and distinct cause of action.

20          **THE COURT:** Yes, I understand that.  I understand

21  that.

22          **MR. SPEARS:** So can I continue?

23          **THE COURT:** With what I've cautioned you about.

24          **MR. SPEARS:** I'm not going to discuss the Perrilloux

25  lawsuit.

OFFICIAL TRANSCRIPT

1          **THE COURT:** And with regard to, you know, insinuating

2    if another person was allowed to speak, that somehow affects

3    her First Amendment.  I'm not going to allow that.

4          **MR. SPEARS:** Open meetings, open meetings.

5          **MR. LANSER:** How does it affect open meetings?

6          **THE COURT:** How does it affect open meetings?  You

7    need to argue.

8          **MR. LANSER:** If they had an open meeting that said

9    everyone is allowed to speak except for this one citizen, that

10   would violate Open Meetings Law.

11         **MR. SPEARS:** Well, that's the First Amendment.

12         **MR. LANSER:** That is both.

13         **THE COURT:** Well, I think it would be both.  If you

14   have an open meeting, it's got to be equally open.

15         **MR. SPEARS:** I think the jury has a right to see how

16   the meeting was conducted, and they can make a decision whether

17   it was fair and open.

18         **THE COURT:** Well, I'll instruct them of that.  And

19   you'll again have an opportunity to redirect.

20         **MR. LANSER:** I understand.  Thank you, Judge.

21              (Whereupon this concludes proceedings held at

22       the bench.)

23   **BY MR. SPEARS:**

24   Q.   So after you spoke, at least one other person, maybe two

25   or three spoke as well; correct?  Do you remember that now?

OFFICIAL TRANSCRIPT

1  A.    Yeah.  I was mostly concerned about when I was speaking.
2  I'm not here for when other people spoke.
3  Q.    You said you left the room?
4            **THE COURT:** She didn't say that just now.
5            **THE WITNESS:** I didn't say that.
6            **THE COURT:** You think she just said that?
7            **MR. SPEARS:** She said, "I'm not here."
8            **THE COURT:** No, she said, "I was mostly concerned
9  about when I was speaking.  I'm not here for when other people
10  spoke."
11            **MR. SPEARS:** I was mishearing her, okay.  Continue.
12                  (Video recording was played.)
13  **BY MR. SPEARS:**
14  Q.    Ms. Banner, was that you calming down the speaker and
15  taking her back to her seat?
16  A.    Yes, that was me.
17  Q.    Okay, and that was after you had already spoken?
18  A.    Yes.
19            **MR. SPEARS:** Okay, all right.  Continue.
20                  (Video recording was played.)
21  **BY MR. SPEARS:**
22  Q.    And that was you walking toward the camera as well?
23  A.    Yeah.  I had dropped something and went pick it up.
24            **MR. SPEARS:** All right, continue.
25                  (Video recording was played.)

OFFICIAL TRANSCRIPT

**BY MR. SPEARS:**

Q.    Is that limit, three minutes, always on the screen right there?

A.    I wouldn't dispute you if you said that it was.  I think there's been times where I don't remember the clock being up there.

                    **MR. SPEARS:** Okay.

                            (Video recording was played.)

**BY MR. SPEARS:**

Q.    So just to be clear, Ms. Banner, at least three additional people spoke after you and after the reading of the statute, and they all spoke against the Parish's agenda -- they all spoke against the parish's agenda item to approve the retaining of R. Gray Sexton; correct?

A.    I would have to say no to that question because -- well, they spoke to Item J.  But what Kim Mathieu, who was speaking, he was saying something different than I was saying.  He did not use the same words that I used.

     So yeah, and I'm here talking about what I said and what happened when I was speaking.  But we were not using the same language.  And so I don't, I don't think that he was even, again, referring to the same -- we had completely different comments; although we were speaking on the same agenda item. So I can't agree to say that we were like saying the same thing.

1  Q.    Okay.  He spoke to Item Agenda J.  Shondrell Perrilloux

2  spoke on Agenda Item J, and Crystal Cook, the last lady, spoke

3  to Agenda Item J; correct?

4  A.    Actually, she was -- that was a mistake.  She was not

5  speaking on Agenda Item J.

6  Q.    Other than not allowing you to present your posters and

7  your handouts, is there anything else that you can point to, to

8  the jurors that the parish council or Jaclyn or Michael

9  violated the Open Meetings Law?

10 A.    When you -- public comments is part of Open Meetings.  And

11 when you don't allow someone to speak, it was my understanding

12 that's in violation of Open Meetings.  It closes the comments.

13 So in my opinion, what I know to be of the law, it's in

14 violation of Open Meetings.

15 Q.    And there are multiple pieces.  So the one piece that they

16 violated is the public comment piece.  Is that what you're

17 saying?

18 A.    I am not an attorney.  But I know for me and for what my

19 understanding of the law and having an open meeting, an open

20 meeting means it's open and open to comment.  And there is

21 no -- there's not even an on-topic rule for this, for our

22 meetings.

23 Q.    So does that -- is your position that you can take the mic

24 and say anything at a council meeting whether it's on the

25 agenda or not?  Is that your position?

OFFICIAL TRANSCRIPT

1  A.   I wouldn't.

2         **THE COURT:** Counsel, she is not an attorney, and I'm

3  not going to allow her to try to opine on the law.  I will

4  instruct the jury on what the law is, what the Open Meetings

5  Law is.

6         We're here to present the facts to the jury.  So if

7  there's some facts that you need her to answer, if there's a

8  question you can ask her that can get her to respond in facts

9  and not on the law, I'm going to allow you to proceed, but

10 within those parameters.

11 **BY MR. SPEARS:**

12 Q.   With regard to your allegation that Gray Sexton was

13 Jaclyn's personal attorney, you said you determined that

14 because he had appeared on her behalf in some previous

15 litigation?  Is that what I heard you say?

16 A.   Yes.  And I believe that there was -- yes.  And there may

17 have been some either paperwork or something that we saw in the

18 process of our trials, process of the zoning cases that he was

19 her attorney.

20 Q.   So you saw some paperwork prior to the meeting that said

21 he was her personal attorney?

22 A.   In relation to the zoning, and he appeared in court as her

23 counsel.

24 Q.   And she was in court in her capacity as St. John Parish

25 President; correct?

OFFICIAL TRANSCRIPT

1    **MR. LANSER:** I'm going to object to relevance.  Her

2  knowledge of this is not relevant.

3    **THE COURT:** Counsel, I do think it's irrelevant to

4  either the Open Meetings Law or to the First Amendment claim.

5    **MR. SPEARS:** She made a statement, Your Honor, and I'm

6  trying to just get clarity, what is the basis for the statement

7  that she made.

8    **THE COURT:** Why does it matter is what I'm trying to

9  get to.  So it's undisputed what was on the agenda; right?  And

10 so what clearly her assumption was that -- she stated the facts

11 as they are, so.  That's how she believed it.  So if you have a

12 question, she's answered it and why she believed that.  You can

13 go on from there, but I'm not quite sure where you're...

14    **MR. SPEARS:** I'm going to move on, Judge.

15 **BY MR. SPEARS:**

16 Q.   After investigating and reviewing your complaint, you are

17 aware that the Ethics Board found no violation on behalf of

18 Parish President Hotard?  Are you aware of that?

19 A.   Yes.

20    **MR. SPEARS:** We're going to mark for purposes of

21 identification as D3 and ask to publish it.

22 **BY MR. SPEARS:**

23 Q.   Did you also get a copy of this letter dated September 10,

24 2024?

25 A.   Yes, I -- yes.


OFFICIAL TRANSCRIPT

1  Q.    Okay.  And that was a letter like the first letter,

2  addressed to Jaclyn Hotard at her home address, referencing the

3  same Board of Ethics investigation and also stamped

4  "confidential"; correct?

5  A.    Yes.

6  Q.    In that letter, they indicate that they were closing the

7  file because they had investigated your ethics complaint and

8  found no violation; correct?

9  A.    Correct.

10         **MR. SPEARS:** Judge, we'd offer, file, and introduce

11 D3.

12         **THE COURT:** Any objection?

13         **MR. LANSER:** No objection.

14         **THE COURT:** All right, it's accepted into evidence as

15 D3.

16 **BY MR. SPEARS:**

17 Q.    Do you have any information to suggest that before, before

18 the November 28, 2023 meeting that the parish council had never

19 previously hired Gray Sexton or his law firm as ethics counsel?

20 A.    I don't -- say the question again.  I don't understand.

21 Q.    The question is:  Do you have any information that you

22 could offer to the jurors that before the meeting that we're

23 talking about, the November 28 meeting, that St. John Parish

24 had never previously hired Gray Sexton as ethics counsel?

25 A.    I don't know that they had not, if that's what you're

1  asking.  I don't know if he's an attorney that they had

2  engaged.

3  Q.    Would you agree with me that the property, the tracts of

4  land that you displayed that you said were owned by Jaclyn's

5  mother-in-law, she owned that, her business owned that long

6  before Greenfield came to town?  Would you agree with that?

7  A.    I'm not sure when Greenfield came to town.

8  Q.    Okay.  If I told you that Greenfield purchased their

9  property in 2021, and I think we've established that, would you

10 agree that Jaclyn's mother-in-law was in business and owned her

11 tracts of land well before that?

12 A.    Before Greenfield purchased their property in 2021?

13 Q.    Yes.

14 A.    I believe her property was purchased before that, before

15 Greenfield bought its property.

16 Q.    Okay.  And would you also agree that Jaclyn Hotard's

17 mother-in-law bought her tracts of land, the tracts of land

18 that you're complaining about, long before Jaclyn married her

19 son Rusty?

20        **THE COURT:** Counsel, y'all approach.

21        **THE WITNESS:** Now you're getting -- I don't know.

22        **THE COURT:** Y'all approach.

23             (Proceedings held at the Bench.)

24        **THE COURT:** We're going into this rabbit hole.  I said

25 we're not going to try the underlying claims.  This jury --

OFFICIAL TRANSCRIPT

1    it's irrelevant, and it's confusing.  You know, even if the

2    plaintiff was wrong about her assumptions, we're talking about

3    the right to free speech and open meetings.

4           **MR. SPEARS:** Okay.

5           **THE COURT:** So spending all this time, you know, on --

6    it's irrelevant.  We know what she wanted to present at the

7    meeting, you know.  Again, we're not going to go down this

8    rabbit hole of trying -- or if you are going to insinuate that

9    she falsely or intentionally made allegations that's certainly

10   irrelevant because she's a public official.  The truth of the

11   matter is not at issue.  So where are you going with this?

12          **MR. SPEARS:** Well, the problem is, Judge, they intend

13   to call her mother-in-law to talk about how she was benefiting

14   from this, and I'm saying that --

15          **THE COURT:** Well, then you cross-examine the

16   mother-in-law.

17          **MR. SPEARS:** I think it's irrelevant.  If you think

18   it's irrelevant, they shouldn't be allowed to call and put

19   that --

20          **THE COURT:** They haven't asked that question yet.  And

21   if you think what the mother-in-law is going to say is

22   irrelevant, then you didn't raise it, you know, before.

23          **MR. SPEARS:** Her lawyer raised it in a whole bunch of

24   pretrial pleadings.

25          **THE COURT:** We've gone all through the mother-in-law

OFFICIAL TRANSCRIPT

owned the property and whatever.  I don't know what I'm going
to limit you to for her.  I'm just cautioning you it's not
going to be a trial about whether or not she was correct with
her assumptions.  It's not going to be a trial about whether or
not she actually made an ethics violation or not because none
of that -- those are all distractions.  It's just what happened
at that meeting.

        **MR. SPEARS:** Uh-huh.  I'm almost finished.

        **THE COURT:** All right.

        **MR. SPEARS:** You're making me withdraw my question?

        **THE COURT:** No, you asked it.  She answered it.

        **MR. SPEARS:** She didn't answer it.

        **THE COURT:** You asked her:

"Would you also agree that Jaclyn Hotard's mother-in-law
bought her tracts of land, the tracts of land that you're
complaining about, long before Jaclyn married her son Rusty?

"THE WITNESS:  Now you're getting -- I don't know."

        She said she doesn't know.  She answered it.

        **MR. SPEARS:** Can I clarify when she got married?

        **THE COURT:** No.  She said she doesn't know.

        (Whereupon this concludes proceedings held at
the bench.)

        **MR. SPEARS:** One second, Your Honor.

**BY MR. SPEARS:**

Q.   Would you at least agree that the Gaudet, and I think we

OFFICIAL TRANSCRIPT

1  called it the Gaumet properties, were purchased before 2019?

2  Would you agree with that?

3  A.    If you say so, then yes.

4          **THE COURT:** Wait, okay.  So you can't say, "If you say

5  so."  Either you know or you don't know for a fact.

6          **THE WITNESS:** I'm not sure when the property was

7  purchased.  I believe it to be prior to or around the time of

8  2019.

9  **BY MR. SPEARS:**

10 Q.    And that's all of the Gaumet properties?

11 A.    That, I'm not sure.

12         **MR. SPEARS:** Okay, one second, Your Honor.  We're

13 coming to a close.

14 **BY MR. SPEARS:**

15 Q.    It's your belief that the reason you were interrupted is

16 because you were being critical of Jaclyn Hotard?  Is that what

17 you're indicating?

18 A.    I was interrupted because I was speaking -- it seemed to

19 trigger, this discussion about the Board of Ethics and what I

20 believed to be this connection and that it was a conflict of

21 interest that should have been disclosed.  And yes, I believe

22 that's the reason why I was being interrupted.

23 Q.    And you would agree that you had never before appeared at

24 a parish council meeting or at a Planning Commission meeting

25 and spoken publicly about a confidential ethics investigation

OFFICIAL TRANSCRIPT

1  prior to the November 28 meeting?  Would you agree with that?

2  A.   I would disagree with it because it's not confidential.

3  Q.   Okay.  Well, let me take the word "confidential" out.

4       Would you agree with me that prior to the November 28th,

5  2023 meeting, you had never appeared at either a Council

6  meeting or a Planning Commission meeting and spoke publicly

7  about a pending Board of Ethics investigation?

8  A.   Yeah, that's exactly my point.

9  Q.   Okay, all right.  Would you also agree with me that

10  although you posted the first letter on Facebook, the letter

11  that said Jaclyn Hotard has an ethics complaint, you did not

12  post the final letter that says, "We've investigated Jaclyn,

13  and the complaint is closed, and there's no violation"?  Would

14  you agree with that?

15            **MR. LANSER:** Object to the relevance.

16            **THE COURT:** She doesn't have an obligation.  The trial

17  is about free speech, Counsel.

18            **MR. SPEARS:** I understand, but I'm just asking whether

19  she posted the second letter.

20            **THE COURT:** All right.

21            **THE WITNESS:** This letter came over almost a year

22  after.  So it was a year after.  It was a year after

23  Greenfield.  So I was in a completely -- at this point, so much

24  had happened, I was still emotionally dealing with it.  So

25  anything dealing with it, I -- that was not anywhere near the

OFFICIAL TRANSCRIPT

1  top of my priority.

2  **BY MR. SPEARS:**

3  Q.   Okay, so the answer is no, you did not post it?

4  A.   The answer is no, I did not post it.

5          **MR. SPEARS:** Okay.  Judge, nothing further.

6          **THE COURT:** All right, do you have any redirect?

7          **MR. LANSER:** I do, Your Honor.

8          **THE COURT:** All right.

9                    **REDIRECT EXAMINATION**

10  **BY MR. LANSER:**

11  Q.   Dr. Banner, Mr. Spears mentioned a few different meetings

12  that you had attended after November 28, 2023.  I believe it

13  was a February meeting and an April meeting; is that correct?

14  A.   Yes.

15  Q.   And as far as your recollection is, it was just, perhaps,

16  those two and maybe a commission meeting or two?

17  A.   Yes, it is -- those meetings, like I said, I know that I

18  had gone to a couple of meetings.  Just the dates that he

19  presented, I think, is February and one in April.  So that is a

20  marked difference in my attendance at the meetings before.

21  Q.   Okay.  When you say "a marked difference," are you

22  referring to the frequency you would go to meetings?

23  A.   Yes.

24  Q.   Okay.  And then we watched in the video a few other

25  individuals got up during public comment.  The first being

OFFICIAL TRANSCRIPT

 1  Ms. Perrilloux.

 2      Did you hear Ms. Perrilloux discuss Ms. Hotard's

 3  mother-in-law?

 4  A.   Not really, no.

 5  Q.   Did you hear Ms. Perrilloux discuss Ms. Hotard's signature

 6  on the zoning application?

 7  A.   No.

 8          **MR. SPEARS:** Your Honor, I have to object to leading.

 9          **THE COURT:** No, that's not -- overruled.  He's not

10  leading.  Go ahead.

11  **BY MR. LANSER:**

12  Q.   Did you hear anyone threaten Ms. Perrilloux with arrest?

13  A.   No, I did not.

14  Q.   All right.  Did you also hear Mr. Mathieu speak during

15  public comment?

16  A.   I did.

17  Q.   And did you hear Mr. Mathieu discuss Ms. Hotard's

18  mother-in-law?

19  A.   No.

20  Q.   And did you hear Mr. Mathieu discuss Ms. Hotard's

21  signature on a zoning application?

22  A.   No.

23  Q.   And was Mr. Mathieu arrested or threatened with arrest

24  that you're aware of?

25  A.   No, he was not.


OFFICIAL TRANSCRIPT

1  Q.    And I believe it is your testimony, correct me if I'm

2  wrong, that you received that letter that the ethics complaint

3  was dismissed approximately a year later?

4  A.    A year later, yes.

5  Q.    Would you -- if you had known then that it would be

6  dismissed, would you still have wanted to do public comment

7  that day?

8  A.    Yes.  It was something that needed to be disclosed.  It

9  was what I believed to be a conflict of interest.  I still

10 think it's a conflict of interest.  And if it was investigated

11 by the Board of Ethics, then it's good they investigated it.

12 But I disagree with their opinion.  But they did investigate

13 it, and that was the point.

14       Sometimes people don't agree with what I have to say.

15 That's fine.  But there should be a procedure that is followed,

16 and the law should apply to everybody, no matter if you're a

17 resident or no matter if you're the president.

18 Q.    Do you feel like you let your family down?

19 A.    In my head, I know that -- I try to tell myself that, no,

20 I don't -- it feels irrational for me to think that I let them

21 down.  But it feels like I let them down, and I'm letting them

22 down because I let this change me.

23       It impacted me.  And I would love to be up here and say

24 that I was strong enough to continue being the same person that

25 I was and having the same courage that I did.  But if I -- I

OFFICIAL TRANSCRIPT

1  have to be honest here, it did change me, and I feel like that

2  is what is the disappointment.

3           **MR. LANSER:** I have no further questions.

4           **THE COURT:** All right, thank you.

5           Next witness.

6           **MR. LANSER:** Yeah, we would now call Harriet Banner.

7           **THE COURT:** All right.  Is everybody okay?  We're

8  going to get into this testimony?  Okay.

9                          **HARRIET BANNER,**

10 after having been duly sworn, did testify as follows:

11          **MR. LANSER:** May I proceed, Your Honor?

12          **THE COURT:** Uh-huh.

13                     **DIRECT EXAMINATION**

14 **BY MR. LANSER:**

15 Q.   Can you state your name for the record, please?

16 A.   Harriet Banner.

17 Q.   And how do you know the Plaintiff Joy Banner?

18 A.   She's my daughter.

19 Q.   Do you have any other children?

20 A.   Oh, yes, I do.

21 Q.   Who are your other children?

22 A.   I have one, her twin sister, and another son and one

23 deceased son.

24 Q.   And what parish do you live in, Ms. Banner?

25 A.   St. John the Baptist.

OFFICIAL TRANSCRIPT

1    Q.    How long have you resided in St. John the Baptist Parish?

2    A.    78 years.

3    Q.    Does your family have roots in St. John the Baptist

4    Parish?

5    A.    Yes.

6    Q.    And can you describe those?

7    A.    From the 1800s.

8    Q.    Would you describe your family as close-knit?

9    A.    Very close.

10   Q.    Do you ever attend St. John the Baptist Parish Council

11   meetings?

12   A.    Yes, I have.

13   Q.    In any given year, approximately how many parish council

14   meetings do you attend?

15   A.    About four.

16   Q.    Do you ever give public comment at those meetings?

17   A.    Yes, I have.

18   Q.    Is there any particular reason you choose to attend a

19   meeting?

20   A.    Basically, just to find out what's going on in the parish

21   and if there's something on the agenda that I need -- want to

22   find out about.

23   Q.    Okay.  What would cause you to want to give public comment

24   at a meeting?

25   A.    Well, sometimes, you know, your council, the people, they

OFFICIAL TRANSCRIPT

1    really need to know your feelings of, you know, what's going on
2    and your feelings of what you need in the parish.
3    Q.    Do you think it's important for citizens to give public
4    comment?
5    A.    I think it is.
6    Q.    And why do you think that?
7    A.    Because I, again, I think they need to know your feelings,
8    your needs, you know, for the parish, for your area.
9    Q.    Okay.  Did you attend the St. John the Baptist Parish
10   Council meeting on November 28, 2023?
11   A.    I did.
12   Q.    Did anyone else attend with you?
13   A.    My husband and some friends.
14   Q.    Do you usually attend with your husband?
15   A.    Yes.
16   Q.    And outside of your daughter Joy, was anyone else from
17   your family there?
18   A.    Yes.  I had some first cousins.
19   Q.    Any other children there?
20   A.    Yes, one son.  And my daughter.
21   Q.    Do you recall there being a public comment period at that
22   meeting?
23   A.    Yes, I did.
24   Q.    And can you just describe in your own words what you
25   witnessed during that public comment meeting period?

OFFICIAL TRANSCRIPT

1  A.   Well, yes.  Joy got up for her presentation or whatever,
2  and she wasn't allowed to speak, to give her comments and
3  whatever.
4  Q.   Do you recall any members of parish government addressing
5  Joy during the public comment period?
6  A.   Yes.
7  Q.   And what do you remember about that?
8  A.   Well, they wouldn't let her speak.  They wouldn't let her
9  give her comments.  And she, you know, it was very frustrating
10  because they wouldn't let her speak.
11  Q.   Do you recall them saying anything else to her beyond
12  just, "You're not allowed to speak"?
13  A.   Well, they even made some comments about arresting her and
14  so forth.
15  Q.   Okay.  And after you heard -- or do you remember who that
16  was that made comments about arresting her?
17  A.   William Wright.
18  Q.   Is that Michael Wright?
19  A.   I'm sorry, Michael Wright.
20  Q.   When you heard Mr. Wright make those statements, what was
21  going through your head?
22  A.   Well, I was very frustrated.  I was very hurt.  I mean,
23  you know, I think that she should have been allowed to give her
24  comments, at least let her speak, you know.  And then after
25  whatever her comments were, then maybe you could address it

OFFICIAL TRANSCRIPT

1   afterwards.  But at least let her speak.

2        And it was frustrating that he wouldn't let her speak.

3   And then, you know, with talking about arresting her and so

4   forth, you know, it was very stressful.  I mean I almost lost

5   it myself because I could tell that it was hurting her and she

6   was very frustrated.  And it was very hurting, you know, for me

7   and my husband, so.

8   Q.   Were you afraid as you were witnessing that, that your

9   daughter might go to jail?

10  A.   Yes, I was.

11  Q.   And how did that make you feel?

12  A.   It made me feel sad.  It made me feel -- just to think

13  that your parish council, you know, would even attempt to do

14  something like that, just for her not -- for them not letting

15  her speak.  And I thought it was just unreal that they would

16  actually, you know, treat a person like that.

17  Q.   And with all these other meetings that you've been to,

18  have you ever heard any other council member threaten someone

19  with criminal penalties?

20  A.   Never.

21  Q.   Did you speak to your daughter after the meeting?

22  A.   Yes.  After the meeting, we all were out in front of the

23  building and all.  And it was just so many people out there

24  really -- well, laughing at us of what happened, you know, with

25  her being threatened to be arrested and just giving little

OFFICIAL TRANSCRIPT

1  comments and just throwing little slangs --

2         **MS. SALLAH:** Objection.  Objection, Your Honor,

3  hearsay.

4         **THE COURT:** What's your response to that?

5         **MR. LANSER:** She's testifying that she overheard

6  people laughing.

7         **MS. SALLAH:** She's talking about outside.

8         **THE COURT:** That in itself is hearsay, an out of court

9  statement.  There might be a response to that, but if you can't

10 articulate it, I'm going to strike that response.

11        **MR. LANSER:** Let me ask this which could clear it up.

12 **BY MR. LANSER:**

13 Q.    Do you remember any specific individuals that were

14 laughing?

15 A.    Well, I mean there was some people, I guess, from, you

16 know, from our area with the Greenfield people or whatever.

17 But not particular -- I just know it was a gang of people.

18 They were laughing and throwing little hints, little comments

19 and so forth.

20 Q.    Okay, I'll move on, Your Honor.

21        Can you describe specifically the conversation you had

22 with your daughter after?

23 A.    Yeah.  I was trying to console her, and she was very

24 upset, you know.  So I was really worried about her.  And after

25 we got home, I, you know, called her on the phone, and we

OFFICIAL TRANSCRIPT

1  talked for about an hour or so.  And her sister was with her.

2  So I told her sister later on, I called her sister and just

3  told her to keep a watch on her.

4           **MS. SALLAH:** Objection, hearsay.

5           **THE COURT:** She didn't say what the sister said; so

6  I'll overrule.  She said what she said to the sister.

7  **BY MR. LANSER:**

8  Q.   I believe you testified Joy was upset.  How did you know

9  she was upset?

10  A.   Oh, I could tell from the expression in her face, her

11  voice.  Her voice was cracking.  We -- actually, we teared up,

12  we cried.  I, you know, because we're a very, very close,

13  really close-knit family.  And when I saw how upset she was,

14  you know, it just it made me upset.  And it was hard to see

15  her, you know, in that mood.

16  Q.   Have you noticed any changes in your daughter in the

17  year-plus since that meeting?

18  A.   Yes, I have.

19  Q.   And can you describe what you've witnessed as changes?

20  A.   I notice she's not as happy.  She's tense.  She tense up a

21  lot.  And like I said, we have a very close family.  And a lot

22  of times in the evenings, my cousins or whatever, we'll just

23  come out and laugh and talk and stand up.  Sometimes we get

24  back into this conversation.  And even up until now, I can tell

25  when we talk about it, she gets frustrated.  She tears up, or

OFFICIAL TRANSCRIPT

1  I, you know.

2      A lot of times we start with the conversation again, and

3  I'll try to get away from it because I don't want her to, you

4  know, get upset about it, you know, anymore, so.  Yeah, but it

5  still has an effect on her.

6  Q.    And has this experience changed how you approach public

7  comment?

8  A.    Well, me and my husband, we were going to give --

9          **MS. SALLAH:** Objection, relevance, Your Honor.

10          **THE WITNESS:** -- public comment.

11          **THE COURT:** Overruled.

12          **MR. LANSER:** You can go ahead.

13          **THE WITNESS:** But after that --

14          **MS. SALLAH:** I'm sorry, Your Honor.

15          **THE COURT:** Wait, hold on a second.  Approach,

16  Counsel, both of you.

17              (Proceedings held at the Bench.)

18          **THE COURT:** So when Mr. Spears was speaking, you said

19  that this was about the chilling effect on the plaintiff.  So

20  now to ask her, she's not a plaintiff here.

21          **MS. SALLAH:** Exactly.

22          **MR. LANSER:** Right, I think it's relevant how other

23  people, if other people interpreted it as a threat as well.

24          **MS. SALLAH:** You objected when Mr. Spears tried to

25  bring that up in the last one.

OFFICIAL TRANSCRIPT

1    **THE COURT:** I'm sustaining her objection.

2    **MR. LANSER:** Okay, that's fine.

3    (Whereupon this concludes proceedings held at

4    the bench.)

5    **MR. LANSER:** One moment, Your Honor.

6    We have no further questions for Ms. Banner.

7    **THE COURT:** All right.  Y'all have any questions?

8    **CROSS-EXAMINATION**

9    BY MS. SALLAH:

10   Q.    Good afternoon, Ms. Banner.

11   A.    Good afternoon.

12   Q.    My name is Joyce Sallah.  I'm one of the attorneys for the

13   Defendants, and I'm just going to ask you a few questions, if

14   that's okay?

15   A.    Okay.

16   Q.    All right.  Were you aware that your daughter Joy filed a

17   complaint with the Louisiana Board of Ethics against Jaclyn

18   Hotard?

19   A.    Yes, I was.

20   Q.    Did you discuss the complaint with her before or even

21   after?

22   **MR. LANSER:** I'm going to object to the relevance of

23   her knowledge of the complaint.

24   **THE COURT:** Sustained.

25   **MR. LANSER:** And the scope of the direct.

OFFICIAL TRANSCRIPT

1          **THE COURT:** What?

2          **MR. LANSER:** And the scope of the direct.

3          **THE COURT:** The scope of the what?

4          **MR. LANSER:** Scope of the direct.

5          **THE COURT:** Oh, all right.  That's true.  You're

6   outside the scope of his direct.  Sustained.

7   **BY MS. SALLAH:**

8   Q.   You said you were aware that she filed an ethics

9   complaint?

10  A.   Yes, I was.

11         **MR. LANSER:** Same objection.

12         **THE COURT:** Okay, I sustained his objection.  You

13  don't reask the question.  Ignore that response.

14         **MS. SALLAH:** That one was allowed.  It was the next

15  one you overruled.  But I'm moving from that line of

16  questioning, Your Honor.

17  **BY MS. SALLAH:**

18  Q.   Were you aware that Joy, your daughter, posted on Facebook

19  a copy of the letter?

20         **MR. LANSER:** Same objection, Your Honor.

21         **THE COURT:** Sustained.

22         **MS. SALLAH:** It's a different line.

23         **THE COURT:** So your objection is?

24         **MR. LANSER:** It's beyond the scope of the direct.

25         **THE COURT:** Sustained.  If you call her as a witness,

OFFICIAL TRANSCRIPT

1   you can ask her those questions.

2            **MS. SALLAH:** Yes, Your Honor.

3   **BY MS. SALLAH:**

4   Q.   Ms. Banner, were you planning to speak at that meeting?

5   A.   Yes, I was.

6   Q.   And did you have a prepared speech?

7   A.   Not really.  Just -- not a speech.  Just top of my head,

8   just speaking from my heart or whatever.

9   Q.   So you were just going to speak off the top of your head

10  so to speak?

11  A.   Right, off the cuff.

12  Q.   And you did not speak; correct?

13  A.   I did not speak.

14  Q.   And why did you not speak?

15  A.   After what happened to my daughter, I was just afraid that

16  the same thing would happen to me.

17  Q.   Did you see all the other multiple people who spoke after

18  your daughter spoke?

19  A.   A couple of people, yes.

20  Q.   And you also saw that they spoke about the same item,

21  Agenda Item J, that your daughter purports to have spoken --

22  A.   Yes.

23  Q.   -- against?

24  A.   Yes.

25  Q.   And you also saw that a couple other people -- and if you

OFFICIAL TRANSCRIPT

1  don't recall, I can show you the video of the meeting.  But you
2  did see that they were also speaking against Item J?
3          **THE COURT:** You have to ask a question.  You're
4  testifying.  So ask a question.
5          **MS. SALLAH:** All right.
6  **BY MS. SALLAH:**
7  Q.    You saw that those people were also speaking against
8  Agenda Item J; correct?
9  A.    Correct.
10 Q.    And you saw a couple of people were not interrupted, and
11 they were allowed to speak; correct?
12 A.    Correct.
13 Q.    Did anyone tell you not to speak?
14 A.    No.
15 Q.    You just chose not to speak after what you saw with your
16 daughter; correct?
17 A.    Yes.  I was in the -- really, it really made me sick, and
18 I -- at that time, I couldn't.  I really couldn't speak.  I was
19 concerned about my daughter, and I was really concerned that
20 what happened to her would have happened to me.  And I leaned
21 over, and I told my husband that I don't think that we should
22 speak, and really.
23 Q.    Okay.  Those other people who spoke after your daughter,
24 if you recall -- if you don't, it's okay.  Let me know -- do
25 you remember them not speaking specifically about a complaint,

1  an ethics complaint?

2  A.   I'm not really sure.

3  Q.   You're not really sure.  You said you've been to at least

4  four other council meetings?

5  A.   Yes.

6  Q.   And you've seen where people doing the public comments are

7  reminded to stay on topic; correct?

8  A.   Correct.

9  Q.   So you understand that the rules of the council is, one,

10  three minutes; right?

11  A.   Right.

12  Q.   And that they have to stay on the agenda topic; correct?

13  A.   Correct.

14  Q.   Your daughter has not been the only person in the four

15  times you've seen the meeting who has been interrupted and

16  reminded to stay on topic; correct?

17  A.   Yes.  But other -- at least they were able to speak.  Even

18  if they reminded them to stay on topic, at least they'd let

19  them give their comments.  But she wasn't allowed to speak.

20  Q.   You didn't see your daughter removed from the podium;

21  correct?

22  A.   Correct.

23  Q.   No security officer came and told her to leave the

24  meeting; correct?

25  A.   No.  But if she would have stayed, I mean they threatened

OFFICIAL TRANSCRIPT

1  to put her in jail or whatever.  So of course.

2  Q.    But you did not see anybody do that; correct?

3  A.    No.

4  Q.    You saw your daughter continue speaking until she

5  voluntarily left the podium?  That's what you saw; right?

6  A.    Well, I mean if I thought I was going to be arrested, I

7  think I would have left the podium too.

8         **MS. SALLAH:** All right, thank you.  Give me one

9  second.

10        May we approach, Your Honor?

11        **THE COURT:** Yes.

12             (Proceedings held at the Bench.)

13        **MS. SALLAH:** Judge, I have more questions.  But I

14  understand she has surgery tomorrow, and we can't call her.

15  And I know you have a time limit today.  Can I continue asking

16  questions?  I know you have a time limit.

17        **THE COURT:** Nobody has to leave here by 5:00.

18        **MS. SALLAH:** I can keep going, okay.

19        **THE COURT:** Are you going to call her back on direct,

20  or do you want to -- you can finish your cross and ask her your

21  questions on direct; so she doesn't have to come back.

22        **MS. SALLAH:** I don't think we're calling her on

23  direct, but I don't want to misspeak at this time.  She has

24  surgery.

25        **THE COURT:** How much time do you have?

OFFICIAL TRANSCRIPT

1            **MS. SALLAH:** A few more.

2            **THE COURT:** A few more means what, two hours?

3            **MS. SALLAH:** No.  Do you need to redirect?

4            **MR. LANSER:** As of now, if I have redirect, it will be

5    extremely limited.

6            **MS. SALLAH:** Okay, I'll keep going.

7                  (Whereupon this concludes proceedings held at

8        the bench.)

9    **BY MS. SALLAH:**

10   Q.   Ms. Banner, I just have a few more questions, and thank

11   you.  Give me one second, I'm sorry.

12       Ms. Banner, are you aware that the Louisiana Open Meetings

13   Law requires that public notice -- that the notice of public

14   meetings must be published at least 24 hours before --

15           **MR. LANSER:** Objection to relevance.

16           **MS. SALLAH:** -- the meeting?

17           **THE COURT:** She's asking if she knows, if she knows

18   that.

19   **BY MS. SALLAH:**

20   Q.   If you're not aware -- are you aware?

21   A.   I'm not aware.

22   Q.   You're not aware.  Do you have any information to offer

23   that the notice of the November 23rd -- I'm sorry, 28th

24   meeting of 2023 was not published at least 24 hours in advance?

25   A.   I'm not aware.

                          OFFICIAL TRANSCRIPT

1  Q.   You're not aware.  Are you aware, ma'am, that the

2  Louisiana Open Meetings Law requires for some means of public

3  comment?  That means a period for public comment.  Are you

4  aware of that?

5  A.   I'm not aware.

6  Q.   And wouldn't you agree that during the November 28th,

7  2023 council meeting that there was a public comment period

8  before an action was taken on the agenda?

9          **MR. LANSER:** Objection, this is a legal opinion she's

10 asking.

11         **THE COURT:** I mean she was there.  You were at the

12 meeting; right?

13         **THE WITNESS:** Correct.

14         **MS. SALLAH:** I was also asking about the public

15 comment period.

16         **THE COURT:** Right.

17         **MS. SALLAH:** I just want to make sure we're all on the

18 same page.  There was a public comment period.  Even if we're

19 disagreeing about what happened during the public comment

20 period, that everyone is in agreement there was a public

21 comment period.

22 **BY MS. SALLAH:**

23 Q.   There was a public comment period; right, Ms. Banner?

24 A.   Correct.

25 Q.   Okay.  Ms. Banner, are you aware that the Louisiana Open

OFFICIAL TRANSCRIPT

1  Meetings Law requires public bodies to allow the recording of

2  the meeting by the audience?

3  A.    I'm not aware.

4  Q.    Do you have any information to offer that the public could

5  not record the November 28th, 2023 council meeting?

6  A.    Not aware.

7  Q.    You're not aware.  And you didn't see anybody stopped from

8  recording or anything like that?

9  A.    Not really.

10  Q.    Okay.  Ms. Banner, are you aware that the Louisiana Open

11  Meetings Law requires public bodies to record the minutes of

12  the proceedings?  Did you know that?

13  A.    No, I didn't.

14  Q.    Do you have any information to offer that the

15  November 28th, 2023 Council meeting was not recorded?

16  A.    No information.

17  Q.    And finally, the Louisiana Open Meetings Law requires

18  public bodies to have open meetings.  That means that the

19  public has to be there to observe it.  Are you aware of that?

20  A.    I'm not aware.

21  Q.    Like it has to be open to the public?

22  A.    I'm not aware.

23  Q.    Do you have any information to offer that the members of

24  the public could not attend the meeting or observe the

25  November 28th, 2023 Council meeting?

OFFICIAL TRANSCRIPT

1  A.    Not aware.

2  Q.    You were present as we've already talked about?  You were

3  present; so it was open to the public; correct?

4  A.    Correct.

5           **MS. SALLAH:** Give me one second, Your Honor.  I'm

6  almost done.

7           No further questions.  Thank you, Ms. Banner.

8           **THE WITNESS:** Okay, thank you.

9           **THE COURT:** Any redirect?

10          **MR. LANSER:** I have no redirect, Your Honor, and I'd

11 also ask if Ms. Banner could be released from your

12 sequestration order.

13          **THE COURT:** Counsel?

14          **MS. SALLAH:** Yes, she can be excused.

15          **THE COURT:** But he also asked if she could stay in the

16 courtroom.

17          You know what, I'm going to say no because she has

18 been a witness, and I don't want her to discuss any testimony

19 she hears in here with anyone else.

20          **MS. SALLAH:** I'll agree with that.  Your Honor, we

21 will not waive sequestration.

22          **THE COURT:** All right, let's go help her.  Help her.

23          How is the jury doing?  Can y'all hear another

24 witness, or y'all want to wrap it up?  Let me see, it's 5:00

25 o'clock.  Oh, we have to wrap it up at 5:00.  Something else is

OFFICIAL TRANSCRIPT

1    going on in here.

2            All right, we are going to recess for the evening.

3    We're going to start tomorrow morning promptly at 9:00.  So get

4    here a little early; so you can get through security.  I'll try

5    to do better on the snacks tomorrow.

6            With that, we are adjourned for the day.  And

7    remember what I said about not discussing the trial with

8    anyone.

9            **DEPUTY CLERK:** All rise.

10                (The jury exited the courtroom.)

11           **THE COURT:** Okay.  We'll resume tomorrow morning at

12   9:00 a.m.

13           **MR. MOST:** Your Honor, we'll pack everything up here.

14   When is the other people due here?

15           **THE COURT:** They're probably standing outside the

16   door.

17           **MR. SPEARS:** So we can't leave our stuff out?

18           **THE COURT:** Don't leave them on the tables.  There's a

19   Tulane Men of Court that meets here today.  So I can't be

20   responsible for anything.

21           **MR. MOST:** Okay, thank you, Your Honor.

22           **MR. SPEARS:** Thank you, Judge.

23           **THE COURT:** You're quite welcome.

24                (Whereupon this concludes Jury Trial Day 1.)

25


                        OFFICIAL TRANSCRIPT

1

2                        **<u>CERTIFICATE</u>**

3

4

5        I, Alexis A. Vice, RPR, CRR, Official Court Reporter for

6    the United States District Court, Eastern District of

7    Louisiana, do hereby certify that the foregoing is a true and

8    correct transcript, to the best of my ability and

9    understanding, from the record of the proceedings in the

10   above-entitled and numbered matter.

11

12                              */s/Alexis A. Vice, RPR, CRR*
                                Alexis A. Vice, RPR, CRR
13                              Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25

                         OFFICIAL TRANSCRIPT