1                      UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF LOUISIANA

3  **************************************************************

    JOY BANNER                           CIVIL ACTION

4                                  NO. 23-7296

    VERSUS                           SECTION "G"

5                                  JANUARY 28, 2025

    MICHAEL WRIGHT, ET AL

6  **************************************************************

7

8                  TRANSCRIPT OF JURY TRIAL DAY 2

9        BEFORE THE HONORABLE CHIEF NANNETTE JOLIVETTE BROWN

                    UNITED STATES DISTRICT JUDGE

10

11  APPEARANCES:

12  FOR JOY BANNER:               William B. Most, Esq.

                            David J. Lanser, Esq.

13                          MOST & ASSOCIATES

                            201 St. Charles Avenue

14                          Suite 2500

                            New Orleans, LA  70170

15

16

17  FOR DEFENDANTS:               Ike Spears, Esq.

                            Joyce Sallah, Esq.

18                          SPEARS & SPEARS

                            909 Poydras Street

19                          Suite 1825

                            New Orleans, LA 70112

20

21

22  Official Court Reporter:      Alexis A. Vice, RPR, CRR

                          500 Poydras Street, HB-275

23                          New Orleans, LA  70130

                          *Alexis_Vice@laed.uscourts.gov*

24

25  *PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT*

    *PRODUCED BY COMPUTER.*

                        OFFICIAL TRANSCRIPT

1                          **INDEX**

2                                                    PAGE

3  **WITNESSES FOR PLAINTIFF:**

4

5  MICHAEL WRIGHT

6       Direct Examination by Mr. Most              145

7

8  DARLA GAUDET

9       Direct Examination by Mr. Most              163
        Cross-Examination by Mr. Spears             182
10      Redirect Examination by Mr. Most            189

11

12 JACLYN HOTARD

13      Direct Examination by Mr. Most              190

14

15 TONIA SCHNYDER

16      Direct Examination by Mr. Most              212
        Cross-Examination by Mr. Spears             216
17      Redirect Examination by Mr. Most            229

18

19 MALLORY GUILLOT

20      Direct Examination by Mr. Most              231
        Cross-Examination by Mr. Spears             232
21

22

23

24

25

                        OFFICIAL TRANSCRIPT

1    **WITNESSES FOR DEFENDANTS:**

2

3    CAROLYN LANDRY

4        Direct Examination by Mr. Spears          255
         Cross-Examination by Mr. Most             258
5        Redirect Examination by Mr. Spears        259

6

7    MALLORY GUILLOT

8        Direct Examination by Mr. Spears          260
         Cross-Examination by Mr. Most             268
9

10

11   JACKIE LANDECHE

12       Direct Examination by Ms. Sallah          270
         Cross-Examination by Mr. Most             289
13

14

15   R. GRAY SEXTON

16       Direct Examination by Mr. Spears          295
         Cross-Examination by Mr. Most             302
17

18

19   MICHAEL WRIGHT

20       Direct Examination by Mr. Spears          305
         Cross-Examination by Mr. Most             337
21       Redirect Examination by Mr. Spears        339

22

23   JACLYN HOTARD

24       Direct Examination by Mr. Spears          340
         Cross-Examination by Mr. Most             369
25

OFFICIAL TRANSCRIPT

**P-R-O-C-E-E-D-I-N-G-S**

**(JANUARY 28, 2025)**

**(JURY TRIAL DAY 2)**

(The Court was called to order.)

**THE COURT:** Good morning.  Before I bring the jury in, I want to talk to the lawyers.  We can do it out here, or if you want to do it in a conference room, that's fine.

As I was -- you can have a seat, Mr. Spears.

I'm going through the pretrial order, and now that I have a better idea of the case, I have said from the beginning that this isn't going to be a trial within a trial, you know. These parties have had numerous forums to hash out their differences.  And this one is limited to the First Amendment issues and the Open Meetings Law.

So you know, to -- it's one thing to provide, you know, with some of the main witnesses and even, you know, lawyers or by stipulation background facts.  But I'm afraid we are just really kind of -- not kind of.  We're going down a rabbit hole here with regard to this ethics complaint.  We know there was an ethics complaint.  We know it was dismissed.  Why or why not really doesn't matter.  It was dismissed.  And the letter doesn't say why it was dismissed; so I'm not sure who knows why it was dismissed.  But it doesn't matter.  It's not a material fact in this case.

OFFICIAL TRANSCRIPT

```
 1            So going down that issue, and you know, whether or
 2   not -- I'm looking at Plaintiff's list, you know.  I don't know
 3   why we need to bring -- is it Ms. Gaudet, the mother-in-law?
 4   If we estopped those issues, I'm not sure why we need the
 5   mother-in-law to come and talk about what, you know.  She can't
 6   talk about -- it doesn't even -- I'm not sure it matters what
 7   Ms. Hotard knew or didn't know or what she shared or didn't
 8   share, you know, because that was part of an ethics complaint,
 9   I would imagine, and that's revolved.
10            Correct me if I'm wrong, it appears to me what likely
11   happened, and I'm going to say this because it does appear that
12   there is a lot of animosity and lack of communication amongst
13   the parties here.  Correct me if I'm wrong, and I don't know,
14   did the Ethics Board ever tell you why it was dismissed?
15            MR. MOST:  No, Your Honor.
16            JOY BANNER:  No, they didn't tell me.
17            THE COURT:  It's just a point of reference for me.
18   I'm telling you from what I heard yesterday, it looks like, so
19   the property was sold to, what is it, Green?
20            MR. MOST:  So yes, Your Honor.  The --
21            THE COURT:  I want to make sure that I understand.
22   Green what?
23            MR. MOST:  Greenfield Louisiana, yeah.
24            THE COURT:  Is that the name of the company that was
25   coming in?
```

OFFICIAL TRANSCRIPT

1          **MR. MOST:** Yeah, it was Greenfield Louisiana, LLC.

2          **THE COURT:** From the testimony yesterday, it seems

3    like the property had already been sold to Greenfield.  Her

4    mother-in-law didn't own the property when it was rezoned.  She

5    didn't own it anymore.

6          **MR. MOST:** That's not accurate, Your Honor.

7          **THE COURT:** Didn't she sell it to Greenfield?

8          **MR. SPEARS:** No, Judge.  I can give you a short,

9    cliff-note version.  There's a huge tract of land that

10   Greenfield bought in 2021.  That land, from 1990 until 2021,

11   was zoned as Industrial 3.  Ms. Gaudet, Jaclyn Hotard's

12   mother-in-law, owns some slivers of land near the Greenfield

13   property.  There are other private owners who also own some

14   tracts.

15         **THE COURT:** Well, I thought it was simpler than that.

16   My job is to try to make these things simpler for the jury.

17   And just the mere fact, I mean, that's a side issue.  It's not

18   material.  And you know, so it's becoming really a distraction.

19         Actually, I'm going to correct one of my errors

20   because I used, and I know I asked y'all to be very concise

21   with your summary of facts, but you know.  And then when I just

22   gave an overview of the law, I only gave them an overview of

23   the First Amendment law.  I need to make clear to the jury that

24   there are two First Amendment claims.  There is a claim that

25   she was denied her First Amendment right to speak at the

OFFICIAL TRANSCRIPT

1    council, she believes, because of her viewpoint.  And secondly,

2    that she was retaliated against by being threatened with

3    prosecution for exercising her rights.

4         And the third claim is that because she was not

5    allowed to speak freely, it violated the Open Meetings Law, if

6    I can summarize that way, right.  So there are three claims.

7         I think they don't know where the Open Meetings Law

8    is coming from right now.  And so I want to make sure they know

9    that there are three claims, and I only instructed them on the

10   law on one.  I'll give them more instruction at the close of

11   trial.  I want to make sure they are listening for three

12   things, Mr. Spears, or they might not know -- you've put on a

13   lot of evidence about, you know, what they do for Open Meetings

14   Law.  I don't know that, you know.  I got to make sure that I

15   did not err in not making it clear that there were three

16   claims.

17        **MR. SPEARS:** We had reduced it to two claims, Judge,

18   the First Amendment claim and Open Meetings Law claim.

19        **THE COURT:** Well, but there are two First Amendment.

20   Retaliation is the second.  It's another angle.  Retaliation is

21   a second First Amendment claim, not a second amendment claim,

22   but an additional.

23        **MR. SPEARS:** Right, I agree with everything you're

24   saying, Judge.  But Open Meetings Law, one claim.  First

25   Amendment, two claims.  The First Amendment may have two

OFFICIAL TRANSCRIPT

```
 1  prongs.
 2           THE COURT: No, that's not -- for the First Amendment
 3  claim, there is -- I don't know if there's one or two prongs,
 4  but I'm telling you there are two different causes of action.
 5  13 years on the bench, I'm not going to say 35 years, because
 6  that ages you as well, as a lawyer, but you know.  I'm glad
 7  y'all laugh because I don't look like I've been on the bench
 8  that long.
 9           I just want to make sure they understand that there
10  is more than -- and you all can clarify that.  But you know,
11  getting back to trying to keep everything on track, again, you
12  know, it now troubles me that, you know.
13           Then Defendants, you want to call Gray Sexton.  Okay,
14  he knew he was, you know, he's a lawyer, but I'm not going to
15  let him testify that he always understood the Ethics Board's
16  investigation to be confidential because it does not matter
17  what he believed.  You didn't stipulate, but you did not oppose
18  Plaintiff's motion early on that there was no defense of --
19  advice of counsel defense.
20           MR. SPEARS: We're not raising that issue, Judge.
21           THE COURT: I know.  I know.  But then why do we need,
22  you know.  I'm going from what you said.  I told you how
23  important a pretrial order is, you know.  She can testify as to
24  whether, you know, who represented her personally.
25           The same thing with Ms. Ardoin, it's irrelevant, and
```

OFFICIAL TRANSCRIPT

1  I think, confusing to the jury to have her testify that what
2  she always understood the Ethics Board's investigations to be
3  confidential or not.  She's a lawyer, you know.

4          And again, it goes into, you know.  So we know, both
5  those lawyers are going to say that the complaint was
6  dismissed.  That has been established.  You had the letter.
7  And so other than coming, you know, and just saying that, I
8  don't believe that anything else that they are going to, you
9  know.  This whole idea that, you know, both these lawyers have
10  all this experience with Ethics Board really is irrelevant to
11  this case.  There's not an advice of counsel defense.  And so
12  again, I think it just sort of distracts the jury from what
13  they need to be focusing on.

14          Again, Carolyn Landry again, you know, the jury is
15  going to be, you know.  You've said that this law is still on
16  the books.  But you both know that laws stay on the books.  If
17  something is decided unconstitutional, we, as a federal court,
18  don't make them go in and repeal it.  And there will be a jury
19  instruction on that because that is the law.  It's my job.  So
20  I'm not going to let a lawyer come and testify about that.

21          Unless there's a witness that's going to come and
22  testify that, you know, somebody from the Ethics Board, to say
23  that, you know -- although you didn't say it in here, in the
24  pretrial order.  If somebody is coming to say or contradict
25  what Ms. Banner said, that they specifically instructed her,

OFFICIAL TRANSCRIPT

1    you know, that she couldn't release this information and it was
2    confidential, then, you know, what "confidential" means and the
3    average person understands it to mean is for the jury to
4    decide.  Not for us to bring in lawyers to say what they know.
5    That is consistent with what my decision was with regard to
6    Mr. Stanley.

7           I say that to say, you know, I suggest we move on and
8    not go down that.  If you persist, either of you, with, you
9    know, you, with Ms. Gaudet, to go down that road, and you, with
10   these lawyers, to go down that road and probably want to refute
11   that, that their testimony is going to be limited, very
12   limited, and two things that are now repetitive.  The complaint
13   was dismissed.

14          **MR. MOST:** Yes.  So Your Honor, so Ms. Guillot is one
15   of our witnesses --

16          **THE COURT:** Let me say this before I forget.  Not only
17   was the complaint dismissed, what also confuses the jury
18   getting into the details of this, you know, is that it was
19   still pending.  It was still pending at the time of the
20   meeting.  So nobody knew what the Ethics Board was going to do
21   at the time of that meeting.  They didn't know that was going
22   to be the end of it.  I mean you haven't, you know.

23          So it's just, again, I think these witnesses confuse
24   the issue.  You know, if you bring them, I'm just saying
25   they're going to be -- now that I know what you told me they

OFFICIAL TRANSCRIPT

1  were going to say, I've heard what has gone on here in trial,

2  and I've repeatedly said we're not retrying or rehearing

3  whether or not that plant should be there.  I know that's very

4  upsetting, but it's true.  We're not retrying anything about

5  the ethics complaint.

6           And we're certainly not going back and forth again

7  about, you know.  It got very close to, you know, saying

8  statements like a complaint was, you know, unfounded or a

9  complaint was, you know, words like that.  I don't think the

10 word "malicious," but there were some negative things about

11 that that troubles me as a judge because people are entitled to

12 file complaints.

13          And you know, I think too it's just allowing the

14 whole First Amendment issue to kind -- the law around First

15 Amendment, I'm afraid with these side issues, are being

16 diluted, you know.  To suggest that someone who maybe says or

17 posts something that upsets us has now the obligation, if they

18 find out something differently, to post a correction is just

19 not true.  It's not true.

20          So you know, with these side issues, we're signaling

21 bad law to the jury which just means that, you know, now I got

22 a list of other things I'm going to have to instruct the jury

23 about.  You know, go through the record and see was there some

24 misstatement of the law here, some innuendo of the law here,

25 that in their mind they're thinking, oh, that must be --

                    OFFICIAL TRANSCRIPT

1  because these are just average citizens.  They do not know.

2          The parties here clearly are, you know, well-versed

3  in public comment and the parameters around them, but they

4  aren't.

5          And so with those instructions, I will allow us to

6  proceed.

7          **MR. MOST:** Yes, Your Honor.

8          **THE COURT:** But there won't be any negative, you know,

9  inferences if any witness is not called.  I'm not going to

10 allow that because I want to keep this trial moving.

11         And look, you know, just on a personal note, I just

12 hope that both of you are hearing each other because, you know,

13 I'm sure when you viewed the video of the council meeting, you

14 have your point of view.  That's why you're here, of what was

15 going on and how disturbing.

16         But I can tell you as all, you know -- I'm talking

17 now to the lawyers and the public officials and even the

18 activists in the room is that we all have this responsibility

19 to the public.  And sometimes things, feelings get hurt, and

20 people feel passionate about things.  And you know, at the end

21 of the day, we want to demonstrate that we can find a way

22 forward, and we can work together, and we find avenues for

23 forgiveness and permission to sometimes make mistakes.  I mean

24 it happens.

25         I don't want to see this community torn apart yet

OFFICIAL TRANSCRIPT

1  again because of this very public trial.  So relitigating and

2  going through issues that are not relevant to this trial, I

3  don't think, is productive for my trial here.  Nor do I think

4  it's productive for the public or the parties that are

5  involved.  So I just want to say that.

6          **MR. MOST:** Understood, Your Honor.

7          **THE COURT:** With that, let's bring in the jury.

8          **MR. MOST:** Your Honor, could I just respond very

9  briefly a clarifying question?  Ms. Guillot was a witness.

10 She's an employee of the Board of Ethics.  Her testimony was

11 very limited.  It was only because --

12         **THE COURT:** Yeah, I know.  I didn't mention her.  I

13 thought I was talking about Darla Gaudet.

14         **MR. MOST:** Yes.  So one of the things Ms. Guillot --

15         **THE COURT:** She's going to talk about, you know,

16 they've already put at issue the word "confidential"; right?

17         **MR. MOST:** That's right.  So she is only going to say

18 what confidential means when we stamp something is that we keep

19 it confidential, not someone else.

20         **THE COURT:** But that's the limit of her testimony?

21         **MR. MOST:** Yes.

22         **THE COURT:** She cannot testify to anything -- and if

23 you have something to or if any of these other witnesses would

24 come just to counter that, I would allow it.  But we're not

25 going down through the whole ethics issues again.

OFFICIAL TRANSCRIPT

1          **MR. MOST:** Yes.  And Your Honor --

2          **THE COURT:** I'm talking to Mr. Spears too because I

3    don't want him to feel slighted by that.  If your witness says

4    that and you got someone to rebut, if it's one of these people,

5    bring them to rebut, but that would be the limit, okay.

6          **MR. MOST:** And then with Ms. Gaudet, we'll sharply

7    compress anything about the land or the ethics complaint.  But

8    I do think at least some of it is relevant because a core issue

9    for the First Amendment retaliation claim is Ms. Hotard's

10   motivation, and our theory is that she was motivated to silence

11   Ms. Banner because --

12         **THE COURT:** Okay, I just want you all to know where

13   I'm going to draw the line.

14         **MR. MOST:** Yes.

15         **THE COURT:** I gave you minutes because I wanted you to

16   be able to be very concise and direct.  And so I just want you

17   to know where I'm coming from, you know, if I start denying or

18   granting objections and limiting testimony.  I want the jury to

19   be focused on the issues in this case and not distracted or

20   confused by issues that are not material.

21         **MR. MOST:** Understood, Your Honor.

22         **THE COURT:** All right.  Anything else, Mr. Spears?

23         Let's bring in the jury.

24         **DEPUTY CLERK:** All rise.

25              (The jury was escorted into the courtroom.)


                    OFFICIAL TRANSCRIPT

1          **THE COURT:** You can have a seat.

2          Before we begin, ladies and gentlemen of the jury,

3    just in case, I want to make sure that in my preliminary

4    instructions that I didn't cause any confusion, that you

5    understand that there is a -- I think I gave you sort of the

6    parameters of a First Amendment claim.  And so that claim,

7    whether you think it's a two-part claim or you think it's two

8    separate claims, there is a claim that Ms. Banner claims her

9    First Amendment rights have been violated, and second, that she

10   was retaliated against for exercising her First Amendment

11   right.  And there's a third claim, and that is whether the Open

12   Meetings Law was violated.

13         So I just want to make sure, and I will give you more

14   instruction and clearer instruction on the law for those three

15   issues; but I was concerned that maybe you didn't understand

16   what some of the evidence meant because I didn't say anything

17   about the Open Meetings Law, so.  Just so we're all on the same

18   page.

19         All right, you can proceed.

20         **MR. MOST:** Thank you, Your Honor.  We'll call our

21   first witness, Michael Wright.

22                    **MICHAEL WRIGHT,**

23   after having been duly sworn, did testify as follows:

24                  **DIRECT EXAMINATION**

25   BY MR. MOST:


                   OFFICIAL TRANSCRIPT

1  Q.   Good morning, Mr. Wright.

2  A.   Good morning.

3  Q.   Could you give us your full name for the record, please?

4  A.   Yes.  Michael Patrick Wright.

5  Q.   And Mr. Wright, are you a member of the St. John the

6  Baptist Parish Council?

7  A.   Yes, sir.

8  Q.   And is that part of the Government of St. John the Baptist

9  Parish?

10  A.   Yes, sir.

11  Q.   And you were also the chair of that council; correct?

12  A.   Not currently.

13  Q.   Okay.  But you were as of November 2023?

14  A.   Yes, sir.

15       **MR. MOST:** Judge, this is a witness identified with an

16  adverse party.  May we use leading questions?

17       **THE COURT:** Yes.

18       **MR. MOST:** Thank you.

19  **BY MR. MOST:**

20  Q.   Mr. Wright, you were elected to the parish council in

21  2011; correct?

22  A.   Yes, that is correct.

23  Q.   And outside of that, you worked in bio-pharmaceutical

24  sales?

25  A.   Actually, since our last deposition, I am currently

OFFICIAL TRANSCRIPT

1  unemployed.

2  Q.   Okay.  But that was your career prior?

3  A.   Yes, that is correct.

4  Q.   And you were the chair of the parish council for several

5  years; correct?

6  A.   Yes, sir.

7  Q.   And you presided over at least dozens of parish council

8  meetings?

9  A.   Yes, sir.

10  Q.   And as we mentioned, on November 28, 2023, you were the

11  chair of the council at that time; correct?

12  A.   Yes, sir.

13  Q.   And when you were chair of the council, that meant you

14  were the decision-maker about order and decorum issues in

15  parish council meetings; correct?

16  A.   Yes, sir.  It's my responsibility as chairman, the

17  chairman's obligation is to maintain order and decorum and make

18  sure the meeting is run efficiently and complied with the Open

19  Meetings Law.

20  Q.   And you were the one who opened and closed public comment;

21  correct?

22  A.   Yes, sir, that is correct.

23  Q.   And you were the one who decided how long to wait for

24  public comment to be open; correct?

25  A.   Yes, sir, that is correct.

OFFICIAL TRANSCRIPT

```
 1   Q.    And when there's a parish council meeting, there's the
 2   parish council sort of in seats; correct?
 3   A.    Say that again, I'm sorry.
 4   Q.    The parish council is seated at each council meeting?
 5   A.    Yes.
 6   Q.    And often the parish president is there as well?
 7   A.    Yes.
 8   Q.    And there's also a law enforcement officer, typically a
 9   sheriff's deputy?
10   A.    Yes.
11   Q.    And that deputy is typically armed and in uniform?
12   A.    Yes, sir.
13   Q.    And when you were the chair, you were the person who could
14   ask law enforcement officers to remove someone; correct?
15   A.    I believe -- yes, I believe it's happened on occasion.
16   Q.    You would be the one to make that decision when you were
17   chair; correct?
18   A.    As presiding over the meeting, yes.
19   Q.    As chair of the parish council, part of your job was to
20   enforce any public comment rules that the council voted on and
21   adopted; agreed?
22   A.    Can you repeat the question?
23   Q.    Sure.  When you were chair of the parish council, part of
24   your role was to enforce the public comment rules that the
25   council voted on and approved; correct?
```

OFFICIAL TRANSCRIPT

1    A.    Yeah, so I would say as my role as council chairman would

2    be to enforce any rules or policies adopted by the council

3    within my parameters.

4    Q.    And those rules would have to be in writing; correct?

5    A.    Yes.

6    Q.    And so about those public comment rules, the St. John the

7    Baptist Parish Council passed its public comment rules in 1993;

8    correct?

9    A.    I'm not sure on the specifics of what was passed in 1993.

10   But I do know that, you know, for the public, for the public

11   comment piece, it's put on the agenda, and usually guidance is

12   gone by Louisiana Open Meetings Law and guidance from the AG's

13   office.

14   Q.    Right.  But the public comment rules were passed in 1993;

15   correct?

16   A.    I can't specifically say what was passed in 1993.  I know

17   there was some adoption, I believe, with Robert's Rules of

18   Order in 1993.  But I'm not sure.

19           **MR. MOST:** May we approach the witness?

20           **THE COURT:** Yes.  Do you have any objection to the

21   document?

22           **MR. SPEARS:** No objection.

23           **THE COURT:** All right.

24   **BY MR. MOST:**

25   Q.    And the public comment rules, they have to be in writing,

OFFICIAL TRANSCRIPT

1  and they have to be voted on by the parish council; correct?

2              **MR. SPEARS:** Objection, asked and answered.

3              **MR. MOST:** What I asked before was were they in

4  writing.  I'm making clear that they are voted on and in

5  writing.

6              **THE COURT:** All right, overruled.

7  **BY MR. MOST:**

8  Q.   Mr. Wright, the rules for public comment for the parish

9  council have to be voted on and in writing; correct?

10 A.   They can be, yes.  Any rules or policies that the council

11 may wish to adopt can be adopted, and that would be in the form

12 of writing.

13 Q.   Right.  And the parish council votes on its own rules;

14 correct?

15 A.   Yes.

16 Q.   Okay.  And so the document in front of you, you see, are

17 these your answers to certain questions asked in this case?

18 A.   Yes.

19             **MR. MOST:** Okay.  We'll move to enter this as

20 Plaintiff's 7.

21             **MR. SPEARS:** Can you identify exactly?

22             **MR. MOST:** Sure.  This is the document that was part

23 of P4 in the exhibit book.

24 **BY MR. MOST:**

25 Q.   Do you see, Mr. Wright, that this says Defendant's,

OFFICIAL TRANSCRIPT

1  Michael Wright, Objections and Responses to Plaintiff's
2  Interrogatories and Requests for Production of Documents?
3  A.   Yes, sir.
4          **MR. MOST:** We'll move to offer this as P7.
5          **THE COURT:** All right.  Did we publish it?  Do we know
6  what it says?
7          **MR. MOST:** Yeah.
8  **BY MR. MOST:**
9  Q.   So these are certain answers you provided in this case;
10  correct?
11  A.   Yes.
12  Q.   Going to page 5, you see that you were asked for all
13  public comment rules maintained by the St. John the Baptist
14  Parish Council; correct?
15  A.   Yes.
16  Q.   And your answer was, "See attachments of the May 27, 1993
17  Regular Session of the St. John the Baptist Parish Council"?
18  A.   Yes.
19  Q.   So that's when the public comment rules were passed?
20  A.   Yes, I believe so.
21  Q.   And in 1993, the parish council only passed a rule
22  limiting comment to three minutes; correct?
23  A.   I believe so.  But I'd have to actually read the document
24  from '93.
25  Q.   Sure.  Do you see that looking at page 8 here, this is the

OFFICIAL TRANSCRIPT

1  document from 1993 you provided?

2  A.    Yes.

3  Q.    If you go down to page 13, you see here that the parish

4  council adopted a limitation of three minutes per person?

5  A.    Yes, that is correct.

6  Q.    Do you see anything in here about requiring people to stay

7  on topic?

8         **MR. SPEARS:** Objection, Your Honor.  This matter has

9  already been addressed with the Court, the on-topic rule.

10        **THE COURT:** That's not an objection.  Already

11  addressed with the Court, I don't understand.

12        **MR. SPEARS:** May we approach, Your Honor?

13        **THE COURT:** Yes.

14              (Proceedings held at the Bench.)

15        **MR. SPEARS:** Mr. Most filed and the Court denied his

16  motion to prohibit the Defendants from discussing the fact that

17  there is an on-topic rule.  Now he's trying to go around that

18  ruling of the Court.  You specifically said that we have a

19  right to argue that she was required to be on topic.

20        **MR. MOST:** Right, they can argue that, and then we can

21  point out they don't have that rule.

22        **THE COURT:** That's what he's -- the point -- I don't

23  have it before me.  He's trying to demonstrate that there is no

24  on-topic rule because it was never adopted.

25        **MR. MOST:** Right.


                    OFFICIAL TRANSCRIPT

1          **THE COURT:** You've been arguing that they have the

2   right to keep them on topic.  You have been able to argue that,

3   and you have argued that.

4          **MR. SPEARS:** And you agreed with that and denied his

5   motion.

6          **MR. MOST:** No.  She said that you were not restricted

7   from not talking about the on-topic rule.  She didn't say you

8   were absolutely right about it.

9          **MR. SPEARS:** Well, I am right about it.

10          **THE COURT:** So overruled.

11          (Whereupon this concludes proceedings held at

12       the bench.)

13  **BY MR. MOST:**

14  Q.   All right.  So Mr. Wright, there's nothing in here about

15  an on-topic rule; correct?

16  A.   That is correct.  The guidance for what we have followed

17  has been with Louisiana Open Meetings Law, and through, you

18  know, it's been a custom and procedure historically that public

19  comment is allowed, posted on the agenda.  Members of the

20  public are allowed to speak and give their comments for items

21  on the agenda that the council is going to be taking action on.

22  Q.   Okay.  But the council has never voted on an on-topic

23  rule, have they?

24  A.   They have not.

25  Q.   Okay.  It's very common for members of the public to be

OFFICIAL TRANSCRIPT

1  off the agenda item; correct?

2  A.    It's very common for members of the public as well as

3  council members.

4  Q.    And you know who Joy Banner is; correct?

5  A.    I do.

6  Q.    You know she is the Plaintiff in this case?

7  A.    Yes.

8  Q.    You know that she has objected to the Parish's efforts to

9  rezone certain property?

10  A.    Yes.

11  Q.    And you're aware that she filed an ethics complaint

12  against the parish president?

13  A.    Yes.

14  Q.    And you were aware that she had filed an ethics complaint

15  against the parish president as of November 2023; correct?

16  A.    I'm not sure when I was made aware of it.

17  Q.    So you're saying you -- today, you're saying you don't

18  know when you learned that?

19           **MR. SPEARS:** Objection.

20           **THE WITNESS:** I don't recall when I --

21           **MR. SPEARS:** Objection, it's been asked and answered.

22  He's not aware of when he was aware.

23           **THE COURT:** Overruled.

24           **THE WITNESS:** I do not recall when I first learned of

25  the ethics complaint.

OFFICIAL TRANSCRIPT

1 **BY MR. MOST:**

2 Q.    Okay.  Do you recall that you gave a deposition in this

3 case?

4 A.    Yes.

5 Q.    Where you gave certain answers under oath to questions?

6 A.    Yes.

7 Q.    And in that deposition, you testified --

8           **THE COURT:** Wait, you have to give them the page.

9           **MR. MOST:** Sure.

10          **THE COURT:** And you have to ask the question you asked

11 in the deposition which should be the same question you just

12 asked.

13          **MR. MOST:** Certainly.

14 **BY MR. MOST:**

15 Q.    Do you see, Mr. Wright, that this is a transcript of your

16 deposition?

17 A.    Yes.

18 Q.    So if we go to page 29 lines 1 to 5, you were asked that,

19 "You were at least aware of Joy Banner's criticism of the

20 parish and the parish president as of the meeting in

21 November 2023"; correct?

22 A.    Yes.

23 Q.    All right.  And at that 2023 meeting, there was an agenda

24 item about hiring special ethics lawyers; correct?

25 A.    Yes.


OFFICIAL TRANSCRIPT

1  Q.    And the agenda item was about the parish paying for those

2  lawyers; correct?

3  A.    Yes.

4  Q.    With taxpayer money?

5  A.    Yes.

6  Q.    And as far as you knew at the time, you only knew of one

7  ethics law issue, the one involving the ethics complaint

8  against Jaclyn Hotard; correct?

9  A.    Again, I'm not sure exactly when I was made aware of the

10  actual complaint.  But the agenda item was a general item to

11  retain counsel which is not unusual for the parish council to

12  do on behalf of the parish because we are the governing

13  authority.

14        So in an agreement like that, you know, we have over

15  200-plus employees that are bound by the Louisiana Code of

16  Ethics.  So it would not be uncommon for me to not be aware of

17  ethics complaints as they are, you know, my understanding,

18  confidential in nature, and the council doesn't manage the

19  day-to-day operations of the parish.

20  Q.    But at the time, you only knew of one ethics complaint.

21  That was the one against Jaclyn Hotard; correct?

22  A.    Again, I don't know specifically when I was made aware of

23  the specific allegations.  So I can't say for certain if it was

24  at that time.  But if you say so and believe so, that was the

25  case, then.

OFFICIAL TRANSCRIPT

1    Q.    Do you recall that you answered this question in a

2    deposition?  And do you recall that you were asked, "But as far

3    as you knew at the time, you only knew of one ethics law issue,

4    the one involving the ethics complaint against Jaclyn Hotard";

5    agreed?

6    A.    Agreed.  So I have no reason to dispute that.

7    Q.    Okay.  And you can't recall any other time the parish has

8    paid for a lawyer to defend a parish official from an ethics

9    complaint; correct?

10   A.    I do not recall.  It's not to say it hasn't happened, but

11   not to my knowledge.

12   Q.    Sure.  So I want to move on to the meeting itself.  At the

13   November 28th, 2023 meeting, you opened public comment;

14   correct?

15   A.    Yes.

16   Q.    And then you waited approximately two seconds and closed

17   it; correct?

18   A.    Yes.

19   Q.    And then you saw some people wanted to speak, and you let

20   them speak; correct?

21   A.    Correct.

22   Q.    And the first person to give public comment was Joy

23   Banner; correct?

24   A.    Correct.

25   Q.    Ms. Hotard interrupted Ms. Banner and asked you to stop

OFFICIAL TRANSCRIPT

1  Ms. Banner's comment; correct?

2  A.    I believe the parish president was calling a point of

3  order.

4  Q.    But at one point, the parish president asked you to stop

5  Dr. Banner's comment; correct?

6  A.    Yes.

7  Q.    And then subsequent to that, you banged your gavel on the

8  table; correct?

9  A.    Yes.

10  Q.    And you expected her to stop talking, Ms. Banner to stop

11  talking when you gaveled; correct?

12  A.    I was trying to retain the floor.

13  Q.    And you expected her to stop what she was saying when you

14  gaveled; correct?

15  A.    Yes.  I expected all parties to stop speaking.

16  Q.    And then when you gaveled her quiet, you chose to read a

17  section of a criminal law during Ms. Banner's public comment;

18  correct?

19  A.    Yes.

20  Q.    And a criminal law is one where if someone violates it,

21  they can be put in prison; correct?

22          **MR. SPEARS:** Objection, asking for a legal conclusion

23  of a lay witness.

24          **THE COURT:** He read the -- overruled.  He read the

25  statute.  So his intent in reading it is what he's asking.

OFFICIAL TRANSCRIPT

1  **BY MR. MOST:**

2  Q.   Your understanding was that a criminal law is one where if

3  someone violates it, they can be put in prison; correct?

4  A.   Yes.  But again, that's not for me to decide.

5  Q.   You cannot remember any other meeting where you've read a

6  criminal law during public comment; correct?

7  A.   Correct.

8  Q.   And how long were you on the council total?

9  A.   I was elected in 2011 and took office in 2012.

10 Q.   So about 13 years?

11 A.   Yes.

12 Q.   In those 13 years, Joy Banner is the only person you've

13 ever stopped in public comment and read a criminal law statute

14 to; correct?

15 A.   To my recollection, as long as I've been on the council, I

16 have -- I do not ever recall someone speaking about a specific

17 ethics complaint.  So this was a unique issue for me.

18 Q.   Okay.  So it was because of the content of what she was

19 saying that you took the actions that you did; correct?

20 A.   She was getting off topic, yes.

21 Q.   So it was the content of what she was saying, that was why

22 you took the actions you did; correct?

23 A.   Yes.  She was getting off topic and speaking about an

24 ethics complaint that my understanding was confidential.

25            **MR. MOST:**  Okay.  For housekeeping, we'd like to

OFFICIAL TRANSCRIPT

1  offer, file, and introduce P7 which was the discovery

2  responses.

3          **MR. SPEARS:** No objection.

4          **THE COURT:** All right, it's accepted into evidence.

5          **MR. MOST:** May I approach the witness?

6          **THE COURT:** Yes, you may.

7  **BY MR. MOST:**

8  Q.   Mr. Wright, do you recognize what you have in your hands?

9  A.   Yes.  R.S. 42:1141.4.

10 Q.   And specifically, this is the piece of paper that you were

11 holding in your hand when you read to Ms. Banner, Dr. Banner;

12 correct?

13 A.   I believe so.

14         **MR. MOST:** We will offer this as Plaintiff's 8.

15         **THE COURT:** All right.

16         **MR. SPEARS:** No objection.

17         **THE COURT:** All right, it's accepted into evidence.

18 **BY MR. MOST:**

19 Q.   And Mr. Wright, you asked the council secretary to print

20 this out for you before the meeting; correct?

21 A.   Yes, that is correct.

22 Q.   And you see there's some highlighting at the top and then

23 also on the second page?

24 A.   Yes, I do see that.

25 Q.   And this highlighting on the second page, this is what you

OFFICIAL TRANSCRIPT

1  read during Dr. Banner's public comment; correct?

2  A.   I believe so, yes.

3  Q.   And at the top of -- well, let's see.  Just to make it

4  more visible, do you see that this, Mr. Wright, is a

5  reproduction of the document that you held in your hand when

6  you read to Dr. Banner?

7  A.   Yes, sir.

8         **THE COURT:** Can all the jurors see it?  You can all

9  see it?

10  **BY MR. MOST:**

11  Q.   And the piece of paper that you were holding said at the

12  top, "Note:  This provision of law was included in the

13  unconstitutional statutes biennial report to the legislature

14  dated March 14, 2016"; correct?

15  A.   Yes, that is correct.

16  Q.   So this piece of paper had the word "unconstitutional" at

17  the top of it; is that correct?

18  A.   Yes.

19  Q.   And did you disclose to anyone in the council room,

20  whether other council members, members of the public, or

21  Dr. Banner, that the piece of paper you were reading from had

22  the word "unconstitutional" at the top?

23  A.   At the time of reading it, I don't believe I saw the word

24  "unconstitutional" or that disclaimer at the top.

25  Q.   You didn't see this note at the top?

OFFICIAL TRANSCRIPT

1  A.   I don't recall seeing it.

2  Q.   Okay.  And given that, it's a true statement that you did

3  not disclose to anyone in the room, whether council members,

4  the public, or Dr. Banner, that the piece of paper had the word

5  "unconstitutional" at the top; agreed?

6  A.   Agreed.

7  Q.   So when you read to Dr. Banner and used the words, "fines,

8  imprisonment, misdemeanor," you were reading from a piece of

9  paper that had the word "unconstitutional" at the top, and that

10  was not disclosed to anyone to your knowledge; agreed?

11  A.   Agreed.

12       **MR. MOST:** Thank you.  We'll offer, file, and

13  introduce that as P8.

14       **THE COURT:** All right, it's accepted into evidence.

15       Do you tender the witness?

16  **MR. MOST:** Yes.

17       **MR. SPEARS:** Judge, we'll reserve the right to call

18  Councilman Wright at a later time as part of our case.

19       **THE COURT:** All right.

20       **THE WITNESS:** May I step down?

21       **THE COURT:** Yes, you can.

22       **MR. MOST:** Plaintiff's next witness is Darla Gaudet.

23                       **DARLA GAUDET,**

24  after having been duly sworn, did testify as follows:

25                    **DIRECT EXAMINATION**


                         OFFICIAL TRANSCRIPT

1    **BY MR. MOST:**

2    Q.    All right, good morning.  Would you give us your full name

3    for the record, please?

4    A.    Darla Gaudet.

5    Q.    Ms. Gaudet, are you related to Defendant Jaclyn Hotard?

6    A.    Yes.

7    Q.    Are you her mother-in-law?

8    A.    Yes, I am.

9          **MR. MOST:** Your Honor, as this is a witness identified

10   with an adverse party, we'd ask for permission to use leading

11   questions.

12         **THE COURT:** Yes.

13   **BY MR. MOST:**

14   Q.    Ms. Gaudet, you live in St. John the Baptist Parish;

15   correct?

16   A.    Yes.

17   Q.    And you have three living children?

18   A.    Yes.

19   Q.    The oldest is Russell Gaudet, the Third?

20   A.    Yes.

21   Q.    He also goes by Rusty?

22   A.    Yes.

23   Q.    And Rusty is married to parish president Jaclyn Hotard;

24   correct?

25   A.    Yes.

                        OFFICIAL TRANSCRIPT

1    Q.    And before she began dating your son, you knew of

2    Ms. Hotard; correct?

3    A.    Correct.

4    Q.    And then she and your son began dating in approximately

5    2018, 2019?

6    A.    That sounds about right.

7    Q.    And Ms. Hotard lived with you on and off for about a year

8    after Hurricane Ida; correct?

9    A.    Yes -- no, it wasn't a year.  It was only a few months

10   until their house was fixed.

11   Q.    Okay.  So Parish President Hotard lived with you for some

12   period of time?

13   A.    Yes.

14   Q.    Ms. Gaudet, what is your profession?

15   A.    I'm a business owner in St. John Parish.

16   Q.    And you own or co-own a range of businesses; correct?

17   A.    Correct.

18   Q.    That includes St. John Fleeting?

19   A.    Yes.

20   Q.    It includes Gaumet Holdings, LLC?

21   A.    Yes.

22   Q.    And Gaumet Holdings, LLC, is a company that owns land in

23   St. John the Baptist Parish; correct?

24   A.    Yes, it is.

25   Q.    And you sometimes talk with Ms. Hotard about your

OFFICIAL TRANSCRIPT

1   businesses and land; correct?

2   A.   I talk to her sometimes.  Not necessarily my businesses or

3   my land.

4   Q.   Sometimes about your land; correct?

5   A.   I've had conversations with her lately, in the past, yes.

6   Q.   And sometimes about your businesses; correct?

7   A.   No, I can't recall we really discussed the business and

8   the aspects of it.

9   Q.   Okay.  And Gaumet Holdings, LLC, owns land adjacent to

10  land where there was a grain elevator project proposed;

11  correct?

12  A.   Yes.

13          **MR. MOST:** We will pull up what is already in evidence

14  as P1 at page 10.

15  **BY MR. MOST:**

16  Q.   This is a diagram, Ms. Gaudet, of the land -- of some of

17  the land that your LLC owns in St. John the Baptist Parish;

18  correct?

19  A.   It looks like it.

20  Q.   And the thin yellow lines, these represent the parcels

21  owned by your LLC; correct?

22  A.   Correct.

23  Q.   And the purplish area is where the grain elevator was

24  proposed; correct?

25  A.   The purple?  It looks blue.

OFFICIAL TRANSCRIPT

```
 1   Q.    I'm sorry, I'm a little bit colorblind.
 2   A.    Oh, okay.  We'll go with that.  It's a bluish/gray.
 3   Q.    Thank you.  And there was to be a rail extension that
 4   would go right through those thin strips that you own; correct?
 5   A.    That's my understanding of it.
 6   Q.    So for this industrial project to proceed, the corporation
 7   would either have to buy your company's land or pay for a right
 8   of way; correct?
 9   A.    Yeah.
10   Q.    In fact, you talked to the corporation about them buying
11   your land?
12   A.    They approached me about buying it, yes.
13   Q.    And owning a strip of land that controls the rail approach
14   to an $800 million industrial project can increase the value of
15   that land; agreed?
16   A.    Yeah, if it was zoned right.
17   Q.    And you talked to Ms. Hotard about the grain elevator
18   project after the rezoning part came up; correct?
19   A.    After it was rezoned, after it was rezoned back to R-1
20   from I-3, yes, I did.
21   Q.    And since then, you have exchanged text messages with
22   Ms. Hotard about the grain elevator project, about the
23   Greenfield corporation, and Joy Banner; correct?
24   A.    Yes.
25              MR. MOST:  Permission to approach?
```

OFFICIAL TRANSCRIPT

1              **THE COURT:** Yes.

2    **BY MR. MOST:**

3    Q.    Ms. Gaudet, these are some of the text messages between

4    you and Ms. Hotard; correct?

5    A.    Yes.

6    Q.    The bubbles on the right that are darker, that's you?

7    A.    Yes.

8              **THE COURT:** We don't see anything, Mr. Most.

9              **MR. MOST:** Sure.

10   **BY MR. MOST:**

11   Q.    Does this match what you have in front of you, Ms. Gaudet?

12   A.    Yes, it does.

13   Q.    And it starts at -- the number in the lower right is 94?

14   A.    Uh-huh.

15   Q.    Okay.  So the darker bubbles on the right, that is you;

16   correct?

17   A.    Correct.

18   Q.    And the lighter bubbles on the left, those are Ms. Hotard;

19   correct?

20   A.    Correct.

21   Q.    And these are text messages between the two of you on

22   October 16, 2023; correct?

23   A.    Correct.

24   Q.    So that's a little bit more than a month before the

25   November 28, 2023 parish council meeting; right?

OFFICIAL TRANSCRIPT

1   A.    I'm not sure.  I -- it's October the 16th.

2   Q.    Sure.  So it's a little bit more than a month before

3   November 28th; correct?

4   A.    Correct.

5            **MR. MOST:** We will offer this as Plaintiff's 9.

6            **MR. SPEARS:** No objection.

7            **THE COURT:** All right, it's accepted into evidence.

8   **BY MR. MOST:**

9   Q.    And Ms. Hotard says in these text messages, "I wanted to

10  choke that woman"; correct?

11  A.    Wait, excuse me, repeat that.

12  Q.    Sure.  So the very first text message that we see here is

13  Ms. Hotard saying, "I wanted to choke that woman"; correct?

14  A.    That's what it says, yes.

15  Q.    And who did you understand that Ms. Hotard was saying she

16  wanted to choke?

17  A.    I'm not -- I don't remember what this was in regards to at

18  this time.  What was going on at this time, I don't remember.

19  So I'm going to take it that it was somebody she was aggravated

20  with about some kind of issue.

21  Q.    So you're saying here today you do not recall who you

22  understood that Ms. Hotard wanted to choke?

23  A.    No, I mean I don't.

24  Q.    Do you recall that you gave a deposition in this case?

25  A.    Yes.  This was -- was this at a meeting?  Was this one of

                        OFFICIAL TRANSCRIPT

1    the meeting days?

2              **THE COURT:** He can't testify for you.

3    **BY MR. MOST:**

4    Q.    I guess my question is:  Are you saying today you can't

5    recall who Ms. Hotard was saying she wanted to choke?

6    A.    It could be anybody.

7    Q.    Do you recall that you gave a deposition in this case?

8    A.    Yes, I did.

9    Q.    And that was a time where you swore an oath to tell the

10   truth?

11   A.    Yes.

12   Q.    And do you recall that you answered --

13   A.    Oh, good, you got my deposition.  Then we'll find out what

14   I said.

15             **THE COURT:** You've got to show her, a proper

16   impeachment.  Show her the question and when it was.

17   **BY MR. MOST:**

18   Q.    Ms. Gaudet, you gave a deposition just a little more than

19   a month ago?

20   A.    Yes.

21   Q.    On page 69 or on page 68, do you see that we were

22   discussing, "Ms. Hotard says in these text messages, 'I wanted

23   to choke that woman'"?

24   A.    Yes.

25   Q.    And then you were asked, "Who is the 'that woman' that

OFFICIAL TRANSCRIPT

1  Ms. Hotard was referring to?"

2  A.    Yes, okay.  That was the Banner woman, yes, okay.

3  Q.    So your understanding of the text message was that

4  Ms. Hotard was saying she wanted to choke Joy Banner; correct?

5  A.    It was my understanding, yes.

6  Q.    Later on down the page, Ms. Hotard refers to "the bitch";

7  correct?

8  A.    That's what it says.

9  Q.    And you understood Ms. Hotard, when she said "the bitch,"

10  to mean Joy Banner; correct?

11  A.    I'm guessing that's what she meant.

12  Q.    And on the next page, the two of you are talking about

13  tracts of land; correct?

14  A.    Yes.

15  Q.    It says track, T-R-A-C-K, but that's a misspelling of

16  tract with a "T"?

17  A.    Yeah, it should have been "T."  Spell check on texting.

18  Q.    And these tracts of land that you were texting with

19  Ms. Hotard about, these were the thin strips of land that

20  intersected the rail approach for the Greenfield grain elevator

21  project; correct?

22  A.    The ones I own, yes.  One of the four tracts.

23  Q.    So at least by this point, Ms. Hotard was aware that you

24  owned land in the Greenfield grain elevator area; correct?

25  A.    Yes.

OFFICIAL TRANSCRIPT

1   Q.    Going down further on what has the number 95 on the lower

2   right, Ms. Hotard writes, "I'm still steaming pissed"; correct?

3   A.    Yes.

4   Q.    "I'm still steaming pissed.  I'm mad.  I told her ass

5   anything, but to let them say I violated the ethics code";

6   correct?

7   A.    That's correct, what it says.

8   Q.    So in October of 2023, Ms. Hotard was telling you,

9   "Anything, but to let them say I violated the ethics code";

10  correct?

11  A.    That's what it says.

12  Q.    Okay.  Ms. Gaudet, do you see in front of you are text

13  messages with Jaclyn Hotard starting at page No. 99?

14  A.    Yes.

15  Q.    And are these further text messages between you and

16  Ms. Hotard?

17  A.    Yes, they are.

18          **MR. MOST:** We would offer this as Plaintiff's 10.

19          **MR. SPEARS:** No objection.

20          **THE COURT:** All right, accepted into evidence.

21  **BY MR. MOST:**

22  Q.    Ms. Gaudet, these are text messages from April 24th,

23  2023; correct?

24  A.    No, it says October 24th.

25  Q.    Yeah, and do you see at the bottom or at the top it says

OFFICIAL TRANSCRIPT

1  text message October 24th, 2023?

2  A.    Yeah, that's what I said, October.  You said April.

3  Q.    Oh, I apologize.  So these are about a month before

4  November 28th, 2023?

5  A.    Correct.

6  Q.    And Ms. Hotard is here texting you a news article;

7  correct?

8  A.    Yes.

9  Q.    And this is a news article about a potential connection

10  between you and your company and Ms. Hotard; correct?

11  A.    Yes, that was printed in the news article.

12  Q.    Uh-huh.  Going down to page 5, Ms. Hotard texts you,

13  "Exactly.  I'm fucking steaming"; is that correct?

14  A.    Yes.

15  Q.    And then she says, "I'm going to take deep breaths, but I

16  did instruct Baileigh to cancel all advertising with them";

17  correct?

18  A.    Yes.

19  Q.    And Baileigh, you understood to refer to a parish

20  employee?

21  A.    She's a parish employee, yes.

22  Q.    And so you understood this text message to mean that

23  Ms. Hotard had instructed someone from the parish to cancel all

24  advertising with the newspaper because of what they printed

25  about you and Ms. Hotard; correct?

OFFICIAL TRANSCRIPT

1  A.    Yes.  And that neither one of us were asked to respond to

2  it.  That was my point on it.

3  Q.    Uh-huh.

4  A.    They printed things and didn't bother to ask anybody if

5  that was the real reason or not or the real purpose of it,

6  other than one person.

7  Q.    And Ms. Hotard's reaction was to instruct someone to

8  cancel all advertising?

9  A.    That looks -- that's what she said.

10  Q.    Okay.  And then on the next page, you text, "I have had

11  enough of those two bitches on the West Bank"; correct?

12  A.    I sure did.

13  Q.    And Ms. Hotard responds, "You were very diplomatic"?

14  A.    Uh-huh.

15  Q.    And "the two bitches on the West Bank," that refers to Joy

16  and Jo Banner; correct?

17  A.    Correct.

18          **MR. MOST:** May I approach?

19          **THE COURT:** Yes.

20          **MR. MOST:** The prior Exhibit P10, we'll offer, file,

21  and introduce as P10.

22  **BY MR. MOST:**

23  Q.    Okay.  Looking at what's in front of you, this matches

24  what's on the screen; correct?

25  A.    Yes.

OFFICIAL TRANSCRIPT

1  Q.   These are further text messages between you and Jaclyn
2  Hotard?
3  A.   Yes, they are.
4  Q.   And here, Jaclyn Hotard is texting you another newspaper
5  article.  This one having a photo of Joy Banner?
6  A.   Yes.
7  Q.   And this one, if we go down to page 16, actually had that
8  map of where your property was in relation to the Greenfield
9  project?
10  A.   Which one are you on?
11  Q.   Sure, page 16.  It should be on your screen as well.
12          **THE COURT:** You can see the monitor.
13          **THE WITNESS:** Yeah.  Yes, that looks like it.
14  **BY MR. MOST:**
15  Q.   So this article that she sent you had a map of your
16  properties alongside the Greenfield property; correct?
17  A.   Uh-huh.
18  Q.   I'm going down to page 22.  You respond, "They are the
19  gift that keeps on giving"?
20  A.   Yes.
21  Q.   And then you had two poop emojis?
22  A.   Correct.
23  Q.   And Ms. Hotard added an exclamation point to your text
24  message?
25  A.   Yes.

OFFICIAL TRANSCRIPT

1  Q.   And the two poop emojis, those were intended to represent
2  Joy and Jo Banner; correct?
3            **MR. SPEARS:** Objection to relevance, Your Honor.
4            **THE COURT:** Overruled.
5            **THE WITNESS:** Yes, they were.
6            **MR. MOST:** Okay.  We'll offer this as P11.
7            **MR. SPEARS:** No objection.
8            **THE COURT:** All right, it's accepted into evidence.
9  **BY MR. MOST:**
10 Q.   We have more text messages we can go through, but you
11 would sometimes text Ms. Hotard during parish council meetings;
12 right?
13 A.   Yes, if I was unable to attend them.
14 Q.   And you would specifically ask Ms. Hotard for updates
15 about the Greenfield matters as they were going through parish
16 council meetings; correct?
17 A.   Correct.
18 Q.   You would specifically ask her to report back to you about
19 who voted yes or no on Greenfield matters; correct?
20 A.   Yes, I did.
21 Q.   And you were asking her about these votes because you had
22 businesses that stood to benefit from the grain elevator
23 project; correct?
24 A.   Yes, myself and hundreds -- and lots of other businesses
25 on that river industry would have benefited from that.  I'm not

1  the only business in St. John the Baptist Parish that would

2  have benefited from it.

3  Q.   Uh-huh.  And Ms. Hotard even offered to send you a

4  play-by-play of certain parish council meetings; correct?

5  A.   That, I don't -- that, I'm not sure.  She just kept me

6  updated if I wasn't able to come.  I wouldn't say it was a

7  play-by-play.  It was what was going on.

8       Oh, you're going to bring me the one of this, okay.

9  Q.   These are further text messages between you and

10 Ms. Hotard; correct?

11 A.   Yes.

12 Q.   And in these text messages, you asked, "Is the council

13 meeting still on for tonight"; correct?

14 A.   Yes, I did.

15 Q.   And you asked if Greenfield was still on the agenda?

16 A.   Yes.

17 Q.   And then Ms. Hotard offered to text you the play-by-play

18 if you don't feel like attending?

19 A.   Yes.

20 Q.   Okay.  And going down to page 4, she did, in fact, report

21 to you about the specific vote on the Greenfield matter?

22 A.   Yes, she did.

23            **MR. MOST:** We'll offer this as P12.

24            **MR. SPEARS:** No objection.

25            **THE COURT:** All right, it's accepted into evidence.

OFFICIAL TRANSCRIPT

```
 1              MR. MOST: May I approach, Your Honor?
 2              THE COURT: Yes.
 3  BY MR. MOST:
 4  Q.    These are further text messages between you and
 5  Ms. Hotard; correct?
 6  A.    Correct.
 7  Q.    And in these text messages, it looks like Ms. Hotard is
 8  giving you a heads-up about a subpoena?
 9  A.    She text me that I was going to be subpoenaed, yes.  No,
10  wait.  Let me back up.  No, she did not text me that.  She text
11  me that, but that came from Sammy Accardo, that I was going to
12  be given a subpoena.
13  Q.    Okay.  So it looks like she screenshotted a text message
14  from someone else about a subpoena and then sent it to you?
15  A.    Correct.
16  Q.    And then she wrote, "I hate these people"; correct?
17  A.    That's what it says.
18  Q.    And by "these people," you understood her to be referring
19  to --
20              MR. SPEARS: Objection to speculation.
21              THE COURT: He's asking her the question.  Overruled.
22  BY MR. MOST:
23  Q.    When Ms. Hotard wrote, "I hate these people," you
24  understood her to be referring to Joy Banner and her sister;
25  correct?
```

OFFICIAL TRANSCRIPT

1  A.   I understood it to be the situation going on, yes.

2  Q.   Specifically, "these people," being Joy Banner and her

3  sister; correct?

4  A.   Descendants and Joy Banner, yes, her sister.

5            **MR. MOST:** We'll offer the text messages on the screen

6  as P13.

7            **MR. SPEARS:** No objection.

8            **THE COURT:** Okay, it's accepted into evidence.

9            **MR. MOST:** May I approach, Your Honor?

10           **THE COURT:** Yes.

11 **BY MR. MOST:**

12 Q.   This, in front of you, is another set of text messages

13 between you and Jaclyn Hotard; correct?

14 A.   Yes.

15 Q.   And these are from September 14, 2024; correct?

16 A.   Correct.

17 Q.   So just about four months ago?

18 A.   Yeah.

19 Q.   While this case was going on; correct?

20 A.   Correct.

21 Q.   And you texted Ms. Hotard, "Please do not share the

22 information I told you," and she responded, "I won't"; correct?

23 A.   Correct.

24 Q.   And you don't recall what that information was; agreed?

25 A.   Well, it says, "I'm only letting people know that no

OFFICIAL TRANSCRIPT

1   violation was found, and the case is closed."

2   Q.   Okay.  But you don't remember what information you were

3   referring to when you said, "Please do not share the

4   information I told you"?

5   A.   That was when she was found clear of the Ethics Board.  I

6   think I stated that in my deposition.

7   Q.   Okay.  The deposition you gave in this case?

8   A.   Correct.

9   Q.   Do you see that you were asked about the September 14th,

10  2024 text message?

11  A.   Yes.

12  Q.   And you were asked what was the information you were

13  describing in this text message?

14  A.   I see, uh-huh.

15  Q.   And your answer was, "I'm going to be honest with you, I

16  don't remember because that's September the 14th.  I've had a

17  lot of shit go down since then"?

18  A.   At the time of that, yes, I did say that.

19  Q.   Okay.  And I'm getting to the end here.  The company that

20  we talked about earlier that owns those thin strips of land,

21  that's called Gaumet Holdings, LLC?

22  A.   Gaumet Holdings, LLC.

23  Q.   Thank you.  And the value of that land would have

24  increased if the rezoning were approved; correct?

25  A.   Correct.

OFFICIAL TRANSCRIPT

1  Q.    And you co-own that company with two family trusts;
2  correct?
3  A.    Yes, I do.
4         **MR. SPEARS:** Objection to relevance, Your Honor.  May
5  we approach?
6         **THE COURT:** Yes.
7              (Proceedings held at the Bench.)
8         **MR. SPEARS:** Judge, I've tried to hold back, but I
9  thought we weren't going down this rabbit hole.
10        **THE COURT:** He has the burden of showing punitive
11 damages claim in the litigation, and so that's why I'm
12 allowing.
13        **MR. MOST:** I mean we're at the very end.  The last
14 thing is going to be that Ms. Hotard's husband secretly had an
15 interest in this which is our theory which is the motive.
16        **THE COURT:** So that's his burden of proof.  So I've
17 got to let him get that kind of evidence in.
18              (Whereupon this concludes proceedings held at
19    the bench.)
20        **THE COURT:** Mr. Spears, you're free to cross-examine
21 it.
22 **BY MR. MOST:**
23 Q.    Ms. Gaudet, you co-own Gaumet Holdings, LLC, with two
24 family trusts; correct?
25 A.    Correct.

OFFICIAL TRANSCRIPT

```
 1  Q.   And those trusts include --
 2              THE COURT: Did she answer?
 3              THE WITNESS: Yes.  I said correct.
 4              THE COURT: I didn't hear you.
 5  BY MR. MOST:
 6  Q.   Those trusts include -- those trusts who co-own this
 7  company that has the land, those trusts include some other
 8  members of Ms. Hotard's family; correct?
 9  A.   Yes.
10  Q.   Isn't it true, Ms. Gaudet, that Ms. Hotard's husband is
11  one of the beneficiaries of one of those trusts?
12  A.   Yes, he is, along with my other two children.  They're
13  beneficiaries of it.
14  Q.   Uh-huh.  And the fact that Jaclyn Hotard's husband is a
15  beneficiary of one of the trusts that co-owns this land, to
16  your knowledge, was that ever publicly disclosed before this
17  case?
18  A.   No.
19  Q.   In fact, the fact that Ms. Hotard's husband is financially
20  connected to this land was a secret until this case revealed
21  that fact; correct?
22  A.   It wasn't a secret.  I knew about it.  It wasn't necessary
23  for the entire parish to know about it or anybody else in this
24  room to know about it.
25  Q.   Do you recall being asked whether it was a secret at
```

OFFICIAL TRANSCRIPT

1  deposition?

2  A.   I'm sure you're going to show me what I said.  So go

3  ahead.

4           THE COURT: You have to answer the question.

5           THE WITNESS: Well, okay, repeat the question then.

6  BY MR. MOST:

7  Q.   Sure.  Do you recall being asked about whether this was a

8  secret at deposition?

9  A.   I don't recall exactly what I said.

10 Q.   Okay.  Do you see in your deposition you were asked, "So

11 that's been a secret until today?"

12       And your answer was, "It's been a secret until you all --

13 until the judge ruled I had to give it to you, yes"?

14 A.   Yes, that's correct.

15           MR. MOST: Thank you.  We tender the witness.

16           Oh, and we'll offer the most recent text message as

17 P14.

18           MR. SPEARS: No objection.

19           THE COURT: It's admitted.

20                        CROSS-EXAMINATION

21 BY MR. SPEARS:

22 Q.   Ms. Gaudet, good morning.

23 A.   Good morning.

24 Q.   Thank you for coming.  I'm sorry you have to go through

25 this; so I'll be very brief.

                        OFFICIAL TRANSCRIPT

1  A.   Okay.

2  Q.   You and your family were successful in business long

3  before Greenfield came to St. John; is that correct?

4  A.   Yes, it is.  Can I tell you my story about it?

5  Q.   Tell us your story.

6  A.   In 1999 --

7          **MR. MOST:** Objection.

8          **THE COURT:** Her whole story?

9  **BY MR. SPEARS:**

10 Q.   Give us a brief synopsis of when and how you got into the

11 business before Greenfield ever came to town.

12 A.   Before Greenfield, my father died in '99, and my brother

13 and I inherited -- my brother and my husband and I inherited

14 the entire company that my father had formed and worked during

15 all his life.

16 Q.   What is the name of the company your father created?

17 A.   It was St. John Fleeting.

18 Q.   And this is long before --

19 A.   Long before Greenfield ever came along and long before any

20 of this was in 2013.

21          **THE COURT:** All right, you've got to ask a question.

22 I'm sorry, not you.  I'm talking to him.  You've got to ask a

23 question.  You can't lead because this is a favorable witness.

24 **BY MR. SPEARS:**

25 Q.   Was this before Jaclyn married your son?

OFFICIAL TRANSCRIPT

1  A.   Absolutely.

2  Q.   Long before?

3  A.   Long, yes.

4  Q.   Now Mr. Most is making a point of your son being a

5  beneficiary of some of the holdings that Gaumet has.

6       Explain to the jurors what is his percentage interest as a

7  beneficiary.

8  A.   His percentage is one-third of 25 percent that he -- that

9  his father had which is 8.3 percent.

10  Q.   And can he go to the bank and borrow on that 8.3 percent?

11  A.   I don't think they would loan him anything on only 8.3.

12  He'd probably have to have his sisters help him.

13  Q.   And when and how would he ever get actual possession of

14  these properties?

15  A.   Upon my death.

16  Q.   Okay.  So as long as you're living, he cannot control

17  these properties?

18  A.   He has no control over it, no.

19  Q.   And his interest in the properties would be his separate

20  property long before he married Jaclyn?

21  A.   Absolutely.  It was an inheritance.

22  Q.   Okay.  It's my understanding that Greenfield came to town

23  and bought properties that you all thought was zoned industrial

24  in 2021.  Is that a correct statement?

25  A.   Yes, sir.

OFFICIAL TRANSCRIPT

1  Q.    Okay.  And when you bought your properties, how were your
2  properties zoned?
3  A.    I purchased four tracts of it from 2013 to 2019, and it
4  was I-3 which is Industrial 3.
5  Q.    Industrial?
6  A.    Yes.
7  Q.    Could you tell the jurors how are your four tracts of land
8  zoned today as we're sitting here in court?
9  A.    My four tracts are R-1 as they were -- as all of it was
10 reverted back to R-1.  And only sections, only certain tracts
11 of the land was rezoned I-3.  So I have R-1 on the outside of
12 it.
13 Q.    So you bought industrial property?
14 A.    Correct.
15 Q.    And because of a state judge ruling, you now have
16 residential property?
17 A.    Correct.
18 Q.    Okay.  So when the parish council and Jaclyn submitted
19 that application for Greenfield to be restored to industrial,
20 did you and all of the other surrounding property owners who
21 had lost your industrial zoning, did you all get rezoned?
22 A.    No, we did not.
23 Q.    Okay.  So if the accusation, allegation was made that
24 Jaclyn was rezoning your property -- and when I say "your
25 property," I'm talking about Gaumet Holdings.

                         OFFICIAL TRANSCRIPT

```
 1   A.    Gaumet.
 2   Q.    Would that be a correct accusation that your property was
 3   being rezoned by Jaclyn and the parish council from -- rezoned
 4   from residential to industrial as part of the Greenfield
 5   rezoning?
 6   A.    Mine wasn't included in the rezoning.
 7   Q.    Okay.  And it's still not included?
 8   A.    Still not included.  It never was included in it.  And I
 9   refer to mine, I'm sorry, I referred to it as mine.  But it's
10   my company's, it's Gaumet Holdings.
11   Q.    And you mentioned not just you, but all of the other
12   surrounding property owners, you all were excluded from this
13   effort to restore industrial to Greenfield; correct?
14   A.    Correct.
15   Q.    Okay.  I want to go back to your deposition that was
16   discussed by Mr. Most.
17              THE COURT: Okay.  Are you impeaching her?
18              MR. SPEARS: No, no, no.
19              THE COURT: Then you can't show her deposition.
20              MR. SPEARS: I'm not impeaching.  I wanted to clarify
21   something Mr. Most --
22              THE COURT: No, you can't do that.  You've got to ask
23   her the question.  If she answers it differently, then you can
24   use the deposition.
25              Wait.  Just to be clear, she's here to testify.  So
```

OFFICIAL TRANSCRIPT

```
 1   you can't just use her deposition unless you're using it to
 2   impeach what she says today.
 3              MR. SPEARS: That's correct.
 4   BY MR. SPEARS:
 5   Q.   In your deposition, after Mr. Most questioned you, I had a
 6   chance to question you as well; correct?
 7   A.   Yes.
 8   Q.   One of the questions I asked you is, "Could it have been
 9   possible that the woman Jaclyn was referring to that she wanted
10   to choke was not the Banner sister, but instead the attorney
11   Pamela Spees?"  Do you remember that?
12   A.   It could be, yes.
13   Q.   And your response was --
14              THE COURT: You can't testify for her.  You have to
15   ask her a question.  And stop reading the deposition.  She is
16   here live to testify live.  So you ask her questions.  Let her
17   respond.  I can't imagine that you would want to impeach your
18   own witness.
19              MR. SPEARS: No.
20              THE COURT: But you can't read from her deposition.
21   She's got to testify on what she remembers today.
22              MR. SPEARS: Thank you, Judge.  I just want to clarify
23   what she said.
24              THE COURT: I know, but you're getting ahead of
25   yourself.  She has to clarify.  She has to answer the question,
```

OFFICIAL TRANSCRIPT

```
 1  not clarify.  She has to answer the questions that you pose to
 2  her.
 3  BY MR. SPEARS:
 4  Q.   Ms. Gaudet, you do remember me asking a specific question
 5  as to whether it could --
 6           THE COURT: You can't refer to her deposition.  You
 7  have to ask her a question because you're not impeaching her.
 8  BY MR. SPEARS:
 9  Q.   Could it also have been Pamela Spees?
10           THE COURT: Okay.  Who else could it have been?
11           MR. SPEARS: Thank you, Judge.
12           THE COURT: That's a non-leading question.  I know you
13  get caught up in the moment.  Take a deep breath.
14  BY MR. SPEARS:
15  Q.   With regard to the text message where Jaclyn said that she
16  had wanted to choke that woman and referred to that woman as a
17  bitch, who else could it have possibly been based on your
18  recollection?
19  A.   It could have been the attorney like you said.
20  Q.   What's the attorney's name?
21  A.   Pamela.
22           MR. SPEARS: Judge, nothing further.
23           THE COURT: All right, any redirect?
24           MR. MOST: Yeah.
25                      REDIRECT EXAMINATION


                      OFFICIAL TRANSCRIPT
```

1  **BY MR. MOST:**

2  Q.    At least some of the land by the Greenfield project you

3  bought after your son and Jaclyn Hotard started dating;

4  correct?

5  A.    Yeah.  There was one tract that was bought in 2019.

6  Q.    And whether or not your land itself was rezoned or not,

7  you stood to benefit financially from the parish rezoning the

8  Greenfield land; correct?

9  A.    I, along with other people, would have benefited from it.

10  I'm not the only one.

11        **THE COURT:** Is your answer yes, then?  Is the answer

12  yes?

13        **THE WITNESS:** Yes, along with other people.

14        **MR. MOST:** Thank you, Ms. Gaudet.  No further

15  questions.

16        **THE COURT:** Thank you.  Is that it?

17        **MR. SPEARS:** May she be released from her subpoena,

18  Your Honor?  We don't intend to re-call.

19        **THE COURT:** All right.  You get to go home.

20        **THE WITNESS:** Thank you.

21        **MR. SPEARS:** Is it possible to take a bathroom break?

22        **THE COURT:** Oh, sure.  Let's take a ten-minute break.

23        **MR. SPEARS:** Thank you, Judge.

24        **DEPUTY CLERK:** All rise.

25              (The jury exited the courtroom.)

OFFICIAL TRANSCRIPT

1        **THE COURT:** We're in recess.

2                (A short recess was taken.)

3        **DEPUTY CLERK:** All rise.

4        **THE COURT:** Bring in the jury.

5                (The jury was escorted into the courtroom.)

6        **THE COURT:** You can have a seat.  Thank you.

7        Counsel, are you ready to proceed?

8        **MR. MOST:** Yes, your Honor.  We call our next witness,

9   Defendant Jaclyn Hotard.

10                    **JACLYN HOTARD,**

11  after having been duly sworn, did testify as follows:

12                    **DIRECT EXAMINATION**

13  BY MR. MOST:

14  Q.   Good morning, Ms. Hotard.  Could you give us your full

15  name for the record, please?

16  A.   Jaclyn Suzanne Hotard.

17  Q.   Ms. Hotard, you are the Parish President of St. John the

18  Baptist Parish; correct?

19  A.   Yes, sir.

20  Q.   And you are a Defendant in this case?

21  A.   Yes, sir.

22        **MR. MOST:** Your Honor, as this is a witness who is an

23  adverse party, may we use leading questions?

24        **THE COURT:** Yes, you may.

25  BY MR. MOST:


                    OFFICIAL TRANSCRIPT

1  Q.    Ms. Hotard, you joined the parish government as a parish
2  council member in 2004; correct?
3  A.    Yes, sir.
4  Q.    And you were a council member for about 15 years until you
5  were elected parish president in 2019?
6  A.    16.
7  Q.    16 years?
8  A.    Yes, sir.
9  Q.    So you've been part of the parish government either as a
10 council member or parish president for more than 20 years;
11 correct?
12 A.    Yes, sir.
13 Q.    And you know Ms. Darla Gaudet; correct?
14 A.    Yes.
15 Q.    You married her son in 2019; correct?
16 A.    Correct.
17 Q.    She is now your mother-in-law?
18 A.    Correct.
19 Q.    And do you know anything about her businesses or the land
20 her businesses owned?
21 A.    What I've learned about my mother-in-law's businesses and
22 the land that she owns, I've learned through these proceedings.
23 You know, as I've stated before in my testimony, I'm not in
24 those conversations about the business.
25        Rusty and I got married a little over five years ago.  And

OFFICIAL TRANSCRIPT

1  the business that belongs to my mother-in-law was established

2  by her father maybe in the '60s, and so I'm not involved in any

3  operations of their business.  In fact, I think I shared with

4  you, I joked with my husband that I didn't even know they had

5  all those businesses on the other side of the levee.  So I'm

6  not involved in their business.

7      And what I've learned, most of what I've learned about

8  their business and property, I learned through these

9  proceedings once all of this started.

10 Q.  Okay.  So before this case, you didn't know anything about

11 Ms. Gaudet's business or the land she purchased or didn't

12 purchase.  Is that your testimony?

13 A.  Yes.  What I was familiar with, I stated before, the

14 company that my husband works for is called St. John Fleeting.

15 What I've learned through this process is they have other

16 companies that do various things.  However, my husband works

17 for St. John Fleeting.

18 Q.  Your husband works for one of Ms. Gaudet's businesses?

19 A.  For his mother, yes.  It's a family business.

20 Q.  Pulling up what has been designated already as P1 at

21 page 10, Ms. Hotard, it's your testimony that before this case

22 you had no idea that these yellow, skinny lines here were

23 pieces of property owned by your mother-in-law's business?

24 A.  Not specifically this case.  But when it was first -- when

25 the allegations were first being made that my mother-in-law

OFFICIAL TRANSCRIPT

1    owned property near the Greenfield tract, I believe the

2    allegations were first made in maybe the planning commission

3    meeting or one of the council meetings, and there was a lot of

4    conversation going on around that.  That's when I first

5    learned.

6         So I can't say specifically when the lawsuit was filed

7    because I don't have recollection on the date that the lawsuit

8    was filed.  But learning about these, you know, tracts of land

9    and it was through the allegations that were being made that I

10   was attempting to rezone property that belonged to my

11   mother-in-law.  However, you know, that wasn't the case.  But

12   those allegations had begun to be made in open meetings.

13        And so that's where I learned about the majority of what's

14   been presented, but not specifically at the filing of this

15   particular lawsuit.

16        And there are two lawsuits that are going on right now

17   that have been filed by The Descendants Project.  So I don't

18   have all of the dates down on all of the lawsuits and the

19   hearings.  However, you know, there's currently two lawsuits

20   that are taking place.  So between this lawsuit, the lawsuit

21   that's still making its way through state court, and some of

22   the allegations that were made by the members of, you know, the

23   Plaintiff, I learned all of what's being said right now.  I

24   learned of the allegations throughout that process.

25        I wouldn't be able to give you the exact dates, but I

OFFICIAL TRANSCRIPT

```
 1   learned all of what's being alleged throughout the various
 2   lawsuits that have been filed and the various allegations that
 3   have been made, whether it be Facebook postings or in open
 4   council meetings that I'm required to attend by law.  I don't
 5   have the discretion to not attend.
 6             THE COURT: Can you just answer the question?  I mean
 7   you're going on and on and on.
 8             THE WITNESS: Yes.
 9             THE COURT: So bring it to a close.
10             THE WITNESS: Yes, ma'am.  Yes, Your Honor.
11   BY MR. MOST:
12   Q.  At least by the month before the November 2023 council
13   meeting --
14             THE COURT: Oh, no.  Whose phone?
15             MR. MOST: Apologies, Your Honor.
16             THE WITNESS: The Plaintiff.
17             MR. MOST: We'll make sure all phones are silenced.
18             THE COURT: All phones should be silenced.
19   BY MR. MOST:
20   Q.  Ms. Hotard, at least by the month before the November 2023
21   council meeting, you knew that Darla Gaudet owned some land by
22   the Greenfield project; correct?
23   A.  Correct.  I believe it was November 28$^{th}$, I believe we
24   said.  Okay, I thought you said the 23$^{rd}$.  Was it the 28$^{th}$?
25   Q.  At least the month before the November 2023 council
```

OFFICIAL TRANSCRIPT

 1  meeting.

 2  A.    Yes, sir.  Okay.

 3  Q.    And your mother-in-law has texted you for updates about

 4  the Greenfield project during parish meetings; correct?

 5  A.    Correct.

 6  Q.    But other than Greenfield, you can't recall any other

 7  issues that your mother-in-law has texted you for updates

 8  during a parish meeting; correct?

 9  A.    No.  My mother-in-law has -- we've communicated about

10  other items coming before parish council meetings in the past.

11  We've definitely communicated about other items that come

12  before parish council meetings.

13        You know, as I stated, we communicate about many, you

14  know, parish things, whether it's water outages, boil water

15  advisories, maybe other property rezonings.  Just other things

16  that are going on in the parish, I mean, just like you would

17  communicate with any family member.  This isn't the only time

18  that she's ever text me about anything going on in the parish.

19  Q.    Okay.  But I'm asking you specifically about your

20  mother-in-law texting you for updates during a parish meeting.

21        And isn't it true that you can't recall any other issues

22  besides Greenfield that your mother-in-law has texted you for

23  updates during a parish council meeting?

24  A.    I'm not sure during a parish council meeting.  But there

25  have been other issues that we've text about or that she text

OFFICIAL TRANSCRIPT

1  me about, just to say, "Hey, what happened with this item, or

2  what happened with that item," whether it was a text message or

3  a phone call.

4        **THE COURT:** Ms. Hotard, Ms. Hotard, if you need him to

5  repeat the question, because you need to answer the question --

6        **THE WITNESS:** Yes, ma'am.

7        **THE COURT:** -- that he asks you.  Not the question

8  that you want to answer.

9        **THE WITNESS:** Okay.  Can you repeat the question?

10        **MR. MOST:** Sure.

11        **THE COURT:** And limit your answer to his question.

12        **THE WITNESS:** Yes, Your Honor.

13  **BY MR. MOST:**

14  Q.   Isn't it true that you can't recall any other issues that

15  your mother-in-law has texted you for updates about during a

16  parish meeting; correct?

17  A.   While the meeting was taking place, is that what you're

18  asking, or about a parish issue that came before the council?

19        **THE COURT:** He said yes.

20        **THE WITNESS:** At the council meeting, I don't recall,

21  but there -- I could think of another rezoning that it's

22  possible.  I just don't know.

23  **BY MR. MOST:**

24  Q.   Okay.  And you can't recall anybody besides your

25  mother-in-law who has ever asked you for specific votes on a

OFFICIAL TRANSCRIPT

1  Greenfield matter; correct?

2  A.    I'm sorry, repeat the question.

3  Q.    Sure.  You can't recall any other person besides your

4  mother-in-law who has asked you about the specific votes on a

5  Greenfield matter; correct?

6  A.    There were, there were many people inquiring about the

7  outcome of the Greenfield matter who attended the meetings.  To

8  say I recall a text message, I can't do that, but were there --

9          **THE COURT:** So his question was, "You can't recall any

10 other person besides your mother-in-law who has asked you about

11 the specific votes on the Greenfield matter; correct?"

12         **THE WITNESS:** I would say --

13         **THE COURT:** He's asking you about the specific votes

14 on the Greenfield matter.

15         **THE WITNESS:** I believe I was asked about specific

16 votes on Greenfield from other people.  I just don't recall

17 exactly who.

18 **BY MR. MOST:**

19 Q.    Okay.  And you heard your mother-in-law testify that your

20 husband is a beneficiary of a trust; correct?

21 A.    Correct.

22 Q.    A trust that co-owns the land running through the middle

23 of the Greenfield project?

24 A.    Or adjacent or through the middle, I don't remember.

25 Q.    When did you learn that your husband was a beneficiary of

OFFICIAL TRANSCRIPT

1  this trust?

2  A.    When I attended my mother-in-law's deposition.    That was

3  maybe a month ago or two months ago.

4  Q.    So you had never discussed it with him before?

5  A.    Never.

6  Q.    And you haven't discussed it with him after either, have

7  you?

8  A.    We've never discussed it.    As I stated in my deposition,

9  I'm not involved in the family business.    And additionally, we

10  were just married five years ago.    It's always my understanding

11  that whatever he owned prior to the marriage is his separate

12  property, and we don't discuss his family's business at all.

13  Q.    Okay.    A few months after your election, you wrote a

14  letter in support of the Greenfield project; correct?

15  A.    Yes, I wrote a letter along with about 35 other officials

16  including our congressmen, governors, state reps, majority of

17  our parish council members, the sheriff.

18        **THE COURT:** So Ms. Hotard, the answer to the question

19  is?

20        **THE WITNESS:** Yes.

21  **BY MR. MOST:**

22  Q.    And when you wrote that letter, did you know your husband

23  had a financial interest in land that ran through the middle of

24  the property at that time?

25  A.    You're saying that he has a financial interest.    That's

OFFICIAL TRANSCRIPT

1  not my testimony.  But again, he and I never discussed anything

2  about any of this when that letter was written.  My job as the

3  parish president is to --

4          **THE COURT:** So answer the question.

5          **THE WITNESS:** No.

6          **THE COURT:** This is not -- in your position, I know

7  you're a witness, and it's very hard for people to sit in that

8  witness chair.  So you can only answer his questions.

9          **THE WITNESS:** Okay.

10          **THE COURT:** And then if you feel like you need to

11  elaborate, then you can say.  But answer his question first.

12          **THE WITNESS:** Yes, ma'am.

13          **THE COURT:** And then I'll see because we're trying to

14  move this forward.

15          **THE WITNESS:** Move it along, yes.

16  **BY MR. MOST:**

17  Q.   You signed a rezoning application for the Greenfield

18  property; correct?

19  A.   I signed a rezoning application at the direction of the

20  parish council through a duly adopted motion.  I was required

21  to carry out the action of the duly adopted motion by the

22  council, yes.

23  Q.   And when you signed that rezoning application, did you

24  know that your husband was a beneficiary of a trust?

25  A.   No.

OFFICIAL TRANSCRIPT

Q.    Okay.  And you understand that as parish president, you
have to avoid participating in transactions that your close
family members have a financial interest in; correct?

        **MR. SPEARS:** I object to relitigating the ethics
issue.

        **THE COURT:** He's just -- we're still -- I'm going to
overrule it.  Do you want to have the explanation, or you want
me to say why?

        **MR. MOST:** I can just ask -- I've got a few more
questions here, and then I'll move on.

        **THE COURT:** All right, because he has the burden of
proving motivation.  That's why I'm allowing him to ask these
questions.

**BY MR. MOST:**

Q.    Ms. Hotard, you understand that as parish president, you
have to avoid participating in transactions that your close
family members have a financial interest in; correct?

A.    Yes.  I've been the parish president for 21 years, and
I've never violated the code of ethics.  So I have a very good
understanding of that.

Q.    But despite that obligation, you haven't taken any steps
to find out what your husband has a financial interest in, have
you?

A.    What I've taken steps to do is to not violate the code of
ethics.  I've never violated the code of ethics.  And in fact,

OFFICIAL TRANSCRIPT

1  in September, the code of ethics dismissed the complaint that
2  you're talking about right now.
3          **THE COURT:** So I'm going to ask you to answer his
4  question.  He says, "Despite the obligation you have to avoid
5  conflicts of interest, you haven't taken any steps to find out
6  what your husband has a financial interest in, have you?"
7          That's his question.  Have you taken any steps to
8  find out what your husband has a financial interest in?
9          **THE WITNESS:** At this time, the Greenfield property,
10  the Greenfield project --
11          **THE COURT:** That's not his question.  His question is
12  what, if any, steps have you taken to find out --
13          **THE WITNESS:** Steps aren't required to find out as it
14  relates to this project because the project is not happening.
15          **THE COURT:** Answer his question.
16          **THE WITNESS:** No, sir.
17          **THE COURT:** And then your lawyer can come back and ask
18  you questions to have you clarify.
19          **THE WITNESS:** Okay.
20          **THE COURT:** But you have to answer his question.
21          Ask it again, Counsel, or you want the court reporter
22  to read it?
23  **BY MR. MOST:**
24  Q.   Have you taken any steps to find out what your husband
25  owns?

OFFICIAL TRANSCRIPT

1    A.    No.

2    Q.    Now the text messages that we went over with your

3    mother-in-law, you were asked to turn over text messages in

4    this case; correct?

5    A.    Correct.

6              **MR. MOST:** May I approach?

7              **THE COURT:** Yes.

8    **BY MR. MOST:**

9    Q.    The document that you're looking at are some of your

10   answers to questions in this case; correct?

11   A.    Correct.

12   Q.    One moment.  You see that these are the text messages that

13   you're looking at, Defendant's Response to Plaintiff's Third

14   Set of Discovery?

15   A.    I'm sorry, you stated that I'm looking at the text

16   messages?

17   Q.    No, I'm sorry.  The document that you're looking at, does

18   it match what's on the screen, Defendant's Response to

19   Plaintiff's Third Set of Discovery Requests to Jaclyn Hotard?

20   A.    Yes, sir.

21   Q.    And this contains your answers to certain questions;

22   correct?

23   A.    Yes, sir.

24              **MR. MOST:** We will offer this as Plaintiff's 15.

25              **MR. SPEARS:** No objection.

OFFICIAL TRANSCRIPT

1        **THE COURT:** All right, it's accepted into evidence.

2   **BY MR. MOST:**

3   Q.    Going down, you see that you were asked for all

4   correspondence, including, emails and text messages with Darla

5   Gaudet regarding Dr. Banner, The Descendants Project,

6   Greenfield Louisiana, LLC, the Greenfield grain elevator

7   project, or the property owned by Gaumet Holdings?

8   A.    Correct.

9   Q.    And your response was no such documents exist; correct?

10  A.    Correct.

11  Q.    And in fact, you signed this personally; correct?

12  A.    Correct.

13  Q.    You certified under penalty of perjury that the foregoing

14  answers were true and correct; right?

15  A.    Correct.

16  Q.    To the best of your knowledge and belief?

17  A.    To the best of my knowledge and belief, correct.

18  Q.    So this was you swearing under oath that no such documents

19  exist; correct?

20  A.    Correct.

21  Q.    But as we've seen, those documents did exist; correct?

22  A.    Correct.

23  Q.    This word "perjury" here, do you know what that means?

24  A.    I'm not an attorney, and I believe we discussed this in

25  great length in the deposition.  I'm not an attorney; so I

1    can't give you a textbook definition of what the word "perjury"
2    means.
3        As I stated previously, I signed stating that it was true
4    and correct to the best of my knowledge and belief.
5    Q.    Okay.  Well, are you aware that there's a crime in
6    Louisiana of falsely swearing under oath?
7            **MR. SPEARS:** Objection, Your Honor.
8            **THE COURT:** Overruled.
9            **THE WITNESS:** I'm not sure if there's a criminal
10   statute.  I can't testify to that.
11   **BY MR. MOST:**
12   Q.    You don't know -- you're saying it's your testimony that
13   you're not aware of any such crime?  Is that your testimony?
14           **MR. SPEARS:** Asked and answered, objection.
15           **THE COURT:** Overruled.
16           **THE WITNESS:** I'm stating that I'm not aware.  I've
17   not seen the criminal statute for perjury.  If you tell me that
18   one exists, I'll accept what you're saying.  But I've not seen
19   a criminal statute regarding perjury.
20           I understand that signing to the best of your
21   knowledge and belief is a requirement and that it's true to the
22   best of your knowledge and belief.  If you tell me that there's
23   a criminal statute regarding perjury, as I stated, I'll accept
24   that to be the case.  However, I'm not an attorney.
25   **BY MR. MOST:**

OFFICIAL TRANSCRIPT

1  Q.   Okay.  Well, stepping back from statutes or laws, are you

2  aware of any consequences for someone who falsely swears under

3  oath?

4  A.   I'm not sure what the consequences are for that.  I'm not

5  sure what the consequences are.

6          **THE COURT:** Answer his question.  Are you aware that

7  there are consequences?

8          **THE WITNESS:** I mean in a general sense, I guess, I'm

9  aware that there would be a consequence, but I'm not aware of

10 what consequences are for -- I'm sorry, I can't answer that.

11 **BY MR. MOST:**

12 Q.   Okay.  You know who Joy Banner is; correct?

13 A.   Yes.

14 Q.   She's a person who has objected to some of your actions as

15 parish president; correct?

16 A.   I'm sorry, a person who what?

17 Q.   Who has objected to some of your actions as parish

18 president; correct?

19 A.   Correct.

20 Q.   And in 2023, she filed an ethics complaint against you?

21 A.   I believe so.

22 Q.   And then in November 2023, you introduced or you sponsored

23 an agenda item for the council to vote on whether to hire and

24 pay for ethics lawyers; correct?

25 A.   I sponsor all of the agenda items, yes.

OFFICIAL TRANSCRIPT

1   Q.    Including the one about hiring and using taxpayer money
2   for ethics lawyers; correct?
3   A.    Correct, I sponsor all of the agenda items.
4   Q.    One of the things that prompted you to sponsor this agenda
5   item was Joy Banner's ethics complaint against you; correct?
6   A.    The parish council, for at least my 21 years, has utilized
7   Gray Sexton in the past on various matters, whether it was
8   other ethics --
9        **THE COURT:** Ms. Hotard, I'm going to ask you to answer
10  the question, and then you can explain.
11       **THE WITNESS:** The -- I'm sorry.
12  **BY MR. MOST:**
13  Q.    I can repeat the question.  One of the things that
14  prompted you to introduce this agenda item was Joy Banner's
15  ethics complaint against you; correct?  Yes or no?
16  A.    There were other ethics issues taking place at the time.
17       **THE COURT:** That wasn't his question.  Answer his
18  question.  Was one of the reasons?
19       **THE WITNESS:** One of the issues at the time, yes.
20  There were multiple issues.
21  **BY MR. MOST:**
22  Q.    Okay.  And then at the November 28th, 2023 meeting, Joy
23  Banner went to the podium to give public comment; correct?
24  A.    Correct.
25  Q.    And she started to talk about things, including,

OFFICIAL TRANSCRIPT

1  Greenfield, Darla Gaudet; correct?

2  A.    She first started to talk about an item that was on

3  executive session.

4  Q.    Okay.  And then she started to talk about Agenda Item J.

5  She said Agenda Item J; right?

6  A.    Yes.

7  Q.    Then she started to talk about her ethics complaint;

8  correct?

9  A.    She started to get into the details of the confidential

10  ethics complaint.

11  Q.    Then you said, "Chairman, Mr. Chairman, I'm going to ask

12  you to stop this comment"; correct?

13  A.    The first thing that I asked the chairman to do was I

14  attempted to call a point of order.  The way that our structure

15  is set up is our governing authority is nine members of a

16  council and a parish president.  Therefore, I'm a member of the

17  council.

18      And so I asked for a point of order because Ms. Banner

19  attempted to discuss an executive session item which is limited

20  to the District Attorney's Office who is the legal advisor to

21  the parish.

22      And then I believe I asked for maybe another point of

23  order once Ms. Banner wanted to discuss the contents of the

24  confidential complaint in the open meeting because it was my

25  understanding that the contents of that complaint was

OFFICIAL TRANSCRIPT

1    confidential.

2         The item on the agenda was an item actually drafted by the
3    District Attorney's Office, the language, and it was specific
4    to the hiring of ethics attorney to address any ethics matters
5    and compliance with state law.  The item on the agenda wasn't
6    about maps and ethics complaints and investigations.  And so
7    therefore, it was my belief and understanding that that was an
8    off-topic discussion.

9         I believe that Ms. Banner was attempting to really
10   litigate an ethics complaint at the council meeting through
11   Item J.  That was her intent was to discuss the actual
12   investigation and that I was under investigation.  That's why
13   the investigation was sent to all of the newspapers.  That was
14   the intent.  And it was off topic.  If the --

15            **THE COURT:** Is that the end of your question?  Because
16   you can't give a lecture.  You answered the question.

17            **THE WITNESS:** Okay.

18   **BY MR. MOST:**

19   Q.   My question was, you said, "Chairman, Mr. Chairman, I'm
20   going to ask you to stop this comment"?

21   A.   Stop the off-topic comment.

22   Q.   What you said was, "Chairman, Mr. Chairman, I'm going to
23   ask you to stop this comment"; correct?

24   A.   Because I said that's not on the agenda, yes.

25   Q.   Is that a yes, that's what you said?

OFFICIAL TRANSCRIPT

1    A.    Yes.

2    Q.    Okay.  And you asked the chairman to stop Joy Banner's

3    comment in your role as parish president; correct?

4    A.    In my role as a member of the governing authority which

5    includes nine parish council members and the parish president.

6    Our structure is a little unique.

7              **THE COURT:**  Again, you answered the question.  That's

8    the end.  We don't need to know again the structure of the

9    parish government.  We just need to move on.

10             **THE WITNESS:**  Yeah.  In my role as a member of the

11   governing authority.

12   **BY MR. MOST:**

13   Q.    And you were able to say, "Stop this comment," because of

14   your role in the governing authority; correct?

15   A.    Yes.

16   Q.    And you asked the chairman to stop Dr. Banner's comment

17   because of the content of what Dr. Banner was saying; correct?

18   A.    Because she was off topic, yes.

19   Q.    So yes, because of the content?

20   A.    Because she was off topic.

21   Q.    Yes?

22   A.    Yes.

23   Q.    Okay.  And then you said, "Ms. Banner, first of all,

24   you're in violation of state law right now"; correct?

25   A.    Correct.

OFFICIAL TRANSCRIPT

1  Q.   And when you said -- you were suggesting that there could
2  be some kind of official consequences if Dr. Banner kept
3  talking; correct?
4  A.   I don't recall saying that in the meeting.  I definitely
5  recall saying that she was in violation of state law.  To which
6  she replied, "Then go file an ethics complaint."
7  Q.   Right, I'm not suggesting you said something about the
8  consequences.  But what you said was, "Ms. Banner, you're in
9  violation of state law right now"; correct?
10 A.   Yes, correct.
11 Q.   And what you were communicating was that there could be
12 some kind of official consequences if Dr. Banner kept talking;
13 correct?
14 A.   I was communicating that she was in violation of state
15 law.
16 Q.   Okay.  Ms. Hotard, you've participated in parish council
17 meetings for at least 20 years?
18 A.   Yes, sir.
19 Q.   You've been to hundreds of parish council meetings?
20 A.   Yes.
21 Q.   Can you recall any time in those 20 years, other than with
22 Joy Banner, that you asked the chairman to stop a public
23 comment?
24 A.   Yes.
25 Q.   Do you recall giving a deposition in this case?

OFFICIAL TRANSCRIPT

1   A.   I've asked for point of order in other council meetings if
2   comments were off topic.  Yes, I've asked for a point of order.
3   Other council members ask for a point of order as well if
4   public comment goes off topic.
5        In fact, in this particular council meeting, the District
6   Attorney's Office even commented that individuals have to stay
7   on topic.
8   Q.   Sure, but I'm not asking you about point of order.  I'm
9   asking in 20 years, other than with Joy Banner, have you ever
10  said, "Stop this comment"?
11  A.   Maybe -- I don't know if I've said it in those words, but
12  I've definitely asked for the attention of the chairman to say
13  that the comments were off topic to an agenda item in a council
14  meeting.
15  Q.   Okay.  But at least using the words, "Stop this comment,"
16  the only time in 20 years, Joy Banner?
17            **MR. SPEARS:** Objection, asked and answered.
18            **THE COURT:** Overruled.  He's trying to clarify.
19            **THE WITNESS:** I can't recall if I've ever said those
20  exact words, "Stop this comment."  However, like I said, it's
21  happened at many meetings where I've asked, hey, this, you
22  know, comment is not germane to the agenda item or not on topic
23  to the agenda item.  Not only myself, other council members and
24  the District Attorney's Office have all done that at council
25  meetings when conversation gets off of the actual item on the

OFFICIAL TRANSCRIPT

1  agenda.
2  **BY MR. MOST:**
3  Q.    So yes or no, can you recall any other time in 20 years
4  that you used the words "stop this comment" besides when
5  someone was talking about an ethics complaint against you?
6  A.    Those three words in a sequence, I don't recall.  But I
7  have asked for comment to be brought back to the topic on the
8  agenda a number of times at numerous council meetings.
9              **MR. MOST:** Thank you.  We tender the witness.
10             **MR. SPEARS:** We reserve our right to call President
11 Hotard later, Judge.
12             **THE COURT:** All right, thank you.
13             **THE WITNESS:** Do I take this with me?
14             **THE COURT:** Oh, get that from her.  You know, just you
15 can go sit down, and give it to your lawyer.  He'll give it
16 back to them.
17             **MR. MOST:** We'll offer, file, and introduce P15.
18             We call our next witness Tonia Schnyder.
19                     **TONIA SCHNYDER,**
20 after having been duly sworn, did testify as follows:
21                 **DIRECT EXAMINATION**
22 **BY MR. MOST:**
23 Q.    Good morning, Ms. Schnyder.
24 A.    Good morning.
25 Q.    Would you give us your full name for the record, please?

OFFICIAL TRANSCRIPT

1    A.    Tonia Marie Schnyder.

2    Q.    Ms. Schnyder, have you ever held elected public office?

3    A.    Yes, I have.

4    Q.    What office was that?

5    A.    I was councilwoman in St. John the Baptist Parish.

6    Q.    And were you a parish council member in 2023?

7    A.    Yes, I was.

8    Q.    What about November 28th, 2023?

9    A.    Yes, I was.

10   Q.    Were you present at the November 28th, 2023 parish

11   council meeting?

12   A.    Yes, I was.

13   Q.    Were you in one of the chairs alongside Michael Wright and

14   the other council members?

15   A.    Yes, I was.

16   Q.    Do you know who Joy Banner is?

17   A.    Yes, I do.

18   Q.    Just broadly, how do you know her?

19   A.    I initially met Ms. Banner when I first joined the

20   council.  She sent the invitation out to the entire council to

21   come out and tour the Whitney Plantation.  And I later knew of

22   her with the grain elevator issues.

23   Q.    And do you recall her speaking at the November 28th,

24   2023 parish council meeting?

25   A.    Yes, I do.

OFFICIAL TRANSCRIPT

```
 1   Q.   Do you recall roughly what she spoke about?
 2   A.   Yes.  She was concerned about the parish president
 3   requesting authorization to hire an ethics attorney for an
 4   ethics violation that was currently ongoing.
 5   Q.   Was that a topic on the agenda that night?
 6   A.   Yes, it was.
 7   Q.   And do you know who Ms. Hotard is?
 8   A.   Yes, I do.
 9   Q.   And she was the parish president at that meeting?
10   A.   Yes, she was.
11   Q.   Did Ms. Hotard disclose to you or the other members of the
12   parish council that when she sponsored that agenda item, that
13   she herself was facing an ethics complaint?
14   A.   No, she did not.
15   Q.   As a council member, did you understand Ms. Banner to be
16   speaking on the topic of the agenda item?
17   A.   Excuse me, say that again.
18   Q.   Sure.  As a council member, did you understand Dr. Joy
19   Banner to be speaking on the topic of the agenda item?
20   A.   Yes, I did.
21   Q.   Do you recall if Ms. Banner was able to finish what she
22   had to say?
23   A.   No, she was interrupted every time she tried to say
24   something.
25   Q.   By whom?
```

OFFICIAL TRANSCRIPT

1   A.    The council chairman and the parish president.

2   Q.    So that would be Jaclyn Hotard and Michael Wright?

3   A.    Correct.

4   Q.    Did you hear Mr. Wright read anything to Ms. Banner?

5   A.    Yes, he did.  He read a revised statute.

6   Q.    And did anything stand out to you about what he read?

7   A.    He was stating that if she continued, she could possibly

8   be arrested or fined.

9   Q.    As a council member, did you understand that to be a

10  threat to Ms. Banner?

11  A.    Yes, I did.

12  Q.    And had you served as a council member alongside

13  Mr. Wright in other meetings?

14  A.    Yes.

15  Q.    And before that night, had you ever heard Mr. Wright issue

16  a threat during public comment before?

17  A.    No, I haven't.

18  Q.    What about afterwards?

19  A.    No, I haven't.

20  Q.    Have you ever heard other -- have you ever heard people

21  speak off topic at parish council meetings?

22  A.    Yes, they have.

23  Q.    Does that happen frequently?

24  A.    Yes, it does.

25  Q.    In any of those times, besides Dr. Joy Banner, did

OFFICIAL TRANSCRIPT

1    Mr. Wright stop them and threaten them with imprisonment?

2    A.    No, he haven't.

3            **MR. MOST:** Thank you.  I tender the witness.

4                        **CROSS-EXAMINATION**

5    **BY MR. SPEARS:**

6    Q.    Ms. Schnyder, good morning.

7    A.    Good morning.

8    Q.    Just to be clear, you served as a councilperson or council

9    member for which district again?

10   A.    District 6.

11   Q.    Which years were those?

12   A.    2024 -- 2020 to 2024.

13   Q.    2020 to 2024?

14   A.    That's correct.

15   Q.    And during that time, Jaclyn Hotard was the president?

16   A.    Yes.

17   Q.    Of the parish?

18   A.    Yes, she was.

19   Q.    And during that time, Michael Wright was a council member?

20   A.    Yes, he was.

21   Q.    He was an at-large council member?

22   A.    Yes, he was.

23   Q.    And you were a district council member?

24   A.    Yes.

25   Q.    Okay.  And you sought re-election to that post as a

                        OFFICIAL TRANSCRIPT

```
 1  district council member, and your re-election was opposed by
 2  Jaclyn and Michael both; correct?
 3  A.    Yes.
 4  Q.    They supported your opponent; correct?
 5  A.    That is correct.
 6  Q.    Okay.  And you lost that re-election; correct?
 7  A.    Yes, I did.
 8  Q.    And they won their re-election; correct?
 9  A.    That is correct.
10  Q.    And on your last day leaving out the building, you flipped
11  the bird at the screen; correct?
12  A.    I don't recall that.
13  Q.    You don't recall that?
14  A.    No.  If I did, I don't recall that.
15  Q.    Okay.  Have you ever -- it's my understanding that your
16  colleagues decide who is the chair; correct?
17  A.    Yes.
18  Q.    Have you ever been elected by your colleagues to chair the
19  parish council?
20  A.    I was vice chair of the finance committee.
21  Q.    Have you ever been elected by your colleagues as chair of
22  the parish council?
23  A.    No, I was never nominated, nor did I care to be a chair to
24  be honest.
25  Q.    Have you ever facilitated a parish council meeting?
```

OFFICIAL TRANSCRIPT

1    A.    Only one.

2    Q.    Which one was that?

3    A.    I don't recall the exact date, when the chair was not

4    available.

5    Q.    Do you have as a former council member, do you have an

6    understanding of the Louisiana Open Meetings Law?

7    A.    Yes, I do.

8    Q.    Is it your understanding that in all of the meetings that

9    you participated in, you all were required as a parish council

10   to follow the Louisiana Open Meetings Law?

11            **MR. MOST:** Objection, calls for a legal conclusion.

12            **THE COURT:** Repeat the question because it wasn't

13   dictated.

14   **BY MR. SPEARS:**

15   Q.    In the meetings that you participated in as a member of

16   the parish council, is it your understanding that you all, as a

17   public body, were required to follow the Louisiana Open

18   Meetings Law?

19            **THE COURT:** I'm going to allow that.

20            **THE WITNESS:** Yes.

21   **BY MR. SPEARS:**

22   Q.    Did you all always follow the Louisiana Open Meetings Law?

23   A.    I'm thinking for the -- well, for the most part, I guess

24   we did.

25   Q.    Okay.  Well, did you publish the notice of the meetings in

OFFICIAL TRANSCRIPT

1  advance, more than 24 hours before the actual meeting?

2  A.   Yes.

3  Q.   Was that always done?

4  A.   I can't tell you it 100 percent was done.  I didn't check

5  it to verify it.  But it's supposed to have been done.

6  Q.   Okay.  And you have no knowledge that it was not ever

7  done; correct?

8  A.   No.

9  Q.   And I'm only talking during your time as a council member.

10  A.   Uh-huh.

11  Q.   You're also supposed to issue a printed agenda in advance

12  of the meeting.  Was that always done?

13  A.   To the council members?

14  Q.   Well, to the public?

15  A.   A printed copy in the newspaper?

16  Q.   No, no, I didn't say newspaper.  Release a copy of the

17  agenda so that the public will know what's going to be

18  discussed at the meeting in advance of the meeting?

19  A.   It was printed in the newspaper.

20  Q.   Okay.  In advance of the meeting?

21  A.   Yes.

22  Q.   Okay.  The meetings under Louisiana Open Meetings Law must

23  be recorded in some form or fashion.  Were your meetings

24  recorded?

25  A.   Yes.

OFFICIAL TRANSCRIPT

1   Q.   The meetings under Louisiana Open Meetings Law must take
2   minutes.   Did someone take the minutes of the meeting?
3   A.   Yes.
4   Q.   The meetings, to be open, must be in a space that is open
5   and the public has access to it.   Was that always the case?
6   A.   Yes.
7   Q.   The meetings, to be compliant with the Louisiana Open
8   Meetings Law, must have some time period in which the public
9   can discuss items that the council is going to vote on.   Was
10  that always done?
11          **MR. MOST:** Objection.   This is just testimony about
12  what the law is from Counsel.
13          **THE COURT:** Well, no, she's a council member; so she
14  can answer questions about what she knew as a council member
15  and the rules that they abided by.   So overruled.
16          **THE WITNESS:** Can you repeat the question, sir?
17  **BY MR. SPEARS:**
18  Q.   The meetings, under the Louisiana Open Meetings Law,
19  should have a time period, a time slot set aside for the
20  general public to speak on agenda items before the council
21  takes a vote; correct?
22  A.   You mean public comments?
23  Q.   Yes.
24  A.   I believe so.
25  Q.   Okay.   Was that always done?

OFFICIAL TRANSCRIPT

1  A.    Yes.

2  Q.    Now with regard to the specific item on the agenda

3  involving hiring an ethics attorney, I think the attorney was

4  R. Gray Sexton.

5        First of all, did you know attorney Gray Sexton or his

6  firm?

7  A.    No, I did not.

8  Q.    Did you have any knowledge as to whether R. Gray Sexton or

9  his firm had previously, before the November 28th meeting,

10  been hired by the parish, the Parish of St. John?

11  A.    R. Gray Sexton, information about them I had previously?

12  I was told, I heard, as in Ms. Hotard's words, street talk that

13  he was a former Board of Ethics attorney or board member or

14  something to that effect.

15        **THE COURT:** His question is:  Did you know whether or

16  not he had represented the parish before?

17        **MR. SPEARS:** Right.  Before the -- we know that

18  ultimately there was a vote.

19        **THE COURT:** If you don't, you don't.  Speak from your

20  knowledge.  Not what you heard on the street.  Your knowledge.

21        **THE WITNESS:** Oh, okay.  That's the knowledge that I

22  have, that's where I got it from is what I'm saying.

23        **THE COURT:** I get you.

24  **BY MR. SPEARS:**

25  Q.    I don't want to talk about the street committee.  Just

OFFICIAL TRANSCRIPT

```
 1  thinking back through your four years as a parish council
 2  member --
 3  A.   Uh-huh.
 4  Q.   -- do you recall -- let me ask a two-part question.
 5       First, do you recall that there were ever agenda items to
 6  hire outside legal counsel by the parish?
 7  A.   For an additional attorney?
 8  Q.   Yes.
 9  A.   Only once that I recall that came before the council to
10  hire.
11  Q.   And do you recall if there was ever, before the
12  November 28$^{th}$ meeting, an item to hire R. Gray Sexton or his
13  law firm?
14  A.   No.
15  Q.   You mentioned that people sometimes got off topic.  As a
16  member of the parish council, the governing body, was it your
17  understanding that speakers were supposed to stay on topic of
18  whatever the particular agenda item was?
19  A.   Per the chairman.
20  Q.   Was it also per the legal advisor Mr. Green who attended
21  the meetings?
22  A.   I believe so.
23  Q.   Okay.  So it would be your recollection that sometimes
24  when members of the public during the public comment period
25  strayed away from the agenda item, either the chairman or the
```

OFFICIAL TRANSCRIPT

```
 1  legal counsel would direct them to get back on topic; correct?
 2  A.   Usually, the chair.  Not the legal counsel.
 3  Q.   And you were familiar with the requirement that speakers
 4  needed to stay on topic; correct?
 5  A.   It was stated at the meetings at the beginning of each
 6  meeting.
 7  Q.   And you supported the notion that in order to have an
 8  orderly meeting, you needed speakers to stay on topic; correct?
 9  A.   Correct.
10  Q.   No one ever arrested Joy Banner at that meeting; correct?
11  A.   I'm not aware of any consequences at that meeting.
12  Q.   You were at the meeting?
13  A.   Yes.  As far as I don't know what happened outside of the
14  council chambers.
15  Q.   Did you personally see her get arrested?
16  A.   No, I did not.
17  Q.   Are you aware that she's been kicked out of other planning
18  committee meetings?
19  A.   No, I'm not.
20  Q.   I think you testified that you were unaware when the
21  Agenda Item J came before the council, you were unaware of the
22  fact that Joy Banner had filed an ethics complaint against
23  Jaclyn Hotard?  Was that your testimony?
24  A.   No, I didn't get asked that question.
25  Q.   Okay.  Were you aware that she had filed a complaint
```

1  against Jaclyn Hotard at the time of the meeting?

2  A.    Not officially.

3  Q.    How were you unofficially aware?

4  A.    Street talk.

5  Q.    Okay.  Not dealing with the street committee, were you

6  aware that she had posted on her personal Facebook page a copy

7  of the letter generated by the Ethics Board advising parish

8  President Hotard that a complaint had been filed?

9  A.    Who posted?

10 Q.    That Ms. Joy Banner had posted it.

11 A.    No, I wasn't aware of that, I don't believe.

12 Q.    Do you follow her on Facebook?

13 A.    Not necessarily.  I'm not on Facebook every day like that.

14 Q.    Okay, I know you're not on it every day.  I'm not on it

15 every day either, but I do get on it from time to time.

16     When you get on it from time to time, do you follow her

17 postings?

18 A.    Not really.  If it doesn't come to my news feed, I don't

19 go looking for it.  I don't follow anyone in particular to be

20 honest.

21         **MR. SPEARS:** Judge, one quick moment.

22 **BY MR. SPEARS:**

23 Q.    So is it your testimony that you've never shared postings,

24 when I say "postings," Facebook postings or social media

25 postings of Joy Banner, her twin sister Jo Banner, or their

OFFICIAL TRANSCRIPT

1  nonprofit The Descendants Project?  Is that your testimony?

2  A.   I probably have shared something from them.  I don't

3  personally follow them, like follow them every day.

4  Q.   And has some of the things that you've shared been

5  negative postings about Jaclyn Hotard?

6  A.   I don't consider it negative.

7  Q.   Have some of the things you've shared been postings about

8  Jaclyn Hotard?

9  A.   Possibly.

10 Q.   Do you have specific recollection of seeing postings by

11 either Jo or Joy Banner or Descendants Project postings

12 regarding Parish President Hotard that you shared on social

13 media?

14 A.   Things that I may share on social media, when they make

15 comment, like Lives, or give an update on something that's

16 happened, that's what I've shared.  Not necessarily negative,

17 it's giving updates of a hearing or something or planning

18 zoning meeting or something that happened.  I never look at it

19 as something as negative.  They just give an update, factual

20 information.

21 Q.   Are you aware of the fact that Joy Banner, her sister, and

22 the nonprofit shared information regarding the November 28,

23 2023 meeting on social media?

24 A.   I honestly don't really remember to be honest with you.

25 Q.   Are you aware of the fact that Joy Banner and Jo Banner

OFFICIAL TRANSCRIPT

1  consider themselves to be social media influencers?

2  A.    Not really.

3  Q.    Okay.  Are you aware of the fact that Joy and Jo Banner

4  have repeatedly posted on social media regarding this

5  particular litigation?

6  A.    No, I'm not aware of that.

7  Q.    Have you seen anything posted by Joy or Jo regarding this

8  particular litigation?

9  A.    I'm not sure if I saw -- I saw an article, but I'm not

10  sure if it came from Jo or Joy.  It was a news article.

11  Q.    Okay.  About this litigation?

12  A.    No, not this litigation, I don't think.  I think it was

13  another, something else.

14  Q.    In your experience as a council -- former council member,

15  excuse me, and as a leader in the parish, do you recognize that

16  Joy and Jo Banner have frequently sued the parish?

17  A.    I'm aware of a few that they've sued.  I don't know all of

18  them.  I don't follow them like that.

19  Q.    But you would agree with me that they have filed multiple

20  lawsuits or they've been involved in multiple litigation

21  against the parish?  Would you agree?

22              **MR. MOST:** Objection.

23              **THE WITNESS:** No.

24              **THE COURT:** Wait, wait.  Hold on a second.  What?

25              **MR. MOST:** Relevance.  Other lawsuits are not relevant

OFFICIAL TRANSCRIPT

```
 1   to this case.
 2           THE COURT:  I'll allow it, but I do see where he'd be
 3   going.
 4   BY MR. SPEARS:
 5   Q.   So you would agree with me that during your time as a
 6   leader on the council, a leader in the community, you are
 7   personally aware of Jo Banner and Joy Banner filing multiple
 8   lawsuits or being involved in multiple --
 9           THE COURT:  Hold on a second.  Hold on a second.  You
10   asked her, "You would agree with me" -- the first time, "You
11   would agree with me that they have filed multiple lawsuits or
12   they've been involved in multiple litigations against the
13   parish?"  The witness said, "No."
14           And then you asked the question again after the
15   objection.  So it has been asked and answered.
16           MR. SPEARS:  Okay, I apologize, Judge.  I didn't hear
17   the "No."  Can I just clarify that she did say "No"?  Because I
18   didn't hear it, Judge.
19           THE COURT:  It's in the record, but yes, you can.
20   BY MR. SPEARS:
21   Q.   So your answer is no, you're not involved in any
22   litigation --
23           THE COURT:  Wait, ask the same question.  You can ask
24   her a different question, but don't say it's the same question.
25           MR. SPEARS:  Judge, you know me.  You know I'm slow.
```

OFFICIAL TRANSCRIPT

1          **THE COURT:** No, I don't know you to be slow.  I know
2    you to be quite bright and on top of it.  So go ahead.
3    **BY MR. SPEARS:**
4    Q.  I don't want to put words in your mouth.  And the judge is
5    reigning me in; so I don't have much time left.
6          But are you aware, personally aware of lawsuits or
7    litigation against the parish being brought by Jo and/or Joy
8    Banner?
9    A.  No.  Because there were lawsuits -- many a time, most of
10   the time, we were, as the council, we were not notified of the
11   lawsuits.  Even though they were against the council, we were
12   not made aware of that.
13   Q.  Okay, one more question, Your Honor.
14         There is a video of this particular council meeting, and
15   one of the executive items on the agenda -- first of all,
16   executive sessions are where you all discuss litigation;
17   correct?
18   A.  Uh-huh.
19   Q.  One of the very first items that Joy Banner wanted to
20   speak on and not allowed to speak on was an executive session
21   matter, *The Descendants Project versus St. John the Baptist
22   Parish.*  Are you familiar with that litigation?
23   A.  Yes.  But I don't quite remember what it was, but I knew
24   we had one that day.
25   Q.  Okay.  And when I say "The Descendants Project," you

OFFICIAL TRANSCRIPT

1   understand that to be an organization formed and created by Jo
2   and Joy Banner; correct?
3   A.    Correct.
4   Q.    Okay.  So at least one time, you're aware of litigation
5   that you addressed in executive session?
6   A.    Yes.  You said multiple, but yes.
7              **MR. SPEARS:** Okay, one.  Okay, Judge, nothing further.
8              **THE COURT:** All right.  Redirect?
9                        **REDIRECT EXAMINATION**
10  **BY MR. MOST:**
11  Q.    Ms. Schnyder, did I hear this correctly from your
12  discussion with Mr. Spears that Jaclyn Hotard kept her ethics
13  complaint a secret from the parish council?
14  A.    I was not aware of it.
15  Q.    She didn't disclose it to you or the other council
16  members?
17  A.    No, she did not.
18  Q.    Then she sponsored an item for taxpayer money to be spent
19  on ethics lawyers?
20  A.    Correct.
21  Q.    And it was your understanding as a parish council member
22  that Dr. Banner was speaking on the topic of the agenda item
23  that night; correct?
24  A.    Correct.
25  Q.    And was she able to freely make public comment that night?

                        OFFICIAL TRANSCRIPT

1  A.    No, she was not.

2              **MR. MOST:** Thank you.

3              **THE COURT:** Is she free from subpoena?

4              **MR. SPEARS:** At this time, I don't intend to call her

5  again, Judge.

6              **THE COURT:** But does that mean we can release her from

7  subpoena, or you want to keep her?

8              **MR. SPEARS:** I'd like to keep her under subpoena,

9  Judge, just in case.

10             **THE COURT:** Okay, all right.  You're not to discuss

11  your testimony with anyone.

12             **THE WITNESS:** Thank you.

13             **THE COURT:** I just want to clarify.  In responding to

14  Mr. Spears' self-deprecating remark, I did comment that I find

15  him to be a very sharp lawyer.  That is not in any way to

16  undermine the quality of the legal experience and talent of

17  opposing counsel as well.

18             **MR. MOST:** Thank you.

19             **THE COURT:** I just wasn't going to let him get away

20  with him saying that I thought he was slow because I do not.  I

21  do not.

22             **MR. MOST:** We have a very short witness, or we can

23  break for lunch, Your Honor, at your pleasure.

24             **THE COURT:** You want to break for lunch or get the

25  short witness?

OFFICIAL TRANSCRIPT

```
 1              What does "short" mean?
 2              MR. MOST: It's only a few questions.
 3              THE COURT: Y'all want to do the witness?
 4              MR. MOST: We're going to call to the stand Mallory
 5    Guillot.
 6              MR. SPEARS: Judge, we'd ask Ms. Schnyder not to
 7    remain in the courtroom, the witness who just left the stand.
 8              THE COURT: Okay.  Is she in the courtroom?
 9              MR. MOST: Oh, yes.
10              THE COURT: Yes, she has to leave.  The witnesses are
11    sequestered.
12              MR. MOST: Can I direct her to wait in the hallway?
13              THE COURT: Yes, so she can wait in the hallway or go
14    home.
15                        MALLORY GUILLOT,
16    after having been duly sworn, did testify as follows:
17                        DIRECT EXAMINATION
18    BY MR. MOST:
19    Q.   Good morning.  Would you give us your full name for the
20    record, please?
21    A.   Yes, Mallory Ann Guillot.
22    Q.   Ms. Guillot, what do you do for work?
23    A.   I am a staff attorney for the Louisiana Board of Ethics.
24    Q.   And just broadly, what is the Board of Ethics?
25    A.   It is a government agency or board that administers and
```

OFFICIAL TRANSCRIPT

1    enforces the Code of Governmental Ethics and other rules and
2    regulations under their jurisdiction.
3    Q.    Does the Board of Ethics sometimes stamp documents with
4    the word "confidential"?
5    A.    Yes.
6    Q.    And does that mean that employees of the Board of Ethics
7    are restricted from talking about it?
8    A.    Correct.
9    Q.    So employees of the Board have to keep it confidential?
10   A.    Yes.
11   Q.    But does the confidential stamp mean that someone else,
12   like the person who filed the ethics complaint, has to keep it
13   confidential?
14   A.    We stamp it confidential just to say that the Board and
15   its employees will keep that information confidential and
16   privileged.
17   Q.    But not that someone else has to keep it confidential and
18   privileged?
19   A.    Right.
20            **MR. MOST:** Okay, thank you.  We tender the witness.
21                        **CROSS-EXAMINATION**
22   **BY MR. SPEARS:**
23   Q.    Ms. Guillot, good morning, afternoon.  We're right on the
24   cusp.
25        You and I previously went through deposition testimony.

                        OFFICIAL TRANSCRIPT

1  Do you remember that?

2  A.    Yes.

3  Q.    And one of the things we concluded was --

4           **THE COURT:** That's not --

5           **MR. MOST:** Objection.

6           **THE COURT:** Sustained.  Are you going to impeach her?

7           **MR. SPEARS:** No, no, no.

8           **THE COURT:** Then you cannot --

9           **MR. SPEARS:** I'm not even talking about the

10  deposition, Judge.

11          **THE COURT:** You just did.

12          **MR. SPEARS:** I was saying that to say we've met

13  before, Judge.

14  **BY MR. SPEARS:**

15  Q.    We've met before?

16  A.    Yes.

17  Q.    Via deposition?

18  A.    Yes.

19  Q.    And as I can recall, you were the actual attorney assigned

20  to the complaint filed against Jaclyn Hotard; correct?

21  A.    Yes.

22  Q.    And ultimately, you were the attorney who signed the

23  letter notifying Jaclyn Hotard that the investigation had been

24  concluded and that there was no ethics violation found;

25  correct?

OFFICIAL TRANSCRIPT

1      **MR. MOST:** This is outside -- objection, this is
2  outside the scope of the direct.
3      **THE COURT:** Sustained.  But you know, if you want to
4  wrap it up and not call her back, then you can -- what I was
5  going to say is you can do your cross and then switch and do
6  your direct.  Just so I know how to handle the objections.
7      **MR. SPEARS:** Judge, I will wait, and I will call her
8  as part of our case-in-chief.  But I'll make her our first
9  witness; so she doesn't have to wait all afternoon.
10     **THE COURT:** Okay.  That's it?
11     **MR. SPEARS:** Yes.
12     **THE COURT:** All right, thank you.  So you're still
13 under subpoena.  You can't discuss your testimony with anyone.
14 So you'll have to wait outside until they call you if they call
15 you back.
16     **MR. MOST:** That is our last witness, Your Honor.  So
17 we rest our case.
18     **THE COURT:** All right.  Ladies and gentlemen, we'll
19 take a lunch break until 1:30.  And so, with that.
20          (The jury exited the courtroom.)
21     **MR. MOST:** I wonder if there's any witness that we can
22 let go home, whether they'll be called this afternoon or not.
23 Ms. Guillot and Ms. Landry came together from Baton Rouge.  I
24 don't know if they'll be called this afternoon.  And then
25 Ms. Schnyder also drove in.

OFFICIAL TRANSCRIPT

 1           **MR. SPEARS:** I can tell you on my list, we have
 2   Ms. Guillot, we have Ms. Landry, we have Mr. R. Gray Sexton,
 3   Ms. Alesia Ardoin, and we have the two Defendants and possibly
 4   Ms. Schnyder.  That's our list.  Whether we can get through all
 5   of that this afternoon, maybe.  Probably.
 6           **THE COURT:** So you don't want to let anybody go?
 7           **MR. SPEARS:** I don't want to let anybody go.
 8           Two things, Judge, first is we do have an oral motion
 9   we'd like to make outside the presence of the jury at this
10   time.
11           **THE COURT:** Okay.
12           **MR. SPEARS:** The second thing, assuming we can push
13   diligently and get all of the witness testimony concluded
14   today, I would ask that we have an opportunity to review the
15   Court's jury instructions and do closings tomorrow.  That would
16   be my -- just logistically.
17           **THE COURT:** Okay, we'll see how soon you finish.
18           **MR. SPEARS:** I'm going to do my best to get it all
19   done today, Judge.
20           **MR. MOST:** We could also do the charge conference over
21   lunch.
22           **MR. SPEARS:** Over this lunch?
23           **THE COURT:** No, no.  We can't do it over lunch because
24   I need to know what all the testimony is before I consider
25   that.

                        OFFICIAL TRANSCRIPT

1          Okay.  So wait, no, no.  He has a motion; right?  Who
2  has a motion?
3          **MR. SPEARS:** We do.
4          **MS. SALLAH:** I do, Your Honor.
5          **THE COURT:** Oh, I'm sorry, y'all were switching spots.
6  I thought you were leaving.
7          **MS. SALLAH:** No, no, no.  Good afternoon, Your Honor,
8  may it please the Court, Joyce Sallah on behalf of the
9  Defendants.
10         At this time, we'd like to make an oral motion
11 pursuant to article -- I'm sorry, pursuant to Federal Rules of
12 Civil Procedure 50(a) for judgment as a matter of law.  Your
13 Honor, we will supplement in writing, but at this time, the
14 Plaintiff has rested her case and has been fully heard on all
15 matters.  The Defendants are entitled to a judgment as a matter
16 of law based on the testimony that has been presented to the
17 court in the last two days -- to the jury in the last two days.
18         Your Honor, I'm going to start off first with the
19 Open Meetings, and then I will go with the way this Honorable
20 Court had separated the First Amendment into two separate
21 arguments as a total of three.  But I'll first start off with
22 the Open Meetings Law.
23         Your Honor, the jury has heard from all of the
24 Plaintiff's witnesses.  All of them have testified, and none of
25 them have given any information or any facts or evidence that

OFFICIAL TRANSCRIPT

1  indicated that the Defendants have violated the Open Meetings

2  Law.  They all testified that there had been notice given to

3  the public, as in the notice had been published to the public

4  as to the meeting, in fact, at least 24 hours which is in

5  compliance with the Open Meetings Law.

6        The second thing is all of them have testified and

7  have not given any contrary facts as to whether the agenda had

8  also been published to the public, again, 24 hours, at least

9  24 hours prior to the November 28th, 2023 parish council

10 meeting that we are here for today.

11       No. 3, all the Plaintiff witnesses agreed that the

12 public was open -- the meeting was open to the public.  In

13 fact, the video which was also entered into evidence showed the

14 jury that the Plaintiff herself was present, and therefore, the

15 public had access to an open meeting place for the meeting

16 which is in compliance with the Open Meetings Law.

17       And the fourth thing is that based also on the video

18 which was submitted into evidence -- at this time, I'm not sure

19 if it was Plaintiff 4, that the jury was able to see that there

20 was a public comment period and that people, multiple people

21 had an opportunity to speak prior to any action taken on the

22 agenda.  In fact, it was after the Pledge of Allegiance, and

23 that was also published and seen by the jury.

24       So all of the elements of the Open Meetings Law has

25 been satisfied.  The Plaintiff's own witnesses, none of them --

1              **THE COURT:** Tell me what the elements are.

2              **MS. SALLAH:** Notice, published agenda.

3              **THE COURT:** Wait, hold on, I'm writing it down.

4              **MS. SALLAH:** It's five.  It's five according to Open

5   Meetings Law.

6              **THE COURT:** Notice, publish.

7              **MS. SALLAH:** The notice, the agenda published at least

8   24 hours prior.  The meeting has to be open to the public in a

9   public forum where the public has access to.  That was 3.

10  No. 4, a period of time that is basically separated out for

11  public comments, for the public to have an opportunity to be

12  heard prior to any action taken on any agenda item which is

13  clear, clearly happened here.  And then the number fourth

14  one --

15             **THE COURT:** I think you're on five.

16             **MS. SALLAH:** I'm sorry, No. 5, which I did not speak

17  earlier on, was that there were minutes taken of the meeting

18  and that it was also recorded, obviously, because we saw a

19  video of the official recording of the actual meeting.  All of

20  Plaintiff's witnesses, all of them agreed that those things

21  happened.

22             What seems to be the disagreement in this case is

23  about the Plaintiff having -- not having unfettered access to

24  complete her comments during the public comment period.  But

25  all the other elements have been satisfied that I've already

OFFICIAL TRANSCRIPT

1    spoke about.

2              So let's talk specifically about that one issue that

3    seems to be at odds in this case.  The Plaintiff -- the jury

4    was able to hear from the Plaintiff that she was interrupted.

5    They were able to see also as to her being interrupted.  The

6    reasons why she was interrupted has to be -- is because she was

7    off topic and that was -- and also, we'll talk later on about

8    the ethics.  So she was off topic.

9              Even though Plaintiff obviously refused to

10   acknowledge the fact that the agenda, the Agenda J Item was not

11   about a specific complaint, the jury was able to plainly see

12   that it was about the retaining of a specific attorney, not

13   about Jaclyn Hotard's specific complaint that she filed.  Even

14   though she refused to admit the truth, the law is clear that

15   pursuant to Federal Rules of Civil Procedure 50(a) -- I'm

16   sorry, Your Honor.  Give me one second.  I apologize, Judge.

17             Provides that a court may enter judgment as a matter

18   of law under the following circumstances.  "If during a trial

19   by the jury a party has been fully heard on issues and there's

20   no legal sufficient evidentiary basis for a reasonable jury to

21   find for that party on that issue, the Court may determine the

22   issue against that party and may grant a motion for judgment as

23   a matter of law against that party with respect to a claim or a

24   defense that cannot, under the controlling law, be maintained

25   or defeated without a favorable finding on that issue."


                        OFFICIAL TRANSCRIPT

1    So when it comes specifically as to whether the
2  Plaintiff reasonably believed that she was on topic, it's
3  obvious based on the -- what the jury was able to see, the
4  agenda, that it was about the retaining of an attorney.  It was
5  not about her complaint.  So therefore, her talking about
6  Ms. Hotard's mother-in-law and the land was not the agenda
7  item.  It was about whether you're going to -- you want the
8  council to vote to retain an attorney or not.  That's all it
9  was.

10    So the fact that the Plaintiff sat there, I mean,
11  spoke for at least over six minutes, trying to bring up things
12  that was not on topic to the actual agenda item was the reason
13  why Council President Wright had a right under the Open
14  Meetings Law to correct her, to try to reign her in because it
15  is a limited forum.  Nobody -- Open Meetings does not allow --
16  does not require a public body to allow anyone to just come
17  into an open forum, like a council meeting, to spew and talk
18  about anything and everything.

19    Actually, the public, the Open Meetings Law requires
20  the public body to maintain public decorum and to have
21  reasonable rules and procedures in place to control the public
22  comment period.  And under the parish council chairman, that
23  was his role, and he did his role.  And it was not personal
24  which I'll go on about the First Amendment.  It was not.  As
25  the jury saw, it was not just her, the Plaintiff, that that was

OFFICIAL TRANSCRIPT

1  done to.  Anybody else who was not on topic was directed to be

2  on topic.

3          In fact, Ms. Perrilloux, who went right after the

4  Plaintiff Ms. Banner, also had to be directed to stay on topic;

5  and in fact, they had to actually clear the room to bring

6  order.  The Open Meetings Law, the law is clear regarding the

7  Open Meetings Law as to the forum that the Plaintiff was in

8  that you're supposed to stay on topic.  She was not on topic.

9  Therefore, they had a right to interrupt her as council

10  president council -- I'm sorry, Council Chairman Wright

11  testified he has been doing that, that is part of his job.  It

12  is not personal.  That is what he's supposed to do, bring

13  decorum.

14          So that's, Your Honor, I believe based on that, the

15  Open Meetings Law claim by the Plaintiff should be dismissed.

16  But more importantly, a reasonable jury will not find based on

17  the information that witnesses have already testified to,

18  they're not going to be able to find for the Plaintiff based on

19  that.

20          **THE COURT:** All right, I'm going to let him respond.

21          **MS. SALLAH:** Before I move on to the First Amendment?

22          **THE COURT:** No, not now.

23          **MR. MOST:** Thank you, Your Honor.

24          So this case is not about whether the agenda was

25  published 24 hours in advance.  That's not the claim.  The

OFFICIAL TRANSCRIPT

1    claim is whether the parish council fulfilled its duty to

2    provide an opportunity for public comment which is Revised

3    Statute 42:14.  And the statute itself says that you have to

4    construe the statute liberally.  That's 42:12.

5         And so this Court already addressed these arguments

6    in ruling on summary judgment in Rec. Doc. 118 at page 18.

7         **THE COURT:** But they can raise it at this point.

8         **MR. MOST:** Certainly, Your Honor.  Of course, they can

9    raise it again, but they haven't really added any new arguments

10   or new --

11        **THE COURT:** But at summary judgment, the Court isn't

12   able to listen to the witnesses and weigh the evidence.  And so

13   if something is denied at summary judgment doesn't necessarily

14   mean that on a Rule 50 motion the Court could not rule...

15        **MR. MOST:** I completely agree.  The ruling on summary

16   judgment doesn't -- it's not collateral estoppel or something

17   like that here.  But I think the reasoning applies here too.

18        What this Court wrote was that, "Plaintiff argues she

19   ended her public comment prematurely because of Defendants'

20   threats of prosecution.  A reasonable jury could conclude that

21   Plaintiff was afforded an adequate opportunity for public

22   comment or vice versa."

23        So this Court had already looked at much of the same

24   evidence and said, look, there was what some people construed

25   as a threat.  My colleague said that Ms. Banner spoke for

OFFICIAL TRANSCRIPT

1  six minutes.  That's not accurate.  Much of the time within
2  that six minutes was taken up by Defendants' talking.

3        And also, my colleague misstates the law when she
4  says that the Open Meetings Law requires a rule that there be
5  an on-topic rule.  The Open Meetings Law does not say that.
6  What it does is it allows public bodies to pass a rule if they
7  so wish.  And what we saw here was that the only place that the
8  council pointed to, the parish pointed to for, "Here's where
9  our rules are," did not have an on-topic rule.

10       So I think, you know, although summary judgment is
11 not dispositive here, really, it's largely the same analysis.
12 A reasonable jury could conclude that the threats of
13 imprisonment resulted in not a free public comment period as
14 required by the Open Meetings Law.

15 **THE COURT:** All right.  So I agree with the Plaintiff
16 in this respect, in that there are -- at a minimum, there are
17 disputed issues of fact.  You listed, Ms. Sallah, you listed
18 the five elements needed to meet the Open Meetings Law.  And
19 under 3 and 4, it must be an open and public meeting where
20 people are allowed to speak and that the period of time, you
21 know, allowed prior to action on the item.

22       I think that a reasonable jury could find that, you
23 know, Dr. Banner was not allowed to fully comment under 3 or 4
24 to be honest with you.  So there is disagreement within the
25 testimony, not just Dr. Banner, but also Ms. Schnyder, you

OFFICIAL TRANSCRIPT

1    know, that there was unfettered access during the public

2    comment period.

3            Also, you do admit that Ms. Banner was interrupted,

4    you say, because she was off topic.  You know, that is going to

5    be a question for the jury to decide.  You seem to argue that

6    there's, you know, no doubt that she was speaking off topic and

7    that she didn't talk about the agenda item which is whether or

8    not to hire an attorney to handle the parish council's or the

9    parish's ethics issues, but she did specifically say that.  Her

10   and others, actually, there was at least another person who --

11   two other people, I think, that did testify to say that they

12   just didn't believe that parish funds should be used to fund an

13   outside attorney when either -- because you had a district

14   attorney.

15           So that is clearly a disputed fact, and I think it is

16   a material fact that must be decided by the jury.  So for those

17   reasons, I'm going to deny your motion for a Rule 50(a) motion

18   regarding the Open Meetings Law issue.

19           **MS. SALLAH:**  Note my objection for the record, Your

20   Honor.

21           **THE COURT:**  Yeah.

22           **MS. SALLAH:**  For the First Amendment, Your Honor.

23           **THE COURT:**  What?

24           **MS. SALLAH:**  For the First Amendment issue?

25           **THE COURT:**  Yes, yes.

OFFICIAL TRANSCRIPT

245

1           **MS. SALLAH:** Thank you, I'll be much shorter.

2           **THE COURT:** You said your objection.  Do you mean you

3    disagree with my decision because that's not something you can

4    object to?

5           **MS. SALLAH:** I disagree with your decision.  Yes, Your

6    Honor.  I disagree, Your Honor.  Chief Judge, I definitely

7    disagree.

8           I'm going to go with, Your Honor, the way you

9    separated it out this morning.  So the first prong of the First

10   Amendment claim, Plaintiff's claim that she allegedly was not

11   allowed to speak because of the complaint, and then the second

12   part of that was a retaliation of arrest; correct, Judge?  I

13   just want to make sure how you separated it out.

14          **THE COURT:** I mean I'll let you phrase it, and I'll

15   let them respond because I think there's dispute as to how you

16   phrase it.  But basically, that her First Amendment right was

17   violated because she wasn't allowed to speak based on

18   viewpoint.

19          **MR. MOST:** If I can just clarify, one claim is

20   viewpoint discrimination.  The other claim is retaliation.

21          **THE COURT:** Right, that's a good way to be concise.

22          **MS. SALLAH:** Okay, all right.  So I'm going to address

23   viewpoint.  For the Federal Rules of Criminal Procedure, my

24   Rule 50 motion --

25          **THE COURT:** Wait, the Federal Rules of Criminal

OFFICIAL TRANSCRIPT

 1  Procedure?

 2           **MS. SALLAH:** I apologize, Your Honor.  Of Civil

 3  Procedure, Rule 50, in terms of the viewpoint, the jury was

 4  able to see from the video under P4 of the actual council

 5  meeting, there were other people who spoke after Dr. Banner who

 6  they allowed to speak and who also spoke up against, and they

 7  were not interrupted because they were on topic.

 8           Dr. Banner was the only person who spoke off topic

 9  about -- well, besides Ms. Perrilloux which is a separate

10  issue, but Dr. Banner's comment was specifically about

11  something that was not on the agenda.  Everybody else came up

12  after her who spoke up, that the jury was able to see, spoke

13  against the item.  So it's not viewpoint because why would they

14  not interrupt everybody else who spoke up against it.  The

15  evidence was clear.

16           **THE COURT:** Okay.  Because, I mean, I'll let Mr. Most

17  speak, but we do want to move through this.  And when there are

18  disputed issues of fact, I'd just as well confront the argument

19  as it comes up.

20           The argument was no one else was bringing up

21  specifically that Ms. Banner had a pending ethics complaint, if

22  I agree, and even the other council member said that she didn't

23  know.  And I mean we didn't ask her, but she didn't know at the

24  time.  So maybe if they hadn't mentioned it, it would have

25  never come to light.  I don't know.

OFFICIAL TRANSCRIPT

1          But you know, that doesn't mean, again, going back to
2    the whole analysis of off topic, you know, that's the viewpoint
3    Plaintiff alleges was suppressed, her viewpoint against.
4          **MS. SALLAH:** Because the open meetings -- that goes
5    back to the first argument.  Open Meetings does not allow you
6    to come --
7          **THE COURT:** We're not talking about Open Meetings.
8    We're talking now about First Amendment, and that is a
9    different standard.  So we have to analyze those facts under
10   the First Amendment standard.
11         **MS. SALLAH:** I understand, Your Honor.  But even at an
12   open meetings, the First Amendment --
13         **THE COURT:** Okay, all right.
14         **MS. SALLAH:** And I understand that, Judge.  I
15   understand we're not talking about the open meetings, but it's
16   a limited forum which limits First Amendment.  Just like I
17   can't go to any public meeting, a parish meeting or a New
18   Orleans Council meeting, to talk about something or something
19   private that is not on the agenda.
20         **THE COURT:** Right, okay.  You've already said it.  We
21   already said that that is in dispute, whether she was speaking
22   on topic or not on topic.
23         **MS. SALLAH:** Okay.  Give me one second, Your Honor.
24         **THE COURT:** I'm going to stop interrupting you.  I
25   just would like to get to, when I see disputed issues of

                        OFFICIAL TRANSCRIPT

1  fact -- to be successful on a Rule 50 motion, there's a pretty

2  high standard.

3          **MS. SALLAH:** Understood.

4          I'm sorry, Your Honor.  Just give me one more second.

5          **THE COURT:** That's why I write on a notepad, and I

6  don't try to use my phone.

7          **MS. SALLAH:** The council recognized her, and she was

8  allotted her three minutes.  Actually, she got more than her

9  three minutes.  Councilman Wright was calm, as you can see in

10  the video, was respectable and calm in his demeanor with his

11  exchanges and requested her to stay on topic as he has done to

12  everybody else.

13          Other than the person who spoke after her,

14  Ms. Perrilloux, who went a lot more boisterous and a lot more

15  reasons why they had to clear the room, they did not do that

16  with Dr. Banner.  Dr. Banner was allowed to continue, to stay

17  at the podium.  She stayed as long as she wanted to.  And all

18  they did was try to direct her back to what she purported to

19  talk about which was the Agenda Item J.

20          So in terms of the viewpoint, other than her bringing

21  up something that was inappropriate during a public meeting,

22  that was -- we're not talking about the confidentiality of it

23  yet.  She was only directed to stay on topic.  It was not in

24  any way because of what she was talking about other than the

25  fact that she was inappropriately raising a private matter in a

OFFICIAL TRANSCRIPT

```
 1   public forum.  But more importantly, even if she started
 2   talking about the sky being blue, she still would have been
 3   directed to, "You're not on topic."
 4             THE COURT: Let me hear Mr. Most.
 5             MR. MOST: Yeah, I'll be brief, Your Honor.
 6             Viewpoint discrimination is forbidden in a limited
 7   public forum.  That's Heaney v. Roberts, 846 F.3d at 802.  As
 8   you pointed out, there's a real -- a reasonable jury could
 9   conclude one way or the other about motivation, why they
10   silenced Dr. Banner.
11             And look, I just want to say I really take issue with
12   the phrase "inappropriate."  Like the -- this was not
13   confidential.  This Court, a section of this Court found that
14   the state law holding ethics issues confidential was ruled
15   unconstitutional.  And for a public body to continue arguing
16   that it's inappropriate to talk about public corruption and an
17   ethics complaint, even after a federal judge has said that law
18   is unconstitutional, I think that's a real problem, so you
19   know.
20             But getting back to the viewpoint discrimination, I
21   think there's abundant evidence that the motivation behind
22   Defendants' actions was motivated by Dr. Banner's viewpoint
23   which is shown by the fact that she was talking about something
24   that no one else was which was the relationship between the
25   parish president and her mother-in-law.  No one else talked
```

OFFICIAL TRANSCRIPT

1  about that.  No one was threatened with imprisonment.

2          **THE COURT:** That is an issue in dispute for the jury

3  to decide.  So I'm going to deny your motion regarding the

4  First Amendment viewpoint discrimination claim.

5          **MS. SALLAH:** I'll disagree with your -- just note my

6  objection for the record.

7          **THE COURT:** You don't have too.

8          **MS. SALLAH:** And I'll supplement in writing.

9          **THE COURT:** The jury is not here, but you know, you

10  have a path to challenge my decisions.

11          **MS. SALLAH:** We can raise it again.

12          **THE COURT:** I know maybe it's just sort of habit maybe

13  you want to say that.  It's not an objection, but it is

14  offensive.  Like you send some signal that you are equal to the

15  Court in this right, and you are not.  I decide, and you can

16  disagree and bring it elsewhere at an appropriate time.  But to

17  continue to argue it is inappropriate.

18          **MS. SALLAH:** I'm sorry.

19          **THE COURT:** I will also say that I'm starting to get a

20  little cringe using the word, you know, something

21  inappropriate, you know, was said in that meeting.  So I would

22  kind of caution you on saying that.  If it's off topic, it's

23  off topic.  There's an issue.  The jury will decide, I guess,

24  if it's -- if it was inappropriate or -- because that sounds

25  like it was unlawful, you know, because that's a whole other

                      OFFICIAL TRANSCRIPT

1    issue that we really don't have to -- nobody has to decide.

2            I'll just, you know.  You're saying that, but I would

3    just -- I'm not going to -- okay, I won't prevent you.  If you

4    want to say that word, you can say that word.  I'm just telling

5    you that it just -- just don't argue with me.  You can argue

6    about the issues, but you can't argue with me.

7            **MS. SALLAH:** I understand.

8            **THE COURT:** So you want to go on to your next?

9            **MS. SALLAH:** No, Your Honor, not at this time.

10           **THE COURT:** All right.  So you're dropping your motion

11   with regard to the retaliation claim?

12           **MS. SALLAH:** Yes.

13           **THE COURT:** All right.  Anything further?

14           **MR. MOST:** No, Your Honor.

15           **THE COURT:** All right.  We can go eat.  But what did I

16   say?  I gave them until 1:30.  We'll still give y'all until

17   1:30.

18                (A lunch recess was taken.)

19           **DEPUTY CLERK:** All rise.

20           **THE COURT:** We're ready for the jury.

21                (The jury was escorted into the courtroom.)

22           **THE COURT:** All right, we can have a seat.

23           Now that Plaintiff has rested, Defendants may begin.

24           **MR. SPEARS:** Judge, we'd call as our first witness

25   Ms. Carolyn Landry.


OFFICIAL TRANSCRIPT

1      **THE COURT:** Before she comes up -- wait a minute.  I
2  want the attorneys to approach.
3              (Proceedings held at the Bench.)
4      **THE COURT:** Let's address this upfront.  So what are
5  you calling her to testify about?
6      **MR. SPEARS:** To authenticate certain documents and to
7  explain the process.
8      **MR. MOST:** The documents he's talking about are
9  already in evidence.  It's D1 and D3.
10     **THE COURT:** Is that it?  So they don't need to be
11 authenticated.  I'm not going to allow her to do that.
12     **MR. SPEARS:** To explain the process.
13     **THE COURT:** Why, the process of what?
14     **MR. SPEARS:** The process of the ethics complaint.
15 They got into all of this.
16     **THE COURT:** No, no, no, no.  Okay, there were
17 elements -- they were allowed to discuss the ethics complaint
18 to the extent that it was evidence of the motivating factor of
19 the Defendants, and they were limited to that.
20     **MR. SPEARS:** They also talked to the last witness
21 about what the confidentiality was.
22     **MR. MOST:** She's testified she doesn't know the answer
23 to that question.  She testified, "I don't know whether or not
24 anyone else has to keep that confidential."
25     **THE COURT:** She said that in a deposition?  Well, then

OFFICIAL TRANSCRIPT

1   you'll be able to bring that out.

2          **MR. SPEARS:** Both of these are very short witnesses.

3          **THE COURT:** I know, but I'm just -- we're not going, I

4   mean, I've made it very clear, the distinction between what the

5   limited ability to bring in evidence about that underlying

6   complaint was.  And I want to make sure; so I'm not

7   interrupting the testimony.

8          **MR. SPEARS:** It's very short.

9          **MR. MOST:** So the internal operations of the Board of

10  Ethics is off limits?

11         **THE COURT:** Exactly.  There's no reason for the Court

12  to know that.  I mean, I'm sorry.  There's no reason for the --

13  tell me why would the jury need to know the inner workings.

14         **MR. SPEARS:** Judge, I think it sets up the background

15  as to the complaint filed.  There's a quick process.  There's

16  an investigation.  Complaint dismissed.

17         **THE COURT:** Wait, what?

18         **MR. SPEARS:** Complaint is filed.  There's an

19  investigative process.  Then the complaint is either moved on

20  for formal adjudication or it's dismissed.

21         **THE COURT:** It doesn't matter.  It's been dismissed.

22         **MR. SPEARS:** I know, but I just want to take two or

23  three questions to walk through that, Judge.

24         **THE COURT:** That is clearly irrelevant because even it

25  has been repeatedly -- and nobody disputes that the

OFFICIAL TRANSCRIPT

254 of 277

1  investigation was ongoing on November 28th.  So why is that

2  relevant for the jury to understand?  Tell me.

3          **MR. SPEARS:** It's extremely relevant, Judge.

4          **THE COURT:** It's extremely relevant.  I want to know

5  why.

6          **MR. SPEARS:** Because they have raised the issue.

7  They've raised the issue and even --

8          **THE COURT:** Wait, wait.  What issue?

9          **MR. SPEARS:** Of the ethics violation.

10         **THE COURT:** You got to be more specific than that.  I

11 limited it.  He couldn't talk about everything he wanted about

12 the ethics matter because you're not going to relitigate the

13 ethics matter.

14         **MR. SPEARS:** I don't want to relitigate it.  I'm going

15 to be very limited.

16         **THE COURT:** If she's coming and she wants to weigh in

17 on what they did, bring up they had someone from that office

18 talk about the meaning of the confidentiality, if she has a

19 different understanding now, you can talk about that.  But

20 we're not going into any details of that again.  There was a

21 time and place.  That was litigated somewhere else.  We're not

22 going to rehash it.

23         **MR. MOST:** Thank you, Your Honor.

24             (Whereupon this concludes proceedings held at

25     the bench.)


                    OFFICIAL TRANSCRIPT

| 1 | **CAROLYN LANDRY,** |
| 2 | after having been duly sworn, did testify as follows: |
| 3 | **DIRECT EXAMINATION** |
| 4 | **BY MR. SPEARS:** |
| 5 | Q.   Ms. Landry, good afternoon.  Please introduce yourself to |
| 6 | the members of the jury. |
| 7 | A.   I'm Carolyn Abadie Landry.  I'm the executive secretary to |
| 8 | the Louisiana Board of Ethics. |
| 9 | Q.   And as executive secretary, what role, if any, do you have |
| 10 | with regard to the receiving of complaints, ethics complaints, |
| 11 | I'm sorry? |
| 12 | A.   I receive all mail for our agency. |
| 13 | Q.   Would you be the first stop in receiving an ethics |
| 14 | complaint? |
| 15 | A.   There's a receptionist that opens the mail and hands it to |
| 16 | me. |
| 17 | Q.   And if and when an ethics complaint involving an elected |
| 18 | official comes to your attention, what steps do you take? |
| 19 | A.   I bring it to the administrator of our office. |
| 20 | Q.   Are any letters generated? |
| 21 | A.   I'm not in charge of that. |
| 22 | Q.   Okay.  I want to show you what has previously been |
| 23 | introduced into evidence and marked as D1 which is a letter |
| 24 | from the Board of Ethics. |
| 25 | **MR. SPEARS:** May I approach, Your Honor? |

OFFICIAL TRANSCRIPT

1    **THE COURT:** Yes.

2    Counsel, Mr. Most, or I don't know who is taking this

3    witness, do you know?

4    **MR. MOST:** Yeah, I've looked at it.  Thank you, Your

5    Honor.

6    **BY MR. SPEARS:**

7    Q.   Take a look at that and let me know, Ms. Landry, if that

8    appears to be a letter bearing your signature?

9    A.   Yes, sir.

10   Q.   Okay.  And in very brief detail, explain what is that

11   letter.

12   A.   This is a letter from our office or actually...

13   Q.   And it may be a clearer copy on the screen.  I'm not sure.

14   A.   Right.  That -- it's just a letter that -- I sign many

15   letters like this.

16   Q.   That would be one of those letters?

17   A.   Yes, sir.

18   Q.   And what is the effect of that letter, just so that we're

19   clear?

20   A.   The effect of this letter?

21   Q.   Yes.  Who is it to?  Let me start with that.

22   A.   It's to Jaclyn Hotard.

23   Q.   And would that be the first letter that a person would

24   receive if there was a formal ethics complaint filed?

25   A.   Actually, I'm not even sure if it's the first letter.

OFFICIAL TRANSCRIPT

1    Q.   But it's one of the letters?

2    A.   Yes, sir.

3    Q.   On that particular letter, there's the word "confidential"

4    stamped.  Do you see that?

5    A.   Yes, sir.

6    Q.   And in the many letters that you generate and sign that go

7    out in connection with ethics investigations, are they all

8    stamped "confidential"?

9    A.   When it comes to this type, yes, sir.

10   Q.   And in addition to all of the letters generated in

11   connection with an ethics investigation against a public

12   official, some letters are not only stamped "confidential," but

13   they're also stamped with a specific Louisiana --

14           **THE COURT:** Wait, uh-uh, you're testifying again.  Ask

15   her a question.

16   **BY MR. SPEARS:**

17   Q.   Are there any letters stamped with anything involving a

18   Louisiana statute?

19           **THE COURT:** Anything other than confidential**?**

20   **BY MR. SPEARS:**

21   Q.   Other than the word "confidential".

22   A.   I don't understand the question honestly.

23   Q.   Okay, and I don't want to confuse you.  Is your testimony,

24   Ms. Landry, that -- and I didn't ask this question.  You've

25   been with the Board of Ethics how many years?

OFFICIAL TRANSCRIPT

1    A.    A little over five years.

2    Q.    In the five years that you've been with the Board of

3    Ethics, it's your understanding that all correspondence is

4    stamped -- all outgoing correspondence is stamped with some

5    form of the word "confidential"?

6    A.    I don't believe all of our -- I'm not even sure if I'm

7    answering that correctly.  I know we have a lot of our letters

8    do have the stamp "confidential," but I can't state that all

9    has it.

10   Q.    Do you generate anything that's not stamped "confidential"

11   from yourself?

12   A.    Sir, attorneys prepare everything that I sign.

13          **MR. SPEARS:** Okay, thank you.

14          **THE COURT:** Are you tendering the witness?

15          **MR. SPEARS:** Yes, I'm tendering the witness.

16          **THE COURT:** Okay, all right.

17                    **CROSS-EXAMINATION**

18   **BY MR. MOST:**

19   Q.    Ms. Landry, when the Board of Ethics stamps documents

20   "confidential," that means the Board of Ethics itself will keep

21   it confidential; right?

22   A.    Yes, sir.

23   Q.    But you don't know if that means that anyone else has to

24   keep it confidential; correct?

25   A.    Correct.

                    OFFICIAL TRANSCRIPT

1            **MR. MOST:** Thank you.

2                       **REDIRECT EXAMINATION**

3  **BY MR. SPEARS:**

4  Q.   Finally, Ms. Landry, is it your understanding during your

5  five years that an investigative phase of an ethics complaint

6  is strictly confidential?

7  A.   Yes, sir.

8            **MR. SPEARS:** Okay, thank you.

9            **THE COURT:** All right, is that it?

10            **MR. SPEARS:** That is it.  Thank you.

11            **THE COURT:** You may be dismissed.  Don't discuss your

12  testimony with anyone.

13            **MR. SPEARS:** Judge, we'll now call Ms. Mallory

14  Guillot.

15            And Judge, may Ms. Landry be excused from her

16  subpoena?

17            **MR. MOST:** No objection.

18            **THE COURT:** Yes.

19            All right, while y'all are getting her, approach

20  again, lawyers.

21                 (Proceedings held at the Bench.)

22            **THE COURT:** I just want to inquire as to the scope of

23  this witness.

24            **MR. SPEARS:** This is when I began to ask questions, I

25  was cut off, and I said I'd call her back as my witness.  He

                       OFFICIAL TRANSCRIPT

1  asked specifically about the confidential.

2        **THE COURT:** I just want to make sure.  So okay, all

3  right.

4        (Whereupon this concludes proceedings held at

5    the bench.)

6        **DEPUTY CLERK:** Ms. Guillot, you were already placed

7  under oath earlier.

8        **THE WITNESS:** Yes.

9        **THE COURT:** You're still under oath is what she

10 explained.

11                **DIRECT EXAMINATION**

12 **BY MR. SPEARS:**

13 Q.   Please give us your -- good afternoon.  Give us your full

14 name and position for the record.

15 A.   Mallory Ann Guillot, and I'm a staff attorney for the

16 Louisiana Board of Ethics.

17 Q.   Ms. Guillot, how long have you been a staff attorney with

18 the Louisiana Board of Ethics?

19 A.   About two and a half years, going on three years.

20 Q.   Very generally, what are your role and responsibilities as

21 staff attorney?

22 A.   I am one of the staff attorneys that is assigned to

23 complaint requests and advisory opinion requests.  I review

24 those requests and docket items for the Board's agenda for its

25 monthly meetings.  And then at the monthly meetings, I advise

OFFICIAL TRANSCRIPT

1  the Board on those matters.

2  Q.   When a complaint comes in, there's some initial paperwork

3  generated; is that correct?

4  A.   I'm sorry?

5  Q.   When an ethics complaint comes into your office, is there

6  any initial paperwork that is generated?

7  A.   There is an acknowledgment letter that is sent out to the

8  complainant.

9  Q.   Okay.  And you're familiar with that acknowledgment

10  letter?

11  A.   I know it exists.  I don't -- I'm not the one who sends it

12  out.

13  Q.   And you don't get involved until the case is -- well, when

14  do you get involved?

15  A.   When the case is assigned to me.

16  Q.   And is that before or during what has been called the

17  investigative phase?

18  A.   The case is assigned to me before it enters the

19  investigation process.

20  Q.   Okay.  And when it's in investigation process, what role,

21  if any, do you have?

22          **MR. MOST:** Objection, internal processes.

23          **THE COURT:** I'm sorry, what's your objection?

24          **MR. MOST:** Internal processes per our discussion.

25          **THE COURT:** So is that relevance?

OFFICIAL TRANSCRIPT

1          **MR. MOST:** Yes, relevance.

2          **THE COURT:** All right.  I'm going to allow it.  I'm

3    going to allow that question.  Go ahead.

4    **BY MR. SPEARS:**

5    Q.    During the investigative phase of an ethics complaint,

6    what role, if any, do you have?

7    A.    I don't have a role in the investigation process.

8    Q.    And once the investigation is concluded, what role, if

9    any, do you have?

10   A.    The investigation report is then submitted to me, and I

11   review it, and then I docket it for the Board's agenda to

12   review.

13   Q.    Okay.  Is it your understanding based on your tenure at

14   the Louisiana Board of Ethics that the investigative phase is

15   strictly confidential?

16   A.    Yes.

17   Q.    I'm assuming there are multiple options that come out of

18   the investigation.  What are those options?

19   A.    Well, the Board can take any action that it pleases after

20   the investigation is concluded.

21   Q.    Does the investigation come with a recommendation?

22   A.    Typically, the staff attorney will give some sort of

23   recommendation to the Board.

24   Q.    And what happens, if anything, if the investigation is

25   complete and there's been no finding of an ethical violation?

OFFICIAL TRANSCRIPT

1  A.    The Board can do as it pleases.  Sometimes it's closed.

2  Sometimes it's closed with a caution letter, or they just

3  choose not to pursue formal charges.

4          **MR. SPEARS:** May I approach, Your Honor?

5          **THE COURT:** Yeah.

6  **BY MR. SPEARS:**

7  Q.    Ms. Guillot, I'm showing you a copy of a letter that's

8  been previously introduced as Defense Exhibit D3.

9          Do you recognize that letter?

10 A.    Yes, I do.

11 Q.    Okay.  Does it bear your signature?

12 A.    Yes, it does.

13 Q.    What is the effect of that letter if you could tell the

14 jurors?

15 A.    This is just a letter informing the subject of a

16 confidential investigation how the Board decided to proceed

17 after the investigation.

18 Q.    And according to that letter, who is the subject of that

19 complaint?

20 A.    The subject of the investigation was Jaclyn Hotard.

21 Q.    And you signed off on this letter because the Board

22 indicated that there was no ethical -- no violation of ethics

23 filed?

24          **MR. MOST:** Objection, relevance, the reasons for

25 her --

OFFICIAL TRANSCRIPT

1          **MR. SPEARS:** I'll withdraw the question.

2    **BY MR. SPEARS:**

3    Q.    This letter is stamped "confidential"; is that correct?

4    A.    Yes.

5    Q.    Are all of the letters that you generate in your capacity

6    as staff attorney with regard to ethics matters, are they all

7    stamped "confidential"?

8    A.    If they are correspondence from the Board of Ethics to

9    someone else, then yes.

10   Q.    Why is that?

11   A.    Because we are required by statute to keep investigations

12   confidential.

13   Q.    And do you know that particular statute that you're

14   required to keep investigations confidential by?

15   A.    Yes, I do.

16   Q.    What is that statute?

17   A.    Louisiana Revised Statute 42:1141.4(K) and (L).

18   Q.    Okay.  And although it's not on this particular letter, is

19   that statute sometimes stamped on correspondence that you send

20   on behalf of the Board of Ethics?

21   A.    I think -- I believe so.

22   Q.    Okay.  You don't have a legal position as to whether or

23   not the confidentiality statute that you just quoted applies

24   only to the Board and Board staff?  You don't have a legal

25   position as to that; correct?

OFFICIAL TRANSCRIPT

1            **MR. MOST:** Objection, calls for a legal position.

2            **THE COURT:** Well, he's saying you don't.

3            **MR. MOST:** Okay, it calls for the absence of a legal

4    position.

5            **THE COURT:** So she shouldn't be giving a legal opinion

6    one way or another.  So you can ask her what's the custom or

7    what's the understanding in the office.

8            **MR. SPEARS:** I'll revise it.

9    **BY MR. SPEARS:**

10   Q.   It is not your understanding that the confidentiality

11   statute that you have just recited to the jury applies only to

12   the Board and Board staff; correct?

13   A.   I'm sorry, you have to repeat that question.

14   Q.   Is it your understanding -- I'm doing the reverse negative

15   thing.  Let me take that question off the table.

16       That statute that you cited has been in place since you

17   have been a staff attorney; correct?

18   A.   Yes.

19   Q.   With regard to just the confidentiality portion --

20           **THE COURT:** Wait, wait.  So now you're kind of -- now

21   you're asking a legal question whether a law was in place

22   since -- how long has she been there, five years?  No, the

23   other one was five years.

24           **THE WITNESS:** Two and a half years.

25           **THE COURT:** Two and a half years.  You're asking her

OFFICIAL TRANSCRIPT

1  was that law in effect for the last two and a half years.  I'm
2  not going to allow her to answer that question.
3          **MR. SPEARS:** Okay.
4  **BY MR. SPEARS:**
5  Q.   Are you aware that the confidentiality portion of the
6  statute applies to people outside of the Board?
7  A.   I only know that it applies to the Board and its
8  employees.
9  Q.   Okay.  Are you aware that the language of the statute
10  applies to people outside --
11          **MR. MOST:** Objection.
12          **THE COURT:** Sustained, calls for legal conclusion.
13          And I direct the jury on the law, Counsel.
14          **MR. SPEARS:** Uh-huh.
15  **BY MR. SPEARS:**
16  Q.   To the best of your knowledge and understanding, are all
17  of the communications generated by the Ethics Board or its
18  staff attorneys stamped in some form or fashion with the word
19  "confidential"?
20  A.   If it's coming from the Board of Ethics, so if it has the
21  Board of Ethics letterhead on it, then yes, it's stamped
22  "confidential."
23  Q.   Okay.  And because it's stamped confidential -- withdraw
24  that.
25          And those letters are sent to both the subject of the

OFFICIAL TRANSCRIPT

1  complaint; is that correct?

2  A.    The letter is sent to the subject of the complaint, yes.

3  Q.    And if there is a sworn complaint, are these letters

4  stamped "confidential" sent to anyone else?

5  A.    The complainant receives a blind carbon copy of the

6  letter.

7  Q.    Okay.  And that's in the case of a sworn complaint?

8  A.    Yes.

9  Q.    So the person who made the complaint against Ms. Hotard

10  would have received a blind copy stamped "confidential";

11  correct?

12  A.    That is what would normally occur, yes.

13  Q.    And neither you, nor anyone that you're aware of, would

14  advise the person making the complaint that it's okay --

15        **THE COURT:** Make your objection.  She's a lawyer.  She

16  can't advise.  She can't talk -- hear about what legal advice

17  she would give.  She's here as a fact witness.

18        **MR. SPEARS:** I understand.

19  **BY MR. SPEARS:**

20  Q.    And the fact is that the complaint made against Jaclyn

21  Hotard was thoroughly investigated, reviewed, and dismissed

22  with no ethics violations found; is that correct?

23  A.    There was a confidential investigation, yes.

24  Q.    And the letter which you have identified by your signature

25  says no violation was found; correct?

OFFICIAL TRANSCRIPT

1    A.    Yes.

2              **MR. SPEARS:** Okay, Judge, nothing further.

3                        **CROSS-EXAMINATION**

4    **BY MR. MOST:**

5    Q.    Ms. Guillot, the letter on the screen is dated

6    September 10, 2024; is that right?

7    A.    Yes.

8    Q.    That's about ten months after November 28, 2023?

9    A.    Yes.

10   Q.    And Mr. Spears asked you about a confidential

11   investigation.  That means that members and employees of the

12   Board of Ethics are restricted from speaking about the

13   investigation?

14             **MR. SPEARS:** Objection, he's asking for a legal

15   conclusion.

16             **THE COURT:** No, he's -- overruled.  It's not a legal

17   conclusion.  Go ahead.

18   **BY MR. MOST:**

19   Q.    The confidential investigation he asked you about means

20   that members and employees of the Board of Ethics are

21   restricted from speaking about the investigation; correct?

22   A.    Correct.

23   Q.    It does not mean that somebody else, like the person who

24   filed the ethics complaint, can't talk about it?

25             **MR. SPEARS:** Objection again.

                        OFFICIAL TRANSCRIPT

| | |
|---|---|
| 1 | **THE COURT:** Overruled. |
| 2 | **BY MR. MOST:** |
| 3 | Q.   It doesn't mean that some other person, like the person |
| 4 | who filed the complaint, can't talk about it; agreed? |
| 5 | A.   When we enter a confidential investigation or stamp |
| 6 | something confidential, it applies to the Board and to the |
| 7 | employees of the Board. |
| 8 | Q.   But that doesn't include the person who filed the |
| 9 | complaint; agreed? |
| 10 | A.   Agreed. |
| 11 | **MR. MOST:** Thank you. |
| 12 | **MR. SPEARS:** Nothing further. |
| 13 | We would ask if she can be released from her |
| 14 | subpoena, Your Honor. |
| 15 | **THE COURT:** Are you okay with that, Mr. Most? |
| 16 | **MR. MOST:** Yes. |
| 17 | **THE WITNESS:** What do I do with this? |
| 18 | **THE COURT:** Just drop it on your way out. |
| 19 | **MR. SPEARS:** I'll come get it. |
| 20 | **THE COURT:** Call your next witness. |
| 21 | **MS. SALLAH:** The Defense would like to call Ms. Jackie |
| 22 | Landeche as our next witness. |
| 23 | **JACKIE LANDECHE,** |
| 24 | after having been duly sworn, did testify as follows: |
| 25 | **DIRECT EXAMINATION** |

OFFICIAL TRANSCRIPT

1  **BY MS. SALLAH:**

2  Q.   Good afternoon, Ms. Landeche, how are you?

3  A.   Good, thank you.

4  Q.   Thank you for being here.  Please introduce yourself to

5  the ladies and gentlemen of the jury.

6  A.   My name is Jacqueline Ann Landeche.  I'm the secretary for

7  the council for St. John the Baptist Parish.

8  Q.   Where are you currently employed, Ms. Landeche?

9  A.   St. John the Baptist Parish Council in LaPlace, Louisiana.

10 Q.   This is the first time you're testifying in court?

11 A.   Yes, ma'am.

12 Q.   You're probably a little nervous?

13 A.   A little.

14 Q.   Okay, you'll be fine.  How long have you been employed --

15 you said you were employed by St. John the Baptist Parish?

16 A.   The council, yes, ma'am.

17 Q.   The council.  What is your title?

18 A.   I'm the council secretary.

19 Q.   How long have you been the council secretary?

20 A.   Tomorrow will be 17 years.

21 Q.   Wow, that's a long time.

22 A.   Yes, ma'am.

23 Q.   All right.  So how many council meetings have you

24 experienced over the years?

25 A.   Well.

OFFICIAL TRANSCRIPT

1  Q.   Over a hundred?

2  A.   We do 24 a year, and I've done 17 years.  So many over a

3  hundred, yes, ma'am.

4  Q.   That's a lot.

5  A.   Yes, ma'am.

6  Q.   All right, so let's talk about your job description.  What

7  are your duties as the council secretary?

8  A.   I give written notice of the council meetings, public

9  notice for the council meetings.  I prepare the agenda that

10 they're given to me.  You know, prepare the agenda information

11 that gets put out to the public, and I keep the official

12 records of the council, the minutes and all the order of the

13 meetings.

14          **MS. SALLAH:** May I approach the witness, Your Honor?

15          **THE COURT:** Uh-huh.

16 **BY MS. SALLAH:**

17 Q.   Ms. Landeche, I'm showing you what's been previously

18 marked as P3.  Do you recognize that document?

19 A.   Yes, ma'am.

20 Q.   What is it?

21 A.   It's a council agenda.

22 Q.   For what specific meeting?

23 A.   It's for the meeting of November 28th of 2023 in

24 LaPlace.

25 Q.   All right.  So you just talked about, testified that you

OFFICIAL TRANSCRIPT

1  publish the -- what do you do with the agenda specifically?

2  A.   Yes, ma'am, I publish them.  They get published on our

3  website, on the parish website, on the official journal

4  website, and it gets posted on the outside of the chamber

5  doors.

6  Q.   And why do you do that?

7  A.   It's public notice.  It's a public meeting.  It's a public

8  meeting.  Open Meeting Law states all public meetings have to

9  be -- a public notice has to go out.  It has to go out within

10  24 hours of the meeting.  Mine go out well in advance of that.

11  Like five days before, I usually have it out.

12      Our meetings are on Tuesday.  I usually have the agenda

13  out on the Thursday afternoon the week before.  So I do my best

14  to be well ahead of time.

15  Q.   Okay.  You talked about also the minutes, that you keep

16  them.  What do you do with the minutes?

17  A.   I take the minutes and record the proceedings of the

18  meeting, the actions taken during the meeting.  I take those

19  minutes that the council will approve at the following meeting.

20  Q.   So you're actually physically present at the meeting, and

21  as people are speaking, you're taking down what's being said?

22  A.   No, ma'am.  I'm physically at the meetings, yes.  I

23  usually write down who first's and second's items as far as

24  motions that are taken.

25      But as far as when people come up, I take their names and

OFFICIAL TRANSCRIPT

 1  their address of who's coming up and speaking, but I don't

 2  write down what they say as they're there, no, ma'am.

 3  Q.  At each meeting, you actually create the minutes; correct?

 4  That's what you're saying, you create the minutes?

 5  A.  Yes, ma'am.  Off of, yeah, off of the items that are done,

 6  yes, ma'am.

 7          **MS. SALLAH:** May I approach the witness, Your Honor?

 8          **THE COURT:** Yes.

 9  **BY MS. SALLAH:**

10  Q.  Ms. Landeche, I just handed you a document.  I'd like this

11  marked as D4 for purposes of identification.

12          Do you recognize that document?

13  A.  Yes, ma'am.

14  Q.  What is it?

15  A.  It's a set of our council minutes.

16  Q.  And what minutes is that specifically for?

17  A.  These are from the November 28th, 2023 council meeting.

18  Q.  All right.  And you created that document?

19  A.  Yes, ma'am.

20          **MS. SALLAH:** Okay.  At this time, I would like to

21  offer, file, introduce, and have it published to the jury.

22          **MR. MOST:** No objection.

23          **THE COURT:** All right.

24          **MS. SALLAH:** Thank you, Your Honor.

25  **BY MS. SALLAH:**

                        OFFICIAL TRANSCRIPT

274

1   Q.   All right.  So let's go back to your job description, what
2   else do you do?
3   A.   Anything that is required of me.  I'm secretary to nine
4   people.  So I do a lot.  Anything.  I do my minutes.  I record
5   all of the actions taken at the meeting, research, whatever is
6   requested.
7   Q.   Okay.  And you talked earlier about the public, the Open
8   Meetings Law, and you talked about publishing the notice you
9   said five days?
10  A.   The public notice, yes, ma'am.  The agenda.
11  Q.   And then where do you publish it?
12  A.   It gets published on our official journal website.  It
13  gets published on our parish website, and a physical one is
14  posted outside the chambers doors at the chambers in LaPlace
15  and the chambers in the Edgard courthouse.
16  Q.   Is that in compliance with the Open Meetings Law --
17  A.   Yes, ma'am, it is.
18  Q.   -- as you understand it?  Because at least 24 hours, you
19  had mentioned --
20  A.   Yes, ma'am.
21  Q.   -- before the meeting?
22         **COURT REPORTER:** Please talk one at a time.  Y'all are
23  stepping on each other.  Just wait for each other to finish.
24         **THE WITNESS:** I am so sorry.
25         **MS. SALLAH:** I apologize.


                        OFFICIAL TRANSCRIPT

1  **BY MS. SALLAH:**

2  Q.   You said earlier that you published it at least five days

3  before the meeting.  I just wanted to clarify.

4  A.   Yes, ma'am.

5  Q.   So you talked about the notice.  And the same thing with

6  the agenda, also five days prior to the meeting?

7  A.   Well, the agenda is the notice.  The agenda is the public

8  notice.

9  Q.   Is the public notice?

10  A.   Yes, ma'am.

11  Q.   And that's in compliance with the Open Meetings Law;

12  correct?

13  A.   Yes, ma'am.

14            **MR. MOST:** Objection, calls for a legal conclusion.

15            **THE COURT:** I can't understand what you're saying.

16            **MR. MOST:** I'm sorry.  Objection, calls for a legal

17  conclusion.

18            **THE COURT:** I'm going to allow it because her job

19  requires her to follow the public -- the Open Meetings Law.  So

20  I imagine she can say that.

21            **MS. SALLAH:** Thank you, Your Honor.

22  **BY MS. SALLAH:**

23  Q.   Were you present at this November 23rd -- I'm sorry,

24  November 28, 2023 meeting --

25  A.   Yes, ma'am.

OFFICIAL TRANSCRIPT

1  Q.   -- that is the subject of this lawsuit?

2  A.   Yes, ma'am.

3  Q.   You were present at that meeting?

4  A.   I'm sorry?

5  Q.   You were present?

6  A.   Oh, yes, ma'am.

7  Q.   Do you recognize the Plaintiff Ms. Joy Banner, Dr. Banner?

8  A.   Yes, ma'am.

9  Q.   Was she at that meeting?

10 A.   Yes, ma'am.

11 Q.   All right.  And how familiar are you with Dr. Banner?

12 You've seen her in multiple meetings?  Have you seen her

13 before?

14 A.   I've seen her at meetings.  But otherwise than that, I did

15 not know Ms. Banner.

16 Q.   How many times have you seen her at meetings in your

17 18 years experience?

18 A.   It's been a pretty good bit.  I've seen her face a lot.

19 Q.   Over 20 times?

20 A.   Probably.  Give or take, probably.

21 Q.   Okay.  And you're familiar with her sister Jo Banner?

22 A.   Yes, ma'am.

23 Q.   And you've seen her the same time?

24 A.   Yes, ma'am.

25 Q.   At least 20?

OFFICIAL TRANSCRIPT

1   A.    Yes, ma'am, yes, ma'am.

2   Q.    Have you seen them speaking at public meetings at the

3   public comment period?

4   A.    Yes, ma'am.

5   Q.    So at the November 23rd -- the November 28th, 2023,

6   did you see Dr. Banner at the lecturn speaking at the public

7   comment period?

8   A.    Yes, ma'am.

9   Q.    And what do you recall happening?

10  A.    We open the public comment section of the agenda.  The

11  chairman opens the public comment.  People come up to make

12  public comment, and she came up to make public comment.

13       And from what I recall, she commented on the items she was

14  commenting -- she wanted to public comment on.  One of them was

15  an executive session item which she could not public comment on

16  because you can't on executive session items.  And the other

17  one was another item that was an authorization to hire a legal

18  firm, and she wanted to speak on that.

19  Q.    Okay.  So do you recall whether she was interrupted while

20  she was speaking?

21  A.    What I recall is being told that it was off topic or being

22  told like, you know, you can't speak on this.  It's off topic.

23  That's what I recall.

24  Q.    Who specifically told her that her comment was off topic?

25  A.    If I remember correctly, if I remember correctly, I think

OFFICIAL TRANSCRIPT

278

1  the chairman did.

2  Q.    And how long have you worked -- you said you've been a

3  council secretary for 18 years; correct?

4  A.    Well, 17 years tomorrow.  But I actually was -- I've been

5  working for the parish since '98.  I was the acting council

6  secretary for two years before I became the council secretary.

7  So basically, 19 years.  But officially, 17 years tomorrow.

8  Q.    So Council President Wright -- I'm sorry, yes.  Council

9  Chair Wright is not the first council chair that you have seen

10  at council meetings?

11  A.    Oh, no, ma'am.  No, ma'am.

12  Q.    Is it normally the council chair who directs people during

13  public comments to stay on topic?

14  A.    Yes, ma'am.

15  Q.    And you've seen that done how many times?

16  A.    Many times.

17  Q.    And how do they usually do that?

18  A.    It's a gavel, hit the gavel, "You're off topic.  I need to

19  ask you to please stay on the topic," and that's usually what

20  they'll do a few times.

21  Q.    And you previously testified that you've seen hundreds at

22  least probably of council meetings; correct?

23  A.    Yes, ma'am.

24  Q.    Is it common for people to be off topic and just come up

25  and talk about a lot of things that is not on the agenda?

OFFICIAL TRANSCRIPT

1  A.    Sometimes, yes.

2  Q.    So it's commonplace to be directing people and the public

3  to stay on topic; correct?

4  A.    Correct, yes, ma'am.

5  Q.    And you said you've noticed the Plaintiff before.  You're

6  also familiar with or have seen her sister Jo Banner.  What is

7  normally -- what is your impression of them?

8       What is their attitude, general attitude during public

9  meetings when you've seen them?  Are they friendly?

10 A.    Not towards the council.  It seems to be a verbally

11 combative situation.  Like it's kind of like a --

12 Q.    Are you saying they're hostile?  I don't want to put words

13 in your mouth.

14 A.    Not happy.  It seems to always come bearing some sort of

15 argument or comment, public comment.

16 Q.    During the public comment period?

17 A.    Yes, ma'am.

18 Q.    Have you seen anywhere where she's been removed -- I'm

19 sorry.  Dr. Banner has been removed from a public meeting?

20 A.    I do think they've been removed from one or two of our

21 meetings.  I know a few people have.

22 Q.    But specifically, Dr. Banner.  If you don't recall.

23 A.    I can't say for sure.

24 Q.    But she was not removed that day; correct?

25 A.    No, ma'am.

OFFICIAL TRANSCRIPT

1  Q.   Now let's talk about the history of what you do or what

2  you've seen.  You said one of the things you've talked about --

3  I want to ask you a quick question about open meetings.

4       Are you aware that the public meetings laws require public

5  bodies to maintain reasonable rules and procedures for the

6  public comment period?

7  A.   Yes, ma'am.

8  Q.   And does St. John the Baptist Parish Council have any

9  reasonable rules or any rules and procedures regarding the

10 public comment period that you are aware of?

11 A.   We have a certified motion that was passed in '93 that

12 allows a three-minute time for the public to speak.

13 Q.   Other than the three minutes, are there any other rules

14 and/or procedures that you are aware of that is practiced by

15 the parish council?

16 A.   We follow Robert's Rules of Order.  We adopted Robert's

17 Rules of Order in '88.  So we follow Robert's Rules of Order.

18 Q.   You still have in front of you what has now been marked as

19 D4, Defense 4, Exhibit 4.  That is the agenda; correct?

20          **THE COURT:** What agenda?  We can't see it.

21          **THE WITNESS:** This one?

22 **BY MS. SALLAH:**

23 Q.   One of them is the agenda.

24 A.   Yes, ma'am, this is the agenda.

25 Q.   Yes.  On the agenda, besides three minutes, what else is

OFFICIAL TRANSCRIPT

1  there in terms of rules of conduct regarding the public

2  comments?

3  A.   It's agenda items only which means when people come to the

4  meeting --

5          **THE COURT:** Wait.  Can we see the document?  Publish

6  the document if she's reading from it.

7          **MS. SALLAH:** Yes.  You want me to take it from her?

8          **THE COURT:** Yes, because the jury needs to know if

9  she's reading accurately from it.

10          **MS. SALLAH:** Oh, please read from the document in

11  front of you.

12          **MR. SPEARS:** We've got to publish it.

13          **THE COURT:** I don't know if that's your question.

14          **MS. SALLAH:** I did already.  I did publish it already.

15          **THE COURT:** It's not up there.  Now it's up there, but

16  it wasn't up there.  So we don't know what you're talking

17  about.

18          **MS. SALLAH:** Oh, I apologize.  I apologize.  I had

19  published it already.  Sorry.

20  **BY MS. SALLAH:**

21  Q.   So read from the -- if it's easier to see it that way?

22  A.   Uh-huh.

23  Q.   Read from it what rules does it say regarding on the top

24  where you're saying it says three minutes per?

25  A.   The public comment is agenda items only.  Three minutes

OFFICIAL TRANSCRIPT

1    per citizen.

2    Q.   Okay.  So you spoke to me about the three minutes.  Tell

3    me about why it's important, if you are aware, as to reasons

4    why it's important to tell the public to stick to agenda items

5    only.

6        When did that, if you know of, come about and why?

7    A.   Well, you have to stay on topic.  It's a public meeting.

8    You have to speak on agenda items only.  The public has to be

9    aware of what you're discussing.  It's a public meeting.  You

10   can't speak about things that aren't on the agenda or even

11   discuss items really that aren't on the agenda because it's not

12   fair to the public.  It's a public meeting.

13           THE COURT:  Is she an expert?  Have you certified her

14   as an expert?

15           MS. SALLAH:  No, she's not an expert.

16           THE COURT:  She needs to talk about facts and not give

17   opinions.

18           MS. SALLAH:  That's why I said if she's aware as to

19   reasons why.  I'll withdraw that question.  I'll withdraw that

20   question.

21   BY MS. SALLAH:

22   Q.   Ms. Landeche, you talked about three minutes.  Why did the

23   three minutes come about, if you're aware, as to why did the

24   parish, you said, adopt rules regarding three minutes?

25   A.   It was passed in '93.  I was not there at the time.  In

OFFICIAL TRANSCRIPT

1  reading the minutes when it was passed, it seemed like at the
2  time --
3          **THE COURT:** Okay, so now she's not talking about
4  facts.  She wasn't there.  I'm just trying to explain; so you
5  know where your questions can go.  A fact witness can only talk
6  about facts that they know and they perceive.  To have her read
7  this and interpret it is giving an opinion.
8          **MS. SALLAH:** Okay.
9          **THE COURT:** So she can't give an opinion.
10 **BY MS. SALLAH:**
11 Q.  Ms. Landeche, I'm asking if you have any personal
12 knowledge regarding the three minutes as to reasons why the
13 parish or what have you seen over time in your capacity as the
14 council secretary as to reasons why it's important to keep
15 people on time.
16         **MR. MOST:** Objection, this is the same thing, reasons
17 why it's important.
18         **MS. SALLAH:** I'm asking in her personal capacity what
19 she's seen.
20         **THE COURT:** Well.
21         **MS. SALLAH:** I'm not asking her to guess.  I'm asking
22 her as to what she's seen over time that leads her to believe.
23         **THE COURT:** That's an opinion, but does she know, in
24 fact, why a meeting has to be?  Because we've already
25 established she doesn't chair the meetings.  Someone else

OFFICIAL TRANSCRIPT

1  chairs the meetings.  That's what's kind of giving me trouble.
2  She's the secretary.  She takes notes.  So if she knows of some
3  reasons that were in the notes.
4        **MS. SALLAH:** Something that happened in her personal
5  presence.
6        **THE COURT:** That she has viewed, right.
7  **BY MS. SALLAH:**
8  Q.   Has something happened in your personal presence at the
9  meetings you've attended as to reasons why three minutes is
10 important, for each person to have only three minutes?
11 A.   Yes.  If you went over that, I mean, some people could get
12 up there and speak for half an hour.  You could be working
13 until midnight.
14 Q.   What time does the meeting start?
15 A.   6:00 p.m.
16 Q.   Okay.  So in your experience or in your personal capacity
17 as you've been the council secretary, has there been any time
18 you've gone into midnight based on public comment?
19 A.   Not since I've been there, no, ma'am.
20 Q.   Since you've been council secretary, have you ever heard
21 or seen anyone read or talk about the contents of an ethics
22 complaint during the public comment period?
23 A.   I don't recall offhand.  I'm sure it's happened.
24 Q.   But you cannot recall?
25 A.   But I cannot recall offhand.

OFFICIAL TRANSCRIPT

1    **MS. SALLAH:** All right, give me one second.

2    **THE WITNESS:** Sure.

3    **BY MS. SALLAH:**

4    Q.   So we talked about -- just a few more questions,

5    Ms. Landeche.  So we talked about you publishing the notices

6    and taking minutes, and that was pursuant to Open Meetings Law;

7    correct?

8    A.   Yes, ma'am.

9    Q.   All right.  Are you aware that the Open Meetings Law

10   requires that the public body has to allow some time for public

11   comment before the body, the public body takes action?

12   A.   Yes.

13   Q.   And to your knowledge, the council, the St. John the

14   Baptist Parish Council follows and has a particular period for

15   public comment before an action is taken on an agenda?

16   A.   We do it at the beginning of the meeting, and we do it for

17   all action items.  The ordinances, they can come back and talk

18   about it when the item comes up also.

19   Q.   All right, thank you.  Are you aware that the Open

20   Meetings Law requires that public bodies allow for recording of

21   the meeting by the audience?

22   A.   Yes.

23   Q.   And to your knowledge, does the parish council follow and

24   allow the public, the general public to record meetings?

25   A.   Yes, we do.

OFFICIAL TRANSCRIPT

286

1  Q.    You talked about recording minutes.  That's part of your
2  job description as you testified; correct?
3  A.    Yes, ma'am.
4  Q.    Are you aware that that's also required by the public
5  meetings; correct?
6  A.    Yes, ma'am.
7  Q.    And as you've already shown, you do take minutes for each
8  meeting, and there were minutes taken from this specific
9  meeting; correct?
10 A.    Yes, ma'am.
11 Q.    Are you aware as to whether the Open Meetings requires the
12 public body should have a place for open meetings that has to
13 be observable to the public with an opportunity for public
14 participation?
15 A.    Yes, ma'am.
16 Q.    And to your knowledge, does the St. John the Baptist
17 Parish Council comply with having an open place for the public
18 to come in and observe --
19 A.    Yes, ma'am.
20 Q.    -- the meeting?
21 A.    Yes, ma'am.
22 Q.    And that happened specifically at the November 28th, 2023;
23 correct?
24 A.    Yes, ma'am.
25 Q.    Okay.  Are you aware that the Open Meetings also requires

OFFICIAL TRANSCRIPT

1  the public body to maintain reasonable rules regarding their

2  public comment period?  Are you aware of that?

3  A.    Yes, ma'am.

4  Q.    And you just mentioned earlier the two that I'm aware of

5  that you just talked about, and that's the three minutes and

6  staying on topic; correct?

7  A.    Uh-huh.

8  Q.    And that's in compliance with Open Meetings Law as far as

9  you're aware of?

10 A.    Yes, ma'am.

11 Q.    Are there any rules that I have not mentioned or you've

12 not mentioned to me regarding the public comment period that

13 St. John the Baptist Parish Council follows in compliance with

14 the Open Meetings Law regarding the public comment period

15 besides three minutes and on topic?

16 A.    No, that's -- three minutes and on topic.

17 Q.    Okay, let's talk about one more thing about the

18 three minutes and the on-topic.  That is on the agenda item,

19 right, that's in front of you?

20 A.    Yes, yes, ma'am.

21 Q.    And that is published to the public; correct?

22 A.    Yes, ma'am.

23 Q.    It's also -- and I have a question.  Is there anywhere

24 it's posted during the public meeting that the public can see

25 those two things?

OFFICIAL TRANSCRIPT

1  A.    Our Open Meetings Law is posted in front of both of our

2  chambers, yes, ma'am.  It's fully posted in front of both of

3  our chambers.

4  Q.    The three minutes?

5  A.    Not the three minutes.  The three minutes is on the

6  agenda.  But the Open Meetings Law is posted in front of our

7  chambers, both of the chambers.

8  Q.    Okay.  When I watch the video of the meeting, and again, I

9  watched the video.  I wasn't there in person.  But you were

10 there in person as you testified?

11 A.    Yes, ma'am.

12 Q.    It seemed there was a clock that has three minutes.  Is

13 that there for the public to see?

14 A.    Yes, ma'am.  And for the person who is, you know, speaking

15 so that they know, you know, you rightfully have your time.

16 Q.    And that is present at every meeting, correct, the

17 three-minute clock that counts down?

18 A.    Yeah, I try my best.  Sometimes I forget.  It's kind of

19 quick, you know.  But I normally like hurry up, and oh, you

20 know.  Because I have to put it up on the screen.  It doesn't

21 stay at the bottom of the screen.  I place the minute clock up.

22 Every time somebody comes up, we start it over.

23 Q.    So you're the one who specifically adjusts the clock, puts

24 the clock for three minutes?

25 A.    Yes, ma'am.

OFFICIAL TRANSCRIPT

1  Q.   That's part of your job?

2  A.   Yes, ma'am.

3  Q.   Okay.

4  A.   Yes, ma'am.

5  Q.   I'm sorry, if I missed that earlier.

6  A.   No, that's okay, that's okay.

7          **MS. SALLAH:** One second.  All right, no further

8  questions.

9          And now definitely Plaintiff's Counsel is going to

10  ask you some questions.

11          **THE WITNESS:** Thank you.

12          **THE COURT:** You tender the witness.

13                     **CROSS-EXAMINATION**

14  **BY MR. MOST:**

15  Q.   Good afternoon, Ms. Landeche.  How are you?

16  A.   Good, thank you.

17  Q.   So I think you testified that the council in 1993 passed a

18  stick-to-three-minute rule?

19  A.   Yes, sir.

20  Q.   And then later, the parish council voted to add in

21  Robert's Rules of Order?

22  A.   Robert's Rules of Order was actually adopted before that.

23  Q.   Okay.  But Robert's Rules of Order doesn't have an

24  on-topic rule; right?

25          **MS. SALLAH:** Objection, she's not an expert here.

OFFICIAL TRANSCRIPT

1            **THE COURT:** It's not about an expert.  She's testified

2      to what their rules are.  I allowed you to ask.  It's a fair

3      question.  Overruled.

4      **BY MR. MOST:**

5      Q.   Do you know if Robert's Rules of Order has an on-topic

6      rule?

7      A.   Yes, I think they do.  I'm almost positive.

8      Q.   You think it does?

9      A.   I would say no if I don't know for sure.

10     Q.   You don't know?

11     A.   If I don't know for sure, no.  But I'm sure it does.

12     Q.   Do you see that this is a document entitled Defendant's

13     Response to Plaintiff's Third Set of Discovery Requests to

14     Michael Wright?

15     A.   Yes, sir.

16     Q.   And do you see that there's some answers in here, some

17     questions and answers?

18     A.   Okay.

19            **MR. MOST:** We're going to offer this as P16.

20     **BY MR. MOST:**

21     Q.   And do you see at the very end that Michael Wright signed

22     these under oath?

23            **MS. SALLAH:** Objection, Your Honor.  He's asking

24     Ms. Landeche to respond to Mr. Wright's --

25            **THE COURT:** I imagine those were submitted to the

                         OFFICIAL TRANSCRIPT

1  parish council or Mr. Wright or what?

2          **MR. MOST:** Yes, these are Defendant's Response to

3  Discovery Requests.

4          **THE COURT:** Overruled.  She works for the Defendant.

5  **BY MR. MOST:**

6  Q.   Do you see on the last page that Mr. Wright signed these

7  under oath?

8  A.   Yes.

9  Q.   And then going to page 3 to 4, do you see that there's a

10  Request for Admission, a request to admit that Robert's Rules

11  of Order does not include an on-topic rule, and that's

12  admitted?

13  A.   I see that, yes, sir.

14  Q.   Do you have any reason to disagree with that?

15          **MS. SALLAH:** Objection, Your Honor.

16          **THE COURT:** What's your objection?

17          **MS. SALLAH:** Again, this is not her discovery

18  responses.

19          **THE COURT:** Overruled.

20          **MS. SALLAH:** This is a different party's discovery

21  responses.

22          **THE COURT:** Overruled.  And when I say overruled, you

23  stop talking because it's called a talking objection.  And so

24  you cannot speak things into the record that would influence

25  what the witness would say.

OFFICIAL TRANSCRIPT

1          **MS. SALLAH:** Understood, Your Honor.

2          **THE COURT:** No talking objections.

3  **BY MR. MOST:**

4  Q.    So Ms. Landeche, you don't know of anywhere that the

5  parish council actually voted to adopt an on-topic rule;

6  agreed?

7  A.    Agreed.

8  Q.    Okay.  And you said you've been to hundreds of parish

9  council meetings with multiple different chairmans; correct?

10  A.    Yes, sir.

11  Q.    Chairpersons?

12  A.    Yes, sir.

13  Q.    Other than November 28, 2023, do you recall any time that

14  any chairperson stopped someone during public comment and read

15  to them a law involving imprisonment or criminal penalties?

16  A.    I couldn't specifically say.  So many times, it could have

17  happened.

18  Q.    It could have happened, but you can't recall any other

19  time; correct?

20  A.    Not specifically, no, sir.

21          **MR. MOST:** Okay, thank you very much.

22          **MS. SALLAH:** May she be excused, Your Honor?

23          **THE COURT:** No redirect?

24          **MS. SALLAH:** No redirect.

25          **THE COURT:** Okay, you may be excused.


OFFICIAL TRANSCRIPT

1            **THE WITNESS:** Do I give these back?

2            **THE COURT:** Just leave them on top.  Make them walk

3  and come and get it.

4            Ms. Sallah, if you feel like you need to say more,

5  you can ask to approach the bench, and then I would let you

6  explain more to me.

7            **MS. SALLAH:** I'm sorry.

8            **THE COURT:** No need to apologize.  We're all learning.

9            **MS. SALLAH:** Plaintiff, did you admit this?

10            **MR. MOST:** I believe so, yeah.  That's P16.

11            **MR. SPEARS:** Judge, we'd call as our next witness R.

12  Gray Sexton.

13            **MR. MOST:** Can we approach before this witness, Judge?

14            **THE COURT:** Yes.

15                 (Proceedings held at the Bench.)

16            **MR. MOST:** So given your ruling that we're not going

17  to get into the internal processes of the Ethics Boards, that

18  seems like kind of the last thing he can testify about.

19            **THE COURT:** So let's see, he will testify as to his

20  employment background as counsel for the Louisiana Board of

21  Ethics, including, his intimate knowledge of policies and

22  procedures used by the Board investigating ethics complaint.

23  That's not an issue here.  He worked there.  He will testify

24  that he has always understood that Ethics Board investigations

25  to be confidential, and he will additionally testify that the

OFFICIAL TRANSCRIPT

1  ethics complaint was dismissed.

2          So you know, his understanding is irrelevant.  It's

3  not like he communicated to them because the legal advice

4  defense, we've already said, is not at issue.  He's going to

5  testify to something the Court has already said -- the

6  complaint was dismissed.

7          What else do you have?

8          **MR. SPEARS:** Well, Judge, there's been lots of

9  testimony that he is her personal lawyer, and one of the

10 allegations that Ms. Banner made in her Facebook post and in

11 her testimony is that she was trying to hire her personal

12 lawyer using taxpayer funds.  So that's one of the issues.

13         **THE COURT:** That's not a material issue here.

14         **MR. SPEARS:** It goes to her credibility, to the

15 Plaintiff's credibility.  We also have the issue of him

16 actually handling the complaint.  I know we're not doing a deep

17 dive.

18         **THE COURT:** We're not going to talk about his -- did

19 the council vote to approve him --

20         **MR. SPEARS:** He was approved.

21         **THE COURT:** -- to handle the complaint?

22         **MR. MOST:** He wasn't there.  We've already got that in

23 evidence.

24         **THE COURT:** I understand that.  I'll let you ask those

25 questions.  I understand that you have been insinuating you

                       OFFICIAL TRANSCRIPT

1    might not have enough time.  I just want to tell you that you

2    seem to be wasting a lot of time putting on evidence that is

3    repetitive.  And so that is something I weigh as to whether or

4    not I give you any more time.

5          With that knowledge and understanding, the scope of

6    what I'm allowing.

7          (Whereupon this concludes proceedings held at

8        the bench.)

9                          **R. GRAY SEXTON,**

10    after having been duly sworn, did testify as follows:

11                         **DIRECT EXAMINATION**

12    **BY MR. SPEARS:**

13    Q.   Sir, give us your name and address for the record.

14    A.   Gray Sexton.  My office address is 8680 Bluebonnet

15    Boulevard in Baton Rouge.

16    Q.   And Mr. Sexton, how are you employed?

17    A.   I'm an attorney.

18    Q.   And there was a particular meeting of the St. John Parish

19    Council in November of 2023 where one of the agenda items was

20    whether or not to retain the Law Firm of R. Gray Sexton to

21    represent the parish on matters related to ethics law.

22          Are you familiar with that meeting?

23    A.   Yes.  I was not at that meeting, but we were, in fact,

24    engaged by the parish to represent its interest.

25    Q.   Okay.  So is it my understanding that a majority of the

OFFICIAL TRANSCRIPT

1  council voted favorably to hire your firm?

2  A.    That is my understanding.

3  Q.    And was your firm actually hired?

4  A.    Yes.

5  Q.    Okay.  And with regard to your firm, is that the typical

6  type of work that you do, ethics work?

7  A.    Yes.

8  Q.    And with regard to St. John the Baptist Parish, we know

9  that you were hired to represent them as a result of the

10  November 28, 2023 meeting.

11      Had you represented St. John or other parishes before?

12  A.    Yes.

13  Q.    So it would not be unusual for a parish to hire you for

14  ethics matters?

15  A.    We routinely provide consultation and litigation services

16  to governmental agencies, including, parishes.

17  Q.    Have you or your law firm ever previously represented

18  Jaclyn Hotard personally?  When I say Jaclyn Hotard, you know

19  who I'm speaking of; correct?

20  A.    I do know Ms. Hotard.  I've known Ms. Hotard for 20 years.

21  Q.    Okay.  And that's about how long she's been an elected

22  official; correct?

23  A.    Perhaps so.

24  Q.    Have you ever represented her personally?

25  A.    No.

OFFICIAL TRANSCRIPT

1  Q.    So if I were to say that you were her personal attorney

2  and Ms. Hotard was attempting to pay her personal attorney with

3  parish funds, would that be incorrect?

4  A.    That would be incorrect.

5  Q.    And the times that you have represented Ms. Hotard, it has

6  been in her official capacity as an elected official?

7  A.    Say that one more time, sir.

8  Q.    When you have represented her on this most recent matter,

9  it was in her official capacity; is that correct?

10  A.    As a member of the council, that is correct.

11  Q.    Well, council or parish president?

12  A.    Parish president.  We previously represented her as a

13  member of the council.

14  Q.    I apologize.

15      There was a specific complaint that we've heard a lot

16  about involving Ms. Joy Banner complaining about a rezoning

17  matter that was signed by Jaclyn Hotard.  Did you represent

18  Ms. Hotard and the parish on that particular matter?

19  A.    We did.

20  Q.    Can you tell the ladies and gentlemen of the jury what was

21  the final outcome of that matter?

22  A.    Yes.  After we informed the Ethics Board staff --

23          **THE COURT:** Can you answer the question?  Answer the

24  question.

25  **BY MR. SPEARS:**

OFFICIAL TRANSCRIPT

1  Q.    What was the final outcome of that matter?

2  A.    What was the final outcome of that matter?  The Ethics

3  Board informed Ms. Hotard directly that she had not violated

4  the ethics code and the file was closed.

5  Q.    As her attorney, are you copied on all correspondence that

6  is sent to Ms. Hotard from the Ethics Board?

7  A.    I would have thought so.  We were not copied on that

8  correspondence.

9  Q.    On which correspondence?

10 A.    The notice that the file was being closed because there

11 was no evidence of a violation of the ethics code.

12 Q.    Is it your understanding that the investigative portion --

13            **THE COURT:** Counsel, approach.

14                (Proceedings held at the Bench.)

15            **THE COURT:** If you're going to ask this witness about

16 whether he thought it was confidential or not, he's not here as

17 an expert to testify about --

18            **MR. SPEARS:** I won't ask that.  I won't ask that.

19            **MR. MOST:** Are we getting into the investigative

20 things?

21            **MR. SPEARS:** I said I won't ask that.

22            **MR. MOST:** Okay.

23                (Whereupon this concludes proceedings held at

24     the bench.)

25 **BY MR. SPEARS:**

                        OFFICIAL TRANSCRIPT

Q.    From your personal knowledge, Mr. Sexton, the communications from the Ethics Board to the person who's subject of the investigation are always stamped "confidential"; is that correct?

A.    That's correct.

Q.    And that has been in all the years you've done this work?

          **THE COURT:** Okay, Counsel, approach.

                    (Proceedings held at the Bench.)

          **THE COURT:** He's not here as an expert or as a testifying -- you told me he was coming in as a fact -- expert because you would have had to have notified the Court, you know, like a treating physician.  So I'm going to strike that.

          I mean he can testify as to whether the particular letters communicated in this particular incident were marked "confidential."  But anything outside of that, he's giving an expert opinion.

          **MR. MOST:** Yeah, I mean I think we've gotten this from three witnesses that these were stamped "confidential," but we can do it again.

          **THE COURT:** But my concern is nobody else comments on the law.  We don't have an expert commenting.  He can only speak about facts, so.

          What I'm really concerned about is you said you weren't going to ask that question, and you turned around and asked that very question.  Don't do that again.  You asked the

OFFICIAL TRANSCRIPT

1  very question I was telling you do not ask because now they

2  have this opinion.  I'm going to have to have an opinion from

3  someone who is not an expert.

4        **MR. SPEARS:** I'll rephrase it to this case.  I thought

5  that's where I was going.

6        **THE COURT:** No, you didn't.  You asked him in his

7  experience.  I'll tell you exactly.  Let me go back.  "The

8  communications from the Ethics Board to persons who are subject

9  of the investigation are always stamped confidential."

10       **MR. SPEARS:** Okay.  Well, I meant this case.

11       **THE COURT:** That's an expert.

12       **MR. SPEARS:** I can say this case?

13       **THE COURT:** I'm striking that.

14       **MR. SPEARS:** Right, I'm saying -- I want to make sure

15 that I say it right.

16       **THE COURT:** In this case.  You already said he's cc'ed

17 on everything.

18               (Whereupon this concludes proceedings held at

19    the bench.)

20       **THE COURT:** Ladies and gentlemen of the jury, the

21 witness here is testifying as a fact witness.  He's not here to

22 testify in his capacity as an attorney.  He can't opine about

23 the law, and he can't opine about anything with his, you know,

24 legal expertise in the sense that I'm striking the question,

25 his response to whether or not he knows if all the

OFFICIAL TRANSCRIPT

1  communications from the Ethics Board who are subject to
2  investigations are always stamped "confidential."
3              He can't come here today and testify about that,
4  right.  We're talking about this case.  An expert would, but he
5  has not been offered or accepted by this Court as an expert.
6  The reasons why, you don't have to bother yourself with, but
7  he's only limited to testifying about the facts in this
8  particular case.
9  **BY MR. SPEARS:**
10  Q.   As to this particular case, Mr. Sexton, is it your
11  understanding and recollection that each and every
12  correspondence that you and President Hotard received from the
13  Ethics Board in regard to this investigation were always
14  stamped "confidential"?
15  A.   Yes.
16  Q.   In addition to the confidential stamp, there's a statute
17  that's sometimes stamped on the correspondence as well;
18  correct?
19  A.   A Title 42 statute, that's correct.
20  Q.   I'm sorry, I didn't hear you.
21  A.   A Title 42 statute, that's correct.
22  Q.   Okay, a Title 42 statute.
23              **MR. SPEARS:** Nothing further, Your Honor.
24              **THE COURT:** All right.
25                           **CROSS-EXAMINATION**

                         OFFICIAL TRANSCRIPT

1  **BY MR. MOST:**

2  Q.    Good afternoon, Mr. Sexton.

3  A.    Mr. Most.

4  Q.    I just wanted to be clear who you represented.  You

5  represented Jaclyn Hotard; correct?

6  A.    That is correct and the parish.

7          **MR. MOST:** Thank you.

8          **THE COURT:** All right, are you done?

9          Thank you, Mr. Sexton.

10          **MR. SPEARS:** Thank you.  We'd now call Alesia Ardoin,

11  Your Honor.

12          **MR. MOST:** Could we approach, Your Honor?

13          **THE COURT:** Yes.

14              (Proceedings held at the Bench.)

15          **MR. MOST:** My understanding is that Ms. Ardoin has

16  literally the exact same testimony as Mr. Sexton.

17          **MR. SPEARS:** You want to stipulate that if she's

18  called, she's going to testify exactly like?

19          **MR. MOST:** I mean her deposition is the same as

20  Mr. Sexton.

21          **MR. SPEARS:** So is that a stipulation?

22          **MR. MOST:** I mean my objection is just going to be

23  asked and answered and cumulative.

24          **MR. SPEARS:** Not asked of her.

25          **THE COURT:** What?

OFFICIAL TRANSCRIPT

303

1           **MR. MOST:** Well, it's cumulative.

2           **THE COURT:** He's got time.  Do y'all want to

3    stipulate?

4           **MR. SPEARS:** I just asked him.

5           **THE COURT:** The concern I have is that there was some

6    of this last lawyer's testimony that I'm really bothered about.

7    I'm not quite sure if my instruction corrected that.  Sometimes

8    when things are said, you know, they're out there.  And I don't

9    want -- and I'm really bothered, Mr. Spears, because I warned

10   you not to ask the question.  You asked the question.

11          And so now, you know, the information is out there.

12   And so I don't want a repeat of that, but I'm not going to, you

13   know.  I don't know if y'all want to stipulate, it's up to you.

14          **MR. SPEARS:** I'm fine with stipulating.

15          **THE COURT:** But I don't want a repeat of the last

16   witness.

17          **MR. MOST:** I would be fine to stipulating to say if

18   Ms. Hotard's other lawyer were called, she would say something

19   similar.

20          **THE COURT:** So Ms. Ardoin is her personal attorney?

21          **MR. MOST:** She works with Mr. Sexton at the same firm.

22          **THE COURT:** Oh, they're at the same law firm?

23          **MR. SPEARS:** She actually personally handled the

24   complaint.  But Judge, I'm fine with a stipulation.  I don't

25   think he wants to do one.

OFFICIAL TRANSCRIPT

1        **MR. MOST:** No, I'm saying we can stipulate.

2        **THE COURT:** Tell me what the stipulation is.

3        **MR. SPEARS:** The stipulation would be if she was

4   called, her testimony would be simply identical to Gray Sexton.

5        **MR. MOST:** Yeah.

6        **THE COURT:** Because they work together.

7        **MR. SPEARS:** They work in the same law firm.

8        **MR. MOST:** Would you like me to say that, or would you

9   like to?

10       **THE COURT:** If y'all want to say it or you want me to

11  say it?

12       **MR. SPEARS:** I'll read it into the record.

13            (Whereupon this concludes proceedings held at

14       the bench.)

15       **MR. SPEARS:** Your Honor, in the interest of time, we

16  would offer a stipulation to the Plaintiff that --

17       **THE COURT:** To the Court.

18       **MR. SPEARS:** To the Court, I'm sorry, Your Honor.  To

19  the Court that Attorney Alesia Ardoin works in the same law

20  firm as R. Gray Sexton.  And if she were called to testify, her

21  testimony would be essentially identical to the testimony we

22  just heard from R. Gray Sexton.

23       **THE COURT:** Except for what I excluded --

24       **MR. SPEARS:** Yes, yes.

25       **THE COURT:** -- as inadmissible opinion testimony.

OFFICIAL TRANSCRIPT

305

1          **MR. MOST:** We agree.

2          **THE COURT:** All right.  So you understand, we're not

3     going to make her come and testify to the same thing and save

4     some time.

5          **MR. SPEARS:** If that's the case, Your Honor, I would

6     ask that both Ms. Ardoin and Mr. Sexton be released from their

7     subpoenas.

8          **MR. MOST:** No objection.

9          **THE COURT:** All right, they may be released.

10     **MR. SPEARS:** Good.

11          Our next witness is council chairperson -- well,

12     actually, he's not the chairperson anymore.

13     Councilman-At-Large Michael Wright.

14          **THE COURT:** All right, Mr. Wright.

15          **DEPUTY CLERK:** Just a reminder, you were already

16     placed under oath.

17                          **DIRECT EXAMINATION**

18     **BY MR. SPEARS:**

19     Q.   Councilman Wright, good afternoon.

20     A.   Good afternoon.

21     Q.   Although you did it earlier, I'll just ask you to give

22     your name and your title to the members of the jury.

23     A.   Yes.  Michael Patrick Wright, current Councilman-At-Large

24     for Division B for St. John the Baptist Parish.

25     Q.   And Councilman Wright, tell us a little bit about

                          OFFICIAL TRANSCRIPT

306

1  yourself.  Where did you grow up?

2  A.    St. John Parish.

3  Q.    All your life?

4  A.    All my life.  I moved briefly, went to UL Lafayette for

5  two years.  Then moved back home and went to Southeastern.

6  Q.    So born and raised in St. John Parish?

7  A.    Yes, sir.

8  Q.    And now you have the honor of representing St. John Parish

9  on the council?

10  A.    Yes, sir.

11  Q.    After college, how did you get into politics?

12  A.    I was very heavily involved in a lot of community work.  I

13  was on the Board of Directors for St. John Theater.  I was

14  involved for many years with Relay For Life of St. John.  I was

15  actually the Chairman for Relay For Life for St. John.

16      So I was very heavily involved from a community

17  standpoint.  And during my later years of college, I worked for

18  the parish as a student worker.

19  Q.    You mentioned Relay For Life.  Some of the jurors may not

20  know what that is.  I only know what it is because you told me.

21      What is Relay For Life?

22  A.    It's a fundraiser from the American Cancer Society raising

23  funds for cancer research.

24  Q.    And what drove you to get involved with cancer?

25  A.    Personal matters.  I had my grandmother passed away in

OFFICIAL TRANSCRIPT

307

1    2008 from cancer.

2    Q.    Okay.  When did you first run for St. John Parish Council?

3    Do you remember when that happened?

4    A.    That was 2011.

5    Q.    And which particular seat on the council did you run for?

6    A.    District 5.

7    Q.    Were you successful?

8    A.    Yes, sir.

9    Q.    And so 2011, you were elected.  And how long did that term

10   last?

11   A.    That was a full four-year term.  Then I ran for

12   re-election.  So I served two terms as a District 5 council

13   member.

14   Q.    And District 5, what part of St. John does that represent

15   for those of us who don't know?

16   A.    I would say the best way to describe it would be sort of

17   between the two lakes, Lake Pontchartrain and Lake Maurepas.

18   Q.    Okay.  Two terms as District Councilman District 5, then

19   what's next?

20   A.    Councilman-At-Large.

21   Q.    And explain to the jurors, what is the difference between

22   an at-large councilman and a District 5 councilman?

23   A.    So the best way I can describe it is similar to state.

24   Every resident is entitled to dual representation.  So you have

25   a state representative and a state senator.

OFFICIAL TRANSCRIPT

308

```
1        Councilman-at-large is basically the parish divided in
2   two.  So a resident will have a district council member as well
3   as an at-large council member.
4   Q.   Okay.  And you're in your first term or your second term?
5   A.   Second term.
6   Q.   Okay.  So all told, how many years do you have as an
7   elected official in parish government?
8   A.   This would be my 13$^{th}$ year.
9   Q.   And all told, how many ethics complaints have been filed
10  against you personally?
11  A.   To my knowledge, none.
12  Q.   When you hear Ms. Banner and her lawyers use the word
13  "corruption" in connection with your name, how does that make
14  you feel?
15  A.   We have thick skin.  You know, it's taken time, but you
16  know, as public officials, we're faced with scrutiny all the
17  time.  So it wouldn't be uncommon to hear that, or you know,
18  see it in the papers.
19  Q.   In one of the presentations, we saw the video, I think.
20  And correct me if I'm wrong, it looks like one of the speakers
21  was hurling some insulting remarks directly at you.  Do you
22  remember that?
23  A.   If you're referring to Ms. Perrilloux referring or asking
24  me if I was slow, yes.
25  Q.   Okay.  She asked that maybe two or three times?
```

OFFICIAL TRANSCRIPT

1  A.    I don't remember how many times, but I know it was asked.

2  Q.    You didn't threaten her with arrest, did you?

3  A.    I did not.

4  Q.    And she wasn't violating any confidentiality statute;

5  although she was insulting you; correct?

6             **MR. MOST:** Objection, calls for a legal conclusion.

7             **THE COURT:** Sustained.  So you're to disregard his

8  reference to violating a confidentiality statute.

9  **BY MR. SPEARS:**

10  Q.    What is your family personal life like, Michael?

11  A.    I'm father of three little boys.  My oldest is four.  My

12  youngest twins are two.  Probably why there's some dark circles

13  under my eyes.  I'm tired.  And I have a wife.  We've been

14  married for seven years.

15  Q.    And do they support the fact that you are an elected

16  official or parish council person?  Are they supportive of

17  that?

18  A.    They're supportive.  My wife is supportive in any of my

19  endeavors in getting involved in the community.  She's not a

20  favor of the public scrutiny that comes with it.

21  Q.    You mentioned in your earlier testimony that you were

22  recently unemployed.  But prior to the recent unemployment,

23  what was your career track, your nonpolitical career track

24  because council is not full-time; is that correct?

25  A.    Correct.  So I've spent about ten years in the healthcare

OFFICIAL TRANSCRIPT

1  space.  Began my career in healthcare, working for Fresenius,

2  dialysis company.  Dealt a lot with, you know, patient care and

3  supporting individual markets.

4       And then after that, I moved into the ASC space for a

5  little while with a company that owns and operates ambulatory

6  surgical centers.

7       And then most recently, I spent about a year at a startup

8  bio-pharmaceutical company.  I'm managing a team across the

9  southeast and was just, you know.  The division was just

10 recently eliminated.

11 Q.   When you say the southeast, what states did that

12 encompass?

13 A.   It was Tennessee down to Louisiana across to Florida.

14 Q.   We've heard a lot, Michael, about this Greenfield grain

15 elevator project.  Are you familiar with this project?

16 A.   Yes.

17 Q.   Were you supportive of this project?

18 A.   Yes.

19 Q.   Explain to us why did you support the Greenfield project.

20 A.   It was a big economic driver for St. John Parish.  It was

21 going into an area, the community of the West Bank that, you

22 know, residents are looking for growth, they're looking for job

23 creation.

24       And you know, the pitch of the proposal for this was that

25 it would create these jobs, and it was a, you know.  And

OFFICIAL TRANSCRIPT

1  modern-day technology, right, has advanced when it comes to
2  grain elevators.  So it was a cleaner alternative than, I
3  guess, what we're used to.
4  Q.   Okay.  You said it was economic development.  Do you have
5  any idea of the scope in terms of dollars that it could
6  potentially have brought to St. John or to Louisiana?
7  A.   I don't know exactly how many jobs.  I know it was
8  hundreds of millions of dollars in construction costs which
9  would be indirect jobs for the construction and then permanent
10  jobs after the fact.
11  Q.   Other than yourself, do you know if the grain elevator had
12  any other prominent support?
13  A.   Yes.  From my understanding, they had a lot of support.
14  Q.   Off the top of your head, can you think of any of the key
15  people from either the state or from the parish who supported
16  it?
17          **MR. MOST:** Objection as to relevance.
18          **THE COURT:** Sustained.
19  **BY MR. SPEARS:**
20  Q.   Did you support the Greenfield project because it was
21  financially beneficial to yourself?
22  A.   No.
23  Q.   Did you support the Greenfield project because it was
24  financially beneficial to President Hotard?
25  A.   No.

OFFICIAL TRANSCRIPT

1  Q.   Did she ever ask you to support it because it was
2  financially beneficial to her?
3  A.   No.
4  Q.   Did you support the project because it was financially
5  beneficial to her husband and her mother-in-law?
6  A.   No.
7  Q.   Okay.  Did you think the project was good for your parish?
8  A.   Yes.
9  Q.   Some time after Greenfield came to town and purchased
10 their 200-plus acres of land, it's my understanding that there
11 was some litigation.
12      Can you tell us what happened with regard to that, around
13 the zoning?
14 A.   I know that there was -- we were issued a lawsuit.  The
15 council was trying to take corrective action after the original
16 lawsuit that was filed stated that the zoning was done
17 incorrectly.  So as part of the process to rectify, the council
18 attempted to put a resolution to start the process again.
19      And I believe there was two lawsuits filed for a temporary
20 restraining order preventing us from doing so.
21 Q.   Okay.  Now you talked about the original lawsuit.  Is that
22 the one that reverted the acres from industrial to residential?
23 A.   I believe so, yes.
24 Q.   Do you remember when that lawsuit was filed?
25 A.   I do not.

OFFICIAL TRANSCRIPT

1  Q.    Okay.  And so in response to the lawsuit that reverted the

2  Greenfield land from industrial -- well, first of all, you

3  cannot build a grain elevator on residential property.  Is that

4  a correct statement?

5  A.    Yes.

6  Q.    So in response to the conversion by the state court judge

7  from residential to -- I mean from industrial to residential,

8  what action, if any, did the council take?

9  A.    The council passed a resolution basically directing the

10  parish administration to start the process of the rezoning from

11  the beginning.

12  Q.    And what was the intention?

13  A.    The intention was to go through the zoning process, to go

14  through the original zoning processes the right way to correct

15  the issue.

16  Q.    And by "correct the issue," what exactly were you hoping

17  would be the ultimate outcome?

18  A.    So having that particular property going back to

19  industrial.

20  Q.    Okay.  And who would benefit -- would that benefit

21  Greenfield?

22  A.    Yes.

23  Q.    Do you recall whether or not the zoning application that

24  was advanced to restore Greenfield from residential back to

25  industrial, do you recall whether or not the surrounding

OFFICIAL TRANSCRIPT

1  properties were included in that application?

2  A.    I don't believe so.

3  Q.    So it was just the Greenfield properties?

4  A.    To my knowledge, yes.

5  Q.    Okay.  Ultimately, there was a meeting which is the

6  subject of this litigation which took place on November 28,

7  2023.  I don't want to start at the meeting.

8       But explain to the jurors what, if anything, did you do in

9  preparation for that meeting?

10 A.    I spoke with -- I had an email and a phone call from

11 District Attorney Keith Green.

12           **MR. MOST:** Can we approach the bench, Your Honor?

13           **THE COURT:** Yes.

14                 (Proceedings held at the Bench.)

15           **MR. MOST:** This is exactly the subject of the motion

16 in limine on advice of counsel.  This is the exact thing that

17 this Court excluded.  I think it was R. Doc. 53, if I remember

18 correctly.

19           **MR. SPEARS:** Your Honor, advice of counsel requires

20 four specific things.  None of which we're going to address in

21 this Q and A.

22           **MR. MOST:** It's about his correspondence from the

23 district attorney who is the --

24           **MR. SPEARS:** That's not advice of counsel.  That is

25 not advice of counsel.

                        OFFICIAL TRANSCRIPT

```
 1              THE COURT: It doesn't mean that you can prove all the
 2   elements.  Is he going to say that he gave him some advice?
 3              MR. SPEARS: No.
 4              THE COURT: Why did he call him then?  He said he
 5   called him.
 6              MR. SPEARS: He gave him an email.  He didn't give
 7   them any advice.  He gave him an email, and we already know
 8   that's been well established.
 9              THE COURT: The email is in?
10              MR. MOST: No, the email was excluded in R. Doc. 53.
11   This is exactly -- we said --
12              THE COURT: You can't let the email in.  You can't
13   talk about the email.  The email is excluded because --
14              MR. MOST: Because the advice of counsel defense
15   wasn't invoked.  And the district attorney is the lawyer for
16   the parish government.
17              THE COURT: Let me see it.
18              MR. SPEARS: I don't have the email.
19              THE COURT: You weren't going to introduce it?  Oh,
20   he's going to talk about the email?
21              MR. SPEARS: He's going to talk about what he did.
22              THE COURT: He's going to talk about the email.
23              Do you have the motion in limine?
24              MR. MOST: It's think it's R. Doc. 53 is my
25   recollection.  Let me grab my computer.
```

OFFICIAL TRANSCRIPT

1          It's R. Doc. 53.  Any reference to advice of counsel
2   is excluded from the trial.  This email is the advice that
3   Keith Green from the District Attorney's Office gave -- this is
4   what in Mr. Wright's deposition, he kept saying, "I was advised
5   by counsel, advised by counsel."  And he was talking about the
6   correspondence from Keith Green.  His deposition prompted this
7   motion.  The motion was granted.

8          **THE COURT:** I was just circling what is said here.
9   The motion in limine was to exclude references to any advice of
10  counsel defense.

11         **MR. SPEARS:** We're not making any reference --

12         **THE COURT:** No opposition to the motion was even
13  submitted, okay.

14         **MR. MOST:** Your Honor, if you look at R. Doc. 39-1,
15  this was our motion.  We said, "For example, Defendant Wright
16  testified that Assistant District Attorney Keith Green, legal
17  advisor to the parish council, advised him to read the
18  unconstitutional criminal statute aloud."

19         So that was the basis for our motion was the
20  correspondence and phone call with Keith Green.

21         **THE COURT:** So you're agreeing?  You said that his
22  testimony doesn't meet the elements of advice of counsel?

23         **MR. SPEARS:** Right, it absolutely does not.

24         **THE COURT:** You agree with that.  So then what purpose
25  is it for you to talk about the fact that he got advice of

OFFICIAL TRANSCRIPT

1  counsel?

2          **MR. SPEARS:** Well, I'm not saying he got advice of

3  counsel.  Judge, first of all, advice of counsel requires that

4  you seek legal advice, that you give a complete and honest

5  disclosure to the counsel, that you receive the advice, and

6  that you rely on the advice.  We're not saying that.

7          What he's going to say is he got an email from the

8  parish attorney.  That's not advice of counsel.  That does not

9  meet the criteria.

10          **THE COURT:** But he got an email from his attorney,

11  from the attorney for the parish.

12          **MR. SPEARS:** For the parish council.  He didn't ask

13  for the advice.

14          **THE COURT:** Let me see the email.

15          **MR. MOST:** Wait, but that's why the motion was granted

16  because it didn't meet the criteria for the advice of counsel.

17          **THE COURT:** I want to see the email.  Is it attached

18  to this?  Was it submitted as an exhibit?

19          **MR. SPEARS:** It's not in our book.

20          **MR. MOST:** So this is from Mr. Wright's deposition:

21      "So as far as you can recall, you only recall an email;

22  right?

23      "Yes.

24      "And Mr. Green suggested that you read this part, of all

25  the statute, during the upcoming meeting?

OFFICIAL TRANSCRIPT

1        "Yes.

2        "Why did he advise you to do -- I mean what was the

3   context of that discussion?

4        "I recall the contents of the email was to limit, to limit

5   the ability of the council's discussion on the matter."

6            The reason why we moved on the advice of counsel

7   defense is because this doesn't meet the criteria for an advice

8   of counsel defense.

9            **MR. SPEARS:** We agree.

10           **MR. MOST:** Which means that they can't get into he was

11  doing it on advice of counsel.  That was the basis for the

12  motion.

13               (Whereupon this concludes proceedings held at

14      the bench.)

15           **THE COURT:** While we're discussing this, we're going

16  to let the jurors take a ten-minute break, 15 minutes, just

17  saying.  It always ends up being a little longer.

18           **DEPUTY CLERK:** All rise for the jurors.

19               (The jury exited the courtroom.)

20           **THE COURT:** You can still stay here.  So you were

21  reading me the deposition testimony?

22           **MR. MOST:** Yeah, from Mr. Wright.

23           **THE COURT:** Well, I don't want him to hear.

24           Mr. Wright, can you leave the witness box?

25           **THE WITNESS:** Yes, Judge.


                         OFFICIAL TRANSCRIPT

1          (Proceedings held at the Bench.)

2          **THE COURT:** So what you're telling me is you want to

3     get in the backdoor what I did not allow you to present in the

4     front door?

5          **MR. SPEARS:** No.  This is not an advice of counsel

6     defense.

7          **THE COURT:** Well.

8          **MR. SPEARS:** It is not.  It doesn't meet the elements.

9          **THE COURT:** But it's an argument.

10          **MR. SPEARS:** It doesn't meet the elements.

11          **THE COURT:** Wait, wait.  It's an argument.

12          **MR. SPEARS:** It's a fact.  He has made a lot to say

13     about he read the statute.  He's simply saying when and where

14     he got the statute.  He didn't get advice.  He got the statute.

15          **THE COURT:** But it's his lawyer.  He did get advice.

16     The lawyer sent him the statute, telling him to read it at the

17     council.  That is plain letter legal advice.

18          **MR. SPEARS:** The advice of counsel defense requires

19     him to seek --

20          **THE COURT:** I'm not going to allow it.

21          **MR. SPEARS:** So he can't say where he got the email

22     from?

23          **MR. MOST:** That's the whole point.

24          **MR. SPEARS:** I'd prefer to hear from the judge.

25          **THE COURT:** You know, the only thing I can do is, but

                         OFFICIAL TRANSCRIPT

1  I think that complicates it more, is tell the jury that, you
2  know, again, because it gets into the fact that he's going to
3  say, you know, that he got it from his attorney.  And the
4  assumption is that he was advised by his attorney.

5          **MR. SPEARS:** That's an assumption.

6          **THE COURT:** Right.  And then the average person is
7  going to say that, well, that's reasonable to read it because
8  you got it from your attorney.  But that's the defense that you
9  did not properly raise.

10         **MR. SPEARS:** We're not raising it, Judge, because
11  there's some specific elements that are not met.  He already
12  said we don't meet the elements.

13         **THE COURT:** But there's a difference between pleading
14  a defense and then meeting the elements of the defense to
15  recover, I mean, to be successful on it.  So you never pled the
16  defense.  You said that you weren't going to plead the defense.
17  So now to offer evidence of the defense --

18         **MR. SPEARS:** No.

19         **THE COURT:** -- is inadmissible.  It is inadmissible.

20         **MR. SPEARS:** Well, we'll note an objection, Judge,
21  because we're not raising an advice of counsel.  We're simply
22  giving the facts as to when and where --

23         **THE COURT:** Facts that goes to, and you want to --
24  actually, you want to weaponize the fact so that the jury can
25  make the conclusion that he had advice of counsel without

OFFICIAL TRANSCRIPT

1    having the burden of actually having to prove it.  If you offer

2    that advice and he comments on it, then it should have been a

3    defense because then I would instruct the jury that he can't

4    rely on advice of counsel unless A, B, C, and D.

5            But it was never a defense.  So they could never

6    prepare for it, and you would not have to prove it.  And so

7    that's why it's impermissible at this time.

8            **MR. SPEARS:** But I'm not trying to prove advice of

9    counsel, Judge.  I'm simply trying to --

10           **THE COURT:** You're not trying to prove advice of

11   counsel, but you're trying to get in evidence of advice of

12   counsel.

13           **MR. SPEARS:** No.

14           **THE COURT:** What are you doing, then?  That is

15   evidence of advice of counsel.  What other purpose are you

16   offering this evidence for?

17           **MR. SPEARS:** It's factually correct as to when, where,

18   and how he got the email with the statute.

19           **THE COURT:** Because of -- and why is the when, where,

20   and how of how he got the email relevant to Plaintiff's claim

21   that she was denied her First Amendment; right?  Why is it

22   relevant?  Because he got it from his lawyer, and you're going

23   to insinuate to the jury that he --

24           **MR. SPEARS:** I'm not going to insinuate that.

25           **THE COURT:** The mere fact that he's going to say it,

OFFICIAL TRANSCRIPT

1  so it does go to that particular element.  I mean, you know,

2  again, I can't let you do that.

3          **MR. SPEARS:** I'll simply say that he received an

4  email, but he won't say it came from the lawyer then.

5          **MR. MOST:** I don't think we should get into where he

6  got it at all.

7          **THE COURT:** No.  But he had it, and he read it.  Now

8  where he got it from is irrelevant unless you want the jury to

9  know he got it from a lawyer; so they can say, oh, well.  The

10 assumption is he's getting legal advice.  Why else would you

11 get information from a lawyer?

12         **MR. SPEARS:** Judge, all due respect, it's not advice

13 of counsel.

14         **THE COURT:** Okay, I agree with you.  You haven't

15 demonstrated enough evidence, and you agree, to be successful

16 on an advice of counsel claim.

17         **MR. SPEARS:** We're not raising that defense.

18         **THE COURT:** And so to admit this evidence, the

19 probative value is outweighed by the prejudicial impact.

20         **MR. SPEARS:** We simply note an objection.

21         **THE COURT:** All right, that's fine.

22         **MR. MOST:** Thank you, Your Honor.

23             (Whereupon this concludes proceedings held at

24     the bench.)

25         **THE COURT:** Do y'all need a break while the jurors are

OFFICIAL TRANSCRIPT

```
 1   out?
 2              Do you need a break, Madam Court Reporter?
 3          COURT REPORTER: I could use a break.
 4          THE COURT: Okay, let me go ahead and give you a
 5   break.
 6                 (A short recess was taken.)
 7          DEPUTY CLERK: All rise.
 8          THE COURT: Bring in the jury.
 9              (The jury was escorted into the courtroom.)
10          THE COURT: Have a seat.
11          You can return to the witness stand.
12          MR. SPEARS: Are we ready, Your Honor?
13          THE COURT: Yes.
14   BY MR. SPEARS:
15   Q.   Michael, as council chair, what were your roles and
16   responsibilities as it related to council meetings?
17   A.   Setting the agenda, running the meetings, keeping order
18   and decorum.
19   Q.   And when you say "keeping order and decorum," what exactly
20   did that entail?
21   A.   Ensuring that we are complying with Open Meetings Law,
22   ensuring that discussion remains on topic to ensure that, you
23   know, the business of the parish is being done appropriately.
24   Q.   We've heard some previous testimony from you, and I think,
25   from Jackie Landeche, that one of the things that guide the
```

OFFICIAL TRANSCRIPT

1  parish council meetings is a three-minute rule that had been
2  previously adopted; is that correct?
3  A.    Yes.
4  Q.    And I think she also mentioned that maybe -- you may have
5  mentioned.  She definitely mentioned.  That Robert's Rules of
6  Order have also been formally adopted; is that correct?
7  A.    Yes.
8  Q.    Let's talk briefly about the Louisiana Open Meetings Law.
9  You are familiar with that law; correct?
10 A.    Yes.
11 Q.    And as a public body, the parish council is governed by
12 that law; correct?
13 A.    Yes.
14            **MR. SPEARS:** Your Honor, may I approach?
15            **THE COURT:** Yes.
16 **BY MR. SPEARS:**
17 Q.    Michael, I'm going to show you what we've marked as D5.
18 Take a look at it and see if you recognize that particular
19 document.
20 A.    Yes.
21 Q.    Explain as best you can to the jurors what is D5.
22 A.    So this is basically guidance from the Louisiana
23 Legislative Auditor on Open Meetings Law.
24 Q.    Okay.  And as an elected council member, have you been
25 provided with that?  Some people call it The Handbook; some

OFFICIAL TRANSCRIPT

1  people call it a White Paper.

2      Have you been provided that White Paper to assist you in

3  running your open meetings?

4  A.   Yes.

5  Q.   And do you follow the guidelines that are laid out in that

6  particular Open Meetings Law White Paper?

7  A.   I believe so.

8  Q.   Okay.  Let's first talk generally about the way you run

9  the meetings.  Are all of the meetings -- and I'm talking not

10 necessarily about the November 28, 2023 meeting, but are all of

11 the meetings publicized in advance?

12 A.   Yes.

13 Q.   Are all of the meetings open to the public?

14 A.   Yes.

15 Q.   Is the agenda of the meetings always available in advance?

16 A.   Yes.

17 Q.   Do the agenda of the meetings specifically provide for the

18 three-minute time limit?

19 A.   Yes.

20 Q.   Do the agendas of the meeting as well as the bulletin

21 board, the digital bulletin board at the meetings, indicate

22 that speakers must be on agenda items only?

23 A.   Yes.

24 Q.   If someone wants to videotape the proceedings, the parish

25 council meetings, is that always permitted?

OFFICIAL TRANSCRIPT

1   A.    Yes.

2   Q.    Do you keep minutes of each and every parish council

3   meeting?

4   A.    The council secretary does.

5   Q.    Okay.  And is the parish council meeting memorialized

6   either on YouTube or some form or fashion?

7   A.    The meetings are posted online via the parish website

8   under the council page.

9   Q.    So even today, if somebody wanted to go back and pull a

10  meeting from a year ago or two years ago, it is still available

11  to the public online?

12  A.    I'm not sure how far back it goes.  But yes, they have

13  some archives.

14  Q.    Okay.  And so with all of that in mind, it's your belief

15  that the meetings you presided over, including, the November 28

16  meeting, have always complied with the Louisiana Open Meetings

17  Law?

18  A.    Yes.

19         **MR. SPEARS:** Judge, we would offer, file, and

20  introduce D5 into the record.

21         **THE COURT:** Any objection?

22         **MR. MOST:** No objection, Your Honor.

23         **THE COURT:** All right, it's accepted into evidence as

24  D5.

25  **BY MR. SPEARS:**


                          OFFICIAL TRANSCRIPT

1  Q.    Now let's go back to the specific meeting of November 28,
2  2023.  You were the chairperson of that meeting; correct?
3  A.    Yes.
4  Q.    And we've seen the video, and I won't play it again.
5  A.    Thank you.
6  Q.    We've seen the video of the meeting, and it's my
7  understanding that there were multiple public speakers.  Is
8  that your recollection?
9  A.    Yes.
10 Q.    And in addition to the multiple public speakers, the first
11 speaker was who?
12 A.    Dr. Banner.
13 Q.    And you came to that meeting armed with a specific
14 statute?
15            **MR. SPEARS:** And can I use your prop?
16            **MR. MOST:** Sure.
17            **THE WITNESS:** Yes, that is correct.
18 **BY MR. SPEARS:**
19 Q.    I've got to make sure I don't have it upside down.
20      You came to the meeting armed with a specific statute that
21 governed -- first of all, what did you interpret or what was
22 your interpretation of that statute when you read it?
23 A.    So my layman's terms understanding was that it was putting
24 parameters around the discussion that could take place on
25 Item J in question.

OFFICIAL TRANSCRIPT

1  Q.   Okay.  And what particular parameters did you believe,
2  based on your layman's terms, that this statute prohibited?
3  A.   It was my understanding that it prohibited speaking of
4  ethics violations without the consent of the person that had
5  the complaint filed against them.
6  Q.   Okay.  And who would have been the person in this case
7  that had the complaint based on what Ms. Banner was saying?
8  A.   In this case, it would have been Jaclyn Hotard.
9  Q.   Did you have anything to suggest that Jaclyn Hotard had
10  given permission for Ms. Banner or anyone else to speak at a
11  public forum about a pending ethics complaint that was
12  ultimately dismissed?
13  A.   To my knowledge, no.
14  Q.   Now when you read the statute, I think, but correct me if
15  I'm wrong, you addressed it not solely to Ms. Banner, but to
16  everyone in the audience, including, the council; is that
17  correct?
18  A.   Yes.  I remember I specifically said also to inform the
19  council.
20  Q.   And why did you do that?
21  A.   Because it was my understanding that this applied to
22  everyone.
23  Q.   Okay.  So as chair, what were you attempting to accomplish
24  by putting everyone on notice of this particular statute?
25  A.   For me, I took it as me informing everyone of the

OFFICIAL TRANSCRIPT

1  parameters of the discussion that we could have on the item.

2  Q.   Okay.  And there was some discussion, I think, during the

3  testimony, your testimony earlier by Mr. Most that the word

4  "unconstitutional" -- well, actually, it wasn't simply the word

5  "unconstitutional."

6       Why don't you read for the jurors -- I'm going to get it a

7  little closer to you -- exactly what did this top note say, the

8  entire note?

9  A.   "Note:  This provision of law was included in the

10  unconstitutional statutes biennial report to the legislature

11  dated March 14th, 2016."

12  Q.   What's a biennial report?

13  A.   I'm not sure.

14  Q.   Okay.  So even -- well, first of all, your testimony is

15  you did not notice or read the particular note?

16         **THE COURT:** Counsel, you can't testify for him.  And

17  you can't lead your own witness either.  I instruct you to --

18  **BY MR. SPEARS:**

19  Q.   Did you read that top note at all?

20  A.   I did not see that top note.

21  Q.   If you had read the top note, would you have understood

22  what biennial reports are?

23  A.   I would not have.

24  Q.   Do you have -- did you have any reason to believe when you

25  read that particular statute to the audience, including,

OFFICIAL TRANSCRIPT

 1  Ms. Banner and to your fellow council members, did you have any
 2  reason to believe that that was not valid Louisiana law?
 3  A.    I did not.
 4  Q.    What did you think?  Did you think it was, in fact, still
 5  valid law?
 6  A.    My understanding was it was, yes.
 7  Q.    Okay.  Are you aware that that law is still on the books?
 8  A.    So I've been told, yes.
 9  Q.    Okay.  So there was some discussion about a court ruling
10  in 2014.  But that particular law is still on the books today;
11  correct?
12  A.    To my understanding, yes.
13  Q.    So let's talk about the meeting.  Ms. Banner got up to
14  speak, and what happened next?
15  A.    I believe President Hotard was going to call a point of
16  order.  Dr. Banner was referring to an ethics violation against
17  President Hotard.  I then began to interject and ask her to get
18  back on topic and that wasn't a part of the agenda.
19  Q.    Why did you do that?
20  A.    Typically, that's how I run all the meetings, including,
21  council members, ensuring everybody stays on topic and on
22  agenda items.
23  Q.    And so you do that at every meeting; even though the
24  council has not formally adopted an on-topic rule?  You do that
25  at every meeting?

OFFICIAL TRANSCRIPT

1   A.    Yes.

2   Q.    Would it be fair to say that Joy Banner and people who

3   regularly attend these meetings are familiar with this process?

4   A.    I would think people that normally attend regularly, yes.

5   Q.    Well, did Joy Banner and her twin sister Jo, were they

6   regular attendees of your meetings?

7   A.    I believe Dr. Banner was.  I'm not sure about her sister,

8   but I know she's come before.

9   Q.    Okay.  Was anyone ever directed to arrest Joy Banner at

10  that meeting?

11  A.    No, they were not.

12  Q.    I saw you cleared the chamber on the video.  But that was

13  not directed at Joy Banner; is that correct?

14          **MR. MOST:** Objection, leading and testifying.

15          **THE COURT:** Yes, sustained.

16  **BY MR. SPEARS:**

17  Q.    Why did you clear the chambers?

18  A.    I cleared the chambers because I could not maintain order.

19  And in previous conversations with the sheriff's office, it was

20  advised to take a recess and clear the chambers to allow time

21  to cool off.

22  Q.    And that is something that is done at every meeting or

23  occasionally?

24  A.    Not every meeting.  On occasion, it's happened.  Usually,

25  my preference is to not do it, but my goal is try to just

OFFICIAL TRANSCRIPT

1  maintain order as much as possible.

2  Q.   Speakers who stay on topic, are they interrupted?

3  A.   They are not.

4  Q.   Speakers who stay within the three-minute parameters, are

5  they interrupted?

6  A.   They are not.

7  Q.   Is it at the discretion of you or anyone else whether or

8  not the speakers can go beyond their three minutes?

9  A.   So I have to follow, I have to follow the agenda, right.

10  So if the council wished to overrule the chair, then they could

11  through a motion.

12  Q.   So your fellow council members can overrule you and give

13  people additional time?  Is that what I'm hearing?

14  A.   It would have to be done through an official motion and

15  get a second and be voted on by the council.

16  Q.   Okay.  And that's pursuant to Robert's Rules of Order?

17  A.   I believe so, yes.

18  Q.   We've covered the Open Meetings Law.  Now let's talk about

19  Ms. Banner's claim regarding her freedom of speech.

20      Were you striking your gavel -- why were you striking the

21  gavel?

22  A.   Because Dr. Banner was going off topic and speaking about

23  an ethics violation which was not a part of the agenda.

24  Q.   Not withstanding that, you didn't clear the room because

25  of Joy Banner; correct?

OFFICIAL TRANSCRIPT

1  A.   I don't believe the room was cleared at that time.

2  Q.   Okay.  And the fact that it was alleged, falsely

3  alleged --

4            **MR. MOST:** Objection.  This is testimony by Counsel.

5            **MR. SPEARS:** I haven't even finished my question.

6            **MR. MOST:** Are you tendering the witness?

7            **MR. SPEARS:** No, I'm not tendering the witness.  I was

8  waiting on a ruling, I'm sorry.

9            **THE COURT:** Well, because you started off with falsely

10  alleged --

11            **MR. SPEARS:** Yes.

12            **THE COURT:** -- which is a strong term, so I do want to

13  hear your question.

14            **MR. SPEARS:** Judge, I have bad hearing, Judge.

15            **THE COURT:** Let me hear your question.

16            **MR. SPEARS:** Okay, thank you, Judge.

17  **BY MR. SPEARS:**

18  Q.   Notwithstanding the fact that it was falsely alleged by

19  Ms. Banner that the council had rezoned Jaclyn Hotard's

20  mother-in-law's property, did that motivate you in any way to

21  silence her up?

22            **MR. MOST:** Mr. Spears saying it was falsely alleged is

23  his testimony.

24            **THE COURT:** Okay, yeah.  I am going to sustain that

25  objection.  It was alleged.

OFFICIAL TRANSCRIPT

334

1          **MR. SPEARS:** Okay, I can take the "falsely" out.

2          **THE COURT:** It was alleged, you know.

3          **MR. SPEARS:** I'll take the "falsely" out, Judge.

4          **THE COURT:** It's a fact issue.  You could have done

5    that initially.  You knew where you were going with that.

6          The jury is to disregard that it was falsely alleged.

7    It was alleged.  Whether it was true or false, you know, the

8    jury can -- I don't even think the jury has to decide that

9    issue.  But it is prejudicial to put it in that way.

10   **BY MR. SPEARS:**

11   Q.   You heard Ms. Darla Gaudet testify earlier; correct?

12   A.   Yes.

13   Q.   Did you hear her testify that her property was not

14   included in this zoning application to restore Greenfield's

15   industrial standing?

16   A.   Yes.

17   Q.   Was she correct in that statement?

18   A.   Yes.

19   Q.   So notwithstanding the fact that Ms. Banner was alleging

20   that the Gaudet property was included, would that have

21   motivated you to gavel her to silence?

22   A.   No.

23   Q.   And the fact that she may have been addressing, as you

24   thought to be, inappropriate, confidential ethics matters, was

25   that one of your motivations to tell her to stay on topic?

OFFICIAL TRANSCRIPT

```
 1  A.    Can you repeat the question?
 2  Q.    The fact that she was attempting to address a confidential
 3  ethics matter, did that motivate you to ask her to stay on
 4  topic?
 5  A.    No.  Because it was drifting off topic.
 6  Q.    Okay.  And you wanted her to get on topic?
 7  A.    Yes.
 8          MR. SPEARS: One second, Your Honor.  I'm almost done.
 9  BY MR. SPEARS:
10  Q.    And ultimately, the motion that was the subject of
11  Ms. Banner's discussion during the open -- well, first of all,
12  she first wanted to talk about something in executive session.
13  Is that ever permitted?
14  A.    No.
15  Q.    Once she got off of the executive session, she wanted to
16  talk about the ethics complaint?
17  A.    I believe, and we just watched the video, she referred to
18  Item J and maybe began speaking about that and then went into
19  the ethics complaint.  I can't say for certain.  I know we just
20  watched the video yesterday, but it was something along those
21  lines.
22  Q.    At least three additional people, Shondrell Perrilloux,
23  Kim Mathieu, and Ms. Crystal Cook also spoke on Item J during
24  the open meeting that you conducted; correct?
25  A.    Yes.
```

OFFICIAL TRANSCRIPT

1  Q.   And there was no -- was there an attempt to silence

2  Ms. Banner because she was speaking negatively about the parish

3  president?

4  A.   No.

5  Q.   Was there an attempt to retaliate against Ms. Banner and

6  to threaten her with the ethics statute which included language

7  about fines and arrest because she was speaking negatively?

8  A.   No.

9  Q.   Although you had a sheriff's deputy on hand, you never

10 directed that deputy to arrest her; correct?

11 A.   I did not.

12 Q.   And you never directed that deputy to remove her; correct?

13 A.   I did not.

14 Q.   And since that meeting, it's your recollection that Joy

15 Banner has appeared, and she has spoken at subsequent parish

16 council meetings; correct?

17          **MR. MOST:** These are leading questions, Your Honor.

18          **THE COURT:** Sustained.

19 **BY MR. SPEARS:**

20 Q.   Has she spoken at any subsequent meetings?

21 A.   I believe so, yes.

22 Q.   Was she allowed to speak her entire three minutes?

23 A.   I was not at the planning and zoning meeting.  I know she

24 spoke there.  So I can't speak to that.  But if speaking about

25 parish meetings, I think any participant that speaks on topic

OFFICIAL TRANSCRIPT

1    and stays to the agenda item gets their allocated time.

2         **MR. SPEARS:** Okay.  Judge, nothing further.  I'm

3    tendering the witness.

4         **THE COURT:** Thank you.

5                    **CROSS-EXAMINATION**

6    **BY MR. MOST:**

7    Q.   Good afternoon, Mr. Wright.

8    A.   Good afternoon.

9    Q.   So the piece of paper that you were holding in your hand

10   when you read to Dr. Banner, it had highlighting on it; right?

11   A.   Yes.

12   Q.   And you read the parts that were highlighted; correct?

13   A.   I believe so.

14   Q.   And the very top was highlighted; correct?

15   A.   Yes.

16   Q.   So you read the very top, but not the next line?

17   A.   Yes.

18   Q.   Okay.  And I believe I heard you say with Mr. Spears, you

19   agreed that the parish has not formally adopted an on-topic

20   rule; correct?

21   A.   Using those words, correct, yes.

22   Q.   The parish --

23   A.   Formally, in your words, formally adopting an on-topic

24   rule, no.

25   Q.   Okay.  So when you were silencing or gaveling Dr. Banner

                        OFFICIAL TRANSCRIPT

1  quiet, it was to enforce a rule that the parish has never

2  formally adopted; is that right?

3  A.    No, I was gaveling to get Dr. Banner back on topic to the

4  agenda item.

5  Q.    Right.  To enforce a rule that the parish has never

6  formally adopted; is that correct?

7  A.    Again, based on the advice and guidance that we get for

8  the Louisiana Open Meetings Law that we may allow public

9  comment for agenda items that the --

10              **THE COURT:** You have to answer his question.

11              **THE WITNESS:** Can you repeat the question?

12  **BY MR. MOST:**

13  Q.    Sure.  When you gaveled her quiet, it was to enforce a

14  rule that the parish has never formally adopted; agreed?

15  A.    Correct.

16  Q.    And you would agree that it's important for council

17  members to know what they're voting on before they vote; right?

18  A.    Yes.

19  Q.    So if someone is sponsoring an agenda item that they would

20  personally benefit from, the council should know that; right?

21  A.    Yes.  The council would have all the supporting

22  documentation in their booklet for that item.

23  Q.    And you didn't receive any supporting documentation

24  indicating that Jaclyn Hotard would be getting the ethics

25  lawyer under the agenda item she sponsored; agreed?

OFFICIAL TRANSCRIPT

1  A.    Agreed.  That would not be, you know, a standard protocol
2  with a general blanket agreement.
3  Q.    Okay.  Mr. Spears talked about the meeting got out of
4  order, and you had to close the meeting.
5        That was after Dr. Banner was done talking; right?  That
6  was during someone else's comment; right?
7  A.    I believe so.
8  Q.    Yeah.  And in fact, Dr. Banner was trying to deescalate
9  the meeting by pulling Ms. Perrilloux back; correct?
10 A.    I believe so, yes.  Yes, that is correct.
11            **MR. MOST:** Thank you.
12            **THE WITNESS:** Thank you.
13            **THE COURT:** Redirect.
14                    **REDIRECT EXAMINATION**
15 **BY MR. SPEARS:**
16 Q.    Do you or did you at the November 28, 2023 meeting have
17 any personal animosity toward Dr. Banner?
18 A.    No, I did not.
19 Q.    Did you attempt to retaliate against Joy Banner at that
20 meeting because she was speaking negatively about President
21 Jaclyn Hotard and her mother-in-law's property?
22 A.    No, I did not.
23 Q.    Did you attempt to violate her right to free speech under
24 the First Amendment because of her viewpoint, her negative
25 viewpoint toward Jaclyn Hotard and what she perceived -- what

                    OFFICIAL TRANSCRIPT

1  Ms. Banner perceived to be an improper zoning application?

2  A.    That was not my intent.

3            **MR. SPEARS:** Nothing further.

4            **THE COURT:** All right, you can go back to your seat.

5            **THE WITNESS:** Thank you.

6            **MR. SPEARS:** We'll call Jaclyn Hotard.

7            **DEPUTY CLERK:** As a reminder, you've been placed under

8  oath.

9            **THE WITNESS:** Yes, ma'am.

10                    **DIRECT EXAMINATION**

11  **BY MR. SPEARS:**

12  Q.    President Hotard, take a moment and introduce yourself.

13  Give your name and title to the jurors.

14  A.    My name is Jaclyn Suzanne Hotard.  I'm the parish

15  president of St. John the Baptist Parish.  I'm pretty much a

16  lifelong resident of St. John.  My parents divorced when I was

17  about 11 or 12, and so I lived in Kenner and Metairie for a

18  little while with my mother while still going back home with my

19  dad, home on the weekends and the summers.

20        Then I moved back, I guess, as a permanent resident in

21  2002.  But my father and my family always still lived in

22  LaPlace.  I got to Kenner and Metairie through a divorce of my

23  parents.

24  Q.    Where did you go to school?

25  A.    I'm sorry.  I attended Bonnabel High School.  I attended

OFFICIAL TRANSCRIPT

341

1  University of New Orleans, and then I received a bachelor's

2  degree from Southeastern.  And I also spent two years at the

3  Southern University Law Center.

4  Q.    Now with regard to your personal life, you're married; is

5  that correct?

6  A.    Yes, I'm married.  I have a daughter that's 27 years old.

7  She lives in Baton Rouge.  She's an LSU graduate, served on

8  Color Guard.  And I have two bonus children.  One attends

9  school in Prairieville, and the other attends school in

10  LaPlace.  And we have an adopted dog, and I have an adopted cat

11  for a grand-cat.

12  Q.    Share with the jurors your political journey in St. John.

13  A.    My political journey began in 2003.  I first ran for

14  council seat.  And my journey into politics, I think, really

15  started in high school.  I was involved in the -- what is it

16  called?  I'm drawing a blank now, like moot court basically.

17  It was a law class.  And I participated in mock trials in my

18  senior year of high school.  I ran unsuccessfully for our class

19  treasurer my senior year.

20        So I've always been in leadership positions.  That

21  particular class I was involved in was called Leadership.  So I

22  always wanted to serve in some capacity.  And in 2003, a

23  council seat became open on our parish council, and so I

24  decided to run.

25  Q.    Okay.  Now we heard earlier from Councilman Michael Wright

OFFICIAL TRANSCRIPT

1  that you have at-large seats, and you have district seats.

2        So what was the first seat that you ran for?

3  A.   The first seat that I ran for was District 4, and that's a

4  district in LaPlace.  We have seven districts and two

5  at-larges.  The at-large is split, half the parish.  In some

6  parishes, your at-larges cover the whole parish.  But in

7  St. John, you have the seven districts, and then the two

8  at-larges kind of the split the parish in half.

9        So my first two terms, I represented LaPlace in

10 District 4.  And then my second two terms, I represented half

11 of the parish which was still pretty much all of LaPlace is in

12 Division B.  The rest of the parish, Reserve and Garyville, the

13 West Bank and Pleasure Bend are in Division A.

14 Q.   Okay.  So when was the first time you ran for parish

15 president, and what were the results?

16 A.   The first time I ran for parish president, interestingly,

17 I was in law school that year and didn't have any intentions of

18 running.  I had a very difficult 2019.  I was married, but my

19 sister was also murdered within probably 60 days.  However, I

20 felt compelled at that point, that my service was coming to an

21 end, to take a leave from school, and entered that race.  I

22 believe I declared in May of 2019.

23       I had four other opponents.  And we won that election in

24 the primary.  I remember it was LSU/Florida because my daughter

25 was in Color Guard; so she missed it.  But I won that night

OFFICIAL TRANSCRIPT

1  with four opponents with 70 percent of the vote.  It still
2  doesn't seem, it still doesn't seem real, but.
3  Q.    That seems like an incredible vote of confidence.
4        What happened when you ran for re-election?
5            **MR. MOST:** Objection to Counsel testifying.
6            **THE COURT:** Sustained.  Sustained.  Are you going to
7  withdraw it?  The jury should disregard that comment.
8            **MR. SPEARS:** Oh, I withdraw the comment.
9  **BY MR. SPEARS:**
10 Q.    What happened when you ran for re-election?
11 A.    In 2023, I ran unopposed.
12 Q.    Okay, so nobody challenged you in 2023.
13       So what is your total number of years that you have been
14 in St. John Parish Government, both as a councilperson,
15 District 4, at-large council member, and as parish president?
16 A.    21 years.
17 Q.    And in the 21 years that you have been serving as parish
18 councilperson and parish president, you have participated in
19 lots of efforts to bring important industry to St. John;
20 correct?
21 A.    Yes.
22           **THE COURT:** You can't lead.
23           **MR. MOST:** Objection as to relevance.
24           **THE COURT:** I'll sustain that.  But I'm giving him an
25 opportunity to introduce her.

OFFICIAL TRANSCRIPT

1  **BY MR. SPEARS:**

2  Q.    Explain to -- we've heard a lot about the Greenfield grain

3  elevator project.  Are you familiar with that project?

4  A.    Yes.

5  Q.    Did you support that project?

6  A.    Yes.

7  Q.    Explain to the jurors why you supported this project for

8  St. John.

9  A.    Part of the job of the parish president is to oversee

10 various departments, recreation, water, wastewater, planning

11 and zoning, and economic development department is one of the

12 departments that I oversee directly.  So it's my job to promote

13 as many economic opportunities that we can for the parish so

14 that we can continue or to grow.

15     Our parish, like many other parishes in the region, has

16 seen a decline in population.  And so it's always at the

17 forefront of the minds of leaders and parish officials that we

18 need to spur economic development so that we can begin to get

19 more residents to stay in the parish and move into the parish.

20 So I'm intimately involved in economic development as I oversee

21 that department.

22 Q.    So with regard to Greenfield itself, the Greenfield

23 project, what did you view as the benefits to St. John?

24 A.    The most important benefit is jobs.  In the River Region

25 and really in this region, in particular, we rely on industry

OFFICIAL TRANSCRIPT

1  for a lot of our good-paying jobs in the region.  And so
2  Greenfield was going to bring, you know, approximately 100 jobs
3  and good-paying jobs, $75,000 a year or more that come, you
4  know, those jobs come with benefits, such as, health insurance.
5  And they were also going to generate tax revenue for the parish
6  as well.

7      And specifically, in the community where Greenfield was
8  located is a community that we've seen a continued decrease in
9  population.  In fact, the way the councilmanic districts are
10  drawn, every ten years we do a redistricting based on
11  population.  And the particular district where Greenfield is
12  located has lost so much population that they continue to have
13  to pick up their population on the East Bank.

14      And so it's always concerning that we have an area that
15  could lose representation on the council by continuing to
16  dilute their representation on the council with East Bank
17  residents.  We always want to make sure that our West Bank is
18  represented as well.  So this is an area of the parish that is,
19  you know, they're declining in population more than some of the
20  other districts, and we see that through the redistricting
21  process which just took place in 2020.

22  Q.   Now you mentioned 100 good-paying jobs.  Were those direct
23  jobs at the Greenfield plant?
24  A.   Yes, those were direct jobs.  And then several other
25  hundred construction-related jobs.  Whenever an industry is

OFFICIAL TRANSCRIPT

1  first coming into a parish, there's a lot of just ancillary

2  revenue is what they'll call it, construction jobs just

3  building the facility and those types of jobs.

4       And then to support other, you know, restaurants, and you

5  know, there's some eateries and gas stations and things like

6  that in the area.  So it would support all of the surrounding

7  businesses.

8  Q.   And bring new residents, perhaps?

9  A.   Hopefully so.  That's a major concern of our parish in

10  general.  Like I said, for Louisiana, as a whole, specifically

11  in St. John, over the last ten years, we've seen a decline.

12  But again, in 2020, when we did our redistricting even, it was

13  brought to our attention by the professionals that did the

14  redistricting how we had to come and pick up so many more

15  residents on the East Bank that traditionally that district,

16  District 1, is a West Bank seat.

17       But because we continue to lose population on the West

18  Bank and parishwide, but disproportionately on the West Bank,

19  we have to continue to pick up voters, if you will, on the East

20  Bank, and it could dilute that representation.

21  Q.   Other than yourself and the parish council, who were some

22  of the other prominent supporters of the --

23            **MR. MOST:** Objection.

24            **THE COURT:** This is -- your objection is relevance?

25            **MR. MOST:** Objection to the relevance.  You ruled on

OFFICIAL TRANSCRIPT

1  this already.

2          **THE COURT:** Yeah, I'm going to sustain.

3          **MR. SPEARS:** Okay.

4  **BY MR. SPEARS:**

5  Q.   It's my understanding from earlier testimony that

6  Greenfield purchased what it believed to be 200 or more acres

7  of industrial property in St. John the Baptist Parish somewhere

8  in 2021; is that correct?

9          **MR. MOST:** Objection, these are leading questions.

10 His testimony, not hers.

11         **THE COURT:** It's leading, and it's repetitive,

12 Counsel.  It's getting long.  It's duplicative, and it's

13 leading.  Ask it in a non-leading way.

14         **MR. SPEARS:** I'll ask it in a non-leading way.

15 **BY MR. SPEARS:**

16 Q.   When did the Greenfield project come to St. John?

17 A.   I was first introduced to Greenfield in 2020 when

18 Greenfield at the time was looking to apply for a grant and

19 they needed letters of support.  They asked me to write a

20 letter of support and had demonstrated to me all of the other

21 letters of support they had from other officials and explained

22 to me about the project.

23         **THE COURT:** So you asked her a question.  I know,

24 Ms. Hotard, that you're accustomed to giving speeches and

25 talking at the council.  But this is a trial, and we need you

OFFICIAL TRANSCRIPT

1   to answer the questions so that we can move on.

2           THE WITNESS: Okay.

3           THE COURT: And so he asked you a question.  Just

4   answer that question because, you know.  I just, your answers

5   are extremely long, and they go -- I hate to say off topic, but

6   I know you're not answering.

7           THE WITNESS: Well, I'm glad you're stopping me when

8   they're off topic.

9           THE COURT: Just answer the questions.

10  BY MR. SPEARS:

11  Q.   So what year did they come to town, or what year did you

12  first --

13  A.   2020.

14  Q.   Okay.  And what did they do as a part of starting this

15  process for this grain elevator?

16  A.   They started to meet with officials and residents in the

17  West Bank community.  They purchased property that the parish

18  held out to be industrial property.  They purchased that

19  property.  And they met with several members of the parish

20  council to discuss their potential project.

21  Q.   And you mentioned industrial property.  How long had this

22  property been zoned industrial?  I'm talking about the property

23  bought by Greenfield.

24  A.   Since 1990.

25  Q.   Did that ever change?

OFFICIAL TRANSCRIPT

1  A.    That changed -- I don't remember if it was '21 or '22.  I
2  don't remember the year.  But the property was zoned
3  industrial.  And in fact, the parish has a website where we
4  maintain a list of all of the available sites for businesses to
5  purchase, and so that was listed on our site as Industrial 3
6  property.
7        They purchased the property sometime '21 or '22.  And then
8  a lawsuit was filed challenging the original rezoning or zoning
9  of that property that had taken place in 1990.
10 Q.    And what was the result of the lawsuit that challenged the
11 1990 zoning?
12 A.    The result of that lawsuit is that that property, and many
13 pieces of property in the area, were reverted back to
14 residential from industrial.
15 Q.    And who made that decision, or how was that decision made?
16 A.    That decision was made by Judge Sterling Snowdy.
17 Q.    Did the council or you as parish president do anything in
18 response to the ruling of the judge to convert the property
19 from industrial to residential?
20 A.    I didn't do anything.  However, the council adopted a
21 resolution to instruct me to rezone the property, to revert it
22 back so that the investment that was made by Greenfield, based
23 on the parish's holding out, like advertising the property as
24 Industrial 3 could be restored.
25        And so the council took steps to rezone the property.

OFFICIAL TRANSCRIPT

1  Because in our, quote, Code of Ordinances, there's only several
2  ways to rezone property, and the council can initiate a
3  rezoning on their own.  And so they passed a resolution
4  initiating the rezoning and instructed me to begin the process
5  of rezoning the property.

6      As the parish administrator, it's my job to carry out all
7  of the directives of the parish council.  In fact, I don't have
8  the liberty, when they pass a duly adopted resolution, to say,
9  "No, I'm not following that."  I must, by law, carry out all of
10  the duly adopted motions by the council.  And they passed a
11  resolution instructing me to rezone that property, only the
12  Greenfield property.

13  Q.   Do you remember when the resolution was passed by the
14  council directing you to rezone the Greenfield property?
15  A.   I believe it was in August or September of 2023.  I don't
16  know the exact date.  It was around that time.  The council
17  actually took two votes.

18          **THE COURT:**  Okay, I'm going to instruct you one more
19  time, and now I'm being firm, and I want to make clear to the
20  jury, this is not a council meeting.  People can't come up here
21  and speak whenever they want.  They can't talk about whatever
22  they want.  It is not that kind of forum at all.

23          So I'm going to instruct you one more time very
24  clearly, answer the question that is asked and then stop.

25          **THE WITNESS:**  Yes, ma'am.

                    OFFICIAL TRANSCRIPT

1        **THE COURT:** Proceed.

2        **MR. SPEARS:** I forgot the question, Judge.  I'll move

3  on.

4        **THE COURT:** Is that supposed to be humorous?  Let's

5  let the court reporter -- I think we all forgot the question

6  because the answers are so long.

7        "Do you remember when the resolution was passed by

8  the council directing you to rezone the Greenfield property?"

9  Yes or no.

10        **THE WITNESS:** It was in 2023.

11  **BY MR. SPEARS:**

12  Q.  Now let's fast-forward past the rezoning of the Greenfield

13  property.

14       You mentioned that there were other properties that Snowdy

15  had reverted from industrial to residential.  What happened to

16  all of those properties?

17  A.  Those properties remain residential.

18  Q.  How are those properties zoned today?

19  A.  Residential.

20  Q.  Is your mother-in-law Darla Gaudet's -- and I know she

21  doesn't own it personally.  Her company Gaumet Holdings owns

22  some property in that vicinity.  How is that property zoned

23  today?

24  A.  Residential.

25  Q.  Did you support the Greenfield rezoning because it

OFFICIAL TRANSCRIPT

352

1  benefited you personally?

2  A.    I supported -- I took no position at the council meeting

3  on the rezoning application.

4  Q.    Now let's go to this ethics complaint.  After the -- when

5  did you learn that an ethics complaint had been filed?

6  A.    It was in 2023.  I don't remember the exact date or the

7  exact month, but it was 2023.

8  Q.    How did you learn?

9  A.    There were so many things happening, and I don't want to

10 give a long answer.  There was an allegation made at a public

11 council meeting.  And I don't recall if I received the letter

12 from the Ethics Board first, or I heard the allegation at a

13 planning commission or a council meeting first because they all

14 were very close together.

15       But it was in 2023 that I learned of the allegations and

16 then the subsequent actual filing of the complaint with the

17 Ethics Board.

18 Q.    Let's talk about the letter from the Ethics Board.  I want

19 to show you what has previously been identified.  Do you

20 recognize this letter?

21 A.    Yes, I do.

22 Q.    And you would have received it sometime shortly after the

23 date of November 7?  Does that date appear to be about the time

24 you got it?

25 A.    Yes.

OFFICIAL TRANSCRIPT

1  Q.   What, if anything, did you do in response to receiving
2  that letter, if you remember?
3  A.   I don't recall.
4  Q.   Do you remember a time when that letter was posted on
5  Facebook?
6  A.   Yes.
7  Q.   Tell us what you remember about that.
8  A.   I remember that a couple of people sent me some
9  screenshots of what was posted on Facebook, that I was under
10 investigation, that people should attend a council meeting
11 because I was under investigation.
12 Q.   Now as a 21-year government employee, you had some
13 understanding of the rules around ethics complaints and
14 investigations; correct?
15 A.   Yes.  I've received subpoenas for other documents from the
16 Ethics Board to my office.
17 Q.   And explain what you mean when you say you received
18 subpoenas.
19 A.   The Ethics Board, when they're conducting an
20 investigation, based on who has the information, they will send
21 what's called a subpoena duces tecum for information for that
22 investigation.  And I've received that more than once on other
23 individuals.
24      And when they send that to you, it's stamped with
25 "confidential" and a law on there.  And in fact, they tell you

OFFICIAL TRANSCRIPT

1  that even if you have to retrieve the documents from someone

2  else in your organization, you can't tell them that it's in

3  response to an ethics complaint.

4  Q.    Let's talk about the law that you referenced, and I think

5  Mr. Most has already entered it as P8.  Let's see if we can

6  pull it up.  Can we make that big, the relevant section?

7        Okay.  Do you see Section (L)(1)?

8  A.    Yes.

9  Q.    Are you familiar with that section?

10  A.    Yes.

11  Q.    Can you read that section?

12  A.    Yes.  It says, "It shall be a misdemeanor punishable by a

13  fine of not more than $2,000 or imprisonment for more than one

14  year or both for any member of the Board of Ethics, its

15  executive secretary, other employee, or any other person other

16  than the person who is subject to the investigation or

17  complaint to make public the testimony taken at a private

18  investigation or private hearing of the Board of Ethics or to

19  make any public statement or give out any information

20  concerning a private investigation or private hearing of the

21  Board of Ethics without the written request of the public

22  servant or other person investigated."

23            **THE COURT:** Would Counsel approach, both of you?

24                (Proceedings held at the Bench.)

25            **THE COURT:** So you have repeatedly said that there are

OFFICIAL TRANSCRIPT

1  these letters that have "confidential" and that statute.  But

2  we haven't seen one piece of evidence where it has that statute

3  and the word "confidential."

4        **MR. SPEARS:** I can introduce it now.

5        **THE COURT:** I don't think you've laid a foundation to

6  ask her that question because there's no evidence that they

7  ever sent a letter with the statute.  And I'm trying to figure

8  out.

9        **MR. SPEARS:** Judge, for clarity, we have letters with

10  the statute on it, and I can put it up next.

11        **THE COURT:** Well, is it something that she has

12  received or in general?

13        **MR. SPEARS:** No, that she's received.

14        **THE COURT:** Okay.

15        (Whereupon this concludes proceedings held at

16    the bench.)

17        **THE COURT:** I've instructed Counsel to lay a

18  foundation for those questions.

19        **MR. SPEARS:** I'll put it up now, Your Honor.

20        You've indicated that -- we're on D6.  I'm going to

21  show President Hotard a document we're going to label D6.

22        May I approach, Your Honor?

23        **THE COURT:** Yes.  This is identified in advance in the

24  pretrial order?  I'm asking.

25        **MR. MOST:** Can I see it?

OFFICIAL TRANSCRIPT

1          **THE COURT:** Was this in the pretrial order?

2          **MR. SPEARS:** Yes.

3          **MR. MOST:** Can we approach?

4          **THE COURT:** Yes.

5                 (Proceedings held at the Bench.)

6          **MR. MOST:** So this is a letter dated February 2024.

7    So it can't have informed her thought process in November of

8    2023.

9          **THE COURT:** It happened after?

10          **MR. MOST:** Yes, it's several months later.

11          **THE COURT:** I don't remember seeing it.

12          **MR. SPEARS:** It's a letter dated February 2nd.  It's

13    on the list.  The last thing on your page, Judge.

14          **THE COURT:** This is February 2nd, okay.  Let's get

15    him to come back up here.  So I mean I see it here, D9.  It was

16    D9.

17          **MR. SPEARS:** Yes.

18          **THE COURT:** Okay.  You can -- but this is for another

19    case?

20          **MR. SPEARS:** No.

21          **MR. MOST:** It's from this case, but it's from

22    three months after the November 28, 2023 meeting.

23          **THE COURT:** You're going to be able to cross-examine

24    on that.

25                 But the other thing is what you told me you were

OFFICIAL TRANSCRIPT

1  going to show is what she was talking about is her

2  understanding of what's confidential based on other subpoenas

3  she got in other cases, you know, and you haven't shown that.

4          **MR. SPEARS:** But this, I thought you wanted to see

5  something that had the statute on it.

6          **THE COURT:** Okay, all right.  Well, still, you will.

7          **MR. MOST:** I'll make a note, yeah.

8          **THE COURT:** And what I have to decide, since that is

9  after, whether I strike the testimony because you still haven't

10  shown me any or presented any evidence that she knew those

11  letters came with that statute on it before.  Because you let

12  her read the statute and then say it always comes in on

13  subpoenas that she has before.  And that is not true, and I

14  can't -- we have to, you know, we have to correct her.

15          Either you want to redirect or the Court's going to

16  correct because you're supposed to be laying a foundation.

17          **MR. SPEARS:** Well, I am.

18          **THE COURT:** Okay, we'll see.

19          (Whereupon this concludes proceedings held at

20      the bench.)

21          **MR. SPEARS:** Okay, I'm going to show you -- may I

22  approach, Your Honor?

23          **THE COURT:** Yes.

24  **BY MR. SPEARS:**

25  Q.    -- a copy of a letter addressed to you marked as D6 and

OFFICIAL TRANSCRIPT

1  ask that it be published on the screen.  Do you recognize that
2  document?
3  A.   Yes.
4  Q.   Is that one of several documents that you received from
5  the Board of Ethics?
6  A.   Yes.
7  Q.   And is there the word "confidential" stamped on that
8  particular document?
9  A.   Yes.
10 Q.   Is there a particular Louisiana Revised Statute also
11 stamped on that document?
12 A.   Yes.
13 Q.   Okay.  And this is the letter from the Board of Ethics
14 advising you of the confidential investigation; is that
15 correct?
16 A.   This is one of several letters I've received from them,
17 yes.
18 Q.   And you testified earlier that that same stamp or similar
19 stamp, "Pursuant to LA RS 42-1141.2," you've seen it on other
20 documents?
21 A.   Yes, I've seen that on other documents in 2022 and 2023,
22 yes.
23 Q.   And why were you receiving those documents?
24 A.   The Ethics Board was -- they sent a subpoena to my office
25 for documents for another person who was being investigated,

OFFICIAL TRANSCRIPT

1  and those subpoenas were marked with the same statute on there.

2  Q.    In addition to receiving that particular letter from the

3  investigator, you were also sent --

4          **MR. SPEARS:** May I approach, Your Honor?  Let me

5  offer, file, and introduce.

6          **THE COURT:** And don't ask a leading question.

7          **MR. SPEARS:** I will not.

8          **THE COURT:** You want to offer, file, and introduce the

9  last?

10          **MR. SPEARS:** We want to offer, file, and introduce D6.

11          **THE COURT:** All right, and am I clear that is your

12  evidence?  You don't have evidence of -- she talked about the

13  other, that she received letters with that statute in '22,

14  '20 -- what did she say '21 and '22?  You don't have those

15  letters?

16          **MR. SPEARS:** I don't have letters from '21 and '22.  I

17  have another document that references the statute.

18          **THE COURT:** Okay.

19          **MR. MOST:** For D6, we'll just note our objection that

20  we already...

21          **THE COURT:** All right.

22  **BY MR. SPEARS:**

23  Q.    Okay.  Do you recognize D7 as additional correspondence

24  that were included in the letters that you got?

25          **THE COURT:** You're leading her again.  Do you

OFFICIAL TRANSCRIPT

1  recognize this document?

2          THE WITNESS: Yes.

3          THE COURT: What do you recognize it from?

4          THE WITNESS: I recognize this document.  Whenever a

5  subpoena for records is sent from the Ethics Board, this notice

6  of confidentiality is included in the packet of information

7  that they send to you with the subpoena.

8  BY MR. SPEARS:

9  Q.    And are you saying that this is the same notice that you

10 get when you respond to requests from the Ethics Board?

11 A.    If it's a request -- this particular notice of

12 confidentiality was contained in the subpoena for records that

13 was sent to my office.  I've received several of them.

14 Q.    Okay.  And that notice of confidentiality cites that

15 specific confidentiality statute?

16 A.    Yes, it cites the same statute.  And contained in the

17 actual subpoena, it says further that if you have to --

18         THE COURT: Do we have the subpoena?  It's the best

19 evidence of what it is.

20         MR. SPEARS: I don't have the actual subpoena, Judge.

21         THE COURT: He didn't ask you about the subpoena.

22         THE WITNESS: Yes, ma'am.

23 BY MR. SPEARS:

24 Q.    It also uses the words that it is deemed privileged and --

25 I'm sorry, confidential and privileged; correct?

OFFICIAL TRANSCRIPT

1  A.    Yes.

2          **MR. SPEARS:** Judge, we'd offer, file, and introduce

3  D7.

4          **MR. MOST:** Objection, best evidence rule.

5          **THE COURT:** Sustained actually.  I'm sorry, objection

6  was to?

7          **MR. MOST:** The best evidence rule, given that the

8  subpoena itself --

9          **THE COURT:** Does he have this -- okay.  Did he ask a

10  question that you were objecting to, or did he offer, file, and

11  introduce this?

12          **MR. MOST:** The latter, Your Honor.  This is an

13  objection to the introduction of the exhibit.

14          **THE COURT:** I'm going to sustain the objection, and I

15  don't know that this -- was this exhibit in the pretrial order?

16          **MR. SPEARS:** Yes.

17          **MR. MOST:** Yes, Your Honor.

18          **THE COURT:** What is it?  It's attached to D9?

19          **MR. SPEARS:** Yes.

20          **THE COURT:** Okay, then I'll allow it.

21          **MR. MOST:** I don't think that's in evidence.  This is

22  talking about a subpoena.  The other thing was talking about a

23  letter.

24          **THE COURT:** Exactly.  So where is this subpoena

25  referenced as an exhibit in the pretrial order?

OFFICIAL TRANSCRIPT

362

1          **MR. SPEARS:** We did not include the subpoena.  We

2    included the notice of confidentiality which was received.

3          **THE COURT:** Where is that?  Oh, that's in D10.  All

4    right, so then I will allow the notice of confidentiality into

5    the record.

6          **MR. SPEARS:** Thank you, Judge.

7    **BY MR. SPEARS:**

8    Q.   What did you believe based on your experiences, your

9    dealings with the Ethics Board was -- what was your concern

10   based on your experience in dealing with the Ethics Board about

11   Joy Banner placing your letter on Facebook?

12   A.   My concern was that it was in violation of what I believed

13   to be, based on the communications sent to me from the Ethics

14   Board, I believed that it was in violation of state law.

15   Q.   And what, if anything, did you do after you learned about

16   the Facebook posting and believed it was in violation?

17   A.   I sent an email to the Ethics Administrator Ms. Kathleen

18   Allen to notify her.  I believe she was the general counsel

19   also, but to notify her that I saw this post on Facebook and to

20   inquire about how Ms. Banner had a copy of a letter that was

21   addressed to me at my home address.

22        At the time, I didn't know that Ms. Banner -- I didn't

23   know exactly how the complaint was filed.  But I sent an email

24   to Ms. Kathleen Allen asking her how did Ms. Banner get a copy

25   of a letter that was addressed to me with my home address.  And

                         OFFICIAL TRANSCRIPT

1  I asked Ms. Allen how she was able to post it on Facebook when
2  it was my understanding that these complaints are confidential.
3  And it appears that the Facebook post would be in violation of
4  state law.
5  Q.   Would you recognize your email to Ms. Allen if you saw it?
6  A.   Yes.
7           MR. SPEARS: May I approach, Your Honor?
8           THE COURT: Yes.
9  BY MR. SPEARS:
10 Q.   I'm going to show you what's marked as Exhibit D8.  Do you
11 recognize that?
12 A.   Yes, sir.
13 Q.   Okay, and explain to the jurors exactly what is that.
14 A.   If you scroll down, it starts out I send an email on
15 November 17th, 2023 at 12:08 p.m. to Ms. Kathleen Allen,
16 Carolyn Landry, and Mallory Guillot.  It says, "Hello, all, I
17 am in receipt of the above-referenced complaint.  Additionally,
18 the complainant Joy Banner made me aware of this complaint via
19 local newspaper article and her personal Facebook video
20 announcing the complaint and the details.  In her announcement,
21 Ms. Banner mentioned that there is a hearing scheduled to
22 discuss this matter in January.  Can you confirm with me,
23 please?  Respectfully."
24      And then Ms. Kathleen Allen writes back to me on
25 November 17th, and she copies Carolyn Landry and Mallory

OFFICIAL TRANSCRIPT

1    Guillot and says, "There is no hearing scheduled in this
2    matter.  Complainants receive acknowledgment letters when the
3    matters will be on the Board's agenda.  However, this matter is
4    not on the agenda for a hearing.  As you were notified, this
5    matter is in the investigation stage.  A confidential
6    investigation will be conducted by our staff to gather the
7    facts surrounding the allegation in the letter."
8        I then say, "Thank you.  Have a great weekend."
9        And then I send another email on November 27th, 2023.
10   "Hello, Kathleen, Joy Banner just posted a copy of the ethics
11   notice addressed to me on her Facebook page.  Did you all copy
12   her or her attorney on this letter?  I'm trying to understand
13   how she has a copy of the letter that," it says she was
14   addressed to me.  I meant, "was addressed to me.  Not to
15   mention, this appears to be a violation of state law.
16   Respectfully, Jaclyn."
17   Q.   Why did you write that last email?
18   A.   Because it's always been my understanding that
19   investigations by the Ethics Board are confidential until they
20   determine whether or not to bring it to the full Board.  And
21   what they've explained as the reason is because anyone can make
22   an ethics complaint.  So they require the complaint, while it's
23   in the investigation stage, to be confidential because if
24   nothing comes about of it, then all of this information could
25   have been made public, and there was really no merit to the

OFFICIAL TRANSCRIPT

1    actual investigation.

2         So since anyone can make a complaint on anyone, they want

3    to protect individuals in that investigation stage.  Once the

4    Board determines that they need to proceed --

5              **THE COURT:** Hold on a second.  Hold on a second.

6              **MR. MOST:** Objection.  This is hearsay.

7              **THE COURT:** It is hearsay.

8              **MR. SPEARS:** I'll ask another question.

9              **THE COURT:** Sustained.  The jury is to disregard what

10   Ms. Hotard said.  "Because it's always been my understanding

11   that investigations by the Ethics Board are confidential until

12   they determine whether or not to bring it to the full Board."

13   And then after that, you can disregard all of that.

14             **MR. SPEARS:** Okay.

15   **BY MR. SPEARS:**

16   Q.   The date of your final email to Kathleen Allen at the

17   Ethics Board was what?

18   A.   Monday, November 27th, 2023 at 3:52 p.m.

19   Q.   What was the date of the meeting that is the subject of

20   this litigation?

21   A.   November 28th, 2023.

22   Q.   So a day before the meeting, you wrote the chief lawyer,

23   the general counsel I think is the title, complaining about the

24   post and saying that you believe the investigation to be

25   confidential?

OFFICIAL TRANSCRIPT

1  A.   Yes, I emailed her to say that I believe it was in
2  violation of state law based on my understanding and my
3  communications directly with the Ethics Board.
4  Q.   And at the meeting itself --
5           **MR. SPEARS:** Judge, I'd like to offer, file, and
6  introduce this exhibit which is labeled D8 into the record.
7           **THE COURT:** Counsel?
8           **MR. MOST:** No objection.
9           **THE COURT:** All right, it's accepted into evidence.
10 **BY MR. SPEARS:**
11 Q.   So this was the day before that you were alerted to the
12 Facebook post and you complained to Kathleen.
13      What happened the next day at the meeting?
14 A.   What happened at the meeting?
15 Q.   Yeah, let's start with -- I just want to talk about the
16 public comment period.  What happened when public comment
17 period began?
18 A.   Initially, Dr. Banner approached the podium, and she
19 attempted to discuss an item that was on executive session.
20 However, executive session items are only for our legal advisor
21 who is the District Attorney's Office to discuss lawsuits with
22 us.  And so the chairman instructed her that there wasn't any
23 conversation on executive session items.
24      And then Ms. Banner proceeded to talk about the ethics
25 complaint.  She had a bunch of maps with her of property that

1   she said belonged to my mother-in-law.  She started to say I
2   was under investigation.  And then I asked the chairman -- I
3   believe I initially called for a point of order, that it was
4   off topic.
5        Ms. Banner continued to talk about all of the details of
6   the investigation, property, rezoning applications.  None of
7   which were on the agenda.  And I continued to ask the chairman
8   to stop the comment that I believed was in violation of state
9   law and that I believed was the sole purpose to just harm me.
10  And it was more about getting in information about a
11  confidential investigation, that she was attempting to do that.
12  Q.    To the best of your knowledge -- and I want to focus on
13  the November 28, 2023 meeting.  To the best of your knowledge
14  and belief based on your time in parish government, did that
15  meeting comply with all of the necessary requirements of the
16  Louisiana Public Meetings law?
17  A.    Yes.
18  Q.    To the best of your knowledge, did you or Michael Wright,
19  Chairman Wright, discriminate and violate Ms. Banner's First
20  Amendment because she was speaking negatively about you,
21  because she was speaking in a way that was displeasing to you?
22  A.    No.  In fact, Ms. Banner has spoken at many public
23  meetings and has been critical of me, just like many people
24  are.  Typically, at council meetings, those who show up are
25  critical of government.  And once you've done this for

OFFICIAL TRANSCRIPT

```
1   21 years, you develop thick skin.  You learn from criticisms.
2       And so there have been many times that not only
3   Dr. Banner, but other individuals have been, you know, critical
4   of me, and they were never interrupted.  My interruption and
5   asking to --
6            THE COURT:  So the question was, "To the best of your
7   knowledge," and we're talking about the night of that public
8   meeting --
9            THE WITNESS:  Yes, ma'am.
10           THE COURT:  -- "did you and Mr. Wright, Chairman
11  Wright, discriminate and violate Ms. Banner's First Amendment
12  because she was speaking negatively about you, because she was
13  speaking in a way that was displeasing to you?"
14           Your response was no.  Is that correct?
15           THE WITNESS:  Yes, ma'am, absolutely not.
16  BY MR. SPEARS:
17  Q.   And with regard to her statements, did you retaliate or
18  ask Chairman Wright to retaliate against her and read the
19  ethics statute that you believe to be valid --
20  A.   Of course not.
21  Q.   -- because -- let me finish, please.  Because she was
22  speaking negatively about you and your mother-in-law's
23  property?
24  A.   Of course not.
25  Q.   Did you believe that some of the things that she was
```

OFFICIAL TRANSCRIPT

1  saying were misleading and untrue about you and the zoning of
2  your mother-in-law's property?
3  A.    Absolutely.
4  Q.    Notwithstanding that fact, did you feel the need to
5  retaliate against her?
6  A.    No.
7            **MR. SPEARS:** One second, Your Honor.
8            Judge, we tender the witness.
9            **THE COURT:** All right, thank you.
10                              **CROSS-EXAMINATION**
11  **BY MR. MOST:**
12  Q.    Good afternoon, Ms. Hotard.  I just want to get the
13  timeline accurate now that we've heard a couple of people's
14  testimony.
15        You married Russell Gaudet April of 2019; correct?
16  A.    April of 2019, yes.
17  Q.    We heard from Darla Gaudet that she bought property in the
18  Greenfield area in October of 2019; correct?
19  A.    Actually, what you heard is that property was titled to
20  her.  She began the purchase of that particular property in
21  2013 or '14.
22  Q.    But she acquired it in October of 2019?
23  A.    It took about five years for it to be --
24            **THE COURT:** Okay, answer the question.
25            **THE WITNESS:** Yes.

                              OFFICIAL TRANSCRIPT

1  **BY MR. MOST:**

2  Q.    And you were also elected parish president October 12th,

3  2019; correct?

4  A.    Correct.

5  Q.    Greenfield came in, in 2020; correct?

6  A.    I was first introduced to Greenfield in 2020.  I'm not

7  sure exactly when they came in.  I believe they had been in the

8  parish before me because they had already been speaking with my

9  predecessor.

10 Q.    And you started supporting Greenfield with letters

11 starting a couple of months after you were elected in late

12 2019; correct?

13 A.    I along with about 35 other officials, yes.

14 Q.    Okay.  And looking at a couple of these documents that

15 Mr. Spears went over with you, he had you look at a document

16 that was entered as Defendant 6.

17        Do you see this was the letter that he showed you from

18 February 2, 2024?

19 A.    Correct.

20 Q.    So that was about three months after the November 28, 2023

21 meeting; correct?

22 A.    Correct.

23 Q.    So nothing in this letter could have informed your

24 decision-making at that November meeting; correct?

25 A.    I was already aware of that.  That's why I was able to

OFFICIAL TRANSCRIPT

1  email the ethics administrator prior to --

2          **THE COURT:** That is not his question.  So answer his

3  question.

4          **THE WITNESS:** Not in this particular letter, no.

5          **THE COURT:** That's the letter he offered into

6  evidence.  You can answer that.

7          **THE WITNESS:** Yes, ma'am.

8          **THE COURT:** Okay.  And then do you want her to

9  elaborate or not?

10         **MR. MOST:** No.  Thank you.

11 **BY MR. MOST:**

12 Q.   And then moving on to what was D8, this was your email

13 correspondence with the Board of Ethics folks; right?

14 A.   Yes.

15 Q.   And you emailed them and let them know that Joy Banner was

16 talking about the ethics complaint on Facebook; right?

17 A.   And in the newspaper.

18         **THE COURT:** Answer the question.

19         **THE WITNESS:** Yes.

20 **BY MR. MOST:**

21 Q.   And there was a newspaper article about it; right?

22 A.   Yes.

23 Q.   And they responded and they did not say that what

24 Dr. Banner was doing was a problem; right?

25 A.   I -- the first email is I just referenced that she shared

OFFICIAL TRANSCRIPT

```
 1   it on Facebook.  I didn't ask them if there was a problem in
 2   that email.
 3   Q.   Okay.  But then they respond, and they don't say anything
 4   like, "What Joy Banner is doing is illegal.  It's not okay.
 5   It's a problem"; agreed?
 6   A.   They refuted what she said.  Because in her Facebook post,
 7   she said that there was a hearing scheduled at the Ethics
 8   Board.  And so the Ethics Administrator Kathleen Allen
 9   clarified and refuted what Dr. Banner put on her Facebook page,
10   that the matter is not on the agenda for a hearing.
11   Q.   Okay.  But Kathleen Allen, nobody else from the Board of
12   Ethics said anything about it being a problem that Joy Banner
13   was talking publicly about this ethics complaint; agreed?
14   A.   Not in this email.
15   Q.   And then you said, "This appears to be a violation of
16   law"; right?
17   A.   Correct.
18   Q.   And they did not email back and agree with you; right?
19   A.   I had a conversation with someone at the Ethics Board.
20   Q.   Okay.
21   A.   But not any more emails.
22   Q.   Okay.  Ms. Hotard, you went to two years of law school?
23   A.   Well, about -- I was there two years.  But in the spring
24   semester, that's when my sister was murdered.  So I dropped two
25   of the classes in my spring semester.
```

OFFICIAL TRANSCRIPT

1  Q.   So you finished half of law school?

2  A.   Half.

3  Q.   And it's your testimony that you don't know what perjury

4  means?

5  A.   I never got into any criminal statutes or anything like

6  that.  I wasn't there yet.

7  Q.   And in 20 years of taking oaths, you haven't learned what

8  perjury is?

9  A.   Not a textbook definition.  I have a basic understanding

10  of what perjury means.  Just like when I was sworn under oath

11  today, that you're going to give testimony, you know, based on

12  your best knowledge and understanding.  Sometimes you can't

13  recall the exact date or time of something, but to the best of

14  your knowledge and understanding and that I'm to be truthful.

15          **MR. MOST:** Okay, thank you very much.

16          **THE WITNESS:** Thank you.

17          **MR. SPEARS:** Judge, no redirect.

18          **THE COURT:** All right.

19          **MR. SPEARS:** We have no additional witnesses at this

20  time.  Your Honor, we would rest at this time.

21          **MR. MOST:** Before we move on, can we let Ms. Schnyder

22  know she can leave because she's been waiting?

23          **THE COURT:** Oh, yes, because they rested.

24          We have some matters to take up outside of your

25  presence.  So since it's a quarter to 5:00, I'm going to go

OFFICIAL TRANSCRIPT

```
 1   ahead and let you all go home.  We'll resume tomorrow morning
 2   at 9:00 a.m.  And at that time, we'll have closing arguments,
 3   and you'll be able to begin deliberating.  Be safe.  Drive home
 4   safely.
 5            DEPUTY CLERK: All rise.
 6                 (The jury exited the courtroom.)
 7            THE COURT: I'll give y'all some time, take a quick
 8   break.  I'm going to go over the draft of my jury instructions.
 9   I'll give y'all a copy, and then we will take up --
10            MR. MOST: Are all witnesses released from
11   sequestration, Your Honor?
12            THE COURT: Yes.  And then we'll take up the charge
13   conference tonight so that we can begin tomorrow with closings.
14            MR. SPEARS: You want to do that here or in the
15   conference room?
16            THE COURT: We do it in the conference room.  But I'm
17   going to give y'all a couple of minutes.  Give me about
18   15 minutes to go over the draft of the jury instructions.
19                 (A short recess was taken.)
20                 (Proceedings held in chambers.)
21            THE COURT: All right, jury instructions.  Okay, No. 1
22   is a general charge.  Everybody have a chance to read through
23   it?
24            MR. MOST: Yeah.  No objection.
25            THE COURT: Any objection?
```

OFFICIAL TRANSCRIPT

```
 1              MR. SPEARS: No objection.
 2              THE COURT: All right.  No. 2 -- wait, I don't have
 3    mine with my notes on it.
 4              LAW CLERK: Oh, okay, let me get that one.
 5              THE COURT: We'll keep going while she gets that.
 6              No. 2, this is the burden of proof.  Any objections?
 7              MR. SPEARS: No objection.
 8              MR. MOST: No objection.
 9              THE COURT: No. 3 is another general jury instruction.
10              MR. SPEARS: No objection.
11              MR. MOST: Same.
12              THE COURT: No. 4.
13              MR. SPEARS: No objection.
14              MR. MOST: Same.
15              THE COURT: No objections on No. 4.  No. 5?
16              MR. SPEARS: No objection.
17              MR. MOST: Same.
18              THE COURT: No. 6?
19              MR. MOST: No objection.
20              MR. SPEARS: No objection.
21              THE COURT: No. 7?
22              MR. MOST: No objection.
23              MR. SPEARS: I don't have anything better to give you,
24    Judge.
25              THE COURT: It's another pattern.


                        OFFICIAL TRANSCRIPT
```

1      **MR. SPEARS:** Yeah, I understand.

2      **THE COURT:** No. 8?

3      **MR. SPEARS:** No objection.

4      **MR. MOST:** Same.

5      **THE COURT:** No. 9, assertion of First Amendment?

6      **MR. MOST:** No objection.

7      **MR. SPEARS:** No objection.

8      **THE COURT:** Okay.  No. 10, take a minute and look at

9   this one.

10      **MR. MOST:** No objection from Plaintiff.

11      **MR. SPEARS:** No objection.

12      **THE COURT:** Okay.  No. 11.

13      **MR. MOST:** I might just omit the words "when she was

14   interrupted."  So it just says, "free speech right during

15   public comment."  Because I think the Plaintiff's framing would

16   be it was the interruption, plus the threat.  So I think it

17   would be simpler just to say, "exercising her First Amendment

18   free speech right during public comment."

19      **MR. SPEARS:** I'm not sure where you're referencing.

20      **THE COURT:** On 11.

21      **MR. SPEARS:** I'm looking at 11.  Is this in the first?

22      **THE COURT:** The first sentence, second line.  I'll

23   read it out loud.  "Plaintiff claims that Defendants retaliated

24   against Plaintiff for exercising her First Amendment free

25   speech right when she was interrupted during public comment at

OFFICIAL TRANSCRIPT

1   a November 28, 2023 parish council meeting."

2              He'd like to amend that to say, "Plaintiff claims

3   that Defendants retaliated against Plaintiff for exercising her

4   First Amendment free speech right during public comment."

5              **MR. MOST:** Yeah, so just delete the words "when she

6   was interrupted" because it was, you know, kind of a couple of

7   things.

8              **THE COURT:** I agree with that.  I kind of struggled

9   with how to write that.  You want to continue to read to see if

10  there's anything else?

11             **MR. SPEARS:** I don't have anything else on that.

12             **THE COURT:** On No. 11, do you have anything more on

13  No. 11?

14             **MR. MOST:** No, so no objection.  Do you object,

15  Mr. Spears?

16             **MR. SPEARS:** (Shakes head.)

17             **THE COURT:** You got that?  We have it.

18             No. 12?

19             **MR. MOST:** No objection from Plaintiff.

20             **THE COURT:** No. 12?

21             **MR. SPEARS:** No objection.

22             **THE COURT:** No. 13?

23             **MR. MOST:** No objection.

24             **MR. SPEARS:** No objection.

25             **THE COURT:** All right, No. 14?


                        OFFICIAL TRANSCRIPT

1           **MR. MOST:** I think this is just the pattern jury
2 instruction.
3           **THE COURT:** Yeah, it is.
4           **MR. MOST:** So no objection.
5           **MR. SPEARS:** No objection.
6           **THE COURT:** All right, okay, No. 15.  That's punitive
7 damages; right?  That's the punitive damages instruction.
8           **MR. MOST:** Yeah, I think this is just the pattern with
9 the names put in.  So no objection for Plaintiff.
10           **MR. SPEARS:** Can I come back to that one, Judge?  I
11 think I had something in my notes, but my computer screen went
12 blank on me.
13           **THE COURT:** I'll come back to 15.
14           16, this is my instruction on the interpretation of
15 42:1141.
16           **MR. SPEARS:** Judge, I'm objecting to the second
17 paragraph.
18           **THE COURT:** And why?
19           **MR. SPEARS:** That was not part of our stipulation.
20           **THE COURT:** I know, it's not.  The first sentence is
21 about your stipulation.  The second sentence is about what the
22 law is.
23           **MR. SPEARS:** Well, the facts are a little more
24 nuanced, Judge, than what's in the second paragraph.  These
25 folks were actually arrested.  They were physically arrested

OFFICIAL TRANSCRIPT

1  and prosecuted.  Those are not similar to the facts in our

2  case.

3        **THE COURT:** No, the federal judge determined that

4  42:1141.4(L)(1) was invalid.  This is a quote, "Insofar as the

5  statute makes it a crime for any other person besides the

6  subject of an ethics investigation to make any public statement

7  or give out any information concerning a private investigation

8  or private hearing of the Board of Ethics absent the subject of

9  the investigation's written request."

10       So he was opining about that portion of the statute

11  which on its face he found to be unconstitutional.  The fact of

12  whether somebody was arrested or not is not the law.

13       **MR. SPEARS:** I read the case, Judge, differently.

14       **THE COURT:** How would you have read the case?

15       **MR. SPEARS:** I read the case, under those particular

16  facts, he found it to be unconstitutional, under the facts of

17  that case.

18       **THE COURT:** But he found it unconstitutional on its

19  face for that specific reason.  Not in all parts, but in two

20  ways.

21       Counsel?

22       **MR. MOST:** Yeah, that's right.  I mean saying on its

23  face, it's specifically saying it's not just about these

24  plaintiffs.

25       **THE COURT:** Right.


OFFICIAL TRANSCRIPT

1    **MR. SPEARS:** Well, we would note an objection, Your
2  Honor, to 16.

3    **THE COURT:** Okay, anything else on 16?

4    **MR. MOST:** I wonder if it's necessary to say "federal
5  courts do not strike down laws" because that -- I'm not sure
6  that's really come up in this trial whether they strike them
7  down or hold them unenforceable.  I wonder if it's just...

8    **THE COURT:** It's the law.  It hasn't come up because
9  it's the law.  It's my responsibility to address that, and the
10 law does cover the fact that, which has been repeatedly said,
11 that that law is still on the books.  But that doesn't mean
12 that it is enforceable because it's on the books.  On the
13 federal law, it is not.

14    **MR. MOST:** I agree, Your Honor.  It's just you're
15 saying to the jury here federal courts don't strike down laws.
16 This is what they do instead.  I'm not sure the first part is
17 necessary because I don't know if it's really, like, in their
18 minds whether or not courts are striking down or not.

19    I wonder if it could just say, "Courts hold laws
20 unenforceable when they are unconstitutional.  Many laws that
21 are plainly unconstitutional remain on the statute books," and
22 not get into the striking down part.  I don't feel super
23 strongly about this, but I think it kind of injects something
24 that's not really at issue.

25    **MR. SPEARS:** Since you don't feel super strongly, I'd

OFFICIAL TRANSCRIPT

1  ask that it remain as it is, you know, notwithstanding that we

2  had the objection to the second paragraph.

3         **THE COURT:** Okay, all right, I'm going to leave it as

4  it is.

5         The last one is just for them, just telling them to

6  go back and deliberate and pick a foreperson.

7         **MR. SPEARS:** I don't have a problem with the last one,

8  Judge.

9         As relates to 15 which I believe is the one --

10        **THE COURT:** Yeah.

11        **MR. SPEARS:** -- where you talked about compensatory

12 and punitives, we had submitted a couple of charges that may or

13 may not have been considered, but they were not included.

14        Our Jury Instruction No. 2, I think, is a better

15 wording.

16        **THE COURT:** Of what?

17        **MR. SPEARS:** Of the issue of punitive damages, and

18 we'd ask that that be included.

19        **THE COURT:** Wait, okay.  Defendant's Proposed Jury

20 Instruction No. 2 reads, "You may also award punitive" -- wait,

21 let me see where mine came from.  I think mine is the pattern.

22        **MR. MOST:** Yeah, Judge, yours is the pattern.

23        **THE COURT:** Right, okay.  Mine is the Fifth Circuit

24 Pattern Instruction 15.7.

25        Yours is, "You may also award punitive damages if

OFFICIAL TRANSCRIPT

1    Plaintiff has proved that Defendants acted with malice or

2    willfully or with a callous or reckless indifference to the

3    rights of others.  One acts willfully or with reckless

4    indifference to the rights of others when he acts in disregard

5    of a high and excess degree of danger about which he knows

6    which would be apparent to a reasonable person in his

7    condition.  If you determine that Defendants' conduct was so

8    shocking and offensive as to justify an award."  So you are

9    citing a 1983 Supreme Court case, *Smith v. Wade*.

10           The Fifth Circuit Pattern Instruction would have been

11   written within the last five years.  I think it is a more

12   accurate description of the law in this circuit and more

13   precise.  So that would be my reason for going with the

14   pattern.

15           **MR. SPEARS:** Can we read them both?

16           **THE COURT:** No, they're only going to be instructed

17   once.

18           **MR. SPEARS:** Well, we'll simply note an objection for

19   not inclusion.

20           **THE COURT:** Okay.

21           **MR. SPEARS:** We also had a Jury Instruction No. 1 on

22   the issue of qualified immunity.

23           **MR. MOST:** Yeah, that's an affirmative defense that

24   was not pled in this case.

25           **THE COURT:** It was not.  That's right, it wasn't pled

OFFICIAL TRANSCRIPT

1  in this case.  Not even -- I looked at the complaint.  You

2  don't even allege immunity in general, not only that you

3  haven't raised qualified immunity.  It was not listed.

4         It is an affirmative defense.  It was not listed in

5  the pretrial order, and you had three opportunities to amend

6  the pretrial order.  I noted that you filed that instruction on

7  the same day that, I think, y'all filed an amended pretrial

8  order.  I didn't sign the pretrial order for yet another week

9  while I was still addressing motions in limine.

10         At this point, Plaintiff has rested.  You have

11  rested.  I'm not aware of any case where qualified immunity has

12  been allowed to be urged for the first time after trial.  And

13  that's essentially where we are.  What I could find, even

14  outside the circuit, the outer limits, was in a Rule 50(a)

15  motion.  You made a Rule 50(a) motion.  You didn't raise

16  qualified immunity at that time.

17         So do you have an argument as to why and some

18  authority why it's not waived?

19         **MR. SPEARS:**  I accept that it's been denied, Judge.

20         **THE COURT:**  All right.  Do you want to make an

21  argument on the record?

22         **MR. MOST:**  Certainly.  Just briefly, Your Honor,

23  qualified immunity is an affirmative defense that must be pled.

24  That's *Harlow v. Fitzgerald,* 457 U.S. 800.  Because it is an

25  affirmative defense, qualified immunity is waived if not pled

OFFICIAL TRANSCRIPT

384

1    in the answer, that's *Clark v. Stalder*.

2              **THE COURT:** What circuit was that from?

3              **MR. MOST:** That's Fifth Circuit 1997.  Quote, "The

4    defense of qualified immunity is an affirmative defense and

5    must be pleaded like any other defense.  The failure to

6    properly raise the defense results in waiver," citations

7    omitted.

8              And then additionally, the proposed jury instruction

9    substantially misstates current qualified immunity doctrine.

10   It suggests -- Defendants jury instruction suggests that

11   Plaintiff must prove that both Defendants' conduct was not

12   objectively reasonable and further that Defendants violated

13   clearly established law.  That framing has been rejected at

14   least four times just in the last year and a half by the Fifth

15   Circuit in *Cruz v. Cervantez*, *Baker v. Coburn*, *Parker v.

16   Leblanc*, and *Hicks v. Leblanc*.

17             And then additionally, there's further more recent

18   Fifth Circuit case law suggesting that the legal questions of

19   qualified immunity are not for a jury to decide.  That's

20   *Ramirez v. Killian*, 113 F.4th 415, Fifth Circuit, 2024.  That

21   is what Defendants' jury instruction calls for.

22             **THE COURT:** Okay.  Mr. Spears, you can't just -- you

23   got to give me some reason.  Why is it that you're raising this

24   for the first time in a jury instruction?

25             **MR. SPEARS:** Judge, I got into the case late, but

OFFICIAL TRANSCRIPT

 1    that's no excuse.  I'm moving on to another --

 2              **THE COURT:** No, no, no, no.  We're going to have

 3    something in the record because qualified immunity is an

 4    affirmative defense, and I don't want to --

 5              **MR. SPEARS:** We did not plead it, and it was not pled

 6    by previous counsel.

 7              **THE COURT:** Okay.  So you agree it was waived?

 8              **MR. SPEARS:** Yes, Judge.  Yes, Judge.

 9              **THE COURT:** You agree that qualified immunity was

10    waived, all right.

11              **MR. SPEARS:** We have a proposed Jury Instruction No. 4

12    that was not included.

13              **THE COURT:** Okay, what is No. 4?

14              **MR. SPEARS:** It deals with the public meetings law and

15    restrictions placed on speakers.

16              **THE COURT:** I think we addressed that, and I was

17    trying to find the case that Ms. Sallah, you had five points.

18              **MS. SALLAH:** From the White Page.

19              **THE COURT:** What's a White Page?

20              **MR. SPEARS:** I can pull it up.

21              **THE COURT:** Is it from a case?

22              **MS. SALLAH:** No, it's from the legislative body, the

23    White Page.  It's in evidence.

24              **THE COURT:** A white page is not the law.

25              **MR. MOST:** I'll note, Your Honor, that this proposed

                         OFFICIAL TRANSCRIPT

```
1   Jury Instruction 4 --
2           THE COURT: Let me see if I can read it.  I want to
3   find it.
4           MR. MOST: This is R. Doc. 124 at page 5.
5           LAW CLERK: It should be in your binder, Judge.
6           THE COURT: Yeah.  "Louisiana Public Meetings Law does
7   not preclude a public body from placing requirements on
8   individuals that desire to speak, such as, filling out a public
9   comment or speakers card before a meeting, limiting the speaker
10  to the agenda item on which he or she would like to speak,
11  limiting the amount of time for each speaker, and/or
12  restricting speakers from making defamatory or accusatory
13  comments."
14          The instruction that I have -- you know, you cite an
15  attorney general opinion.  That's an opinion.  It's not the
16  law.  It is what it is.  It might have some guidance.  I've
17  allowed you a lot of leeway in trial.  That's why I was asking
18  where that information came from, you know.  And you've alluded
19  to all of these in your questions without objection from
20  Plaintiff to the ability to restrict.  So you've had evidence
21  on it.  So I've allowed it in as a factual issue.
22          But I don't think that it is controlling law, and I
23  do think it's covered.  Which one is it?
24          LAW CLERK: Is it Jury Charge No. 10 you're referring
25  to?
```

OFFICIAL TRANSCRIPT

1        **THE COURT:** Jury Charge No. 10 says, "In terms of

2    First Amendment analysis, a city or parish council meeting is a

3    limited public forum.  In such a forum, a government may apply

4    reasonable time, place, and manner restrictions to speech so

5    long as the restriction, No. 1, does not discriminate against

6    speech on the basis of viewpoint, and 2, is reasonable in light

7    of the purpose served by the forum."

8        You know, the law itself, Louisiana Public Meetings

9    Law is very general.  It's very general.  So you know, I'm not

10    going to cite an attorney general opinion as the law in my jury

11    instruction.

12        **MR. MOST:** I'll note also, Your Honor, the part at the

13    end about restricting speakers from making defamatory or

14    accusatory comments, that's not only not part of this case,

15    there's been no suggestion that the parish had such a rule.

16        But if they did, there would be serious First

17    Amendment problems with any sort of rule restricting speakers

18    from making accusatory comments.  I'll cite the Court to *New*

19    *York Times v. Sullivan*, the Supreme Court, 1964.  And then this

20    is out of circuit, but a Fourth Circuit case *Grimmett v.*

21    *Freeman*, 59 F.4th 689.  When plaintiffs challenged in North

22    Carolina to criminalize certain derogatory reports, the Fourth

23    Circuit concluded not only did plaintiffs show a likelihood of

24    success, it's difficult to imagine them losing.

25        So a rule about accusatory comments would probably be

OFFICIAL TRANSCRIPT

 1  unconstitutional and not in this case.

 2          **THE COURT:** I know there's been a lot of accusations

 3  going back and forth about, you know.  You can certainly

 4  criticize government.  And maybe as government officials, we

 5  don't always like that criticism, but you are a public

 6  official.  And so, you know, I would have serious problems.  I

 7  don't think that No. 4 is reflective of the law.

 8          Like I said, it's an attorney general opinion.  It's

 9  just an opinion, and so I would not include that as an

10  instruction for that reason.

11          **MR. SPEARS:** Okay.

12          **THE COURT:** Any others?

13          **MR. SPEARS:** That is it.

14          **MS. SALLAH:** Your Honor, may I answer your previous

15  question about where I got the elements from?

16          **THE COURT:** Yeah, yeah.

17          **MS. SALLAH:** We admitted it under Michael Wright.

18  It's D5.  It's the Legislative Auditor's explanation of the

19  Open Meetings, and I can direct you to which page, but we did

20  admit it as D5.

21          **THE COURT:** Okay, it's admitted.  Again, it's still

22  not law.  Okay, thank you, though.

23          Let's go to the verdict form.

24          **MR. MOST:** Sure.

25          **THE COURT:** The verdict form, I don't know about it

OFFICIAL TRANSCRIPT

1  titled that way.  I mean if somebody feels some kind of way, I
2  don't have to put the law.

3         **MR. MOST:** I think that's fine for just setting aside
4  the sections.

5         **THE COURT:** So Jury Verdict Form, First Amendment
6  freedom of speech, No. 1, Do you find by a preponderance of the
7  evidence that one or more Defendants restricted Plaintiff's
8  speech based on her viewpoint?  Circle yes or no as to each
9  Defendant.  Michael Wright, Yes, No; Jaclyn Hotard, Yes, No;
10 St. John the Baptist Parish, Yes, No.

11        **MR. MOST:** No objection to Question 1.

12        **MR. SPEARS:** No objection.

13        **THE COURT:** No. 2, Do you find by a preponderance of
14 the evidence that one or more Defendants engaged in First
15 Amendment retaliation?  Circle yes or no as to each Defendant.
16 Michael Wright, Yes or No; Jaclyn Hotard, Yes or No; St. John
17 the Baptist, Yes or No.

18        Damages is No. 3.  If you circled yes -- this is when
19 we got to pay attention that this stuff makes sense when you
20 say it.  If you circled yes for any of the questions above, one
21 or two, continue on with this question.  If you circled No for
22 all of the questions above, move on to Question 5.

23        So if you circled yes for any one of those questions,
24 what sum of money, if paid now in cash, would fairly and
25 reasonably compensate Plaintiff for the harm she has suffered

OFFICIAL TRANSCRIPT

1   from one, if any, of the following Defendants?

2          **MR. MOST:** No objection to that.

3          **LAW CLERK:** What are we including, Judge?

4          **THE COURT:** What sum of money, if paid now in cash --

5   if you answered yes to No. 1 or 2, right, which would mean that

6   you'd have to find that they discriminated against her

7   viewpoint or retaliated against her.  If you circled yes for

8   any of those questions, what sum of money, if paid now in cash,

9   would fairly and reasonably compensate Plaintiff for the harm

10  she has suffered from.

11         **MR. MOST:** From Defendants.

12         **MR. LANSER:** From each Defendant.

13         **THE COURT:** From one or more -- from any of the

14  Defendants.  I don't want to tell them that they have to choose

15  all of them or none of them.

16         **MR. SPEARS:** Well, I thought that there was a

17  discussion that William proposed -- Mr. Most proposed to put a

18  total number.  And then after putting the total number, ask

19  them to apportion the percentages.  Obviously, if they circled

20  no, then it would be zero for a particular Defendant.  If they

21  circled yes, it could be 50 percent.  It could be 100 percent.

22         **THE COURT:** You know, this is not like a personal --

23  the only damage is emotional distress.  So I don't know that we

24  apportion that way.

25         **MR. MOST:** So I was looking at some of the case law

OFFICIAL TRANSCRIPT

 1   about that, and it looks like it's a little bit opaque frankly

 2   from my quick search.  It looks like for constitutional claims,

 3   some courts have asked the jury to apportion between different

 4   defendants.  In some cases where there's joint tortfeasors,

 5   they do joint and several liability.

 6          So I think we could either say, you know, pick the

 7   number, and it just be one number, or we could tell the jury to

 8   pick a number and then apportion it between the Defendants.

 9          The thing I'm worried about is if we say please

10   determine a number and then there's three lines, it might -- I

11   want to avoid potential double recovery, right.  So if they

12   decide like it's $100,000, I don't want them to put $100,000

13   for each because then there would be double or triple recovery

14   if that makes sense.

15          **THE COURT:** What sum of money, if paid now in cash,

16   would fairly and reasonably compensate Plaintiff for the harm

17   caused by any of the Defendants listed below?

18          **MR. MOST:** Or any of the Defendants you circled yes

19   for, perhaps.

20          **MR. SPEARS:** Can I make a suggestion, Judge?  Since

21   you have indicated that emotional distress is the only

22   recoverable claim, instead of saying harm, can we say for her

23   emotional distress?

24          **LAW CLERK:** Should we include an instruction on

25   emotional distress?

OFFICIAL TRANSCRIPT

1          **THE COURT:** Don't we have one?

2          **MR. MOST:** There's one.

3          **LAW CLERK:** I'm sorry, a verdict number on emotional

4   distress.

5          **THE COURT:** Why?  That's not -- we don't do that.

6   They might suggest one, but we don't do that.

7          **MR. SPEARS:** My other suggestion, Judge, is after the

8   one -- after the Wright, Hotard, and Parish, could we just put

9   maybe Total?

10         **THE COURT:** Oh, like at the end, they have one, two,

11  three, and then a line that says Total.

12         **MR. SPEARS:** And then maybe say add up the -- they

13  know what total means.  They're smart people.

14         **MR. MOST:** Okay, yeah.

15         **THE COURT:** Do you see what it would look like?  It

16  would just be Total.

17         Would fairly and reasonably compensate Plaintiff for

18  the harm caused by any of the Defendants listed below.

19         **MR. SPEARS:** By putting Total, they know it's not

20  triple recovery.

21         **MR. MOST:** I'm okay with that, yeah.  I think that's

22  sensible.

23         **MR. SPEARS:** Did we say emotional distress instead of

24  harm?

25         **MR. MOST:** I mean there's a violation of her rights.

OFFICIAL TRANSCRIPT

1  There can be nominal damages for constitutional violations even
2  without.  I think "harm" is a broader, more capacious, and more
3  accurate word.

4          **THE COURT:** Again, that's for the jury instruction.
5  It's in the jury instruction, I think.  I thought about a
6  general just compensatory damage, but I didn't find that there
7  was evidence of anything more than emotional distress.

8          So for her emotional distress?

9          **MR. SPEARS:** I think that makes it more sound.

10         **THE COURT:** Because later, we talk about if they
11 violated the Open Meetings Law, there is a limit on how much
12 they can recover.

13         **MR. SPEARS:** I'm in favor of "emotional distress" as
14 opposed to "harm."

15         **MR. MOST:** I mean I would note an objection to that
16 because I think that harm is more descriptive of, you know,
17 damages.

18         **THE COURT:** I hate to tell them.  I think I am going
19 to -- "Plaintiff for the harm she suffered caused by any of the
20 Defendants below," I think I'm going to leave it, Mr. Spears,
21 the way I have it.  Because I don't want them, you know, I
22 don't want them to go back and necessarily find emotional
23 distress if they didn't hear emotional distress.  It's in the
24 jury instruction, you know.  But when you tell them that,
25 they're going to feel like they got to put a number down.

OFFICIAL TRANSCRIPT

1             **MR. SPEARS:** Okay, I'm okay with that.

2             **THE COURT:** Do you find that Plaintiff is entitled to

3    an award for punitive damages against any of the individual

4    Defendants?  If yes, fill in a dollar amount next to each

5    individual Defendant you find liable for punitive damages and

6    then move on to 5.  If no -- didn't I change that?

7             **LAW CLERK:** I think you decided to keep it the way it

8    was.

9             **THE COURT:** No, I meant if none, move on to 5.

10            **MR. MOST:** I think yes and no is mirror, yeah.

11            **THE COURT:** And so those are the only two Defendants,

12   right, or do we put St. John?  I think for punitive damages,

13   they have to act through an individual, right, is what the law

14   is?

15            **MR. MOST:** I'm sorry?

16            **THE COURT:** For punitive damages, the parish has to

17   act through an individual?

18            **MR. MOST:** Yes, that's right.

19            **THE COURT:** That's why I didn't put St. John the

20   Baptist.

21            **MR. MOST:** That's right, you can't have punitive

22   damages against a municipal entity or parish government.

23            **THE COURT:** Do you want to put Total at the bottom of

24   this one too for the same reason that you did in 3?

25            **MR. SPEARS:** I don't know if that's necessary for the

OFFICIAL TRANSCRIPT

1   punitive.

2           **MR. MOST:** Yeah, I agree.

3           **THE COURT:** Open Meetings Law, Do you find by a

4   preponderance of the evidence that one or more Defendants

5   violated the Open Meetings Law?  Circle yes or no as to each

6   Defendant.  If you answered Yes as to Michael Wright or Jaclyn

7   Hotard in Question 5, continue with this question.  If you did

8   not, proceed to the end and sign the form.

9           Do you find by a preponderance of the evidence that

10  either individual Defendant Wright or Hotard knowingly and

11  willfully participated in a meeting in violation of the Open

12  Meetings Law?  If yes, put a number of civil penalties next to

13  each applicable Defendant up to $500 per violation.  If no,

14  proceed to the end.

15          **MR. MOST:** Yes.

16          **MR. SPEARS:** Now this is slightly confusing.  I

17  interpret it that the most that they can award against each one

18  is $500.

19          **MR. MOST:** The statute says $500 per violation.

20          **MR. SPEARS:** There's only one meeting involved.  It

21  would be you violated the Open Meetings Law.  So there's only

22  one meeting involved.  So I think by saying per violation, it

23  opens it up for them to potentially do something that would

24  be --

25          **MR. MOST:** We did some research into this.  I think

OFFICIAL TRANSCRIPT

1  one interpretation of a violation is a meeting.  But I couldn't

2  find any case law that said one way or the other.  This just

3  tracks the statutory language.  So the statute says $500 per

4  violation.

5              **THE COURT:** Oh, it says per violation.

6              **MR. MOST:** Yeah, so I think the safest thing to do is

7  just track the statute rather than try and interpret.

8              **THE COURT:** And I guess then you could argue to the

9  jury that a violation is one meeting.

10             **MR. SPEARS:** Oh, Judge, that becomes real confusing

11 because I think we agree that the violation is you violate

12 it -- it's only one meeting at issue.  If they had said you

13 violated six meetings, then it could be six times $500.

14             **THE COURT:** But is it who violated?

15             **MR. SPEARS:** Each one could get $500.

16             **THE COURT:** Okay, okay.

17             **MR. SPEARS:** Yeah, but.

18             **THE COURT:** So we all agree on that.

19             **MR. SPEARS:** Banging the gavel was a violation.

20 Reading the statute was a violation.

21             **THE COURT:** Okay, I get you.  I mean everybody,

22 there's no disagreement that up to $500 could be assessed.

23             **MR. SPEARS:** Per Defendant.

24             **THE COURT:** Per Defendant.

25             **MR. MOST:** Respectfully, I don't agree with that.  The

OFFICIAL TRANSCRIPT

statute says per violation.  It doesn't say there's one

violation per meeting.  I think it's possible that you could

violate the Open Meetings Law multiple times in one meeting.

And I haven't seen any case law to the contrary.

            **THE COURT:** He does have a point.

            **MR. MOST:** So I think just tracking the statutory

language --

            **THE COURT:** But what was -- tell me what do you

perceive, as the Plaintiff, what were the violations?

            **MR. MOST:** Yeah, I think that one violation could be

gaveling her quiet to enforce a rule that they did not have.  I

think another violation could be when he threatened her with

the potential criminal consequences.  I think another violation

could be when Ms. Hotard said, "Stop this comment."  I think

there could have been multiple.

            **THE COURT:** That's like medical malpractice.  You

don't practice in that area?

            **MR. MOST:** I don't.

            **MR. SPEARS:** Judge, the issue is there's a law which

requires you to have open meetings.  If you violate that law,

that is a violation.  Now whether you violated the law because

you didn't post it 24 hours in advance or because the meeting

wasn't allowed to be televised, the meeting itself is the

violation.  So to not expressly say that you can go up to $500

per person, I think, is going to create a problem.

OFFICIAL TRANSCRIPT

1    **THE COURT:** I don't think it's a problem -- I mean I

2  think it's a distinction with a difference because even if they

3  had -- they didn't tell you how to apportion, right.  It they

4  had ten violations in one meeting, they still can't -- they

5  can't assess $500 for every violation.  And we all agree, that

6  can't happen.

7    **MR. SPEARS:** I agree with you.  I'm not sure Mr. Most.

8    **MR. MOST:** I think the statutory language actually

9  suggests it's not Mr. Spears' interpretation.  This is 42

10  Section 28, "Any member of a public body who knowingly and

11  willfully participates in a meeting conducted in violation of

12  this chapter shall be subject to a civil penalty not to exceed

13  $500 per violation." So it talks about a meeting and then per

14  violation.  So I think that suggests there can be more than one

15  violation per meeting.

16    I don't think we have to resolve this.  I think we

17  just say per violation.  That's what the statute says.

18    **MR. SPEARS:** I'm asking, Judge, that somewhere in the

19  instruction or on the jury form, it is clear to the jurors that

20  they can award up to $500 against each.

21    **THE COURT:** I think we say it in the jury instruction.

22    **MR. SPEARS:** Because otherwise, I'm going to be asking

23  you, assuming they awarded $1,000 or $5,000, to strike it and

24  put in $500.

25    **MR. MOST:** Do you have any authority for that?

OFFICIAL TRANSCRIPT

1          **MR. SPEARS:** It's a plain reading of the statute.

2          **THE COURT:** Well, then that will be an issue of law

3     that I can decide later, you know, if you challenge it.

4          **MR. SPEARS:** Well, I'd like to not create a problem if

5     we can avoid it.

6          **THE COURT:** Where is it?

7          **LAW CLERK:** No. 13.

8          **MR. SPEARS:** I certainly don't want Mr. Most to argue

9     that there were ten violations at this meeting in his closing

10    argument.

11         **MR. MOST:** I'm not going to.

12         **THE COURT:** No. 13, that's not it.

13         **MR. SPEARS:** I got some good stuff in my proposed jury

14    instructions, Judge, if you want.

15         **THE COURT:** I thought I saw it.  Did we have an

16    earlier instruction?  Did we take it out?

17         Mr. Spears, where does yours come from?

18         **MR. SPEARS:** I was just joking, Judge.  You don't like

19    any of my instructions; so I don't even know why I keep trying.

20         **THE COURT:** No, I took everybody's Fifth Circuit

21    Pattern Instructions.  I thought I saw it.

22         **MR. SPEARS:** Keeping us this late, you should have had

23    some food.  That's all I'm saying.

24         **THE COURT:** We got some potato chips.

25         **MR. SPEARS:** Not that anybody cares, my parking is

OFFICIAL TRANSCRIPT

1  expiring in 15 minutes.

2          **MR. MOST:** It doesn't cut off at like 6:00 p.m.?

3          **THE COURT:** It might already be gone.

4          **MR. SPEARS:** I added more time, but it's telling me

5  that at 6:42 I'm out.

6          **THE COURT:** You can add some more time.

7          **MR. SPEARS:** I know I can.

8          **THE COURT:** Are you on the street?

9          **MR. SPEARS:** No, I'm in the lot across the street.

10          **THE COURT:** Well, I just don't know -- point to me, to

11  make it quick, tell me, read to me the instruction.

12          **MR. SPEARS:** Well, I don't have an instruction on what

13  we're debating.  I'm just saying, Judge, it's confusing if we

14  don't make it clear that they can award up to.  They don't have

15  to award $500.  They could award $100 per person, but they

16  cannot award more than $500 per Defendant assuming that they

17  believe there was a violation.  If they award more than $500 --

18          **THE COURT:** But the statute does say up to $500 per

19  violation.

20          **MR. SPEARS:** And the meeting is a violation.

21          **MR. MOST:** That's an argument, but we haven't heard

22  any authority for that.  I think it's safer just to keep it

23  with the statutory language.

24          **THE COURT:** We haven't had any argument.  It hasn't

25  been briefed.

OFFICIAL TRANSCRIPT

1    **MR. SPEARS:** We don't have a lot of Open Meetings Laws
2    in federal court, Judge, not a lot.

3    **THE COURT:** No, but we used the Louisiana Open
4    Meetings Law I quoted in there.  I just haven't seen an
5    interpretation of this $500 per violation.  I don't know what
6    that means.

7    **MR. SPEARS:** It means if you violate the Open Meetings
8    Law --

9    **THE COURT:** But I think Mr. Most makes a good point
10   too.  You can violate it in more than one way.  But I guess if
11   you had a violation of the Open Meetings Law, let's analyze
12   this.  If you violated the Open Meetings Law, whether you
13   violated it once or twice, you would have to have the meeting
14   again on some other kind of issue, I'm just thinking, right.

15   **MR. MOST:** I think another way of framing it is that
16   if Mr. Spears' interpretation were correct, the statute would
17   just say if they participated in a public meeting in violation
18   of the Open Meetings Law, there's a civil penalty of $500.  It
19   wouldn't say then per violation.

20   You know, we looked for authority.  We couldn't find
21   any sort interpreting this either way.

22   **MR. SPEARS:** You're assuming that the same skillful
23   legislators who allow a statute to remain on the books
24   ten years after a federal judge declared it unconstitutional
25   would think through the possible consequence of not specifying

OFFICIAL TRANSCRIPT

1  that in no circumstances could any one person be assessed more

2  than $500.

3            I think we're opening up a potential problem.  Look,

4  I'm hoping that they won't find a violation.  But if they do, I

5  certainly don't want them awarding more than $500.

6            **MR. MOST:**  I mean, look, this tracks the language of

7  the statute.  I'll represent that I'm not going to be arguing

8  for many, many violations.  I think I'm just going to --

9            **MR. SPEARS:**  Limit it to ten?

10           **MR. MOST:**  I'm not going up to ten.

11           **THE COURT:**  I think we, you know, and I don't have --

12  the problem is going to be that I don't -- if I just said up to

13  $500, that's not accurate.  It's $500 per violation.  So I

14  can't restrict it that way.

15           **MR. SPEARS:**  I could argue, Judge, that it could only

16  be 250 per person.

17           **MR. MOST:**  Sure.

18           **MR. SPEARS:**  Because they're splitting the $500.

19           **MR. MOST:**  You can argue less than $500.

20           **MR. SPEARS:**  No, no, I'm saying I could interpret it

21  to mean that $500 is the most you can get from one violation.

22  It's one meeting, one violation, split the 500 between two

23  people.

24           **THE COURT:**  You know what, we could ask them.  It says

25  up to $500 per violation and then ask them how many violations

OFFICIAL TRANSCRIPT

1  did you find.

2       **MR. SPEARS:** Oh, Lord, Judge, you just -- oh, God.

3       **THE COURT:** Well, but I'm just saying, because then

4  after the fact, we don't have to have a whole new trial.  Then

5  we could go back --

6       **MR. SPEARS:** I object to that because that hints,

7  Judge, that they're allowed to find more than one violation.

8  You're about to make me faint, Judge.  I'm already hungry.  My

9  car is about to get booted.

10       **THE COURT:** Don't faint in here.  We didn't even eat

11  our lunch until that last break.  We don't have any food in

12  here.

13       **MR. SPEARS:** Judge, no, I would oppose the suggestion

14  to them that there can be multiple violations from a single

15  meeting.

16       **THE COURT:** Up to $500 per violation is what the

17  statute says.  I don't see any other way around it.  You want

18  it to say what?

19       **MR. SPEARS:** $500 per person.

20       **THE COURT:** But that's not what the statute says.

21       **MR. SPEARS:** I know it doesn't say that.

22       **THE COURT:** I'm explaining to you and for the record.

23       **MR. SPEARS:** Or up to $500, period.

24       **THE COURT:** But the statute doesn't say that.  It says

25  per violation.  So we're asking them -- let me go back and see

OFFICIAL TRANSCRIPT

1  here.  Do you find by a preponderance of the evidence that one

2  or more Defendants violated the Open Meetings Law?  That's what

3  they're going to hear.  We all agreed on that.  That is how we

4  asked the question.

5          Now whether they violated it in different

6  circumstances, at the end of the day, the meeting would be null

7  and void.  I'm just thinking.

8          I think that, you know, I don't want to go back and

9  then try to -- I just don't know how to fix it.  But I think

10  this sort of indicates, if you go back to this, Do you find by

11  a preponderance of the evidence that one or more Defendants

12  violated the Open Meetings Law, they're thinking violating the

13  Open Meetings Law in that particular meeting.

14          **MR. SPEARS:** Uh-huh.

15          **THE COURT:** And that's okay because that's what's been

16  argued.  And so basically, what we're asking them in the next

17  question is who did, you know.  Who violated?  Which one of

18  them?

19          **MR. MOST:** Right.

20          **THE COURT:** We're not asking them how many times.

21          **MR. MOST:** Right.

22          **THE COURT:** So I think that's how they would interpret

23  this.

24          **MR. MOST:** And for what it's worth, Your Honor, you

25  mentioned voiding.  Voiding a governmental decision is a remedy

OFFICIAL TRANSCRIPT

1  that can happen if they find there's an Open Meetings Law

2  violation, but that's an equitable remedy that we would brief

3  to the Court subsequent if they find an Open Meetings Law

4  violation.  I don't think that's for the jury to decide.

5              **THE COURT:** Okay, heads-up.

6              **MR. MOST:** Heads-up.

7              **THE COURT:** Are we good now with this?

8              **MR. MOST:** With these changes, no objection from

9  Plaintiff.

10             **MR. SPEARS:** You added something new?

11             **MR. MOST:** Could Mr. Spears just note what, if any,

12  objection he has to the verdict form?

13             **MR. SPEARS:** Didn't we just walk through the verdict

14  form?

15             **THE COURT:** That's what that was.

16             **MR. MOST:** Okay, but then other than the objections

17  you noted, you have no objections?

18             **MR. SPEARS:** Only what I stated.

19             **MR. MOST:** Okay.  I just wanted to make sure we got it

20  on the record.

21             **THE COURT:** She's been here the whole time.  It's all

22  on the record.

23             **MR. MOST:** Would it be possible to email us a copy of

24  the jury instructions and verdict form?

25             **THE COURT:** Sure.  You don't want to wait for her to

OFFICIAL TRANSCRIPT

1  finish?

2          **MR. MOST:** We'll wait for her to finish, but if we

3  could also get an electronic copy?

4          **THE COURT:** Sure.  But let me tell you, there will be

5  no more amending them.  It's all done.

6          **MR. MOST:** No, no.  It's going to be for the closing

7  argument to show them the verdict form and say here's what it

8  looks like.

9          **MR. SPEARS:** Can you bring two?

10          **MR. MOST:** Can I bring two, two what?

11          **MR. SPEARS:** Two blowups, two whatevers.

12          **MR. MOST:** I'm doing it with PowerPoint.

13          **MR. SPEARS:** Can you make two PowerPoints?

14          **MR. MOST:** You'll have to do your own job.

15          **MR. SPEARS:** You were generous to let me use your

16  little white board today.

17          **THE COURT:** I saw that.

18          **MS. SALLAH:** Chief Judge, it's page 9 of D5 is the

19  elements.

20          **THE COURT:** We're way beyond that.  Let's not go back.

21  See you all at 9:00.

22                  (Whereupon this concludes Jury Trial Day 2.)

23

24

25

OFFICIAL TRANSCRIPT

1     **<u>CERTIFICATE</u>**

2

3

4        I, Alexis A. Vice, RPR, CRR, Official Court Reporter for

5     the United States District Court, Eastern District of

6     Louisiana, do hereby certify that the foregoing is a true and

7     correct transcript, to the best of my ability and

8     understanding, from the record of the proceedings in the

9     above-entitled and numbered matter.

10

11                              */s/Alexis A. Vice, RPR, CRR*
                               Alexis A. Vice, RPR, CRR
12                             Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25

                          OFFICIAL TRANSCRIPT